1   DISABILITY RIGHTS ADVOCATES
    STUART SEABORN (Bar No. 198590)
2   MELISSA RIESS (Bar No. 295959)
    2001 Center Street, Fourth Floor
3   Berkeley, California 94704-1204
    Telephone: (510) 665-8644
4   Facsimile:  (510) 665-8511
    sseaborn@dralegal.org
5   mriess@dralegal.org

6   Attorneys for Plaintiffs

7

8                   **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12  INDEPENDENT LIVING RESOURCE          Case No. _____
    CENTER SAN FRANCISCO, a California
13  non-profit corporation, JUDITH SMITH, an   **COMPLAINT FOR INJUNCTIVE AND**
    individual, JULIE FULLER, an individual,   **DECLARATORY RELIEF FOR**
14  SASCHA BITTNER, an individual, TARA        **VIOLATIONS OF THE AMERICANS**
    AYRES, an individual, and COMMUNITY        **WITH DISABILITIES ACT, 42 U.S.C. §§**
15  RESOURCES FOR INDEPENDENT                  **12181,** *et seq.*
    LIVING, a California non-profit corporation,
16                                             **CLASS ACTION**
                        Plaintiffs,
17
    v.
18
    LYFT, Inc., a Delaware corporation,
19
                        Defendant.
20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## I.     INTRODUCTION

1.     Plaintiffs bring this action to remedy ongoing discrimination by Lyft, Inc. ("Lyft") against people with mobility disabilities who want to, but cannot, use the on-demand transportation service Lyft operates.

2.     Since launching its transportation service in San Francisco in May 2012, Lyft has rapidly grown into the second largest ridesharing company in the United States, seizing an ever-expanding market share from taxi companies. Lyft estimates that its services are now available to over 95% of the United States population.[1] In 2018, Lyft provided over 600 million rides[2] through its network of nearly 2 million drivers globally.[3]  Lyft had $2.2 billion in revenue in 2018, representing a 103% growth rate from 2017 to 2018.[4]

3.     Meanwhile, Lyft has carefully crafted an image as a conscientious company with strong progressive values, in contrast to its main rival, Uber. According to Lyft's president, Lyft is "a responsible company that takes care of everyone that's involved."[5]  However, Lyft has excluded and continues to exclude people with mobility disabilities who need to use wheelchair accessible vehicles ("WAVs") from being able to use its service. Indeed, despite having been repeatedly placed on notice of the need to modify its policies and practices to ensure it provides sufficient numbers of WAVs in its fleet in order to provide persons who need WAVs full and equal access to its service, Lyft has failed to do so.  In the San Francisco Bay Area, Lyft effectively provides no WAV service at all.

4.     As detailed below, Lyft's practice of excluding persons with mobility disabilities who need WAVs violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*

---

[1] Lyft, Inc., Registration Statement (Form S-1), at 140 (Mar. 1, 2019).

[2] *Id.* at 81.

[3] *Id.* at 110.

[4] *Id.* at 34.

[5] Victor Luckerson, *Taking the High Road*, The Ringer (Feb. 22, 2018), https://www.theringer.com/tech/2018/2/22/17039018/lyft-uber-ridesharing-autonomous-cars-travel-ban.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

5.     This is not a case about money. This litigation is intended to halt Lyft's ongoing discrimination against individuals with mobility disabilities. Plaintiffs seek only injunctive and declaratory relief to redress Lyft's violations of federal law.

6.     Nor do Plaintiffs specifically seek an order requiring Lyft to purchase vehicles as a way of putting an end to its discriminatory conduct. Given Lyft's extensive control over the operation of its drivers, including through its fare structure and its ability to provide incentives to drivers to drive certain categories of vehicles, there are many ways Lyft can provide relief. Lyft has simply not prioritized doing so. Plaintiffs request that Lyft implement modifications to its policies and practices that will ensure that it offers its service to persons with disabilities who need WAVs in a manner equivalent with the service it offers to the rest of its customers.

7.     Because Lyft's practices adversely impact thousands of disabled individuals, Plaintiffs ask the Court to certify their claims for class treatment and to order relief that will benefit all members of the Class.

## II.     PARTIES

8.     Plaintiff Independent Living Resource Center San Francisco ("ILRC") is a disability rights organization in San Francisco, California, that advocates for people with disabilities and supports them in living independent and active lives. ILRC's board, staff, and the consumers of its services include people with mobility disabilities who have been deterred from downloading and using Lyft because of Lyft's failure to make its service accessible to them. Lyft's discriminatory policies and practices regularly impose economic harms on ILRC, frustrate the organization's efforts to engage in its core advocacy work, and force it to divert resources that it needs to spend on other work. Plaintiff ILRC sues on behalf of itself, its consumers, board members, and staff, and in furtherance of its mission of ensuring that people with disabilities are fully integrated into the social and economic fabric of their communities.

9.     Plaintiff Community Resources for Independent Living ("CRIL") is a disability rights advocacy and support organization located in Hayward, California. CRIL supports people with disabilities in southern Alameda County to live independently, advocate for themselves, and access services, programs, activities, resources, and facilities in the community. CRIL's

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

consumers include individuals who use motorized wheelchairs and scooters and would use Lyft but for unavailability of wheelchair accessible Lyft vehicles. CRIL participates in advocacy on a variety of issues affecting people with disabilities, including mobility and transportation. Lyft's discriminatory policies and practices regularly impose economic harms on CRIL by frustrating its efforts to engage in its core advocacy work, and by forcing it to divert resources that it needs to spend on other work. Plaintiff CRIL sues on behalf of itself and its members, and in furtherance of its mission of ensuring that people with disabilities receive full and equal access to the services and facilities.

10.     Plaintiff Judith Smith is an individual residing in Oakland, California. She uses a motorized wheelchair and would use Lyft but for the lack of accessible Lyft vehicles. Because Ms. Smith has heard about and witnessed the unavailability of the service, she has not downloaded Lyft's application because she knows trying to use Lyft would be futile.

11.     Plaintiff Julie Fuller is an individual residing in Oakland, California. She uses a motorized wheelchair and would use Lyft but for the unavailability of wheelchair accessible Lyfts. She has learned that WAVs are not available through Lyft from other wheelchair users, and people she knows at ILRC. She has not downloaded the application to access Lyft's service because she knows trying to use the service would be futile.

12.     Plaintiff Sascha Bittner is an individual residing in San Francisco. She uses a motorized wheelchair and would use Lyft but for the unavailability of wheelchair accessible Lyfts. She has witnessed family members attempt to call wheelchair accessible Lyfts and knows that they are not reliably available. She would use Lyft's WAV service if she could count on it for reliable door-to-door transportation.

13.     Plaintiff Tara Ayres is an individual residing in Richmond, California and working in San Francisco. She uses a motorized wheelchair and would use Lyft but for the unavailability of wheelchair accessible Lyfts. Because Ms. Ayres has heard about and witnessed the unavailability of the service, she has not downloaded Lyft's application because she knows trying to use Lyft would be futile.

14. Defendant Lyft, Inc. ("Lyft") is a for-profit corporation that provides on-demand transportation services throughout California, including in Alameda, Contra Costa, and San Francisco Counties. Lyft is registered in Delaware and its principal place of business is San Francisco, California.

### III.    JURISDICTION

15. Plaintiffs bring this action for declaratory and injunctive relief under the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 12188. The Court has jurisdiction to issue declaratory relief under 28 U.S.C. § 2201 and to order further relief under 28 U.S.C. § 2202.

### IV.    VENUE

16. Venue is proper in the Northern District of California under 28 U.S.C. §§ 1391(b)-(c) because Defendant's principal place of business is in San Francisco, California, the business practices at issue were conducted throughout California, including in San Francisco County, Contra Costa County, and Alameda County, liability arose in those counties, and events and conduct giving rise to the violations of law asserted herein occurred in those counties. Plaintiffs Judith Smith and Julie Fuller reside in Oakland, California, Tara Ayres resides in Richmond, California, and Sascha Bittner resides in San Francisco, California. They have suffered discrimination on the basis of their disabilities and been deterred from taking advantage of the transportation service offered by Lyft in Alameda County, Contra Costa County and San Francisco. Plaintiff ILRC has its principal place of business in San Francisco, and has likewise suffered injury there. Plaintiff CRIL has its principal place of business in Alameda County, and has suffered injury there.

### V.    INTRADISTRICT ASSIGNMENT

17. The appropriate division for this case is the San Francisco Division. Defendant's principal place of business is in San Francisco and a substantial part of the acts or omissions, including the business practices at issue in this case, were developed and implemented in San Francisco.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## VI.    CLASS ACTION ALLEGATIONS

18.    Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs bring this action on behalf of themselves and all other persons similarly situated. The Class consists of all individuals in San Francisco County, Alameda County, and Contra Costa County who are disabled because of a mobility impairment, use wheelchairs or other mobility devices and therefore use Wheelchair Accessible Vehicles ("WAVs") for transportation, and who have been and continue to be deterred from using Lyft's transportation service due to Lyft's discriminatory acts and practices. Excluded from the Class is any individual who has previously utilized Lyft and/or has downloaded the Lyft application, and Lyft's officers and employees.

19.    Plaintiffs are unable to state the precise number of potential members of the proposed Class. The Class numbers in the hundreds, if not thousands, and members of the Class are sufficiently numerous and geographically diverse that joinder of all members is impracticable.

20.    There is a well-defined community of interest among the members of the proposed Class in that there are questions of law and fact common to all of their claims. Those common issues include, but are not limited to: whether Lyft provides the transportation services that persons who need WAVs can use; and whether Lyft has violated Title III of the ADA by failing to provide equal access to its service to people who use wheelchairs and need WAVs.

21.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of all other members of the Class because Lyft conducted and continues to conduct its business in a manner which caused, continues to cause, and will in the future cause all Class members to suffer the same or similar injury. Plaintiffs, by advancing their claims, will also advance the claims of all other similarly-situated individuals.

22.    Plaintiffs and their counsel will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiffs' claims and those of absent Class members that would make class certification inappropriate. Plaintiffs' counsel is experienced in disability rights and class action litigation and will vigorously assert Plaintiffs' claims and the claims of all Class members.

23.     A class action is superior to other potential methods for achieving a fair and efficient adjudication of this controversy. Whatever difficulties may exist in the management of this case as a class action will be greatly outweighed by the benefits of the class action procedure, including but not limited to providing Class members with a method for the redress and prevention of their injuries and claims that could not, given the complexity of the issues and the nature of the requested relief, be pursued in individual litigation. Further, the prosecution of separate actions by the individual Class members, even if possible, would create a risk of inconsistent or varying adjudications and incompatible standards of conduct for the Defendant.

## VII.   GENERAL ALLEGATIONS

24.     Lyft has been integral to the creation of a new form of transportation that has rapidly and drastically transformed for-hire transportation. It was the first to provide peer-to-peer transportation, in which drivers use their own personal vehicles to drive Lyft's customers, and was so successful that its rival, Uber, adopted the model.

25.     Lyft provides this transportation service to members of the general public, including in Alameda, Contra Costa, and San Francisco Counties.

26.     In California, Lyft offers multiple categories of service: Lyft (its basic rideshare option), Shared (a carpool option), Lyft XL (larger cars), Lux (high end), Lux Black (black car), and Lux Black XL (6-seat black SUV). Lyft also gives its riders the option of activating "Wheelchair access" mode to let Lyft know that they would like to request a vehicle that can accommodate a wheelchair with a lift or ramp. However, when a user requests a Lyft while Wheelchair access mode is activated, the user receives a text message stating that Lyft has no wheelchair accessible vehicles available, and Lyft provides the user with a list of public transit, paratransit, and taxi cab phone numbers around the country.

27.     Lyft exercises extensive control over all aspects of its service and actively manages the network of drivers and riders who make its on-demand transportation system function.  Lyft recruits and retains drivers, who contractually agree to provide rides to Lyft's customers in accordance with terms and conditions specified by Lyft. In all material respects, including the financial terms, the transactions between the drivers and the customers are dictated,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    mediated, and controlled by Lyft. There are no negotiations between Lyft's drivers and its

2    customers. And Lyft takes a large cut of the revenues generated in the transactions.

3        28.    Lyft's stated mission is to "[i]mprove people's lives with the world's best

4    transportation."[6]  Lyft describes its transportation service as having big implications for the

5    future of transportation, with the power to solve problems like urban congestion and climate

6    change and bring greater prosperity to all.[7] Yet it has failed to include people with mobility

7    disabilities in this vision of the future.

A.    **Lyft Discriminates Against Individuals With Mobility Disabilities By Failing To Make Its On-Demand Ridesharing Service Readily Available To Persons Who Need Wheelchair Accessible Vehicles**

10       29.    Lyft purports to offer accessible service to its users by allowing them to activate

11   its "access" mode. According to Lyft, "access" mode allows passengers to "request a vehicle that

12   is specially outfitted to accommodate wheelchairs."[8] In reality, "access" mode is a completely

13   inadequate substitute for actual accessible transportation. Indeed, it provides wheelchair users

14   with no access whatsoever to Lyft's ridesharing service. Instead of connecting a rider in access

15   mode with an accessible vehicle in Lyft's fleet, Lyft sends the rider a text message with a link to

16   a website listing phone numbers for paratransit, public transportation agencies, and local taxi

17   companies around the country. For California, Lyft's website provides links to listings by region

18   for taxi companies on the yellow pages website, the websites of public transportation agencies,

19   and phone numbers for paratransit companies.[9] Not all of the links work, and some of the links

20   are to transportation options that are not accessible.  One of the links is to a pdf of a 90-page

21   transit resource guide from 2009.[10]

22

23   [6] *Id.* at 1.

24   [7] John Zimmer and Logan Green, *The End of Traffic: Increasing American Prosperity and Quality of Life*, Medium (Jan. 17, 2017), https://medium.com/@johnzimmer/the-end-of-traffic-6d255c03207d.

25

26   [8] Lyft, Inc., *Accessible vehicle dispatch*, https://help.lyft.com/hc/en-us/articles/115013081668-Accessible-vehicle-dispatch (last visited Mar. 19, 2019).

27   [9] *Id.*

28   [10] Santa Barbara County, *Transit Resource Guide*, (2009), http://www.sbcag.org/uploads/2/4/5/4/24540302/transit_resource_guide_santa_barbara_county.pdf.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

30.     Additionally, paratransit does not offer an even remotely comparable service to that of Lyft. For one thing, it may take months to complete the application process to use paratransit – if one is eligible for the service in the first place. Eligible users must schedule their rides at least a day in advance, and most systems are plagued by delays and unreliability. If a wheelchair user were out and found there were no Lyfts available, they could not simply use Lyft's list of phone numbers to call paratransit for a ride home.

31.     Lyft's ongoing failure to provide equivalent service for WAV users is striking in light of the amount of notice Lyft has had of the need for such service. Indeed, Lyft has already been sued in multiple cities for its violation of disability laws by failing to provide wheelchair-accessible service, yet it has continued its policy of denying that service. *See, e.g.*, *Lowell v. Lyft, Inc.*, 352 F.Supp.3d 248 (2018); *Ramos v. Uber Techs., Inc.*, No. 14-CA-502(XR), 2015 WL 758087, (W.D. Tex. Feb. 20, 2015).

### B.     Lyft's Discrimination Results In Real Harm

32.     Lyft's failure to make accessible vehicles available through its service denies people who use wheelchairs access to reliable, on-demand transportation that could drastically improve their lives, enabling them to travel to a wider variety of destinations without having to rely on transportation via expensive taxis, unreliable paratransit, and limited public transit. It would enable them to travel spontaneously, without having to schedule transportation hours or even days in advance. Unfortunately, Plaintiffs and members of the class are excluded from these benefits and suffer real harm as a result.  As described below, the lack of access to this new mode of transportation means that Plaintiffs may lose employment opportunities to those with access to more reliable transportation, and may experience social isolation and other harms, including the stigma associated with not being able to use Lyft's transportation system.

#### 1.     Judith Smith

33.     Plaintiff Judith Smith lives and works in Oakland, California. She uses a motorized wheelchair because of mobility disabilities.

34.     Ms. Smith would and could use Lyft if she knew she could count on it for service. She has a smartphone, but she has not downloaded Lyft's app. Early in Lyft's existence she was

excited by the prospect of finding transportation more easily, but she quickly learned from friends and colleagues about the lack of accessible vehicles on Lyft. Since then, she has watched several people attempt to call a wheelchair accessible Lyft, and none has ever succeeded.  As a result, she has concluded it would be futile to download the app.

35.     Ms. Smith is the Founder and Artistic Director Emerita of Axis Dance Company, a group of contemporary dancers with and without physical disabilities. Several members of the company, including Marc Brew, the group's Artistic Director, use power wheelchairs. Ms. Smith and her colleagues frequently share their frustrations about their transportation options, and specifically about their inability to access the convenience of Lyft. For example, Mr. Brew shared the following frustrating experience from his visit to the Bay Area in 2017.

36.     Mr. Brew attended a dance performance at Berkeley's Zellerbach Hall. After the performance, Mr. Brew needed to get home, but it was after midnight and he had missed the last BART train. There were no accessible vehicles on Lyft, and all of his friends who had vehicles with wheelchair lifts were either out of town or asleep. Stranded, and with his chair nearly out of power, he ultimately decided to roll to the home of a friend, who was kind enough to put him up for the night.

37.     There are many situations in which Ms. Smith would use Lyft if WAVs were available. For example, in March 2019 she will be traveling for work from San Francisco to Washington, DC. She has an early flight from San Francisco Airport and will need to be at the airport before 6 a.m. While most Bay Area residents could simply order a Lyft, Ms. Smith has limited options to get to the airport at this hour. BART does not run early enough for her to get to the airport in time, and the local airport shuttle services are not accessible. She could drive herself, but would not be able to get from the long- term parking lots to the airport because the parking lot shuttles are not accessible. As a result, Ms. Smith will either have to find a friend to take her, or hire someone to come pick her up, drop her off, and drop off her vehicle in the long-term parking lot, which would be substantially more expensive than the options that are available to people who do not need WAVs. Ms. Smith will face the same issue when she returns from her trip.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

38.     If they were accessible to her, Ms. Smith would be able to use Lyfts in the same situations as would someone who does not need a wheelchair accessible vehicle. She would order Lyfts to and from the airport, when she is out late at night, when she wants to travel to high-density places like San Francisco where parking is limited, or to places that are far from public transportation, in inclement weather, or when health reasons prevent her from driving. In these situations, Ms. Smith is left without any alternative transportation and therefore must stay at home or suffer arduous transportation delays and other indignities from not having access to the same service as Lyft users who do not use accessible vehicles.

### 2.     Julie Fuller

39.     Plaintiff Julie Fuller lives in Oakland, California. She has mobility and vision disabilities and uses a motorized wheelchair. She has a smartphone but has not downloaded the Lyft app because she has heard from other wheelchair users that there are no wheelchair accessible Lyfts. For example, she has discussed this issue at a weekly support group she attends. The other members of her support group, most of whom use motorized wheelchairs, have shared their frustrations with being unable to access Lyfts. She has also volunteered at ILRC in the past. She has discussed the unavailability of wheelchair accessible Lyfts with Jessie Lorenz, ILRC's former executive director.

40.     Every Wednesday, Ms. Fuller attends weekly support group sessions in Berkeley. The drive from her house in Oakland to the support group is approximately 15 minutes. However, in order to get to the sessions, Ms. Fuller leaves an hour early to catch a ride on BART or AC Transit. She leaves the group early so that she does not have to travel home while it is dark, as she has impaired vision and feels unsafe when she is on the street in her chair at night.

41.     Because she feels vulnerable when she is out at night, Ms. Fuller also misses other evening events, such as social gatherings, as well as her neighborhood council, which meets one evening a month at the library a few blocks away from her house. Similarly, when it rains, she stays at home because she does not want to risk waiting outside in the rain for prolonged periods to avoid damage to her chair. If she were able to rely on door-to-door transportation from Lyft, she would be able to attend these events.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

42.     Ms. Fuller regularly attends medical appointments at a facility that is a ten-minute drive from her home. In order to travel to these appointments, she arranges a ride with paratransit. The local paratransit provider is notoriously unreliable, so she arranges her ride with paratransit to arrive at her appointment an hour early to ensure that she arrives on time. Because she needs to build in so much extra time for her ride, a trip to the doctor ten minutes away often takes up a substantial portion of her day. If she could use Lyft's on-demand service, she would not have to waste so much time with paratransit and would be able to use her time more efficiently.

### 3.     Sascha Bittner

43.     Sascha Bittner lives in San Francisco, California. She uses a motorized wheelchair because she has mobility disabilities. Ms. Bittner does not have a smartphone but has often been out with family and friends who do have the Lyft app on their smartphones, and have attempted to order a wheelchair accessible vehicle through the app and been unable to do so.

44.     Ms. Bittner is also active on social media, and she has seen posts by friends who have attempted to hail wheelchair accessible vehicles through Lyft and been unable to do so.

45.     Ms. Bittner campaigns for fair wages for in-home care workers and attends events around the Bay Area and the state related to this work. She also participates in workshops at ILRC.  Because she does not have access to a reliable ridesharing service, she often relies on her stepfather or other relatives to drive her in the family's accessible van.

46.     In March 2019, Ms. Bittner attended a reception for her City Supervisor. She was ready to leave the event, but was unable to do so because she had to wait for a family member to pick her up. If a wheelchair accessible Lyft had been available, she would have used it to leave the event once she was ready to depart.

47.     For Ms. Bittner, going out to routine events such as regular medical appointments or meetings becomes an all-day ordeal, when she builds in time for delays and disruptions on public transit. Paratransit is routinely hours behind schedule. For example, she was hours late to a 9:30 appointment for which she scheduled paratransit pickup two hours early.  She is often left

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

out of spontaneous social gatherings because she can't simply call a Lyft like everyone else to get there and come pick her up when it is over.

48.     The lack of wheelchair accessible Lyfts excludes Ms. Bittner from an on-demand door-to-door service that is available to people who do not use wheelchairs, and which would greatly improve Ms. Bittner's ability to live an active life.

### 4.     Tara Ayres

49.     Plaintiff Tara Ayres lives in Richmond, California, and works in San Francisco, California. She uses a motorized wheelchair because of a mobility disability. She has a smartphone but has been deterred from downloading Lyft's app because she knows that there are never any WAVs available on the app, so downloading it would be pointless. The inaccessibility of Lyft's service is widely known in the community of people with mobility disabilities. For example, an article in New Mobility magazine, a publication widely read by wheelchair users, including Ms. Ayres, described how neither Uber nor Lyft had made their service wheelchair accessible.[11]

50.     There are many situations in which Ms. Ayres would use Lyft if she knew she could count on being able to request a vehicle with a ramp or lift. For example, she frequently has medical appointments in San Francisco's UCSF Mt. Zion facility. Although Ms. Ayres drives, the hospital is in a location in San Francisco where parking is extremely scarce and the terrain is hilly. In order to park her van, she must find a flat parking spot where the sidewalk is wide and unobstructed in order to use her van's ramp. Her alternative is to take public transportation, which requires a round-trip journey of over four hours. If she had the option of taking Lyft to connect to the hospital from BART, the trip would be much less time consuming and stressful.

51.     She is deterred from attending events in San Francisco because of the difficulty of getting there on public transportation and finding parking for her van there. Ms. Ayres recently joined a book discussion group that meets monthly in San Francisco. At the time of the January

---

[11] Josie Byzek, *Uber: Does the Transportation Revolution Include Us?*, New Mobility (May 2, 2016), http://www.newmobility.com/2016/05/uber-transportation-access/.

1   2019 meeting, the first meeting she was scheduled to attend, Ms. Ayres was using a loaner

2   wheelchair while her wheelchair was undergoing repairs. She did not want to miss this first

3   meeting, but faced a difficult trip traveling a mile from the BART station to the meeting location

4   in a heavy rainstorm. The trip included having to travel up a steep hill, and she had to veer off

5   the sidewalk and into the road when a portion of the sidewalk was too steep to navigate. The trip

6   was harrowing for both her and her service dog, and Ms. Ayres worried that the rain would

7   damage the loaner wheelchair. Ms. Ayres wanted to attend the February meeting of the group,

8   but skipped it because it was raining once again and she knew it would be a difficult trip based

9   on her experience in January. If she could have simply called a Lyft, she would have been able to

10  attend, and would have a greater likelihood of being able to attend future meetings regardless of

11  the weather.

12              5.      Independent Living Resource Center San Francisco

13          52.     Independent Living Resource Center San Francisco ("ILRC") is a disability rights

14  organization in San Francisco, California, that advocates for people with disabilities and supports

15  them in living independent and active lives. ILRC's board, staff, and the consumers of its

16  services include people with mobility disabilities who have been deterred from downloading and

17  using Lyft because of Lyft's failure to make accessible service available to them. Lyft's

18  discriminatory policies and practices regularly impose economic harms on ILRC, frustrate its

19  efforts to engage in its core advocacy work, and force it to divert resources that it needs to spend

20  on other work. Additionally, many members of its board, staff and constituency are harmed by

21  Lyft's discriminatory failure to make its service equally accessible to people who need WAVs.

22          53.     In recent decades, ILRC has worked to ensure that transportation options are

23  available to people with disabilities. The continued inaccessibility of Lyft transportation is thus

24  an issue of concern for ILRC. ILRC has expended time and resources on advocacy work to

25  improve access, including transportation options, for disabled residents of San Francisco. This

26  work has included advocacy and engagement with a wide variety of entities including the San

27  Francisco Metropolitan Transportation Agency, the Mayor's Office on Disability, and San

28  Francisco Paratransit. For example, ILRC has worked with BART to ensure that all aspects of

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    the system, from paying the fare to riding the train, are accessible to people with disabilities, and

2    has advocated for BART to incorporate accessible design principles in its selection of its new

3    train cars. Further, ILRC Community Organizer Fiona Hinze, is involved with the Paratransit

4    Coordinating Council working to monitor paratransit and improve that service.

5        54.    On the issue of ridesharing services specifically, ILRC has been monitoring the

6    growth of these services, and engaging in advocacy work to encourage ridesharing services to

7    provide wheelchair accessible vehicles. ILRC has devoted staff time and resources to conducting

8    a survey to collect information about the experiences of people with disabilities using ridesharing

9    services, to aid them in their advocacy efforts. It has participated in public engagement processes

10   by the San Francisco Mayor's Office on Disability and the Metropolitan Transportation Agency

11   regarding the availability of on-demand transportation to people with disabilities in San

12   Francisco. This includes efforts to increase the availability of accessible transportation provided

13   by rideshare companies such as Lyft.

14       55.    ILRC itself has been injured as a direct result of Lyft's failure to provide a service

15   that is accessible to people who use wheelchair accessible vehicles. ILRC's interests are

16   adversely affected because it must expend resources, as it has done in its organizing and

17   advocacy efforts, advocating for its constituents who are harmed by Lyft's policies and practices.

18   ILRC has suffered injury in the form of diversion of these resources and frustration of its

19   mission.

20       56.    Some of ILRC's staff and board have mobility disabilities, use power

21   wheelchairs, and therefore use a wheelchair accessible vehicle if they are traveling in a car. For

22   example, Ms. Hinze uses a motorized wheelchair. Lyft would provide her an additional option to

23   commute to work or to off-site meetings, speaking engagements, and other important work-

24   related events. Without the option of a reliable, convenient on-demand mode of transportation,

25   she is often late, gets stuck in inclement weather, or is vulnerable to outages on public

26   transportation. Each such instance imposes a direct economic harm on ILRC, in the form of lost

27   employee work-time and productivity.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

57.     Additionally, one or more members of ILRC or consumers of ILRC's services, including Plaintiff Sascha Bittner, have been injured as a direct result of Lyft's discriminatory policies and practices and would have standing to sue in their own right. ILRC can bring this action on behalf of its members because the interests at stake are germane to the organization's purpose and only injunctive and declaratory relief are requested, which do not require the participation of individual members in the lawsuit.

6.     Community Resources for Independent Living

58.     Community Resources for Independent Living ("CRIL") is a disability rights organization located in Hayward, California. CRIL supports people with disabilities in southern Alameda County to live independently, advocate for themselves, and access services, programs, activities, resources, and facilities in the community. Lyft's discriminatory policies and practices harm CRIL and its members, frustrate its efforts to engage in its core advocacy work, and force it to divert resources that it needs to spend on other work. Additionally, many members of its board, staff and constituency are harmed by Lyft's discriminatory policies and practices.

59.     One of the many services CRIL provides to its constituent community is training on how to use public transportation, including BART, AC Transit, paratransit, and rideshare. CRIL employs two travel trainers in its Hayward office. The travel trainers assist people with disabilities to become comfortable using a variety of modes of transportation and learn about the accommodations that are provided to make these modes accessible to people with disabilities. The lack of wheelchair accessible Lyfts deprives CRIL's constituents of an important transportation option. While CRIL would train its constituents who need WAVs on ridesharing options available through Lyft, it has had to focus its training on alternatives that do not offer the on-demand service Lyft offers its non-disabled customers.

60.     Additionally, to address the lack of wheelchair accessible vehicles in the area, a situation that would be dramatically improved if Lyft provided timely and reliable WAV service, CRIL started a van share program, through which it makes available two wheelchair accessible vans via Getaround, a peer-to-peer car share portal.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

61.     CRIL also advocates on a variety of issues affecting people with disabilities, including mobility and transportation. For example, it provided feedback to BART's design team to help BART ensure that its new train cars will be fully accessible to people with all kinds of disabilities.

62.     CRIL's policy advocacy includes participation in public comment and grassroots advocacy around the expansion of WAV service at ridesharing companies in the Bay Area. CRIL has participated in multiple policy coalitions discussing the increased regulatory requirements for ridesharing companies on accessibility, and it is in the process of monitoring the public planning process state regulators are engaged in on these issues.

63.     Many of CRIL's staff, constituency, and board have mobility disabilities, use power wheelchairs, and therefore use a wheelchair accessible vehicle if they are traveling in a car.

64.     For example, CRIL's board president Dorene Giacopini uses a motorized wheelchair. She has not downloaded Lyft's app because she has heard from friends who use wheelchairs that they have tried to hail WAVs through Lyft and have been unable to do so. She has also read articles discussing the unavailability of WAVs on Lyft's app and has read accounts on social media by people who have tried and failed to access WAVs through Lyft. If WAVs were available through Lyft, Ms. Giacopini would use Lyft's transportation service in the same situations as the rest of Lyft's customers. For example, she would use the service to get to and from the airport for upcoming travel later in March to San Diego without subjecting herself to the hassle and expense of long-term parking and transporting baggage to the terminal.

65.     CRIL board member Chris Finn also uses a motorized wheelchair. He has not downloaded Lyft's app, but would do so if he knew he could count on Lyft to provide him with transportation to his appointments, including events at CRIL. Currently he relies on getting rides from friends, and on BART, AC Transit, and paratransit to get around, but using these modes of transportation is limiting. Taking paratransit is often an all-day event because of severe delays. Additionally, when the weather is bad, if he does not have transportation already arranged, Mr. Finn must sometimes stay at home to avoid damage to his power wheelchair, which means

1   having to miss events, including his duties as a board member of CRIL. Having access to Lyft's

2   on-demand transportation would make a variety of activities more accessible to Mr. Finn,

3   including job opportunities, social gatherings, and events, would save him a huge amount of time

4   going about his daily routine, and enable him to get around more freely and spontaneously.

5   66.   Ms. Giacopini and Mr. Finn have been injured as a direct result of Lyft's

6   discriminatory policies and practices and would have standing to sue in their own right, as would

7   other members of CRIL.

8   67.   CRIL can bring this action on behalf of its members because the interests at stake

9   are germane to the organization's purpose and only injunctive and declaratory relief are

10   requested, which do not require the participation of individual members in the lawsuit.

11   **C.   Lyft Controls The Transportation Service It Has Created**

12   68.   Lyft has carefully created its on-demand ridesharing service by recruiting,

13   retaining, and training a network of drivers who enter into contracts with Lyft agreeing to

14   provide rides to Lyft's customers under terms and conditions determined by Lyft.

15   69.   Lyft sets standards for which makes, models, and age of vehicle can be driven in

16   the Lyft network, including the condition of the vehicle, number of seatbelts, whether the body

17   has damage or dents, and the condition of the tires, windshield wipers, climate control, tailpipe,

18   and muffler. *See* Lyft, Inc., *Vehicle requirements*, https://help.lyft.com/hc/en-

19   us/articles/115013077448 (last visited Mar. 19, 2019).  These standards are detailed – but

20   nowhere do they mention wheelchair accessible vehicles.

21   70.   Lyft also sets standards for which makes, models, and age of vehicle can be

22   driven for each class of Lyft vehicle, such as XL, Lux, and Lux Black XL. Drivers with large or

23   luxury cars may drive for Lyft's premium services for additional money.

24   71.   Lyft-authorized vehicles include a number of vans.  Lyft requires that van models

25   must be at least 2002 or later, depending on the location within California.  *See* Lyft, Inc.,

26   *California Driver Application Requirements*, https://www.lyft.com/driver-application-

27   requirements/california (last visited Mar. 19, 2019).

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

17

72.     Lyft also makes vehicles available to drivers for rental through its Express Drive program (*see* Lyft, Inc., https://www.lyft.com/expressdrive (last visited Mar. 19, 2019)). and through partnerships with dealerships.[12] When a driver rents a vehicle as part of this program, Lyft "collect[s] rental fees by deducting such amounts from drivers' earnings on the Lyft platform, or through charging the driver's credit card."[13]

73.     Lyft provides very detailed guidelines regarding how its drivers are to conduct themselves and maintain their vehicles ("The inside of your car should be 100% clear at all times."[14])  Lyft prohibits its drivers from smoking while driving for Lyft and requires its drivers to ensure that the vehicles they drive are free from the smell of smoke. Lyft requires that its drivers meet or exceed the estimated time-of-arrival that Lyft generates and provides to each customer.

74.     Through its Terms of Service, Lyft also dictates whether, when, where and how frequently drivers choose to offer Lyft rides.  It also exercises extensive control over the safety and quality of the service provided by drivers, including issuing required training and other directives to drivers.

**D.     Lyft Offers Incentives To Drivers To Encourage Certain Behavior**

75.     Lyft already utilizes a series of incentives to encourage driver behavior and optimize participation in certain markets.

76.     For example, Lyft offers bonuses to drivers to offset the cost of weekly vehicle rental fees to incentivize them to drive more for Lyft.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[12] Stephen Edelstein, *GM's Maven Gig Car Rental Service Launches in Austin*, The Drive (Mar. 2, 2018), http://www.thedrive.com/tech/18935/gms-maven-gig-car-rental-service-launches-in-austin.

[13] Lyft, Inc., Registration Statement (Form S-1), at 91 (Mar. 1, 2019).

[14] Lyft, Inc., *Keeping your car clean*, https://help.lyft.com/hc/en-us/articles/115013081708-Keeping-your-car-clean (last visited Mar. 19, 2019).

77.     Lyft also offers incentives including "Peak Hours," "Ride Challenges," and "Streak Bonuses" to encourage drivers to drive more, and to accept a high percentage of the ride requests Lyft sends them.[15]

78.     Additionally, Lyft maintains an incentive program for drivers related to regions within cities called "Power Zones," where drivers can receive a bonus for driving in an area where there is particularly high demand.[16]

79.     Lyft "frequently test[s] driver incentives on subsets of existing drivers and potential drivers."[17] It "sometimes provide[s] incentives to drivers to be on [its] platform when and where [Lyft] anticipate[s] high demand as well as more broadly to attract drivers to, and retain them on, [Lyft's] platform."[18]

**E.     Lyft Could Modify Its Policies And Practices To Make WAV Service Readily Available To Bay Area Riders.**

80.     Lyft has already made WAVs available in Philadelphia in response to a law passed by the Pennsylvania legislature, and rolled out a fleet of WAVs in June of 2017.[19] It is working on a similar program in response to legislation in Texas.

81.     However, Lyft has taken no steps to provide wheelchair accessible Lyfts in a way which would make Lyft's transportation service fully and equally accessible in the Bay Area.

82.     Plaintiffs do not here specifically seek an order requiring Lyft to purchase vehicles as a way of putting an end to its discriminatory conduct. Given Lyft's extensive control over the operation of the drivers, including through its fare structure, there are many ways Lyft can provide relief.

---

[15] Lyft, Inc., *Earnings and Promos*, https://help.lyft.com/hc/en-us/categories/115002006508-Earnings-and-Promos (last visited Mar. 19, 2019).

[16] Lyft, Inc., *Power Zones*, https://help.lyft.com/hc/en-us/articles/115012926807-Power-Zones-for-drivers (last visited Mar. 19, 2019).

[17] Lyft, Inc., Registration Statement (Form S-1), at 23 (Mar. 1, 2019).

[18] *Id*. at 88.

[19] Jason Laughlin, *Uber and Lyft's wheelchair access grows, with room to improve,* Philly.com (Jul. 6, 2017), http://www.philly.com/philly/business/transportation/ubers-wheelchair-accessibility-grows-with-room-for-improvement-20170706.html.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

83.     In previous communications with Lyft, Plaintiffs and their counsel have enumerated some of the possible ways that appropriate WAV service could be achieved, and have made numerous requests to Lyft to reasonably modify its policies to provide full and equal access to its service for riders who need WAVs.  Among the possible methods suggested by Plaintiffs include the use of possible incentives to drivers who utilize WAVs.

84.     On July 10, 2018, Plaintiffs' counsel sent a letter to Lyft's counsel listing some of the ways Lyft could provide wheelchair access consistent with their business purposes. Plaintiffs also previously sought remedies for Lyft's failure to provide equal access to its service based on California anti-discrimination laws in California state court.[20]

85.     Despite Plaintiffs' requests over the past year, Lyft has not responded with modifications to provide full and equal access to its transportation services.

## FIRST CAUSE OF ACTION

### Discrimination Prohibited by the Americans With Disabilities Act
### (42 U.S.C. §§ 12181, *et seq.*)

86.     Plaintiffs incorporate by reference as though fully set forth herein the preceding and subsequent paragraphs of this Complaint.

87.     Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184.

88.     Plaintiffs and all members of the class are persons with "disabilities" entitled to protection under the ADA.

89.     Public transportation is defined to mean "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10).

90.     Defendant provides specified public transportation services within the meaning of the term under Title III on a regular and continuing basis.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[20] That case was precluded from being heard on the merits by state law jurisdictional issues.

91.     Defendant discriminates against Plaintiffs and members of the putative class on the basis of disability by denying them full and equal enjoyment of Lyft's specified public transportation services.

92.     Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, and/or accommodations provided by places of public accommodations. 42 U.S.C. § 12182.

93.     Defendant operates a public accommodation subject to Title III's nondiscrimination requirements. 42 U.S.C. §§ 12181, 12182.

94.     Defendant operates a "travel service" as defined by 42 U.S.C. § 12181.

95.     Defendant's operations affect interstate commerce, including by providing transportation across state lines.

96.     Defendant discriminates against Plaintiffs and members of the putative class o the basis of disability by denying them full and equal enjoyment of Lyft's goods, services, facilities, privileges, advantages, and/or accommodations in violation of Title III of the ADA. Defendant has failed to make reasonable modifications to their policies, practices, or procedures, provide auxiliary aids and services, and remove barriers in order to afford full and equal access to their service to Plaintiffs and members of the putative class.

97.     Therefore, Plaintiffs are entitled to injunctive relief remedying the discrimination under 42 U.S.C. § 12188. Unless the Court issues injunctive relief to halt Lyft's unlawful practices, Plaintiffs will continue to suffer irreparable harm.

98.     Plaintiffs are also entitled to reasonable attorneys' fees, costs, and expenses.

99.     WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CAUSE OF ACTION**

Declaratory Relief on Behalf of Plaintiffs

100.    Plaintiffs incorporate by reference all foregoing and subsequent allegations as though fully set forth herein.

101.    An actual controversy exists between the parties. Plaintiffs contend, and are informed and believe that Defendant denies, that by failing to adopt policies and practices that

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   make WAVs available through its service, Defendant is failing to comply with applicable laws,

2   including but not limited to Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181,

3   *et seq.*

4       102.   A judicial declaration is necessary and appropriate at this time in order that the

5   parties may know their respective rights and duties and act accordingly.

6       WHEREFORE, Plaintiffs pray for the relief set forth below.

7   **PRAYER FOR RELIEF**

8       Based on the foregoing, Plaintiffs respectfully pray for relief as follows:

9       1.   For an order certifying this case as a class action pursuant to Federal Rule of Civil

10  Procedure 23(b)(2), and appointing Plaintiffs as the representatives of the Class and their counsel

11  as Class Counsel;

12      2.   For an order finding and declaring that the acts and practices of Lyft as set forth

13  herein are unlawful, unfair, and violate the Americans with Disabilities Act, 42 U.S.C. §§ 12181,

14  *et seq.*;

15      3.   For a permanent injunction pursuant to the Americans with Disabilities Act, 42

16  U.S.C. §§ 12181, *et seq.*, requiring Defendant to modify its policies and practices to ensure that

17  persons who use wheelchairs, including Plaintiffs, are able to use Lyft's service on a basis that is

18  full and equal to that which is available to other members of the general public;

19      4.   For an award of attorneys' fees, costs and expenses incurred in the filing and

20  prosecution of this action, as authorized by 42 U.S.C. §12188; and

21      5.   For such other and further relief as the Court deems just and proper.

22

23  DATED:  March 20, 2019           Respectfully submitted,

24

25                  DISABILITY RIGHTS ADVOCATES

26

27                  Melissa Riess
                Attorneys for Plaintiffs

28