DISABILITY RIGHTS ADVOCATES
STUART SEABORN (Bar No. 198590)
MELISSA RIESS (Bar No. 295959)
REBECCA SERBIN (NY State Bar No. 5273255)*
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
mriess@dralegal.org
rserbin@dralegal.org

Attorneys for Plaintiffs
*Admitted Pro Hac Vice

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, TARA AYRES, an individual, SASCHA BITTNER, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> LYFT, Inc., a Delaware corporation, <br><br> Defendant. | Case No. 3:19-CV-01438-WHA <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:    January 30, 2020 <br> Time:    8:00 a.m. <br> Place:   Courtroom 12 <br> Judge:   Honorable William Alsup |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on January 30, 2020 at 8:00 a.m. or as soon thereafter as the matter may be heard by the Hon. William Alsup in the United States District Court, Northern District of California, Courtroom 12, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California 94012, Plaintiffs Judith Smith, Julie Fuller, Tara Ayres, and Sascha Bittner, each individually and on behalf of all others similarly situated, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) and any other applicable rule of civil procedure or law, will move this Court for an order: (i) certifying Plaintiffs' claims as a class action; (ii) appointing Plaintiffs as Class Representatives; and (iii) appointing Class Counsel pursuant to Fed. R. Civ. P. 23(g).

Plaintiffs propose a Rule 23(b)(2) class defined as follows:

> All individuals in San Francisco County, Alameda County, and Contra Costa County who are disabled because of a mobility impairment, use wheelchairs or other mobility devices and therefore need Wheelchair Accessible Vehicles ("WAVs") for transportation, and who have been and continue to be deterred from using Lyft's transportation service due to Lyft's failure to provide equivalent transportation services for WAV users in those counties. Excluded from the Class is any individual who has downloaded the Lyft application.

To the extent the Court disagrees with the above-stated definition for the Plaintiff Class, Plaintiffs move for the Court to redefine or modify that definition, as such determinations are within the Court's discretion. Fed. R. Civ. P. 23(d)(1).

Plaintiffs also move for the appointment of Plaintiffs Judith Smith, Julie Fuller, Tara Ayres, and Sascha Bittner as Class Representatives. Plaintiffs further move for Disability Rights Advocates to be appointed as Class Counsel under Fed. R. Civ. P. 23(g).

This motion is based upon this notice; the accompanying memorandum of points and authorities; the concurrently filed declaration of Plaintiffs' counsel, Stuart Seaborn; additional declarations in support of the motion, including the declarations of Judith Smith, Julie Fuller, Tara Ayres, Sascha Bittner, Lana Nieves, Fiona Hinze, Dorene Giacopini, and Chris Finn; the

1   pleadings and records on file with the Court in this action; and any argument or additional

2   evidence as may be requested by the Court or presented at the time of hearing.

3

4   DATED: December 5, 2019                    DISABILITY RIGHTS ADVOCATES

5

6

7

    Stuart Seaborn
8   Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

**TABLE OF CONTENTS**

I.      Introduction ................................................................................................. 1

II.     Legal Framework for Class Claims ............................................................ 2

III.    Statement of Facts ...................................................................................... 4

        A.      Lyft Offers On-Demand Transportation Service to the Non-
                Disabled Public in the Bay Area ................................................... 4

        B.      Lyft Does Not Offer On-Demand Wheelchair-Accessible
                Transportation in the Bay Area ..................................................... 5

        C.      Lyft Could Modify its Practices to Offer Equivalent Service to
                Those Who Need WAVs in the Bay Area ...................................... 6

        D.      The Experiences of the Named Plaintiffs Demonstrate the
                Common Harms Facing Putative Class Members Due to Lyft's
                Failure to Provide Equivalent Service for WAV Users ................. 8

                1.      Judith Smith Has Been Harmed ......................................... 8

                2.      Julie Fuller Has Been Harmed ........................................... 9

                3.      Tara Ayres Has Been Harmed ........................................... 10

                4.      Sascha Bittner Has Been Harmed ...................................... 11

                5.      The Employees, Constituents, and Board Members of the
                        Independent Living Resource Center San Francisco Have
                        Been Harmed ..................................................................... 13

                6.      The Employees, Constituents, and Board Members of
                        Community Resources for Independent Living Has Been
                        Harmed .............................................................................. 13

IV.     Proposed Class .......................................................................................... 14

V.      Legal Argument ......................................................................................... 14

        A.      Legal Standard Under Rule 23 ....................................................... 14

        B.      The Class Is So Numerous That Joinder Would Be Impracticable ..... 15

        C.      Class Members Share Common Questions of Fact and Law ............... 16

        D.      The Individual Plaintiffs' Claims Are Typical of The Class ............... 17

        E.      The Proposed Class Representatives and Proposed Class Counsel
                Will Adequately Represent the Interests of the Proposed Class. ...... 18

        F.      The Proposed Class Satisfies the Conditions of Rule 23(b)(2) .......... 20

VI.     Conclusion ................................................................................................ 20

1

2

**TABLE OF AUTHORITIES**

3

**Cases**

4

*Access Living of Metro. Chicago v. Uber Techs., Inc.,* 351 F. Supp. 3d 1141 (N.D. Ill. 2018) ............................................................................................................. 3

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ......................................... 20

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ................................................. 16

*Cal. for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334 (N.D. Cal. 2008) ............................................................................................................. 19

*Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) ............................................................................................ 2, 4

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................ 19

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012) ................ 16

*Foster v. Adams & Assocs.*, Inc., No. 18-CV-02723-JSC, 2019 WL 4305538 (N.D. Cal. Sept. 11, 2019) ................................................................................ 15

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) ....................................... 18

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................ 17, 19

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ................................. 18

*Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909 (9th Cir. 1964) .............. 15

*In re online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ............... 19

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ...................................................... 20

*Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997) ......... 4

*Jordan v. Los Angeles Cnty.*, 669 F.2d 1311 (9th Cir. 1982) ................................. 20

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) ....................................... 18

*Kincaid v. City of Fresno*, 244 F.R.D. 597 (E.D. Cal. 2007) ................................. 16

*Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248 (S.D.N.Y. 2018) ...................................... 3

*Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007) ................... 18

*Molski v. Foley Estates Vineyard & Winery, LLC*, 531 F.3d 1043 (9th Cir. 2008)......... 4

*Nat'l Fed. of the Blind of Cal. v. Uber Tech., Inc.*, 103 F. Supp. 3d 1073 (N.D. Cal. 2015) ............................................................................................................. 3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ............................................................ 16, 17, 20

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ...................................................................... 3

*Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002) .................................. 3

*Ramos v. Uber Tech., Inc.*, No 14-CA-502(XR), 2015 WL 758087 (W.D. Tex. Feb. 20, 2015) ..................................................................................................................... 3

*Rannis v. Recchia*, 380 F. App'x 646 (9th Cir. 2010) ............................................................ 15

*Reeves v. MV Transp., Inc.*, 845 F. Supp. 2d 104 (D.D.C. 2012) ........................................... 2

*Rodriguez v. Hayes*, 578 F.3d 1032 (9th Cir. 2009), *rev'd on other grounds*, 591 F.3d 1105 (2010) ................................................................................................................ 16

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2011) ............................................................. 20

*Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623 (9th Cir. 2018) ............................................. 19

*Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391 (N.D. Cal. 2005) ................................ 18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338  (2011) ......................................................... 16

*Wang v. Chinese Daily News, Inc.*, 737 F.3d 538 (9th Cir. 2013) ......................................... 16

**Statutes**

42 U.S.C. § 12181(10) ............................................................................................................ 2

42 U.S.C. § 12181(7)(F) ......................................................................................................... 3

42 U.S.C. § 12182 .................................................................................................................. 3

42 U.S.C. § 12182 (b)(2)(A)(ii) ............................................................................................. 4

42 U.S.C. § 12182 (b)(2)(A)(iii) ............................................................................................ 4

42 U.S.C. § 12184(a) .............................................................................................................. 2

**Other Authorities**

William B. Rubenstein, 1 Newberg on Class Actions § 3:12 (5th ed. 2019) ............................. 15

**Rules**

Fed. R. Civ. P. 23(a) .......................................................................................................... 15, 16

Fed. R. Civ. P. 23(a)(1) .......................................................................................................... 15

Fed. R. Civ. P. 23(a)(3) .......................................................................................................... 17

Fed. R. Civ. P. 23(a)(4) .......................................................................................................... 19

1

Fed. R. Civ. P. 23(b)(2) .................................................................................................... 15, 20

2

**Regulations**

3

49 C.F.R. § 37.29(a) .............................................................................................................. 2

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## I.   INTRODUCTION

Lyft has created an on-demand transportation service that has become an essential way to get around the Bay Area – but Lyft excludes many of the people who need it most by failing to make its service wheelchair accessible. On behalf of wheelchair users in three Bay Area counties whose lives would be transformed by access to reliable on-demand transportation, Plaintiffs bring this class action to challenge Lyft's failure to provide people with disabilities who need wheelchair accessible vehicles ("WAVs") equivalent access to the on-demand transportation service Lyft provides the non-disabled public.

This is a quintessential case for class treatment under Rule 23. The Named Plaintiffs and members of the putative class, all of whom seek only injunctive relief and no monetary damages, have been impacted in exactly the same way: all have been deterred from attempting to use Lyft because they know that it fails to provide them with on-demand WAV service equivalent to the on-demand ridesharing service Lyft provides to the non-disabled public in the three counties at issue. It is undisputed that Lyft provides extensive, on-demand transportation service in inaccessible vehicles throughout the Bay Area, but provides severely limited service in wheelchair accessible vehicles. Non-disabled persons can get a Lyft ride at any time of day in locations throughout the three Bay Area counties at issue in minutes. WAV users, on the other hand, have no access to Lyft's on-demand ridesharing service in Alameda and Contra Costa counties. Though Lyft has recently implemented a 5-vehicle "pilot" WAV program during limited hours in San Francisco, the pilot offers woefully inadequate service at best—and is in no way comparable to the on-demand, 24/7 service Lyft offers to non-disabled riders in San Francisco.

Additionally, no individual analysis of any of the Plaintiffs' or putative class members' individual circumstances is required to determine a remedy for this discrimination. Rather, the Court's inquiry will focus entirely on Lyft's actions – or inactions. Lyft could stop discriminating against persons who need WAVs by utilizing its extensive market power, its billions of dollars in resources, and the control it exercises over its drivers to ensure that it

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    provides equivalent service for WAV users in San Francisco, Alameda, and Contra Costa

2    Counties.  By its own account, Lyft has made the modifications necessary to its programs in

3    other markets, such as New York City, to provide WAV service there.  A common issue of fact

4    in this case is whether Lyft could make similarly needed modifications here in the Bay Area.

5        And, to the extent Lyft pursues the defenses it raised in its Answer to the Complaint, such

6    as Lyft's allegation that the modifications needed to provide equivalent service for WAV users in

7    the Bay Area would present an undue burden or fundamentally alter Lyft's business, the Court's

8    determination of whether Lyft has met its burden of proof on those defenses will focus on *Lyft's*

9    resources and business model rather than an analysis of Plaintiffs' or class members' individual

10   experiences.

11       Certification of the class is therefore the most efficient and practical way to address these

12   issues. Accordingly, this Court should certify the proposed class in accordance with Federal Rule

13   of Civil Procedure 23(a) and 23(b)(2).

14   **II.    LEGAL FRAMEWORK FOR CLASS CLAIMS**

15       Plaintiffs and members of the putative class seek injunctive and declaratory relief based

16   on Lyft's failure to provide them and similarly situated WAV users in the Bay Area with full and

17   equal enjoyment of Lyft's on-demand transportation service in violation of Title III of the ADA.

18       The ADA prohibits discrimination "in the full and equal enjoyment of specified public

19   transportation services provided by a private entity that is primarily engaged in the business of

20   transporting people." 42 U.S.C. § 12184(a).  Title III defines "specified public transportation" to

21   include transportation by any conveyance provided to the "general public with general or special

22   service (including charter service) on a regular and continuing basis."  42 U.S.C. § 12181(10).

23   Various modes of transportation are covered, including "taxi services" (49 C.F.R. § 37.29(a))

24   and paratransit (*Reeves v. MV Transp., Inc*., 845 F. Supp. 2d 104, 106–107 (D.D.C. 2012)).

25   Courts in this District have allowed claims to proceed under Title III where plaintiffs have

26   alleged that ridesharing companies operated covered transportation services. *See Crawford v.*

27   *Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *3–4 (N.D. Cal. Mar. 1, 2018)

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   (denying Uber's motion for judgment on the pleadings regarding Uber's status as an entity

2   "primarily engaged in the business of transporting people" under the ADA); *accord Access*

3   *Living of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1156 (N.D. Ill. 2018);

4   *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 261–62 (S.D.N.Y. 2018); *Ramos v. Uber Tech., Inc.*,

5   No 14-CA-502(XR), 2015 WL 758087, at *10 (W.D. Tex. Feb. 20, 2015) (denying Lyft's and

6   Uber's motions to dismiss on grounds they are not "primarily engaged in the business of

7   transporting people").

8        Title III of the ADA also prohibits discrimination on the basis of disability in the full and

9   equal enjoyment of goods, services, facilities, privileges, advantages, and/or accommodations

10  provided by places of public accommodations.  42 U.S.C. § 12182.  The statute defines "public

11  accommodation" by reference to 12 broad categories, which "'should be construed liberally' to

12  afford people with disabilities 'equal access' to the wide variety of establishments available to

13  the nondisabled."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676–77 (2001).  Included as one of

14  the covered forms of public accommodation is a "travel service."  42 U.S.C. § 12181(7)(F).

15  Courts have been reluctant to dismiss challenges to Title III claims on the basis that ridesharing

16  companies may not be covered places of public accommodation.  *See, e.g.*, *Nat'l Fed. of the*

17  *Blind of Cal. v. Uber Tech., Inc.*, 103 F. Supp. 3d 1073, 1083-1084 (N.D. Cal. 2015).

18       Persons with disabilities can demonstrate discrimination under Title III by showing that

19  they are aware of a discriminatory condition with respect to a covered entity's service that deters

20  them from accessing that service.  *See Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133,

21  1136–37 (9th Cir. 2002) ("[O]nce a plaintiff has actually become aware of discriminatory

22  conditions existing at a public accommodation, and is thereby deterred from visiting or

23  patronizing that accommodation, the plaintiff has suffered an injury."); *Doran v. 7-Eleven, Inc.*,

24  524 F.3d 1034, 1042 (9th Cir. 2008); *see also Nat'l Fed. of the Blind of Cal.*, 103 F. Supp. 3d at

25  1080–81 (applying deterrence-based theory of injury under Title III to plaintiffs deterred from

26  downloading and using Uber's app because they are aware of discriminatory conditions

27  involving Uber's service); *Crawford v. Uber Techs., Inc.*, 2018 WL 1116725, at *2–3 (same).

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

While covered entities are required to ensure they provide people with disabilities access to the full and equal enjoyment of their services, and to make reasonable modifications to their services when it is necessary to do so, they do not have to make modifications or take other steps that would fundamentally alter the goods or services they offer to the public or that would result in an undue burden.  *See* 42 U.S.C. §§ 12182 (b)(2)(A)(ii) and (iii).  Covered entities claiming that proposed reasonable modifications to their programs would present an undue burden or fundamental alteration face the burden of proof on these defenses.  *See Molski v. Foley Estates Vineyard & Winery, LLC*, 531 F.3d 1043, 1048–49 (9th Cir. 2008); *see also Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997).

**III.    STATEMENT OF FACTS**

**A.    Lyft Offers On-Demand Transportation Service to the Non-Disabled Public in the Bay Area**

Lyft does not dispute its status as a provider of transportation services.  It describes itself as providing "a ridesharing transportation business." Declaration of Stuart Seaborn ("Seaborn Decl."), Ex. D at 14:19–25.  And, business is booming. Since launching in 2012, Lyft has provided over a billion rides in more than 300 markets in the United States and Canada.  Seaborn Decl., Ex. E at LYFT00000235, 240.  Lyft estimates that its transportation service is available to more than 95% of the United States population.  *Id.* at LYFT00000235.  In 2018, Lyft's revenue was $2.2 billion, representing a 103% growth rate from 2017 to 2018.  *Id.* at LYFT00000236.

Lyft also admits that it offers on-demand transportation service in the Bay Area.  Seaborn Decl., Ex. D at 18:1–22.  Lyft markets itself as a fast and convenient way to secure a ride in minutes, no matter where the customer is located.  For example, Lyft's marketing materials for the San Francisco area state,

> "Whether you're riding to escape the fog, grab a sour ale in the Mission, or get a boost up Potrero Hill, count on Lyft for reliable, affordable rides in minutes.  The Lyft app matches you with local drivers in just a few taps.  Request, ride, then simply pay in the app."

*See* Seaborn Decl., Ex. F  at 2.

For those who can use it, Lyft's standard or "classic" service, which is one of Lyft's most

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    economical services, Seaborn Decl., Ex. G, is available on-demand, throughout the three Bay

2    Area counties at issue, without any limitation on where a rider can go or any limitations on hours

3    of service.  Seaborn Decl., Ex. D at 18:1–22; 21:14–22:9.  In addition to the "classic service,"

4    Lyft provides various modes of service in the Bay Area, including modes offering categories of

5    luxury vehicles and carpool rides.  *Id.* at 16:23–17:7. Passengers can use the Lyft App to request

6    a ride in these service modes at any time of day or night or in any location in the three Bay Area

7    counties at issue.  *Id.* at 23:16-29:11, 31:12-25, 33:8-34:2.

8         As Lyft's business has grown, the traditional taxi industry, previously an important

9    option for on-demand accessible transportation in the San Francisco area, has declined

10   precipitously. In the years after Lyft and Uber introduced their on-demand service, the number of

11   rides in ramp taxis dropped by a third, and the number of ramp taxi permits taken out by taxi

12   companies dropped by 60%, leaving people who use wheelchairs with few accessible options.

13   Seaborn Decl., Ex. K at ILRC000099-102.

14        **B.    Lyft Does Not Offer On-Demand Wheelchair-Accessible Transportation in
                  the Bay Area**

15

16        For people in the three Bay Area counties at issue whose disabilities require them to use

17   WAVs, the on-demand, flexible ridesharing service Lyft offers the non-disabled public is simply

18   not an option.  Lyft offers no WAV service whatsoever in Alameda and Contra Costa Counties.

19   Seaborn Decl., Ex. D at 63:11–17.  While Lyft did start a 5-vehicle "pilot" WAV program in San

20   Francisco after this litigation was initiated, *id.* at 63:22–64:4, Ex. H at LYFT00001817, it is so

21   limited that it fails to come close to serving the needs of WAV users and is no way comparable

22   to the 24-hour on-demand transportation service enjoyed by Lyft's non-disabled customers

     throughout the Bay Area.
23

24        The pilot program is limited to five WAV vehicles, Seaborn Decl., Ex. D at 65:16–22,

25   and has limited hours – it does not operate 24-hours-a-day like Lyft's other services. *Id.* at

26   67:10–14.  Lyft has no concrete plans to increase these service hours.  *Id.* at 72:18–20.  Nor do

27   users of the pilot program have the flexibility of using the limited pilot to travel throughout the

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Bay Area as non-disabled riders do.  To order a WAV using Lyft, a passenger's ride must originate within San Francisco County.  *Id.* at 66:6–19.  While a passenger could use the pilot to get a ride from San Francisco to, for example, Oakland, that passenger could not use the pilot to get a ride back to San Francisco.  *Id.*

For those able to use the pilot WAV program during the hours and in the locations it is available, the service is not comparable to Lyft's standard on-demand transportation service.  For example, Lyft's own data shows that during the week of August 12, 2019, the average weekday wait time from when a rider requested a ride in the pilot WAV program to pickup was ▮ minutes, ▮ seconds. For the same time period, the average wait time for Lyft's standard "classic" mode was ▮ minutes and ▮ seconds. *Id.* at 91:12–92:5 and Seaborn Decl. Ex. L at 1-2.  And for the same time period, ▮ different drivers drove the five vehicles available in Access mode, which applies to the WAV pilot, compared to ▮ drivers driving in standard mode. *Id.* at 92:6–23, Ex. L at 2.[1]

## C. Lyft Could Modify its Practices to Offer Equivalent Service to Those Who Need WAVs in the Bay Area

Lyft has the market power and capacity to make the modifications necessary to its programs to provide a functionally equivalent WAV program in the Bay Area.  Lyft has already done so in other jurisdictions. For example, Lyft has a WAV program in New York City that is far more extensive than the limited San Francisco pilot.  Lyft's WAV program in New York City has already met the Taxi and Limousine Commission's comparable wait-time standards for

---

[1] Even the way that WAV users request rides through this limited pilot is different – and more complicated – than how Lyft's other customers access its transportation service. Unlike other Lyft users, a rider who wants to access a WAV ride must first change the settings of the Lyft App to enable "Access Mode" before they can even see the option to request one of the five WAVs in San Francisco.  Seaborn Decl., Ex. J at LYFT00001603.  Lyft has done little to publicize the existence of the pilot, Seaborn Decl., Ex. D at 76:7–18, so would-be WAV users must know that the option exists and how to access it to even be able to request a ride.  When discussing the number of requests for WAV service it receives, Lyft stated that it received under ▮ requests for WAV rides per week during October. *Id.* at 71:23-72:4. Such low numbers are no surprise, given the lack of publicity, the hurdles Lyft has erected to accessing WAVs, and the limited nature of the WAV pilot.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  WAV vehicles there.  Seaborn Decl., Ex. I at p. 5–6, 12 (Lyft completed 75% of rides in under

2  15 minutes and 95% in under 30 minutes).

3          Additionally, when it comes to its non-WAV service, Lyft uses driver incentives and

4  contracts with car-rental companies to ensure sufficient supply of vehicles and drivers for on-

5  demand service.  Lyft's own materials describe these efforts:

6    • "To ensure that a sufficient number of drivers are available to provide rides

7       during peak demand hours, [Lyft] utilize[s] a range of incentives for drivers . . ."

8       Seaborn Decl., Ex. E at LYFT00000311.  This includes incentivizing drivers to

9       drive more frequently, to drive at certain times of the day when demand is high,

10      or to drive in certain geographic areas where more drivers are needed. Seaborn

11      Decl., Ex. D at 54:4–57:19.

12   • "The scale of [Lyft's] network enables [Lyft] to predict demand and proactively

13      incentivize drivers to be available for rides in the right place at the right time."

14      Seaborn Decl., Ex. E at LYFT00000240.

15   • Lyft "has collected data from over one billion rides and over ten billion miles

16      driven" and uses "data insights to anticipate market-specific demand, enabling

17      [Lyft] to create customized incentives for drivers in local markets."  *Id.* at

18      LYFT00000237.

19   • Lyft's "machine learning algorithms continuously train [Lyft's] optimization

20      models and dynamically incentives drivers to be on [Lyft's] platform when and

21      where riders are seeking transportation."  *Id.* at LYFT00000242.

22   • Lyft has partnerships with Hertz, Avis, and Flexdrive in which drivers can

23      procure vehicles and those companies provide insurance for the vehicles.  Seaborn

24      Decl., Ex. D at 36:16-22.

25   • Lyft also recruits drivers through advertising on Google, Facebook, and online job

26      platforms, *Id.* at 47:10–20, and by offering referral incentives to existing drivers

27      who recruit others to join the platform, *Id.* at 47:21–48:2.

28

- Additionally, to increase the number of passengers, Lyft offers discounts for first-time riders to try Lyft, and offer incentives to existing passengers who refer new passengers to the platform.  Seaborn Decl., Ex. E at LYFT00000243.

Despite these tools and Lyft's extensive resources, Lyft has not made the modifications needed to provide anything close to adequate or equivalent WAV service in the Bay Area. Indeed, when asked, Lyft was unable to point to any advertising or marketing it has done in connection with its WAV service pilot program in San Francisco.  Seaborn Decl., Ex. D at 76:7–22:14.

**D.      The Experiences of the Named Plaintiffs Demonstrate the Common Harms Facing Putative Class Members Due to Lyft's Failure to Provide Equivalent Service for WAV Users**

1.      Judith Smith Has Been Harmed

Plaintiff Judith Smith has a mobility disability and uses a motorized wheelchair for mobility. Declaration of Judith Smith ("Smith Decl.") ¶¶ 3–4. Ms. Smith lives in Oakland, California in Alameda County.  *Id.* ¶ 2.  Similar to members of the proposed class, Ms. Smith would use Lyft's on-demand service in the Bay Area if it were accessible to her.  *Id.* ¶¶ 8–10.

Soon after Lyft launched its service in the Bay Area, Ms. Smith was excited by the prospect of having access to on-demand transportation, but she quickly learned from friends and colleagues that Lyft did not provide WAV service.  *Id.* ¶¶ 5–6.  Since then, she has watched several people attempt to call a wheelchair accessible Lyft, and none has ever succeeded. *Id.* ¶ 6. As a result, although she has a smartphone, Ms. Smith has concluded it would be futile to download the App.  *Id.* ¶ 7.

If Lyft's service were accessible to her, Ms. Smith would be able to use Lyft in the same situations as someone who does not need a wheelchair accessible vehicle.  *Id.* ¶ 8.  She would order Lyfts to and from the airport, when she is out late at night, when she wants to travel to high-density places like San Francisco where parking is limited, or to places that are far from public transportation, in inclement weather, or when health reasons prevent her from driving.  *Id.* In these situations, Ms. Smith is left without any alternative transportation and therefore must

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   stay at home or suffer arduous transportation delays and other indignities from not having access

2   to the same service as Lyft users who do not use accessible vehicles.  *Id.* ¶ 9.

3           For example, Ms. Smith traveled out of town earlier this fall, and would have called a

4   Lyft to take her to the airport instead of having to deal with the expensive parking at SFO – but

5   there were no Lyfts available that could take her there from her home in Oakland.  She also

6   traveled to Sacramento earlier this year for a training and would have preferred to travel by

7   Amtrak instead of driving, but it was too much of a hassle to arrange accessible transportation to

8   the train station.  If she'd had the option, it would have been easy to just take a Lyft to the train

9   station like anybody else.  Smith Decl. ¶ 10.

10                  2.       Julie Fuller Has Been Harmed

11          Plaintiff Julie Fuller has a mobility disability and uses a motorized wheelchair for

12   mobility.  Declaration of Julie Fuller ("Fuller Decl.") ¶ 3–4.  Ms. Fuller lives in Oakland,

13   California in Alameda County.  *Id.* ¶ 2.  Similar to members of the proposed class, Ms. Fuller,

14   would use Lyft's on-demand service in the Bay Area if it were accessible to her. *Id.* ¶¶ 8–10.

15          Ms. Fuller has a smartphone, but she has not downloaded the Lyft App because she has

16   heard from other wheelchair users that there are no wheelchair accessible Lyfts in her area. *Id.* ¶

17   5. She has had discussions with other community members and friends about the lack of

18   transportation options, including the lack of WAVs on Lyft.  *Id.* ¶ 6.

19          Due to of the lack of wheelchair accessible on-demand transportation options, Ms. Fuller

20   must spend a large amount of time planning and coordinating her schedule.  If she had access to

21   on-demand service through Lyft, it would alleviate some of this planning.  For example, Ms.

22   Fuller regularly attends medical appointments at a facility that is a ten-minute drive from her

23   home.  *Id.* ¶¶ 7–8.  In order to travel to these appointments, she often arranges a ride with

24   paratransit.  The local paratransit provider is notoriously unreliable, so she arranges her ride with

25   paratransit to arrive at her appointment an hour early to ensure that she arrives on time.  *Id.*

26   Because she needs to build in so much extra time for her ride, a trip to the doctor ten minutes

27   away often takes up a substantial portion of her day.  *Id.*  If she could use Lyft's on-demand

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

service, she would not have to waste so much time with paratransit and would be able to use her time more efficiently. *Id.*

Additionally, having access to on-demand Lyft service would make it more likely that she could attend events during bad weather. She tends to avoid doing so now because she does not want to risk waiting outside in the rain for prolonged periods waiting for paratransit because it could damage her motorized wheelchair. She also would be able to make spontaneous plans with friends instead of always needing to plan in advance. *Id.* ¶¶ 9–10.

### 3. Tara Ayres Has Been Harmed

Plaintiff Tara Ayres has a mobility disability and uses a motorized wheelchair. Declaration of Tara Ayres ("Ayres Decl.") ¶¶ 3–4. Ms. Ayres lives in Richmond, California in Contra Costa County. *Id.* ¶ 2. Similar to members of the proposed class, Ms. Ayres, would use Lyft's on-demand service in the Bay Area if it was accessible to her. *Id.* ¶¶ 6–9.

Ms. Ayres has a smartphone but has been deterred from downloading Lyft's app because she knows that there are never any WAVs available on the app in the East Bay where she lives, so downloading it would be pointless. *Id.* ¶ 5. The inaccessibility of Lyft's service is widely known in the community of people with mobility disabilities. *Id.* For example, an article in *New Mobility* magazine, a publication widely read by wheelchair users, including Ms. Ayres, described how neither Uber nor Lyft had made their service wheelchair accessible. *Id.* Ms. Ayres has read social media posts by other people about the lack of wheelchair accessible service on Lyft. *Id.*

There are many situations in which Ms. Ayres would use Lyft if she knew she could count on being able to request a vehicle with a ramp or lift. *Id.* ¶ 6. For example, she lives 1.25 miles from BART in Richmond and often would choose to take a Lyft to or from the BART station if she had the option. *Id.* ¶ 7. Late at night, the bus that runs near her house to the BART station runs infrequently, and she either has to wait for prolonged periods for the bus or walk home through dark and deserted streets, where she feels vulnerable. In wet weather, the lack of WAV service means Ms. Ayres simply stays at home rather than risk damage to her chair by

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    walking to the BART station in the rain.  She also has a routine medical procedure at her

2    doctor's office in south Berkeley which often leaves her in pain afterwards.  If she had the

3    option, she would choose to take a Lyft rather than an uncomfortable and lengthy BART ride

4    home.

5         Ms. Ayres also frequently has appointments in San Francisco's UCSF Mt. Zion facility.

6    Although she drives, the hospital is in a location in San Francisco where parking is extremely

7    scarce and the terrain is hilly.  *Id.* ¶ 8.  In order to park her van, she must find a flat parking spot

8    where the sidewalk is wide and unobstructed in order to use her van's ramp.  *Id.*  Her alternative

9    is to take public transportation, which requires a round-trip journey of over four hours.  *Id.*  If she

10   could use Lyft to connect to the hospital from BART, the trip would be much less time

11   consuming and stressful.  *Id.*

12        Ms. Ayres is aware of Lyft's five-vehicle pilot in San Francisco, but has not downloaded

13   Lyft's app or attempted to use Lyft's WAV pilot because she cannot use it to call a Lyft from her

14   home in the East Bay.  Additionally, the pilot is so limited that she would not be able to count on

15   reliably getting a ride in San Francisco.  *Id.* ¶ 9.

16                    4.    Sascha Bittner Has Been Harmed

17        Plaintiff Sascha Bittner has a mobility disability and uses a motorized wheelchair for

18   mobility. Declaration of Sascha Bittner ("Bittner Decl.") ¶ 3–4.  Ms. Bittner lives in San

19   Francisco, California, in San Francisco County.  *Id.* ¶ 2.  Similar to members of the proposed

20   class, Ms. Bittner, would use Lyft's on-demand service in the Bay Area if it was accessible to

21   her.  *Id.* ¶ 6.

22        Ms. Bittner has been deterred from using Lyft because she has heard from friends that it

23   is not a reliable form of transportation for people who need WAVs.  She does not have a

24   smartphone now, but would consider either getting a smartphone and using the Lyft App or

25   ordering a Lyft through a service that lets people do so by phone if she knew that she could

26   access reliable, on-demand transportation.  *Id*. ¶¶ 5–6.

27        However, as it is now, she believes that it would be pointless to download the app

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

because the level of service is unreliable and nonexistent in many parts of the Bay Area. Ms. Bittner is active on social media, and she has seen posts by friends who have attempted to hail wheelchair accessible vehicles through Lyft and been unable to do so. *Id.* She has also been with friends when they attempted to order an accessible Lyft ride, and saw they were not successful. *Id.* Ms. Bittner is aware of Lyft's five-vehicle pilot in San Francisco, but has not downloaded Lyft's app or attempted to use Lyft's WAV pilot in San Francisco because it is so limited that she does not feel she can count on getting a ride that would take her to her destinations on time. *Id.* ¶ 6.

There are many occasions when Ms. Bittner would use Lyft if it were accessible to her. For example, in rainy weather she is reluctant to travel because she is concerned that the rain will damage the electronics in her power wheelchair. She is scheduled to lead a meeting in Berkeley, but rain is forecast and she is concerned about getting from the BART station to her destination, which is about a ten minute walk. If she could count on a Lyft to get her from the BART station to the destination, she would use it, but as it is there are no Lyft WAVs available in Berkeley. *Id.* ¶ 8.

Ms. Bittner campaigns for fair wages for in-home care workers and attends events around the Bay Area and the state related to this work. *Id.* ¶ 9. She also participates in workshops at ILRCSF. Because she does not have access to a reliable ridesharing service, she often relies on her stepfather or other relatives to drive her in the family's accessible van. *Id.*

For Ms. Bittner, going out to routine events such as regular medical appointments or meetings becomes an all-day ordeal, when she builds in time for delays and disruptions on public transit. *Id.* ¶ 10. She uses paratransit, but that service is routinely hours behind schedule. For example, she was recently hours late to a political event for which she had scheduled a paratransit pickup two hours early. *Id.*

Ms. Bittner is also often left out of spontaneous social gatherings because she can't simply call a Lyft like everyone else to get there and come pick her up when it is over. *Id.* ¶ 11. The lack of wheelchair accessible Lyfts excludes Ms. Bittner from an on-demand door-to-door

1  service that is available to people who do not use wheelchairs, and which would greatly improve

2  Ms. Bittner's ability to live an active life.  *Id.* ¶ 12.

3        5.      The Employees, Constituents, and Board Members of the Independent
                 Living Resource Center San Francisco Have Been Harmed

4        Independent Living Resource Center San Francisco ("ILRCSF") is a disability rights

5  organization in San Francisco, California, that advocates for people with disabilities and supports

6  them in living independent and active lives.  Nieves Decl. ¶ 2.  ILRCSF's board, staff, and the

7  consumers of its services include people with mobility disabilities who have been deterred from

8  downloading and using Lyft because of Lyft's failure to make accessible service reliably

9  available to them.  *Id.* ¶ 4.

10       For example, Fiona Hinze, ILRCSF's Director of Systems Change, uses a motorized

11  wheelchair.  *Id.* ¶ 5, Declaration of Fiona Hinze ("Hinze Decl.") ¶ 5.  Lyft would provide her an

12  additional option to commute to work or to off-site meetings, speaking engagements, and other

13  important work-related events.  Hinze Decl. ¶ 7.  Without the option of a reliable, convenient on-

14  demand mode of transportation, she cannot travel around the city spontaneously to attend work

15  events because she has to book her transportation well in advance using paratransit.  *Id.* ¶ 8–9.

16  Ms. Hinze has not attempted to use Lyft because she knows its on-demand service is not reliably

17  available for people needing WAVs in the Bay Area.  *Id.* ¶ 7.  She is aware of Lyft's five-vehicle

18  pilot program in San Francisco County, but has not downloaded the app because the pilot is so

19  limited that she does not view it as a reliable transportation option.  *Id.* ¶ 10.  Named Plaintiff

20  Sascha Bittner is also a consumer of ILRCSF's services and, as described above, is deterred from

21  using Lyft because it fails to provide its on-demand service to persons needing WAVs in the Bay

22  Area.  Bittner Decl. ¶¶ 6-7.

23       6.      The Employees, Constituents, and Board Members of Community
                 Resources for Independent Living Has Been Harmed

24

25       Community Resources for Independent Living ("CRIL") supports people with disabilities

26  in southern Alameda County to live independently, advocate for themselves, and access services,

27  programs, activities, resources, and facilities in the community. Declaration of Dorene Giacopini

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

("Giacopini Decl.") ¶ 4. CRIL's board, staff, and the consumers of their services include people with mobility disabilities who have been deterred from downloading and using Lyft because of Lyft's failure to make accessible service available to them. *Id.* ¶ 4.

For example, two members of CRIL's board of directors, Dorene Giacopini and Chris Finn, use motorized wheelchairs and need to use WAVs when they travel by car. Giacopini Decl. ¶¶ 5–6; Declaration of Chris Finn ("Finn Decl.") ¶¶ 5–6. Neither has downloaded Lyft's app because they have learned from friends and colleagues that doing so would be pointless because Lyft does not provide WAV service. Giacopini Decl. ¶ 8; Finn Decl. ¶ 8. However, both would use WAV service through Lyft if it were available to go to work engagements, get to the airport, go to medical appointments, and attend events at CRIL. Giacopini Decl. ¶ 8; Finn Decl. ¶ 9. Both have been unable to attend CRIL meetings in person due to transportation difficulties. Giacopini Decl. ¶ 12; Finn Decl. ¶ 10. Having access to reliable on-demand transportation like Lyft provides in non-accessible vehicles would enable them to fulfill their duties as CRIL board members more fully. Giacopini Decl. ¶ 12; Finn Decl. ¶ 11.

## IV.    PROPOSED CLASS

Plaintiffs seek to certify the following class of individuals pursuant to Federal Rule of Civil Procedure 23(b)(2): all individuals in San Francisco County, Alameda County, and Contra Costa County who are disabled because of a mobility impairment, use wheelchairs or other mobility devices and therefore need Wheelchair Accessible Vehicles ("WAVs") for transportation, and who have been and continue to be deterred from using Lyft's transportation service due to Lyft's failure to provide equivalent transportation services for WAV users in those counties. Excluded from the Class is any individual who has downloaded the Lyft application. The proposed class seeks injunctive and declaratory relief. It does not seek damages.

## V.    LEGAL ARGUMENT

### A.    Legal Standard Under Rule 23

Class certification is proper under Federal Rule of Civil Procedure 23(a) if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    common to the class, (3) the claims or defenses of the representative parties are typical of the

2    claims or defenses of the class, and (4) the representative parties will fairly and adequately

3    protect the interests of the class.  Fed. R. Civ. P. 23(a).

4         In addition, the proposed class must be certifiable under one of the three sub-provisions

5    of Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(2), pursuant to which class

6    certification is proper if "the party opposing the class has acted or refused to act on grounds

7    generally applicable to the class, thereby making appropriate final injunctive relief or

8    corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

9         **B.    The Class Is So Numerous That Joinder Would Be Impracticable**

10        A proposed class is sufficiently numerous if joining its members as individual plaintiffs

11   would be "impracticable."  *See* Fed. R. Civ. P. 23(a)(1).  "Impracticable" does not mean

12   impossible: joinder is impracticable if it would be difficult or inconvenient to join all members of

13   the class.  *See Foster v. Adams & Assocs.*, Inc., No. 18-CV-02723-JSC, 2019 WL 4305538, at *3

14   (N.D. Cal. Sept. 11, 2019) (citing *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–

15   14 (9th Cir. 1964)).

16        The numerosity requirement is "not tied to any fixed numerical threshold"—courts

17   generally find that classes with 40 or more members satisfy it, but even much smaller classes can

18   suffice.  *See Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (discussing standard, and

19   affirming district court's certification of 20-member class); *see also* William B. Rubenstein, 1

20   Newberg on Class Actions § 3:12 (5th ed. 2019) ("a class of 40 or more members raises a

21   presumption of impracticability of joinder based on numbers alone").

22        Here, the size of the proposed class far exceeds this threshold.  According to a report

23   published by the San Francisco Metropolitan Transportation Agency, there are approximately

24   5000 wheelchair users in San Francisco. Seaborn Decl., Ex. K at ILRC000108.  Approximately

25   29,500 people use motorized wheelchairs or motorized scooters in the combined three counties at

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   issue.[2]  Even if only a fraction of this group met the class definition of people who would use

2   Lyft WAV if it were available, and had not downloaded Lyft's app, the class would still satisfy

3   numerosity.

4       **C.**    **Class Members Share Common Questions of Fact and Law**

5         Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed.

6   R. Civ. P. 23(a).  In a civil rights class action such as this one, "commonality is satisfied where

7   the lawsuit challenges a system-wide practice or policy that affects all of the putative class

8   members . . . [i]n such circumstance, individual factual differences among the individual litigants

9   or groups of litigants will not preclude a finding of commonality."  *Armstrong v. Davis*, 275 F.3d

10  849, 868 (9th Cir. 2001); *see also Parsons v. Ryan*, 754 F.3d 657, 681–82 (9th Cir. 2014); *Evon*

11  *v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012).  A "single issue common

12  to the class" satisfies the commonality requirement.  *Kincaid v. City of Fresno*, 244 F.R.D. 597,

13  602 (E.D. Cal. 2007); *see also Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542–44 (9th Cir.

14  2013); *Rodriguez v. Hayes*, 578 F.3d 1032, 1048 (9th Cir. 2009), *rev'd on other grounds*, 591

15  F.3d 1105 (2010)).  Such issues are those which have "the capacity . . . to generate common

16  *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

17  338, 350 (2011) (internal citations omitted) (emphasis in original).

18        The instant case, which seeks no monetary damages, is a quintessential civil rights class

19  action alleging systemic discrimination.  Named Plaintiffs and members of the proposed class all

20  face the same harm—they do not have equivalent access to the on-demand transportation service

21  Lyft provides the non-disabled public in San Francisco, Alameda, and Contra Costa Counties.

22

---

23  [2] The National Household Transportation Survey, conducted by the United States Department of
    Transportation, found that about 8.3% of people with disabilities use motorized wheelchairs or
24  motorized scooters. Stephen Brumbaugh, Issue Brief: Travel Patterns of American Adults with
    Disabilities 2 (2018), available at https://www.bts.gov/sites/bts.dot.gov/files/docs/explore-topics-
    and-geography/topics/passenger-travel/222466/travel-patterns-american-adults-disabilities-9-6-
25  2018_1.pdf.  The population of people with disabilities in the three counties is 355,432
    (Alameda: 149, 226; Contra Costa: 118,603; San Francisco: 87,603), and 8.3% of that number is
26  29,500.  Population figures are drawn from National Institute on Disability, Independent Living,
    and Rehabilitation Research, 2015  California Report for County-level Data: Prevalence,
27  https://disabilitycompendium.org/compendium/overall-prevalence-report/CA [last accessed Dec.
    3, 2019].

28

1    Common questions of fact include, among others, whether reasonable modifications can be made

2    to Lyft's programs so that Lyft could offer on-demand ridesharing service using WAVs.  The

3    answers to these questions require no inquiry whatsoever into the individual circumstances of

4    each proposed class member.  Indeed, all are injured by Lyft's failure to provide WAV service,

5    and all seek the same remedy.  Rather, the factual determination will address *Lyft's* resources and

6    capacity to make the modifications needed to provide functionally equivalent WAV service in

7    these Bay Area counties.

8           Additionally, in response to Plaintiffs' Complaint, Lyft has alleged, among other

9    defenses, that its business is not covered by the ADA, that requiring the company to modify its

10   policies, practices, or procedures to provide WAVs would be a fundamental alteration of its

11   business, and that the relief sought by Plaintiffs and the proposed class would place an undue

12   burden on Lyft. *See* Def.'s Answer to Complaint, ECF No. 19 at 16–18.  These defenses further

13   underscore the fact that any resolution of Plaintiffs' claims will be common to all class members.

14   They require the Court to evaluate the nature of Lyft's business and Lyft's financial resources.

15   Again, such an analysis will in no way rely on an individualized analysis of the particular claims

16   of each Named Plaintiff or proposed class member.  Thus, Lyft's own affirmative defenses

17   indicate the need for resolution on a class-wide basis.

18          **D.      The Individual Plaintiffs' Claims Are Typical of The Class**

19          Class certification is also proper where "the claims or defenses of the representative

20   parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Under [Rule

21   23(a)(3)'s] permissive standards, representative claims are 'typical' if they are reasonably

22   coextensive with those of absent class members; they need not be substantially identical."

23   *Parsons*, 754 F.3d at 685 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.

24   1998) (*overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011))).

25   "The requirement of typicality is not primarily concerned with whether each person in a

26   proposed class suffers the same type of damages; rather, it is sufficient for typicality if the

27   plaintiff endured a course of conduct directed against the class."  *Just Film, Inc. v. Buono*, 847

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  F.3d 1108, 1118 (9th Cir. 2017); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th

2  Cir. 1992) ("Typicality refers to the nature of the claim or defense of the class representative, and

3  not to the specific facts from which it arose or the relief sought"); *Lozano v. AT & T Wireless*

4  *Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007) (citing *Simpson v. Fireman's Fund Ins. Co.*, 231

5  F.R.D. 391, 396 (N.D. Cal. 2005) for the proposition that"[i]n determining whether typicality is

6  met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury

7  caused"). Because typicality overlaps with commonality, a finding of commonality usually

8  supports a finding of typicality.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13

9  (1982) (noting that commonality and typicality requirements frequently "merge").

10  Here, the Named Plaintiffs have experienced the same harm, rely on the same legal

11  theories, and seek the same declaratory and injunctive relief as all members of the Proposed

12  Class.  Smith Decl. ¶¶ 8–10, 12; Fuller Decl. ¶¶ 7–10, 12; Ayres Decl. ¶¶ 6-9, 11; Bittner Decl.

13  ¶¶ 8–12, 14.  Like all members of the Proposed Class, Named Plaintiffs all have mobility

14  disabilities and use WAVs to travel by car.  Smith Decl. ¶¶ 3–4; Fuller Decl. ¶¶ 3–4; Ayres Decl.

15  ¶¶ 3–4; Bittner Decl. ¶¶ 3–4.  And like all members of the Proposed Class, Plaintiffs are deterred

16  from downloading the Lyft App because of the lack of on-demand WAV service, and are denied

17  access to Lyft's transportation services because Lyft does not provide on-demand WAV service.

18  Smith Decl. ¶¶ 5–7; Fuller Decl. ¶¶ 5–6; Ayres Decl. ¶¶ 5, 9; Bittner Decl. ¶¶ 5–7.

19  Because the Named Plaintiffs seek the same relief, rely on the same legal theories, and

20  experience the same injuries as the rest of the class, their claims are typical of the class, and

21  satisfy the typicality requirement on Rule 23(a).

22  **E.    The Proposed Class Representatives and Proposed Class Counsel Will
        Adequately Represent the Interests of the Proposed Class**

23
24  To determine if the proposed class representatives "will fairly and adequately protect the

    interests of the class" under Rule 23(a)(4), courts ask whether 1) "named plaintiffs and their
25
    counsel have any conflicts of interest with other class members" and 2) whether "the named
26
    plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class[.]"  *Sali*
27
28

1   *v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 634 (9th Cir. 2018) (citation omitted); *Hanlon*, 150

2   F.3d at 1020; Fed. R. Civ. P. 23(a)(4).  To answer these questions, courts look at a range of

3   factors, including "an absence of antagonism between representatives and absentees, and a

4   sharing of interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657

5   F.3d 970, 985 (9th Cir. 2011).  "Only conflicts that are fundamental to the suit and that go to the

6   heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.

7   A conflict is fundamental when it goes to the specific issues in controversy." *In re online DVD-*

8   *Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (internal citations omitted).  Adequate

9   representation of counsel is generally presumed in the absence of contrary evidence. *Cal. for*

10  *Disability Rights, Inc. v. Cal. Dep't of Transp.,* 249 F.R.D. 334, 349 (N.D. Cal. 2008).

11      Here, the Named Plaintiffs will adequately protect the interests of the class because they

12  are each long time members of the local community, are deeply committed to improving access

13  for persons with disabilities, do not have any conflicts of interest with class members, and are

14  prepared to act vigorously to pursue injunctive relief for the class.  *See* Smith Decl. ¶¶ 5, 11–14;

15  Fuller Decl. ¶¶ 6, 11–14; Ayres Decl. ¶¶ 10–13; Bittner Decl. ¶¶ 5, 13–16.  Moreover, there is no

16  conflict between the interests of the Named Plaintiffs and those of the other members of the class

17  because they all seek the same relief – an injunction to require Lyft to take the affirmative steps

18  necessary to ensure that it offers on-demand WAV service equivalent to its non-WAV

19  transportation service.  *See,* Smith Decl. ¶¶ 12–14; Fuller Decl. ¶¶ 12–14; Ayres Decl. ¶¶ 11–13;

20  Bittner Decl. ¶¶ 14–16.  None of the Named Plaintiffs seeks any individual compensation or

21  damages of any kind. Complaint, ECF No. 1 ¶ 5.

22      Plaintiffs' counsel also meet the requirements of Rule 23(g), and should therefore be

23  appointed class counsel.  Plaintiffs are represented by experienced and qualified counsel who are

24  recognized experts in class action litigation and in the protection of the rights of persons with

25  disabilities.  *See* Seaborn Decl., ¶¶ 3–11. Plaintiffs' counsel are thus well-qualified to litigate the

26  class-wide claims and ably meet the adequacy standards of Rule 23(g).  *See, e.g.*, *Jordan v. Los*

27  *Angeles Cnty.*, 669 F.2d 1311, 1323 (9th Cir. 1982) *(overruled on other grounds by Cnty. of Los*

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  *Angeles v. Jordan*, 459 U.S. 810 (1982)). Counsel have done extensive work investigating the

2  claims in this action and have more-than sufficient resources to vigorously litigate this case. In

3  addition, counsel does not have any conflicts of interest with class members.  *See* Seaborn Decl.

4  ¶¶ 12–13.  Thus, the adequacy requirement of Rule 23(a) is satisfied as to both the Named

5  Plaintiffs and Plaintiffs' Counsel.

6        **F.**    **The Proposed Class Satisfies the Conditions of Rule 23(b)(2)**

7        This Court should certify a Rule 23(b)(2) class because Defendants have "acted or

8  refused to act on grounds that apply generally to the class . . . ."  Fed. R. Civ. P. 23(b)(2).

9  Certification under Rule 23(b)(2) is appropriate where, as here, "a single injunction or

10  declaratory judgment would provide relief to each member of the class."  *Jennings v. Rodriguez*,

11  138 S. Ct. 830, 851–52 (2018).  When conducting a Rule 23(b)(2) inquiry, courts do not

12  "examine the viability or bases of class members' claims for declaratory and injunctive relief,

13  but only to look at whether class members seek uniform relief from a practice applicable to all of

14  them."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2011).

15        The claims raised by Plaintiffs in this action are precisely the sort that Rule 23(b)(2) was

16  designed to facilitate: the "primary role of [the rule] has always been the certification of civil

17  rights class actions . . . ."  *Parsons*, 754 F.3d at 686; *see also Amchem Prods., Inc. v. Windsor*,

18  521 U.S. 591, 614 (1997) (noting that "[c]ivil rights cases against parties charged with unlawful,

19  class-based discrimination are prime examples" of proper (b)(2) actions).  Plaintiffs seek class-

20  wide declaratory and injunctive relief to remedy Defendant's discriminatory conduct.

21  **VI.**    **CONCLUSION**

22        Lyft has become an essential transportation option for people living in the Bay Area, but

23  Plaintiffs and other people who use wheelchairs are excluded from using it because it is not

24  accessible to them, and they have few alternatives.  Lyft and its fellow on-demand transportation

25  companies have played a major role in upending the traditional taxi industry, previously an

26  important source of accessible transportation in the San Francisco area.

27        Plaintiffs seek a systemic remedy that would make this option available to them and other

28

1   people in the Bay Area who use wheelchairs. Accordingly, the Court should grant Plaintiffs'

2   motion to certify the class, make Plaintiffs the Class Representatives, and appoint Disability

3   Rights Advocates as Class Counsel.

4

5   DATED:  December 5, 2019                          Respectfully submitted,

6

7                                                     DISABILITY RIGHTS ADVOCATES

8

9                                                     _____
                                                      Stuart Seaborn
10                                                    Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644