1   FOLGER LEVIN LLP
    Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
2   Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
    Sherri M. Hansen (CSB No. 302903, shansen@folgerlevin.com)
3   199 Fremont Street, 20th Floor
    San Francisco, CA  94105
4   Telephone: 415.625.1050
    Facsimile: 415.625.1091
5

6   Attorneys for Defendant LYFT, INC.

7

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10

11  INDEPENDENT LIVING RESOURCE          Case No. 3:19-cv-01438-WHA
    CENTER SAN FRANCISCO, a California
12  non-profit corporation, JUDITH SMITH,   **DEFENDANT LYFT, INC.'S OPPOSITION**
    an individual, JULIE FULLER, an         **TO PLAINTIFFS' MOTION FOR CLASS**
13  individual, SASCHA BITTNER, an          **CERTIFICATION**
    individual, TARA AYRES, an individual,
14  and COMMUNITY RESOURCES FOR          Date:      February 20, 2020
    INDEPENDENT LIVING, a California     Time:      8:00 a.m.
15  non-profit corporation,              Judge:     Hon. William Alsup

16                  Plaintiffs,

17          v.

18  LYFT, Inc., a Delaware corporation,

19                  Defendant.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    FACTUAL BACKGROUND .................................................................................. 2

    A.     Lyft's Business ........................................................................................... 2

    B.     Driving On The Lyft Platform ................................................................... 3

    C.     Riding On The Lyft Platform ..................................................................... 3

    D.     Wheelchair Accessible Vehicles (WAVs) ................................................ 4

    E.     State And Local Requirements Regarding WAVs ...................................... 5

        1.     New York City ............................................................................... 5

        2.     California ........................................................................................ 6

    F.     Lyft's SF WAV Pilot .................................................................................. 6

    G.     Plaintiffs Have Not Tried The SF WAV Pilot ........................................... 7

    H.     Lyft's Plan For A New Three-County Pilot ............................................... 8

III.   ARGUMENT .......................................................................................................... 9

    A.     The Premise Of Plaintiffs' Motion And Class Definition – That Lyft
        Discriminates By Failing To Provide WAV Service – Is Contrary To The
        ADA's Legal Framework............................................................................ 9

        1.     The ADA Does Not Require Private Entities To Acquire WAVs ........... 10

        2.     The ADA Does Not Require Private Entities To Provide
            "Equivalent Service" Except In Certain Circumstances That Do Not
            Apply To Lyft's Rideshare Platform ........................................... 11

        3.     The ADA Does Not Require Private Entities To Provide
            Specialized Goods Or Services For Use By Persons With
            Disabilities .................................................................................. 12

        4.     The ADA Does Require Plaintiffs To Identify Specific Policies Or
            Practices They Claim Are Causing Them Harm...................................... 13

    B.     By Failing To Identify Any Specific Policy Or Procedure To Be Modified,
        Named Plaintiffs Have Failed To Establish Standing................................. 14

    C.     Plaintiffs Have Failed To Demonstrate That Common Issues Will Drive
        This Litigation............................................................................................ 17

    D.     Plaintiffs Have Not Shown Their Claims Are Typical Of The Claims Of
        Absent Class Members............................................................................... 19

    E.     Plaintiffs Fail To Meet The Requirements Of Rule 23(b)(2)............................. 20

    F.     Plaintiffs Fail To Satisfy The Requirement Of Numerosity ................................. 21

IV.    CONCLUSION..................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Council of the Blind v. Astrue*
    No. C-05-04694-WHA, 2008 U.S. Dist. LEXIS 123376 (N.D. Cal. September 11, 2008)
    .................................................................................................................................. 14

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*
    603 F.3d 666 (9th Cir. 2010)........................................................................................ 1, 12

*Armstrong v. Davis*
    275 F.3d 849 (9th Cir. 2001)............................................................................... 15, 16, 20

*Atencio v. United States Postal Serv.*
    198 F. Supp. 3d 340 (S.D.N.Y. 2016).............................................................................. 19

*B.K. v. Snyder*
    922 F.3d 957 (9th Cir. 2019)....................................................................... 9, 14, 15, 16, 20

*Castaneda v. Burger King Corp.*
    264 F.R.D. 557 (N.D. Cal. 2009) ..................................................................................... 21

*Celano v. Marriott Int'l, Inc.*
    242 F.R.D. 544 (N.D. Cal. 2007) ............................................................................... 22, 23

*Chapman v. Pier 1 Imports Inc.*
    631 F.3d 939 (9th Cir. 2011)..................................................................................... 15, 16

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr. ("CREEC")*
    867 F.3d 1093 (9th Cir. 2017)................................................................................... 18, 21

*Davis v. Astrue*
    250 F.R.D. 476 (N.D. Cal. 2008) ..................................................................................... 22

*DL v. District of Columbia*
    713 F.3d 120 (D.C. Cir. 2013) ........................................................................................ 18

*Doe v. Mut. Of Omaha Ins. Co.*
    179 F.3d 557 (7th Cir. 1999)........................................................................................... 12

*Evans v. Linden Research, Inc.*
    No. C 11-01078 DMR, 2012 U.S. Dist. LEXIS 166006 (N.D. Cal. Nov. 20, 2012)......... 15

*Fortyune v. American Multi-Cinema, Inc.*
    364 F. 3d 1075 (9th Cir. 2004)............................................................................... 2, 14, 17

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*
    528 U.S. 167 (2000).......................................................................................................... 15

*Greenn v. Borg-Warner Protective Servs. Corp.*
    95 Civ. 10419 (RPP), 1998 U.S. Dist. LEXIS 292 (S.D.N.Y. Jan. 15, 1998) .................. 23

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992)........................................................................................... 19

*Jeffries v. Pension Trust Fund*
    172 F. Supp. 2d 389 (S.D.N.Y. 2001).............................................................................. 23

*La Duke v. Nelson*
    762 F.2d 1318 (9th Cir. 1985).......................................................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*LeGrand v. N.Y.C. Transit Auth.*
95-CV-0333 (JG), 1999 U.S. Dist. LEXIS 8020 (E.D.N.Y. May 26,1999) ..................... 23

*Lewis v. Casey*
518 U.S. 343 (1996)................................................................................................. 15

*Los Angeles v. Lyons*
461 U.S. 95 (1983).................................................................................................. 15

*Maldonado v. Ochsner Clinic Found.*
493 F.3d 521 (5th Cir. 2007)................................................................................... 21

*Marcus v. BMW of N. Am., LLC*
687 F.3d 583 (3d Cir. 2012)................................................................................... 23

*Namisnak v. Uber Techs.*
No. 17-CV-060124-RS, 2018 U.S. Dist. LEXIS 221054 (N.D. Cal. Oct. 3, 2018).......... 10

*Nelsen v. King Cnty.*
895 F.2d 1248 (9th Cir. 1990).................................................................................. 15

*Noel v. New York City Taxi and Limousine Comm'n*
687 F.3d 63 (2d Cir. 2012)..................................................................................... 11

*Nordstrom v. Ryan*
762 F.3d 903 (9th Cir. 2011).................................................................................. 18

*O'Byrne v. Reed*
No. CV 09-08406 DMG (DTBx), 2010 U.S. Dist. LEXIS 153617 (C.D. Cal. Feb. 5, 2010)
............................................................................................................................... 19

*Parsons v. Ryan*
754 F.3d 657 (9th Cir. 2014)........................................................... 1, 17, 18, 19, 20

*Pickern v. Holiday Quality Foods*
293 F.3d 1133 (9th Cir. 2002)................................................................................. 16

*Prado-Steiman v. Bush*
221 F.3d 1266 (11th Cir. 2000)............................................................................... 15

*San Diego Gun Rights Comm. v. Reno*
98 F.3d 1121 (9th Cir. 1996).................................................................................. 15

*Schulz v. Bay Area Motivate, LLC*
No. 19-cv-02134-MMC, 2019 U.S. Dist. LEXIS 209256 (N.D. Cal. 2019) ................... 12

*Schwartz v. Upper Deck Co.*
183 F.R.D. 672 (S.D. Cal. 1999)............................................................................. 23

*Shields v. Walt Disney Parks & Resorts US, Inc.*
279 F.R.D. 529 (C.D. Cal. 2011) ........................................................................... 14

*Stevens v. Harper*
213 F.R.D. 358 (E.D. Cal. 2002) ....................................................................... 15, 16

*Stockwell v. City & Cty. of San Francisco*
749 F.3d 1107 (9th Cir. 2014)................................................................................. 17

*Toomer v. City Cab*
443 F.3d 1191 (10th Cir. 2006).......................................................................... 2, 9, 10

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-iii-

DEFENDANT LYFT, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:19-CV-01438-WHA

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Vega v. T-Mobile USA, Inc.*
    564 F.3d 1256 (11th Cir. 2009) ........................................................................................ 23

*Wal-Mart Stores, Inc. v. Dukes*
    564 U.S. 338 (2011) ..................................................................................... 2, 14, 20, 24

*Weyer v. Twentieth Century Fox Film Corp.*
    198 F.3d 1104 (9th Cir. 2000) ............................................................................... 9, 10, 12

**Statutes and Regulations**

42 U.S.C. § 12181 ...................................................................................................... 10

42 U.S.C. § 12182 ............................................................................................. 10, 11, 13

42 U.S.C. § 12183 ...................................................................................................... 13

42 U.S.C. § 12184 ............................................................................................... 2, 10, 11

42 U.S.C. § 12185 ...................................................................................................... 10

42 U.S.C. § 12186 ...................................................................................................... 10

28 C.F.R. § 36.307 ...................................................................................................... 12

28 C.F.R. § 36.303 ...................................................................................................... 13

28 C.F.R. Part 36, Appendix C ................................................................................. 13, 18

49 C.F.R. § 37.29 ....................................................................................................... 10

49 C.F.R. § 37.5 ........................................................................................................ 10

49 C.F.R. § 37.103 ..................................................................................................... 11

49 C.F.R. § 37.105 ..................................................................................................... 11

49 C.F.R. § 37.171 ..................................................................................................... 11

49 C.F.R. Part 37, Appendix E .................................................................................... 18

Cal. Pub. Util. Code § 5440 ...................................................................................... 4, 6

**Other Authorities**

Decision On Track 1 Issues: Transportation Network Company Trip Fee And Geographic Areas,
    Cal. Pub. Util. Comm. Rulemaking 19-02-012 (June 27, 2019) ......................................... 6

New York City Taxi and Limousine Commission Rule Book § 59B-17 ....................................... 5

## I.     INTRODUCTION

Defendant Lyft, Inc. ("Lyft") operates a technology-powered ridesharing platform that makes millions of connections between riders and drivers each day. Lyft does not own any of the vehicles that are used on its ridesharing platform or tell the drivers when and where to drive. Instead, the drivers bring their own personal vehicles, set their own hours, and decide where they will give rides on any given day.

Frustrated by decades of failure by public and private entities to offer reliable transportation options to individuals with disabilities, Plaintiffs want Lyft to fill this void and offer wheelchair assessible vehicles ("WAVs") on its platform.

But the Motion for Class Certification Plaintiffs filed has a fatal flaw: it does not identify any legal violation underlying their claim. In typical class actions brought under the Americans with Disabilities Act ("ADA"), the plaintiffs, in their motion for class certification, do not hesitate to identify the conduct they claim to be at the heart of their lawsuit. A plaintiff may thus allege that a restaurant violated building codes by failing to provide an accessible entrance or restroom, or that a government agency failed to offer auxiliary aids and services by not providing important benefit information in accessible formats to individuals with vision impairments. The plaintiffs do not hesitate to identify the specific ADA violation at the heart of their case, because they know without it, the court, in making its certification determination, cannot assess whether the harms allegedly suffered by the putative class are tethered to the claims being asserted by the named plaintiffs. *See, e.g., Parsons v. Ryan*, 754 F.3d 657, 678-9 (9th Cir. 2014).

Here, the lack of WAV service on Lyft's platform is not a violation of the ADA. Nothing in the ADA states that Lyft must modify its service or create a new service to accommodate individuals who use wheelchairs. The law is clear that the ADA does not dictate the content of the goods or services provided by a private entity. *See, e.g., Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 671 (9th Cir. 2010). Just as a bookstore does not have to carry Braille books, Lyft is free to operate its innovative ridesharing platform in the manner it was designed and conceived. The outcome does not change under the transportation provisions of ADA Title III: nothing in the statute or regulations requires a private entity, no

matter how successful, to bear the massive cost of on-demand WAV service. *See, e.g.*, *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006).

What the ADA does require is for Plaintiffs to identify the allegedly discriminatory policy or practice at issue, and identify how Lyft could have modified such policy or practice to prevent the discrimination from occurring. *Fortyune v. American Multi-Cinema, Inc.*, 364 F. 3d 1075, 1083 (9th Cir. 2004). The failure to reasonably modify a policy or practice is at the heart of the discrimination claim that Plaintiffs have set forth in their pleading (Compl. ¶¶ 83, 84, 96, 101), and Plaintiffs must, in some fashion, demonstrate the nature of the legal violation they claim resulted in the lack of WAV service. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011) (proof of commonality may overlap with merits contention that defendant engages in a pattern or practice of discrimination).

Plaintiffs have done none of these things, and this is the fatal flaw underlying their Motion for Class Certification. The legal framework of the ADA does not permit Plaintiffs' simplistic theory that the failure to provide WAV service constitutes discrimination for which they are entitled to seek the remedy of an "equivalent" WAV program. *See* 42 U.S.C. § 12184(b)(3). Unless they are able to identify the policy or practice they claim resulted in the alleged shortage of WAVs on the platform, this Court has no basis for concluding that Plaintiffs were harmed, or that Plaintiffs have complied with Rule 23 by satisfying the elements of numerosity, commonality, typicality, or the uniform injunction standard of Rule 23(b)(2).

Plaintiffs failed to satisfy the elements of Rule 23. The Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Lyft's Business.

Lyft operates a peer-to-peer marketplace for on-demand ridesharing through its popular mobile application ("app"). Declaration of Andrés Muñoz ("Muñoz Decl.") ¶ 2. Through the app, individual riders are connected to drivers who have elected to drive on the platform. *Id.*

All individuals – both drivers and riders – who participate in Lyft's platform must agree to the Lyft Terms of Service ("TOS"), which sets forth the general terms for use of the platform. Muñoz Decl. ¶ 3. The TOS includes an arbitration provision by which the majority of all legal

1    claims against Lyft by drivers and riders are subject to binding arbitration. *Id.*

2         **B.       Driving On The Lyft Platform.**

3         Lyft does not own, lease, or rent any of the vehicles used for ridesharing on the Lyft

4    platform. Instead, drivers who wish to drive on the Lyft platform bring their own personal

5    vehicles or rent vehicles from third party providers through Lyft's Express Drive Program.

6    Muñoz Decl. ¶ 5.

7         Different types of vehicles qualify for different "Modes" in the app, which in turn

8    correspond with different price points. *Id.* Generally, any driver with a vehicle with four or more

9    passenger seats may provide rides in the most affordable "Standard" or "Shared" Modes. Drivers

10   who bring a luxury or large vehicle onto the platform may qualify to provide rides in "Lux" or

11   "XL" Modes, with corresponding higher price points. *Id.* ¶ 6. Lyft typically does not recruit

12   drivers by the type of car they drive or by Mode. *Id.* ¶ 8. Lyft also does not set the hours of work

13   for any driver, nor does it tell drivers where to drive or for how long. *Id.* ¶ 9.

14        What Lyft does do is deploy certain monetary incentives in an effort to influence driver

15   behavior. *Id.* One example of such an incentive is "Ride Challenge," which rewards drivers if

16   they complete a certain number of rides within a set amount of time. *Id.* Another is "Personal

17   Power Zones," which offers drivers monetary incentives so that they will offer rides in a "high-

18   demand" area. *Id.* But no driver is required to accept any form of incentive. Rather, drivers are

19   free to make their own decisions as to when and where they wish to drive. *Id.*

20        **C.       Riding On The Lyft Platform.**

21        Riders who use Lyft in San Francisco, Alameda, and Contra Costa Counties (the "Bay

22   Area Counties") are generally able to select from different Modes, such as "Standard," "Shared,"

23   "Lux," or "XL." But not all modes are available in all areas at all times. *Id.* ¶ 8. Critically, the

24   availability and response time for any Mode of service in a given area is a direct function of

25   dynamic supply and demand. Muñoz Decl. ¶ 10. Lyft does not and cannot control how many

26   drivers sign up to drive with a particular vehicle in a particular area, or how many passengers

27   request a particular ride type in a particular area. This leads to different wait times and mode

28   availability in different areas. For example, the average estimated time of arrival in San Francisco

1    is likely to be shorter than the average estimated time of arrival in most areas of Alameda and

2    Contra Costa Counties. *Id.* ¶ 12. The ability to request "Lux" or "XL," or even "Shared," service

3    depends on driver availability in that geographic area. In contrast to San Francisco County (46.87

4    square miles in size, with a population of 17,179 per square mile), Alameda and Contra Costa

5    Counties cover land areas of 739 square miles (2,043 people per square mile) and 761 square

6    miles (1,465 people per square mile), respectively, and the geographic areas covered include

7    urban, suburban, and rural areas.[1] Especially in less densely populated or remote areas of

8    Alameda or Contra Costa Counties, riders may not be able to select a certain Mode of their choice

9    and/or may face a lengthy wait for the ride, depending on the time of day or the supply of drivers

10   in the area at any given time. Muñoz Decl. ¶ 10.

11        **D.      Wheelchair Accessible Vehicles (WAVs).**

12        WAVs are typically vans or minivans that have been specially modified for wheelchairs

13   and adapted with special equipment, including a ramp or lift for the wheelchair that can be folded

14   inside the vehicle or removed when it is not in use, a lowered floor to accommodate the

15   equipment, and a securement device to keep the wheelchair in place when the vehicle is in

16   motion. *See e.g.*, Ayres Depo. [Ex. 1] at 34:15-35:11; Finn Depo. [Ex. 7] at 30:4-6; Giacopini

17   Depo. [Ex. 2] at 25:10-21; Hinze Depo. [Ex. 8] at 19:13-19.[2] WAVs are expensive, and they are

18   not readily available for purchase. They are typically specially-manufactured or adapted vehicles,

19   and new WAVs can cost over $50,000 per vehicle. *See, e.g.*, Ayres Depo. [Ex. 1] at 40:14-18;

20   Finn Depo. [Ex. 7] at 28:1-4, 29:23-30:1. Because they are larger and heavier vehicles, WAVs

21   cost more to operate. For example, insurance and fuel costs are higher for WAVs than regular

22   vehicles. *See* Cal. Pub. Util. Code § 5440(f) (describing the high costs of operation and

23   maintenance of WAVs).

24   _____

25        [1] *See* U.S. Census QuickFacts: Contra Costa County, California; Alameda County,
     California; San Francisco County, California, available at: https://www.census.gov/quickfacts/
26   fact/table/contracostacountycalifornia,alamedacountycalifornia,sanfranciscocountycalifornia/PST
     045218.

27        [2] All deposition testimony excerpts cited in this brief are attached to the Declaration of
     Jiyun Cameron Lee in Support of Lyft's Opposition to Plaintiffs' Motion for Class Certification
28   as Exhibits 1 to 8.

DEFENDANT LYFT, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:19-CV-01438-WHA

Lyft does not know how many WAVs are out on the road, and neither do Plaintiffs. With very rare exceptions, the only individuals who own a personal WAV are those with disabilities or family members of those with disabilities. *See* Ayres Depo. [Ex. 1] at 45:25-46:3; Bittner Depo. [Ex. 3] at 38:6-9; Finn Depo. [Ex. 7] at 33:15-34:6; Giacopini Depo. [Ex. 2] at 38:21-39:8; Hinze Depo. [Ex. 8] at 26:12-16; Smith Depo. [Ex. 5] at 21:14-19. While the exact number of WAVs is not known, Ms. Hinze, whose role at organizational plaintiff Independent Living Resource Center San Francisco ("ILRC") includes transportation advocacy, has discussed with colleagues "how few [WAVs] there are in the community." Hinze Depo. [Ex. 8] at 28:8-9, 30:19. Plaintiffs also have no reliable evidence of how many WAV owners may want to drive on the Lyft platform. Plaintiffs could only identify just three people who ever expressed an interest in driving a WAV for a ridesharing platform such as Lyft or Uber, and just one with any concrete intention (a person who already drives for Uber). Ayres Depo. [Ex. 1] at 47:15-48:8; Bittner Depo. [Ex. 3] at 41:3-42:6; Finn Depo. [Ex. 7] at 37:25-38:2; Fuller Depo. [Ex. 6] at 30:19-21; Giacopini Depo. [Ex. 2] at 40:21-41:25; Hinze Depo. [Ex. 8] at 27:17-19; Nieves Depo. [Ex. 4] at 23:1-24:6; Smith Depo. [Ex. 5] at 23:14-17.

### E.   State And Local Requirements Regarding WAVs.

In recent years, several State and local jurisdictions have enacted laws or regulations aimed at increasing the availability of WAVs on ridesharing platforms. Two such jurisdictions are New York City and the State of California.

#### 1.   New York City.

In New York City, the Taxi and Limousine Commission ("TLC") issued regulations requiring Lyft, Uber, and other ridesharing companies (referred to as "High Volume For-Hire Services" in New York City) to offer WAV service. Among the TLC's requirements was that by June 2019, 60% of all WAV requests within the five boroughs (comprising total land area of approximately 302 square miles) must be met in less than 15 minutes. *See* New York City Taxi and Limousine Commission Rule Book § 59B-17(f)(3).

In order to comply with the TLC's mandate, Lyft entered into a number of contracts with third party companies who own WAVs. Pursuant to these contracts, the third party companies

provided the WAVs and drivers to be deployed on Lyft's platform. The cost to Lyft of this program is millions of dollars annually. Muñoz Decl. ¶ 18.

### 2. California.

In California, Lyft and Uber are categorized as transportation network companies ("TNCs") and regulated by the California Public Utilities Commission ("CPUC"). In 2018, the California Legislature passed SB 1376, the TNC Access For All Act (the "TNC Act"), with the support of TNCs, including Lyft and Uber. As the Legislature acknowledged in enacting the TNC Act, making WAVs available on TNC platforms is made difficult by the high cost of WAVs, among other reasons. Cal. Pub. Util. Code § 5440(f).

The TNC Act mandated the creation of the "TNC Access for All Fund" ("Access Fund"), which is funded by a 10-cent surcharge on every completed TNC trip originating in California. Lyft, Uber and other TNCs are responsible for collecting the surcharge and remitting it to the Access Fund. *See* Decision On Track 1 Issues: Transportation Network Company Trip Fee And Geographic Areas, Cal. Pub. Util. Comm. Rulemaking 19-02-012 (June 27, 2019), available at: http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M309/K524/309524812.PDF.

Rulemaking by the CPUC under the TNC Act is ongoing. Among the issues yet to be decided by the CPUC is the criteria by which Lyft and other TNCs may offset their required contribution to the Access Fund with amounts spent on providing WAV service.

### F. Lyft's SF WAV Pilot.

In July 2019, Lyft launched a WAV Pilot in San Francisco ("SF WAV Pilot").[3] Muñoz Decl. ¶ 16. The WAVs used in the SF WAV Pilot are five dedicated vehicles operated by First Transit, a third party transportation company. *Id.* Dedicated WAVs mean that these vehicles are reserved for the sole and exclusive use of wheelchair passengers. First Transit employs and trains all the drivers who drive the WAVs in the SF WAV Pilot. *Id.* WAV vehicles are owned by First Transit and available on the Lyft platform from 7 a.m. until midnight, seven days a week, for rides originating in San Francisco County and San Francisco International Airport only. *Id.*

---

[3] Lyft launched a similar WAV pilot program in Los Angeles for rides originating and ending in Los Angeles County.

1    The annualized cost to Lyft of the SF WAV Pilot is approximately $1.5 million. *Id.* Since

2    the pilot launched, the weekly ridership has not increased, averaging just 18 rides per week. The

3    average cost to Lyft of providing each ride is approximately $1,460. *Id.* ¶ 17. Each of the riders in

4    the pilot has accepted Lyft's TOS, including the arbitration provision, and thus would not be a

5    putative class member.

6         **G.     Plaintiffs Have Not Tried The SF WAV Pilot.**

7    None of the four individual Plaintiffs here, including Sascha Bittner, who lives in San

8    Francisco, has tried Lyft's SF WAV Pilot. Ayres Depo. [Ex. 1] at 63:8-17; Bittner Depo. [Ex. 3]

9    at 51:12-14; Fuller Depo. [Ex. 6] at 35:11-36:1; Smith Depo. [Ex. 5] at 28:18-25. None of the

10   four individual Plaintiffs or the four officers or directors of the two organizational Plaintiffs

11   deposed in connection with this Motion had much information regarding the SF WAV Pilot.

12   None of these eight individuals has spoken with anyone who tried the SF WAV Pilot. One

13   person, Ms. Hinze, did speak with someone whose friend tried the pilot and was able to get a

14   WAV vehicle in eight minutes. Hinze Depo. [Ex. 8] at 37:9-23. Another person, Ms. Bittner, saw

15   a social media post about an individual who tried the pilot whose ride was delayed (by how much

16   it was not clear), but has also heard that the average wait is under 30 minutes. Bittner Depo. [Ex.

17   3] at 46:12-47:5, 51:21-52:1. Although Plaintiffs variously asserted that five vehicles are not

18   enough for the SF WAV Pilot, they had no specific knowledge about why that could be so. Ayres

19   Depo. [Ex. 1] at 64:5-10; Bittner Depo. [Ex. 3] at 51:12-53:6; Finn Depo. [Ex. 7] at 49:10-21;

20   Hinze Depo. [Ex. 8] at 41:17-42:12; Smith Depo. [Ex. 5] at 29:9-19.

21   When asked, the deponents who use WAVs identified a number of different reasons for

22   why they personally had not tried the SF WAV Pilot. Plaintiff Tara Ayres, a regular visitor to San

23   Francisco, said she had not downloaded the Lyft app or tried the SF WAV Pilot because the

24   WAV pilot was not available in the East Bay, and because she understood downloading the Lyft

25   app would interfere with her ability to continue being a plaintiff in this litigation. Ayres Depo.

26   [Ex. 1] at 64:22-65:11. Plaintiff Sascha Bittner does not own a smartphone. Bittner Depo. [Ex. 3]

27   at 38:10-11. Even though she lives in San Francisco, she has no plan to try Lyft's WAV service

28   until Lyft offers 24-hour service, with 15-minute response times for WAV users. *Id.* at 51:16-20,

57:8-11. Plaintiff Judith Smith, another regular visitor of San Francisco, likewise has not tried Lyft's SF WAV Pilot, and would not until it offered 15-20 minute response times – the test for what she considers "reliable." Smith Depo. [Ex. 5] at 29:20-23. Plaintiff Julie Fuller is somewhat differently situated than the other individual plaintiffs in that she is able to walk short distances and regularly uses standard, non-WAV, vehicles. Fuller Depo. [Ex. 6] at 27:7-17. Ms. Fuller is not sure she would use Lyft's services at all unless Lyft agreed the car would be "scent-free." *Id.* at 28:12-29:10. One of the reasons she has not tried Lyft is because she understands it would interfere with her ability to continue this litigation. *Id.*at 43:1-11. Dorene Giacopini, President of the Board of Directors of organizational plaintiff Community Resources for Independent Living ("CRIL"), has not tried the SF WAV Pilot because she uses Uber and is familiar with Uber's service. Giacopini Depo. [Ex. 2] at 75:24-76:3. Chris Finn, a member of the Board of Directors of CRIL, rarely travels with his smartphone, and is not sure he could use the Lyft app. Finn Depo. [Ex. 7] at 35:23-36:14, 37:13-24, 49:22-50:8. Many "variables," such as cost, would influence whether he would download and use Lyft. *Id.* at 49:22-50:8, 55:7-12. Fiona Hinze, Director of System Change at ILRC, has also not tried Lyft's SF WAV Pilot despite living and working in San Francisco. Hinze Depo. [Ex. 8] at 38:17. Ms. Hinze testified she would use Lyft's service only when it offered "equivalent service," meaning the same response time as service by a non-WAV vehicle at a specific time in a specific area. *Id.* at 38:19-24, 40:6-10, 43:22-44:18.

### H.     Lyft's Plan For A New Three-County Pilot.

Lyft is investigating potential paths to see if it can reduce the staggering cost of WAVs. Muñoz Decl. ¶ 19. To that end, Lyft intends to launch a new pilot in the first quarter of 2020 in Alameda, Contra Costa, and San Francisco Counties (the "Three-County Pilot"). *Id.* For this pilot, a third party rental company would offer up to 65 WAVs for rental to interested Lyft drivers to provide WAV rides in the three Bay Area Counties. *Id.* Lyft plans to heavily subsidize the rental cost of these vehicles so that interested drivers can rent them at the same rate as if they were renting a Toyota Corolla or Prius that could be used in the "Standard" Mode. *Id.* at ¶ 20.

Whether the Three-County Pilot will succeed is not known. The success of the program will depend, in large part, on whether there is sufficient interest in the community of drivers to

rent WAVs and drive them on the Lyft platform, and whether the supply of interested drivers can be maintained over the long-term. *Id.*

### III.   ARGUMENT

**A.   The Premise Of Plaintiffs' Motion And Class Definition – That Lyft Discriminates By Failing To Provide WAV Service – Is Contrary To The ADA's Legal Framework.**

Central to the Court's consideration of Plaintiffs' Motion is the legal framework of the ADA, the statute underlying Plaintiffs' claim. *See B.K. v. Snyder*, 922 F.3d 957, 975-76 (9th Cir. 2019) (vacating certification of the Medicaid subclass because it was based on a misconception of the applicable legal framework).

The basic premise underlying Plaintiffs' Motion is that the ADA requires Lyft to provide "equivalent access" to its on-demand service to individuals who need WAVs. *See, e.g.,* Motion at 1:3-8. Plaintiffs' theory is that Lyft discriminates by failing to provide WAV service on an equivalent basis as it provides its standard ridesharing service. Plaintiffs frame their proposed class definition to encompass a class of individuals in the Bay Area Counties who are allegedly "deterred from using Lyft's transportation service due to Lyft's failure to provide equivalent transportation services for WAV users." *Id.* at 14:20-21.

The problem with Plaintiffs' theory of discrimination is that nothing in the ADA states a private entity violates the law unless it offers its goods or services on an equivalent basis to individuals with disabilities. To the contrary, the law is the exact opposite: the ADA specifically exempts private entities from having to acquire WAVs for its transportation service, *see, e.g.*, *Toomer*, 443 F.3d at 1195, and further states that no private entity is required to provide specialized goods or services to individuals with disabilities, *see, e.g.*, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000).

More specifically, as discussed below, Plaintiffs' theory of discrimination as presented in their Motion is contrary to the legal framework of the ADA in at least four ways: (1) the ADA does not require private entities to acquire WAVs; (2) the ADA does not require private entities to provide "equivalent service"; (3) the ADA does not regulate the content of goods or services offered by a private entity, but; (4) the ADA does require Plaintiffs to identify the allegedly

1    discriminatory "policy or practice" for purposes of class certification.

2                    **1.       The ADA Does Not Require Private Entities To Acquire WAVs.**

3          Title III of the ADA applies to a private entity that is engaged in providing "specified

4    public transportation services" or operates a place of public accommodation.[4] *See* 42 U.S.C.

5    §§ 12181, *et seq.* Sections 12184-12186 of Title III apply to transportation service providers, and

6    Sections 12182-12183 apply to public accommodations.

7          The provisions of Title III that apply to transportation service providers make clear that

8    when private entities acquire vehicles, they need not acquire WAVs except in limited

9    circumstances. *See* 42 U.S.C. § 12184(b)(3)-(7). Notably, the acquisition of a new automobile

10   (*e.g.,* passenger sedans) or a van with seating capacity of less than 8 passengers for use in a

11   "demand responsive" system (*e.g.,* a taxi service) specifically does not trigger the duty to

12   purchase a WAV. *Id.* § 12184(b)(3).

13         The Department of Transportation ("DOT"), which Congress entrusted to issue

14   regulations to carry out the goals of the ADA (*id.* § 12186(a)(1)), confirmed Congress's intent as

15   follows: "Under the ADA, *no private entity is required to purchase an accessible automobile.*" 49

16   C.F.R. Pt. 37, App'x D (emphasis added). "Discrimination" occurs *not* when an entity fails to

17   provide accessible service, but when an entity denies an individual with a disability "the

18   opportunity to use the entity's transportation service for the general public, *if the individual is*

19   *capable of using that service.*" 49 C.F.R. § 37.5(b) (emphasis added); *see also* 49 C.F.R.

20   § 37.29(b) ("Providers of taxi service are not required to purchase or lease accessible

21   automobiles."). Courts have affirmed Congress's intent, holding that "a taxi fleet consisting

22   entirely of non-accessible vehicles would be in accord with the ADA." *Toomer*, 443 F.3d at 1195*;*

23   *accord Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 72 (2d Cir. 2012).

24              [4] While Lyft does not concede the issue, if Title III applies here, it applies because Lyft
25   provides "specified public transportation services" under the statute. Lyft denies it is a public
     accommodation because it does not fit the definition of "public accommodation," which is limited
26   to "actual, physical places" under binding Ninth Circuit precedent. *Weyer,* 198 F.3d at 1114; *see*
     *also Namisnak v. Uber Techs.*, No. 17-CV-060124-RS, 2018 U.S. Dist. LEXIS 221054, at *10
27   (N.D. Cal. Oct. 3, 2018) (finding that Uber's transportation service is not a place of public
28   accommodation under the ADA).

Nothing in the statute, the regulations, or case law interpreting the ADA requires a private entity to purchase or lease WAVs in order to comply with the ADA.

> **2.    The ADA Does Not Require Private Entities To Provide "Equivalent Service" Except In Certain Circumstances That Do Not Apply To Lyft's Rideshare Platform.**

Title III of the ADA also contradicts the second premise underlying Plaintiffs' Motion and proposed class definition, which is that Lyft must provide "equivalent transportation service."

As a preliminary matter, the phrase "equivalent transportation service" may mean different things to different people, including, potentially, to members of the putative class. *See infra* Part II.G. Despite the prominence of the notion of "equivalent service" in their class definition, Plaintiffs make no effort to explain what they mean, even though it is their burden to do so.

One possible reason why Plaintiffs do not define the phrase "equivalent service" may be that the phrase has a special meaning under the ADA and is triggered in limited circumstances. As set forth in DOT regulations, "equivalent service" means service made available to individuals with disabilities on a basis that is on par with service that is provided to the general public when measured by characteristics such as schedule, response time, geographic scope, hours of operations, and fares. *See* 49 C.F.R. § 37.105.

For private entities who are primarily engaged in providing specified public transportation services, the "equivalent service" standard is triggered if they acquire a vehicle that is *not* accessible in situations when they are otherwise required to acquire a WAV. *See* 42 U.S.C. § 12184(b)(3); 49 C.F.R. § 37.103(c). If, for example, a taxi company acquires a large vehicle with seating capacity of 16, then the taxi company would have to purchase a WAV. If it elects not to acquire a WAV, however, the taxi company would have to make sure that it was otherwise compliant with the equivalent service standard. 49 C.F.R. §§ 37.29(b), 37.103(c) and (d). The "equivalent service" standard can also be triggered when a public accommodation that is *not* primarily engaged in providing specified public transportation services – such as a hotel – offers complimentary shuttle service. In that situation, the hotel must ensure that the service they provide offers "equivalent service" to their customers who require service by WAVs. *See* 42

U.S.C. §§ 12182(b)(2)(B) and (C); 49 C.F.R. § 37.171.

Here, Lyft does not own any of the vehicles that are driven on its platform. Because Lyft does not acquire any vehicles, the "equivalent service" standard does not apply.

### 3. The ADA Does Not Require Private Entities To Provide Specialized Goods Or Services For Use By Persons With Disabilities.

Just as Congress deemed it permissible for a private transportation provider to provide services using non-WAV automobiles only, Congress also made it clear, in enacting the ADA, that the statute would not require private entities to change the goods or services they offer.

As the Ninth Circuit explained, "Title III prohibits discrimination in the enjoyment of 'the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" *Weyer*, 198 F.3d at 1115. This means "whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of *those* goods and services." *Id.* (emphasis added). Put another way, the ADA "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." *Id.* For example, "a bookstore cannot discriminate against disabled people in granting access, but need not assure that the books are available in Braille as well as print. '[L]ikewise, an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the non-disabled.'" *Id.* (citation omitted); s*ee also Goddard*, 603 F.3d at 671; *Doe v. Mut. Of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999) ("The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated."); *Schulz v. Bay Area Motivate, LLC*, No. 19-cv-02134-MMC, 2019 U.S. Dist. LEXIS 209256, *18-19 (N.D. Cal. 2019) (bikeshare program is not required to alter its inventory to stock types of bicycles it does not presently offer for rent); 28 C.F.R. § 36.307 (no need to alter inventory "to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities.").

The plain language of the statute, regulations, and decades of case law thus confirm that under the ADA, there is nothing inherently unlawful about the fact that Lyft offers services that are not accessible to individuals with disabilities to the same extent as individuals without

disabilities. After all, the foundation of Lyft's business is supply and demand: a supply of drivers who join the platform to meet the demand by riders. Nothing in the ADA requires Lyft to create a new service or program by artificially creating or expanding the supply of WAVs and putting them on the platform.

### 4. The ADA Does Require Plaintiffs To Identify Specific Policies Or Practices They Claim Are Causing Them Harm.

Since nothing in the ADA requires Lyft to provide equivalent service to WAV users, the only way a proper class may be fashioned is by reference to the elements of the claim Plaintiffs have pled under the ADA. The theory Plaintiffs have set forth in their pleading is that Lyft discriminates by failing to adopt certain "reasonable modifications" to its "policies, practices, or procedures." Compl. ¶¶ 83, 84, 96, 101; Motion at 4:2-3, 6:15-16.

Sections 12182(b)(2)(A)(ii) and 12184(b)(2)(A) define "discrimination" to include:

> a failure to make *reasonable* modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would *fundamentally alter* the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).[5]

The elements of a claim of discrimination under Section 12182(b)(2)(A)(ii) are: (1) that Plaintiffs are disabled; (2) Lyft is a private entity subject to the ADA; (3) Lyft employs a discriminatory policy or practice; and (4) Lyft discriminated against Plaintiffs by (a) failing to make a reasonable modification of the policy or practice that was (b) necessary to accommodate the plaintiff's disability. *Fortyune*, 364 F. 3d at 1083 (citations omitted). The ADA thus demands

---

[5] In their Motion, Plaintiffs also reference 42 U.S.C. § 12182(b)(2)(A)(iii). *See* Mot. At 4:5. That subsection relates to the failure to offer auxiliary aids and services, which is not at issue here. As the Department of Justice has made clear, "auxiliary aids and services are those aids and services required to provide effective communications." 28 C.F.R. Part 36, Appendix C (1991). Section-by-Section Analysis at Section 36.303. WAVs most certainly do not fall in this category. *See also* 28 C.F.R. § 36.303(b) (defining "auxiliary aids and services" to include qualified interpreters, transcription services, assistive listening devices, audio recordings, Brailled materials, and screen reader software).

1  that Plaintiffs identify the allegedly discriminatory policy or practice that has resulted in the lack

2  of equivalent WAV service.

3       But in their class definition and Motion, Plaintiffs make no reference whatsoever to any

4  policy or practice that could be modified to offer them WAV service. This is clearly inadequate:

5  as the Supreme Court has stated, Rule 23 sets forth more than "a mere pleading standard." *Dukes*,

6  564 U.S. at 350. In ADA class actions, plaintiffs must, through their allegations and evidence,

7  come forward with a factual basis upon which the courts are able to assess the specific policies or

8  practices that were being claimed at the class certification stage. *See, e.g.*, *Shields v. Walt Disney

9  Parks & Resorts US, Inc.*, 279 F.R.D. 529, 540 (C.D. Cal. 2011) (identifying 10 classes of

10  visually impaired individuals who suffered harm as a result of specific policies or practices at

11  Disney parks and resorts); *Am. Council of the Blind v. Astrue*, No. C-05-04694-WHA, 2008 U.S.

12  Dist. LEXIS 123376 (N.D. Cal. September 11, 2008) (plaintiffs sought to require SSA to provide

13  benefits information in five accessible formats; granting class certification in part and narrowing

14  the class definition to cover only those programs for which plaintiffs sought to compel action).

15       The framework of the ADA demands Plaintiff to do more than simply assert a class that is

16  premised on the alleged failure to provide "equivalent service," because nothing in the ADA

17  requires Lyft to offer an "equivalent" WAV service. What Plaintiffs must do instead is identify

18  the factual bases for their theory of discrimination, including identifying the specific policies or

19  procedures, the modification of which they contend will lead to an equivalent WAV service

20  across the entire putative class. *See B.K.*, 922 F.3d at 975-76 ("without further findings on the

21  policies or practices that caused" the alleged failure to provide adequate services, it is not clear

22  whether the failures caused the same deprivations across the whole subclass).

23       The very foundation of Plaintiffs' class definition is at odds with the language of the ADA

24  and the claim they have pled. The Court should deny the Motion.

25       **B.     By Failing To Identify Any Specific Policy Or Procedure To Be Modified,
26             Named Plaintiffs Have Failed To Establish Standing.**

27       Plaintiffs' failure to identify the elements of their ADA claim, in addition to making it

28  impossible to fashion a class, makes it impossible for this Court to determine whether the four

named Plaintiffs have standing to pursue injunctive relief on behalf of any class.

To seek injunctive relief on behalf of a class, the named Plaintiffs must establish "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling," *B.K.,* 922 F.3d at 966, as well as "a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc); *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). In a proposed class action such as this, questions relating to the named Plaintiffs' standing and entitlement to equitable relief, the propriety of class certification, and the availability of systemwide relief will often overlap. *See Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001). "Although these inquiries may intersect, standing and entitlement to equitable relief are threshold jurisdictional requirements that must be satisfied prior to class certification." *Stevens v. Harper*, 213 F.R.D. 358, 366 (E.D. Cal. 2002), citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000).

At the class certification stage, Plaintiffs' burden to establish standing is an evidentiary one. *Evans v. Linden Research, Inc.*, No. C 11-01078 DMR, 2012 U.S. Dist. LEXIS 166006, at *17 (N.D. Cal. Nov. 20, 2012) (at class certification, plaintiffs must "demonstrate, not merely allege" that they have Article III standing to bring the claims asserted on behalf of the class); *see also San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) ("plaintiffs bear the burden of establishing their standing to sue . . . because plaintiffs seek declaratory and injunctive relief only, there is a further requirement that they show a very significant possibility of future harm"); *Nelsen v. King Cnty.*, 895 F.2d 1248, 1249-50 (9th Cir. 1990) ("Standing is a jurisdictional element that must be satisfied prior to class certification.") (citation and quotation marks omitted). Because plaintiffs "must demonstrate standing separately for each form of relief sought," the named Plaintiffs must establish imminent injury traceable to each separate Lyft policy or practice that they seek to modify or enjoin. *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 185 (2000); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("standing is not dispensed in gross" and is limited to the injury shown).

But here, Plaintiffs have failed to identify any actual "policy or practice" which, if modified, would eliminate the allegedly discriminatory condition. *See Chapman*, 631 F. 3d at 947

1    (the "standing analysis must focus on the nature and source of [the plaintiff's] claim –

2    discrimination *as defined by the ADA*") (emphasis added). While Plaintiffs make a reference to

3    Lyft's driver and rider incentive programs (*see* Motion at 7-8), they make no attempt to show how

4    a change to any incentive program would bring about the change they want, which is the

5    provision of "adequate or equivalent WAV service in the Bay Area." *Id.* at 8:5. Plaintiffs'

6    references to the scale of Lyft's network, "machine learning algorithms," and "data insights" (*id.*

7    at 7) similarly fail to explain how Lyft could enact necessary changes to any policy or practice to

8    make WAVs appear on Lyft's platform in sufficient numbers to ensure Plaintiffs' concept of

9    "equivalent service," or whether the change in policy would result in the appearance of a

10   sufficient number of WAVs to cover (never mind provide "equivalent service" throughout) the

11   entire 1,500 square mile area at issue. Plaintiffs thus "fail to link their injuries to any particular

12   policies or practices or allege that they will be directly affected by these policies or practices in

13   the future."[6] *Stevens*, 213 F.R.D. at 368; *Chapman*, 631 F. 3d 939.

14          This paucity of evidence (or even any factual allegations) stands in sharp contrast to other

15   class actions seeking systemic relief. In *Armstrong*, plaintiffs provided "overwhelming" evidence

16   of repeated violations to themselves and other class members via specific board policies and long-

17   standing practices. 275 F.3d at 864; *see also B.K.*, 922 F.3d at 967 (plaintiff presented evidence of

18   lack of adequate medical care and of statewide policies and practices exposing her to a risk of

19   similar future harms). By contrast, here, Plaintiffs have not shown how the injuries they suffered

20

21          [6] Lyft reserves its right to challenge other elements of standing, including Plaintiffs'
     deterrence theory of harm, at a later date. Plaintiffs here invoke the "deterrent effect doctrine" to
22   establish an injury in fact. *Chapman*, 631 F.3d at 946. To establish an injury under this theory, a
     plaintiff must demonstrate that it was the discriminatory condition that deterred her from
23   returning to an allegedly non-compliant accommodation. *Pickern v. Holiday Quality Foods*, 293
     F.3d 1133, 1137 (9th Cir. 2002). Here, two Plaintiffs, Ms. Ayres and Ms. Fuller, testified that it is
24   not the lack of WAV access, but the desire to participate in this litigation, that has kept them from
     using Lyft's services. Ayres Depo.[Ex. 1] at 65:6-11; Fuller Depo.[Ex. 6] at 43:5-19. Ms. Fuller
25   also testified that she has not used a taxi since childhood due to an incident with a driver, and has
     not downloaded the Lyft app in part because she is not sure she would understand how to use it.
26   Fuller Depo.[Ex. 6] at 28:12-29:10, 38:5-18. These are examples of testimony that raise serious
     questions as to whether Plaintiffs have been deterred from using Lyft's service because of Lyft's
27   alleged non-compliance with the ADA.

28

1    in the past can "fairly be traced" to Lyft's policies or practices to support injunctive relief. *La*

2    *Duke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985). Plaintiffs have failed to establish standing.

3    **C.    Plaintiffs Have Failed To Demonstrate That Common Issues Will Drive This Litigation.**

4

5    Plaintiffs' failure to identify any "policy or practice" allegedly causing the lack of WAVs

6    on the Lyft platform also dooms a finding of commonality under Rule 23(a)(2).

7    "In this case, as in all class actions, commonality cannot be determined without a precise

8    understanding of the nature of the underlying claims." *Parsons*, 754 F.3d at 676. To assess

9    whether the putative class members share a common question, the Court must identify and

10   examine the elements of Plaintiffs' case-in-chief. *Id.* (citing *Stockwell v. City & Cty. of San*

11   *Francisco,* 749 F.3d 1107, 1114 (9th Cir. 2014)). As noted above in Part III.A.4, the relevant

12   elements of Plaintiffs' ADA claim are that (1) Lyft employed a discriminatory policy or practice,

13   and (2) Lyft discriminated against Plaintiffs by failing to make a requested reasonable

14   modification to its policy or practice that was necessary to accommodate Plaintiffs' disability.

15   *Fortyune*, 364 F. 3d at 1083.

16   Here, Plaintiffs have not only failed to submit any evidence of a discriminatory policy or

17   practice they allege should be modified, they fail to even identify such a policy or practice.

18   Instead, Plaintiffs contend "[c]ommon questions of fact include, among others, whether

19   reasonable modifications can be made to Lyft's *programs* so that Lyft could offer on-demand

20   ridesharing service using WAVs." Motion, 17:1-2 (emphasis added). There are at least five major

21   problems with Plaintiffs' contention.

22   *First*, under the legal framework of the ADA, Plaintiffs have no basis for seeking a change

23   to Lyft's *programs*. As discussed in detail in Part III.A above, like other private entities, Lyft is

24   entitled to offer the program or service it offers, even if the program or service is not accessible or

25   usable by everyone. Absent some legal authority that Plaintiffs may compel the creation of a new

26   program or service under the ADA, Plaintiffs cannot satisfy commonality.

27   *Second*, at this class certification stage, Plaintiffs must identify the allegedly

28   discriminatory policy or practice that they claim is subject to reasonable modification. *Parsons*,

754 F.3d at 676. "[U]tterly threadbare allegations that a group is exposed to illegal policies and practices" are not enough to confer commonality. *Parsons*, 754 F.3d at 683. *See also DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013) (commonality not shown where class action had not identified "a single policy or practice that bridges all their claims"); *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr. ("CREEC")*, 867 F.3d 1093, 1104 (9th Cir. 2017) (allegations of an unwritten, de facto policy of non-compliance insufficient to support class certification).

Third, Plaintiffs cannot simply claim to be harmed by Lyft's failure to offer WAV service because the "failure to offer WAV service" is not, standing alone, discrimination under the ADA. "[M]erely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient." *CREEC*, 867 F.3d at 1104, *citing Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2011). Because Plaintiffs have not identified any specific policy or procedure to be modified, this Court has no basis on which it could examine whether the lack of WAV service on the Lyft platform resulted from such policy or procedure.

Fourth, that Lyft offers a robust WAV program in New York City as a result of the TLC regulations, or even that Lyft offers other WAV programs in certain cities, including San Francisco, is irrelevant to assessing commonality.[7] Those WAV programs, whether they were undertaken voluntarily or involuntarily by Lyft, do not change the ADA's requirements, nor do they result in the imposition on Lyft of a greater duty than that the ADA otherwise imposes. *See, e.g.*, *Atencio v. United States Postal Serv.*, 198 F. Supp. 3d 340, 360 (S.D.N.Y. 2016) ("providing

---

[7] It is worth noting that in each instance, Lyft has been able to offer a WAV program only by creating an inorganic supply of WAV drivers that did not previously exist, at the cost of millions of dollars. Nothing in the ADA requires Lyft to create a supply of WAV drivers where none exists. Requiring a private entity to create a supply of drivers is not a modification of a policy or practice, nor is it a "reasonable" one. *See, e.g.*, 28 C.F.R. Part 36, Appendix C (Section 36.302 Modifications in Policies, Practices, or Procedures) (while the ADA mandates accessibility to a bookstore, it "would not require a bookstore to stock Brailled books or order Brailled books, if it does not do so in the normal course of its business"). Moreover, requiring Lyft to create a supply of WAV drivers is a fundamental alteration of Lyft's business that is not required under the ADA. *See, e.g.*, 49 C.F.R. Part 37, Appendix E (describing requests for special equipment or dedicated vehicles as fundamental alteration).

an accommodation that goes above and beyond what the Act requires does not subject an employer to liability when it discontinues such accommodation, or constitute an admission that the accommodation is reasonable as defined by the Act."); *O'Byrne v. Reed*, No. CV 09-08406 DMG (DTBx), 2010 U.S. Dist. LEXIS 153617, at \*16 (C.D. Cal. Feb. 5, 2010) (when an entity "voluntarily goes beyond its statutory duty" under the ADA with respect to one service, it does not create a parallel obligation with respect to another). To hold otherwise would indeed create perverse incentives, as no private company, including Lyft, would ever voluntarily engage in pilot programs to see if they could improve services to individuals with disabilities.

*Fifth*, because Plaintiffs have not identified any specific policy or procedure, this Court has no basis on which to assess whether the putative class members across the three Bay Area Counties were impacted the same way. The availability of Lyft service and the response time depend on availability of drivers, which in turn, is affected by factors such as demand for rides, geographic location, and population density. Muñoz Decl. ¶¶ 10-12. Getting a ride within mere minutes is much easier in densely populated areas of San Francisco, than in sparsely populated or rural areas of Alameda or Contra Costa Counties. *See id*. Plaintiffs have given this Court no basis to determine that modifying a policy or procedure will impact all putative members in the same way across the approximately 1,500 square mile area that comprises the Bay Area Counties. Plaintiffs have failed to demonstrate commonality.

### D.    Plaintiffs Have Not Shown Their Claims Are Typical Of The Claims Of Absent Class Members.

Under Rule 23(a)(3), the "test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons*, 754 F.3d at 685 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Here, Plaintiffs have not identified any "course of conduct" by Lyft other than that it does not offer WAV service. This is in stark contrast to plaintiffs in other class actions, who support their motions with data, deposition testimony, expert reports, and other evidence demonstrating that putative class members are those who will be harmed by the defendants' conduct. *See, e.g.*,

1    *B.K.*, 922 F.3d at 970. The failure to identify a course of conduct makes it impossible to assess

2    typicality.

3           Another barrier to showing typicality is that Lyft has offered WAV service in San

4    Francisco since July 2019. The Court cannot conclude named plaintiff Sascha Bittner, a San

5    Francisco resident who has deliberately chosen not to take part in the SF WAV Pilot because she

6    believes Lyft should offer 24-hour WAV service with 15 minute response times, has been injured

7    in the same way as a putative class member living in Tracy, California. *See Armstrong*, 275 F.3d

8    at 869 (the typicality inquiry involves comparing the injury of the named plaintiff with those of

9    unnamed class members). Typicality has not been satisfied.

10          **E.      Plaintiffs Fail To Meet The Requirements Of Rule 23(b)(2).**

11          Rule 23(b)(2) provides for class certification only when a single injunction or declaratory

12   judgment would provide relief to each member of the class. *Dukes*, 564 U.S. at 360. Although

13   Plaintiffs need not "specify the precise injunctive relief they will ultimately seek at the class

14   certification stage," *B.K.*, 922 F.3d at 972, they must nonetheless provide the "general contours of

15   an injunction that would provide relief to the whole class." *Id.* (citations omitted). This injunction

16   must be more "specific than a bare injunction to follow the law." *Id.* (citations omitted).

17          Even if a single injunction could be deemed appropriate across all three Bay Area

18   Counties in light of Lyft's SF WAV Pilot, Plaintiffs offer no guidelines or contours for any

19   "reasonable modification" to Lyft's policies or practices that would result in the "equivalent"

20   class-wide service they seek. *Cf. Parsons*, 754 F.3d at 687 (granting Rule 23(b)(2) class

21   certification where plaintiffs introduced four expert reports explaining the specific policies that

22   were deficient, with descriptions of court-ordered policy remedies that could alleviate the alleged

23   violations). For example, Plaintiffs have put forth no evidence of a common discriminatory policy

24   (*e.g.*, that Lyft discourages WAV drivers from joining Lyft's platform), or even that there is a

25   supply of Bay Area WAV drivers who could be incentivized to join Lyft's platform in sufficient

26   numbers to provide "equivalent" service. *Cf. Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,

27   317 F.R.D. 91, 105 (N.D. Cal. 2016) (denying class certification where plaintiffs' suggestion that

28   the court could "issue an injunction requiring [defendant] to comply with the ADA" was nothing

1    more "a bare injunction to follow the law"), *affirmed on other grounds*, 867 F.3d 1093 (9th Cir.

2    2017); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (denying class

3    certification where appellants sought "mutually affordable health care," but failed "to identify any

4    way to determine what a reasonable or 'mutually affordable' rate is); *Castaneda v. Burger King*

5    *Corp.*, 264 F.R.D. 557, 566 (N.D. Cal. 2009) (denying certification of a 92-store class because

6    injunctive relief is only appropriate as to those stores where there are statutory violations).

7         Because Plaintiffs have failed to meet their burden of describing even the "general

8    contours" of an injunction that would constitute a reasonable modification under the ADA, a Rule

9    23(b)(2) class should not be certified.

10        **F.     Plaintiffs Fail To Satisfy The Requirement Of Numerosity.**

11        As in the case of the other Rule 23 elements discussed above, Plaintiffs' failure to identify

12   an allegedly discriminatory policy or practice to be modified renders it impossible for Lyft or the

13   Court to evaluate whether the requirement of numerosity has been met as to each class or

14   subclass. But even if the class definition proposed by Plaintiffs in their Motion is accepted at face

15   value, Plaintiffs have failed to demonstrate numerosity under Rule 23(a)(1).

16        Plaintiffs define their proposed class as individuals in the Bay Area Counties who (1) need

17   WAVs for transportation, (2) are deterred from using Lyft due to Lyft's failure to provide

18   "equivalent transportation services for WAV users," and (3) have not downloaded the Lyft app.

19   Plaintiffs dedicate just one paragraph and footnote of their Motion to demonstrating their factual

20   bases for numerosity (Motion at 15:22-16:3 and n.2), and ask the Court to assume, based on

21   Census data regarding an estimated number of wheelchair users, that the size of the proposed

22   class must far exceed any relevant numerical threshold. This is inadequate.

23        The Census data cited by Plaintiffs fail to account for the many reasons why an individual

24   WAV user may be deterred from using Lyft. Among the myriad reasons include the following:

25   (1) the individual may have limited income, and thus has a limited budget for transportation

26   (Fuller Depo. [Ex. 6] at 34:14-22; Finn Depo. [Ex. 7] at 38:18-22, 41:16-42:1); (2) she may not

27   be able to travel outside her home independently due to her disabilities; (3) she may not own a

28   smartphone (Bittner Depo. [Ex. 3] at 38:10-11; Finn Depo. [Ex. 7] at 48:16-21); (4) she may not

1    be comfortable with technology (Fuller Depo. [Ex. 6] at 38:9-12); (5) she may not like the idea of

2    engaging in financial transactions, such as paying for Lyft rides, by using the app; (6) she may be

3    using Uber's WAV service and is comfortable with that service (Giacopini Depo. [Ex. 2] at

4    75:24-76:3); (7) she may prefer paratransit, public transit, or other services available to her at a

5    reduced price (Hinze Depo. [Ex. 8] at 15:13-16, 17:1-2), or (8) she may have access to a personal

6    or family-owned WAV, and she does not feel the need for alternative on-demand transportation.

7    For WAV users who live or work in San Francisco, where Lyft started providing WAV service in

8    July 2019, the reasons may also include that the individual may not know of the SF WAV Pilot.

9         That there may be alternate reasons for a lack of interest in an on-demand WAV service is

10   demonstrated by the report Plaintiffs cite. In footnote 2 of their Motion, Plaintiffs cite Stephen

11   Brumbaugh, Issue Brief: Travel Patterns of American Adults with Disabilities 2 (2018), available

12   at: https://www.bts.gov/sites/bts.dot.gov/files/docs/explore-topics-and-

13   geography/topics/passenger-travel/222466/travel-patterns-american-adults-disabilities-9-6-

14   2018.pdf. This publication confirms that a large segment of individuals with travel-limiting

15   disabilities are: older; live in households with annual household incomes under $25,000; are less

16   likely to use technology, and/or; are unable to leave their homes due to their disabilities. *See id.* at

17   1. Given the range of potential reasons why a putative class member may not be interested in

18   using Lyft's WAV service, Plaintiffs may not rely on assumptions and speculation to satisfy the

19   numerosity requirement. *See*, *e.g.*, *Davis v. Astrue*, 250 F.R.D. 476, 486 (N.D. Cal. 2008)

20   (although 1,947,274 people with mental disorders receive SSDI benefits, plaintiff failed to show

21   the percentage of the total who were attempting to work or what "subset of the unidentified

22   percentage" of them had been subject to the conduct at issue).

23        *Celano v. Marriott Int'l, Inc.* highlights the inadequacy of Plaintiffs' showing on

24   numerosity. 242 F.R.D. 544 (N.D. Cal. 2007). In *Celano*, plaintiffs (also represented by Disability

25   Rights Advocates) sought to certify a class of individuals with mobility disabilities who required

26   "single-rider" golf carts to play golf at Marriott-owned or operated golf courses. While plaintiffs

27   submitted "21 declarations from individuals who are mobility-impaired golfers (including the

28   three named plaintiffs)" plus census data, the court found the evidence "too ambiguous and

speculative to establish numerosity." *Id.* at 548-549. While plaintiffs were not required to demonstrate the number of potential class members with certainty, "any common sense inferences that plaintiffs urge[d] the court to make [must] be based upon something other than rank speculation untethered to real facts." *Id.* at 550. The court noted that plaintiffs and their attorneys were active in disability rights organizations, but there was "no indication that the disabled membership of any of [these] organizations . . . [had] been polled on their interest and/or attempts to play at Marriott courses." The court found that, "absent that kind of information, plaintiffs fail[ed] to link their population data to the alleged violation and injury at issue." *Id.*[8]

Just as in *Celano*, despite the participation of two organizational plaintiffs serving several hundred individuals annually, Plaintiffs have not submitted any membership polls gauging an interest in Lyft's WAV service; instead, they have offered just eight declarations (including four by the named Plaintiffs). The representatives for the organizational Plaintiffs, moreover, were not able to identify any putative class members, other than the named Plaintiffs and three staff and board members who submitted declarations. *See* Finn Depo. [Ex. 7] at 42:25-43:21, Giacopini Depo. [Ex. 2] at 55:5-25, 56:17-57:14; Hinze Depo. [Ex. 8] at 32:6-16; Nieves Depo. [Ex. 4] at

---

[8] The *Celano* court is not the only court to demand evidence of numerosity so that it can evaluate numerosity based on more than assumptions or speculation. *See also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) (even though BMW had a nationwide presence, the "complete lack of evidence specific to BMWs purchased or leased in New Jersey" with the alleged defect "crossed the line separating inference and speculation); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009) (fact that T-Mobile employed "thousands" of retail sales associates nationwide could not demonstrate a sufficiently numerous class of retail sales associates employed by T-Mobile in Florida); *Jeffries v. Pension Trust Fund*, 172 F. Supp. 2d 389, 394 (S.D.N.Y. 2001) (overall number of laid off employees does not establish numerosity absent evidence of how many of those employees suffered the alleged injury); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681–82 (S.D. Cal. 1999) ("[s]ales volume standing alone cannot serve as the basis of a numerosity finding" where only a subset of purchasers constituted the putative class); *LeGrand v. N.Y.C. Transit Auth.*, 95-CV-0333 (JG), 1999 U.S. Dist. LEXIS 8020, at *11 (E.D.N.Y. May 26,1999) (numerosity not satisfied because the statistical data on number of employees who took maternity leave did not suffice to show the number of women who suffered pregnancy discrimination); *Greenn v. Borg-Warner Protective Servs. Corp.*, 1998 U.S. Dist. LEXIS 292, at *11-13 (S.D.N.Y. Jan. 15, 1998) (fact that four thousand adults reside in shelters on any given day, along with some reports of assault and misconduct at shelters, does not establish numerosity based on a "substantial percentage" of them hypothetically suffering the same misconduct).

25:1-27:8.

Plaintiffs' inability to specifically identify even ten putative class members is striking. Plaintiffs have not demonstrated numerosity and the Motion should be denied on that basis.

## IV.   CONCLUSION

On a motion for class certification, Plaintiffs must affirmatively demonstrate their compliance with Rule 23 and "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. Plaintiffs have failed to make such a showing. Lyft respectfully requests that the Court deny the Motion.

Dated:  December 26, 2019

FOLGER LEVIN LLP

*/s/ Jiyun Cameron Lee*

Jiyun Cameron Lee
Attorneys for Defendant
LYFT, INC.

1047680.1