DISABILITY RIGHTS ADVOCATES
STUART SEABORN (Bar No. 198590)
MELISSA RIESS (Bar No. 295959)
REBECCA SERBIN (NY State Bar No. 5273255)*
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
mriess@dralegal.org
rserbin@dralegal.org

Attorneys for Plaintiffs
*Admitted Pro Hac Vice

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, TARA AYRES, an individual, SASCHA BITTNER, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>LYFT, Inc., a Delaware corporation,<br><br>    Defendant. | Case No. 3:19-CV-01438-WHA<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:     February 20, 2020<br>Time:    8:00 a.m.<br>Place:    Courtroom 12<br>Judge:   Honorable William Alsup |

## I. INTRODUCTION

Lyft's opposition highlights why this is a quintessential case for class treatment. Lyft helpfully identifies one of the primary common issues of law: "The basic premise underlying Plaintiffs' Motion is that the ADA requires Lyft to provide "equivalent access" to its on-demand service to individuals who need WAVs." Def.'s Opp. to Pls.' Motion for Class Certification ("Def.'s Opp."), ECF No. 50 at 14. That Lyft may disagree with this premise only underscores the appropriateness of class certification here.

Additionally, Lyft offers no evidence to refute the fact that the named Plaintiffs and all similarly situated persons who need to use wheelchair accessible vehicles ("WAVs") do not have full and equal access to the on-demand transportation service Lyft provides non-disabled persons in the three counties at issue. It is undisputed that, irrespective of any plans Lyft may claim it has, at present, Lyft provides no WAVs whatsoever in Alameda or Contra Costa Counties. Nor can Lyft dispute the fact that its 5-vehicle "pilot" program in San Francisco is in no way comparable to the on-demand service it offers in San Francisco. Lyft's own data shows that average wait times are more than ▮ times as long for WAVs in San Francisco as for Lyft's standard service and, while there were ▮ drivers driving for Lyft's standard mode during the time period measured, there were only ▮ drivers for Lyft's WAV pilot during that same time period. ECF No. 46-6 at 92:6–23; ECF No. 46-7 at 2.

Because it cannot dispute the facts shared by the named Plaintiffs and putative class members, Lyft attempts to use out-of-context references from the Plaintiffs' testimony regarding additional considerations WAV users may have about the service, such as cost or comfort, to suggest that this case requires individualized analysis. But these additional considerations do not change what the named Plaintiffs and proposed class members have in common: that they would use Lyft but are deterred from doing so because of the lack of reliable, on-demand WAV service. Like the Plaintiffs, non-disabled Lyft passengers undoubtedly consider cost and other factors in determining how often to use Lyft's service, but unlike Plaintiffs and members of the proposed class, non-disabled Lyft passengers have on-demand access to Lyft when they want or need it.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Plaintiffs seek that Lyft reasonably modify its policies and practices in order to rectify this vast inequity. Reasonable modifications are required under Title III unless Lyft can prove that making the modifications would fundamentally alter Lyft's services or result in an undue burden. Plaintiffs have offered multiple examples of modifications Lyft could make to its services to increase WAV service in the Bay Area counties at issue, including utilizing incentives for drivers and building off the existing contracts it has with rental car companies that offer WAVs and existing providers of WAV transportation service, among other possible modifications.[1] The analysis of whether such modifications are reasonable, in other words, whether they would place an undue burden on Lyft or fundamentally alter Lyft's services, depends entirely on *Lyft'*s capacity and the nature of its services, and requires no inquiry into the individual circumstances of any of the named Plaintiffs or putative class members. Thus, a class action is the most efficient method of reaching a determination on this issue.

Plaintiffs have satisfied the requirements of Rule 23 and respectfully ask the Court to certify the class.

## II. PLAINTIFFS ASSERT VALID REASONABLE MODIFICATION CLAIMS UNDER TITLE III OF THE ADA

Lyft's legal argument highlights some of the issues that make class certification appropriate for this case, but seriously mischaracterizes Plaintiffs' claims and the requirements of the ADA. Plaintiffs do not seek an order requiring Lyft to purchase WAVs. Complaint, ECF No. 1 at ¶ 7. Rather, Plaintiffs seek that Lyft make reasonable modifications to its policies and practices that will allow Plaintiffs and putative class members full and equal access to the service Lyft provides. *Id*. at ¶ 96. Despite Lyft's conclusory statements to the contrary, Plaintiffs do provide Lyft and the Court with multiple examples of reasonable modifications Lyft could make to its policies and practices in order to provide plaintiffs and other WAV users with sufficient access to Lyft's service. *Id*. at ¶¶ 80–85; Pls.' Motion for Class Certification, ECF No. 45 at 14.

Lyft already has extensive driver incentive programs as well as partnerships with multiple

---

[1] Complaint, ECF No. 1 at ¶¶ 7, 75–85; Pls.' Motion for Class Certification, ECF No. 45 at 13–15.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1 car rental companies. Lyft could use its extensive market power as a company with over $2
2 billion in revenue to create additional incentives for WAV drivers and/or utilize its partnerships
3 with car rental companies to incentivize drivers to secure WAVs. Lyft self-reports that it has
4 done so in other cities – without having to purchase WAV vehicles. *See, e.g.*, Def.'s Opp. at 8
5 (stating that Lyft does not own any of the vehicles on its platform), 5–6 (describing the steps Lyft
6 has taken to provide WAV service in New York City); Declaration of Rebecca Serbin ("Serbin
7 Decl."), Ex. A (contract between Lyft and a third party for the provision of WAV service in
8 Phoenix); *Id.*, Ex. B (contract between Lyft and a third party for the provision of WAV service in
9 Austin); *Id.*, Ex. C (contract between Lyft and a third party for the provision of WAV service in
10 Boston); *Id.*, Ex. D (contract between Lyft and a third party for the provision of WAV service in
11 Portland).

12 Plaintiffs' reasonable modification claims fall squarely within the framework of Title III,
13 which requires covered entities to make reasonable modifications to their policies, practices and
14 procedures where doing so is necessary to provide persons with disabilities full and equal
15 enjoyment of the services they offer the public unless the covered entity can demonstrate that
16 doing so would fundamentally alter the nature of those services. *See* 42 U.S.C. §§ 12182
17 (b)(2)(A)(ii); 12184(b)(2)(A). Indeed, every court to have addressed reasonable modification
18 claims in the context of ridesharing companies' failure to provide equivalent service for persons
19 needing WAVs has come to the same conclusion, at least regarding the plausibility of such
20 reasonable modification claims. *See Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018
21 WL 1116725, at *3–4 (N.D. Cal. Mar. 1, 2018); *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 260
22 (S.D.N.Y. 2018); *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141,
23 1157–58 (N.D. Ill. 2018); *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL
24 758087, at *12 (W.D. Tex. Feb. 20, 2015).

25 Lyft is free to argue that such modifications would fundamentally alter their programs
26 and services or would otherwise place an undue burden on Lyft, but it bears the burden of proof
27 of demonstrating this, a burden it has entirely failed to meet thus far. *Fortyune v. Am. Multi-*
28

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19-CV-01438-WHA**   **3**
**Plaintiffs' Reply Brief in Support of Motion for Class Certification**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Cinema, Inc*., 364 F.3d 1075, 1082 (9th Cir. 2004). And as Plaintiffs' motion notes, such a determination will not require any individual inquiry into the circumstances of the named Plaintiffs or putative class members. Instead, it will address Lyft's resources and capacity to make the requested modifications, further solidifying the appropriateness of class certification.[2] Further, at this stage Plaintiffs do not have to demonstrate that they will prevail on their reasonable modification claims. *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 977 n.5 (9th Cir. 2019) (plaintiffs need not show at class certification that they will prevail on the merits; "they must show only that, if they do prevail on the merits, they will be able to prevail class-wide").

### III. THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23

#### A. The Class Meets the Requirement for Numerosity

The proposed class easily satisfies the requirement for numerosity, which is "not tied to any fixed numerical threshold," and courts generally find that classes with 40 or more members satisfy it, but even much smaller classes can suffice. *See Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (discussing standard, and affirming district court's certification of a 20-member class).

Here, even looking at the number of WAV taxi users in San Francisco alone, numerosity is more than satisfied. For example, the SF Paratransit Taxi program, which provides subsidized rides in WAV taxis for ADA-eligible paratransit customers, provided between 400 and 1000 rides a month between January 2011 and January 2019. ECF No. 45-12 at 14.[3] These numbers exclude many of the 5,000 San Francisco wheelchair users who do not qualify for paratransit because they are able to use fixed-route public transportation, *id*. at 14, 22. They also exclude all

---

[2] Lyft's citation to 49 C.F.R. § 37.5(b) (ECF No. 50 at 15) is inapposite as that regulation merely states that even if a public entity offers paratransit service to people with disabilities, it must still allow people with disabilities who are able to use the entity's transportation service for the general public to do so if they are capable of using that general service, and covered public entities do offer wheelchair access as a part of their general service.

[3] The number of SF Paratransit Taxi program passengers has decreased as the number of WAV taxis in San Francisco has decreased, along with the overall reduction in taxi service in San Francisco, following the introduction of app-based rideshare services. ECF No. 45-12.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

of the proposed class members in Alameda and Contra Costa counties. The proposed class likely includes thousands of wheelchair users in the three counties at issue, but clearly includes at least 40 such individuals. William B. Rubenstein, 1 Newberg on Class Actions § 3:12 (5th ed. 2019) ("a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone").

Lyft's attack on numerosity ignores the boon that having on-demand, 24-hour transportation would provide to Bay Area wheelchair users, particularly in light of the limited nature of WAV options currently. Fiona Hinze for example, who does not use the existing WAV taxi program in San Francisco, would use Lyft because she wants to be able to be spontaneous, to travel to parties or other events without having to plan so far in advance. Serbin Decl., Ex. E, Hinze Dep. at 28:24-29:24. Others who are used to driving their own cars and don't use paratransit would still use Lyft to avoid parking difficulties or in situations where they do not want to drive themselves—just as other Lyft users do. *Id.*, Ex. F, Ayres Dep. at 53:7-54:25; *Id.*, Ex. G, Giacopini Dep. at 50:14–51:24; Ayres Decl., ECF No. 45-16 at ¶¶ 6-8; Smith Decl., ECF No. 45-14 at ¶¶ 8–10. And contrary to Lyft's assertion, the number of wheelchair users who would use Lyft, the second-largest rideshare company in the country and a major provider of transportation in the three populous Bay Area counties at issue, is in no way analogous to the limited number of persons with mobility disabilities who would use single-rider golf carts to play golf at private, Marriott-owned or operated golf courses. Def.'s Opp., ECF No. 50 at 27.

Here, Plaintiffs have offered sufficient facts, through both WAV-specific data and class member testimony, to satisfy numerosity.

### B. Class Members Share Common Questions of Fact and Law

Lyft's opposition highlights that this case, at minimum, involves one common question of law: whether the ADA requires Lyft to make reasonable modifications needed to offer service for WAV users comparable to the on-demand transportation service it offers non-disabled users. The answer to this question will be the same no matter where in the three counties a class member lives, whether the class member would use Lyft WAV service on a daily basis or only

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

on occasion, or how factors such as cost might impact a given class member's decision to use Lyft more or less frequently.

Lyft's defenses regarding the feasibility of making modifications necessary to provide comparable service for WAV users present additional common questions because the Court's analysis of those defenses will involve an assessment of Lyft's capacity and resources without having to make any inquiries into the individual circumstances of any of the named Plaintiffs or putative class members.

To distract from the common issues at the center of this case, Lyft cherry-picks out-of-context references from Plaintiffs' depositions to argue that various factors might deter Plaintiffs from using Lyft. The specific differences between Plaintiffs in no way change what they and other WAV users have in common: each testified that they would use Lyft if it was accessible to them. Serbin Decl., Ex. H, Finn Dep. at 49:22-50:14; *Id.*, Ex. G, Giacopini Dep. at 50:14-51:25;[4] *Id.*, Ex. I, Smith Dep. at 30:11–19; *Id.*, Ex. J, Fuller Dep. at 32:1–8, 35:11–36:17; *Id.*, Ex. K, Bittner Dep. at 43:19–44:6, 51:12–20, 54:17–24; *Id.*, Ex. F, Ayres Dep. at 63:14–64:4; *Id.*, Ex. E, Hinze Dep. at 28:24-29:24.

The fact that the named Plaintiffs may consider cost when determining what transportation service to use at any given time, or that they may not all be tech savvy, or may consider using Lyft for spontaneous as opposed to pre-planned transportation makes them no more different or distinct than any other non-disabled Lyft user. Undoubtedly non-disabled Lyft users consider cost or comfort in determining when and whether to take a Lyft ride instead of some other form of transportation. The only difference between the Plaintiffs and non-disabled Lyft users, a difference common to Plaintiffs and members of the proposed class, is that they need WAV access to use Lyft and cannot rely on Lyft to provide equivalent service.

If a group of wheelchair users were to challenge the lack of an accessible entrance to a

---

[4] Defendant misquotes Ms. Giacopini. She did not testify that she does not use Lyft because she is comfortable with Uber's service, but instead made clear that she does not use Lyft because Lyft does not provide service she can use. Ex. G, Giacopini Dep. at 75:13-76:20. Ms. Giacopini also testified that she only used Uber's service a couple of times in the Bay Area because it is not accessible to her. *Id.* at 75:13–76:3.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  department store, the fact that some of the wheelchair users would plan to visit the store to buy
2  clothing while others would visit to buy shoes, or that some would visit more or less frequently,
3  does not destroy the common link that they all need an accessible entrance in order to physically
4  enter the store. One of the reasons Lyft's on-demand transportation service has been so
5  successful is that it offers flexibility for passengers to use the service for a variety of purposes,
6  including commuting by Lyft every day as well as using Lyft only infrequently when other
7  transportation options are less desirable.

8  Additionally, Lyft's reliance on the stereotypes that all proposed class members lack
9  disposable income, and that individuals with limited income do not or should not use Lyft, does
10  nothing to diminish the proposed class's common claims. Further, ride-sharing may be more cost
11  effective than owning a vehicle, Serbin Decl., Ex. H, Finn Dep. at 41:14–42:1, and class
12  members testified regarding their ability to pay for Lyft service if WAV service was available,
13  *see, e.g.*, *Id.*, Ex. K, Bittner Dep. at 43:7–44:6; *Id.*, Ex. F, Ayres Dep. at 53:1–6. This is
14  particularly so given that wheelchair users in the Bay Area have such limited options for on-
15  demand transportation.

### C. The Individual Plaintiffs' Claims are Typical of the Class

Named Plaintiffs experience the same injury as members of the putative class. All are WAV users and all have been deterred from using Lyft due to Lyft's failure to make the modifications necessary to provide WAV users in the three Bay Area counties at issue comparable access to the on-demand transportation service Lyft offers its other users.[5] The named Plaintiffs thus meet Rule 23's typicality requirement. *See Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) ("representative claims are 'typical' if they are reasonably coextensive with those of absent class

---

[5] Though Lyft argues that Plaintiffs lack specific statistics about Lyft's pilot program in San Francisco, it does not take a statistician to determine that a five-vehicle pilot cannot provide reasonable transportation service in a city the size and density of San Francisco, and certainly cannot provide service anywhere near comparable to the on-demand transportation service Lyft provides the non-disabled public in San Francisco, which utilizes over ▓▓▓ drivers. ECF No. 46-6 at 92:6–23, ECF No. 46-7 at 2.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

members")). Additionally, "[t]he test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).[6]

Lyft's attack on the typicality of the individual Plaintiffs' claims based on comments from San Francisco WAV users that they would want wait times comparable to those Lyft offers non-disabled users in San Francisco is a red herring. Plaintiffs all seek WAV service that is comparable to the service that Lyft provides to passengers who do not use WAVs, understanding that the level of non-WAV service is not identical in all locations and at all times. The fact that Ms. Bittner would want service within 15 minutes in San Francisco does not mean that she or others in San Francisco would expect exactly that same level of service in more rural areas. Like all members of the proposed class, Ms. Bittner seeks WAV service in her area that is comparable to non-WAV service in her area.[7] She, like all of the named Plaintiffs' and members of the proposed class, seek comparable WAV service, with the same inevitable variation in wait times and other metrics as non-WAV service.[8]

### D. The Proposed Class Satisfies the Conditions of Rule 23(b)(2)

Finally, the proposed class satisfies Rule 23(b)(2) as Plaintiffs have more than met the requirement that they provide "general contours" of an injunction that would provide relief to the class. *See B.K. v. Snyder*, 922 F.3d at 972 ("Rule 23(b)(2) ordinarily will be satisfied when plaintiffs have described the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding,

---

[6] The fact that some of the Plaintiffs were additionally deterred from downloading the Lyft App so as to preserve their ability to challenge Lyft's discrimination against WAV users in court does not change that they have been injured by Lyft's lack of comparable service. *Access Living, of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d at 1150, n.6.

[7] Lyft's reference to wait times in Tracy, California is misplaced as Tracy is a location outside the three counties at issue in this case.

[8] Plaintiffs note that Lyft challenges neither the adequacy of the individual Plaintiffs to serve as class representatives nor the adequacy of Plaintiffs' counsel to serve as class counsel.

negotiations, and expert testimony." *Parsons*, 754 F.3d at 689 n.35).

Here, Plaintiffs are not merely requesting that Lyft follow the law. Rather, they have requested reasonable modifications to Lyft's practices – for example, that Lyft expand its use of incentives, partnerships with WAV providers, and contracts with rental companies to ensure that sufficient number of WAVs are providing service in the Bay Area. Lyft self-reports it has taken such steps in other markets. If doing so in the Bay Area is too costly to be feasible, Lyft must prove that.

Plaintiffs' reasonable modification request is thus far more concrete than the proposed class relief in *Civil Rights Education and Enforcement Center v. Hospitality Properties Trust*, 867 F.3d 1093, 1103-1105 (9th Cir. 2017), where plaintiffs asserted a variety of different ADA violations at the different hotels at issue and thus an injunction would have merely stated that Defendant had to comply with the law. Here, Plaintiffs seek modifications sufficient to provide comparable service to WAV users. Though the development of a remedial plan may require greater substance and specificity at a later stage of the litigation, including the possible use of expert testimony regarding questions about how many vehicles will be needed to provide service or what kind of incentives would be effective, such is the kind of proposed relief contemplated by *Parsons* as meeting the requirements of Rule 23(b)(2).

## IV.   CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court grant their Motion to Certify the Class.

DATED:  January 9, 2020                           Respectfully submitted,

                                                        DISABILITY RIGHTS ADVOCATES



                                                        Stuart Seaborn
                                                       Attorneys for Plaintiffs