DISABILITY RIGHTS ADVOCATES
STUART SEABORN (Bar No. 198590)
MELISSA RIESS (Bar No. 295959)
REBECCA SERBIN (NY State Bar No. 5273255)*
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
mriess@dralegal.org
rserbin@dralegal.org

Attorneys for Plaintiffs
*Admitted Pro Hac Vice

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, TARA AYRES, an individual, SASCHA BITTNER, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> LYFT, Inc., a Delaware corporation, <br><br> Defendant. | Case No. 3:19-CV-01438-WHA <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: October 8, 2020 <br> Time: 8:00 a.m. <br> Place: Courtroom 12 <br> Judge: Honorable William Alsup |

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on October 8, 2020, at 8:00 a.m. or as soon thereafter as the matter may be heard by the Hon. William Alsup in the United States District Court, Northern District of California, Courtroom 12, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California 94012, Plaintiffs Judith Smith, Julie Fuller, Tara Ayres, Sascha Bittner, Independent Living Resource Center San Francisco, and Community Resources for Independent Living, pursuant to Federal Rule of Civil Procedure 56 and any other applicable rule of civil procedure or law, will move this Court for an order finding Defendant Lyft liable under Title III of the Americans with Disabilities Act for failing to make reasonable modifications needed to ensure that persons who use wheelchair accessible vehicles due to mobility disabilities have full and equal access to Lyft's on-demand transportation service in San Francisco, Alameda, and Contra Costa Counties

This motion is based upon this notice; the accompanying memorandum of points and authorities; the concurrently filed declaration of Plaintiffs' counsel, Stuart Seaborn; the declarations of Michael Galvan and Fiona Hinze; the Parties' Stipulation re: Facts and Authenticity of Documents, the pleadings and records on file with the Court in this action; and any argument or additional evidence as may be requested by the Court or presented at the time of hearing.

DATED: September 3, 2020                    DISABILITY RIGHTS ADVOCATES

Rebecca C. Serbin
Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION ................................................................................................. 1

3   II.   STATEMENT OF FACTS ................................................................................... 2

4         A.    Lyft Offers Robust and Reliable Inaccessible Service. .......................... 2

5         B.    Lyft Offers WAV Service in Markets Outside of the Bay Area. ............. 3

6         C.    Lyft Provides Essentially No WAV Service in the Bay Area. ................. 4

7         D.    Plaintiffs ................................................................................................. 6

8               1.    Judith Smith ................................................................................. 6

9               2.    Julie Fuller .................................................................................. 7

10              3.    Tara Ayres .................................................................................. 7

11              4.    Sascha Bittner ............................................................................. 8

12              5.    Independent Living Resource Center San Francisco ................... 9

13              6.    Community Resources for Independent Living ........................... 10

14              7.    Members of the Putative Class .................................................. 11

15  III.  LEGAL STANDARD ......................................................................................... 11

16  IV.   ARGUMENT ..................................................................................................... 12

17        A.    Lyft's Transportation Service Is Covered by Title III of the
                Americans with Disabilities Act. ........................................................... 12
18
19              1.    Lyft Is Primarily Engaged in the Business of Transporting
                      People ......................................................................................... 12

20              2.    Lyft Is a Public Accommodation. ............................................... 13

21        B.    Lyft Has Violated the ADA by Failing to Make Reasonable
                Accommodations. .................................................................................. 14
22
23        C.    Lyft Has Not Met Its Burden to Establish Defenses ............................. 17

24              1.    Lyft Has Not Shown that Providing WAV Service Would
                      Be an Undue Burden. ................................................................. 18
25
                2.    Lyft Has Not Shown That Providing WAV Service Would
26                    Be a Fundamental Alteration. .................................................... 21

27        D.    Plaintiffs Have Standing. ...................................................................... 22

28              1.    The Individual Plaintiffs Have Been Injured by Lyft's
                      Failure to Provide WAV Service. .............................................. 22

2.     The Organizational Plaintiffs Have Been Injured by Lyft's Failure to Provide WAV Service. ............................................................ 24

3.     Lyft Caused Plaintiffs' Injury and Could Redress It. ............................... 25

V.     CONCLUSION ............................................................................................ 25

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, Case No. 3:19-CV-01438-WHA
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

ii

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*, Inc.,
   477 U.S. 242 (1986) ..................................................................................................... 11

*Chapman v. Pier 1 Imports (U.S.), Inc.*,
   631 F.3d 939 (9th Cir. 2011) (en banc) ...................................................................... 23

*Cotter v. Lyft, Inc.*,
   60 F. Supp. 3d 1067 (N.D. Cal. 2015) ........................................................................ 13

*Crawford v. Uber Techs., Inc.*,
   No. 17-CV-02664-RS, 2018 WL 1116725 (N.D. Cal. March 1, 2018) ........................... 13, 23

*Disabled in Action v. Board of Elections in City of New York*,
   752 F.3d 189 (2d Cir. 2014) ........................................................................................ 12

*Doran v. 7-Eleven, Inc.*,
   524 F.3d 1034 (9th Cir. 2008) ..................................................................................... 23

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
   823 F. Supp. 2d 995 (N.D. Cal. 2011) ........................................................................ 18

*Fair Hous. Council of San Fernando Valley v. Roomate.com, LLC*,
   666 F.3d 1216 (9th Cir. 2012) ..................................................................................... 24

*Fortyune v. Am. Multi-Cinema, Inc.*,
   364 F.3d 1075 (9th Cir. 2004) ........................................................................ 14, 21, 22

*Karczewski v. DCH Mission Valley LLC*,
   862 F.3d 1006 (9th Cir. 2017) ..................................................................................... 17

*Lentini v California Center for the Arts*,
   370 F.3d 837 (9th Cir. 2004) ....................................................................................... 15

*Lowell v. Lyft, Inc.*,
   352 F. Supp. 3d 248 (S.D.N.Y. 2018) ........................................................................ 13, 23

*Mannick v. Kaiser Found. Health Plan, Inc.*,
   No. C 03-5905 PJH, 2006 WL 2168877 (N.D. Cal. July 31, 2006) .................... 15, 16, 17

*Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..................................................................................................... 11

*Namisnak v. Uber Techs., Inc.*,
   444 F. Supp. 3d 1136 (N.D. Cal. 2020) ...................................................................... 13, 16

*Namisnak v. Uber Techs., Inc.*,
   No. 18-15860, 2020 WL 4930650 (9th Cir. Aug. 24, 2020) .................................... 23

*Nat'l Fed. of the Blind of Cal. v. Uber Tech., Inc.*,
   103 F. Supp. 3d 1073 (N.D. Cal. 2015) .......................................................... 14, 23, 24

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Newman-Green, Inc. v. Alfonzo-Larrain,*
  490 U.S. 826 (1989) ................................................................................ 22

*PGA Tour, Inc. v. Martin,*
  532 U.S. 661 (2001) ................................................................................ 13

*Ramos v. Uber Tech., Inc.,*
  No SA-14-CA-502XR, 2015 WL 758087 (W.D. Tex. Feb. 20, 2015) ............... 13, 23

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) .................................................................................. 25

*Valle Del Sol, Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ................................................................. 24

*Wong v. Regents of the Univ of Cal.,*
  192 F.3d 807 (9th Cir. 1999) ................................................................... 14

**Statutes**

42 U.S.C. § 12181 ...................................................................................... 12, 13

42 U.S.C. § 12182 ...................................................................................... 13, 21

42 U.S.C. § 12184 ...................................................................................... passim

42 U.S.C. § 12188(a)(1) ............................................................................. 22

**Rules and Regulations**

28 C.F.R. § 36.104 ..................................................................................... 17, 18

Fed. R. Civ. P. 56(a) .................................................................................. 11

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1

## I.    INTRODUCTION

Since launching in 2012, Lyft has built its on-demand, app-based transportation service into a major source of transit in the Bay Area and around the country. Lyft has used a wide variety of tools, from technology to marketing to partnerships with rental car companies, to build a transportation service on which passengers can rely at any time of day or night, anywhere in San Francisco, Alameda, and Contra Costa Counties (the "Bay Area Counties" at issue in this litigation). In February 2020, a Lyft passenger in the Bay Area Counties could expect to wait an average of ▮ minutes for their standard Lyft ride to arrive. Parties' Stipulation re: Facts and Authenticity of Documents ("Stip.") at ¶ 27.

As Lyft meticulously built its transportation service in the Bay Area, it took no steps to include passengers with disabilities who require wheelchair-accessible vehicles ("WAVs") to travel by car. At the time Plaintiffs filed this action, Lyft offered no WAV service in the Bay Area Counties. Stip. ¶ 23. Three months after Plaintiffs filed this action, Lyft launched a limited, five-vehicle pilot program offering WAV service only to passengers in San Francisco with limited service hours. Stip. ¶¶ 23, 28–30.

Lyft knows the steps it needs to take to build a reliable, robust transportation service because it has done so to build its non-WAV service. Lyft also knows the steps it needs to take to build a more reliable and robust WAV service because it has done so outside of the Bay Area Counties. Yet, Lyft has opted to do almost nothing to provide WAV service in the Bay Area. Lyft focuses on what it views as the high cost of providing WAV service, but it is clear from the record that Lyft believes it could pay less for WAV service than it currently spends and that Lyft has failed to take the steps it believes would lower WAV costs.

Title III of the ADA prohibits discrimination by covered entities that are primarily engaged in the business of transporting people under Section 12184 or that operates a public accommodation under Section 12182. Under either section, discrimination includes the failure to make "reasonable modifications in policies, practices, or procedures" to achieve full and equal access for people with disabilities. 42 U.S.C. § 12184(b)(2)(A) (citing § 12182(b)(2)(A)(ii)).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  Lyft has failed to meet this requirement. Plaintiffs have repeatedly suggested reasonable

2  modifications, including some that Lyft routinely takes to provide non-WAV service or to

3  provide WAV service in other cities. Yet Lyft has done essentially nothing to provide WAV

4  service in the Bay Area Counties and, at the time of this motion, does not even allow

5  independent contractor WAV drivers to provide service on its platform in the Bay Area.

6  Plaintiffs now seek partial summary judgment solely on Lyft's liability for violating Title III.

7        Plaintiffs do not seek perfection. But Lyft cannot continue to refuse to do anything to

8  provide access to its service on the basis that it may be unable to provide literally identical

9  access. The Court need not reach the issue of exactly what level of service Lyft must provide to

10  Plaintiffs to constitute "full and equal enjoyment" under Title III because no matter where that

11  line is reasonably drawn, Lyft is nowhere near it.

12  **II.    STATEMENT OF FACTS**

13        **A.    Lyft Offers Robust and Reliable Inaccessible Service.**

14        Since launching in 2012, Lyft has provided over a billion rides in the United States and

15  Canada. Decl. of Stuart Seaborn ("Seaborn Decl."), Ex. E at LYFT00000235. Lyft estimates that

16  its transportation service is available to more than 95% of the United States population. *Id*. In

17  2018, Lyft's revenue was $2.2 billion, representing a 103% growth rate from 2017 to 2018. *Id*. at

18  LYFT00000236.

19        For those who can access it, Lyft's standard or "classic" service, is available on-demand,

20  throughout the three Bay Area Counties, without any limitation on hours of service. Stip. ¶¶ 5–6.

21  In February 2020, Lyft had approximately ████████ standard ride requests in the Bay Area

22  counites, and the average wait time across all standard mode rides in the three Counties was ██

23  minutes. Stip. ¶ 27.

24        In addition to its "classic service," Lyft provides various modes of service in the Bay

25  Area, including modes offering categories of luxury vehicles and carpool rides. Stip. ¶ 6.

26  Passengers can use the Lyft App to request a ride in these service modes at any time of day or

27  night and in any location in the three Bay Area Counties at issue. Stip. ¶ 5.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

It is no accident that Lyft's non-WAV service is robust and reliable. Lyft has taken numerous steps to ensure that this is so, and that it remains so. "To ensure that a sufficient number of drivers are available to provide rides during peak demand hours, [Lyft] utilize[s] a range of incentives for drivers . . ." Seaborn Decl., Ex. E at LYFT00000311. This includes incentivizing drivers to drive more frequently, to drive at certain times of the day when demand is high, or to drive in certain geographic areas where more drivers are needed. Ex. D, Deposition of Andres Muñoz ("Muñoz Depo.") at 54:4–57:19. Lyft "has collected data from over one billion rides and over ten billion miles driven" and use these data insights to "anticipate market-specific demand, enabling [Lyft] to create customized incentives for drivers in local markets." Ex. E at LYFT00000237. Lyft's "machine learning algorithms continuously train [Lyft's] optimization models and dynamically incentivize drivers to be on [Lyft's] platform when and where riders are seeking transportation." *Id.* at LYFT00000242.

Lyft has partnerships with Hertz, Avis, and Flexdrive under which drivers can procure vehicles and those companies provide insurance for the vehicles. Seaborn Decl., Ex. D, Muñoz Depo. at 36:7–36:15. Lyft also recruits drivers through advertising, Ex. D, *Id.* at 47:10–20, and by offering referral incentives to existing drivers who recruit others to join the platform, *Id.* at 47:21–48:2. It "believe[s] that much of the growth in [its] rider base and the number of drivers on [its] platform is attributable to [its] paid marketing initiatives." Ex. E, LYFT00000275. Lyft knows what it needs to do in order to build a reliable transportation service that will attract passengers and riders, and it has successfully done so in the Bay Area Counties and around the United States.

**B.     Lyft Offers WAV Service in Markets Outside of the Bay Area.**

When Lyft believes it must offer WAV service because of a local regulatory requirement or some other reason, it does so. Lyft entered into a legal settlement with the local regulator under which it must provide WAV service in the five boroughs of New York City and meet certain wait time requirements. Stip. ¶¶ 18, 44–45. For June 2019, the terms of the settlement required that 60% of WAV rides be provided in under fifteen minutes and 90% of rides be

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  provided in under thirty minutes. Stip. ¶ 18. Lyft self-reported that it met this requirement. Stip. ¶

2  18.

3          To achieve this level of service, Lyft used a combination of different models it has

4  identified for providing WAV service. Stip. ¶¶ 20, 46. This includes contracting with rental car

5  companies to provide subsidized WAV rentals, providing incentives to drivers who own or

6  otherwise have access to WAV vehicles outside of a Lyft rental car partnership, and partnering

7  with other transportation providers who have WAV vehicles in their fleet. Stip. ¶¶ 12, 20, 46.

8  Lyft has used one or more of these models to provide WAV service in other markets and has also

9  partnered with a company to onboard WAV taxis onto the Lyft platform in Chicago. Stip. ¶¶ 11,

10 12, 15, 22. With few exceptions, Lyft uses the same strategies to build WAV service that it uses

11 to build non-WAV service, including providing incentives to drivers and making it easier for

12 prospective drivers to obtain vehicles to use to drive for Lyft through rental car partnerships. *See*

13 *supra* Section II(A); Stip. ¶ 12.

14          **C.      Lyft Provides Essentially No WAV Service in the Bay Area.**

15          Lyft knows how to build an on-demand transportation service, and it has done throughout

16 the United States. Lyft also knows how to include WAV vehicles in that on-demand

17 transportation service, as it does so when it chooses to. But in the Bay Area, it does not. Lyft

18 offers no WAV service whatsoever in Alameda County or Contra Costa County. Stip. ¶ 30.

19 While Lyft did start a five-vehicle "pilot" WAV program in San Francisco after this litigation

20 was initiated, Stip. ¶ 23, the program is so limited that it fails to come close to serving the needs

21 of WAV users and is in no way comparable to the twenty-four-hour on-demand transportation

22 service enjoyed by Lyft's non-disabled customers throughout the Bay Area.

23          The pilot program originally involved five WAV vehicles but included only two vehicles

24 as of July 2020. Stip. ¶¶ 23, 29. The pilot has limited hours and does not operate twenty-four

25 hours per day like Lyft's other services, Stip. ¶¶ 5, 7, 29. ████████████████████

26 ████████████      Seaborn Decl., Ex. D, Muñoz Depo. at 72:18–20.  Nor do users of the pilot

27 program have the flexibility of using the limited pilot to travel throughout the Bay Area as non-

28

1   disabled riders do. To order a WAV using Lyft, a passenger's ride must originate in San

2   Francisco. ¶¶ 28, 30. While a passenger could use the pilot to get a ride from San Francisco to,

3   for example, Oakland, that passenger could not use the pilot to get a ride back to San Francisco.

4   *Id*.

5        For those able to use the pilot WAV program during the hours and in the locations it is

6   available, the service is not comparable to Lyft's standard on-demand transportation service.  For

7   example, Lyft's own data show that during the week of August 12, 2019, the average weekday

8   wait time from when a rider requested a ride in the WAV pilot program to pickup was ████

9   ████████████████. Stip. ¶ 33. For the same time period, the average wait time for

10  Lyft's standard mode was ████████████████. Stip. ¶ 34. And for the same

11  time period, ████ different drivers drove the five vehicles available in Access mode, which

12  applies to the WAV pilot, compared to ████ drivers driving in standard mode. Stip. ¶ 35. More

13  recently, in February 2020, when the average wait time in the three Bay Area Counties was ██

14  minutes for Lyft's standard service, the average wait time for the for the San Francisco WAV

15  pilot was ████ minutes. Stip. ¶¶ 26, 27.

16       Lyft originally entered into a ████████████ to provide the pilot program, ████

17  ████████████████████████████████. Stip. ¶¶

18  31–32. While Lyft has partnerships with rental car companies to offer subsidized WAV rentals to

19  prospective Lyft drivers in New York, it paused its plans to pursue such a partnership in the Bay

20  Area. Stip. ¶¶ 39, 41, 46. While Lyft "believe[s] that much of the growth in [its] rider base and

21  the number of drivers on [its] platform is attributable to [its] paid marketing initiatives," Seaborn

22  Decl., Ex. E, LYFT00000275, it has used no such initiatives to advertise the WAV pilot to

23  passengers or drivers in the Bay Area. Stip. ¶¶ 36, 42. And, while Lyft claims that its least

24  expensive option for providing WAV service is through an "Organic" model in which drivers

25  with access to WAVs drive for Lyft as independent contractors, Stip. ¶¶ 12(c), 14, Lyft does not

26  even allow such drivers to provide WAV service on its platform in the Bay Area, Stip. ¶ 43.

27  Further, while Lyft asserts that it could lower its costs by increasing demand, it has not taken

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  steps that have increased demand for WAV service outside of the Bay Area, such as removing

2  the need for WAV users to toggle "Wheelchair Access" mode in settings in order to order a

3  WAV ride. Seaborn Decl. Ex. F, Deposition of Isabella Gerundio ("Gerundio Depo.") at 27:5–

4  28:18. Lyft could take steps to modify its policies, practices, and procedures in order to provide

5  reliable WAV service in the Bay Area, but it has chosen not to do so.

6        **D.**   **Plaintiffs**

7             1.   Judith Smith

8        Plaintiff Judith Smith has a mobility disability and uses a motorized wheelchair for

9  mobility. Decl. of Judith Smith ("Smith Decl."), ECF No. 45-14, ¶¶ 3–4. Ms. Smith lives in

10  Oakland, California, in Alameda County. *Id.* ¶ 2. Ms. Smith would use Lyft's on-demand service

11  in the Bay Area if it were accessible to her. *Id.* ¶¶ 8–10.

12        Soon after Lyft launched its service in the Bay Area, Ms. Smith was excited by the

13  prospect of having access to on-demand transportation, but she quickly learned from friends and

14  colleagues that Lyft did not provide WAV service. *Id.* ¶¶ 5–6. Since then, she has watched

15  multiple people attempt to call a wheelchair-accessible Lyft, and none have ever succeeded. *Id.* ¶

16  6; Seaborn Decl. Ex. G, Deposition of Judith Smith ("Smith Depo.") at 26:12–27:2. As a result,

17  although she has a smartphone, Ms. Smith has concluded it would be futile to download the Lyft

18  app. Smith Decl. ¶ 7. Ms. Smith is aware that Lyft now offers a WAV pilot program in San

19  Francisco, but she has not tried to use the pilot because she does not believe that a program

20  involving only five vehicles in a large city could be a reliable source of transportation. Smith

21  Depo. at 28:16–29:8.

22        If Lyft's service were accessible to her, Ms. Smith would be able to use Lyft in the same

23  situations as someone who does not need a wheelchair accessible vehicle. Smith Decl. ¶ 8. She

24  would order Lyfts to and from the airport, when she is out late at night, when she wants to travel

25  to high-density places like San Francisco where parking is limited or to places that are far from

26  public transportation, in inclement weather, and when health reasons prevent her from driving.

27  *Id.*

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, Case No. 3:19-CV-01438-WHA
PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT       6

1

2.     Julie Fuller

2         Plaintiff Julie Fuller has a mobility disability and relies on WAVs when traveling by car.

3 Stip. ¶ 1. Ms. Fuller lives in Oakland, California, in Alameda County. Decl. of Julie Fuller

4 ("Fuller Decl."), ECF No. 45-15 ¶ 2. Ms. Fuller would use Lyft's on-demand service in the Bay

5 Area if it were accessible to her. *Id*. ¶¶ 8–10. Ms. Fuller has a smartphone, but she has not

6 downloaded the Lyft app because she has heard from other wheelchair users that there are no

7 wheelchair-accessible Lyfts in her area. Fuller Decl. ¶ 5. She has had discussions with other

8 community members and friends about the lack of transportation options, including the lack of

9 WAVs on Lyft. *Id*. ¶ 6. She is aware that Lyft has a WAV pilot program in San Francisco, but it

10 is not useful to her because she does not travel in San Francisco regularly. Seaborn Decl. Ex. H,

11 Deposition of Julie Fuller ("Fuller Depo.") at 35:14–36:17.

12         Due to the lack of wheelchair-accessible on-demand transportation options, Ms. Fuller

13 must spend a large amount of time planning and coordinating her schedule. Fuller Decl. ¶ 7. If

14 she had access to on-demand service through Lyft, it would alleviate some of this planning. For

15 example, Ms. Fuller regularly attends medical appointments at a facility that is a ten-minute

16 drive from her home and travels there by paratransit. *Id*. ¶ 8. The local paratransit provider is

17 notoriously unreliable, so she arranges her ride with paratransit to arrive at her appointment early

18 to ensure that she arrives on time. *Id*. Because she needs to build in so much extra time for her

19 ride, a trip to the doctor ten minutes away often takes up a substantial portion of her day. *Id*. If

20 she could use Lyft's on-demand service, she would not have to waste so much time with

21 paratransit and would be able to use her time more efficiently. *Id*.

22

3.     Tara Ayres

23         Plaintiff Tara Ayres has a mobility disability and uses a motorized wheelchair. Decl. of

24 Tara Ayres ("Ayres Decl."), ECF No. 45-16 at ¶¶ 3–4. Ms. Ayres lives in Richmond, California,

25 in Contra Costa County. *Id*. ¶ 2. Ms. Ayres would use Lyft's on-demand service in the Bay Area

26 if it was accessible to her. *Id*. ¶¶ 6–8.

27         Ms. Ayres has a smartphone but has not downloaded the Lyft app because she knows that

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19–CV–01438–WHA**
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**         7

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   there are never any WAVs available on the app in the East Bay where she lives, so downloading

2   it would be pointless. *Id.* ¶ 5. She is aware of Lyft's pilot program in San Francisco, but she has

3   not attempted to use it because she spends most of her time in the East Bay, and because she

4   knows the pilot has only five vehicles, and thus she does not think she would be likely to get a

5   ride. Seaborn Decl., Ex. I, Deposition of Tara Ayres ("Ayres Depo.") at 64:19–65:1; 65:15–22.

6   The inaccessibility of Lyft's service is widely known in the community of people with mobility

7   disabilities. Ayres Decl. ¶ 5. Ms. Ayres has read social media posts by other people about the

8   lack of wheelchair-accessible service on Lyft. *Id.* She has had many conversations with

9   wheelchair users about the lack of WAV vehicles on the Lyft platform. Ayres Depo. at 55:13–

10   56:17, 57:14–58:15.

11        There are many situations in which Ms. Ayres would use Lyft if she knew she could

12   count on being able to request a vehicle with a ramp or lift. Ayres Decl. ¶ 6.  For example, she

13   lives 1.25 miles from BART in Richmond and often would choose to take a Lyft to or from the

14   BART station if she had the option. *Id.* ¶ 7, Ayres Depo. at 53:7–54:9. Late at night, the bus that

15   runs near her house to the BART station runs infrequently, and she has to either wait for

16   prolonged periods for the bus or walk home through dark and deserted streets.  Ayres Decl. ¶ 7.

17              4.      Sascha Bittner

18        Plaintiff Sascha Bittner has a mobility disability and uses a motorized wheelchair for

19   mobility. Decl. of Sascha Bittner ("Bittner Decl."), ECF No. 45-17 at ¶ 3–4. Ms. Bittner lives in

20   San Francisco, California, in San Francisco County. *Id.* ¶ 2. Ms. Bittner would use Lyft's on-

21   demand service in the Bay Area if it was accessible to her. *Id.* ¶ 6.

22        Ms. Bittner has been deterred from using Lyft because she has heard from friends that it

23   is not a reliable form of transportation for people who need WAVs. She does not have a

24   smartphone now, but she would consider either getting a smartphone and using the Lyft app or

25   ordering a Lyft through a service that lets people do so by phone if she knew that she could

26   access reliable, on-demand transportation. *Id.* ¶¶ 5–6.

27        However, as it is now, she believes that it would be pointless to download the app

28

because the level of service is unreliable and nonexistent in many parts of the Bay Area. Ms. Bittner is active on social media, and she has seen posts by friends about the lack of WAV service on the Lyft platform. Seaborn Decl., Ex. J, Deposition of Sascha Bittner ("Bittner Depo.") at 45:3–47:12. She has also been with friends when they attempted to order an accessible Lyft ride and saw they were not successful. Bittner Decl. ¶¶ 5–6. Ms. Bittner is aware of Lyft's five-vehicle pilot in San Francisco, but she has not downloaded Lyft's app or attempted to use Lyft's WAV pilot in San Francisco because it is so limited that she does not feel she can count on getting a ride and because of its limited hours. *Id.* ¶ 6; Bittner Depo. at 51:15–20.

There are many occasions when Ms. Bittner would use Lyft if it were accessible to her. Ms. Bittner campaigns for fair wages for in-home care workers and attends events around the Bay Area and the state related to this work. *Id.* ¶ 9. She has also participated in workshops at ILRCSF. *Id.* Because she does not have access to a reliable ridesharing service, she often relies on her stepfather or other relatives to drive her in the family's accessible van. *Id.*

For Ms. Bittner, going out to routine events such as regular medical appointments or meetings becomes an all-day ordeal, when she builds in time for delays and disruptions on public transit. *Id.* ¶ 10. She uses paratransit, but that service is routinely hours behind schedule. For example, she was recently hours late to a political event for which she had scheduled a paratransit pickup two hours early. *Id.* Ms. Bittner is also often left out of spontaneous social gatherings because she can't simply call a Lyft like everyone else to get there and to depart when it is over. *Id.* ¶ 11.

### 5.   Independent Living Resource Center San Francisco

Independent Living Resource Center San Francisco ("ILRCSF") is a disability rights organization in San Francisco, California, that advocates for people with disabilities and supports them in living independent and active lives. Decl. of Lana Nieves ("Nieves Decl."), ECF No. 45-18 at ¶ 2. ILRCSF's board, staff, and the consumers of its services include people with mobility disabilities who have been harmed because of Lyft's failure to make accessible service reliably available to them. *Id.* ¶ 4.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    For example, Fiona Hinze, ILRCSF's Director of Systems Change, uses a motorized

2    wheelchair. *Id*. ¶ 5; Decl. of Fiona Hinze ("Hinze Decl."), ECF No. 45-19 ¶ 5. Lyft would

3    provide her an additional option to commute to work and to off-site meetings, speaking

4    engagements, and other important work-related events. Hinze Decl. ¶ 7. Without the option of a

5    reliable, convenient on-demand mode of transportation, she cannot travel around the city

6    spontaneously to attend work events because she has to book her transportation well in advance

7    using paratransit. *Id*. ¶¶ 8–9.  Ms. Hinze has not attempted to use Lyft because she knows its on-

8    demand service is not reliably available for people needing WAVs in the Bay Area. *Id*. ¶ 7. She

9    is aware of Lyft's five-vehicle pilot program in San Francisco, but she has not downloaded the

10   app because the pilot is so limited that she does not view it as a reliable transportation option.  *Id*.

11   ¶ 10, Seaborn Decl., Ex. K, Deposition of Fiona Hinze ("Hinze Depo.") at 40:23–41:7. Plaintiff

12   Sascha Bittner is also a consumer of ILRCSF's services, Bittner Decl. ¶ 9, and, as described

13   above, has been harmed by Lyft's failure to provide its on-demand service to persons needing

14   WAVs in the Bay Area. *Id*. ¶¶ 6–7. Additionally, ILRCSF has expended resources advocating

15   for increased transportation options for consumers who use WAVs, including access to rideshare

16   services. Second Decl. of Fiona Hinze ("Second Hinze Decl.") at ¶¶ 4–7.

17              6.      Community Resources for Independent Living

18         Community Resources for Independent Living ("CRIL") supports people with disabilities

19   in southern Alameda County to live independently, advocate for themselves, and access services,

20   programs, activities, resources, and facilities in the community. Decl. of Dorene Giacopini

21   ("Giacopini Decl."), ECF No. 45-20 at ¶ 4. CRIL's board, staff, and the consumers of their

22   services include people with mobility disabilities who have been harmed by Lyft's failure to

23   make accessible service available to them. *Id*.

24         For example, Dorene Giacopini, President of CRIL's board of directors, uses a motorized

25   wheelchair and needs to use WAVs when she travels by car. *Id*. ¶¶ 5–6. She has not downloaded

26   the Lyft app because she has learned from friends and colleagues that doing so would be

27   pointless because Lyft does not provide WAV service. *Id*. ¶ 8. However, she would use WAV

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  service through Lyft if it were available to go to work engagements, get to the airport, go to

2  medical appointments, and attend events at CRIL. *Id.* ¶¶ 8–9. She sometimes been unable to

3  attend CRIL meetings in person due to transportation difficulties. *Id.* ¶ 12. Having access to

4  reliable on-demand transportation such as Lyft provides in non-accessible vehicles would enable

5  her to fulfill her duties as a CRIL board president more fully. *Id.* ¶ 12. CRIL has expended

6  resources advocating for increased transportation options for consumers who use WAVs and by

7  operating an accessible Van Share program. Decl. of Michael Galvan ("Galvan Decl.") at ¶¶ 5–7.

8         7.   Members of the Putative Class

9        Members of the putative class include WAV users who have been similarly harmed by

10  Lyft's failure to provide its on-demand transportation service to WAV users in the Bay Area

11  Counties. *See, e.g.*, Decl. of Allie Cannington ¶ 5 (would use Lyft WAV to travel to medical

12  appointments and social events and to visit family), Decl. of Ann Cupolo Freeman ¶ 5 (would

13  use Lyft to travel to the airport, accessible public transportation, and medical appointments and

14  to visit friends); Decl. of Anne Finger ¶ 5 (would use Lyft to attend evening events and to travel

15  to the airport); Decl. of Aubrie Lee ¶ 5 (would use Lyft to socialize and attend events); Decl. of

16  Bonnie Lewkowicz ¶ 5 (would use Lyft during inclement weather, when driving is difficult, and

17  when parking is limited); Decl. of Elizabeth Henry ¶ 5 (would use Lyft to travel to work and

18  appointments and to visit friends and family).

19  **III.**   **LEGAL STANDARD**

20        A moving party is entitled to summary judgment if they show "that there is no genuine

21  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

22  Civ. P. 56(a). A dispute as to an issue of material fact is genuine "if the evidence is such that a

23  reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc.,

24  477 U.S. 242, 248 (1986). To establish a genuine dispute sufficient to warrant trial, the

25  nonmoving party "must do more than simply show that there is some metaphysical doubt as to

26  the material facts." *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586

27  (1986). The nonmoving party must set forth "specific facts showing there is a genuine issue for

28

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19-CV-01438-WHA**
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**          11

1  trial." *Id*. at 587. A party may move for summary judgment on a claim or defense or on part of a

2  claim or defense. Fed. R. Civ. P. 56(a). When plaintiffs demonstrate that there is no genuine

3  issue of material fact as to the defendant's liability, the court may grant partial summary

4  judgment on liability and later address remedies. *See, e.g.*, *Disabled in Action v. Board of*

5  *Elections in City of New York*, 752 F.3d 189, 194 (2d Cir. 2014) (describing district court's

6  bifurcation of proceedings between liability and remedy).

7  **IV.    ARGUMENT**

8          Lyft's failure to take essentially any steps to provide WAV service in the Bay Area

9  violates Title III of the ADA. Lyft is a covered entity under Title III either because it is engaged

10  in the business of transporting people under Section 12184 or because it offers a public

11  accommodation under Section 12182. As a result, Lyft is obligated not to discriminate on the

12  basis of disability in the "full and equal enjoyment" of its services. Under either Section 12184

13  or Section 12182, the statute defines discrimination to include a failure to make reasonable

14  modifications in its policies, practices, or procedures when such modifications are necessary to

15  provide people with disabilities full and equal enjoyment of the entity's services. 42 U.S.C. §

16  12184(b)(2)(A) (citing § 12182(b)(2)(A)(ii)). Lyft has violated this requirement. Additionally,

17  the four individual Plaintiffs and two organizational Plaintiffs have been injured by Lyft's

18  discrimination, and each has standing to pursue their claims.

19          **A.      Lyft's Transportation Service Is Covered by Title III of the Americans with**
20          **Disabilities Act.**

21               1.      Lyft Is Primarily Engaged in the Business of Transporting People.

22          The ADA prohibits discrimination "in the full and equal enjoyment of specified public

23  transportation services provided by a private entity that is primarily engaged in the business of

24  transporting people." 42 U.S.C. § 12184(a). Title III defines "specified public transportation" to

25  include transportation by any conveyance provided to the "general public with general or special

26  service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10).

27          Lyft is a private entity primarily engaged in the business of transporting people and thus

28  is subject to Section 12184. Lyft provides a ridesharing transportation service in the Bay Area.

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, Case No. 3:19-CV-01438-WHA
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**                                                              12

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   Seaborn Decl., Ex. D, Muñoz Depo. at 14:19–25. It states that its mission is to "[i]mprove

2   people's lives with the world's best transportation" and that it is "one of the larger and fastest-

3   growing multimodal transportation networks in the United States and Canada." Ex. E,

4   LYFT00000235. Lyft is "singularly focused on revolutionizing transportation," *id.* at

5   LYFT00000237, and its corporate designee to testify regarding Lyft's business model was not

6   aware whether Lyft offers any services that are not transportation services. Seaborn Decl. Ex. M,

7   Deposition of Edward Niedermeyer ("Niedermeyer Depo.") at 12:13-18.

8          While no Court has reached this issue on summary judgment, Courts have consistently

9   declined to dismiss Section 12184 claims against rideshare companies. *See Crawford v. Uber*

10  *Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *3–4 (N.D. Cal. March 1, 2018);

11  (denying Uber's motion for judgment on the pleadings regarding Uber's status as an entity

12  "primarily engaged in the business of transporting people" under the ADA); *Namisnak v. Uber*

13  *Techs., Inc.*, 444 F. Supp. 3d 1136, 1141-43 (N.D. Cal. 2020), (finding that Uber's argument that

14  it is not a transportation provider "strains credulity"); *accord Lowell v. Lyft, Inc.*, 352 F. Supp. 3d

15  248, 261- 62 (S.D.N.Y. 2018); *Ramos v. Uber Tech., Inc.*, No SA-14-CA-502XR, 2015 WL

16  758087, at *10 (W.D. Tex. Feb. 20, 2015) (denying Lyft's and Uber's motions to dismiss and

17  rejecting their assertion that they are not "primarily engaged in the business of transporting

18  people"). Outside of the WAV context, a Court in this District has referred to Lyft's contention

19  that it does not provide transportation services as "obviously wrong." *Cotter v. Lyft, Inc.*, 60 F.

20  Supp. 3d 1067, 1078 (N.D. Cal. 2015). As a transportation provider, Lyft is subject to the broad

21  mandate of Section 12184 to provide "full and equal enjoyment of specified public transportation

22  services" to people with disabilities. 42 U.S.C. § 12184(a).

23                  2.       Lyft Is a Public Accommodation.

24          In the alternative, Lyft's transportation service falls within the expansive definition of

25  "public accommodation" in the ADA. 42 U.S.C. § 12182. The statute defines "public

26  accommodation" by reference to twelve broad categories, which "'should be construed liberally'

27  to afford people with disabilities 'equal access' to the wide variety of establishments available to

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

the nondisabled." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 676–77 (2001). Lyft is a "private entity" whose operations affect commerce, and it owns, leases, or operates a "travel service," one of the covered forms of public accommodation. 42 U.S.C. § 12181(7)(F). While no Court has reached this issue on summary judgment, a Court in this District has declined to dismiss a Title III claim on the grounds that a rideshare company is not a public accommodation under Section 12182. *See, e.g., Nat'l Fed. of the Blind of Cal. v. Uber Tech., Inc.,* 103 F. Supp. 3d 1073, 1083–1084 (N.D. Cal. 2015).

**B.**   **Lyft Has Violated the ADA by Failing to Make Reasonable Accommodations.**

As either a transportation provider under Section 12184 or travel service under Section 12182, Lyft is required to make "reasonable modifications in policies, practices, or procedures" to achieve full and equal access for people with disabilities. 42 U.S.C. § 12184(b)(2)(A) (citing § 12182(b)(2)(A)(ii)). It has failed to do so. The Court need not reach the issue of what level of service constitutes "full and equal access" as Lyft has come nowhere near that standard under any reasonable definition. Lyft provides no WAV service whatsoever in two of the three Bay Area Counties and began offering its limited, wholly unequal pilot program in San Francisco after Plaintiffs filed their Complaint.

To establish that Lyft has violated the ADA by failing to provide requested reasonable modifications, Plaintiffs must first establish that the requested modification is necessary. *Fortyune v. Am. Multi-Cinema, Inc.,* 364 F.3d 1075, 1083 (9th Cir. 2004). Lyft does not contest that Plaintiffs are persons with disabilities under the ADA. Stip. ¶ 1. And, Lyft also does not contest that Plaintiffs requested modifications to its polices, practices, and procedures in order to ensure Lyft's service is available in the Bay Area to persons needing WAVs, Stip. ¶ 9, nor that Plaintiffs require access to WAVs in order to travel by car due to their disabilities, Stip. ¶ 1.

Next, Plaintiffs must show that the requested modifications are reasonable. "Although neither the ADA nor the courts have defined the precise contours of the test for reasonableness, it is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   modification in light of the nature of the disability in question and the cost to the organization

2   that would implement it." *Fortyune*, 364 F.3d at 1083 (quoting *Staron v. McDonald's Corp.*, 51

3   F3d. 343, 356 (2d Cir. 1995)). *See also Wong v. Regents of the Univ of Cal.*, 192 F.3d 807, 818

4   (9th Cir. 1999) ("[T]he issue of reasonableness depends on the individual circumstances of each

5   case, this determination requires a fact-specific, individualized analysis of the disabled

6   individual's circumstances and the accommodations that might [be necessary to ensure her

7   ability to enjoy a public accommodation]").

8           Plaintiffs do not have a high burden. They need only show evidence that they have

9   requested reasonable modifications that are "reasonable in the general sense," meaning

10  "evidence that the requested modification is reasonable in the run of cases." *Mannick v. Kaiser*

11  *Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 2168877, at *12 (N.D. Cal. July 31,

12  2006) (quoting *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir.

13  1997)).  "Once the plaintiff meets the burden of showing that a modification is reasonable in the

14  general sense," the burden shifts to the defendant to "make the requested modification unless the

15  defendant pleads and meets its burden of proving that the requested accommodation would

16  fundamentally alter the nature of the public accommodation."  *Id.*; *see also Lentini v California*

17  *Center for the Arts*, 370 F.3d 837, 844–46 (9th Cir. 2004).

18          Plaintiffs have met their burden. In 2018, Plaintiffs' counsel wrote to Lyft's counsel

19  suggesting a number of potential modifications that would enable Lyft to provide wheelchair

20  access. Stip. ¶ 9. These suggested modifications included using some of the strategies Lyft has

21  used in order to build their non-WAV service, *see supra* Section II(A), and to provide WAV

22  service in other markets, Stip. ¶ 12, including offering incentives to drivers, creating WAV rental

23  opportunities, and contracting with a third-party company with WAV vehicles in its fleet. Stip. ¶

24  9. Plaintiffs also suggested other possible modifications, including incentivizing van owners who

25  drive for Lyft to convert their vehicles into WAVs. Stip. ¶ 9. Plaintiffs have made additional

26  suggestions during the course of this litigation and have been clear that Plaintiffs do not seek that

27  Lyft be required to make any particular modification. *See, e.g.*, Seaborn Decl., Ex. N (ILRCSF's

28

1  Supplemental Responses to Lyft's First Set of Interrogatories at 2–4). Rather, Plaintiffs want

2  access to the robust, reliable transportation service that Lyft offers non-WAV users. There are

3  multiple ways to reach achieve this outcome, and it is Lyft's prerogative to determine how they

4  wish to get there.

5       It is evident that the requested modifications are reasonable "in the general sense" and "in

6  the run of cases," *Mannick*, 2006 WL 2168877, at *12, as Lyft has already made most of the

7  requested modifications in cities outside the Bay Area. *See also Namisnak*, 444 F.Supp.3d at

8  1142–43 (declining to dismiss Plaintiffs' Section 12184 claim that Uber failed to provide

9  reasonable modifications where the request modifications included steps Uber had previously

10 taken to provide WAV in other cities and to provide non-WAV service). For example, in New

11 York, Lyft provides WAV service by using a hybrid model that includes providing incentives to

12 independent contractor drivers, rental partnerships, and contracting with third parties. Stip. ¶ 20.

13 In Chicago, Lyft provides WAV service by contracting with a company that helped onboard

14 WAV taxis onto the Lyft platform. Stip. ¶ 22. Lyft also has a longstanding practice of using paid

15 advertising and marketing to recruit non-WAV drivers and passengers to its platform. Seaborn

16 Decl., Ex. E, LYFT00000275.

17      Meanwhile, in the Bay Area, Lyft has used no paid advertising to recruit WAV drivers or

18 passengers, Stip. ¶¶ 36, 42, nearly began but then paused a rental car partnership, Stip. ¶¶ 39-41,

19 and does not currently even permit prospective independent contractor WAV drivers to sign up

20 to provide WAV service, Stip. ¶ 43. Lyft does have a partnership with a third party to provide the

21 San Francisco pilot program, but it has opted not to expand that partnership to include Alameda

22 or Contra Costa County or to provide twenty-four-hour service. Stip. ¶¶ 29, 30. Lyft cannot show

23 that the requested modifications are unreasonable when has previously chosen and continues to

24 choose to make these modifications outside the Bay Area and when some of these modifications

25 involve steps that Lyft has routinely taken to build its non-WAV service.

26      Lyft knows it could make modifications to its policies that would allow it to provide

27 more robust WAV service in San Francisco, and any WAV service in Alameda or Contra Costa

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   County, because it has done so elsewhere. The CPUC agrees, as it has imposed service level

2   requirements that rideshare companies must meet to qualify to receive reimbursement of a per-

3   ride fee imposed on all rideshare rides in the State, service requirements that certainly exceed the

4   zero service Lyft currently provides in Alameda and Contra Costa Counties. Stip. ¶ 54(B). If Lyft

5   meets these requirements, it estimated it could recoup up to ▊▊▊▊▊▊ statewide. Stip. ¶

6   51. Plaintiffs have met their burden to show that they have requested reasonable modifications

7   and that these modifications are indeed reasonable. The burden now shifts to Lyft to demonstrate

8   that the proposed modifications are not reasonable, and it is clear that Lyft cannot meet this

9   burden when it is has made and continues to make many of the requested modifications

10  elsewhere.

11        Even if the Court were to determine that one or more of the requested modifications are

12  not reasonable, Lyft should not be excused from making the modifications that it is able to make.

13  If an ADA litigant asked a public accommodation to make a facility's front entrance and all of its

14  bathrooms accessible, it surely would not excuse the facility's obligation to make the

15  modifications it is able to reasonably make merely because it was not reasonable for it to modify

16  one of the bathrooms due to some site-specific issue. Similarly, if a small theater company could

17  only reasonably provide an American Sign Language interpreter at some but not all of its

18  performances, this limitation would not excuse the theater's refusal to provide an interpreter

19  when it is able to do so. If Lyft cannot make all the modifications sought, it must make the

20  modifications that it can. As either a provider of transportation or a travel service, Lyft has

21  violated the ADA by failing to make reasonable modifications in order to provide full and equal

22  enjoyment of its transportation service.

23        **C.    Lyft Has Not Met Its Burden to Establish Defenses.**

24        Covered entities claiming that proposed reasonable modifications to their programs

25  would present an undue burden or fundamental alteration face the burden of proof on these

26  defenses. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1010 (9th Cir. 2017);

27  *Mannick*, 2006 WL 2168877, at *6.

28

1.   <u>Lyft Has Not Shown that Providing WAV Service Would Be an Undue Burden.</u>

Under the ADA's regulations, "[u]ndue burden means significant difficulty or expense." 28 C.F.R. § 36.104. "In determining whether an action would result in an undue burden, factors to be considered include . . . [t]he nature and cost of the action needed under this part; . . .[t]he overall financial resources of the site or sites involved in the action. . . . [i]f applicable, the overall financial resources of any parent corporation or entity; the overall size of the parent corporation or entity with respect to the number of its employees; [and] the number, type, and location of its facilities." *Id*. "[C]ases finding undue burden demonstrate it is a high bar." *Enyart v. Nat'l Conference of Bar Examiners, Inc*., 823 F. Supp. 2d 995, 1014 (N.D. Cal. 2011).

Lyft is a publicly traded company that generated $8.1 billion in bookings and $2.2 billion in revenue in 2018. Seaborn Decl., Ex. E at LYFT00000236. Lyft believes it is "still in the very early phases" of capturing some of the over $1 trillion in annual consumer spending on transportation. *Id*. at LYFT00000238–39. In a May 2020 press release, Lyft's CEO explained that "[w]hile the COVID-19 pandemic poses a formidable challenge to our business, we are prepared to weather this crisis." Stip. ¶ 54(C) at 1. To the extent Lyft argues that it is an undue burden to provide WAV service because it historically has had to spend more on WAV rides than it has received in WAV fares, it ignores that Lyft's non-WAV business is also not currently profitable, Seaborn Decl., Ex. M, Niedermeyer Depo. 49:5–14, and that Lyft has "incurred net losses each year since [its] inception." Ex. E at LYFT00000255.

If Lyft wishes to assert that providing a particular level of WAV service would constitute an undue burden, it must first articulate how it has determined the cost of providing that level of WAV service. At this time, Lyft has not shown that any particular level of WAV service would impose such a burden. For example, in New York City, where Lyft agreed to meet certain ETA requirements as part of a legal settlement, Lyft uses a hybrid model of providing WAV service, and its data show that it has spent an average of ▮ per ride. Stip. ¶¶ 20, 45. In Chicago, where Lyft provides WAV service using taxis, it has spent an average of ▮ per ride. Stip. ¶ 22. While Lyft views these amounts as high, it has made no showing that these expenditures have actually

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   placed an undue burden on Lyft, the second-largest rideshare company in the United States.

2         The record reflects that Lyft believes the cost of providing service is variable and that

3   Lyft has been able to provide this service more cheaply when it knows more about the relevant

4   market, when it has been able to negotiate better rates in its contracts, and where demand for its

5   service is higher. Seaborn Decl., Ex. L, Second Deposition of Andres Muñoz ("Muñoz Second

6   Depo.") at 74:16-77:3; 85:22–86:13. Lyft has not yet taken advantage of any of these cost-

7   lowering conditions in the Bay Area. It offered no WAV service in the Bay Area until it

8   launched its limited San Francisco pilot program in July 2019, Stip. ¶ 23, and thus is new to the

9   WAV market in the region. Lyft is in the middle of a national RFP process in which it hopes to

10  renegotiate its contracts, including the contract under which it provides WAV service through the

11  San Francisco pilot program. Seaborn Decl., Ex. F, Gerundio Depo. at 98:14–99:6. The Lyft

12  employee in charge of overseeing all national WAV operations believes that this process will

13  lower the cost of providing WAV service. *Id.* at 99:7-25.

14        Finally, while Lyft believes that higher demand for its WAV program can lower the cost

15  of providing WAV service, it has failed to take the steps it knows would increase demand for

16  WAV service. In order for prospective riders to even see that the San Francisco WAV Pilot may

17  be an option for them, they must first know to toggle "Wheelchair Access" mode in the app's

18  settings. Ex. D, Muñoz Depo. at 77:15–78:13. Riders need not take this or a similar step to see

19  which of Lyft's other ride modes are available in their area. *Id.* at 79:4-16.  In New York City,

20  Lyft removed the need to toggle "Wheelchair Access" mode in order to see WAV vehicles as an

21  option on the app and saw demand for their WAV service increase sharply, or about 100 percent.

22  Ex. F, Gerundio Depo. at 27:5-28:18. Lyft knows that removing "Wheelchair Access" mode

23  could significantly increase WAV demand. Yet, it has not done so.

24        Lyft "believe[s] that much of the growth in [its] rider base and the number of drivers on

25  [its] platform is attributable to [its] paid marketing initiatives." Seaborn Decl., Ex. E,

26  LYFT00000275. Yet despite this belief, Lyft has not used any paid advertising to market the San

27  Francisco WAV pilot program. Stip. ¶¶ 36, 42. The record reflects that in markets like San

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  Francisco where Lyft ████████████████████████████████████████████

2  ██████████████████████████████████████████ Ex. Q, Deposition of

3  Christopher Wu ("Wu Depo.") at 29:22–30:11, 32:8–34:2; Ex. O at 2 (Wu Depo. Ex. 80).

4       Similarly, the record reflects that Lyft believes that ████████████████

5  ████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████. Seaborn

7  Decl., Ex. R., Deposition of Audrey Ren ("Ren Depo."), at 89:10–90:3, 92:14–93:17, 95:1–21;

8  Ex. P at 1 (Ren Depo, Ex. 50). Lyft knows that it has numerous potential levers it can use to

9  increase demand and believes that higher demand will ultimately reduce the cost of providing

10  WAV service, but it has elected not to use these levers.

11       Lyft asserts that its independent contractor model of providing service is the least

12  expensive way to provide WAV service, but it has neither taken steps to recruit independent

13  contractor WAV drivers outside a now-paused rental pilot in the Bay Area nor does it even

14  permit WAV independent contractor drivers in the Bay Area Counties to provide WAV service

15  through the Lyft platform. Stip. ¶¶ 41–43.

16       In addition to steps Lyft could take, but has not taken, to reduce the amount it spends to

17  provide WAV service in the Bay Area, Lyft has an opportunity to be reimbursed by the CPUC

18  for at least some of the cost of providing WAV service as long as it meets certain service

19  requirements. Beginning on July 1, 2019, Lyft was required to pay ten cents per Lyft ride in the

20  state of California into a fund. Seaborn Decl., Ex. L, Second Muñoz Depo. at 33:5–15. If Lyft

21  meets the CPUC's service requirements and shows quarter over quarter improvement in any

22  California county, it can be reimbursed for the cost of providing WAV service for the previous

23  quarter. *Id.* at 34:5–13. Lyft has estimated that the potential reimbursement for the state of

24  California could be from ███████████. Stip. ¶ 51.

25       Finally, even if Lyft could demonstrate that the cost of providing a certain level of WAV

26  service in the Bay Area Counties would somehow constitute an undue burden, factoring in its

27  many levers for reducing costs and the availability of the CPUC offset, Lyft cannot show that the

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   cost of providing significantly more equal WAV service in the Bay Area than it currently

2   provides would constitute such a burden. While Lyft does not provide fully equivalent WAV

3   service in New York, it does provide service that is significantly more robust than the San

4   Francisco pilot program. There is nothing in the record to indicate that providing this level of

5   WAV service in New York has had any noticeable impact on Lyft's overall business or finances.

6   Lyft has not established that providing any given level of WAV service would constitute an

7   undue burden, but at minimum, Lyft has not shown that providing significantly more WAV

8   service in the Bay Area than it currently provides would constitute such a burden.

9         2.    <u>Lyft Has Not Shown That Providing WAV Service Would Be a</u>
               <u>Fundamental Alteration.</u>

10

11       Lyft has similarly failed to demonstrate that providing WAV service would constitute a

12   fundamental alteration. As an entity covered under either Section 12182 or Section 12184, Lyft

13   is required to make reasonable modifications to its policies, practices, and procedures to afford

14   access to its services, unless "the entity can demonstrate that making such modifications would

15   fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or

16   accommodation." 42 U.S.C. §12182(b)(2)(A)(ii); 12184(b)(2)(A). *See also Fortyune*, 364 F.3d

17   at 1084 (holding that a requested modification at AMC movie theaters would "have a negligible

18   effect—if any—on the nature of the service provided by the Theater" where any resulting shift

19   would be "modest" and "not rise to the level of a 'fundamental alteration' of the Theater itself").

20       Lyft cannot meet this burden as Plaintiffs merely request that Lyft make the reasonable

21   modifications necessary so that Plaintiffs can access Lyft's on-demand, app-based ridesharing

22   service. Plaintiffs are not asking that Lyft offer some service other than transportation, and Lyft

23   already offers its transportation service in a range of ride "modes," including WAV service in

24   some markets and the limited pilot program in San Francisco. Plaintiffs have largely requested

25   that Lyft take the same steps it has already taken to build its non-WAV service, and to build its

26   WAV service outside of the Bay Area, in order to offer WAV service in the Bay Area. Lyft

27   could certainly opt to take steps to provide WAV service that it has not previously taken, but

28   Plaintiffs do not seek an order requiring Lyft to do so.

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19-CV-01438-WHA**
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**                                         21

And to the extent Lyft argues that it would be a fundamental alteration to take any steps to provide WAV service beyond the steps Lyft has taken to provide non-WAV service, it is undisputed that Lyft has failed to even take such steps. To build its non-WAV service in the Bay Area, Lyft has used paid advertising, offered driver incentives to recruit independent contractor drivers, and facilitated car rentals to assist prospective independent drivers in obtaining a vehicle to use to provide Lyft service. *See supra* Section II(A). Lyft has not taken a single one of those steps to provide, or even attempt to provide, WAV service in the Bay Area Counties. It cannot assert that it would "fundamentally alter" its business to take actions that have long been part of how it conducts its non-WAV business. Lyft cannot show that it would fundamentally alter its business, or mission to "[i]mprove people's lives with the world's best transportation," Seaborn Decl., Ex. E, at, LYFT00000235, to provide service that is usable to Plaintiffs and other people with disabilities who rely on WAVs.

### D.   Plaintiffs Have Standing.

The individual and organizational Plaintiffs can each readily establish standing. "[T]o satisfy Article III's case or controversy requirement, [a Plaintiff] needs to show that [she] has suffered an injury in fact, that the injury is traceable to the challenged action of [Defendant], and that the injury can be redressed by a favorable decision." *Fortyune*, 364 F.3d at 1081 (citation omitted). Further, "[i]n the context of injunctive relief, [a Plaintiff] must additionally demonstrate 'a sufficient likelihood that [she] will again be wronged in a similar way[.]'" *Id.* (citation omitted). Each Plaintiff meets these requirements. "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989).

####    1.   The Individual Plaintiffs Have Been Injured by Lyft's Failure to Provide WAV Service.

The four individual plaintiffs are all individuals with disabilities who rely on WAVs to travel by car. Stip. ¶ 1. They each reside in the Bay Area, routinely travel around the Bay Area, and would use Lyft it if offered reasonably equivalent WAV service. Because Lyft offers no WAV service in two of the three Bay Area Counites, and only a limited pilot in San Francisco,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Plaintiffs have been deterred from downloading the Lyft app. *See supra* Section II(D)(1)-(4).

2         The ADA provides that an individual can suffer an injury cognizable under Title III

3    without having to "engage in a futile gesture." 42 U.S.C. § 12188(a)(1). Once a disabled

4    individual has "become aware of alleged ADA violations that deter his patronage of or otherwise

5    interfere with his access to a place of public accommodation, he has already suffered an injury in

6    fact traceable to the defendant's conduct and capable of being redressed by the courts, and so he

7    possesses standing under Article III . . . ." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1042 n.5 (9th

8    Cir. 2008); *Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 950 (9th Cir. 2011) (en banc)

9    (citing *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002) ("We

10   nevertheless concluded that the plaintiff had Article III standing because 'a disabled individual

11   who is currently deterred from patronizing a public accommodation due to a defendant's failure

12   to comply with the ADA has suffered 'actual injury''").

13        The Plaintiffs have not attempted to access Lyft's WAV service because they know that

14   doing so would be futile. *See supra* Section II(D)(1)-(4). At the time of filing the Complaint,

15   they were aware that Lyft offered no WAV service in the Bay Area whatsoever. They have since

16   become aware of the limited pilot program in San Francisco but have not attempted to use it

17   because they know it is extremely limited and indeed offers no service in Alameda or Contra

18   Costa County. *Id.* Plaintiffs have suffered an injury because they are aware that Lyft offers

19   almost no WAV service, and therefore they have been deterred from trying to access that service.

20   They have also identified specific incidences where they would have used Lyft, and would use

21   Lyft going forward, if its on-demand transportation service was accessible to them, but, because

22   it is not, they have experienced and continue to experience actual and actionable harm. *Id.* Each

23   such incident represents a cognizable injury that is actionable under Title III of the ADA.

24   *Chapman*, 631 F.3d at 949–50.

25        Courts around the country have found that plaintiffs with nearly identical deterrence-

26   based claims and facts have standing. *See Namisnak v. Uber Techs., Inc.*, No. 18-15860, 2020

27   WL 4930650, at *3 (9th Cir. Aug. 24, 2020) (applying deterrence-based theory of injury under

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19-CV-01438-WHA**
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**                                                                              23

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   Title III to plaintiffs deterred from downloading and using Uber's app because they are aware of

2   discriminatory conditions involving Uber's service); *Nat'l Fed. Of the Blind of Cal.*, 103 F.

3   Supp. 3d at 1080–81 (same); *Crawford v. Uber Techs., Inc.*, 2018 WL 1116725, at *2–3 (same);

4   *Lowell*, 352 F. Supp. 3d at 256; *Ramos*, 2015 WL 758087, at *7-9.

5                  2.      The Organizational Plaintiffs Have Been Injured by Lyft's Failure to
                           Provide WAV Service.

6

7          The Organizational Plaintiffs have both associational and organizational standing to bring

8   this action. To establish associational standing, an entity must demonstrate that "(1) its members

9   would otherwise have standing to sue in their own right; (2) the interest it seeks to protect are

10  germane to the organization's purpose; and (3) neither the claim *asserted nor the relief requested*

11  *requires the participation of individual members in the lawsuit.*" *Nat'l Fed'n of the Blind of*

12  *California*, 103 F. Supp. 3d at 1078 (citing *Hunt v. Wash. State Apple Adver. Com'n*, 432 U.S.

13  342, 344 (1997) (emphasis added). "[C]laims for declaratory and injunctive relief do not require

14  individualized proof, thereby satisfying the third prong." *Id.*

15         ILRCSF consumer Sascha Bittner and staff member Fiona Hinze, and CRIL board of

16  directors President Dorene Giacopini, are all people with disabilities who travel by WAV and

17  have been deterred from using Lyft's transportation service. *See supra* Section II(D)(4)-(6). They

18  therefore each have standing to sue in their own right. Both ILRSCF and CRIL are disability

19  rights organizations that work to advocate for people with disabilities, and therefore Plaintiffs'

20  claims are germane to the organizations' missions. Nieves Decl. ¶ 2, Galvan Decl. ¶ 4. Finally,

21  Plaintiffs seek only injunctive relief, and thus neither the claim nor relief requested requires the

22  participation of individual ILRSCF or CRIL members.

23         Additionally, both Organizational Plaintiffs have standing to sue on their own right as

24  each can show (1) that the challenged practice frustrates its core mission, and (2) that it has

25  diverted its resources to combat the challenged practice. *See Valle Del Sol, Inc. v. Whiting*, 732

26  F.3d 1006, 1018 (9th Cir. 2013); *Fair Hous. Council of San Fernando Valley v. Roomate.com,*

27  *LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012). Both ILRCSF and CRIL have expended resources

28  they would not have otherwise expended advocating for access to accessible transportation in

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    general and to app-based rideshare services specifically, Second Hinze Decl. ¶¶ 4–8, Galvan

2    Decl. ¶ 5, 6, 8, and CRIL has expended resources operating an accessible Van Share program

3    because of the lack of flexible transportation options available to WAV users. Galvan Decl. ¶ 7.

4              3.    Lyft Caused Plaintiffs' Injury and Could Redress It.

5              Plaintiffs' injury is fairly traceable to Lyft, and Lyft could redress that injury. Plaintiffs'

6    injury was caused by Lyft's failure to make reasonable modifications to its policies, practices,

7    and procedures, which has resulted in a failure to provide equivalent WAV service, or any WAV

8    service whatsoever in two of the three Bay Area Counties. There is thus "a fairly traceable

9    connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel

10   Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). And there is "a likelihood that the

11   requested relief will redress the alleged injury," *id.*, as Lyft has shown that it is able to offer more

12   reliable and robust WAV service when it modifies its policies, practices, and procedures outside

13   the Bay Area Counties. *See supra* Section II(B).

14   **V.    CONCLUSION**

15             Lyft has demonstrated that it can make modifications to provide more robust WAV

16   service when it believes it has to. However, here, rather than attempt to make those

17   modifications, Lyft has chosen to argue it does not have to. Plaintiffs expect that the parties

18   could come together to agree on a reasonable remedy after a ruling on Lyft's liability. Thus,

19   Plaintiffs respectfully request that the Court grant their motion for partial summary judgment and

20   declare Lyft liable for failing to make reasonable modifications needed to provide its on-demand

21   service to WAV users. Following such a ruling, Plaintiffs, who do not seek perfection, will make

22   all reasonable efforts to engage in meaningful settlement discussions regarding a possible

23   remedial plan.

24

25

26

27

28

1

2   DATED:  September 3, 2020          Respectfully submitted,

3
                                      DISABILITY RIGHTS ADVOCATES
4

5

6

7                                     _____
                                      Rebecca C. Serbin
8                                     Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644