1

FOLGER LEVIN LLP
Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)

2

Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
Sherri M. Hansen (CSB No. 302903, shansen@folgerlevin.com)

3

199 Fremont Street, 20th Floor
San Francisco, CA 94105

4

Telephone: 415.625.1050
Facsimile: 415.625.1091

5

6

Attorneys for Defendant LYFT, INC.

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11

INDEPENDENT LIVING RESOURCE
CENTER SAN FRANCISCO, a California

12

non-profit corporation, JUDITH SMITH,
an individual, JULIE FULLER, an

13

individual, SASCHA BITTNER, an
individual, TARA AYRES, an individual,

14

and COMMUNITY RESOURCES FOR
INDEPENDENT LIVING, a California

15

non-profit corporation,

16

Plaintiffs,

17

v.

18

LYFT, Inc., a Delaware corporation,

19

Defendant.

Case No. 3:19-cv-01438-WHA

**NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT BY
DEFENDANT LYFT, INC.;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

Date:         October 8, 2020
Time:        8:00 a.m.
Courtroom:  12 – 19th Floor

20

21

22

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

23

24

25

26

27

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................. 1

II. STATEMENT OF FACTS ............................................................................................... 3

    A. Lyft's Ridesharing Platform.................................................................................. 3

    B. Wheelchair Accessible Vehicles .......................................................................... 5

        1. No Evidence Of WAV Supply ................................................................. 5

        2. No Evidence Of WAV Demand ............................................................... 6

        3. No Evidence Of Density Of WAV Demand And Supply To Sustain Lyft's Ridesharing Platform .................................................................... 7

    C. In Response To Local Regulation, Lyft Offers "Access Mode" In Nine Cities By Artificially Creating A Supply Of WAVs On Its Platform At Significant Cost .................................................................................................... 8

        1. "Partner" Model ...................................................................................... 8

        2. "Rental" Model ....................................................................................... 9

        3. "Organic Driver" Model ......................................................................... 9

    D. In Response To SB 1376, Lyft Launched The SF WAV Pilot ............................ 10

III. ARGUMENT ................................................................................................................. 11

    A. The Court Should Grant Lyft's Motion For Summary Judgment Because Plaintiffs Cannot Establish A Prima Facie Case Of Discrimination Under The ADA ............................................................................................................ 11

        1. In Enacting The ADA, Congress Explicitly Exempted Private Entities Who Provide Demand Responsive Transportation Services From Having To Acquire, Lease, Or Retrofit WAVs ............................... 12

        2. Plaintiffs' Discrimination Claim Fails Because They Cannot Identify A Discriminatory Policy, Practice, Or Procedure Which, If Modified, Would Result In WAV Service On Lyft's Platform ............... 13

        3. Each Purported "Modification" Proposed By Plaintiffs Fails................... 15

            a. Plaintiffs' First Purported Modification – That Lyft Adopt Incentives And Advertisements To Replicate Its Ridesharing Platform – Fails Because There Is No Evidence Of What Those Incentives And Advertisements Could Be Or That They Would Be Effective .................................................. 16

            b. Plaintiffs' Second Purported Modification – That Lyft Engage Expensive Third-Party Partners – Fails Because Contracting For WAV Supply Is Not A Reasonable Modification To A Policy, Practice, Or Procedure ....................... 17

            c. Plaintiffs' Third Purported Modification – That Lyft Develop A Complex Rental Program To Arrange For A Supply Of WAVs – Also Fails Based On Its Enormous Cost And The Lack Of Any Evidence It Will Work ............................ 20

    B. To Provide WAV Service, Lyft Must Fundamentally Alter Its Business............ 22

**TABLE OF CONTENTS**
**(continued)**

Page

C.    Plaintiffs' Inability To Identify A Reasonable Modification To A Policy,
Practice, Or Procedure Also Dooms Their Ability To Establish Standing .......... 23

1.    Because Plaintiffs Cannot Identify Any Specific Policy Or Practice
That Is Discriminatory, Plaintiffs Have Not Shown Any Injury
Traceable to Lyft's Conduct ........................................................................ 23

2.    Plaintiffs' "Do Whatever It Takes" Approach Lays Bare The Flaw
That No Injunction Is Available, Demonstrating That The Alleged
Harm Is Not Redressable Under The ADA ............................................. 24

IV.    CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. v. Walt Disney Parks & Resorts US, Inc.*
No. 6:14-cv-1544-Orl-22GJK, 2020 U.S. Dist. LEXIS 109205
(M.D. Fla. June 22, 2020) ............................................................................ 18, 19, 23

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*
603 F.3d 666 (9th Cir. 2010) ...................................................................................... 18

*Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.*
158 F. Supp. 2d 1353 (S.D. Fla. 2001) ...................................................................... 23

*Baughman v. Walt Disney World Co.*
685 F.3d 1131 (9th Cir. 2012) ............................................................................ 19, 21

*Castelan v. Universal Studios Inc.*
No. CV 12-05481 BRO (AGRx), 2014 U.S. Dist. LEXIS 9092
(C.D. Cal. Jan. 10, 2014) ............................................................................................ 18

*Chapman v. Pier 1 Imps. (U.S)*
631 F. 3d 939 (9th Cir. 2011) ..................................................................................... 24

*Crowder v. Kitagawa*
81 F.3d 1480 (9th Cir. 1996) ............................................................................... 16, 17

*Dalberg v. Avis Rent a Car Sys., Inc.*
92 F. Supp. 2d 1091 (D. Colo. 2000) ......................................................................... 17

*Fortyune v. Am. Multi-Cinema, Inc.*
364 F.3d 1075 (9th Cir. 2004) ........................................... 12, 14, 15, 19, 21, 22

*Fortyune v. Am. Multi-Cinema, Inc.*
No. CV 01-05551 NM (JWJx), 2002 U.S. Dist. LEXIS 27960
(C.D. Cal. Oct. 21, 2002) ............................................................................................ 25

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*
528 U.S. 167 (2000) .................................................................................................... 23

*Galvan v. Walt Disney Parks and Resorts*
425 F.Supp.3d 1234 (C.D. Cal. Nov. 27, 2019) ......................................................... 23

*Galvez v. Auto. Club of S. Cal.*
No. SA CV 16-0887-DOC (KESx), 2017 U.S. Dist. LEXIS 214650
(C.D. Cal. May 5, 2017) ............................................................................. 15, 17, 19, 21

*Granny Goose Foods, Inc. v. Bhd. Of Teamsters*
415 U.S. 423 (1974) .................................................................................................... 24

*Ind. Coal. For Pub. Educ.-Monroe Cty. v. McCormick*
338 F. Supp. 3d 926 (S.D. Ind. 2018) ........................................................................ 24

*Lentini v. Cal. Ctr. for the Arts*
370 F.3d 837 (9th Cir. 2004) ............................................................................... 19, 21

*Lewis v. Casey*
518 U.S. 343 (1996) .................................................................................................... 23

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) .................................................................................................... 23

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-iii-

DEFENDANT'S NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT
CASE NO. 3:19-CV-01438-WHA

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mark v. Valley Ins. Co.*
275 F. Supp. 2d 1307 (D. Or. 2003) ................................................. 18

*Moore v. City of Berkeley*
No. 14-cv-00669-CRB, 2018 U.S. Dist. LEXIS 48611
(N.D. Cal. Mar. 23, 2018) ................................................. 16, 17

*Musick v. Burke*
913 F.2d 1390 (9th Cir. 1990) ................................................. 22

*Namisnak v. Uber Techs.*
No. 17-CV-060124-RS, 2018 U.S. Dist. LEXIS 221054
(N.D. Cal. Oct. 3, 2018) ................................................. 12

*Nat'l Labor Relations Bd. v. A-Plus Roofing, Inc.*
39 F.3d 1410 (9th Cir. 1994) ................................................. 18

*Noel v. New York City Taxi and Limousine Comm'n*
687 F.3d 63 (2d Cir. 2012) ................................................. 13

*O'Byrne v. Reed*
No. CV 09-08406 DMG (DTBx), 2010 U.S. Dist. LEXIS 153617
(C.D. Cal. Feb. 5, 2010) ................................................. 20

*PGA Tour, Inc. v. Martin*
532 U.S. 661 (2001) ................................................. 12, 15, 22

*Schmidt v. Lessard*
414 U.S. 473 (1974) ................................................. 24

*Schulz v. Bay Area Motivate, LLC*
No. 19-cv-02134-MMC, 2019 U.S. Dist. LEXIS 209256
(N.D. Cal. Dec. 3, 2019) ................................................. 18

*Simon v. E. Ky. Welfare Rights Org.*
426 U.S. 26 (1976) ................................................. 24

*Toomer v. City Cab*
443 F.3d 1191 (10th Cir. 2006) ................................................. 13

*Union Pac. R.R. v. Mower*
219 F.3d 1069 (9th Cir. 2000) ................................................. 24

*Weyer v. Twentieth Century Fox Film Corp.*
198 F.3d 1104 (9th Cir. 2000) ................................................. 12, 18

*Wong v. Regents of the Univ. Of Cal.*
192 F.3d 807 (9th Cir. 1999) ................................................. 15

**Statutes**

42 U.S.C. § 12181 ................................................. 12

42 U.S.C. § 12182 ................................................. 12, 13, 18, 20

42 U.S.C. § 12184 ................................................. 12

42 U.S.C. § 12186 ................................................. 13

Cal. Pub. Util. C. § 5440 ................................................. 5, 10, 20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Other Authorities**

49 C.F.R. § 37.5 ................................................................................................ 19

49 C.F.R. Pt. 37 ........................................................................................... 13, 20

Final Rule, Transportation for Individuals with Disabilities;
      Reasonable Modification of Policies and Practices,
      80 Fed. Reg. 13253, 13262 (March 13, 2015) ................................ 19

**Rules**

Fed. R. Civ. P. 65 ............................................................................................ 24

## NOTICE OF MOTION AND MOTION

### TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on October 8, 2020 at 8:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 12 – 19th Floor at 450 Golden Gate Avenue, San Francisco, California, Defendant Lyft, Inc. ("Lyft") will move this Court for an order granting Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Lyft moves on the grounds that there is no genuine issue as to any material fact, and it is entitled to judgment as a matter of law. The motion is based on this Notice of Motion and Memorandum of Points & Authorities, the Joint Stipulation Regarding Facts and Authenticity of Documents, the Declaration of Jiyun Cameron Lee and accompanying exhibits, the Declaration of Edward Niedermeyer, the Declaration of Isabella Gerundio, and such further evidence and argument as may be presented at or before the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

The cost of providing on-demand wheelchair accessible vehicle ("WAV") service on Lyft's ridesharing platform is staggering. In February 2020 alone, Lyft paid ▮▮▮▮ to a third-party contractor, First Transit, Inc., to provide five fully-dedicated WAV vehicles, available 17 hours per day, 7 days a week, in San Francisco. *See* Joint Stipulation Re Facts and Authenticity of Documents ("Stip.") ¶¶ 23-26. At that cost, these dedicated vehicles completed just ▮▮ WAV rides that month – which Lyft subsidized at the rate of ▮▮▮ per ride. *Id.* ¶ 26.

WAV service is expensive because WAVs are expensive *and rare*. WAVs are specially-modified vehicles with equipment not found in mass-produced cars sold at dealerships. People do not purchase a WAV unless they or their family members need it. Because there is not a ready-supply of WAVs available, the only way Lyft can provide WAV service is by artificially *creating* a supply of these vehicles, often through costly third-party contracts.

Nowhere else does Lyft create a steady supply of vehicles for its platform in this fashion. Instead, the typical supply on Lyft's ridesharing platform consists of drivers who bring their own vehicles – all of which are mass-produced and sold in dealerships – onto the platform. The

FOLGER LEVIN LLP
ATTORNEYS AT LAW

platform is based on fundamental supply and demand economics: the greater the demand for rides, the higher the supply of drivers motivated by the potential for more earnings. The marketplace functions optimally in areas of high population density, such as San Francisco, where riders can expect to get a ride nearly any time, day or night. But for WAVs, there is *no* evidence of enough supply or demand to sustain a ridesharing platform.

Ignoring the enormous cost and challenge of creating an artificial WAV supply where a natural one does not exist, Plaintiffs insist that Lyft's failure to offer on-demand WAV service throughout Alameda, Contra Costa, and San Francisco counties ("Bay Area Counties"), with the same wait times and reliability as non-WAV service, constitutes discrimination under the Americans with Disabilities Act ("ADA"). However, *not* offering WAV service is not discrimination. In fact, Congress specifically wrote in the ADA that private companies who are subject to the ADA need not buy WAVs, lease WAVs, or retrofit vehicles to create WAVs. Thus, even if Lyft were deemed subject to the ADA, Lyft is not in violation of the ADA.

Plaintiffs know that the plain language of the ADA undercuts their claim. *See* Compl. [Dkt. 1] ¶ 6 (admitting that they do not seek an order requiring Lyft to purchase vehicles). Plaintiffs have therefore alleged that Lyft failed to make "reasonable modifications" to its policies, practices, or procedures, and that such "reasonable modifications," if made, would result in WAVs on Lyft's ridesharing platform. The problem is that Plaintiffs lack the basic evidence needed for their claim - such as evidence that an organic supply of WAV exists out on the roads. Plaintiffs cannot even say how many WAVs would be needed (or at what cost) to provide them with the service they want throughout the 1,500 square mile area that comprises the Bay Area Counties. Plaintiffs' claim fails for three separate and independent reasons:

*First*, Plaintiffs cannot establish the basic elements of their discrimination claim. Plaintiffs have failed to identify any specific policy, practice, or procedure that is alleged to be discriminatory, and all but admit that they do not know how one could be reasonably modified to create WAV service on Lyft's ridesharing platform. Instead, Plaintiffs take the position that Lyft must do whatever it takes, such as entering into expensive third-party contracts, to guarantee WAV service. In short, Plaintiffs want Lyft to expand the types of services it provides on its

platform, not modify its current "policies, practices, or procedures." Just as the ADA does not require book sellers to sell Braille books, the ADA does not require Lyft to create a new type of service for Plaintiffs.

*Second*, even if entering into expensive third-party contracts could be deemed a "reasonable modification" of a policy, practice, or procedure, requiring Lyft to artificially create a supply of WAVs fundamentally alters Lyft's ridesharing platform. Lyft's platform facilitates a two-sided, ride*sharing* marketplace where drivers and riders choose to participate at the time and place they want, and drivers drive their own vehicles. The only way to provide reliable WAV service, however, is by artificially creating a supply of WAVs driven by employees of third-party transportation companies. Such a fundamental alteration is not required under the ADA.

*Third*, Plaintiffs lack standing. Not only have Plaintiffs failed to establish a causal connection between Lyft's allegedly discriminatory policy or practice and their injury, they have failed to offer even the barest contours of what an injunction to create WAV service throughout the Bay Area Counties might look like. In essence, Plaintiffs ask the Court to order Lyft to issue a blank check without establishing that the money spent will achieve any of the benefits they seek. Plaintiffs cannot establish the basic elements of standing to proceed with this action.

There is no genuine issue of material fact. The ADA does not require Lyft to provide WAV service, and Plaintiffs have identified no reasonable modification to a policy, practice, or procedure that would unlock a supply of WAVs on Lyft's platform. Therefore, the Court should grant this Motion for Summary Judgment.

## II.    STATEMENT OF FACTS

### A.    Lyft's Ridesharing Platform.

Lyft is a San Francisco-based technology company that has built a multi-sided platform that, among other things, connects people looking for a driver with people who are willing to drive them. Stip. ¶ 2; Declaration of Edward Niedermeyer ("Niedermeyer Decl.") ¶ 4. Lyft uses computer algorithms to match independent drivers and riders in the same area efficiently, like "brokers" do in many industries. Niedermeyer Decl. ¶ 5. Lyft's platform is a digital marketplace; drivers and riders are free to participate at times and places of their choosing. *Id*. Lyft treats both

1   drivers and riders as users, providing a number of services to both. *Id.* ¶ 4. Lyft does not own or

2   lease any vehicles used for ridesharing on the Lyft platform, nor does it set any schedules or

3   establish any routes for the drivers. Stip. ¶ 4; Niedermeyer Decl. ¶ 4.

4        Each ride request on the Lyft platform is handled through the Lyft App, which drivers and

5   riders download onto their mobile phones. Niedermeyer Decl. ¶ 5. Riders and drivers select from

6   a variety of "modes," such as Standard (a basic sedan vehicle) or XL (a larger vehicle that can

7   seat up to 6 passengers), that correlate with the driver's vehicle type. Stip. ¶ 6; Niedermeyer

8   Decl. ¶¶ 18-19. Lyft does not impose any restrictions on the time of day that riders can request a

9   ride on the Lyft platform, nor does it dictate when or where a driver may drive. Stip. ¶¶ 4-5.

10  Whether a ride will be available and the wait time for the ride depend on driver availability at the

11  time and location of the ride request. Stip. ¶ 5; Niedermeyer Decl. ¶ 6.

12       Lyft's platform depends on fundamental supply and demand economics. Niedermeyer

13  Decl. ¶ 6. When there is a high density of demand, the platform becomes more attractive to

14  drivers, who can expect to be more highly "utilized," that is, spend more time actively giving

15  rides. *Id.* ¶ 7; Expert Report of Marc Rysman, Ph.D. ("Rysman Report") [Ex. 22 to Declaration of

16  Jiyun Cameron Lee[1] at 13-14 and Figure 3. More available drivers means a higher likelihood that

17  a ride will be matched and the rider wait time will be reduced. Niedermeyer Decl. ¶ 8. In contrast,

18



19

20

21

22

23

24

25

26  Number of requested rides (left) and population density (right) in the Bay Area Counties by zip code.
    Rysman Report at 14, Figure 3.

27       [1] All references to "[Ex. #]" refer to exhibits to the Declaration of Jiyun Cameron Lee in

28  Support of Lyft's Motion for Summary Judgment.

where there is low demand, a driver will sit idly on the platform. *Id.* ¶ 7. When drivers are underutilized, they are less likely to want to drive on the platform. *Id.* The platform performs best in areas with high population density, with high supply and demand, as demonstrated by lower wait times for riders. *See id.* ¶ 8.

## B.   Wheelchair Accessible Vehicles.

Individuals who use fixed-frame wheelchairs cannot take rides in Lyft's typical "modes" because of the need for specialized equipment installed in WAVs. *See, e.g.*, Compl. [Dkt. 1] ¶ 3. WAVs are vans or minivans that have been modified with a wheelchair ramp or lift that can be folded inside the vehicle or removed when not in use, a lowered floor to accommodate the equipment, and a securement device to keep the wheelchair in place when the vehicle is in motion. Stip. ¶ 8; Ayres Depo. [Ex. 1] at 34:15-35:10; Finn Depo. [Ex. 7] at 30:4-6; Giacopini Depo. [Ex. 2] at 25:10-21; Hinze Depo. [Ex. 8] at 19:13-19. New WAVs can cost over $50,000 per vehicle, much more than comparable non-WAVs. Ayres Depo. [Ex. 1] at 40:14-18; Finn Depo. [Ex. 7] at 28:1-4, 29:23-30:2. Because they are larger and heavier, WAVs cost more to operate, with higher insurance and fuel costs. Stip. ¶ 8; Cal. Pub. Util. C. § 5440(f) (describing the high costs of operation and maintenance of WAVs). These specialized vehicles are not mass-produced for sale at a typical car dealership, but specially modified to meet the needs or preferences of a particular user. Ayres Depo. [Ex. 1] at 35:24-36:14, 40:21-41:3, 42:4-15.

### 1.   No Evidence Of WAV Supply.

Not all "modes" of service – such as "XL" or "Lux" – are available on the Lyft platform in every market. Stip. ¶ 7. Lyft makes the decision to open up a "mode" in a market when it appears there already exists a sufficient supply of vehicles meeting the features of that mode (*e.g.*, vehicles large enough to seat up to 6 passengers) on the platform. *Id.* ¶ 7; Niedermeyer Decl. ¶ 22.

There is no evidence suggesting that there exists a sufficient number of drivers with personally-owned WAVs in the Bay Area Counties who want to and would drive on the Lyft platform if Lyft made modifications to its policies or practices. Declaration of Isabella Gerundio ("Gerundio Decl.") ¶ 21. Indeed, Lyft is not aware of any evidence, in the factual record or otherwise, of how many of these specially modified vehicles even exist in the Bay Area Counties

1    or surrounding areas. *Id*.

2        Plaintiffs admit they have no such evidence. In response to Lyft's Interrogatory asking

3    whether it was Plaintiffs' contention that Lyft would be able to recruit drivers with personally-

4    owned WAVs in sufficient numbers by reasonably modifying its policies, practices, or

5    procedures, Plaintiffs conceded that they "cannot reasonably predict the number of drivers with

6    personally-owned WAVs who, given unspecified conditions, might be willing to provide WAV

7    service for Lyft." Pls. Resp. Rog. [Exs. 15-20] No. 9. In depositions, Plaintiffs could identify just

8    three people who ever expressed an interest in driving a WAV on a ridesharing platform such as

9    Lyft or Uber, and just one with any concrete intention (a person who already drives on the Uber

10   platform). Ayres Depo. [Ex. 1] at 47:15-48:8; Bittner Depo. [Ex. 3] at 41:3-42:6; Finn Depo.

11   [Ex. 7] at 37:25-38:2; Fuller Depo. [Ex. 6] at 30:19-21; Giacopini Depo. [Ex. 2] at 40:21-41:25;

12   Hinze Depo. [Ex. 8] at 27:17-19; Nieves Depo. [Ex. 4] at 23:11-24:6; Smith Depo. [Ex. 5] at

13   23:14-17.

14           **2.    No Evidence Of WAV Demand.**

15       Discovery also revealed no evidence of a demand for WAVs at numbers sufficient to

16   create a sustainable market for WAVs on Lyft's platform. The San Francisco Municipal

17   Transportation Agency ("SFMTA") estimates that approximately 5,000 individuals in San

18   Francisco (less than one percent of the population) use a wheelchair for mobility. Seaborn Decl.

19   In Support of Class Certification [Dkt. 45-1] Ex. K ("TNCs and Disabled Access") at 22. There is

20   no evidence that a higher density population of wheelchair users exists in Alameda or Contra

21   Costa counties. Because many individuals who use wheelchairs use foldable wheelchairs, which

22   can be stored in the trunk of most standard vehicles, the population of people who rely on WAVs

23   (*i.e.*, those who use fixed-frame wheelchairs) *and* would like to use Lyft's WAV service is likely

24   much lower than one percent of the overall population.

25       Indeed, Lyft data confirms that demand for its WAV service, where offered, is far less

26   than one percent of the total demand it sees on its ridesharing platform. As described in detail

27   below, Lyft offers WAV service (called "Access" mode) in certain markets in response to local

28   regulation. In Portland, Lyft's oldest WAV market where it has offered Access mode for 5 years,

less than ▮ of all rides requested in February 2020 were Access rides (▮ requests for WAVs vs. over ▮ for Standard rides). In San Francisco, where the program has had over ▮ unique users since its launch in July 2019, a total of only ▮ Access rides were completed in February 2020 – fewer than one ride per user *per month*. Stip. ¶¶ 26, 37.

### 3.   No Evidence Of Density Of WAV Demand And Supply To Sustain Lyft's Ridesharing Platform.

Based on the lack of evidence showing widespread supply or demand for WAVs, Lyft retained Dr. Marc Rysman[2] to study the viability of an Access mode on the Lyft platform. *See* Rysman Report [Ex. 22].

Extrapolating from the SFMTA study cited above, Dr. Rysman conservatively estimated the total population of WAV users across the 1,500 square miles of the Bay Area Counties to be approximately 22,000 – or about *15 people* per square mile. *Id.* at 22. According to Dr. Rysman's analysis, this level of population density is far too low to sustain a platform like Lyft's Standard mode, which, in February 2020, averaged a wait time of ▮ minutes in the Bay Area Counties. Dr. Rysman opined that even delivering a wait time of five minutes across the three-county area would require a population density of approximately *10,000 people* per square mile. *Id.* at 18.

But there are just 22,000 potential WAV users who are assumed to reside in all three Bay Area Counties combined. In order for these individuals to generate a level of demand needed to sustain a ridesharing platform, every single one of them would need to take 2.5 Lyft WAV rides *each day*. *Id.* at 23. This is not realistic. To put this number in perspective, when measured against the general population, the Lyft platform generates ▮ Standard mode rides per person per day. *Id.*

Similarly, Dr. Rysman concluded that there is not sufficient supply to sustain a ridesharing platform. Specifically, he determined that there would have to be approximately 1,300 drivers driving WAVs on the platform *every hour of every day* to deliver average wait times comparable

---

[2] Dr. Rysman is a Professor of Economics at Boston University who specializes in the study of two-sided platforms. Plaintiffs did not designate an expert, either in support of their case-in-chief or in opposition to Lyft's designation of Dr. Rysman.

to Standard mode throughout the Bay Area Counties. *Id.* at 29.

### C. In Response To Local Regulation, Lyft Offers "Access Mode" In Nine Cities By Artificially Creating A Supply Of WAVs On Its Platform At Significant Cost.

Lyft offers WAVs only in markets with regulatory requirements, or where it has a partnership with a transit agency. Stip. ¶ 10. Currently, Lyft offers Access mode in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California. Stip. ¶ 11.

Because there is no organic supply of WAVs on its platform, Lyft creates a supply of WAVs in three ways: by contracting with third party "partners," by creating opportunities for drivers to rent WAVs, and by on-boarding drivers with access to WAVs. Stip. ¶ 12; Gerundio Decl. ¶ 4. Lyft uses the three models independently or in combination, depending on market needs and regulations. Stip. ¶ 15. None of them works like Standard mode on the Lyft platform, and each method imposes significant costs and unique challenges on Lyft as discussed below.

#### 1. "Partner" Model.

Lyft relies on the "Partner" model, the most expensive of the three, in a majority of the markets where it provides Access mode. Gerundio Decl. ¶¶ 9-10. It *must* use it in markets such as New York and Portland, where local authorities have set specific wait time ("ETA") requirements by regulation. *Id.*; Stip. ¶ 17. Under the "Partner" model, Lyft contracts with a third-party company to provide WAVs, paying the company an hourly rate (generally, between ███ per hour per vehicle) to meet given service levels, such as maximum wait times. Stip. ¶ 12(a); Gerundio Decl. ¶¶ 9-10. The "Partner" company employs the WAV drivers and trains them to properly use the equipment and assist riders. *Id.* ¶¶ 4(a), 9-10.

The reason Lyft relies on the Partner model most often is because it offers the only means by which Lyft can ensure that WAVs are on the platform during all required times. Gerundio Decl. ¶ 9. In addition, Lyft can direct its partners where to place the WAVs in an effort to minimize wait times. *Id.*

Such control over the Partner drivers comes at a significant cost to Lyft: Lyft pays its

1   partners a fixed hourly rate per vehicle, regardless of the number of rides. Gerundio Decl. ¶ 10.

2   This results in a significant subsidy of Access mode by Lyft. In February 2020, of the seven

3   WAV markets where Lyft offered Access mode at least in part using the partner model, five

4   markets (New York, Boston, Dallas, Los Angeles, and San Francisco) had a per-ride cost in

5   excess of ▮▮▮▮. San Francisco and Los Angeles had a per-ride cost in excess of ▮▮▮ and ▮▮▮,

6   respectively. *Id.* ¶ 10. In New York City, where Lyft provides WAV service by combining the

7   "Partner" model, "Rental" model, and "Organic Driver" model, for the six-month period from

8   October 2019 to March 2020, the total amount spent by Lyft was ▮▮▮▮▮▮. Stip. ¶ 20. The

9   total number of WAV rides on the platform in New York during the same six-month period was

10  ▮▮▮▮,[3] equaling more than a ▮▮▮ per-ride subsidy. Stip. ¶ 20; Gerundio Decl. ¶ 12. Except

11  where local governmental entities provide a subsidy for WAV, Lyft does not recoup any of the

12  excess costs for WAV from anyone, including riders, because Lyft does not charge riders who use

13  Access mode any more than it charges those who use Standard mode. Gerundio Decl. ¶ 5; Pls.

14  Resp. to RFAs [Ex. 21] No. 3.

15              **2.      "Rental" Model.**

16          The "Rental" model refers to an arrangement by which Lyft contracts with a rental car

17  provider to have that company acquire WAVs and offer them for rent to independent drivers. Stip

18  ¶ 12(b); Gerundio Decl. ¶ 4(b). Lyft helps finance the high cost of WAVs used in the "Rental"

19  model by heavily subsidizing the rental cost, at several hundred dollars per vehicle per month, so

20  that drivers who rent WAVs generally pay no more than they would to rent a standard sedan. *Id.*

21  Lyft also pays incentives designed to encourage these drivers to accept WAV rides. *Id.* The only

22  city in which Lyft uses the Rental model is New York City. *Id.*

23              **3.      "Organic Driver" Model.**

24          The "Organic Driver" model refers to a model in which drivers who own or have access to

25

26          [3] Access mode comprises a miniscule percentage of all rides on the platform. In
    comparison to ▮▮▮ Access mode rides in New York City from October 2019 to March 2020,
27  the total number of *all* rides given by New York City drivers on the Lyft platform exceeded ▮▮▮
    ▮▮▮ in the same period. Gerundio Decl. ¶ 12. Thus, Access rides composed just ▮▮▮ of all
28  rides.

WAVs independent of any rental arrangement facilitated by Lyft drive on the Lyft platform. Stip ¶ 12(c); Gerundio Decl. ¶ 4(c).These drivers are incentivized to accept WAV rides on the Lyft platform through bonuses paid out on a per-ride or hourly basis. *Id.* For example, Lyft may pay a driver ▮ for each WAV ride completed, or ▮ per hour that the driver is logged into the platform. *Id*. These incentives often exceed the passenger fare. Gerundio Decl. ¶ 4(c).

The "Organic Driver" model is the least expensive of the three models used by Lyft to create a supply of WAVs on the platform. However, in Lyft's experience, the "Organic Driver" model does not work in every city, but works only in those cities or regions where there is a sufficient number of drivers who either (a) have access to WAV taxis (Chicago), or (b) can rent WAVs independently of Lyft (New York). Gerundio Decl. ¶ 4(c).

In markets where Lyft has tried this model, even with large bonuses, it has struggled on multiple occasions to find drivers who have a WAV and want to drive it on the Lyft platform. Gerundio Decl. ¶ 7. Most recently, Lyft contacted over ▮ drivers in Philadelphia and Delaware with offers of referral and sign-on bonuses for drivers with qualifying WAVs. The outreach resulted in ▮ responses and approximately ▮ referrals, but when Lyft followed up, it turned out that *none of them* actually owned a WAV. *Id.*

### D.      In Response To SB 1376, Lyft Launched The SF WAV Pilot.

In July 2019, Lyft launched a WAV pilot program in San Francisco ("SF WAV Pilot"). The launch followed the passage of SB 1376, the "TNC Access for All Act," which authorized the California Public Utilities Commission ("CPUC") to establish "a program relating to accessibility for persons with disabilities" as part of its regulation of TNCs. Cal. Pub. Util. C. § 5440.5. Acting under this authority, the CPUC imposed a $0.10 per ride surcharge on all TNC rides. Stip. ¶¶ 49, 54(a) (CPUC Decision on Track 1 Issues) at 2. The TNC Access for All Act does not require TNCs to offer WAV service. Instead, a TNC may comply with the law by remitting the collected $0.10 per ride surcharge into an "Access Fund". Cal. Pub. Util. C. § 5440.5(a)(1)(B)(ii); Stip. ¶ 54(b) (CPUC Decision on Track 2 Issues ("Track 2")) at 3. If a TNC chooses to offer WAV service, it may apply to recoup its costs from the Access Fund, but only if it can demonstrate that it has met certain service levels set by the CPUC. Track 2 at 18-21.

Lyft uses the "Partner" model for the SF WAV Pilot, by contracting with First Transit. Stip. ¶ 23. Under the contract, First Transit agreed to provide up to five WAVs fully-dedicated to giving WAV rides in San Francisco from 7 am to midnight, seven days a week, for an hourly fee of ▮▮▮ per vehicle. Stip. ¶¶ 23, 28. The per-vehicle annual cost to Lyft exceeds ▮▮▮. Gerundio Decl. ¶ 15. Like all "Partner" model arrangements, First Transit employs the drivers who drive the WAVs, and is responsible for training the WAV drivers in the proper use of the equipment and in providing assistance to riders. Stip. ¶ 24.

In February 2020, before the COVID-19 pandemic, Lyft provided ▮▮ WAV rides originating in San Francisco (approximately ▮ rides per day) and paid First Transit ▮▮▮ (approximately ▮▮ per day), which translates to a subsidy by Lyft of approximately ▮▮ per ride. Stip. ¶ 26. WAV rides comprised just ▮▮▮▮ Lyft rides given in San Francisco in February 2020. Stip. ¶ 27; Gerundio Decl. ¶ 16.

Due to the COVID-19 pandemic and resulting decrease in demand, Lyft reduced the number of First Transit vehicles but maintained the same service hours. Stip. ¶ 29; Gerundio Decl. ¶ 17. As of July 2020, Lyft's WAV pilot program consisted of two dedicated WAVs, with service available during the same hours of 7 am to midnight, seven days a week.[4] Stip. ¶ 29.

### III.    ARGUMENT

**A.    The Court Should Grant Lyft's Motion For Summary Judgment Because Plaintiffs Cannot Establish A *Prima Facie* Case Of Discrimination Under The ADA.**

Plaintiffs have made one thing clear: they want Lyft to provide WAV service that is "equivalent" to non-WAV service. The problem for Plaintiffs is that they cannot articulate a viable theory of discrimination to support the outcome they seek.

As Plaintiffs concede, the ADA does not require Lyft to purchase WAVs. Compl. [Dkt. 1] ¶ 6; 42 U.S.C. § 12184(b)(3). But the ADA goes even further: it also does not require Lyft to

---

[4] Due to the pandemic, Lyft also paused its plan to launch a 65-vehicle "Rental" pilot in the Bay Area Counties, in which it had planned to invest heavily – ▮▮▮ per vehicle per month, as well as additional driver incentives – to have Hertz rent WAVs to independent drivers. Gerundio Decl. ¶ 19. Lyft does not know how many drivers would have signed up to rent WAVs through the program, or how much Lyft would have had to pay in driver incentives. *Id.* ¶ 20.

lease WAVs or to eliminate "transportation barriers" that can only be remedied by retrofitting vehicles with a ramp or lift so that they can be used by individuals who rely on wheelchairs. 42 U.S.C. §§ 12182(b)(2)(A)(iv), 12184(b)(3).

Based on the plain language of the ADA, the only way Plaintiffs can establish a claim of discrimination is by identifying an allegedly discriminatory policy, practice, or procedure that Lyft can "reasonably modify" to ensure WAV service on its platform. The required elements of Plaintiffs' claim include: (1) Lyft employed a discriminatory policy or practice; and (2) Lyft discriminated against Plaintiffs based on their disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate plaintiffs' disability. *See* Order Denying Class Certification (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674, 683 n.38 (2001)); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004). Not only are Plaintiffs unable to identify an allegedly discriminatory policy, practice, or procedure, but they have not identified any "reasonable modification" that would cause a supply of WAVs to appear on the Lyft platform.

> **1.    In Enacting The ADA, Congress Explicitly Exempted Private Entities Who Provide Demand Responsive Transportation Services From Having To Acquire, Lease, Or Retrofit WAVs.**

As a preliminary matter, it is helpful to state what the law does not require: even if, for purposes of this motion, Lyft is considered subject to Title III of the ADA, the law does not require Lyft to purchase, lease, or retrofit WAVs.[5]

Congress was explicit in Title III that when private entities "purchase or lease" vehicles,

---

[5] Title III of the ADA applies to private entities that are engaged in "specified public transportation services" or that own or operate a place of public accommodation. Sections 12184-12186 of Title III apply to private entities engaged in "specified public transportation," and Sections 12182-12183 apply to private entities who own or operate places of public accommodation. As a matter of law, Lyft is not a public accommodation, since the ADA's definition of "public accommodation" is limited to "actual, physical places" under binding Ninth Circuit precedent. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *see also Namisnak v. Uber Techs.*, No. 17-CV-060124-RS, 2018 U.S. Dist. LEXIS 221054, at *10 (N.D. Cal. Oct. 3, 2018) (finding that Uber's platform is not a place of public accommodation under the ADA). Lyft reserves the right to dispute that its technology platform (which merely facilitates connections between riders and drivers) fits the statutory definition of "specified public transportation" under ADA Title III. 42 U.S.C. § 12181(10). However, Lyft is not seeking summary judgment on this issue, and it is not necessary for the Court to decide this issue for purposes of ruling on this Motion.

they need not acquire WAVs except in limited circumstances. *See* 42 U.S.C. § 12184(b)(3)-(7). Notably, the "purchase or lease" of a new automobile (*e.g.*, passenger sedans) or a van with seating capacity of less than 8 passengers for use in a "demand responsive" system (*e.g.,* a taxi service) does not trigger the duty to purchase a WAV. 42 U.S.C. § 12184(b)(3). Congress likewise exempted private entities from having to retrofit vehicles into WAVs, by defining discrimination to include "a failure to remove . . . transportation barriers in existing vehicles . . . (*not including* barriers that can only be removed through the retrofitting of vehicles . . . by the installation of a hydraulic or other lift), where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv) (emphasis added). The statute is clear: the fact Lyft does not provide WAVs on its platform in any given market is not discrimination.[6]

Regulators and courts agree. The Department of Transportation ("DOT"), which Congress entrusted to issue regulations to carry out the goals of the ADA (*see* 42 U.S.C. § 12186(a)(1)), summarized Congress's intent as follows: "Under the ADA, *no private entity is required to purchase an accessible automobile.*" 49 C.F.R. Pt. 37, App'x D (emphasis added). As noted by the Tenth Circuit, "a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA." *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006); *accord Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 74 (2d Cir. 2012) (the Title III exemption providing that taxi providers need not purchase or lease WAVs "compels the conclusion that the ADA, as a whole, does not require the New York City taxi industry to provide accessible taxis").

> **2.    Plaintiffs' Discrimination Claim Fails Because They Cannot Identify A Discriminatory Policy, Practice, Or Procedure Which, If Modified, Would Result In WAV Service On Lyft's Platform.**

Plaintiffs have the burden to identify the policy, practice, or procedure which, if

---

[6] While Plaintiffs cursorily allege that Lyft has failed to remove transportation barriers, *see* Comp. ¶ 96, the main basis for this claim identified by Plaintiffs is Lyft's failure "to provide WAV service equivalent to Lyft's non-WAV service." Pls. Supp. Resp. Rog. [Exs. 9-14] No. 5. Because Lyft is not required to purchase, lease, or retrofit WAVs as discussed above, this is not a cognizable theory. In addition, Plaintiffs claimed in discovery that the Lyft App setting which "requires WAV users to take the additional step of placing the Lyft App into 'Wheelchair Access Mode'" constitutes a separate "transportation barrier." *Id.* But the App setting is irrelevant unless Plaintiffs can first establish a right to WAV service. Moreover, as they admit, none of the Plaintiffs have downloaded the Lyft App. *See* Compl. ¶¶ 10-13. Not having downloaded the App, Plaintiffs cannot complain about the App's design.

reasonably modified, would end the alleged discrimination. *Fortyune*, 364 F.3d at 1085. Lyft's

Motion should be granted for the simple reason that Plaintiffs have failed to identify any allegedly

discriminatory policy, practice, or procedure that resulted in the alleged insufficiency of WAV

service on Lyft's platform. *Id.*

More than one year after filing this lawsuit, when asked by Lyft to "[i]dentify any policy,

practice, or procedure" that Plaintiffs contend resulted in the alleged failure to provide "full and

equal" WAV service, Plaintiffs responded:

> Lyft has used a combination of advertising, driver and passenger
> incentives, driver and vehicle requirements, agreements with rental
> car companies, and other tools to ensure that sufficient drivers are
> available to passengers on the Lyft platform. Lyft has failed to
> make reasonable modifications to these policies and practices to
> ensure that Lyft offers equal access to its services for passengers
> who use WAV vehicles. For example:
>
> Lyft could use marketing and driver incentives to recruit
> independent contractor drivers to provide WAV service, as it has
> done throughout the country to recruit independent contractor
> drivers to provide non-WAV service.
>
> Lyft could similarly utilize its extensive market power and
> resources to provide lease or rental options to WAV drivers, as it
> has also previously done to build and maintain its roster of non-
> WAV independent contractor drivers.
>
> Lyft could expand contracts with existing third- party providers of
> WAV services, as it and its competitors have done in New York
> City and other markets.
>
> Lyft also could use a combination of marketing and rider incentives
> to ensure that there is sufficient consumer awareness of Lyft's
> services and demand for those services, and could use ongoing
> promotions to retain riders, as it has done to attract and retain non-
> WAV riders.
>
> Lyft could utilize one or a combination of such options, all of which
> it has successfully utilized to build its non-WAV service around the
> country or to provide WAV service outside of the Bay Area, to
> ensure it is able to provide comparable access to its on-demand
> transportation service to persons with disabilities who need access
> to WAVs in the Bay Area.

Pls. Supp. Resp. Rog. [Exs. 9-14] No. 1 (paragraph breaks added for emphasis). This is not

sufficient. Plaintiffs have only identified a range of affirmative steps Lyft could take to expand its

business operations, rather than identify any policy, practice, or procedure that they claim is

causing the alleged discrimination. *PGA Tour*, 532 U.S. at 683 n.38; *Fortyune*, 364 F.3d at 1085.

In addition, Lyft's Motion should be granted based on Plaintiffs' refusal to identify any modification to a policy or practice that Lyft should be required to make. Asked to identify such modifications, Plaintiffs stated: "Lyft could make any number of potential reasonable modifications to its policies and practices to ensure full and equal access to its services for people who use WAV vehicles. *Plaintiffs do not seek that Lyft be required to make any specific modification*, but Plaintiffs have provided numerous examples of potential modifications and potential combinations of modifications Lyft could make." Pls. Supp. Resp. Rog. [Exs. 9-14] No. 2 (emphasis added).

At the summary judgment stage, Plaintiffs' refusal to identify the reasonable modification is dispositive. *Wong v. Regents of the Univ. Of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (plaintiff bears the burden of producing evidence of a reasonable modification); *Galvez v. Auto. Club of S. Cal.*, No. SA CV 16-0887-DOC (KESx), 2017 U.S. Dist. LEXIS 214650, at *17 (C.D. Cal. May 5, 2017) (while the plaintiff "has shown that he may have requested a policy change from Defendant . . . it is unclear *what* modification Plaintiff is actually requesting. At [the summary judgment stage] in the proceedings, this is fatal to Plaintiff's ADA claim."). Therefore, the Court should grant Lyft's Motion.

### 3.      Each Purported "Modification" Proposed By Plaintiffs Fails.

Even if the Court were to consider the expansions to Lyft's business operations proposed by Plaintiffs as "modifications," the outcome of this Motion does not change. From what Lyft can glean, Plaintiffs have proposed the general contours of three purported "modifications" to Lyft's business operations. The first is based on Lyft's standard consumer ridesharing platform model: Plaintiffs contend Lyft could use driver and rider incentives and advertisements to stimulate supply and demand to make the platform function with WAVs as it does with non-WAVs. The second and third purported "modifications" are the "Partner" and "Rental" models employed by Lyft in markets with regulatory requirements to artificially create a supply of WAVs on the platform. Pls. Supp. Resp. Rog. [Exs. 9-14] No. 1. All three alleged "modifications" are fatally flawed as shown below.

**a. Plaintiffs' First Purported Modification – That Lyft Adopt Incentives And Advertisements To Replicate Its Ridesharing Platform – Fails Because There Is No Evidence Of What Those Incentives And Advertisements Could Be Or That They Would Be Effective.**

Plaintiffs' first "modification" is that Lyft can use incentives and advertisements, as it does for its platform generally, to attract both WAV drivers and riders. This assertion does not come close to meeting Plaintiffs burden of proof for at least two reasons: first, Plaintiffs offer no specifics as to the nature of any modification they propose, and second, they offer no evidence that such modification would resolve the alleged harm, which is the lack of WAV service on the Lyft platform. Without these specifics, neither Lyft nor this Court can evaluate whether the proposed modifications are reasonable or necessary to achieve the outcome Plaintiffs seek. *Moore v. City of Berkeley*, No. 14-cv-00669-CRB, 2018 U.S. Dist. LEXIS 48611, at *18 (N.D. Cal. Mar. 23, 2018); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1488-86 (9th Cir. 1996).

As described in Part II.A above, Lyft's ridesharing platform is based on the existence of an adequate supply and demand, and a threshold population density is critical for this platform to function. For WAVs, there is no evidence that a sufficient density in population exists. To the contrary, the only evidence is that less than one percent of the overall population relies on WAVs – far below what would be necessary for the platform to function with service levels similar to non-WAVs. *See* Rysman Report [Ex. 22] at 22-29. Plaintiffs have no evidence, such as expert testimony, demonstrating that there exists some previously untapped density of supply and demand to support a ridesharing platform for WAVs, or that money spent on incentives and advertisements could somehow overcome the platform's reliance on population density.

Just as they offer no evidence of a sufficient supply or demand for WAVs, Plaintiffs offer no specific proposal for changing Lyft's incentives or advertisements to create an "equivalent" WAV service (or any WAV service at all). Plaintiffs have no idea what modifications – such as incentives or advertisements – will ensure that a sufficient number of drivers with personally-owned WAVs will drive on the Lyft platform. Pls. Resp. Rog. [Exs. 15-20] Nos. 9-10. Asked whether an organic supply of WAV drivers exists in the Bay Area Counties, Plaintiffs responded that they "cannot reasonably predict the number of drivers with personally-owned WAVs who,

1   given unspecified conditions, might be willing to provide WAV service for Lyft." *Id.* No. 9.

2   When asked what amount of bonus will compensate a WAV driver for the increased cost of

3   acquiring and maintaining a WAV, Plaintiffs did not know, and refused to set any limit on the

4   amount of money Lyft should be compelled to spend on a "reasonable" modification. *Id.* No. 7.

5        Lacking any affirmative evidence, Plaintiffs instead seek to shift the burden of proof onto

6   Lyft to prove a negative by, for example, insisting that Lyft should have attempted to recruit

7   WAV drivers by incentivizing them. But the law is clear that the burden rests with Plaintiffs, not

8   with Lyft. At the summary judgment stage, it is Plaintiffs who must point to evidence that the

9   lack of WAV service on Lyft's platform resulted from Lyft's failure to make a reasonable

10  modification. *Moore*, 2018 U.S. Dist. LEXIS 48611, at *18; *see also Crowder*, 81 F.3d at 1485-

11  86. It is not Lyft's burden to prove that no amount of incentives or advertisements will lead to

12  WAVs on its platform. *See Dalberg v. Avis Rent a Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1108 (D.

13  Colo. 2000) ("if the court were to accept Dahlberg's argument, the effect would be to foist onto

14  Avis the burden of proving that there are no reasonable modifications which could be made to its

15  reservations system thereby short circuiting the burden-shifting analysis for reasonable

16  modifications cases."). Plaintiffs' interrogatory responses make clear Plaintiffs have no idea how

17  Lyft should "reasonably modify" its incentives or advertisements to create a WAV market on its

18  platform. But in this ADA case, Plaintiffs "must point to evidence that [they have] indeed

19  proposed a necessary and reasonable policy modification." *Galvez*, 2017 U.S. Dist. LEXIS

20  214650, at *17. Therefore, Lyft's alleged failure to adopt unspecified incentives or advertising

21  campaigns cannot constitute discrimination as a matter of law.

22              **b.   Plaintiffs' Second Purported Modification – That Lyft**
                     **Engage Expensive Third-Party Partners – Fails Because**
23                   **Contracting For WAV Supply Is Not A Reasonable**
                     **Modification To A Policy, Practice, Or Procedure.**
24

25        As a tacit concession that changes to advertising and incentives may be insufficient to

26  create the outcome they seek, Plaintiffs also propose that Lyft "expand contracts with existing

27  third-party providers of WAV services," per the "Partner" model discussed in Part II.C above.

28  While Plaintiffs are correct the "Partner" model is the only method of creating a supply of WAVs

1   at any given time, they ignore the fact that the Partner model costs hundreds of thousands of

2   dollars per vehicle, per year. This is not a "reasonable modification" to a "policy, practice, or

3   procedure" as a matter of law or common sense.

4       As a preliminary matter, not only does the ADA specifically exempt private entities from

5   having to purchase or lease WAVs, 42 U.S.C. § 12184(b)(3), it also "does not require provision

6   of different goods or services." *Weyer*, 198 F.3d at 1115. Here, requiring Lyft to enter into

7   additional third party contracts for WAV service is akin to an order requiring Lyft to expand into

8   a service that Lyft does not otherwise provide.[7] In the context of public accommodations, courts

9   have clearly held that bookstores need not stock braille books and rental car companies need not

10  stock WAV vehicles. *Id. See also Arizona ex rel. Goddard v. Harkins Amusement Enterprises,*

11  *Inc.*, 603 F.3d 666, 671 (9th Cir. 2010) ("Th[e] [ADA] does not require provision of different

12  goods or services, just nondiscriminatory enjoyment of those that are provided."); *A.L. v. Walt*

13  *Disney Parks & Resorts US, Inc.*, No. 6:14-cv-1544-Orl-22GJK, 2020 U.S. Dist. LEXIS 109205,

14  at *49 (M.D. Fla. June 22, 2020) ("Applied to a theme park, the business is not required to create

15  a service or access designed exclusively for cognitively-disabled individuals, such as adding an

16  individual 'disabled-only' ride or an exclusive 'disabled-only' entrance line to a ride."); *Schulz v.*

17  *Bay Area Motivate, LLC*, No. 19-cv-02134-MMC, 2019 U.S. Dist. LEXIS 209256, at *19 (N.D.

18  Cal. Dec. 3, 2019) (provider of rental bikes need not acquire accessible bicycles); *Castelan v.*

19  *Universal Studios Inc.*, No. CV 12-05481 BRO (AGRx), 2014 U.S. Dist. LEXIS 9092, at *18

20  (C.D. Cal. Jan. 10, 2014) (no duty under ADA to design specialized ride). Nothing in Sections

21  12184-12186 of Title III evidences Congress's intent to treat entities that are engaged in

22  "specified public transportation" differently. To the contrary, Congress was clear that private

23

24  ---

    [7] Plaintiffs rely on the ADA's requirement to reasonably modify policies, practices, or
25  procedures (42 U.S.C. § 12184(b)(2)(a)) to override Congress's clear mandate that private entities
    need not purchase or lease WAVs (*id.* § 12184(b)(3)) or remove those "transportation barriers"
26  that can only be removed by retrofitting vehicles (42 U.S.C. § 12182(b)(2)(A)(iv)). "It is a well-
    settled canon of statutory interpretation that specific provisions prevail over general provisions."
    *Nat'l Labor Relations Bd. v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1415 (9th Cir. 1994); *see also*
27  *Mark v. Valley Ins. Co.*, 275 F. Supp. 2d 1307, 1315 (D. Or. 2003). The Court should reject
    Plaintiffs' invitation to construe the "reasonable modification" requirement to override the
28  exemption Congress explicitly provided in the law to private entities.

entities need not purchase or lease WAVs. 42 U.S.C. § 12184(b)(3).

Moreover, requiring Lyft to expand the Partner model is not "reasonable." As the Ninth Circuit has held, a "reasonable" modification is one that imposes moderate changes to specific, identifiable, policies. *See Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134-35 (9th Cir. 2012) (modification to policy permitting motorized wheelchairs or scooters in park); *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 845 (9th Cir. 2004) (modification of policy of excluding service animals that make noise during a performance); *Fortyune*, 364 F.3d at 1087 (modification to a theater's policy on companion seating). *See also* Final Rule, Transportation for Individuals with Disabilities; Reasonable Modification of Policies and Practices, 80 Fed. Reg. 13253, 13262 (March 13, 2015); 49 C.F.R. § 37.5 ( a passenger's request for special equipment or personal assistance can be denied where it is not otherwise required).

Here, because there is no organic supply of drivers with WAVs on its platform, Lyft must contract with third-party "Partners" to create a WAV supply. *See* Stip. ¶ 17; Gerundio Decl. ¶ 9. It is undisputed that each First Transit vehicle costs ███████ per year. Stip. ¶¶ 23, 29. While Plaintiffs offer no evidence as to how many such vehicles would be needed to cover the entire *1,500 square mile area* of the Bay Area Counties, Plaintiffs have asserted that five vehicles are not enough for San Francisco, an area of just 47 square miles. At five vehicles, the cost is ███ million each year; at ten vehicles, the cost would be ███ million each year; and at twenty vehicles, the cost would be ███ million each year, just for these three Bay Area Counties. Imposing an ongoing, long-term obligation on Lyft of spending unknown millions of dollars per year,[8] without any potential for profit but at a substantial loss, is not "reasonable" under the ADA. *See Fortyune*, 364 F.3d at 1083 (reasonable modifications may not impose undue financial or administrative burdens); *Galvez*, 2017 U.S. Dist. LEXIS 214650, at *16 (a modification is not reasonable if it "imposes 'undue financial and administrative burdens'")*; A.L.*, 2020 U.S. Dist.

---

[8] If this Court determines Lyft must provide WAV service in the 1,500 square miles of the Bay Area Counties as a "reasonable modification," whatever the ultimate cost of such a program will not be limited to those regions. Lyft's ridesharing platform is available throughout the United States. Following Plaintiffs' logic, Lyft would have to spend countless hundreds of millions to provide WAV service nationwide.

LEXIS 109205 at *76-77 (allowing ten readmission passes for disabled theme park guests giving them nearly unlimited access for rides would have led to fraud and abuse, leading to other guests' dissatisfaction and undermining the park's revenue base).

Finally, the fact Lyft uses the Partner model to offer Access mode in certain markets does not make the Partner model "reasonable" under the ADA. Lyft is compelled to comply with local regulations, and the fact it undertakes compliance does not change the elements of the ADA. Moreover, that Lyft may voluntarily undertake a WAV pilot program in San Francisco in response to the TNC Access for All Act is likewise not evidence that the Partner model is "reasonable." If that were the law, no company would ever experiment or innovate to see if they can improve services for individuals with disabilities. *See O'Byrne v. Reed*, No. CV 09-08406 DMG (DTBx), 2010 U.S. Dist. LEXIS 153617, at *16 (C.D. Cal. Feb. 5, 2010) (requiring entities to continue voluntary programs that go beyond a statutory duty would create a "perverse incentive" to discourage such activities). Indeed, the TNC Act itself provides that "Nothing in this section shall be construed to expand …any obligations…of a transportation network company under existing state or federal disability access laws." Cal. Pub. Util. C. § 5440.5(d).

The reasonableness of the Partner model must be judged under the ADA. Under the plain language of the ADA and cases interpreting it, the Partner model is not a reasonable modification.

### c. Plaintiffs' Third Purported Modification – That Lyft Develop A Complex Rental Program To Arrange For A Supply Of WAVs – Also Fails Based On Its Enormous Cost And The Lack Of Any Evidence It Will Work.

Finally, Plaintiffs propose that Lyft implement, in effect, its "Rental" model, by arranging for a supply of WAVs to rent, and by providing sufficient subsidies to encourage independent drivers to rent and use these vehicles to provide WAV rides on Lyft's platform. This proposal fails for numerous reasons.

*First*, Plaintiffs are, in essence, asking Lyft to acquire WAVs through its partnerships with rental car companies. But Lyft is not required to acquire WAV vehicles or retrofit existing vehicles under the ADA. 49 C.F.R. Pt. 37, App'x D; 42 U.S.C. § 12182(b)(2)(A)(iv).

*Second*, requiring Lyft to adopt the Rental model is akin to requiring Lyft to adopt a new

business operation. Implementing the Rental model is *not* a modification to a "policy, practice, or procedure." *Cf. Baughman*, 685 F.3d at 1134 (modification to policy on permitting motorized wheelchairs); *Lentini*, 370 F.3d at 845 (modification of policy of excluding noisy service animals).

*Third*, the Rental model is not "reasonable." *Fortyune*, 364 F.3d at 1083 (reasonable modifications may not impose undue financial or administrative burdens). Prior to the COVID-19 pandemic, Lyft had planned to launch a WAV rental pilot program in the Bay Area Counties.[9] The program involved making up to 65 WAVs available to drivers for rent through Hertz. Gerundio Decl. ¶ 19. To make this work, Lyft planned to subsidize the acquisition cost of the WAVs by ███ per vehicle *per month*. Annualized, for all 65 vehicles, this would have resulted in the cost of ██████ – not including additional driver incentives and rental subsidies.

*Fourth*, Plaintiffs offer no specifics as to what the scope of the Rental program should be. How many vehicles would be required to meet Plaintiffs' demands throughout the three Bay Area Counties? How much should Lyft pay in driver incentives? Once more, Plaintiffs do not offer any specifics, but simply ask the Court to order a blank check. This does not meet Plaintiffs' burden. *Fortyune*, 364 F.3d at 1082; *see also Galvez*, 2017 U.S. Dist. LEXIS 214650, at *19 ("in the absence of a specific proposal . . . Plaintiff has failed to meet his burden to identify a reasonable modification.")

*Fifth*, there is no evidence that a Rental program is "necessary" to eliminate the alleged discrimination. While Lyft uses the Rental model in New York City, it does so in combination with the Partner and Organic Driver models. Stip. ¶ 20. This is because, even though Lyft facilitates WAV rentals, it has no control over when or where the drivers drive their rented WAVs. Moreover, there is no guarantee – and certainly no evidence – that if Lyft were to implement a Rental program, Lyft will be able to recruit and maintain sufficient numbers of drivers in the Bay Area Counties. Gerundio Decl. ¶ 20.

At the summary judgment stage, Plaintiffs must come forward with "*specific facts*

---

[9] Lyft did not launch the WAV rental pilot as planned due to a number of factors, including the economic downturn resulting from the COVID-19 pandemic. Gerundio Decl. ¶ 19.

1    showing that there is a genuine issue for trial." *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.

2    1990). With their proposed "modifications," taken separately or together, Plaintiffs have failed to

3    meet their burden. This court should grant Lyft's Motion for Summary Judgment.

4            **B.      To Provide WAV Service, Lyft Must Fundamentally Alter Its Business.**

5            Plaintiffs' demand is that, regardless of cost, Lyft should figure out and implement

6    whatever changes are needed so that they can order WAVs on-demand, 24 hours a day, 7 days a

7    week, with arrival times of mere minutes. As shown above, Plaintiffs have not identified any

8    specific *reasonable* modification that would make such service possible. But even assuming

9    Plaintiffs have met their *prima facie* burden, the evidence makes clear that the outcome Plaintiffs

10   demand requires a fundamental alteration to Lyft's business. *PGA Tour*, 532 U.S. at 682.

11           Plaintiffs want Lyft to subsidize an entirely new and specialized service for individuals

12   who use fixed-frame wheelchairs for mobility. The undisputed evidence is that the only reliable

13   way Lyft has found to provide the service Plaintiffs want is the Partner model: contracting for a

14   fixed supply of WAVs and drivers on the platform, for an hourly rate paid by Lyft. Gerundio

15   Decl. ¶¶ 9-10. This is because independent contractor drivers on Lyft's platform set their own

16   hours and decide where they will drive. Stip. ¶¶ 4, 9. Especially with very small numbers of

17   drivers, there is no guarantee a driver will be available at a given time, in a given place. Stip. ¶ 5.

18           In addition to being exorbitantly and unreasonably expensive, the Partner model is wholly

19   inconsistent with Lyft's ridesharing platform. The Lyft platform is a two-sided marketplace of

20   riders who need rides and drivers who use their own vehicles and set their own hours. Plaintiffs

21   want Lyft to remove half of that equation, thereby creating a one-sided marketplace in which Lyft

22   guarantees a contracted supply of WAVs to serve a small population of WAV users. But this is

23   not how a supply-and-demand platform works. *See* Rysman Report [Ex. 22] at 4.

24           The change sought by Plaintiffs cuts to the core of the "fundamental character" of Lyft's

25   ridesharing platform. *PGA Tour*, 532 U.S. at 682; *see also Fortyune*, 364 F.3d at 1084 (noting a

26   proposed change would have a "negligible effect if any on the nature of the service provided by

27   the Theater: screening films."). It turns on its head not only Lyft's two-sided model, but also its

28   potential for revenue, by demanding that Lyft spend millions every year to provide WAVs. These

-22-

1  changes are far more extreme than those that other courts have deemed to be fundamental

2  alterations. *A.L.*, 2020 U.S. Dist. LEXIS 109205, at *49 (granting Disneyland guests with

3  disabilities additional fast passes was a fundamental alteration to the theme park because it would

4  increase the ride wait times of other guests and "fundamentally alter" Disney's business model by

5  undermining its revenue base); *Galvan v. Walt Disney Parks and Resorts*, 425 F.Supp.3d 1234,

6  1242 (C.D. Cal. Nov. 27, 2019) (same); *Ass'n for Disabled Ams., Inc. v. Concorde Gaming

7  Corp.*, 158 F. Supp. 2d 1353, 1366 (S.D. Fla. 2001) (concerning the game of craps, allowing

8  players in wheelchairs to roll dice from a different location or lowering the table fundamentally

9  altered the nature of the game).

10      Summary judgment should be granted on the independent ground that the outcome sought

11  by Plaintiffs can only be achieved by a fundamental alteration to Lyft's ridesharing platform.

12      **C.      Plaintiffs' Inability To Identify A Reasonable Modification To A Policy,
               Practice, Or Procedure Also Dooms Their Ability To Establish Standing.**

13

14      By failing to identify a coherent policy, practice or procedure which could be modified to

15  end the alleged discrimination, Plaintiffs have also failed to establish standing.

16      To establish standing, Plaintiffs must show an imminent injury traceable to each policy or

17  practice that they seek to modify or enjoin. *Friends of the Earth, Inc. v. Laidlaw Environmental

18  Services, Inc.*, 528 U.S. 167, 185 (2000); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)

19  ("standing is not dispensed in gross" and is limited to the injury shown). Plaintiffs must also

20  demonstrate that the injury will likely be redressed by a favorable decision. *Lujan v. Defs. of

21  Wildlife*, 504 U.S. 555, 561 (1992). Each element of standing "must be supported in the same way

22  as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and

23  degree of evidence required at the successive stages of the litigation." *Id.* Plaintiffs cannot

24  establish that Lyft has caused harm, or that their alleged injury is redressable under the ADA.

25      **1.      Because Plaintiffs Cannot Identify Any Specific Policy Or Practice
               That Is Discriminatory, Plaintiffs Have Not Shown Any Injury
               Traceable to Lyft's Conduct.**

26

27      As discussed in Part III.A.2 above, Plaintiffs have failed to identify any specific "policy or

28  practice" which, if modified, would eliminate the allegedly discriminatory condition. *See*

*Chapman v. Pier 1 Imps. (U.S)*, 631 F. 3d 939, 947 (9th Cir. 2011) (the "standing analysis must focus on the nature and source of [the plaintiff's] claim – discrimination *as defined by the ADA*") (emphasis added). While Plaintiffs broadly cite to Lyft's driver incentives, and reference Lyft's third party WAV partnerships in other regions, they make no attempt to show how a modification to any specific policy or practice would bring about the change they want, which is the provision of "equivalent" WAV service throughout the entire 1,500 square mile area of the Bay Area Counties. Plaintiffs thus fail to link their injuries to any particular policies or practices or allege that they will be directly affected by these policies or practices in the future. *Id.*

**2.     Plaintiffs' "Do Whatever It Takes" Approach Lays Bare The Flaw That No Injunction Is Available, Demonstrating That The Alleged Harm Is Not Redressable Under The ADA.**

At the summary judgment stage, the proponent of jurisdiction must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43, 96 (1976)). To establish that the harm they allege is redressable by a favorable opinion, Plaintiffs must show that injunctive relief is available. *Chapman*, 631 F.3d at 959; *Ind. Coal. For Pub. Educ.-Monroe Cty. v. McCormick*, 338 F. Supp. 3d 926, 941, 943 (S.D. Ind. 2018) (noting at summary judgment that plaintiffs lacked standing in part because they had "not shown that the Court may order the requested relief"). Injunctions are governed by Rule 65, which provides that every order granting an injunction must "state its terms specifically" and "describe in reasonable detail —and not by referring to the complaint or other document — the act or acts restrained or required." Fed. R. Civ. P. 65(d). "The Supreme Court has explained that 'one basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.'" *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (quoting *Granny Goose Foods, Inc. v. Bhd. Of Teamsters*, 415 U.S. 423, 444 (1974)). "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

To order Lyft to carry out a "reasonable modification," the Court must, at a minimum, be able to identify the contours of such a modification. *See Fortyune v. Am. Multi-Cinema, Inc.*, No. CV 01-05551 NM (JWJx), 2002 U.S. Dist. LEXIS 27960, at *22 (C.D. Cal. Oct. 21, 2002) (noting plaintiff had shown injury tied to policy regarding companion seating, "and Plaintiff's alleged injury would be redressed by the policy modification he seeks"). Here, the Court has no ability to fashion injunctive relief because, among other things, Plaintiffs have not offered any evidence as to the type or amount of incentives that would bring a sufficient number of drivers onto the Lyft platform with their WAVs; the factors that would cause independent drivers to rent WAVs and drive them on the Lyft platform in sufficient numbers to ensure adequate coverage throughout the Bay Area Counties; or how many contracted third-party WAVs would be needed to deliver "equivalent" service throughout the 1,500 square mile area at issue.

Because Plaintiffs lack evidence to establish a causal connection or redressability, this case must be dismissed for lack of standing.

### IV.   CONCLUSION

From the outset, Plaintiffs have approached this litigation with one outcome in mind: an on-demand WAV service that is equivalent to Lyft's standard mode of service. But Plaintiffs must do more than identify the outcome they want, they must be able to articulate a legal theory and come forward with evidence to support that theory. Plaintiffs can do neither.

Because Plaintiffs cannot establish the necessary elements of their claim, Lyft respectfully requests that the Court grant this Motion for Summary Judgment and enter judgment in its favor.

Dated: September 3, 2020

FOLGER LEVIN LLP

*/s/ Jiyun Cameron Lee*

Jiyun Cameron Lee
Attorneys for Defendant
LYFT, INC.

1077038.6