FOLGER LEVIN LLP
Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
Sherri M. Hansen (CSB No. 302903, shansen@folgerlevin.com)
199 Fremont Street, 20th Floor
San Francisco, CA 94105
Telephone: 415.625.1050
Facsimile: 415.625.1091

Attorneys for Defendant LYFT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, SASCHA BITTNER, an individual, TARA AYRES, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>LYFT, Inc., a Delaware corporation,<br><br>Defendant. | Case No. 3:19-cv-01438-WHA<br><br>**DECLARATION OF ISABELLA GERUNDIO IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:       October 8, 2020<br>Time:       8:00 a.m.<br>Courtroom: 12 – 19th Floor |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

I, Isabella Gerundio, declare as follows:

1. I am the Program Lead for WAV at Lyft, Inc. ("Lyft"). I submit this declaration in support of Lyft's Motion for Summary Judgment. I have personal knowledge of the matters set forth in this declaration, and if called as a witness I would testify competently to those matters.

2. I have been involved in WAV since I joined Lyft in February 2019. Currently, as Program Lead for WAV, I oversee Lyft's WAV program, called "Access" mode, in every market in which Access mode is offered. Currently, Lyft offers Access mode in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California.

3. Providing WAV service is complex and operationally challenging.

4. Our most significant challenge is finding a supply of WAVs to perform WAV rides through the Lyft app. To overcome this obstacle, Lyft uses three methods to artificially generate a supply of WAVs to drive on its platform.

   a. **"Partner" model**. Under this model, Lyft contracts with a third-party company to provide WAVs. The third-party company employs the drivers who drive the WAVs, and is responsible for training the WAV drivers in the proper use of the equipment and in providing assistance to riders. Lyft uses the Partner model in a majority of the markets where it provides Access mode, including San Francisco and New York City.

   b. **"Rental" model**. Under this model, Lyft contracts with a rental car provider that acquires WAVs and offers them for rent to independent contractor drivers. Lyft helps finance the high cost of WAVs used in the "Rental" model by heavily subsidizing the rental cost, at several hundred dollars per vehicle per month. Drivers who rent WAVs generally pay no more in monthly costs than they would pay to rent a standard sedan, and receive incentives designed to encourage them to accept WAV rides. Currently, the Rental model is only used in New York City.

    c. **"Organic Driver" model**. Under this model, drivers who own or have access to WAVs independent of any rental arrangement facilitated by Lyft are highly incentivized to accept WAV rides on the Lyft platform through bonuses ▮. For example, Lyft may pay a driver ▮, or ▮, on top of regular per-ride earnings. Based on my past experience, ▮. The incentives we offer to drivers ▮. Nonetheless, the "Organic Driver" model is the least expensive of the three models. This model does not work in every city, but works only in those cities or regions where there is a sufficient number of drivers who either (a) have access to WAV taxis (like in Chicago) or (b) can rent WAVs independently of Lyft (like in New York).

5. Regardless of how Lyft generates the supply of WAVs to drive on the Lyft platform, riders in Access mode pay no more than they would to ride in Lyft's Standard mode.

6. Lyft uses these three models independently or in conjunction with one another, depending on market needs and regulations.

7. As noted above, the "Organic Driver" model is the least expensive. But during my time at Lyft, we have struggled on multiple occasions to locate drivers with WAVs who may be interested in driving for Lyft. The most recent such experience was in Philadelphia. On August 10, 2020, Lyft sent a promotional text and in-app console card to its active driver base in the Philadelphia and Delaware markets, contacting ▮. Lyft received ▮ responses and about ▮ referrals as of August 31, 2020. Of those respondents and their referrals, it turned out that **none** owned a vehicle with a wheelchair ramp.

8. One of the least expensive WAV markets is Chicago. In Chicago, Lyft relies on the "Organic Driver" model. Lyft is not subject to any ETA requirements. In addition, Lyft

1  receives a per-ride subsidy from the City of Chicago for each WAV ride. From October 2019 to
2  March 2020, ███████████████████████████████████████████████████████████████████████
3  ███████████████████████████████████████████████████.

4         9.       In markets with wait time ("ETA") requirements set by regulations, Lyft relies on
5  the "Partner" model. This is because, without using the Partner model, Lyft cannot guarantee
6  adequate service levels or specific hours of service for WAV users. Through contracts with third-
7  party partners, Lyft can ensure that WAVs are on the platform during all hours of service that
8  Lyft designates. Lyft can also pinpoint locations to position WAVs to lower ETAs for riders,
9  based on manual observation and analysis of demand patterns. Because drivers on the Lyft
10 platform are independent contractors, and can choose where and when to drive, consistent service
11 levels for WAV is not possible in any other context.

12       10.       The Partner model is extremely expensive. Lyft pays the partner company an
13 hourly rate which can range between approximately ███████████ per vehicle, depending
14 on the region and available contracting partners, to meet given service levels, such as maximum
15 wait times. Lyft pays the hourly rate regardless of whether the vehicles provide any rides or
16 generate any revenue. As a result, Lyft subsidizes the cost of each WAV ride. In almost every
17 market that uses the Partner model, the cost per ride exceeds the revenue collected by at least
18 ███, resulting in Lyft effectively subsidizing the rides for WAV passengers by that amount. For
19 example, in February 2020, of the seven WAV markets where Lyft offered WAV service at least
20 in part using the partner model, five markets (New York, Boston, Dallas, Los Angeles, and San
21 Francisco) had a per-ride cost in excess of ███. Four markets had a per ride cost over ███. San
22 Francisco and Los Angeles had a per ride cost in excess of ███ and ███, respectively.

23       11.       I have been involved in our WAV program in Lyft's New York City market,
24 referred to as "BKN." Lyft is subject to strict ETA requirements in BKN from the New York City
25 Taxi and Limousine Commission ("TLC"). For June 2019, the TLC regulations required 60% of
26 WAV rides be provided in under 15 minutes and 90% of WAV rides be provided in under 30
27 minutes. By June 2020, 80% of WAV rides had to be provided in under 15 minutes and 90% of
28 WAV rides had to be provided in under 30 minutes.

12.     In order to meet these strict ETA requirements, Lyft provides WAV service in BKN by combining the "Partner" model, "Rental" model, and "Organic Driver" model. From October 2019 to March 2020, the total amount spent by Lyft on these three methods was over ▇. This paid for ▇ online vehicles through the Partner model, ▇ WAV rental vehicles, and subsidies to ▇ independent drivers, equaling more than a ▇ per ride subsidy – considering the amount received in ride fares from passengers (▇), and the total number of rides (▇). In contrast, there were over ▇ million total rides in all ride modes in BKN during this period, including over ▇ rides in Standard mode.

13.     Lyft met the ETA requirements in BKN for the June 2019 measurement period. ▇. If Lyft does not meet the ETA requirements in BKN, it would be forced to comply with the alternative "trip percentage rule" or cease operations in BKN. Under the trip percentage rule, 25% of all of Lyft's rides in BKN would have to be completed in a WAV. Lyft estimated that to comply with this rule, which would require ▇, effectively forcing Lyft out of the market.

14.     In all markets, WAV rides make up a small percentage of total Lyft rides. In Portland, Lyft's oldest WAV market where it has offered WAV service for over 5 years, less than ▇% of all rides requested in February 2020 were Access rides (▇ requests for WAVs, compared to over ▇ Standard rides).

15.     Lyft launched a WAV pilot in San Francisco in July 2019 ("SF WAV Pilot"). Lyft uses the "Partner" model for the SF WAV Pilot, by contracting with First Transit, Inc. Under the contract, First Transit agreed to provide up to 5 dedicated WAVs (approximately ▇ hours of contracted WAV service a week) for an hourly fee of ▇ per vehicle. For a vehicle that is in operation 17 hours per day, the annual cost exceeds ▇.

16.     In February 2020 Lyft provided ▇ WAV rides originating in San Francisco. In comparison, there were a total of over ▇ rides in all ride modes in San Francisco in February 2020, including over ▇ rides in Standard mode.

17.     Due to the COVID-19 pandemic and resulting decrease in demand, Lyft reduced

1 the number of First Transit vehicles. As of July 2020, Lyft's WAV pilot program consisted of two
2 dedicated WAVs, with service available from 7 am to midnight, seven days a week. In July 2020,
3 Lyft provided ▮ Access rides with an average wait time of ▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5 ▮▮▮▮▮▮▮▮▮▮.

      18.     The California Public Utilities Commission ("CPUC") has imposed a per-ride fee on all rides provided by Transportation Network Companies ("TNCs"). The CPUC has indicated that it will provide an offset of this per-ride fee for TNCs that provide WAV service that meets certain service levels specified by the CPUC. Prior to the pandemic, Lyft had estimated that it could qualify for between ▮▮▮▮▮▮▮▮▮▮ annually statewide in offset of the per-ride fee it paid in California if it provided WAV service that complied with CPUC service levels in every county in the state. Due to the pandemic and the significant drop in the overall volume of rides on its platform, the amount of offset available to Lyft in 2020 is substantially reduced.

      19.     Also due to the COVID-19 pandemic, Lyft paused its plan to launch a 65-vehicle "Rental" pilot in Alameda, Contra Costa, and San Francisco ("Bay Area Counties"). The Rental pilot was meant to augment the First Transit partnership and allow Lyft to provide Access mode outside of San Francisco. Under the Rental pilot, Lyft had contracted to pay ▮▮▮ per vehicle per month for its rental partner, Hertz, to acquire vans and retrofit them into WAVs. Lyft also planned to pay driver incentives to independent contractor drivers to encourage them to drive on the platform, and rental subsidies to offset the higher rental cost of a WAV.

      20.     Since this program did not launch, Lyft does not know how many drivers it could have recruited to this Rental program, how much such recruitment may have cost in incentives and rental subsidies, how much time independent drivers would have spent on the Lyft platform performing WAV rides, or where the independent drivers would have driven within the Bay Area Counties. Some of the difficulties we anticipated include: (a) WAVs are more expensive for drivers, because they require more gasoline to operate; (b) WAV rides take longer than non-WAV rides because drivers must help riders embark and disembark (it was thus unclear whether drivers would elect to continue driving WAVs), and; (c) drivers who drive WAVs can accept non-WAV

rides, so there was a significant possibility that the drivers would elect to drive where there was a higher demand in non-WAV rides, rather than in locations where WAV users may live.

21. I am only aware of one person in the Bay Area Counties approaching Lyft to drive their personally-owned WAV on the Lyft platform. Outside of this one potential personal WAV, I am unaware of any excess supply of WAVs that is available to perform rides on the Lyft platform in the Bay Area Counties.

I state under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 2 day of September 2020, in Antioch, California.

_____
Isabella Gerundio

1076516.7