1

FOLGER LEVIN LLP
Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)

2

Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
Sherri M. Hansen (CSB No. 302903, shansen@folgerlevin.com)

3

199 Fremont Street, 20th Floor
San Francisco, CA  94105

4

Telephone: 415.625.1050
Facsimile: 415.625.1091

5

6

Attorneys for Defendant LYFT, INC.

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11

INDEPENDENT LIVING RESOURCE
CENTER SAN FRANCISCO, a California

12

non-profit corporation, JUDITH SMITH,
an individual, JULIE FULLER, an

13

individual, SASCHA BITTNER, an
individual, TARA AYRES, an individual,

14

and COMMUNITY RESOURCES FOR
INDEPENDENT LIVING, a California

15

non-profit corporation,

16

Plaintiffs,

17

v.

18

LYFT, Inc., a Delaware corporation,

19

Defendant.

Case No. 3:19-cv-01438-WHA

**DEFENDANT LYFT, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Date:       October 8, 2020
Time:       8:00 a.m.
Courtroom:  Courtroom 12

20

21

22

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

23

24

25

26

27

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................................... 3

    A.     Lyft's Ridesharing Platform............................................................................................ 3

    B.     No Evidence Of WAV Supply ......................................................................................... 4

    C.     No Evidence Of WAV Demand To Sustain A Ridesharing Platform ................... 4

    D.     The High Cost Of Creating A WAV Supply ............................................................... 5

        1.     Partner Model........................................................................................................ 5

        2.     Rental Model.......................................................................................................... 6

        3.     Organic Driver Model ......................................................................................... 7

III.    SUMMARY JUDGMENT STANDARD ........................................................................... 7

IV.     ARGUMENT ........................................................................................................................ 8

    A.     Plaintiffs' Motion Is Built On The Faulty Premise That Title III Of The ADA Requires Lyft To Provide WAVs On Its Platform ....................................... 8

    B.     The Court Should Deny Plaintiffs' Motion Based On Their Refusal To Identify The Most Basic Element Of Their Case, Which Is The Modification They Deem Necessary To Achieve "Full And Equal Access." ...... 10

    C.     The Court Should Deny Plaintiffs' Motion Based On Their Failure To Present Any Evidence That The Cost Of The Modification They Seek Is "Reasonable."................................................................................................................ 12

    D.     The Court Should Deny Plaintiffs' Motion Because There Are Genuine Disputes Of Material Fact As To Whether Any Of The Purported "Modifications" Would Be Effective Or Reasonable ........................................... 14

        1.     There Is A Genuine Dispute Of Material Fact As To Whether The Purported Modification Of Using Advertising And Incentives Would Be Effective In Reversing The Alleged Discrimination ............... 14

        2.     There Is A Genuine Dispute Of Material Fact As To Whether The Strategies Lyft Implemented To Create WAV Supply In Other Markets Would Work In The Bay Area Counties.................................... 17

        3.     The Available Evidence Regarding The Cost Of Purported Modifications Demonstrates That At A Minimum, There Is A Disputed Issue Of Fact As To Their Reasonableness ............................. 18

    E.     Plaintiffs' Motion Should Be Denied Because Lyft Has Presented Sufficient Evidence That The Modifications Plaintiffs Seek Would Result In A Fundamental Alteration ......................................................................................... 19

    F.     Plaintiffs' Motion Should Be Denied Because They Have Failed To Come Forward With Sufficient Evidence To Establish Standing .................................. 21

V.      CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........................................................................................... 7, 19

*Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.*
158 F. Supp. 2d 1353 (S.D. Fla. 2001) ........................................................................ 21

*Baughman v. Walt Disney World Co.*
685 F.3d 1131 (9th Cir. 2012)........................................................................... 9, 19

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*
213 F.3d 474 (9th Cir. 2000)................................................................................. 8, 12

*Chapman v. Pier 1 Imps. (U.S)*
631 F. 3d 939 (9th Cir. 2011) ................................................................................. 21

*Crowder v. Kitagawa*
81 F.3d 1480 (9th Cir. 1996)..................................................................................... 17

*Disabled in Action v. Board of Elections in the City of New York*
752 F.3d 189 (2d Cir. 2014) ..................................................................................... 11

*Doe v. Mut. of Omaha Ins. Co.*
179 F.3d 557 (7th Cir. 1999)..................................................................................... 10

*Fortyune v. Am. Multi-Cinema, Inc.*
No. CV 01-05551 NM (JWJx),
2002 U.S. Dist. LEXIS 27960 (C.D. Cal. Oct. 21, 2002) ................................... 22

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*
528 U.S. 167 (2000)................................................................................................. 21

*Galvan v. Walt Disney Parks and Resorts*
425 F.Supp.3d 1234 (C.D. Cal. Nov. 27, 2019)................................................... 21

*Galvez v. Auto. Club of S. Cal.*
No. SA CV 16-0887-DOC (KESx),
2017 U.S. Dist. LEXIS 214650 (C.D. Cal. May 5, 2017) ................................... 12

*Houghton v. South*
965 F.2d 1532 (9th Cir. 1992)..................................................................................... 8

*Ind. Coal. For Pub. Educ.-Monroe Cty. v. McCormick*
338 F. Supp. 3d 926 (S.D. Ind. 2018) ..................................................................... 22

*Karczewski v. DCH Mission Valley LLC*
862 F.3d 1006 (9th Cir. 2017)................................................................................. 14

*Lentini v. Cal. Ctr. for the Arts*
370 F.3d 837 (9th Cir. 2004)........................................................................... 9, 10, 11

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992)................................................................................................. 21

*Mannick v. Kaiser Found. Health Plan, Inc.*
No. C-03-5905-PJH,
2006 U.S. Dist. LEXIS 57173 (N.D. Cal., July 31, 2006) ................................... 13

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Namisnak v. Uber Techs.*
No. 17-CV-060124-RS,
2018 U.S. Dist. LEXIS 221054 (N.D. Cal. Oct. 3, 2018) .................................. 8

*Noel v. New York City Taxi and Limousine Comm'n*
687 F.3d 63 (2d Cir. 2012) ............................................................................... 9

*Simon v. E. Ky. Welfare Rights Org.*
426 U.S. 26 (1976) ........................................................................................... 21

*Toomer v. City Cab*
443 F.3d 1191 (10th Cir. 2006) ....................................................................... 9

*Weyer v. Twentieth Century Fox Film Corp.*
198 F.3d 1104 (9th Cir. 2000) ................................................................... 8, 10

*Wong v. Regents of the Univ. Of Cal.*
192 F.3d 807 (9th Cir. 1999) .................................................................... 12, 17

**Statutes**

42 U.S.C. § 12143 ................................................................................................. 9

42 U.S.C. § 12181 ................................................................................................. 8

42 U.S.C. § 12182 ...................................................................................... 8, 10, 19

42 U.S.C. § 12184 ...................................................................................... 9, 10, 19

**Other Authorities**

49 C.F.R. Pt. 37 ..................................................................................................... 9

Avis Disability Services ........................................................................................ 4

Enterprise "Customers with Disabilities" ............................................................ 4

Hertz "Car Rental Services for People with Disabilities" .................................... 4

**Rules**

Fed. R. Civ. Pro. 56 .............................................................................................. 7

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-iii-

DEFENDANT LYFT, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT; CASE NO. 3:19-CV-01438-WHA

1

### I.   INTRODUCTION

By their Motion for Partial Summary Judgment ("Motion"), Plaintiffs ask the Court to hold Lyft liable for discrimination under the Americans with Disabilities Act ("ADA") without specifying a remedy. It is a curious tactic: after all, their lawsuit is predicated on the theory that there is a remedy – *i.e.,* a "reasonable modification" – that would reverse the alleged discrimination if only Lyft would implement it. *See* Compl. [Dkt. 1] ¶ 6 ("Plaintiffs request that Lyft implement modifications to its policies and practices that will ensure that it offers its service to persons with disabilities who need WAVs"). Yet, Plaintiffs *never* identify what exactly Lyft should do to "ensure that it offers its service to persons with disabilities who need WAVs." Instead, Plaintiffs ask the Court to grant them partial summary judgment as to liability only, so that with such a ruling in hand, the parties can engage in settlement discussions. Plaintiffs assure the Court that they, "who do not seek perfection, will make all reasonable efforts to engage in meaningful settlement discussions regarding a possible remedial plan." Motion at 25:21-23.

There is a simple explanation why Plaintiffs have chosen this tactic—they cannot actually identify a "reasonable modification." Based on their review of extensive internal Lyft documents, including over 1.3 million lines of ride data,[1] and depositions of dedicated Lyft employees concerning their efforts to create a WAV solution that would be both reliable and scalable (*i.e.*, reproducible in numerous regions at an affordable cost), Plaintiffs know there is no "reasonable modification" that would create on-demand WAV service on the Lyft platform. Among other reasons, this is because WAVs are rare and because on the Lyft platform, drivers drive their personal vehicles and set their own hours. Lacking evidence of hundreds or thousands of drivers with personally-owned WAVs who stand ready to drive their WAVs on the Lyft platform, Plaintiffs know that the only way Lyft can provide reliable WAV service is by contracting with third-party transportation companies at an hourly cost that would add up to ███████ *per vehicle per year* if deployed 24-hours a day.

No court has ever found that under the ADA, a private entity must spend such

---

[1] *See* Declaration of Marie E. Jonas in Support of Lyft's Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Jonas Decl.") ¶¶ 3-5.

extraordinary sums, year after year, to create a service tailored to individuals with disabilities. Yet this is what Plaintiffs ask of this Court. The impact of such a ruling, moreover, would not stop at the borders of the three counties – San Francisco, Alameda, and Contra Costa (the "Bay Area Counties") – identified in Plaintiffs' Complaint. To the contrary, if accepted, the expansive theory underlying Plaintiffs' Motion – that Lyft must provide service in the East Bay because a rider can currently take Lyft from San Francisco to Oakland but not the other way around (*see* Motion at 5:2-3) – would subject Lyft to endless other lawsuits demanding WAV service in other cities.

Plaintiffs' Motion should be denied for the following reasons:

*First*, Plaintiffs misstate the law, creating out of whole cloth statutory obligations that do not exist, namely, that the ADA imposes on Lyft an independent duty to provide WAV service and/or to provide "full and equal access" to WAVs on its platform. It does not. Nothing in the ADA imposes such an expansive obligation on a private entity to create a specialized service tailored to meet the needs of individuals with disabilities.

*Second*, even if the Court were to accept that the ADA somehow obligates Lyft to provide "full and equal access" to WAVs on its platform, the Motion should be denied because Plaintiffs have failed to identify *any* modification to a policy, practice, or procedure that would unlock a supply of WAVs on the Lyft platform in the Bay Area Counties. Identifying a modification that would eradicate the alleged discriminatory condition is a required element of Plaintiffs' prima facie case. Because Plaintiffs cannot establish prima facie discrimination, the Motion should be denied.

*Third*, the reason Plaintiffs refuse to identify the purported "modification" that they believe Lyft must make is that they know the cost to implement such a program is massive. In addition, it is not a one-time cost, but a recurring cost that Lyft would have to undertake, year after year, county after county. The available evidence shows that the cost Lyft would be forced to undertake to create "full and equal" access to WAVs on Lyft's platform is not reasonable.

*Fourth,* as Plaintiffs admit, determining whether a particular modification is "reasonable" requires a fact-specific, case-by-case inquiry that considers the cost of the modification as well as its effectiveness. Motion at 14:25-15:2 (quoting *Fortyune v. Am. Multi-Cinema, Inc.,* 364 F.3d

1075, 1083 (9th Cir. 2004)). The litany of vague "modifications" that Plaintiffs cite are unsupported by any evidence as to their effectiveness or cost in the three Bay Area Counties at issue in this case. The evidence in the factual record as to the effectiveness and cost of these alleged "modifications" in other markets, moreover, contradicts Plaintiffs' conclusory assertions as to their reasonableness. At a minimum, genuine disputes of material fact preclude Plaintiffs' Motion.

*Fifth*, forcing Lyft to create a supply of WAVs that does not exist in order to provide WAV service on the Lyft platform is a fundamental alteration of Lyft's business. The undisputed evidence is that Lyft's ride*sharing* platform is a supply-and-demand driven, two-sided technology platform that uses algorithms to match riders who need rides with drivers who are willing to drive them. It is uncontested that drivers on the platform drive their personal vehicles. Requiring Lyft to create a supply of WAVs is fundamentally contrary to its two-sided ridesharing platform.

*Sixth*, Plaintiffs' refusal to identify the purported "modification" they seek means they have no way to show that their injury was caused by Lyft's alleged failure to make the modification or that their injury will be redressed by a favorable decision. At a minimum, there are genuine disputes of material fact as to whether Plaintiffs have standing.

Ultimately, Plaintiffs' refusal to identify the act of alleged discrimination dooms their case. Plaintiffs' Motion must be denied.

## II.     FACTUAL BACKGROUND

The relevant facts are largely undisputed, *see* Stipulation Re: Facts and Authenticity of Documents [Dkt. 68-1] ("Stip."), and a full discussion of the factual background is included in Lyft's Motion for Summary Judgment [Dkt. 68] at 3-11. Lyft highlights below those facts pertinent to this Motion, as well as those critical facts that are missing from the evidentiary record presented by Plaintiffs.

### A.     Lyft's Ridesharing Platform.

Lyft is a San Francisco-based technology company that has built a multi-sided platform that, among other things, uses computer algorithms to match people looking for a driver with people who are willing to drive them. Stip. ¶ 2; Declaration of Edward Niedermeyer in Support of

1  Lyft's Motion for Summary Judgment [Dkt. 68-3] ("Niedermeyer Decl.") ¶ 4. Lyft does not own

2  or lease any vehicles used for ridesharing on the Lyft platform, nor does it set any schedules or

3  establish any routes for the drivers. Stip. ¶ 4; Niedermeyer Decl. ¶ 4. Whether a ride will be

4  available and the wait time for the ride depend on driver availability at the time and location of

5  the ride request. Stip. ¶ 5; Niedermeyer Decl. ¶ 6.

6       Lyft's platform depends on fundamental supply and demand economics. Niedermeyer

7  Decl. ¶ 6. The platform performs best in areas with high population density, with high supply and

8  demand, as demonstrated by lower wait times for riders. *See id.* ¶ 8.

9       **B.    No Evidence Of WAV Supply.**

10      There is no evidence of a pool of drivers with personally-owned WAVs in the Bay Area

11  Counties who want to and would drive on the Lyft platform. Declaration of Isabella Gerundio in

12  Support of Lyft's Motion for Summary Judgment [Dkt. 68-2] ("9/03/20 Gerundio Decl.") ¶ 21.

13  Indeed, Lyft is not aware of any evidence of how many of these specially modified vehicles even

14  exist in the Bay Area Counties or surrounding areas. *Id*. Plaintiffs did not submit any such

15  evidence in support of their Motion, and admitted in discovery that they did not have such

16  evidence, stating in their Interrogatory Responses that they "cannot reasonably predict the number

17  of drivers with personally-owned WAVs who, given unspecified conditions, might be willing to

18  provide WAV service for Lyft." Declaration of Jiyun Cameron Lee in Support of Lyft's Motion

19  for Summary Judgment [Dkt. 68-4] ("9/03/20 Lee Decl.") Exs. 15-20, Resp. No. 9.

20      There is also no evidence in the record of any excess WAV supply in third-party,

21  commercial fleets. Declaration of Audrey Ren in Support of Lyft's Opposition ("Ren Decl.")

22  ¶¶ 5, 9. Rental car companies, moreover, generally do not have WAVs in their fleets.[2] *Id.* ¶ 9.

23      **C.    No Evidence Of WAV Demand To Sustain A Ridesharing Platform.**

24      According to Lyft's expert, Dr. Marc Rysman, a primary determinant of the number of

25

26      [2] *See also* Hertz "Car Rental Services for People with Disabilities," https://www.hertz.com/rentacar/productservice/index.jsp?targetPage=PhysicallyChallengedUS.jsp; Avis Disability Services, https://www.avis.com/en/customer-service/disability-services;

27  Enterprise "Customers with Disabilities," https://www.enterprise.com/en/help/customers-with-

28  disabilities.html.

drivers and the number of riders on Lyft's ridesharing platform is the number of people in a geographic area. Rysman Report [9/03/2020 Lee Decl. Ex. 22] at 7. Dr. Rysman conservatively estimated the total population of WAV users across the 1,500 square miles of the Bay Area Counties to be approximately 22,000 – or about 15 people per square mile. *See id.* at 22. According to Dr. Rysman's analysis, this level of population density is far too low to sustain a platform comparable to Lyft's Standard mode. Dr. Rysman opined that even delivering a wait time of five minutes across the three-county area would require a population density of approximately 10,000 people per square mile. *Id.* at 18.

In support of their Motion, Plaintiffs submitted no expert testimony or other evidence demonstrating that the demand for WAVs in the Bay Area Counties would be sufficient to sustain any ridesharing platform.

### D.     The High Cost Of Creating A WAV Supply.

Lyft offers WAVs only in markets with regulatory requirements, or where it has a partnership with a transit agency. Stip. ¶ 10. Currently, Lyft offers Access mode in nine cities in the United States, including in San Francisco and New York. Stip. ¶ 11.

Because there is no organic supply of WAVs available on its platform, Lyft must create a supply of WAVs whenever it offers Access mode. Lyft does this in three ways: by contracting with third-party "partners" (the "Partner" model), by creating opportunities for drivers to rent WAVs (the "Rental" model), and by onboarding drivers with access to WAVs (the "Organic Driver" model). Stip. ¶ 12; 9/03/2020 Gerundio Decl. ¶ 4.

### 1.     Partner Model.

The Partner model is the most expensive of the three, but offers the only means by which Lyft can ensure that WAVs will be on the platform throughout all service hours. 9/03/2020 Gerundio Decl. ¶ 9. Under the Partner model, Lyft contracts with a third-party transportation company that provides WAVs (and drivers for those WAVs) in exchange for a per-vehicle, per-hour rate. Stip. ¶ 12(a).

Lyft uses the Partner model for the WAV pilot program it launched in San Francisco in July 2019 ("SF WAV Pilot"). Lyft began discussing pilot programs in San Francisco and Los

Angeles in 2018, and decided to launch these pilot programs after attending a workshop relating to the California Public Utilities Commission's ("CPUC's") rulemaking proceeding for the TNC Access for All Act in December 2018. Declaration of Traci Lee in Support of Lyft's Opposition ("Traci Lee Decl.") ¶ 2; Declaration of Isabella Gerundio in Support of Lyft's Opposition ("Gerundio Oppo. Decl.") ¶ 7. Under its current contract with its partner in San Francisco, First Transit, Lyft pays an hourly fee of ███████ per vehicle. Stip. ¶ 23. Based on current service hours of 7 a.m. to midnight, 7-days per week, the annual cost per vehicle to Lyft exceeds ███████.[3] 9/03/2020 Gerundio Decl. ¶ 15. In late 2018, Lyft issued a request for proposal to see if it could obtain more favorable hourly rates for its third-party WAV partners. ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ in San Francisco. Gerundio Oppo. Decl. ¶¶ 10-11.

### 2. Rental Model.

The Rental model is less expensive than the Partner model, but nonetheless still involves significant costs. This is because rental car companies generally do not have WAVs in their fleets. Lyft thus has to finance the cost of creating the supply of WAVs used in the Rental model. Stip. ¶ 12(b); 9/03/20 Gerundio Decl. ¶ 4(b); Ren Decl. ¶ 9.

Before the COVID-19 pandemic, Lyft had planned to launch a Rental pilot in the Bay Area Counties. The program contemplated making up to 65 WAVs available to drivers for rent through Hertz. Stip. ¶ 40; 9/03/20 Gerundio Decl. ¶ 19. Based on the planned per-vehicle subsidy, the expected annualized cost to Lyft of subsidizing the cost of WAVs was ███████. *Id.* With anticipated driver incentives, the total expected cost of the Rental pilot for the Bay Area Counties was ████████████████. Ren Decl. ¶ 10.

Lyft currently uses the Rental model in New York City only. In New York City, applicable regulations have created a unique incentive for drivers to rent WAVs. As a result of

---

[3] Notwithstanding this significant cost, Plaintiffs denigrate the SF WAV Pilot as being "so limited that it fails to come close to serving the needs of WAV users." Motion at 4:20-21. It is not clear how much Lyft would have to spend to meet Plaintiffs' amorphous standard.

regulations put in place by the Taxi and Limousine Commission ("TLC"), Lyft restricted the onboarding of new drivers onto its platform unless they drive WAVs. Ren Decl. ¶ 6. Without such a unique regulation-driven incentive, it is not known whether drivers in other cities (including in the Bay Area) can be incentivized to rent WAVs, because, among other reasons, WAVs are more expensive to operate and WAV rides take longer to complete. 9/03/20 Gerundio Decl. ¶ 20.

### 3.   Organic Driver Model.

The Organic Driver model is the least expensive of the three models used by Lyft to create a supply of WAVs on the platform. However, in Lyft's experience, the "Organic Driver" model works only where there is a sufficient number of drivers who either have access to WAV taxis (such as in Chicago), or can rent WAVs independently of Lyft (such as in New York). 9/03/2020 Gerundio Decl. ¶ 4(c).

In markets where Lyft has tried this model, even with large driver bonuses, it has struggled on multiple occasions to find drivers who have a WAV and want to drive it on the Lyft platform. 9/03/2020 Gerundio Decl. ¶ 7. Most recently, Lyft contacted over ▆▆▆ drivers in Philadelphia and Delaware with offers of referral and sign-on bonuses for drivers with qualifying WAVs. The outreach resulted in ▆▆▆▆▆ responses and approximately ▆ referrals, but when Lyft followed up, it turned out that *none of them* actually had access to a WAV. *Id.*

Lyft is not aware of any evidence suggesting that the Organic Driver model would work in the Bay Area Counties.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A dispute as to an issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480

1 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The moving

2 party "has the initial burden of establishing the absence of a genuine issue of fact on each issue

3 material to its case." *Id.*

## IV.    ARGUMENT

### A.    Plaintiffs' Motion Is Built On The Faulty Premise That Title III Of The ADA Requires Lyft To Provide WAVs On Its Platform.

Plaintiffs cannot seem to decide what legal standard applies. On the one hand, Plaintiffs

claim that "Lyft's failure to take essentially any steps to provide WAV service in the Bay Area"

violates Title III of the ADA. Motion at 12:8-9. On the other hand, Plaintiffs claim that "Lyft is

required to make 'reasonable modifications in policies, practices, or procedures' to achieve full

and equal access for people with disabilities." *See* Motion at 14:10-11; *see also id.* at 12:13-15

(stating that the statute defines discrimination to include a failure to make reasonable

modifications "when such modifications are necessary to provide people with disabilities full and

equal enjoyment of the entity's services"). Unfortunately for Plaintiffs, neither standard is correct.

First, there is no basis for Plaintiffs' theory that Lyft must do *something* to provide

WAVs. Even if the Court assumes, for purposes of this Motion, that Lyft is subject to the

transportation provisions of ADA Title III,[4] Congress made clear in the language of the statute

that there is no independent statutory requirement to purchase WAVs, lease WAVs, or retrofit

vehicles to create WAVs. *See generally* 42 U.S.C. § 12184(b)(3); § 12182(b)(2)(A)(iv).[5]

---

[4] Lyft does not oppose Plaintiffs' present Motion on the ground that it is not subject to Title III of the ADA. Lyft has a number of significant, meritorious arguments against Plaintiffs' Motion, and therefore the Court need not decide the issue. However, Lyft does not concede that it is subject to Title III of the ADA, and reserves the right, at trial, to dispute that it is an entity "primarily engaged in the business of transporting people" or that it operates a place of public accommodation. As described in Part II.A, above, Lyft operates a multi-sided technology platform that, among other things, facilitates connections between riders and drivers. Lyft's ridesharing platform does not fit the statutory definition of "specified public transportation." 42 U.S.C. § 12181(10). Lyft's platform is also not a physical place; under binding Ninth Circuit precedent, "public accommodations" are, by definition, "actual, physical places." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *see also Namisnak v. Uber Techs.*, No. 17-CV-060124-RS, 2018 U.S. Dist. LEXIS 221054, at *10 (N.D. Cal. Oct. 3, 2018).

[5] As addressed at length in Lyft's prior briefing, *see* Lyft's Opposition to Plaintiffs' Motion for Class Certification [Dkt. 50], there is no free-standing obligation on any private entity

Throughout the ADA, WAVs are treated categorically differently than automobiles. *See, e.g.*, *id.*; 42 U.S.C. § 12143 (requiring public entities that provide fixed route service to provide paratransit as a complement). As this Court noted in ruling on Plaintiffs' Motion for Class Certification: "Significantly, plaintiffs are not asking Lyft to acquire WAVs, *which acquisitions the ADA does not require*. 49 C.F.R. Pt. 37, App'x D; *see also* 42 U.S.C. § 12184(b)(3)." Order [Dkt. 58] at 3 (emphasis in original). *See also Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) ("a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA"); *Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 74 (2d Cir. 2012) (the Title III exemption for taxi providers "compels the conclusion that the ADA, as a whole, does not require the New York City taxi industry to provide accessible taxis"). Plaintiffs' Motion fails to discuss or distinguish – or even mention – any of these authorities.

Second, the specific statutory provision relied on by Plaintiffs to argue that Lyft must make "reasonable modifications in policies, practices, or procedures," does not include the words "full and equal." *See* 42 U.S.C. §§ 12184(b)(2)(C) and 12182(b)(2)(A)(ii). To the contrary, those provisions merely require modifications to grant access to an entity's existing goods or services.

The key language, found in Section 12182(b)(2)(A)(ii), defines discrimination to include "a failure to make reasonable modifications in policies, practices, or procedures, *when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities*." (Emphasis added.) The provision does not create an obligation to provide "full and equal" access — this is Plaintiffs' own invention. Instead, the focus of the provision is the goods or services that a private entity already offers. *See, e.g., Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134-35 (9th Cir. 2012) (modifying policy to permit motorized wheelchairs or scooters in park); *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 845 (9th Cir. 2004) (modifying policy to permit service animals, even if they make some noise during a performance); *Fortyune*, 364 F.3d at 1087 (modifying a theater's policy on companion seating to ensure an individual who uses a wheelchair can sit next to his companion).

to purchase WAVs in the ADA, unless they purchase large vehicles of the kind not found on Lyft's ridesharing platform. *See generally* 42 U.S.C. § 12184(b).

Lyft's reading of the statute – not Plaintiffs' – is consistent with the statutory language and with settled case law. Even when the relevant statutory provision includes the phrase "full and equal enjoyment" – such as 42 U.S.C. § 12182(a), which provides that no individual shall be discriminated against "in the full and equal enjoyment" of the goods or services of any place of public accommodation – the Ninth Circuit has held that Title III "does not require the provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." *Weyer*, 198 F.3d at 1115; *see also Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (stating that the core meaning of Section 12182(a) is that the owner of a facility may not "exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do").

In short, nothing in ADA Title III requires private entities to create new lines of business that offer different goods or services that are tailored to individuals with disabilities, nor does it require a private entity to make whatever modifications are needed to provide WAV service. The Court should reject Plaintiffs' attempt to read into the statute words – and obligations – that Congress never intended.

**B.     The Court Should Deny Plaintiffs' Motion Based On Their Refusal To Identify The Most Basic Element Of Their Case, Which Is The Modification They Deem Necessary To Achieve "Full And Equal Access."**

Even if the Court overlooks Plaintiffs' faulty reading of the ADA, the Motion should be denied based on Plaintiffs' refusal to identify the "modification" that would eradicate the alleged act of "discrimination" on the Lyft platform.

As discussed above, the definition of "discrimination" at the heart of this case is the alleged "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. §§ 12184(b)(2)(C) and 12182(b)(2)(A)(ii) (emphasis added); *see* Motion at 12:8-9. "Discrimination," therefore, is the failure to make a modification of a policy or practice which, if made, would reverse the alleged discrimination by providing Plaintiffs the access they seek. *See Lentini*, 370 F.3d at 845 (a modification is necessary if, "but for the modification, [plaintiff] would effectively be excluded

from future performances at the Center"). Under the statutory provision, if a professional golfer requires a golf cart to play in a tournament because he is unable to walk the course due to his disability, it is discrimination to refuse to permit the use of a golf cart. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001). If an individual who relies on a wheelchair needs to have his companion seated next to him, it is discrimination to refuse to hold the companion seat until 10 minutes prior to showtime. *Fortyune*, 364 F.3d at 1084.

Identifying the necessary modification, therefore, is a prima facie element of a claim for discrimination under Section 12182(b)(2)(A)(ii). *PGA Tour*, 532 U.S. at 674, 683 n.38. But in their Motion, Plaintiffs make clear they will not identify the purported modification that they contend will reverse the alleged discrimination on the Lyft platform. While they list a number of purported "modifications" they suggest might work, Plaintiffs pointedly refuse to say which modification (or combination of them) would result in their goal of "full and equal access," stating: "Plaintiffs want access to the robust, reliable transportation service that Lyft offers non-WAV users. There are multiple ways to reach achieve [sic] this outcome, and it is Lyft's prerogative to determine how they wish to get there." Motion at 16:1-4.[6]

It comes as no surprise to Lyft that Plaintiffs are refusing to identify the necessary modification. Providing WAV service is not a simple proposition because there is no ready supply of WAVs or WAV drivers. *See, e.g.,* 9/03/2020 Gerundio Decl. ¶¶ 20-21. WAVs are rare and expensive because of the specialized equipment installed in them. Stip. ¶ 8. Plaintiffs know this, and recognize that if they identify the "modification," they will have to prove that the cost of

---

[6] Because they refuse to say what modification is needed, Plaintiffs seek not summary judgment, but *partial* summary judgment as to liability only. Motion at 2:6. The main case on which Plaintiffs rely for bifurcating liability from remedy in this way is *Disabled in Action v. Board of Elections in the City of New York*, 752 F.3d 189 (2d Cir. 2014). But that case involved a very different cause of action alleging that the Board of Elections ("BOE") had failed to provide the plaintiffs with meaningful access to its voting program under ADA Title II and Section 504 of the Rehabilitation Act of 1973 by, in predominant part, failing to remove architectural barriers to polling places. *Id.* at 191-93. The district court granted plaintiffs' motion for summary judgment because there was "no genuine dispute of material fact as to the existence of pervasive and recurring barriers to accessibility on election days at poll sites designated by the BOE." *Id.* at 194. In contrast, here, there is no underlying requirement to provide WAVs. Instead, Plaintiffs must establish that there was a failure to implement a reasonable and necessary modification that would have resulted in WAV service on the platform. Unlike in *Disabled in Action,* liability and remedy here are inextricably linked.

implementing such modification is reasonable – which they cannot do.

But in this reasonable modification case, identifying the reasonable and necessary modification – *i.e.,* identifying the necessary contours of injunctive relief – is a required element of Plaintiffs' case on which they bear the burden of proof. *See PGA Tour*, 532 U.S. at 683 n.38; *Wong v. Regents of the Univ. Of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (plaintiff bears the burden of producing evidence as to his prima facie case of discrimination). As the party moving for partial summary judgment, Plaintiffs must come forward with evidence sufficient for a directed verdict as to the modification they deem reasonable and necessary to ensure "full and equal" access. *See C.A.R. Transp.,* 213 F.3d at 480.

Plaintiffs have fallen far short of producing evidence that would entitle them to a directed verdict, because they fail to identify the modification they claim is necessary. The Court should deny Plaintiffs' Motion for the simple reason that they have refused to articulate this basic element of their case. *Galvez v. Auto. Club of S. Cal.*, No. SA CV 16-0887-DOC (KESx), 2017 U.S. Dist. LEXIS 214650, at *17 (C.D. Cal. May 5, 2017) (while the plaintiff "has shown that he may have requested a policy change from Defendant . . . it is unclear *what* modification Plaintiff is actually requesting. At [the summary judgment stage] in the proceedings, this is fatal to Plaintiff's ADA claim").

## C.    The Court Should Deny Plaintiffs' Motion Based On Their Failure To Present Any Evidence That The Cost Of The Modification They Seek Is "Reasonable."

Because they do not identify which modification is needed, Plaintiffs do not say how much such purported modification would cost. Of course, they know the cost would be astronomical. But just as it is Plaintiffs' burden to identify the necessary modification, it is also their burden to show that it is reasonable. *PGA Tour*, 532 U.S. at 683 n.38; *Fortyune*, 364 F. 3d at 1083.

The real costs of providing WAV service are not reasonable. If the Court assumes the modification sought by Plaintiffs is the extension of the Partner model, the evidence is that, based on the hourly cost of a First Transit vehicle used in the SF WAV Pilot, one vehicle on the road for 24 hours, 7-days-a-week would cost ███████ per year. Stip. ¶ 23; Gerundio Oppo. Decl. ¶ 11.

Plaintiffs have proffered no evidence to suggest how many such vehicles would be needed to cover the 1,500 square mile area of the Bay Area Counties, except to declare the 5 vehicles for the SF WAV Pilot – which covers San Francisco only, an area comprising 47 square miles – to be wholly inadequate. *See, e.g.*, Motion at 4:19-22, 5:10-12. Plaintiffs also do not say what wait times would be acceptable, other than to declare ███ minutes to be too long. *Id.* at 5:14-15. The Court is thus left to speculate as to how many such vehicles may be needed to deliver the "robust, reliable" WAV service Plaintiffs want throughout the three Bay Area Counties. Assuming just 20 vehicles for the entire 1,500 square mile area, the annual amount would be ███████ . These are not one-time costs, but recurring, long-term costs.

The same is true for the Rental model. Lyft expected to spend, at minimum, approximately ██████ for the first two years of the rental pilot comprised of 65 WAVs. Ren Decl. ¶ 10. Plaintiffs' Motion suggests 65 vehicles would not be adequate, and that to achieve parity with Standard mode, Lyft should have approximately ████ WAV drivers deployed throughout the Bay Area Counties at all times. *See* Motion at 5:10-12 (citing Stip. ¶ 35). Nowhere, however, do Plaintiffs cite what the cost of such an extraordinary fleet of WAVs might be.

The evidence from other markets is consistent. In New York City, notwithstanding Lyft's ability to use a combination of different models, including the less expensive Organic Driver model, it costs Lyft approximately ██████ per month to provide WAV service. Stip. ¶ 48. Annualized, the total is approximately ███████ for the five boroughs of New York City, a geographic area that is just over 300 square miles, equaling approximately one-fifth the area of the Bay Area Counties.

As the court held in *Mannick v. Kaiser Found. Health Plan, Inc.,* No. C-03-5905-PJH, 2006 U.S. Dist. LEXIS 57173, *38 (N.D. Cal., July 31, 2006), a case relied on by Plaintiffs in their Motion, it is Plaintiffs' burden to show that they requested a reasonable modification, and to provide evidence showing that the specific modification requested was reasonable. As the Court stated, "a 'feasible' modification is not necessarily 'reasonable.'" *Id.* at *39. As in *Mannick,* Plaintiffs' Motion should be denied for failure to provide evidence that the requested modification

1    is reasonable.

2        **D.    The Court Should Deny Plaintiffs' Motion Because There Are Genuine Disputes Of Material Fact As To Whether Any Of The Purported "Modifications" Would Be Effective Or Reasonable.**

3

4        While refusing to identify any particular modification that they contend would create

5    "robust, reliable" WAV service on the Lyft platform in the Bay Area Counties, Plaintiffs mention

6    a number of possible purported modifications[7] and offer to leave it to Lyft's prerogative as to

7    which of them it might choose. Motion at 16:1-4. But as Plaintiffs admit, "the determination of

8    whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry

9    that considers, among other factors, the effectiveness of the modification in light of the nature of

10   the disability in question and the cost to the organization that would implement it." Motion at

11   14:26-15:2 (quoting *Fortyune*, 364 F.3d at 1083).

12       Plaintiffs' Motion fails to meet the very standard they cite, by failing to give this Court the

13   evidence it needs to make the fact-specific inquiry required in a reasonable modification case. As

14   set forth in its own Motion for Summary Judgment [Dkt. 68], Lyft's position is that it is entitled

15   to summary judgment on Plaintiffs' Complaint based on Plaintiffs' failure to come forward with

16   evidence. However, at a minimum, Plaintiffs' Motion should be denied because based on the

17   stipulated facts and evidence presented by Lyft in opposition, there exist genuine disputes of

18   material facts precluding Plaintiffs' Motion.

19       **1.    There Is A Genuine Dispute Of Material Fact As To Whether The Purported Modification Of Using Advertising And Incentives Would Be Effective In Reversing The Alleged Discrimination.**

20

21       Among the alleged "modifications" identified in Plaintiffs' Motion is the use of incentives

22   and paid advertising to recruit WAV drivers and passengers onto Lyft's platform. *See, e.g.*,

23   Motion at 16:11-18. Plaintiffs claim that since Lyft uses advertising and incentives to recruit non-

24

---

25       [7] As Lyft argued in its Motion for Summary Judgment [Dkt. 68], some of these purported "modifications" are not "modifications to policies, practices or procedures" of the kind contemplated by the plain language of 42 U.S.C. § 12182(b)(2)(A)(ii). For example, the Partner and Rental models require Lyft to invest heavily to create a supply of vehicles. *See* Stip. ¶¶ 12(a) and (b); 9/03/2020 Gerundio Decl. ¶¶ 4(a) and (b). These constitute expansions of Lyft's business operations, not modifications of a policy or practice. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1012 (9th Cir. 2017) (noting that not even creative lawyers would describe certain types of changes, such as a permanent structural change, "as a modification of a policy").

26

27

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

DEFENDANT LYFT, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 3:19-CV-01438-WHA

WAV drivers, they can do the same for WAV drivers.[8] But this overlooks the critical distinctions between WAVs and non-WAVs: supply and availability.

Lyft is a supply-and-demand driven platform that depends on population density. *See* Niedermeyer Decl. ¶¶ 8-9. The uncontroverted evidence is that the population of individuals who use wheelchairs is less than 1 percent of the total population. Rysman Report [9/03/20 Lee Decl. Ex. 22] at 22. Plaintiffs proffer no evidence of the number of drivers with personally-owned WAVs in or around the Bay Area Counties, or the number of such drivers who would be willing to drive their WAVs on the Lyft platform. *See* Pls. Rog. Resp. [9/03/20 Lee Decl. Exs. 15-20] No. 9 (conceding that they "cannot reasonably predict the number of drivers with personally-owned WAVs who, given unspecified conditions, might be willing to provide WAV service for Lyft").[9] Plaintiffs proffer no evidence as to how many WAV drivers might be needed. Plaintiffs also proffer no evidence, including expert testimony, as to how Lyft might craft paid advertising or incentives to target this incredibly small population to recruit the necessary number of WAV drivers to its platform in the Bay Area Counties.[10]

While Plaintiffs have put forth no evidence on which this Court could determine the effectiveness of incentives and paid advertising, Lyft's evidence shows that it is very difficult to identify and sign up independent contractor WAV drivers. 9/03/2020 Gerundio Decl. ¶ 7. Lyft's experience is that the "Organic Driver" model works only where there is a sufficient number of

---

[8] Plaintiffs' claim that Lyft departed from its normal business model in not doing paid advertising is false. Lyft's marketing campaigns are generally not targeted to a specific Mode, but aimed at raising brand awareness generally. *See* Niedermeyer Decl. ¶ 16. Indeed, as described below, Lyft went beyond its standard marketing efforts by engaging in targeted outreach to specific interest groups.

[9] Recent testimony from a putative class member confirmed an additional reason why it is difficult to find drivers with personally-owned WAVs: individuals who are most likely to own WAVs – *i.e.,* those who rely on wheelchairs themselves – may not be able to assist a rider in tying down, or securing, the rider's wheelchair. *See* Lewkowicz Depo. [Jonas Decl. Ex. 4] at 16:19-18:6.

[10] Plaintiffs do make clear that to achieve parity, they believe Lyft will need to onboard approximately ███ WAV drivers. *See* Motion at 5:10-12 (citing Stip. ¶ 35). Plaintiffs' position is consistent with the conclusion reached by Lyft's expert, Dr. Rysman, that there would have to be approximately 1,300 WAV drivers on the platform every hour of every day to deliver average wait times comparable to Standard mode. *See* Rysman Report [9/03/20 Lee Decl. Ex. 22] at 29. There is zero evidence in the record that this number of WAV drivers even exists, let alone could be incentivized to drive on the Lyft platform.

1    drivers who have access to WAVs independent of Lyft, such as in Chicago or New York City. *Id.*

2    ¶ 4(c). Outside those cities, Lyft has struggled on multiple occasions to find drivers with WAVs.

3    *Id.* ¶ 7. In the Bay Area Counties specifically, Lyft is unaware of any excess supply of WAVs that

4    is available to perform rides on the Lyft platform. *Id.* ¶ 21. Plaintiffs also offer no evidence as to

5    how Lyft can or should handle operational challenges unique to offering WAVs on the platform,

6    including, for example, how independent contractor drivers would be trained to provide WAV

7    service, who would inspect the wheelchair ramp or lift installed on the vehicle, or how often such

8    inspections should occur.[11]

9        In addition, the suggestion in Plaintiffs' Motion that Lyft has done nothing to publicize or

10   advertise the SF WAV Pilot is false. As Lyft launched the SF WAV Pilot, Lyft publicized the

11   program through various means including: issuing a press release and engaging media outlets,

12   which led to articles in the San Francisco Chronicle, SF Gate, and Engadget, and news programs,

13   including on KRON 4; contacting various stakeholders, including the participants in the CPUC

14   Rulemaking Proceeding and elected officials; and meeting and speaking with representatives of

15   dozens of organizations such as Mayor's Disability Council, Institute on Aging, Self-Help for the

16   Elderly, Community Living Campaign, Jewish Community Center of San Francisco, San

17   Francisco Senior Center, Coalition of Agencies Serving the Elderly, Catholic Charities – OMI

18   Senior Center, Dignity Fund Coalition, and many others. Traci Lee Decl. ¶ 3.[12]

19       At a minimum, there is a disputed issue of fact that precludes a finding of partial summary

20   judgment based on Lyft's alleged failure to engage in marketing or paid advertising efforts to sign

21

22       [11] Plaintiffs point out that Lyft currently does not allow drivers with personally-owned
         WAVs to drive on its platform in the Bay Area. Motion at 5:25-26. There is a simple reason for
23       this, which is that drivers who provide rides using their personal WAVs should be required to
         have safe, compliant equipment, including proper tie-downs to secure wheelchairs in transit.
24       These WAV drivers should also be trained to assist riders with disabilities— training that, at the
         time of this filing, Lyft would need to develop or implement specifically for WAV service. *See,*
25       *e.g.,* CPUC "Decision On Track 2 Issues: Offsets, Exemptions and Access Provider
         Disbursements" dated March 19, 2020, at 27 (driver training and vehicle inspection required to
26       qualify for offset).

27       [12] For reasons not known to Lyft, Lyft's outreach efforts were far more successful in Los
         Angeles than in San Francisco. Traci Lee Decl. ¶ 4. Demand for WAVs in Los Angeles has also
28       been consistently higher than in San Francisco. Gerundio Oppo. Decl. ¶ 8.

up WAV drivers and riders.

> **2.    There Is A Genuine Dispute Of Material Fact As To Whether The Strategies Lyft Implemented To Create WAV Supply In Other Markets Would Work In The Bay Area Counties.**

Plaintiffs also claim that Lyft can choose to implement in the Bay Area Counties various strategies it employed in cities like New York or Chicago as "reasonable modifications." But Plaintiffs offer no evidence that the strategies that succeeded in those other cities would work in the Bay Area Counties, and Lyft's evidence, at a minimum, creates disputed issues of fact.

As a preliminary matter, the fact that Lyft uses the Partner, Rental, or Organic Driver model, or some combination of them, to create WAV supply in other cities does not constitute proof that any of those models would be reasonable or effective here. Regardless of what works in New York City or Chicago, the Court must determine whether the solution is reasonable and necessary for the three Bay Area Counties. "[T]he determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Crowder v. Kitagawa,* 81 F.3d 1480, 1486 (9th Cir. 1996); *see also Wong v. Regents of the Univ. Of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999) (determination of reasonableness "depends on the individual circumstances of each case," and "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations" that might be necessary).

In Chicago, Lyft has relied on a partnership, facilitated by the City of Chicago, that helped onboard WAV taxis onto the Lyft platform. Stip. ¶ 22. Plaintiffs offer no evidence of such a partnership, facilitated by a regulator or public agency, being available here. *See also* Gerundio Oppo. Decl. ¶ 12. In fact, as Plaintiffs know, Lyft investigated the feasibility of partnering with a taxi company in the Bay Area, only to learn that there was an insufficient number of WAV taxis available. Deposition of Andrés Muñoz (June 11, 2020) at 123:22-124:7 [Jonas Decl. Exh. 2].

As for New York City, Lyft utilizes a mix of Partner, Rental, and Organic Driver models to meet local regulatory requirements in that market. Lyft is able to use the Organic Driver model in New York City because its competitors offer WAV rental opportunities to drivers who then drive those independently rented WAVs on the Lyft platform. Similarly, Lyft is able to rely on the Rental model because drivers are uniquely incentivized to rent WAVs as a result of local

1    regulations and Lyft's new driver waitlist, neither of which applies to drivers who use WAVs.

2    Ren Decl. ¶ 6.

3          In short, there is no evidence on which the Court can conclude that any of these models,

4    other than the Partner model, would be effective in the Bay Area Counties.

5          **3.    The Available Evidence Regarding The Cost Of Purported
             Modifications Demonstrates That At A Minimum, There Is A Disputed
6             Issue Of Fact As To Their Reasonableness.**

7          As demonstrated in Part IV.C above, Plaintiffs have failed to give the Court the evidence

8    necessary to assess the total cost of implementing any modification throughout the 1,500 square

9    mile area of the Bay Area Counties. Instead of presenting evidence, Plaintiffs claim, without

10   citing to the factual record, that increasing demand will somehow lead to a decrease in the cost of

11   providing WAVs (Motion at 5:27), that Lyft has not taken any of the known steps to reduce

12   WAV costs in the Bay Area (*id.* at 19:6-7), and that in any event, the cost does not matter because

13   Lyft can recoup them from the CPUC (*id.* at 17:4-6).

14         None of Plaintiffs' claims have any merit. First, it makes no sense that it would cost *less*

15   to provide *more* rides, as Lyft would have to increase its WAV supply in response to increased

16   demand. Gerundio Oppo. Decl. ¶¶ 20-21. If Plaintiffs have any evidence that Lyft could somehow

17   achieve cost-neutrality providing on-demand WAV rides, they should present it. Second, it makes

18   no sense that Lyft, a public company, would deliberately fail to take known steps to reduce its

19   costs. Again, if Plaintiffs have any evidence (rather than mere unfounded speculation) of cost-

20   cutting measures Lyft could implement to reduce costs anywhere, including specifically in the

21   Bay Area, they should present such evidence. Third, Plaintiffs' claim that Lyft could recoup up to

22   ███████████  statewide from the TNC Access for All Fund ("Access Fund") is misleading. As

23   Plaintiffs know, the amount for which Lyft can seek an offset for any money spent on providing

24   WAV service is limited by county, up to the amount that was collected from the $0.10 surcharge

25   levied on rides originating in that county. In other words, if, for illustration purposes only, Lyft

26   contributes $1 million to the Access Fund for San Francisco County and just $250,000 for Contra

27   Costa County based on the number of rides given in each, the amount Lyft can recoup is limited

28   to those sums for each county. What this means is that if Lyft spends $1 million in San Francisco

and $2 million in Contra Costa for WAVs, Lyft can only recover $1,250,000, even if it contributed additional sums for Marin, San Mateo, Santa Clara, and other counties. Traci Lee Decl. ¶¶ 5-6. Moreover, there is no guarantee that Lyft will meet the service level requirements set, which is a prerequisite to obtaining the offset. *Id.* Additionally, even if Lyft meets service level requirements, its ability to offset is by no means guaranteed. The CPUC is still defining and determining what qualifying WAV-related expenses can be reimbursed, and considering objections filed by third parties, including disability advocacy groups, transit agencies, and municipalities. Traci Lee Decl. ¶¶ 6-7.

The reason Plaintiffs focus on these extraneous issues, instead of focusing on the amount of actual cost of WAVs, is that they do not know how much it would cost to provide "robust and reliable" WAV service throughout the Bay Area Counties. All available evidence indicates the cost would be astronomical.

A "reasonable" modification is one that imposes moderate changes to specific, identifiable, policies. *See Baughman*, 685 F.3d at 1134-35 (modification to policy permitting motorized wheelchairs or scooters in park); *Fortyune*, 364 F.3d at 1083 (reasonable modifications may not impose undue financial or administrative burdens). At a minimum, there is a genuine dispute of material fact as to whether the modifications Plaintiffs seek are reasonable. A dispute as to an issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Therefore, the Court should deny Plaintiffs' Motion.

**E.    Plaintiffs' Motion Should Be Denied Because Lyft Has Presented Sufficient Evidence That The Modifications Plaintiffs Seek Would Result In A Fundamental Alteration.**

Plaintiffs argue Lyft cannot establish the affirmative defense of fundamental alteration[13]

---

[13] Plaintiffs also argue that Lyft cannot establish its affirmative defense of undue burden. Lyft asserted that affirmative defense because Plaintiffs' Complaint included the allegation that Lyft engaged in discrimination by failing to provide auxiliary aids or services under 42 U.S.C. §§ 12182(b)(2)(A)(iii) and 12184(b)(2)(B). Compl. [Dkt. 1] ¶ 96. Pursuant to stipulation, Plaintiffs have agreed that they will not base their claim of discrimination on the theory that Lyft has failed to provide auxiliary aids and services. *See* Stipulation Re: Auxiliary Aids and Services [Jonas Decl. Ex. 1].

1   because Plaintiffs "merely request" that Lyft make reasonable modifications, and because

2   "Plaintiffs are not asking that Lyft offer some service other than transportation." Motion at 21:22.

3         Plaintiffs' argument ignores the following pieces of evidence, among others:

4         *First*, the modifications sought by Plaintiffs require Lyft to create a supply of WAVs that

5   previously did not exist on the platform – if it exists anywhere at all – through third-party

6   contracts, including with rental car providers. *See* Ren Decl. ¶ 5. There is *zero* evidence that Lyft

7   does this with respect to any other mode of service on the platform. To the contrary, all the

8   evidence is that the drivers on the platform bring their own vehicles, which are mass produced

9   cars that can be bought at car dealerships or rented through rental car companies of the type you

10  can find at any airport. Stip. ¶ 4; Niedermeyer Decl. ¶ 19; Ren Decl. ¶ 5.

11        *Second*, the Lyft platform is a two-sided marketplace of riders who need rides and drivers

12  who use their own vehicles and set their own hours. It relies on organic supply and demand, and

13  functions best in areas of high population density. Niedermeyer Decl. ¶ 8. In contrast, the only

14  way to produce the "robust and reliable" WAV service that Plaintiffs want is by ignoring half of

15  the two-sided marketplace – the drivers who drive their own vehicles – and replace them with a

16  contracted supply of WAVs. But this is not how a supply-and-demand platform works. *See*

17  Rysman Report [9/03/2020 Lee Decl. Ex. 22] at 4.

18        The modifications sought by Plaintiffs thus cut to the core of the "fundamental character"

19  of Lyft's ride*sharing* platform. *PGA Tour*, 532 U.S. at 682; *see also Fortyune*, 364 F.3d at 1084

20  (noting a proposed change would have a "negligible effect -- if any -- on the nature of the service

21  provided by the Theater: screening films"). What Plaintiffs want is to have this Court declare that

22  the ADA requires Lyft to provide service that is specially tailored to meet the needs of individuals

23  with disabilities, at an astronomical cost each year in the Bay Area Counties alone. No court has

24  ever interpreted the ADA so expansively. *Cf. A.L. v. Walt Disney Parks & Resorts US, Inc.*, 2020

25  U.S. Dist. LEXIS 109205, at *49 (granting Disneyland guests with disabilities additional fast

26  passes was a fundamental alteration to the theme park because it would increase the ride wait

27  times of other guests and fundamentally alter Disney's business model by undermining its

28  revenue base); *Galvan v. Walt Disney Parks and Resorts*, 425 F. Supp. 3d 1234, 1242 (C.D. Cal.

Nov. 27, 2019) (same); *Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.*, 158 F. Supp. 2d 1353, 1366 (S.D. Fla. 2001) (concerning the game of craps, allowing players in wheelchairs to roll dice from a different location or lowering the table fundamentally altered the nature of the game).

In enacting the ADA, Congress never contemplated that a private entity would be compelled to create a supply of WAVs to meet the needs of individuals with disabilities. The Court should deny Plaintiffs' Motion because as a matter of law, requiring Lyft to provide WAVs on its platform fundamentally alters the nature of its business.

**F.    Plaintiffs' Motion Should Be Denied Because They Have Failed To Come Forward With Sufficient Evidence To Establish Standing.**

Finally, Plaintiffs' Motion should be denied because by failing to identify the discrimination at the heart of their case, Plaintiffs have failed to establish standing.

To establish standing, Plaintiffs must show an imminent injury traceable to Lyft's allegedly discriminatory conduct, *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 185 (2000), and demonstrate that the injury will likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

As discussed in Part IV.B above, Plaintiffs refuse to say what modification can reverse the alleged discrimination on the Lyft platform. Their refusal to identify the necessary modification means they cannot trace their alleged injury to Lyft's actions (or inactions). After all, Plaintiffs cannot trace an injury to Lyft's conduct if they cannot specify how Lyft's conduct can be modified to create a robust platform for WAVs. *See Chapman v. Pier 1 Imps. (U.S)*, 631 F. 3d 939, 947 (9th Cir. 2011) (the "standing analysis must focus on the nature and source of [the plaintiff's] claim – discrimination *as defined by the ADA*").

Moreover, at the summary judgment stage, Plaintiffs must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43, 96 (1976)). To establish that the harm they allege is redressable by a favorable opinion, Plaintiffs must show that injunctive relief is available. *Chapman*, 631 F.3d at 959; *Ind. Coal. For Pub.*

*Educ.-Monroe Cty. v. McCormick*, 338 F. Supp. 3d 926, 941, 943 (S.D. Ind. 2018) (noting at summary judgment that plaintiffs lacked standing in part because they had "not shown that the Court may order the requested relief"). In a case for "reasonable modification," the Court must, at a minimum, be able to identify the contours of the required modification to satisfy the demand for specificity found in Rule 65 of the Federal Rules of Civil Procedure. *See Fortyune v. Am. Multi-Cinema, Inc.*, No. CV 01-05551 NM (JWJx), 2002 U.S. Dist. LEXIS 27960, at *22 (C.D. Cal. Oct. 21, 2002) (noting plaintiff had shown injury tied to policy regarding companion seating, "and Plaintiff's alleged injury would be redressed by the policy modification he seeks").

Plaintiffs make it clear in their Motion that they will not identify the terms of the injunctive relief they seek. Nonetheless, they ask the Court to declare Lyft liable as a general matter, so that afterwards, "Plaintiffs, who do not seek perfection, [can] make all reasonable efforts to engage in meaningful settlement discussions regarding a possible remedial plan." Motion at 25:21-23.

Plaintiffs' position is a stunning admission of their inability to prove their case. They do no favors for this Court by insisting on continuing with a case in which they cannot plainly identify what the allegedly discriminatory conduct is, or how such alleged discrimination can be cured with a reasonable modification. The Court should deny Plaintiffs' Motion based on their admission that they will not say how their injury can be redressed.

## V.    CONCLUSION

Plaintiffs' Motion makes clear that neither they nor Lyft has a magic wand they can wave to make WAVs appear on the Lyft platform. And that is the intractable problem for Plaintiffs: there is no ready supply of WAVs, and the ADA does not require Lyft to shoulder the financial burden of creating that supply. Unless Plaintiffs can show that a supply of WAVs and their drivers are ready, willing, and able to join Lyft's platform, they cannot prevail on their theory of reasonable modification.

This is why Plaintiffs want this Court to hold Lyft liable without specifying the remedy. Unfortunately, Plaintiffs' request is inconsistent with the requirements of the statutory provision underlying their lawsuit. Lyft respectfully requests that the Court deny Plaintiffs' Motion for

1    Partial Summary Judgment.

2

3    Dated:  September 17, 2020                    FOLGER LEVIN LLP

4                                                 /s/ Jiyun Cameron Lee

5                                                 Jiyun Cameron Lee
                                                  Attorneys for Defendant
6                                                 LYFT, INC.

7

8

9    1078415.8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28