UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, SASCHA BITTNER, an individual, TARA AYRES, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation | No. C 19-01438 WHA |
| Plaintiffs, | **ORDER RE MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| LYFT, INC., | |
| Defendant. | |

**INTRODUCTION**

In this ADA action, both parties move for summary judgment. For the reasons stated below plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART**. Defendant's motion is **DENIED**.

**STATEMENT**

A previous order has stated the background of this case (Dkt. No. 58). Defendant Lyft, Inc. provides on-demand ridesharing transportation services. In some regions, Lyft provides riders with an "Access" mode to indicate their need for a wheelchair-accessible vehicle (WAV). Lyft offers such services in Boston, Chicago, Dallas, Los Angeles, New York, Philadelphia, Portland, Phoenix, and San Francisco. It does not offer WAV services in Alameda or Contra Costa County (Stip. ¶ 11).

Plaintiffs are disability rights organizations and disabled individuals. Plaintiffs allege that Lyft's WAV services are more restrictive than their non-WAV services in San Francisco and nonexistent elsewhere in the Bay Area. Plaintiffs allege that in San Francisco, the wait times are longer for WAV users and WAV services do not operate 24-hours a day. Plaintiffs accordingly have not used Lyft, believing it would be futile to do so (Compl. ¶ 30).

Based on the foregoing, plaintiffs filed the instant action in March 2019 alleging a violation of the ADA and requesting declaratory and injunctive relief. Plaintiffs filed a motion for class certification in December 2019. A March 2020 order denied the motion without prejudice, finding the class definition to be insufficient. Both parties now move for summary judgment.

**ANALYSIS**

Summary judgment is appropriate if there is no genuine dispute of material fact. Material facts are those "that might affect the outcome of the suit." A genuine dispute carries sufficient evidence such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986).

**1.   ADA.**

Title III of the ADA prescribes a general rule that "[n]o individual shall be discriminated against on the basis of his disability. . ." 42 U.S.C. § 12182(a). Discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182 (b)(2)(A)(ii). The

2

burden is on the plaintiff to demonstrate that he is disabled as that term is defined by the ADA and that the defendant discriminated against the plaintiff based upon the plaintiff's disability. *Fortyune v. Am. Multi-Cinema, Inc.,* 364 F.3d 1075, 1082 (9th Cir. 2004)(citations omitted)

Plaintiffs here specifically claim that Lyft has violated 42 U.S.C. § 12184 of the ADA, which provides, among other things, that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment *of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce*" (emphasis added).

Plaintiffs first move for summary judgment as to whether Lyft is covered by this provision. Lyft is a private entity that provides ridesharing services. Its mission is to "[i]mprove people's lives with the world's best transportation" (Plaintiff Exh. E). This order finds that Lyft is a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce, and is covered under Section 12184.

Without conceding whether it's subject to the ADA, Lyft replies that if it is covered by Section 12184, then subsection (b)(3) also applies and accordingly exempts it from having to purchase or lease WAVs. Section 12184(b)(3) states that discrimination includes (emphasis added):

> [T]he purchase or lease by such entity of a new vehicle (*other than an automobile, a van with a seating capacity of less than 8 passengers, including the driver, or an over-the-road bus*) which is to be used to provide specified public transportation and for which a solicitation is made after the 30th day following the effective date of this section, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs; except that the new vehicle need not be readily accessible to and usable by such individuals if the new vehicle is to be used solely in a demand responsive system and if the entity can demonstrate that such system, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service provided to the general public;

Lyft correctly contends that Congress, when passing the ADA, did not seek to burden private entities by requiring them to acquire WAVs. And this provision does apply and exempts entities like Lyft from having to purchase or lease vehicles with a seating capacity of less than eight passengers. 49 C.F.R. Pt. 37, App'x D. But this section does not, however,

1   negate the ADA's requirement for entities like Lyft to make reasonable modifications to rectify
2   a discriminatory policy, practice, or procedure. As stated earlier, the ADA prohibits
3   discrimination against individuals with disabilities, and defines discrimination as "a failure to
4   make reasonable modifications in policies, practices, or procedures" subject to certain
5   exceptions. 42 U.S.C. § 12182 (b)(2)(A)(ii). Plaintiffs are not, however, trying to require Lyft
6   to purchase or lease WAVs. The proposed modifications, detailed further below, would
7   require Lyft to work with external parties who would in turn purchase or lease WAVs.

8   The main issue is thus whether Lyft has a specific policy, practice, or procedure that is
9   discriminatory and whether plaintiffs have requested a reasonable modification.

### A. POLICY, PRACTICE, OR PROCEDURE.

Lyft first contends that plaintiffs have failed to identify a discriminatory policy, practice, or procedure at issue. Although plaintiffs have not pinpointed one specific policy, practice, or procedure that has led to their injuries, they have sufficiently demonstrated a combination of Lyft's practices are at issue here. In particular, Lyft has admitted that it uses different practices or procedures, specifically driver incentives, advertising, partnerships, and rentals to provide WAV services in other cities. It has also instituted similar policies, practices, or procedures to incentivize drivers to provide non-WAV services in the Bay Area counties. *See e.g.,* Opp. Exh. D at 36:7–19 47:10–48:16. As stated above, the ADA defines discrimination as a failure to reasonably modify "policies, practices, or procedures when such modifications are necessary" to accommodate individuals with disabilities. 42 U.S.C. § 12182 (b)(2)(A)(ii). Plaintiffs' point is that Lyft's failure to extend some of the policies, practices, and procedures it uses for non-WAV services (and certain WAV services in other cities) to include WAV services in the Bay Area counties is discriminatory, and has led to their injuries.

True, plaintiffs' proposed modifications are vague in the sense that they offer a variety of options that Lyft could take and do not provide specific detail, for example, how many WAV vehicles to rent out or which third-party with whom to partner. This does not mean, however, that a discriminatory policy, practice, or procedure doesn't exist, especially because Lyft has some of these policies, practices, and procedures in place for non-WAV services in the Bay

4

1   Area counties, has made some of these modifications in other cities, and has even tried some of
2   them in San Francisco.  Lyft's arguments as to the impossibility or burden of some of these
3   modifications go to the reasonableness of the modifications, not their existence.  Since
4   plaintiffs have identified policies, practices, or procedures that can be implemented, the key
5   question is whether making these modifications in the Bay Area Counties would be reasonable.

### B. REASONABLE MODIFICATIONS?

Whether a proposed modification is reasonable is a fact-specific inquiry in which factors such as the effectiveness of the modification in light of the nature of the disability in question and the effectiveness of the modification in light of the nature of the disability in question are considered.  *Fortyune* 364 F.3d at 1083.  The standard for reasonableness under the ADA is the same as under the Rehabilitation Act, and the Supreme Court has found in the context of the Rehabilitation Act, that an "[a]ccommodation is not reasonable if it . . . imposes 'undue financial and administrative burdens'. . . ."  *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n. 17 (1987).

The burden is on plaintiff to demonstrate that a modification is reasonable.  Once plaintiff has done so, the burden then shifts to defendant to demonstrate the modification is unreasonable in the sense that it would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodation.  *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999); 42 U.S.C. 12182(b)(2)(a)(ii).

Plaintiffs here have provided Lyft with some high-level suggestions for modifications including but not limited to the following.  *First,* plaintiffs suggest Lyft could "use marketing and driver incentives to recruit independent contractor drivers to provide WAV service."  *Second,* plaintiffs suggest Lyft could use its "market power and resources to provide lease or rental options to WAV drivers."  *Third,* plaintiffs suggest Lyft could "expand contracts with existing third-party providers of WAV services."  *Fourth,* plaintiffs suggest Lyft could use some combination of the above options (Plaintiff Supp. Rog.; Stip ¶ 9).  Lyft has instituted some of these practices in other regions where regulations require WAVs or where Lyft has a partnership with a transit agency.

Lyft argues that based on the financial and supply/demand data it has of WAV programs it has implemented in other cities as well as a pilot program in San Francisco, implementing any similar program in the Bay Area Counties would be unreasonable or otherwise, fundamentally alter the nature of the services it provides.

As an initial matter, just because some cities have implemented local regulations that require certain accommodations such a minimum number of WAVs on the road does not mean that it would be reasonable to apply such rules nationwide. Allowing this could create perverse incentives in policymaking and contravenes the ADA, which requires an individualized analysis in determining the reasonableness of a modification. *See O'Byrne v. Reed*, No. CV 09-08406, 2010 WL 11596665, at *6 (C.D. Cal. Feb. 5, 2010) (Judge Dolly Gee).

### (i) Incentives and Marketing.

An incentive and marketing method would entail Lyft purchasing advertisements to stimulate driver supply and paying, for example, flat bonuses for each WAV ride completed or an additional amount per hour for a driver to log into WAV mode. Lyft has submitted a declaration from Program Lead Isabella Gerundio stating that based on experience, Lyft might offer a driver $30 for each completed ride or five dollars for every hour logged into the app. A lower amount would likely be ineffective. Lyft admits this is the most cost-effective option, but notes that the model would likely not entice a sufficient amount of drivers. For example, in August 2020, Lyft sent a text message to over 26,000 drivers in Philadelphia and Delaware offering $100 incentives for signing up to provide WAV services. Lyft received approximately 30 referrals, none of whom owned a WAV. Given the fact that WAVs, according to plaintiffs, can cost over $50,000, such incentives would not, on their own, be effective at ensuring a sufficient supply of WAV drivers (Ayres Depo. at 40:14–18; Finn Depo. at 28:1–4, 29:23–30:2). The ineffectiveness of this proposed procedure makes this modification, at least on its own, unreasonable.

### (ii) Partnerships.

Another proposed modification is for Lyft to partner with a third-party such as a transit agency. Under this plan, Lyft would contract with the third-party, which in turn would train

1   WAV drivers, provide WAVs to those drivers, and employ those drivers. Lyft states that this
2   is the best way to ensure a sufficient number of WAVs on the road and to minimize wait times.
3          In July 2019, Lyft launched a pilot program under this partnership model with First
4   Transit in San Francisco. Pursuant to that contract, First Transit, at the cost of $58.62/hour,
5   provided Lyft with five WAVs and offered WAV rides in San Francisco between 7A.M. and
6   midnight. In February 2020, Lyft paid First Transit $115,467 for their services, which equates
7   to an approximately $925 subsidy per ride (Stip. ¶¶ 23, 26, 29).
8          Plaintiffs correctly reply that the $925 subsidy does not account for the fact that Lyft
9   might not have sufficiently advertised the pilot program (leading to low demand). Nor did it
10  account for the possibility that some of this cost could be offset by CPUC. It is also true that
11  when viewed in the context of a business like Lyft that generated $8.1 billion in bookings and
12  $2.2 billion in revenue, $925 does not appear to be such a significant amount. The problem is
13  that WAV riders in San Francisco paid on average only $15.96 per ride (Stip. ¶ 26). A $925
14  subsidy is nearly 57 times what the rider is paying, and is unreasonable.
15         As to plaintiffs' point that the $925 subsidy ignores the possibility of certain mitigating
16  factors, the evidence presented in support is speculative. For example, it is unclear whether
17  advertising or other marketing efforts would in fact, lower Lyft's subsidy to a more reasonable
18  amount. After all, marketing costs could negate or at least diminish any increased revenue
19  effective marketing could bring. Additionally, CPUC's offset is contingent upon Lyft
20  achieving certain benchmarks in wait times. It may not be possible for Lyft to achieve
21  CPUC's benchmarks using the partnership method alone, or doing so could lead to an even
22  higher subsidy amount that would minimize the effects of the CPUC offset. Given the subsidy
23  Lyft would have to provide, partnerships, at least on their own, are an unreasonable
24  modification.

                *(iii)*    *Rentals.*

26         Plaintiffs also propose that Lyft rent out WAV vehicles for their drivers to use. Until
27  March 2020, Lyft had planned to launch a rental pilot in the Bay Area. Under that plan, Lyft
28  would have contracted with a third-party to fit up to 65 vehicles with WAV accessible features

1    and then make those vehicles available to drivers.  Lyft estimates it would have cost
2    approximately $980 per vehicle per month to do so without factoring the approximately
3    $83,000 monthly incentives it would pay to drivers.[1]  Lyft halted the program due to the
4    COVID-19 pandemic (Stip. ¶¶ 39–40).  A $980 subsidy would be significant, but if it is
5    calculated on a per ride basis, the per ride subsidy could be a much lower and reasonable
6    amount.[2]  Additionally, this amount does not account for factors such as the possibility of
7    cross-dispatching vehicles or even the demand of such vehicles across the Bay Area counties,
8    not just San Francisco.  Based on the evidence presented, there thus exists a dispute of material
9    fact whether this modification would be reasonable.

###    *(iv)    Combination.*

A combination of two or more of the above practices and procedures may be the best possibility for implementing a financially feasible WAV program in the Bay Area.

Lyft has implemented a combination of all three of the above in New York.  There, from October 2019 to March 2020, Lyft subsidized approximately $200 for each ride, a far more reasonable amount.  Lyft still believes, however, that making these modifications or a combination of them in the Bay Area would be ineffective, citing to the lack of supply and demand as well as the financial burden.

As to costs, Lyft has not provided conclusive evidence as to how implementing a combination of these methods in the Bay Area would be financially burdensome.  Furthermore, as plaintiffs have already noted, Lyft could receive a financial offset of approximately $17 to $22 million from the CPUC for providing WAV services.  It is possible that Lyft could achieve the CPUC benchmarks for the offset if it implemented a combination of the proposed modifications and receive a large portion of the offset, even with the limitations on the TNC Access for All Fund, minimizing any financial burden.  Additionally, Lyft's competitor Uber had, in March 2020, proposed a WAV plan for the Bay Area Counties with wait times

---

[1] This amount was calculated based on Lyft's declaration that it planned to spend two million dollars over two years on incentives (Ren. Decl ¶ 10).

[2] For example, under the partnership pilot program, Lyft provided 125 WAV rides in a month, and Lyft could potentially provide even more rides if 65 vehicles were used.

8

comparable to those in New York, although the effectiveness and financial feasibility of this plan has not been tested (Stip. ¶ 54B).

As to achieving the necessary supply and demand, it is true that a modification cannot merely be reasonable because it has been made in other geographic regions. Data from similar programs in other cities are helpful, but not dispositive here. Plaintiffs are asking for WAV services comparable to non-WAV services in San Francisco County, Alameda County, and Contra Costa County, which covers not only a city, but over 1,500 square miles of suburban and rural areas. This geographic layout is different than for example, more densely populated cities like Chicago and New York City where Lyft has implemented WAV programs. This distinction is an important factor given that Lyft's wait times are dependent on demand and supply. To achieve parity with other non-WAV users as plaintiffs have requested, Lyft may have to hire over 12,000 drivers.[3] Even if, as plaintiffs state, they are not seeking complete parity with non-WAV users, a significant number of new drivers would still need to be deployed on the road, and based on the evidence presented there is a dispute of material fact as to whether this can be done without an unreasonable financial burden. The conclusions drawn by Lyft's expert as to the impossibility of achieving an adequate supply and demand for parity with non-WAV riders only takes the partnerships and incentives approaches in account. It may be possible to achieve parity or a similar wait time without an unreasonable financial burden if Lyft used another combination of the proposed methods. Thus without more specific evidence regarding, for example, how a different combination of these proposed methods would be implemented in the Bay Area, the supply of WAV drivers that could be deployed, or the financial costs of doing so, it is unclear whether the proposed modifications are reasonable. There accordingly exists a general dispute of material fact as to this issue.

Lyft finally argues that even if any of proposed modifications are reasonable, summary judgment should still be granted in its favor because implementing the modifications would

---

[3] Lyft's expert, Professor Marc Rysman calculated this projection under the assumption that wait times would be approximately five minutes, which is equivalent to the wait time that non-WAV users experience, as the complaint requests (Compl. ¶ 6). Plaintiffs have now, however, conceded, they are "willing to consider slightly longer wait times."

9

fundamentally alter its business.  Lyft contends that the partnership model is the only reliable way to provide plaintiffs with the WAV service they are requesting, and that the partnership method requires Lyft to create a nonexistent supply of WAV vehicles through third-party contracts, a sweeping change that could also *change its potential for revenue*.

Similarly, Lyft has also argued throughout its briefing that making these modifications would be akin to requiring a bookstore that does not sell Braille books to sell them, citing to *Weyer v. Twentieth Century Fox Film* in which our court of appeals found that the ADA "does not require provision of different goods or services." 198 F.3d 1104, 1115 (9th Cir. 2000). These arguments are, however, when applied in Lyft's context, essentially analogous to the argument that the proposed modifications would be financially burdensome, a function of reasonableness, not of the fundamental alteration analysis.  Lyft has already instituted WAV programs using not only the partnership model, but other models in other geographic regions — it cannot argue that something it is already doing would fundamentally alter its business, though doing so might be cost prohibitive in our region.

Accordingly, plaintiffs' and defendant's motion for summary judgment is **DENIED** as to this claim.

2. STANDING.

Both parties move for summary judgment as to whether plaintiffs have standing. Standing requires plaintiff show "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  There is no dispute the individual plaintiffs and organizational plaintiffs have suffered an injury even though they have not downloaded Lyft.

Lyft alleges that such injury is not, however, traceable to the company because plaintiffs have not identified a specific policy, procedure, or practice that could be changed to rectify the injury.  As stated above, plaintiffs have demonstrated that Lyft's failure to implement a combination of policies, practices, and procedures, which they have implemented in other

geographic regions, has led to their injury — inability to access WAV services "equivalent with the service it offers to the rest of its customers" (Compl. ¶ 6).

The dispositive issue is, instead, redressability. Plaintiffs need only show that a favorable decision will relieve their injuries. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Lyft can redress the alleged harm here. It has been able to provide sufficient WAV services in other cities, and it seems the primary obstacle to doing so in the Bay Area is cost. The reasonableness requirement in Title III is not part of determining redressability.

Lyft also argues that the injury is not redressable here because the Court cannot craft injunctive relief that is specific enough under Rule 65, which requires, among other things, "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . .".

*Fortyune,* cited by both sides, is helpful here. Plaintiff Robin Fortyune, a wheelchair-bound individual, sought to sit next to his wife for a movie at an American Multi-Cinema theater. The showing was fully booked. Other patrons had taken the companion seats in the theater and refused to move, so plaintiff was unable to view the movie with his wife. The district court granted a permanent injunction requiring AMC to "ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats." Although AMC argued the injunction was too vague, our court of appeals upheld the injunction, finding that specificity under Rule 65 did not require actually telling a party "*how* to enforce the injunction." 364 F.3d at 1087.

So too here. Lyft is well-versed in the types of practices and procedures to use in creating a WAV program because it has done so in other regions. It thus, at a minimum, understands the contours of what actions to take if an injunction is ordered. There is no need explain how to enforce the injunction by, for example, delineating how many third-party drivers are necessary, how many WAVs to rent, or what combination of the above-mentioned policies and procedures to implement, especially given, as defendant alleges, the complexities

11

of certain procedures such as a rental program.  Plaintiffs thus have standing, and summary judgment is **GRANTED** in favor of plaintiffs and against defendant as to this issue.

\*                              \*                              \*

We will have to hold a trial on the main issue of whether the proposed modifications, specifically a rental model or a combination of the models, are reasonable.  As stated above summary judgment is granted for plaintiffs as to whether Lyft qualifies under Section 12184. Summary judgment is granted for plaintiffs and against defendant as to the existence of a discriminatory policy, practice, or procedure.  Summary judgment is denied for both parties as to the reasonableness of the proposed modifications.  Summary judgment is granted for plaintiffs and against defendant on the issue of standing.

**IT IS SO ORDERED.**

Dated: November 3, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12