# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, et al.**<br><br>          **Plaintiffs,**<br><br>          **v.**<br><br>**LYFT, Inc.**<br><br>          **Defendant.** | Case No. 3:19-cv-01438 |

**EXPERT REPORT OF**

**MARC RYSMAN, PH.D.**

**July 31, 2020**

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.   Introduction ....................................................................................................................1

   A.   Qualifications .........................................................................................................1

   B.   Assignment .............................................................................................................2

   C.   Organization of Report ..........................................................................................2

II.   Summary of Opinions ......................................................................................................3

III.   The Economics of platform Industries ............................................................................4

   A.   Ridesharing Platforms Exhibit Network Effects ...................................................5

   B.   Ridesharing Platforms exhibit Economies of Density............................................6

IV.   Empirics of the Lyft Platform .........................................................................................8

   A.   Areas with Many Rides Requested Have Low Waiting Times .............................10

   B.   Population Density is an Important Determinant of Rides and Wait Times ..........13

   C.   In Order to Average Five Minute Wait Times, the Lyft Platform Requires a High
        Level of Activity...................................................................................................19

   D.   Achieving Five-Minute Wait Times Requires an Unrealistic Increase in Access
        Mode Activity.......................................................................................................22

   E.   Analysis of Unmatched Ride Requests Further Corroborates the Importance of Scale
        in the Lyft Platform .............................................................................................23

V.   Target Waiting Times imply an Unrealistic Number of WAVs on the Lyft Platform ...........28

   A.   There Are Not Enough WAVs to Accommodate the Necessary Increase in Access
        Mode to reduce Waiting Times .............................................................................28

   B.   The Economics of WAVs Makes it Even Less Likely to Meet the Necessary level of
        WAV Participation. ..............................................................................................31

   C.   Lyft Creates a Supply for Access Mode in a Different Way Than for Other Modes.......33

VI.   Conclusion ....................................................................................................................34

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

## LIST OF APPENDICES

Appendix A:  Curriculum Vitae of Marc Rysman ......................................................... 35

Appendix B:  Prior Testimony Past Four Years .......................................................... 47

Appendix C:  Documents Relied Upon ....................................................................... 48

Appendix D:  Reproduction of Primary Figures Using Data  from August and September 2019 50

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

# I. INTRODUCTION

## A. QUALIFICATIONS

1.  My name is Marc Rysman and I am a Professor of Economics at Boston University, where I teach courses on industrial organization, econometrics, antitrust, and regulation.  I received my Ph.D. in Economics from the University of Wisconsin at Madison in 1999.  My research focuses on industrial organization and competition, and the related issues of antitrust and regulation.  I have investigated a variety of industries, including telecommunication, Yellow Pages directories, payment cards, and consumer electronics.  My research is primarily empirical, ranging from research that is heavily motivated by theory to work that is primarily descriptive.

2.  From 2009 to 2019, I was a Visiting Scholar at the Federal Reserve Bank of Boston.  I have been a Visiting Associate Professor at MIT (2007-2008), a Visiting Scholar at Harvard University (2003-2004, and 2014-2015), a Visiting Fellow at Northwestern University (2003), and a Visiting Scholar at the Federal Reserve Bank of Minneapolis (2003).

3.  I have won numerous teaching and research awards, including the Neu Family Award for Teaching Excellence in Economics (2006 and 2012), Networks, Electronic Commerce and Telecommunications (NET) Institute Grants (2003, 2006, and 2009), Professor of the Year at Boston University (A teaching award, 2007), National Science Foundation Grants (2001, 2004, 2006, and 2009), and the Christensen Award in Empirical Economics (1997, with Philip Haile, now of Yale University).

4.  I have published numerous articles in top peer-reviewed journals in the field of Economics, including in the *American Economic Review*, *Journal of Political Economy*, *Review of Economic Studies*, *Journal of Economic Perspectives*, *Journal of Industrial Economics*, *International Journal of Industrial Organization*, and *RAND Journal of Economics*.  I was an Editor of the *RAND Journal of Economics* from 2014-2020.  I am a former president of the Industrial Organization Society and currently on

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

the Board of Directors, and I am the current Chair of the Department of Economics at Boston University.  A copy of my curriculum vitae, which includes a list of my publications, is attached as Appendix A to this report.

5.   I have served as an expert witness on issues involving the economics of platform industries, as well as a damages expert in litigation matters involving a number of industries.  I have also served as a consultant to corporations and government agencies. A list of cases in which I have testified in the past four years is listed in Appendix B.

## B.   ASSIGNMENT

6.   I have been retained by Counsel for Lyft, Inc. ("Lyft") to provide my expert opinion on the viability of a wheelchair accessible vehicle ("WAV") mode on the Lyft platform.

7.   I understand that Plaintiffs in this matter allege that Lyft fails to comply with the Americans with Disabilities Act (the "ADA") because it does not provide "full and equal" access to its platform to individuals with disabilities who require WAVs.  I further understand that to Plaintiffs, a component of "full and equal" access includes the ability of a rider who requests a WAV ride to get a ride within a comparable wait-time as a rider who requests a non-WAV, standard ride on the Lyft platform.

8.   My findings are based on information available to me at the time this report was prepared.  Data, documents, testimony, or other materials may become available subsequent to filing this report that could lead me to supplement my conclusions.

9.   I am being compensated for the time I spend on this matter at my standard rate of $760 per hour.  I have been assisted by The Brattle Group, Inc., an economic research and consulting firm, whose staff has performed research under my direction.  I also receive compensation based on the billings of the Brattle Group.  My compensation is not contingent upon the substance of my opinions or the outcome in this matter.

## C.   ORGANIZATION OF REPORT

10.   After summarizing my opinions in Section II, I lay out the economics of platform industries and explain how the economics of platforms applies to Lyft in Section III. In Section IV, I evaluate activity on the Lyft platform in the three San Francisco Bay

Area counties at issue in this case (San Francisco, Alameda, and Contra Costa).  In Section V, I discuss whether it is feasible for a WAV mode to operate on the Lyft platform with comparable wait times to Lyft's Standard mode of service.

## II.   SUMMARY OF OPINIONS

11.   As discussed in detail in this Report, my opinions include the following:

- Platform firms, such as Lyft, connect market participants, such as buyers and sellers.  Lyft operates a ridesharing platform in which people looking for a ride can connect to drivers willing to provide rides.  The platform exhibits network effects and economies of density.  As more nearby drivers join the Lyft platform, the Lyft platform becomes more attractive to riders, who can expect shorter wait times.  Similarly, as more nearby riders join the Lyft platform, the platform becomes more attractive to drivers, who can expect higher utilization rates.

- My analysis of the activity on the Lyft platform in the three Bay Area counties confirms that, as we might expect from a platform model, the local population density is an important determinant of both the number of rides and the expected wait time:  ZIP Codes with higher population densities have many more rides and lower wait times for Lyft rides than ZIP Codes with low population densities.  The analysis shows that a population density of approximately 10,000 people per square mile is needed to generate an expected waiting time of five minutes.

- There are relatively few riders and drivers of wheelchair accessible vehicles ("WAVs"), and thus the Access mode (which connects riders and drivers of WAVs) exhibits similar features as Standard mode in a locale with extremely low population density.  In order to generate five-minute wait times for Access mode, I conclude the level of activity would have to be increased to a level that appears implausible: Access mode riders would have to generate 14,083 rides

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

in each ZIP Code each month, meaning that *every* person who relies on a wheelchair must take 2.5 Access rides every day.

- Generating five-minute wait times for Access mode requires not only a significant increase in the number of rides, but a sufficient supply of drivers with WAVs who are willing to drive on the Lyft platform. My analysis shows that to generate five-minute wait times, we would need approximately 1,300 drivers, on average, with WAVs on the platform each hour of each day. There is no evidence to suggest that such a supply of drivers with personally-owned WAVs exists. It is particularly implausible to find such a high number of drivers willing to drive WAVs in Access mode because these vehicles earn less and cost more than a conventional vehicle in Standard mode.

- The data show it is not feasible for Lyft to rely on its platform model to provide Access mode service. As a result, Lyft has chosen to create a supply of WAVs in San Francisco by contracting with a third-party provider of WAVs and WAV drivers.

## III.   THE ECONOMICS OF PLATFORM INDUSTRIES

12.   A *platform industry* is one in which firms connect market participants. In the case of ridesharing, Lyft is a platform for connecting automobile drivers and riders.[1] Without ridesharing platforms, drivers who are willing to provide rides would have difficulty in finding riders. The Lyft platform provides a *network* of riders and drivers that allows them to find each other, and deliver services and payment. In order to understand the fundamental economic characteristics of a network such as Lyft, it is helpful first to discuss some important economic features of platform industries. In this report, I discuss two features of platform markets that explain critical features of Lyft and other ridesharing platforms: (a) network effects and (b) economies of density.

---

[1]   Lyft provides several other services, such as bicycle sharing and information about public transportation. In this report, I focus on ridesharing in automobiles.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

### A.  RIDESHARING PLATFORMS EXHIBIT NETWORK EFFECTS

13.  Network effects arise when the value of a good to a consumer depends on how many other consumers also buy the good or how frequently other consumers use the good. For example, consumers value e-mail when other consumers also have e-mail accounts. Similarly, the value of eBay depends on how many sellers and products are present on the platform, and the number of products and sellers rises as more consumers use the platform, thus increasing the value of eBay as a platform.  This virtuous circle (or feedback loop) creates network effects, because consumers care how many other consumers use eBay, albeit indirectly, through the number of products and sellers.

14.  The market for ridesharing is similarly characterized by network effects.  Network effects operate through several channels:

15.  Passengers place a higher value on the Lyft platform as the number of drivers increases. One channel through which this increasing value operates is that as more drivers are on the Lyft platform at a given time, the expected time that passengers have to wait for a ride decreases (assuming all else remains constant).  I understand that expected waiting time is a central aspect of this case.  Lyft identifies ETA (which is the acronym for expected time of arrival or equivalently, waiting time) as a primary measure of the level of service being provided to passengers.[2]

16.  Drivers on the Lyft platform (including potential drivers who are considering driving on the platform) also place a higher value on the platform as the number of passengers using the platform increases.  As more passengers use the platform, drivers typically experience higher *utilization rates* (assuming the number of drivers remains constant). The utilization rate is the ratio of time drivers spend fulfilling rides to the total amount of time the driver spends on the Lyft platform, expressed as a percentage.  For instance, if a driver spends two hours on the Lyft platform and ends up providing rides for one hour of that time, the utilization rate is 50%.

---

[2]  Lyft, "Lyft Business Model 101," (no date), p. 11.  *See also* Deposition of Edward Niedermeyer, June 16, 2020, 18:5-13.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

17.     Lyft refers to the driver utilization rate as a "primary driver-facing service level."[3]  That is, it is one of the most important characteristics determining driver satisfaction with the Lyft platform. Typically, drivers earn money for the time they spend providing rides with a passenger in the vehicle.  Higher utilization rates generally imply drivers spend more of their time driving passengers and less time waiting to receive a ride request, and thus drivers receive higher earnings for their time on the Lyft platform.

18.     Together, these two phenomena create a feedback loop, where more drivers leads to more riders and more riders leads to more drivers.  Cultivating this feedback loop is critical to the success of Lyft.

19.     Lyft exhibits network effects in other ways.[4]  However, I focus in this report on the feedback loop between riders and drivers, rather than other sources of network effects, as the rider-to-driver feedback loop is critical to understanding the relationship of Lyft to the WAV market.

**B.     RIDESHARING PLATFORMS EXHIBIT ECONOMIES OF DENSITY**

20.     With an Internet sales platform such as eBay, consumers can benefit from products that are offered for sale from anywhere in the world.[5]  In contrast, the nature of network effects on ridesharing platforms varies at a local level depending on geographic density of demand and supply in the particular region.  That is, the number of riders or drivers in one region (e.g., Miami) has little, if any, impact on the platform in another region (e.g., San Francisco).

---

[3]   Lyft, "Lyft Business Model 101," (no date), p. 11.

[4]   Other sources of potential network effects, which are beyond the scope of this Report, include Lyft's shared-ride feature.  A rider may share the cost of a ride with other riders traveling along a similar route whom the Lyft platform connects in the same car.  As more riders adopt the shared-ride feature, it becomes easier for the platform to find compatible sharing partners; when this happens, the ride sharing feature, and by extension the Lyft platform, becomes more valuable to those riders.  Lyft has paused offering shared rides during the pandemic.  (See https://www.lyft.com/safety/coronavirus.)

[5]   Buyers and sellers on eBay may also benefit from being located near each other to the extent that shipping costs and times are related to distance.  In addition, some large or heavy items may be offered for sale under the condition that the buyer picks up the product directly from the seller.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

21. As described above, a critical factor in determining whether potential riders will use Lyft is the expected wait time until their requested ride arrives.  On the driver side, a critical factor in attracting and retaining drivers is the utilization rate, as this affects driver earnings.

22. Keeping a rider's expected waiting time low depends on having a driver nearby when a rider requests a ride; the chance of having a driver nearby increases as there are more drivers on the platform.  Keeping a driver's expected utilization rate high depends on having a steady stream of riders appearing near to the driver.  If riders do not expect drivers to be available, then riders will not use the Lyft app or bother checking the Lyft app.  If drivers do not expect to find a sufficient stream of riders, drivers will not participate on the Lyft platform.  Thus, Lyft is successful only in areas with sufficient riders and drivers.[6]

23. A primary determinant of the number of drivers and the number of riders is the number of people in a geographic area.  In an area that is dense with people, there will be more people in need of a ride and more people who are willing to supply rides.  As I will discuss below, the Lyft platform is highly functional in areas with high population density, and is used less in areas with low density.

24. To see why, imagine that the number of drivers in a rural area is high enough to generate an expected wait time similar to the expected wait time in an urban area, say five minutes.  With five minute wait times, demand from rural riders would be higher than what we observe now.  Suppose demand were proportionally higher, so rural per-person demand was the same as the per-person demand in an urban area with a five-minute wait time.  Even at this higher level of demand, rural drivers would experience longer periods without any riders because there are fewer riders.  Furthermore, when those riders appeared, they would be geographically farther apart because the rural area is less densely settled.  Thus, drivers would earn less than they would in the urban area.

---

[6] For a discussion of the importance of the Lyft platform having a sufficient number of riders and drivers, *see* Deposition of Christopher Wu, July 17, 2020, 42-53.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

25.     Drivers who are not satisfied with their earnings would leave the system.  That would mean riders would face fewer drivers and the average wait time would increase.  Facing higher wait times, riders would no longer choose to adopt and use the Lyft platform.  That would further decrease utilization for drivers, leading to further exit by drivers.  This process would continue until the market reached an *equilibrium* in which riders and drivers found an expected wait time and utilization rate that is tolerable to both sides, or if no such equilibrium could be reached, participation on the Lyft platform would decrease to essentially zero.

26.     This line of thinking predicts that, in more dense areas, we should see lower wait times and more rides.  In markets with particularly low density, we may see almost no Lyft activity at all.

## IV.   EMPIRICS OF THE LYFT PLATFORM

27.     In this section, I empirically analyze activity on the Lyft platform in the three counties at issue in this case, San Francisco, Alameda, and Contra Costa Counties.  I calculate the increase in the level of activity on the WAV or "Access" mode that would be necessary in order to generate expected wait times that are comparable to what occurs on Standard mode.  I find that the increase required is very high to the point of being unrealistic.

28.     My analysis follows several steps.  First, I show that there is substantial heterogeneity in waiting times and the number of rides on the Standard mode on the Lyft platform across the three-county area, and the number of rides in an area is closely related to the expected wait time.  Next, I show that local population density is an important determinant of both the number of rides and the expected wait time on the Lyft platform.  Next, I use regression analysis to uncover the functional form that best fits these relationships and allows me to calculate the number of rides we would need to deliver hypothetical expected wait times.  I use these results to calculate the increase in Access mode activity that would be necessary to generate target wait times.

29.    Throughout this section, I focus my empirical analysis on the Standard mode of service. In this sense, I am using activity on the Standard mode of service as a model to understand the market for Access mode.   In the next section, I discuss issues that are specific to the Access mode for Lyft, and I find that those issues make the required level of increase even more unrealistic.

30.    For this empirical work, I have access to data from Lyft.  The data include detailed information for each ZIP Code within the three counties and each hour of the day, including the number of rides requested; total waiting time; and type of Lyft service (Standard, Access, Premium, Shared, XL) for the month of February 2020.[7]  This includes over 3.6 million requested rides and nearly 3.4 million ride requests with an associated waiting time.[8]  I also conducted my primary empirical analyses using data from Lyft for the months of August and September 2019, and my results, shown in Appendix D, are consistent with the results I present in for the month of February 2020.

31.    I focus on ZIP Codes because ZIP Codes are an appropriate geography for evaluating activity on the Lyft platform.  While activity on the Lyft platform varies significantly from one ZIP Code to another, it is probably reasonably homogenous within a ZIP Code, as 5-digit ZIP Codes are relatively small to drive across.  To derive population counts for each ZIP Code, I use estimated population data, by 5-digit ZIP Code Tabulation Area (ZCTA), from the 2018 U.S. Census Bureau's American Community Survey.  ZCTAs are nearly identical to ZIP Codes, as described in the associated data guidelines,[9] and were matched to the ZIP codes in the Lyft data via the last 5 characters in the ZCTAs (e.g., "ZCTA5 94517" maps into "94517").  To calculate each ZIP

---

[7]   File:  ilrc-demand-2020-07-06.csv.  I understand that the dataset for the month of February was drawn based on Coordinated Universal Time (sometimes referred to as Greenwich Mean Time).  As such, throughout my report, I will refer to the month of February as consisting of rides requested during the 29 days from 4:00 p.m. local time on January 31 through 3:59 p.m. local time on February 29, 2020.

[8]   The dataset includes a total of 3,625,079 requested rides in the three-county area of San Francisco, of which 3,359,282 had an associated waiting time.  Unless otherwise noted, I will focus my analysis on those ride requests that include a waiting time.

[9]   "Zip Code Tabulation Areas (ZCTAs™)," U.S. Census Bureau, United States Department of Commerce, available   at https://www2.census.gov/geo/pdfs/education/brochures/ZCTAs.pdf, accessed July 31, 2020.

Code's population density, I divided the population estimates by land-area data from the San Francisco local government's open data site.[10]

## A.   AREAS WITH MANY RIDES REQUESTED HAVE LOW WAITING TIMES

32.   A review of the data for Lyft's Standard mode, which is by far the most popular mode of service accounting for more than 2.3 million rides, 69 percent of all rides, and more than 95 percent of all non-Shared rides, reveals a number of important observations. As such, I will concentrate my analysis on the Standard mode, and will focus on ride requests in Standard mode for which the would-be rider received an estimated waiting time (2.28 million requests).

33.   The data reveal that there is substantial heterogeneity across ZIP Codes in Standard mode.  There are six ZIP Codes in the three counties that had more than 100,000 Standard mode rides requested during the month at issue; by contrast, there are ten ZIP Codes with fewer than 100 Standard mode rides requested.  In one ZIP Code (94516, Canyon, California, in Contra Costa County), we observe zero rides.  The top panel of Figure 1 maps the areas by the number of Standard mode rides requested, and shows that activity on the Lyft platform, as measured by the number of rides requested, is greater in the areas closer to San Francisco and Oakland than farther out in Alameda and Contra Costa counties.  Relatedly, the bottom panel of Figure 1, which maps the average waiting time for Standard mode in each ZIP Code, shows that average waiting times are lower in those areas with greater activity on the platform.

---

[10]   "Bay Area ZIP Code Areas," DataSF.org via SF.gov, available at https://data.sfgov.org/Geographic-Locations-and-Boundaries/Bay-Area-ZIP-Codes/u5j3-svi6 , accessed July 31, 2020. DataSF.org reports land area in square feet; I converted this area into square miles (one square mile is 27,878,400 square feet). SF.gov shows an aggregate area of 1,584 square miles across the ZIP Codes in the three counties of interest. However, the 2018 U.S. Census county-level data show that the three counties have an aggregate land area of 1,501 square miles.  The difference appears to relate to 82.3 square miles of water in Alameda County, which when added to the 1,501 square miles equals 1,584 (subject to rounding).

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 1:  Number of Rides Requested and Average Waiting Times, by ZIP Code**



34. The average waiting time across all Standard mode rides is ███ minutes (███████ ██████).  Figure 2 graphs the average waiting time for Standard mode in each ZIP Code against the number of Standard mode rides requested in the month.  It shows a clear relationship between the number of rides requested in a ZIP Code and the average waiting time.  Every ZIP Code with more than ██████ Standard mode rides requested

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

had an average waiting time ████████████████; for ZIP Codes with very few rides, the average wait times can be significantly longer, often in excess of ████████. Thus, it appears that areas with an average wait time in excess of ████████ are also areas where the demand is very low. There is substantially less use of the Lyft platform in these areas.

**Figure 2: Average Waiting Time v. Number of Rides Requested**



Source: ilrc-demand-2020-07-06.csv.
Notes: Each dot represents a ZIP Code. Average Waiting Time is reported as the overall average waiting time for a Standard mode ride within a ZIP Code. Number of rides requested is reported as the total number of Standard mode rides requested by riders located in that ZIP Code that were associated with a waiting time from 4:00 p.m. on January 31, 2020 through 3:59 p.m. on February 29, 2020. This chart includes 120 ZIP Codes and excludes one ZIP Code in which no rides were requested.

35. I understand that Plaintiffs seek a comparable level of service in Access mode to Lyft's Standard mode in the three counties at issue. As an economist, I can evaluate the level of service on Lyft's Standard mode. When I observe very low numbers of rides over a month in certain geographic areas, such as less than 1,000, less than 100, or even zero rides, I conclude that the Lyft platform is not achieving the necessary scale to provide

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

reliable wait times to riders and utilization rates to drivers in those areas.  Based on this analysis, it appears that the Lyft platform is not sufficiently attractive to drivers and riders in large portions of the three-county area, i.e., areas with small numbers of rides and long wait times.

**B.   POPULATION DENSITY IS AN IMPORTANT DETERMINANT OF RIDES AND WAIT TIMES**

36.    As discussed above, both the waiting times and the number of rides are metrics that relate to the success of the Lyft platform.[11]  Thus, I will relate these variables to the demographics of the areas within the three counties in the Bay Area.

37.    Based on my discussion in Section III, we should find that the level of activity on the Lyft platform tracks the population density of the local geography.  The top panel of Figure 3 shows a map of the population density in each ZIP code; the bottom panel, which is duplicated from Figure 1, maps the number of rides requested on the Standard mode in each ZIP code.  Figure 3 shows that population density (not just the overall population) is closely related to the number of rides requested.

---

[11]    *See* Deposition of Isabella Gerundio, June 26, 2020, 72:3-5.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 3:  Number of Rides Requested and Population Density, by ZIP Code**



38.     I graph the relationship between the number of Standard mode rides requested by ZIP Code and population density of the ZIP Code in Figure 4.  As we can see, the number of rides requested increases with an increase in population density.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 4:  Requested Rides v. Population Density**



Source:  Number of rides in ZIP Code come from ilrc-demand-2020-07-06.csv; Figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).

Notes:  Each dot represents a ZIP Code.  The number of rides requested is reported as the total number of Standard mode rides requested by riders located in that ZIP Code that were associated with a waiting time from 4:00 p.m. on January 31, 2020 through 3:59 p.m. on February 29, 2020. Population density is reported as the ZIP Code's population per square mile.  This chart includes 109 ZIP Codes; it excludes 11 ZIP Codes for which population density data are missing and one ZIP Code in which no rides were requested.

39.    As is common in these types of data, there are a few ZIP Codes with very high density and a very high number of standard ride requests.[12]  Because most ZIP Codes have lower numbers, there are many ZIP Codes clustered together at the bottom-left corner

---

[12]    Although the correlation between population density and the number of ride requests is positive, not every ZIP Code conforms to this pattern.  Some ZIP Codes have a relatively low population density but a large number of ride requests because they are in a central business district or otherwise near an attraction.  For example, ZIP Code 94107 (which includes Portrero Hill, a CalTrain station, and the San Francisco Giants' Oracle Park) has a population density of 12,485 per square mile, toward the left of Figure 4, and 112,858 Standard ride requests, more than all but four ZIP Codes in the three counties.  Another example of such a ZIP Code would be 94621 (where Oakland Airport is located), which has a population density of only 4,115, but had 45,000 ride requests.  On the other hand, there are some ZIP codes with a high population density and relatively few ride requests, such as 94108 (which includes Chinatown), which is the second-most densely populated ZIP Code (52,645 per square mile) and has 54,680 Standard ride requests.  Such *outliers* are to be expected in any statistical study.  A statistician can still conclude that one variable explains another variable in a statistical sense even if not every observation conforms to that relationship.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

of Figure 4.  In order to better see the distribution of these variables, I also plot the number of rides requested against population density and show the results on a logarithmic (or "log") scale.  The log has the effect of compressing large numbers.  The result is shown in Figure 5.  Again, we can see that the number of rides requested increases with an increase in population density.  In this presentation, the relationship looks close to linear.  I will focus on this "log-log" relationship in my econometric analysis.

**Figure 5:  Rides Requested v. Population Density**



Source:  Number of rides in ZIP Code come from ilrc-demand-2020-07-06.csv; figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).
Notes: Each dot represents a ZIP Code.  The number of rides requested is reported as the total number of Standard mode rides requested by riders located in that ZIP Code that were associated with a waiting time from 4:00 p.m. on January 31, 2020 through 3:59 p.m. on February 29, 2020.  Population density is reported as the ZIP Code's population per square mile.  The number of rides and population density are shown on a logarithmic (base 10) scale.  This chart includes 109 ZIP Codes; it excludes 11 ZIP Codes for which population density data are missing and one ZIP Code in which no rides were requested.

40.     Based on my discussion in Section III, the expected waiting time for a ride should also track the population density of the local geography.  In order to explore this

relationship, I graph the average waiting time and density by ZIP Code.  The result appears in Figure 6.

**Figure 6:  Average Waiting Time v. Population Density**



Source:  Number of rides in ZIP Code come from ilrc-demand-2020-07-06.csv; figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).
Notes:  Each dot represents a ZIP Code.  The average waiting time is reported in minutes and includes Standard mode ride requests that had an associated waiting time from 4:00 p.m. on January 31, 2020 through 3:59 p.m. on February 29, 2020.  Population density is reported as the ZIP Code's population per square mile in ZIP Codes that had data on population and land-area. This chart includes 109 ZIP Codes; it excludes 11 ZIP Codes for which population density data are missing and one ZIP Code in which no rides were requested.

41.    As expected, we see in Figure 6 that the expected waiting time declines at least until about 20,000 people per square mile.  For ZIP Codes with population density greater than 20,000 people, the average waiting time for a fulfilled ride is ▉ minutes ▉ ▉▉▉▉▉▉▉▉.  Overall across the three counties at issue, the average wait time for a Standard mode ride is ▉ minutes ▉▉▉▉▉▉▉▉▉.  To be conservative, I set the target expected waiting time to be five minutes.  According to Figure 6, it

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

appears to require a population density of approximately 10,000 people per square mile to generate an expected waiting time of five minutes.

42.     As with the number of rides, many ZIP Codes are compressed at the lower end of the scale to fit all of the ZIP Codes onto the chart.  A log specification can address this compression, and make the relationship between the two variables easier to see.  Thus, I also graph the expected waiting time on population density (using a log scale), which appears in Figure 7.  Again, we see that expected waiting time declines as population density increases, with 5 minutes being reached at about 10,000 people per square mile. The variables in this figure exhibit a relationship that is close to linear, so I utilize this "level-log" relationship in my econometric estimation.[13]

---

[13]   I leave the expected waiting time in levels rather than logs.  As that does not have such a skewed distribution (like density), it is not necessary to log it.  However, the relationship between log expected waiting time and log density also appears linear, and my results do not change much if I use this approach.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 7:  Waiting Time v. Population Density**



Source:  Number of rides in ZIP Code come from ilrc-demand-2020-07-06.csv; figures for
population density come from the 2018 American Community Survey (population) and
DataSF.org (land-area).
Notes:  Each dot represents a ZIP Code.  The average waiting time is reported in minutes and
includes Standard mode ride requests that had an associated waiting time from 4:00 p.m. on
January 31, 2020 through 3:59 p.m. on February 29, 2020.  Population density is reported as the
ZIP Code's population per square mile in ZIP Codes that had data on population and land-area.
Population density is shown on a logarithmic (base 10) scale.  This chart includes 109 ZIP Codes;
it excludes 11 ZIP Codes for which population density data are missing and one ZIP Code in
which no rides were requested.

## C.   IN ORDER TO AVERAGE FIVE MINUTE WAIT TIMES, THE LYFT PLATFORM REQUIRES A HIGH LEVEL OF ACTIVITY

43.   I understand that Plaintiffs would like rider-side service levels, such as expected
waiting time, on Lyft's Access mode to be comparable to Lyft's Standard mode.  In the
previous subsection, we saw that expected waiting time is determined by the overall
level of activity on the platform, such as the number of rides requested.   In this
subsection, I calculate how much more activity would be required in Access mode in
order to achieve the target waiting time of five minutes.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

44.    I do so by first, for Standard mode, calculating the population density associated with the target waiting time, and then calculating the number of rides associated with that level of population density.  These calculations provide the number of rides necessary to generate the target waiting time.  I compare this level of rides to the number of Access mode rides to determine the necessary increase in the number of Access rides to achieve the target.

45.    In order to perform these calculations, I perform a regression analysis.[14]  Regression analysis uncovers the mathematical relationship between variables by fitting functional forms, typically linear functional forms, through sets of points.  For instance, regressing the number of rides requested on population density provides an estimate of the functional relationship between these variables, and allows me to calculate the number of rides we would expect for any given population density that we are interested in.

46.    I regress the natural log of the number of Standard rides on the log of population density.[15]  The result appears in column 1 of Table 1.  As expected, the number of rides increases with higher population density.  Second, I regress the expected waiting time on the log of population density to evaluate how population density affects expected waiting times.  The result appears in column 2 of Table 1.  As expected, the expected waiting time decreases with higher population density.[16]  Parameters are precisely identified in the sense that standard errors are small.  I use linear models as we saw in the figures that linear models fit well.[17]

---

[14]   For a general discussion of regression analysis see, for example, Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern* Approach 4th Ed.  (Mason, OH), 2009, Chapter 2.

[15]   Note that I use the base-10 logarithm for the figures above and the natural log for regressions.  These concepts are closely related, but while base-10 is more natural for graphical presentation, the natural log is more common for regression analysis.

[16]   My regressions relate outcomes in a ZIP Code to population density in the ZIP Code.  However, we might consider other explanatory variables as well, such as population density of the surrounding ZIP Codes or the amount of commercial activity in the ZIP Code.  My understanding is that population density in a ZIP Code is both very important on its own and also correlated with these other variables.  I expect similar results in more complicated regressions.

[17]   As a robustness check, I also ran an alternative model regressing waiting times on the log of number of rides directly rather than estimate how these variables relate to population density.  The results of that regression

47.    Above, I pointed out that the Lyft platform connects relatively few riders and drivers in ZIP Codes with low density, for instance delivering fewer than 1,000 rides and delivering waiting times in excess of 10 minutes.  As a sensitivity analysis, I also ran these regressions after dropping those ZIP codes from the analysis.  My results are similar if I drop these ZIP Codes, so I am confident that they are not unduly influenced by a few ZIP Codes..[18]

**Table 1:  Impact of Population Density on Rides Requested and Expected Waiting Times**

| VARIABLES | (1) Ln (Rides w ETA.) | (2) Waiting Time |
|---|---|---|
| Ln(Population Density) | 0.9615*** | -1.575*** |
|  | (0.0699) | (0.0819) |
| Constant | 0.7416 | 19.434*** |
|  | (0.5975) | (0.6993) |
|  |  |  |
| Observations | 109 | 109 |
| R-squared | 0.639 | 0.776 |

Standard Errors in parentheses
*** signifies statistically significant at the 1% level
** signifies statistically significant at the 5% level

48.    Using column 2 of Table 1, if we want the waiting time to be five minutes for Access mode, and assuming Access mode behaves like Standard mode, we need the activity level on Access mode to be equivalent to that of a region with a population density of 9,546 people per square mile.[19]  Using column 1, a ZIP Code with this level of population density generates 14,083 rides.[20]  Thus, to the extent that Access mode behaves like Standard mode, delivering the target expected waiting time on Access mode requires the Lyft platform to generate 14,083 rides per ZIP Code.

---

lead to substantively similar conclusions to those I present in this report.  See back-up workpapers for the results.

[18]  *See* back-up workpapers.

[19]  Solving the equation in column 2 of Table 1 for five minutes yields a ln(Population density) of 9.164.  That is, $19.434 - 1.575 \times 9.164 = 5$.  Furthermore, $e^{9.164} = 9,546$.

[20]  $0.7416 + 0.9615 \times 9.164 = 9.554$.  Furthermore, $e^{9.554} = 14,083$.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

D.   ACHIEVING FIVE-MINUTE WAIT TIMES REQUIRES AN UNREALISTIC INCREASE IN ACCESS MODE ACTIVITY

49.   Ideally, we would compare the level of Access mode activity on the Lyft platform to the target of 14,083 rides per month.  However, there is no traditional independent contractor activity for Access mode on the Lyft platform in San Francisco.  All activity is delivered through contracted third-party WAV providers.  I therefore use my regression analysis to predict the level of activity that would result from the WAV level of density.

50.   The San Francisco Municipal Transportation Agency ("SFMTA") estimates that there are about 5,000 people who use wheelchairs in San Francisco, or approximately 0.6 percent of the population.[21]  Those using foldable wheelchairs are able to use the Standard mode, so the number of people who require Access mode should be substantially fewer than 5,000.  However, in order to be conservative, I use the overinclusive number 5,000.

51.   Extrapolating the SFMTA's estimate that 0.6 percent of the population in San Francisco uses a wheelchair to the three counties in the San Francisco area suggests that there are approximately 22,000 people who use wheelchairs in the three counties.[22]  The area of the three counties in the San Francisco area is 1,501 square miles.[23]  This implies a population density of approximately 14.75 people who use wheelchairs per square mile.[24]  We do not observe any ZIP Codes with total population density this low, and the average total population density in the data is much higher than 14.75.  Based on the analysis so far, it is unclear that the Lyft platform would generate any rides at population densities this low.  Nonetheless, to be conservative, I use Table 1 to make a prediction.  I find that a ZIP Code with a population density of 14.75 people who use

---

[21]   San Francisco Municipal Transportation Agency, "TNCs and Disabled Access," April 26, 2019, p. 22.

[22]   The Census Bureau reports that the three counties had a population of 3,691,632 in 2018.  Applying the SFMTA's estimate for the number of people who use wheelchairs in San Francisco of 0.6% to the population of the three counties yields approximately 22,000 (0.6% × 3,691,632 = 22,150).

[23]   https://www2.census.gov/geo/docs/maps-data/data/gazetteer/counties_list_06.txt (visited July 28, 2020).

[24]   22,150 ÷ 1,501 = 14.75.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

wheelchairs per square mile implies that there would be about 28 Access rides in each ZIP Code per month. Note that no ZIP Code in my data set has 28 Access rides per month (the highest number of Access rides in any ZIP Code is 14). Still, going forward with this example, to achieve 14,083 Access rides in each ZIP Code every month, Lyft would need to raise the level of activity by an *additional* 14,055 Access rides in each ZIP Code per month to reach the target waiting time.[25]

52.   The ZIP Codes at issue average 19,388 Standard rides in each month. Thus, in targeting 14,055 additional Access rides per month, we are asking the Lyft platform to generate a level of Access mode activity that is nearly sufficient to create an entirely new Lyft platform.[26] This level of activity is unrealistic. To see why, the 22,000 people who use wheelchairs in the three counties amounts to an average of 191 people in each ZIP Code. For those 191 people to take 14,055 rides each month would require *every* person who relies on a wheelchair to take an *additional* 2.5 Access rides every day.[27] To put this number in perspective, the Lyft platform generates 0.02 Standard rides per person per day.[28]

E.   **ANALYSIS OF UNMATCHED RIDE REQUESTS FURTHER CORROBORATES THE IMPORTANCE OF SCALE IN THE LYFT PLATFORM**

53.   When a potential rider tries to use the Lyft platform but cannot connect to a driver, it is a sign that there are not enough drivers nearby, and more generally, this experience will lead would-be riders to believe they cannot expect to find drivers on the Lyft platform. To the extent that these failures of a potential rider to find a driver are associated with the scale of activity on the Lyft platform in the area, it further supports

---

[25]   $14,083 - 28 = 14,055$.

[26]   $14,083/19,388 = 72.4\%$, so we are asking Lyft to generate a level of WAV activity that is 72 percent of the Standard mode level of activity.

[27]   This figure is calculated as follows: 14,083 total rides each month divided by 191 people means that each person would need to take 74 rides each month. This implies each person would have to take 2.5 rides per day.

[28]   This figure is calculated as follows: The population of the three counties is 3,691,632, which is 32,383 people on average per ZIP Code. 19,388 rides per month divided by 32,383 people in each ZIP Code means that each person takes 0.6 rides per month, or 0.02 rides per person per day.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

the conclusions I drew earlier about how increasing the scale of activity on the Lyft platform in the area leads to better service to riders.

54. The Lyft data I received include two measures of *lapsed requests*, which are requests that are not matched to a driver. A *system lapse* occurs when a passenger requests a ride but the Lyft platform cannot identify a driver to whom to forward the request; a *driver lapse* occurs when the Lyft platform forwards the request to a driver, but the driver does not accept the ride request. To the extent that these lapses are associated with areas with low numbers of rides, it supports my opinion that the Lyft platform requires sufficient density and scale to be attractive to riders and drivers.

55. Overall, my analysis indicates that there were very few lapsed requests in Standard mode: Out of a total of 2.4 million rides requested on the Standard mode, only 1,651 requests lapsed (6.7 lapses per 10,000 ride requests). It is nonetheless informative to analyze those requests. Because the number of lapsed requests may be related to the total number of requests made, I evaluate the number of lapsed requests per 10,000 ride requests. Figure 8 shows the rate of system lapses on Standard mode, which shows that ZIP Codes with less activity on the Lyft platform, as measured by number of rides requested, have higher rates of requests that cannot be matched to a driver.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 8  System Lapses per 10,000 Rides Requested**



Source:  ilrc-demand-2020-07-06.csv.
Each dot represents a ZIP Code.  The number of system lapses is the total number of Standard mode rides requested by riders in that ZIP Code from 4:00 p.m. on January 31, 2020 through 3:59 p.m. on February 29, 2020 that were not matched to a driver.  The number of rides requested is all rides requested in that ZIP Code during the period, whether or not they were matched to a driver. The number of system lapses per 10,000 rides requested and number of rides requested are shown on a logarithmic (base 10) scale.  This chart includes 84 ZIP codes with at least one system lapse.

56.     Figure 9 below, which shows the number of driver lapses per 10,000 Standard mode
        ride requests, shows the same relationship.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 9  Driver Lapses per 10,000 Rides Requested**



Source:  ilrc-demand-2020-07-06.csv.
Notes: Each dot represents a ZIP Code.  The number of driver lapses is the total number of
Standard mode rides requested by riders in that ZIP Code 4:00 p.m. on January 31, 2020 through
3:59 p.m. on February 29, 2020 that the driver did not accept.  The number of rides requested is all
rides requested in that ZIP Code during the period, whether or not they were matched to a driver.
The number of driver lapses per 10,000 rides requested and number of rides requested are shown
on a logarithmic (base 10) scale.  This chart includes 96 ZIP codes with at least one driver lapse.

57.     To illustrate this point further, Table 2 shows the average number of Standard mode
        ride requests made for the ZIP Codes with the highest and lowest rates of lapsed
        requests.  ZIP Codes with the highest rates of both system lapses and driver lapses had
        significantly fewer ride requests than those ZIP Codes with the lowest rate of lapsed
        requests.  For example, the table shows that the five ZIP Codes with the highest rate of
        system lapses (ranging from 119 to 769 system lapses per 10,000 requests) had an
        average of 1,186 Standard mode ride requests in the month, compared with an average
        of more than 43,000 Standard mode rides requests for the five ZIP Codes with the
        lowest rates (ranging from 0.24 to 0.36 system lapses per 10,000 requests).  Similarly,
        the 40 ZIP Codes with the highest rate of lapsed requests had an average of 6,482

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

Standard mode ride requests, compared with an average of more than 50,000 Standard mode ride requests for the 40 ZIP Codes with the lowest rate of system lapses.

**Table 2:  Ride Requests and Number of Lapsed Requests**

| | System Lapses | | | Driver Lapses | |
|---|---|---|---|---|---|
| | Rides Requested in Zip Codes with … | | | Rides Requested in Zip Codes with … | |
| Zip Codes | Highest Rate | Lowest Rate | Zip Codes | Highest Rate | Lowest Rate |
| 5 | 1,186 | 43,458 | 5 | 574 | 79,689 |
| 10 | 2,628 | 57,542 | 10 | 1,692 | 68,365 |
| 20 | 3,596 | 52,446 | 20 | 2,730 | 57,698 |
| 25 | 4,091 | 56,898 | 25 | 2,909 | 60,143 |
| 40 | 6,482 | 50,279 | 40 | 5,952 | 46,355 |

Source:  ilrc-demand-2020-07-06.csv.
Note:  ZIP Codes with zero lapsed ride requests are not included in the relevant panel.  There were 84 ZIP Codes with at least one System Lapse and 96 ZIP Codes with at least one Driver Lapse.

58.    A similar pattern emerges for driver lapses.  The five ZIP Codes with the highest rate of lapsed requests (ranging from 143 to 1,538 lapses per 10,000 Standard mode ride requests) had an average of 574 Standard mode ride requests during the month, whereas the five ZIP Codes with the lowest rate of lapsed requests (ranging from 0.10 to 0.36 lapses per 10,000 ride requests) had an average of more than 79,000 Standard mode ride requests.  Similarly, the 40 ZIP Codes with the highest rate of lapsed requests had an average of 5,952 Standard mode ride requests, compared with more than 46,000 requests for the five ZIP Codes with the lowest rate of lapsed rides.

59.    Connecting riders to drivers is arguably the main point of the Lyft platform, and lapses are indicative of when the platform fails to achieve this goal.  Lapses are a sign that the platform is failing to attract enough drivers, and lapses likely dissuade riders from future use.  These results corroborate the overall importance of scale in how the platform functions.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

## V.   TARGET WAITING TIMES IMPLY AN UNREALISTIC NUMBER OF WAVS ON THE LYFT PLATFORM

60.   In Section IV.D, I showed that in order for the Lyft platform to be at a sufficient scale to accommodate a five-minute ETA for people who use a wheelchair, every person who relies on a wheelchair would have to increase their use of Lyft by 2.5 rides every day. This is unrealistic to expect. We can also consider whether drivers could increase to a level of activity sufficient to accommodate a five-minute ETA.

### A.   THERE ARE NOT ENOUGH WAVS TO ACCOMMODATE THE NECESSARY INCREASE IN ACCESS MODE TO REDUCE WAITING TIMES

61.   In order to better understand a functional WAV mode, I calculate the number of WAVs that would be required on the Lyft platform at any one time in order to generate the target wait time of five minutes. To do so, I rely on data provided by Lyft on the number of Standard mode drivers who were on the platform in the three-county region and the number of hours these drivers were active on the platform each day in February.[29]

62.   The data show that there were 523,369 Standard mode driver-days[30] in February in the three-county area, and that these driver-days generated a total of 1,214,523 hours on the platform. Thus, each driver drove for an average of 2.32 hours (2 hours 19 minutes) per day. If these drivers began driving at a constant rate throughout each day over the month, then there would be 752 drivers getting on the Lyft platform every hour. If every driver stays on the platform for 2.32 hours, then there would be 1,745 active drivers each hour on the Lyft platform in the three-county area throughout the day.

63.   The Standard mode drivers completed 2,285,735 rides over the course of the month, which is an average of 78,818 Standard mode rides per day. Recall that the average

---

29   File:  ilrc-supply_agg-2020-07-07_2.csv.  As with my analysis of waiting times, I concentrate on the Standard mode of service.

30   I use the term "driver-day" to denote a driver being on the Lyft platform on a given day, regardless of how much time the driver spends on the platform that day or how many times the driver logs on and off the platform in a given day.  For example, a driver who is on the Lyft platform from 7:00 a.m. until 10:00 a.m. and again that day from 3:00 p.m. until 6:00 p.m. is counted as one driver-day even though the driver in this example was on the platform two distinct times on that day.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

wait time in the data is ███ minutes, whereas my analysis targets only a five-minute wait time.  To achieve a five-minute wait time, the total number of rides needed in the three-county area is 58,274 per day. [31]  If the number of drivers scaled with the number of rides, we need only three-quarters as many drivers I calculated in the previous paragraph to generate five-minute wait time.[32]

64.    Thus, if availability of Access mode was spread evenly throughout the day, we would need roughly 1,300 drivers each hour on Access mode throughout the month. [33]  There is no evidence to suggest there are nearly enough WAVs in the area, and drivers willing to operate the WAVs on the Lyft platform, to generate this number of drivers.

65.    For such an increase to happen, there would need to be a sufficient supply of drivers who want to drive their personal WAV on the platform.  There is no evidence to suggest that there is anywhere near enough supply of personally-owned WAVs to meet that demand.  If we assume that 90 percent of households with a wheelchair user in the three counties owns a vehicle,[34] we would have no more than 20,000 WAVs in the three-county area.  To have 1,300 drivers on Access mode throughout the day, as calculated in Paragraph 64, means that 6.5 percent of *all* WAVs would have to be on the Lyft

---

[31]  Recall that we need 14,083 rides per ZIP Code in order to generate five-minute waiting times, and there are 120 ZIP Codes in the three counties with at least one ride requested.  14,083 rides per ZIP Code times 120 ZIP Codes divided by 29 days = 58,274 rides per day.

[32]  58,274 divided by 78,818 = 74 percent.

[33]  This number was calculated as follows:  On average, there were 1,745 drivers on the Lyft platform in the three-county area in any given hour (*See* Paragraph 62) who completed 78,818 rides per day (*See* Paragraph 63).  To achieve a five-minute waiting time, we would need approximately three-quarters as many drivers (*See* Paragraph 63 and Footnote 32).  Multiplying the 1,745 drivers each hour by 74 percent yields 1,292 drivers on the Lyft platform each hour for waiting times of five minutes.

[34]  A survey from the Department of Transportation found that 88 percent of households in California own a car.  (See U.S. Department of Transportation, National Household Travel Survey," 2017.)  This is a rough calculation that overstates (likely vastly) the number of WAVs in the three counties.  This is an overstatement because it assumes that (i) households with individuals who use wheelchairs own automobiles at the same rate as all households; (ii) each person who uses a wheelchair lives in a separate household; and (iii) every such household that owns an automobile owns a WAV.  Although the first two assumptions are likely to be reasonable approximations, the third assumption no doubt leads me to overestimate the number of WAVs in the three-county area.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

platform at all times.[35]   This seems highly implausible:   To put this number into perspective, less than 0.1 percent of all automobiles registered in the three counties is on the Lyft platform on Standard mode at a given hour.[36]

66.   This in fact understates the problem, because ride requests and drivers are not distributed evenly throughout the day.   Figure 10 shows the number of rides requested in each hour of day over all weekdays in the month.   It shows that between Hour 0 and Hour 5 (midnight to 5:59 a.m.), there were fewer than 25,000 Standard mode rides requested in each hour over the course of the month.   By contrast, ride requests peaked in the 6:00 p.m. hour, when there were 129,500 Standard mode rides requested over the month (an average of 4,467 in that hour each day).

---

[35]   This number is likely to be substantially higher to the extent that my estimate of the number of WAVs is overstated, as discussed in Footnote 34.

[36]   The California DMV has estimated that there are approximately 2.37 million automobiles registered in the three counties.   (See California DMV Forecasting Unit, "Estimated Vehicles Registered by County for the Period of January 1 through December 31. 2019" available at https://www.dmv.ca.gov/portal/file/estimated-fee-paid-vehicle-registration-by-county-report-pdf/ (accessed July 26, 2020)).   As I will discuss in Paragraph 63, there are approximately 1,745 drivers (or 0.07 percent of 2.37 million registered automobiles) on Standard mode on the Lyft platform at any time.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure 10  Number of Rides Requested by Hour of Day, Weekdays Only**



Source:  ilrc-supply_agg-2020-07-07_2.csv.
Note:  This graph shows the total number of Standard mode rides requested in the three-county region from 4:00 p.m. on January 31, 2020 through 3:59 p.m. on February 29, 2020.  It includes only weekdays (Monday through Friday).  Hour 0 is the midnight hour and hour 23 is the 11:00 p.m. hour.  To calculate an average daily number of rides in a given hour, these figures should be divided by 20 weekdays over the period.  For example, Hour 18 (6:00 p.m.) had 129,531 rides requested, which means that on an average weekday, there were 6,477 rides requested in that hour.

67.    Based on these results, the peak hour has demand that is 41 percent greater than the average.[37]  Applying that to values above tells us that we would need 1,818 drivers at the peak time.  This is an even more unrealistic level of WAV participation.[38]

**B.    THE ECONOMICS OF WAVS MAKES IT EVEN LESS LIKELY TO MEET THE NECESSARY LEVEL OF WAV PARTICIPATION**

68.    So far, I have shown that even if Access mode behaved like Standard mode, the level of activity in Access mode required to generate five-minute waiting times is unrealistic because there are so few WAV riders and drivers. However, when we consider how

---

[37]   This figure was calculated by dividing 4,467 rides in the peak hour by 3,175 rides in the average hour (76,191 rides per day, as seen in Paragraph 63, divided by 24 hours in a day).  4,467 divided by 3,175 = 1.41.

[38]   I also evaluated the number of drivers that would need to be on the Lyft platform in order to satisfy the number of rides observed in the month.  That result is generally consistent with the discussion presented here, and leads to relatively more drivers on the platform in peak times than on average over the day than what we see using the peak number of rides requested.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

different the market for Access mode is from the market for Standard mode, we see that it is even more unrealistic. Even if there was equivalent demand for Access mode as for Standard mode (which there definitely is not), we still could not expect an equivalent number is WAVs to service Access mode for several reasons.

69. First, a driver would have to purchase a specialized WAV vehicle, which can cost $35,000 *more* than a non-WAV vehicle that can be used to drive on the Standard mode.[39] In addition to the higher acquisition cost, the National Mobility Equipment Dealers Association has estimated that the annual cost to maintain the components specific to a WAV is approximately $3,000, which an owner of a non-WAV vehicle would not incur.[40]

70. Yet, despite the higher initial investment and operating costs, a driver of a WAV cannot expect to generate higher income than a driver of a conventional vehicle.[41] Lyft charges Access mode riders the same amount as Standard mode riders, so there is no revenue benefit to using a WAV. In fact, WAV drivers can expect to earn less revenue because they would experience lower utilization than drivers of other vehicles.[42] One obvious reason for this is that there are many fewer Access mode rides requested. However, even if the platform for Access mode were as robust as the platform for Standard mode, WAV drivers would expect to give fewer rides because Access rides take longer than other modes, even for rides of comparable distance. Access rides may take longer for a variety of reasons, including, increased onboarding and offboarding times for passengers in wheelchairs and WAV-specific passenger equipment. The data show that Access rides took an average of 22.3 minutes from pick-up to drop-off and traveled an average distance of 4.7 miles, whereas Standard rides took an average of

---

[39] Deposition of Christopher Wu, July 17, 2020, 54:4-7.

[40] Retirement Living, "Best Wheelchair Vans of 2020," May 4, 2020, available at https://www.retirementliving.com/wheelchair-vans, accessed July 31, 2020.

[41] It is my understanding that Lyft does not charge riders who use Access mode a higher price than it charges riders who use Standard mode.

[42] In this analysis, Access mode is assumed to be a stand-alone platform, which means that drivers on Access mode are not able to accept ride requests on Standard mode or other modes.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

15.63 minutes despite covering a longer distance (5.6 miles).  The average fare for those rides was similar ($15.79 for Access mode rides and $15.25 for Standard mode rides).  Based on these figures, assuming an equal utilization rate, WAV drivers could expect to earn less than a driver on the Standard mode.[43]  As such, it would not be economically rational for a driver considering joining the Lyft platform to choose to invest in a WAV over a less expensive vehicle without receiving a significant subsidy.

71.   Overall, even if there was the same level of demand on Access mode as Standard mode, servicing Access mode rides costs more and earns less than Standard mode.  Thus, the level of activity required to generate low waiting times is even more unrealistic than suggested by the above analysis that focused on using Standard mode as a model for understanding Access mode.

## C.   LYFT CREATES A SUPPLY FOR ACCESS MODE IN A DIFFERENT WAY THAN FOR OTHER MODES

72.   For these reasons, Lyft does not try to replicate its platform approach to Standard mode for Access mode.  Rather, it is my understanding that Lyft primarily attempts to create supply by subsidizing WAVs in two ways:  (a) by contracting with outside transportation companies to provide WAVs and WAV drivers; and (b) by providing rental subsidies and other incentives to drivers who are willing to rent and drive a WAV on the platform.[44]

---

[43]   Given the average time for a ride of 22.3 minutes for an Access ride, a WAV driver can drive at most 2.7 separate rides in an hour for a total of $42.50 in fares, compared with 3.8 separate rides on the Standard mode ($58.54 in fares per hour).  Although a driver's earnings depends on factors other than the fare paid by the rider, I understand that the differences in fares, mileage, and time described here would lead a driver on Access mode to earn less than a driver on Standard mode (assuming tips that drivers receive are comparable).

[44]   In economic terms, Lyft's Standard mode is based on a "spot-market transaction" model, which refers to a model in which the buyer and seller do not form any kind of a relationship but engage in an anonymous transactions.  Because there are significant barriers to a spot-market model for WAVs as discussed above, Lyft has entered into contracts with third parties to deliver WAV service in San Francisco and other cities.  Such contracts, depending on their duration and terms, can be understood to approximate leases or purchases.  Carlton and Perloff write "… vertical restrictions are determined through contractual negotiations between the manufacturer and the distributor. The manufacturer places these restrictions so as to approximate the outcome that would occur if the firms vertically integrated."  (Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization* 3d Ed.  (Boston:  Addison Wesley) 1999, p. 396.)

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

73.    In San Francisco, Lyft contracts with the firm First Transit, Inc., to have First Transit supply both the WAVs and the drivers who drive them.  In February 2020, Lyft paid First Transit ███████ to provide riders with ████ completed WAV rides,[45] for an average cost of ████ per ride.  Because Lyft charges the same amount for Access mode as it does for Standard mode, Lyft is not able to recoup the cost of these rides from Access mode riders.

## VI.   CONCLUSION

74.    Lyft's ridesharing platform depends on a density of supply and demand.  My analysis shows that the density of individuals who use wheelchairs in the Bay Area is far too low to produce activity at levels sufficient to result in rides with comparable waiting times to those of Lyft's Standard mode of service.  Indeed, to generate comparable waiting times on Access mode, individuals who rely on WAVs would need to use Lyft 100 times as much as the general population.  Moreover, there is no evidence that there is a supply of drivers with privately-owned WAVs in the Bay Area, in anywhere near sufficient numbers, to generate comparable waiting times.  In sum, Lyft is unable to operate Access mode with comparable waiting times through the same platform approach that Lyft uses for Standard mode.

_____

Marc Rysman, Ph.D.

Date:_____7/31/2020_____

---

[45]    Lyft's payments to First Transit come from LYFT00032385; the number of WAV rides comes from the file LYFT00032129 Native Excel version.xlsx ("SFO" tab).  The file ilrc-demand-2020-07-06.csv shows ████ Access mode rides in San Francisco.  I understand that the difference reflects (a) that the data for the file ilrc-demand-2020-07-06.csv reflect rides requested in the month of February UTC (i.e., from 4:00 p.m. local time on January 31 through 3:59 p.m. local time on February 29, as discussed in Footnote 7), which accounts for two additional rides; (b) one ride that originated at SFO Airport, which is in San Mateo County; and (c) one ride that was requested in San Francisco County near the border of San Mateo County for which the rider was picked up just over the border in San Mateo County.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Appendix A:  Curriculum Vitae of Marc Rysman**

**MARC RYSMAN**

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**MARC RYSMAN**

June, 2020

Department of Economics                    mrysman@bu.edu
Boston University                          sites.bu.edu/mrysman/
270 Bay State Road                         (617) 353-3086 (office)
Boston, MA 02215

Citizenship: United States

## EDUCATION

University of Wisconsin-Madison, PhD, Economics, 1999.

Columbia University, BA, Economics, 1992.

## PRIMARY ACADEMIC APPOINTMENTS

Professor, Boston University, 2011 to present.

Associate Professor, Boston University, 2006 to 2011.

Assistant Professor, Boston University, 1999 to 2006.

## VISITING POSITIONS

Visiting Scholar, Center for Consumer Payments Research, Federal Reserve Bank of Boston, 2009-2019.

Visiting Scholar in Economics, Harvard University, 2014-2015.

Visiting Associate Professor, Economics Department, Massachusetts Institute of Technology, 2007-2008.

Visiting Scholar in Economics, Harvard University, 2003-2004.

Visiting Fellow, Center for Studies in Industrial Organization, Northwestern University, May-June 2003.

Visiting Scholar, Federal Reserve Bank of Minneapolis, July 2003.

Research Assistant, Brookings Institution, 1992-1994.

## EDITORIAL POSITIONS

Editor, RAND Journal of Economics, July 2014 to present.

Editor, Review of Network Economics, 2010-2015.

Associate Editor, Journal of Industrial Economics, 2010-2014.

Associate Editor, The RAND Journal of Economics, 2007-2014.

Associate Editor, International Journal of Industrial Organization, 2005 to 2014.

Co-editor, Journal of Economics and Management Strategy, 2007-2010.

## OTHER PROFESSIONAL SERVICE

Academic Panel Member, Competition and Markets Authority, United Kingdom, 2016 to present.

Secretary, Industrial Organization Society, 2018 to present.

President, Industrial Organization Society, 2016 to 2017.

Vice-President, President-Elect of Industrial Organization Society, 2014-2015.

Organizing Committee, International Industrial Organization Conference 2008-2014.

Organizer, Standards, Innovation and Patents Conference in Tucson. Sponsored by the NBER and USPTO. February 2012. Editor for special issue in IJIO.

Organizing Committee, European Association for Research in Industrial Economics (EARIE) conference, Stockholm, 2011.

Local Organizer, Summer Meetings of the North American Econometric Society, Boston University, 2009.

**INVITED LECTURES (SELECTED)**

Panel on "The Current Economic Understanding of Multi-Sided Platforms," *Competition and Consumer Protection Hearings*, organized by the Federal Trade Commission at George Mason Law School, October, 2018.

"Antitrust in Digital Industries," Public Lecture organized by the Japanese Federal Trade Commission, Tokyo, March, 2014.

"Estimating Price-Cost Margins in a Dynamic Environment," Invited Lecture, European Association for Research in Industrial Economics (EARIE), Munich, September 2015.

"Payment Networks," Academic Consultants Conference for the members of the Board of Governors, Federal Reserve Bank, October 2011.

"Estimating Network Effects in a Dynamic Environment," Invited Lecture, European Association for Research in Industrial Economics (EARIE), Stockholm, September 2011.

"Adoption and Use of Payment Instruments by US Consumers," Keynote speech at conference entitled Payments Markets: Theory, Evidence and Policy, Granada, Spain. June, 2010.

"Platform Pricing at Sportscard Conventions," Plenary speech at conference entitled Platform Markets: Regulation and Competition Policy. Mannheim, Germany, May, 2010.

"Empirical Analysis of Payment Card Usage," Plenary session at Conference on Two-Sided Markets, Institut D'Economie Industrielle, Toulouse, January 2004.

## INVITED SHORT COURSES

"Two-Sided Markets: From Theory to Empirics and Applications," Shanghai University of Finance and Economics, June 2017.

"Static and Dynamic Demand Estimation," for joint PhD program among Berlin universities, August 2014.

"Network Effects, Two-Sided Markets and Standard Setting," Fordham Competition Law Institute Training for Agency Economists. (I taught one section of a week-long training for competition authority economists from many countries.) June, 2007-June, 2013.

"Structural Econometrics in Industrial Organization," Hitotsubashi University, February 2009.

## PUBLICATIONS

Chiou, L., Kafali, E. N., and Rysman, M. (In Press). Internet use, competition, and geographical rescoping in Yellow Pages advertising. *Information Economics and Policy*.

Rysman, M., Simcoe, T., and Wang, Y. (In Press). Differentiation in adoption of environmental standards: LEED from 2000-2010. *Management Science*.

Chu, C. S. and Rysman, M. (2019). Competition and strategic incentives in the market for credit ratings: Empirics of the financial crisis of 2007. *American Economic Review*, 109:3514–3555.

Rysman, M. (2019). The reflection problem in network effect estimation. *Journal of Economics and Management Strategy*, 28:153–158.

4

Greene, C., Rysman, M., Schuh, S., and Shy, O. (2018). Costs and benefits of building faster payment systems: The U.K. experience. *Journal of Financial Transformation*, 47:51–66.

Rysman, M. and Schuh, S. (2017). New innovations in payments. In Greenstein, S., Lerner, J., and Stern, S., editors, *Innovation Policy and the Economy*, volume 17, pages 27–48. University of Chicago Press.

Falls, C., Friedman, P., and Rysman, M. (2016). The impact of the internet on distribution. In Banks, T., Langenfeld, J., and Wittrock, Q., editors, *Antitrust Law and Economics of Product Distribution*, chapter 10, pages 475–495. American Bar Association, second edition.

Rysman, M. (2016). Empirics of business data services. Appendix B of *Business Data Services Federal Notice of Proposed Rulemaking*, FCC 16-54.

Koulayev, S., Rysman, M., Schuh, S., and Stavins, J. (2016). Explaining adoption and use of payment instruments by US consumers. *RAND Journal of Economics*, 47:293–325.

Jin, G. and Rysman, M. (2015). Platform pricing at sports cards conventions. *Journal of Industrial Economics*, 63:704–735.

Rysman, M. and Wright, J. (2014). The economics of payment cards. *Review of Network Economics*, 13:303–353.

Rysman, M. (2013). Exclusionary practices in two-sided markets. In Hawk, B. E., editor, *Proceedings of the 39th Fordham Competition Law Institute International Conference on Antitrust Law and Policy*, pages pp. 537–564, New York. Juris.

Gowrisankaran, G. and Rysman, M. (2012). Dynamics of consumer demand for new durable goods. *Journal of Political Economy*, 120:1173–1219.

Rysman, M. and Simcoe, T. (2011). A NAASTY alternative to RAND pricing commitments. *Telecommunications Policy*, 35:1010–1017.

Crowe, M., Rysman, M., and Stavins, J. (2010). Mobile payments at the retail point of sale in the United States: Prospects for adoption. *Review of Network Economics*, 9.

Mehta, A., Rysman, M., and Simcoe, T. (2010). Identifying the age profile of patent citations. *Journal of Applied Econometrics*, 25:1179–1204.

5

De Stefano, M. and Rysman, M. (2010). Competition policy as strategic trade with differentiated products. *Review of International Economics*, 18:758–771.

Rysman, M. (2010). Consumer payment choice: Measurement topics. In *The Changing Retail Payments Landscape: What Role for Central Banks? An International Payment Policy Conference*, pages 61–81. Federal Reserve Bank of Kansas City.

Rysman, M. (2009). The economics of two-sided markets. *Journal of Economic Perspectives*, 23:125–144.

Rysman, M. and Simcoe, T. (2008). Patents and the performance of voluntary standard setting organizations. *Management Science*, 54:1920–1934.

Rysman, M. (2007a). Empirical analysis of payment card usage. *Journal of Industrial Economics*, 60:1–36.

Rysman, M. (2007b). Empirics of antitrust in two-sided markets. *Competition Policy International*, 3:197–209.

Greenstein, S. and Rysman, M. (2007). Coordination costs and standard setting: Lessons from 56k modems. In Greenstrein, S. and Stango, V., editors, *Standards and Public Policy*, pages 123–159. Cambridge University Press.

Rysman, M. and Simcoe, T. (2007). The performance of standard setting organizations: Using patent data for evaluation. *Journal of IT Standards and Standardization Research*, 5:25–40.

Augereau, A., Greenstein, S., and Rysman, M. (2006). Coordination vs. differentiation in a standards war: 56k modems. *RAND Journal of Economics*, 37:887–909.

Rysman, M. and Simcoe, Timothy, . G. (2006). Measuring the performance of standard setting organizations. In *International Standardization as a Strategic Tool: Commended Papers from the IEC Centenary Challenge 2006,*. IEC Press, Geneva.

Ackerberg, D. A. and Rysman, M. (2005). Unobservable product differentiation in discrete choice models: Estimating price elasticities and welfare effects. *RAND Journal of Economics*, 36:771–788.

Busse, M. and Rysman, M. (2005). Competition and price discrimination in Yellow Pages advertising. *RAND Journal of Economics*, 36:378–390.

Rysman, M. and Greenstein, S. (2005). Testing for agglomeration and dispersion. *Economics Letters*, 86:405–411.

Rysman, M. and Simcoe, T. (2005). Evaluating the performance of standard setting organizations with patent data. In Egyedi, T. and Sherif, M., editors, *Proceedings of the 4th International Conference on Standardization and Innovation in Information Technology*, pages 195–206, Geneva. IEEE.

Rysman, M. (2004). Competition between networks: A study of the market for Yellow Pages. *Review of Economic Studies*, 71:483–512.

Rysman, M. (2002). Review of the book: The economics of network industries, by Oz Shy. *Journal of Economic Literature*, 40:556–557.

Rysman, M. (2001). How many franchises in a market? *International Journal of Industrial Organization*, 19:519–542.

**WORKING PROJECTS**

Kaido, H., Li, J., and Rysman, M. (2018). Moment inequalities in the context of simulated and predicted variables. Unpublished manuscript, Boston University.

McCalman, P. and Rysman, M. (2019). Airline services agreements: A structural model of network formation. Unpublished Manucript, Boston University.

Cohen, M., Rysman, M., and Wozniak, K. (2017). Payment choice with consumer panel data. Unpublished Manuscript.

Gowrisankaran, G., Park, M., and Rysman, M. (2014). Measuring network effects in a dynamic environment. Unpublished Manuscript, Boston University.

Gowrisankaran, G., Rysman, M., and Yu, W. (2013). Computing price-cost margins in a durable goods environment. Unpublished Manuscript, Boston University.

Rysman, M. (2003). Adoption delay in a standards war. Unpublished manuscript, Boston University.

Rysman, M. (2000). Competition policy as strategic trade. Industry Studies Project Working Paper, #100, Boston University.

## GRANT ACTIVITY

Estimation and Computation of Dynamic Oligopoly and Network Effects Models, with Gautam Gowrisankaran. National Science Foundation, SES-0922629, 2009-2013.

Dynamic Demand for New Durable Goods: An Empirical Model and Applications to Pricing and Welfare, with Gautam Gowrisankaran. National Science Foundation, SES-0551348, 2006-2009.

Discrete adjustment costs, investment dynamics, and productivity growth: Evidence from Chilean manufacturing plants, with Simon Gilchrist. National Science Foundation, SES-0351454, 2004-2006.

Empirical Studies of Network Effects, National Science Foundation, SES-0112527, 2001-2002.

## COURSES TAUGHT

EC333 Market Organization and Public Policy (Antitrust and Regulation): Fall 1999, Fall 2000, Spring 2002-2003, Spring 2005-2011, Fall 2008-2011, Spring 2016.

EC732 Topics In Industrial Organization (Graduate Empirical IO): Spring 2000-2001, Fall 2001, Spring 2003, Fall 2004, Spring 2005-2013, Spring 2016-2019.

EC711 Topics in Econometrics: Spring 2010-2011.

EC709 Advanced Econometrics II: Fall 2006, Fall 2015, Fall 2017-2018.

EC201/303 Intermediate Microeconomics: Fall 2001, Fall 2002, Fall 2005.

EC903 Graduate Student Seminar: Fall 1999, Fall 2000.

**AWARDS**

Neu Family Award for Teaching Excellence in Economics, 2006, 2012.

Networks, Electronic Commerce and Telecommunications (NET) Institute Grant, 2009.

Professor of the Year, 2006-2007, awarded by Boston University Fraternities and Sororities

Networks, Electronic Commerce and Telecommunications (NET) Institute Grant, 2005.

Networks, Electronic Commerce and Telecommunications (NET) Institute Grant, 2003.

Gerald M. Gitner Award for Excellence in Undergraduate Teaching, 2000.

Christensen Award in Empirical Economics, 1997 (with Phil Haile).


**GRADUATE STUDENTS FOR WHICH I SERVED AS PRIMARY ADVISOR (AND FIRST PLACEMENT)**

Martino De Stefano (Charles River Associates)
Minsoo Park (KISDE - Korean research institute)
Firat Inceoglu (Sabanci University)
Justin Lenzo (Kellogg School of Management)
Gustavo Vincentini (Analysis Group)
Pasquale Schiraldi (London School of Economics)
Hernando Roman (University de los Andes)
Chun-Yu Ho (Georgia Tech)
Haizhen Lin (Kelly School of Management)
David Rapson (UC Davis)
Calixte Ahokpossi (IMF)
Ben Tomlin (Bank of Canada)
Ana Mier Y Teran (Bank of Mexico)
Jessica Calfee Stahl (Board of Governors, FRB)
Yun Mi Nam (KISDE)
Naoaki Minimahashi (Bank of Canada)
Caixia Shen (Shanghai University of Finance and Economics)
Chien-Yuan Sher (National Sun Yat-sen University, Taiwan)
Nilay Yilmaz (Cambridge Health Alliance, Harvard Medical School)
Hyo-Youn Cho (Kyunghee University)
Myongjin Kim (University of Oklahoma)
Yanfei Wang (Capital University of Economics and Business, Beijing)

9

Yang Li (Bank of Santander)
Grace Wei Yu (Charles River Associates)
Yanghsin Park (Korea Institute for Industrial Economics & Trade  KIET)
Jiaxuan Li (Amazon.com)
Talal Ur Rahim (Digonex, Inc.)
Haoyu Zhou (East China Normal University)
Christoph Walsh (Tilburg University)
So Hyun An (Korea Institute for Industrial Economics & Trade - KIET)
Youming Liu (Post-doc at Cornell University)

**UNIVERSITY SERVICE**

Associate Chair of the Department of Economics, 2017-present.

Department Liaison to the Scientific Computing and Visualization Center, 2012- 2016

Merit and Equity Advisory Committee, 2001, 2002, 2009, 2014, 2016, 2019.

Advisor to Second-year Graduate Students, 2013-2014, 2008-2009.

Director, Junior Recruiting Committee, 2006-2007, 2009-2010, 2013-2014.

Department newsletter. 2013.

Chair, Academic Promotion and Tenure, College of Arts and Sciences, 2012-2013.

Academic Promotion and Tenure, College of Arts and Sciences, 2011-2012.

Discussion Facilitator in the Program in Responsible Conduct of Research for Graduate Students and Postdoctoral Researchers on March 31, 2011

College Teaching Prize Committee, Spring, 2011

Committee on Conflicts of Interest, 2008-2011

Co-director, Junior Recruiting Committee 2000-2001.

Social Science Curriculum Committee, 2005-2007.

Representative to CAS Reg-Prep (Registration Preparation)

Acting Director, Industry Studies Program, 2001-2002, 2009-2010

Summer Orientation Academic Advising, 2001, 2002, 2004, 2005

Junior Recruiting Committee 1999-2005.

Undergraduate Studies Committee 1999-2005.

## Appendix B:  Prior Testimony Past Four Years

1.  *Twentieth Century Fox Film v. Wark Entertainment*, JAMS Ref. No. 1220052735.  Deposition June 2018; Trial Testimony August 2018.

2.  *Determination of Rates and Terms for Making and Distributing Phonorecords (Phonorecords III)*:  Docket No. 16-CRB-0003 (PR 2018-2022) before the Copyright Royalty Board, Library of Congress, Washington, D.C.  Written Direct Testimony filed October 2016; Written Rebuttal Testimony filed February 2017; Deposition March 2017; Live Testimony March/April 2017.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

## Appendix C:  Documents Relied Upon

| *Legal Documents and Statutes* |
| --- |

Complaint for Injunctive Relief for Violations of the Americans With Disabilities Act, 42 U.S.C. §§ 12181, *et seq*., March 20, 2019

Order re Motion for Class Certification, March 6, 2020

Defendant Lyft, Inc.'s Response to Plaintiffs' Second Set of Interrogatories, July 29, 2020

| *Documents Provided by the Parties* |
| --- |

LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx

LYFT00032129 Native Excel version.xlsx

LYFT00032385 - Historical WAV Expenses.xlsx

ilrc-demand-2020-07-06.csv

ilrc-supply_agg-2020-07-07_2.csv

U.S. Census Bureau, "American Community Survey," 2018.

San Francisco Municipal Transportation Agency, "TNCs and Disabled Access," April 26, 2019.

Lyft, "Lyft Business Model 101," (no date), p. 11.

Lyft, sfo_map.json (geojson file)

U.S. Census Bureau, "Quick Facts:  Contra Costa, Alameda County, San Francisco County, California," accessed June 11, 2020.

Lyft, "Lyft Wheelchair Accessible Vehicles Overview," May 28, 2020, LYFT00032148-LYFT00032160

| *Depositions* |
| --- |

Deposition of Isabella Gerundio, June 26, 2020

Deposition of Andres Munoz, October 31, 2019

Deposition of Andres Munoz, June 11, 2020

Deposition of Edward Niedermeyer, June 16, 2020

Deposition of Audrey Ren, June 24, 2020.

Deposition of Christopher Wu, July 17, 2020

| *Data* |
| --- |

U.S. Department of Transportation, "National Household Travel Survey," 2017.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

"Zip Code Tabulation Areas (ZCTAs™)," U.S. Census Bureau, United States Department of Commerce, available at https://www2.census.gov/geo/pdfs/education/brochures/ZCTAs.pdf, accessed July 31, 2020.

"Bay Area ZIP Code Areas," DataSF.org via SF.gov, available at https://data.sfgov.org/Geographic-Locations-and-Boundaries/Bay-Area-ZIP-Codes/u5j3-svi6, accessed July 31, 2020.

https://www2.census.gov/geo/docs/maps-data/data/gazetteer/counties_list_06.txt (visited July 28, 2020).

California DMV Forecasting Unit, "Estimated Vehicles Registered by County for the Period of January 1 through December 31. 2019" available at https://www.dmv.ca.gov/portal/file/estimated-fee-paid-vehicle-registration-by-county-report-pdf/ (accessed July 31, 2020)).

**Publicly Available Sources**

Baumbaugh, Stephen, "Issue Brief:  Travel Patterns of American Adults with Disabilities," U.S. department of Transportation, September 2018.

(Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization* 3d Ed.  (Boston:  Addison Wesley) 1999, p. 396.)

"Lyft's latest on COVID-19," Lyft Inc., available at https://www.lyft.com/safety/coronavirus, accessed July 31, 2020.

Retirement Living, "Best Wheelchair Vans of 2020," May 4, 2020, available at https://www.retirementliving.com/wheelchair-vans, accessed July 31, 2020.

Wooldridge, Jeffrey M., *Introductory Econometrics:  A Modern Approach* 4th Ed.  (Mason, OH), 2009.

**Miscellaneous**

Discussion with Abbas Bozorgirad, Data Scientist, Lyft, July 29, 2020

Discussion with Izzy Gerundio, Program Lead, Lyft, June 22, 2020, July 29, 2020

Discussion with Eddie Niedermeyer, Analytics Manager, Lyft, June 28, 2020, July 2020

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Appendix D:  Reproduction of Primary Figures Using Data
from August and September 2019**

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-11:  Number of Rides Requested and Average Waiting Times, by ZIP Code**



HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-2:  Average Waiting Time v. Number of Rides Requested**



Source:  "LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx".
Notes:  Each dot represents a ZIP Code.  Average Waiting Time is reported as the overall average waiting time for a Standard mode ride within a ZIP Code.  Number of rides requested is reported as the total number of Standard mode rides requested by riders located in that ZIP Code that were associated with a waiting time from August 1, 2019 through September 30, 2019.  This chart includes 107 ZIP Codes to maintain consistency with charts excluding ZIP Codes for lack of population density figures.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-3:  Number of Rides Requested and Population Density, by ZIP Code**



**Figure D-4:  Requested Rides v. Population Density**



Sources:  Number of rides in ZIP Code come from "LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx"; Figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).

Notes:  Each dot represents a ZIP Code.  The number of rides requested is reported as the total number of Standard mode rides requested by riders located in that ZIP Code that were associated with a waiting time from August 1, 2019 through September 30, 2019.  Population density is reported as the ZIP Code's population per square mile.  This chart includes 107 ZIP Codes; it excludes 9 ZIP Codes for which population density data are missing.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-5:  Rides Requested v. Population Density**



Sources: Number of rides in ZIP Code come from "LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx"; Figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).

Notes:  Each dot represents a ZIP Code.  The number of rides requested is reported as the total number of Standard mode rides requested by riders located in that ZIP Code that were associated with a waiting time from August 1, 2019 through September 30, 2019.  Population density is reported as the ZIP Code's population per square mile.  The number of rides and population density are shown on a logarithmic (base 10) scale.  This chart includes 107 ZIP Codes; it excludes 9 ZIP Codes for which population density data are missing.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-6:  Average Waiting Time v. Population Density**



Sources:  ETA Data comes from "LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx"; Figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).

Notes:  Each dot represents a ZIP Code.  The average waiting time is reported in minutes and includes Standard mode ride requests that had an associated waiting time from August 1, 2019 through September 30, 2019.  Population density is reported as the ZIP Code's population per square mile in ZIP Codes that had data on population and land-area.  This chart includes 107 ZIP Codes; it excludes 9 ZIP Codes for which population density data are missing.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-7:  Waiting Time v. Population Density**



Sources:  ETA Data comes from "LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx"; Figures for population density come from the 2018 American Community Survey (population) and DataSF.org (land-area).

Notes:  Each dot represents a ZIP Code.  The average waiting time is reported in minutes and includes Standard mode ride requests that had an associated waiting time from August 1, 2019 through September 30, 2019.  Population density is reported as the ZIP Code's population per square mile in ZIP Codes that had data on population and land-area.  This chart includes 107 ZIP Codes; it excludes 9 ZIP Codes for which population density data are missing.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-8:  System Cancels per 10,000 Rides Requested**

Note:  Data not available.

**Figure D-9:  Driver Lapses per 10,000 Rides Requested**

Note:  Data not available.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**Figure D-10:  Number of Rides Requested by Hour of Day, Weekdays Only**



Source:  File: "LYFT00002024_HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY.xlsx".
Note:  This graph shows the total number of Standard mode rides requested in the three-county region from August 1, 2019 through September 30, 2019.  It includes only weekdays (Monday through Friday).  Hour 0 is the midnight hour and hour 23 is the 11:00 p.m. hour.  To calculate an average daily number of rides in a given hour, these figures should be divided by 43 weekdays over the period

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY