FOLGER LEVIN LLP
Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
199 Fremont Street, 20th Floor
San Francisco, CA  94105
Telephone: 415.625.1050
Facsimile: 415.625.1091

Attorneys for Defendant LYFT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, SASCHA BITTNER, an individual, TARA AYRES, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation,<br><br>              Plaintiffs,<br><br>      v.<br><br>LYFT, Inc., a Delaware corporation,<br><br>              Defendant. | Case No. 3:19-cv-01438-WHA<br><br>**DEFENDANT LYFT, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**DEFENDANT LYFT, INC.'S**

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      FINDINGS OF FACT**

**A.      The Parties.**

1.      Plaintiffs Judith Smith, Tara Ayres, Julie Fuller, and Sascha Bittner are each individuals with a disability under the Americans with Disabilities Act.

2.      Plaintiffs Judith Smith and Julie Fuller live in Oakland, CA. Plaintiff Tara Ayres lives in Richmond, CA. Plaintiff Sascha Bittner lives in San Francisco, CA.

3.      Plaintiff Independent Living Resource Center San Francisco ("ILRC") is a disability rights organization located in San Francisco, California.

4.      Plaintiff Community Resources for Independent Living ("CRIL") is a disability rights advocacy and support organization located in Hayward, California.

5.      Defendant Lyft, Inc. ("Lyft") is a San Francisco-based company that launched its peer-to-peer marketplace for on-demand ridesharing in 2012.

**B.      Lyft's Ridesharing Platform.**

6.      Lyft operates a multi-sided technology platform that, among other things, connects people looking for a driver with people who are willing to drive them on the Lyft App ("App"). Lyft uses computer algorithms to match independent drivers and riders in the same area efficiently.

7.      In its Terms of Service, which every user must accept before using the Lyft App, Lyft describes the platform as follows:

> The Lyft Platform provides a marketplace where, among other things, persons who seek transportation to certain destinations ("Riders") can be matched with transportation options to such destinations. One option for Riders is to request a ride from rideshare drivers who are driving to or through those destinations ("Drivers"). Drivers and Riders are collectively referred to herein as "Users," and the driving services provided by Drivers to Riders shall be referred to herein as "Rideshare Services." As a User, you authorize Lyft to match you with Drivers or Riders based on factors such as your location, the requested pickup location, the estimated time to pickup, your destination, User preferences, driver mode, and platform efficiency, and to cancel an existing match and/or rematch you with a Driver or Rider based on the same considerations. Any

decision by a User to offer or accept Rideshare Services is a
decision made in such User's sole discretion. Each Rideshare
Service provided by a Driver to a Rider shall constitute a separate
agreement between such persons.

8.      Matching of drivers and riders as described in the Terms of Service is done by Lyft's technology platform using a proprietary algorithm.

9.      Lyft's ridesharing marketplace is generally available throughout San Francisco, Alameda, and Contra Costa Counties (the "Bay Area Counties"). Using the App, riders are able to request a ride at any time, 24 hours a day, throughout the Bay Area Counties.

10.     As stated in its Terms of Service, Lyft makes no guarantee that a ride request will be matched with a driver or that a driver will be available or accept the ride request. Lyft also makes no guarantee as to how quickly a driver will arrive. Instead, the amount of time any rider must wait is the direct result of the active supply-and-demand dynamic on the platform at the time and place of the ride request.

11.     Drivers on the Lyft platform typically drive their personally owned or leased vehicles.

12.     In the Bay Area Counties, Lyft makes available the following ride "modes," among others: (a) Standard (its classic rideshare option), (b) XL (larger vehicles for up to 6 riders), (c) Lux (high-end or luxury vehicles), (d) Lux Black (high-end or luxury black car), and (e) Lux Black XL (high-end or luxury black SUV for up to 6 riders). Riders pay more (and in turn, the drivers receive more) when they request XL or Lux modes through the Lyft app than they would pay for a Standard mode.

13.     Lyft offers Standard mode in all regions, but does not offer the other modes in all regions.

14.     Lyft does not recruit drivers by the type of car they drive. Instead, Lyft typically launches a new mode, such as XL or Lux, once it determines that it has a sufficient number of cars already on its platform that meet the requirements for that mode. The Lux mode, for example, is not available in many regions because there is not a sufficient number of vehicles in all regions that qualify as "Lux" vehicles. A driver with a Lux vehicle can still choose to drive on

the Lyft platform; but because Lux mode is not available in the region, riders cannot request a Lux ride.

15.     The primary reason Lyft does not offer Lux mode in all regions is that, absent an adequate supply of cars in that mode on its platform, it will not be able to meet riders' demand reliably. For example, if there are just five drivers with Lux vehicles on the Lyft platform serving an entire region, the likelihood that a rider who wants a Lux vehicle will get one is extremely small. This is because Lyft does not tell its drivers when or where to drive. The result is that, for example, all five drivers may decide to drive only on Tuesdays and Thursdays, leaving no Lux vehicles available the rest of the week. It is also possible that all five drivers are part-time drivers who drive just ten or fewer hours per week on the Lyft platform, leaving the remaining hours without any drivers with Lux vehicles.

16.     The demand for XL, Lux, or similar modes is less in all regions than the demand for Standard mode. Drivers with vehicles that qualify as XL or similar modes may choose to accept rides in other modes. For example, a driver with a vehicle that qualifies as a "Lux Black XL" may accept a Standard, XL, or Lux request, even though each of those modes pays less than "Lux Black XL." The driver may nonetheless choose to accept the lower-paying ride if there is not a demand for Lux Black XL. This is called "cross-dispatching." Drivers may elect to cross-dispatch in lower modes, or elect to dispatch only in a higher mode or modes.

C.     **A Study Of Lyft's Ridesharing Platform In The Bay Area Counties Shows That The Platform Works Best In Densely Populated Areas.**

17.     Lyft offers, among other things, an on-demand ridesharing platform. A platform company is one that connects market participants, and Lyft connects drivers and riders that freely participate in the market. eBay is an example of a platform company that connects buyers and sellers of products. One difference between Lyft and eBay is that on a platform like eBay, consumers can benefit from products that are offered for sale from anywhere in the world. In contrast, for a ridesharing platform like Lyft's, the availability of drivers in one region (*e.g.*, New York City) has no impact on the platform in another region (*e.g.*, San Francisco). The key to the success of Lyft's platform, therefore, is the density of demand and supply available in a specific

geographic region.

18.     On Lyft's ridesharing platform, drivers and riders are free to participate at times and places of their choosing. Lyft does not tell drivers when to drive, or where to drive. Drivers tend to drive most in areas of high demand. This is because they want to maximize earning opportunities. Drivers can increase earnings by increasing their "utilization" – that is, the amount of time spent actively giving rides, in comparison to the amount of time spent waiting for a ride request or driving to pick up a ride.

19.     Lyft's platform tends to work best in densely populated areas. For example, it is generally easier to get a ride more quickly in San Francisco than in the East Bay. Greater density in population tends to generate greater density in demand, which then tends to increase the number of drivers in the area. A higher number of drivers is good for riders because it results in shorter wait times (or "ETAs"), meaning that riders do not have to wait a long time for a driver to arrive.

20.     Balancing the supply and demand is critical to the success of Lyft's platform. If there are too few drivers in comparison to the number of riders, riders will have to wait longer for a ride. Longer ETAs lead to dissatisfaction, leading riders to seek out other options, and ultimately may lead them to stop using the Lyft platform. On the other hand, if there are too many drivers in comparison to the number of riders, driver utilization rates will decrease. Drivers who are no longer able to generate sufficient opportunities will stop driving on the platform.

21.     A review of Lyft's data for Standard mode rides in the Bay Area Counties shows a clear relationship between the number of rides requested in a ZIP code and the average waiting time. In the month of February 2020, every ZIP Code with more than 25,000 Standard mode rides requested had an average waiting time of less than five minutes; in comparison, in ZIP codes with very few rides, the average wait times were significantly longer, often in excess of ten minutes.

22.     Lyft's data for Standard mode also shows that population density in a certain ZIP code is closely related to the number of rides requested, such that the number of rides requested increases with an increase in population density.

23.     Wait time is also correlated with population density: the Lyft platform appears to

1   require a population density of approximately 10,000 people per square mile to generate an

2   expected wait time of five minutes. The data thus confirms that the Lyft platform functions best in

3   areas of high population density.

4       **D.   Wheelchair Accessible Vehicles.**

5       24.     Wheelchair accessible vehicles ("WAVs") are specialized vehicles built to

6   accommodate fixed-frame wheelchairs. WAVs are typically equipped with a wheelchair ramp or

7   lift, a lowered floor, and a securement device to keep the wheelchair in place when the vehicle is

8   in motion.

9       25.     WAVs are not mass-produced for sale at a typical car dealership, but are specially

10  modified to meet the needs or preferences of a particular user. In other words, they are not

11  standard vehicles. For example, some WAVs are designed to accommodate a *driver* who relies on

12  a wheelchair, whereas other WAVs are designed to accommodate a *passenger* who relies on a

13  wheelchair.

14      26.     Because WAVs are specially modified vehicles, they are more expensive than

15  comparable non-WAV vehicles. A new WAV can cost over $50,000, or individuals may pay

16  $20,000 or more to modify a standard van or SUV to include a ramp or lift. WAVs have higher

17  gas mileage than comparable non-WAV vehicles, and have higher insurance costs than

18  comparable non-WAV vehicles.

19      **E.   There Is No Evidence Of An "Organic" Supply Of WAVs In The Bay Area.**

20      27.     Lyft is not aware of any drivers with WAVs on its platform in the Bay Area

21  Counties. Isabella Gerundio, Program Manager of WAV at Lyft, testified that she was aware of

22  only one individual in the Bay Area Counties who approached Lyft to drive their personally-

23  owned WAV on the platform.

24      28.     On the occasions when Lyft has attempted to identify and recruit WAV drivers to

25  drive on its platform in other regions, it has experienced a great deal of difficulty. For example, in

26  August 2020, Lyft sent out a text message to over 26,000 drivers in Philadelphia and Delaware

27  offering $100 incentives for signing up to provide WAV services. Lyft received approximately 30

28  referrals, but none of them owned a WAV.

29.     Plaintiffs did not present any contrary evidence, such as evidence demonstrating that there exists a large number of WAVs in the Bay Area Counties, nor did they present any evidence showing that there are numerous WAV drivers in the Bay Area who want to drive on the Lyft platform.

**F.      In Response To Local Regulations, Lyft Provides WAV Service By Artificially Creating A Supply Of WAVs At Significant Cost.**

30.     In recent years, Lyft has been required by certain local government entities to offer WAV service, also called "Access" mode.

31.     As of January 2021, Lyft offered Access mode in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California.

32.     Lyft offers WAVs in the nine cities listed above because in those cities, there are regulatory requirements or partnerships with a transit agency. Because there is not an "organic," or natural, supply of WAVs on the Lyft platform, the biggest challenge Lyft faces in each city where it provides WAV service is attempting to find an adequate supply of WAVs.

33.     The amount of money Lyft spends in each city on WAV service is directly tied to the regulatory requirements set out by local authorities. Lyft spends the most (at a significant loss) in those cities where regulatory bodies have set ETA requirements. For example, in New York City, Lyft must make sure there is an adequate supply of WAVs available, 24-hours-a-day, seven-days-a-week, to meet strict ETA requirements. A failure to meet these requirements may lead to a loss of Lyft's ability to operate in New York City.

34.     In July 2019, Lyft began offering WAV service in San Francisco by partnering with First Transit, Inc., a third party transportation company that supplies the WAVs and employs and trains WAV drivers. In exchange, Lyft pays First Transit an hourly rate of $58.62 per vehicle during the hours of 7 a.m. to midnight, seven days a week.

35.     First Transit vehicles used on the Lyft platform were not a part of a pre-existing fleet; they were created specifically for use on the Lyft platform. These vehicles are fully

dedicated to providing WAV rides for Lyft. On the Lyft platform, First Transit vehicles are not cross-dispatched, meaning that they do not provide Standard mode or any other mode of ride. This means that if there are just two requests for WAV rides in one day, the First Transit vehicles (and their drivers) are on standby for all the other remaining hours. Lyft takes this business strategy because if these vehicles were cross-dispatched, they may not be available when a WAV is requested, which might negatively impact the customer experience. To ensure that First Transit vehicles are only used for Access mode, Lyft currently does not cross-dispatch in San Francisco.

36.     In the month of February 2020, before the COVID-19 pandemic in the United States, Lyft provided just 125 Access mode rides, or approximately 4.5 rides per day, in San Francisco. Lyft paid First Transit the amount of $115,467 to provide these 125 rides, at the cost of $925 per ride. Riders paid an average of just $15.96 per ride.

37.     There is no other mode on the Lyft platform in which Lyft pays to have drivers sit on standby for a ride request that may never materialize. There is no other mode on the Lyft platform for which Lyft continues to provide vehicles in that mode despite low and inconsistent demand.

38.     Given the high costs associated with the arrangements with companies like First Transit, in 2019, Lyft engaged in a process to reevaluate all of its WAV partners, including First Transit in San Francisco. As part of this process, Lyft issued a Request for Proposal and evaluated the proposals received. None of the responses to the Request for Proposal in San Francisco, however, provided a prospect for better results than First Transit in terms of price, service levels, and regional availability.

39.     Using a vendor like First Transit imposes various operational challenges for Lyft. Some of the operational differences and challenges of using a vendor like First Transit include the inability to automate payments to vendors in the same way it does for drivers on the Lyft platform, and the need to manually onboard and maintain both vehicles and drivers, outside of Lyft's standard onboarding processes. Another significant operational departure from Lyft's ordinary practice is that Lyft strategically and manually positions First Transit vehicles near riders who most frequently request Access mode and actively tracks partner performance such as

acceptance rates so that those riders are assured of a short wait time when they need a ride.

**G.      There Is No Evidence That The "Rental Pilot" Previously Planned For The Bay Area Counties Will Be Effective Or Reasonable.**

40.      Due to the incredibly high cost of providing WAVs through contracts with partners like First Transit, Lyft wanted to see if it would be possible to lower its costs. In New York City, Lyft (as well as Uber and other "for-hire vehicle" companies) had created opportunities for drivers to rent WAVs. Lyft wanted to know if a similar rental program could work outside of New York City, and the only way to know whether or not it could work elsewhere was to try it on a pilot basis.

41.      From late 2019 to March 2020, Lyft planned to launch a WAV rental pilot program in the Bay Area Counties ("Rental Pilot") to test the viability of a model for creating a supply of WAVs on its platform that may be less expensive than entering into an hourly contract with vendors like First Transit. Due to the COVID-19 pandemic, however, the Rental Pilot was put on hold and Lyft has no plan to launch the pilot program today.

**1.      For The Rental Pilot, Lyft Entered Into A Contract To Have Hertz Acquire Vans And Modify Them To Create WAVs In Exchange For Monthly Lease Payments From Lyft.**

42.      For the Rental Pilot, Lyft contracted with Hertz to have Hertz acquire and modify a minimum of 10, and a maximum of 65, Dodge Grand Caravan SE vehicles to create WAVs ("Hertz Rental Agreement"). Under the terms of the Hertz Rental Agreement, Hertz would deliver 10 WAVs initially, and Lyft would have the option to request additional WAVs up to a total of 65.

43.      For each WAV "acquired and made available for rental in the Lyft Rental Program by Hertz," Lyft agreed to "make a monthly payment to Hertz of (a) Nine Hundred Eighty Dollars ($980.00 USD) per month for the first twenty-four (24) months," and "(b) Five Hundred Fifty Dollars ($550.00 USD) per month for each month in which the WAV Vehicle remains in such fleet after the first twenty-four (24) months."

44.      These WAVs were to be offered to interested independent contractor drivers on the platform at the weekly rental rate of $219 per week, or at the same weekly rental rate at which

1    Lyft drivers in certain markets can rent standard vehicles, such as a Toyota Prius, from Hertz.

2            **2.    There Is No Evidence That Lyft Would Have Been Able To Recruit**
3            **The Needed Number Of Drivers For The Rental Pilot.**

4            45.    In setting up the Rental Pilot, one of the biggest questions for Lyft was whether it

5    could find drivers to rent WAVs rather than a smaller, more fuel-efficient standard vehicle, such

6    as a Toyota Prius. Even if Lyft could find such drivers at the outset, Lyft was not sure if it could

7    maintain the drivers driving the WAVs based on the high fuel costs and operational challenges

8    associated with driving WAVs and giving WAV rides.

9            46.    For this reason, Lyft structured the contract with Hertz to make sure that it was

10   obligated to pay for just 10 WAVs at the outset, but would have the right to have Hertz acquire

11   more WAVs based on its ability to recruit and retain drivers.

12           47.    There was no evidence presented that Lyft would have been able to recruit enough

13   drivers for the Rental Pilot. Plaintiffs presented no evidence of persons who expressed any

14   interest in renting and driving a WAV through the Rental Pilot. Plaintiffs also presented no expert

15   testimony showing that there would be a sufficient number of drivers willing to participate in the

16   Rental Pilot. The only evidence Plaintiffs pointed to was anecdotal, that Lyft had implemented a

17   rental program in New York City.

18           48.    In New York City, however, there are unique circumstances that incentivize

19   drivers to rent WAVs. The most significant among them is that under the regulatory structure

20   imposed by the New York City Taxi and Limousine Commission ("NYTLC"), the only new

21   vehicles that have been licensed to operate as a ridesharing vehicle in New York City since 2018

22   are WAVs or electric vehicles. As a result of these unique regulatory restrictions, according to the

23   NYTLC's database, the number of individually owned or leased, wheelchair-accessible, "for-hire

24   vehicles" (a category that includes ridesharing companies like Lyft and Uber) in New York City

25   increased from approximately 550 in 2018 to over 2,500 in 2021.

26           49.    Unlike in New York City, there is no such regulatory structure encouraging or

27   incentivizing drivers to rent or buy WAVs in the Bay Area Counties.

28

DEFENDANT LYFT, INC.'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 3:19-CV-01438-WHA

3. **There Is No Evidence That The Rental Pilot Would Enable Lyft To Meet The Demand For WAVs In the Bay Area Counties.**

50.     Lyft's other concern with the Rental Pilot was whether the pilot would allow Lyft to meet the demand for Access mode in the Bay Area Counties.

51.     Even if Lyft could recruit and retain drivers to participate in the Rental Pilot, these drivers, unlike dedicated First Transit drivers, would be able to accept Standard and XL mode ride requests. They would not be limited to driving in Access mode only, because if they were so limited, they would not have enough earnings opportunities to cover the weekly rental cost for the vehicle. Moreover, Lyft does not typically limit drivers to driving in particular modes if the vehicle qualifies for providing rides in more than one mode and those modes are available in a given market.

52.     The Rental Pilot drivers would thus be "cross-dispatched," meaning that they can accept Standard and XL ride requests, in addition to Access mode ride requests. In addition, like other independent contractor drivers on the Lyft platform, drivers in the Rental Pilot would set their own hours and drive where they want to drive. Lyft thus does not and cannot guarantee that the drivers participating in the Rental Pilot would be available to provide Access mode rides to riders needing a WAV when they wanted them.

53.     While cross-dispatching is good for drivers because it reduces their idle time and increases their earnings potential, Lyft's experience is that this may negatively impact riders who need Access mode rides.

54.     The reason cross-dispatching will impact Access mode riders is explained by the supply-and-demand nature of the Lyft platform. Because there are so few Access mode ride requests, Lyft predicts that potential drivers in the Rental Pilot will use their WAVs to accept Standard and XL rides. This means that if a rider requests an Access mode ride, the chances are that the drivers in the Rental Pilot will be engaged in giving a Standard or XL ride, and thus unavailable to accept the rider's Access mode request. This, of course, assumes the Rental Pilot driver happens to be driving during the time of the rider's request in the area near that rider, rather than in a different location elsewhere in the 1,500 square mile area at issue.

55.     A recent experiment Lyft conducted in Los Angeles confirmed the adverse impact of cross-dispatching on availability of WAVs for Access mode. In Los Angeles, as in San Francisco, Lyft offers Access mode through a partnership with First Transit. In June 2020, Lyft designated just one of six First Transit vehicles in Los Angeles to be "cross-dispatched," meaning that a single First Transit vehicle could be used to service non-WAV ride requests. Until this experiment, all First Transit vehicles in Los Angeles were fully-dedicated to fulfilling Access mode requests only and not permitted to accept other ride modes.

56.     What Lyft learned was that while cross-dispatching was good for Lyft, it significantly and adversely impacted the availability of the First Transit vehicles to fulfill Access mode ride requests. While just one of six First Transit vehicles was cross-dispatched, the outcome was a substantial drop in the availability of vehicles to satisfy the demand for Access mode rides, leading to lower acceptance rates by drivers for Access mode ride requests. For riders, a lower availability of vehicles and lower acceptance rates mean that *reliability* is reduced. In other words, a rider is less likely to be able to get a ride when she wants one. As a result of this finding, Lyft stopped the cross-dispatching experiment in Los Angeles.

57.     Based on what it learned in Los Angeles, Lyft does not believe that a fleet of an unknown number of cross-dispatched WAVs, driven by independent contractor drivers who set their own hours and decide where they want to drive, would be able to produce outcomes in Access mode that is in any way reliable, never mind comparable to Standard mode.

      **4.     There Is No Evidence That The Rental Pilot Would Be Effective In Delivering WAV Service That Is On Par With Standard Mode On The Lyft Platform Because 65 WAVs Would Likely Fall Far Short Of The Total Number Of WAVs Needed On The Platform.**

58.     The only evidence as to the number of WAVs that would be needed to deliver comparable wait times in Access mode throughout the Bay Area Counties was presented by Lyft's expert, Dr. Marc Rysman. Dr. Rysman analyzed Lyft's ride data for the month of February 2020 and computed the average wait time for Lyft's "Standard" mode in the three Bay Area Counties.

59.     Rounding up to be conservative, Dr. Rysman looked at how many drivers would

be needed to generate a 5 minute wait time in "Access" mode. Dr. Rysman opined there would have to be approximately 1,300 drivers driving WAVs on the platform every hour of every day. Dr. Rysman testified that he found no evidence suggesting there would be nearly enough WAVs in the Bay Area Counties to meet the target of 1,300 WAV drivers on the Lyft platform every hour of every day.

60.     Since filing their initial pleadings, Plaintiffs have changed their demand and said they do not necessarily require 5 minute times or wait times that are exactly the same as standard wait times. However, they have presented no expert or other testimony demonstrating the number of drivers with WAVs who would be needed to deliver the wait times they want (they have not even identified what specific wait times they want).

### 5.     The Cost Of The Rental Pilot Is Significant.

61.     Lyft estimates that the cost of the Rental Pilot with 65 WAVs would be at least $1.76 million annually. This includes $765,000 in annual lease costs to Lyft for the 65 WAVs, plus approximately $1 million in driver incentives. As discussed above, there is no evidence that expending these costs would yield effective results. Indeed, as Dr. Rysman opined, providing 5-minute wait times for WAVs would require 1,300 WAVs on the Lyft platform every hour.

### H.     There Is No Evidence That A "Combination" Of Solutions Will Be Effective Or Reasonable In The Bay Area Counties.

62.     Plaintiffs propose a "combination" of methods for providing Access mode in the Bay Area Counties.

63.     Plaintiffs offer no parameters for what this combination might look like, or how much it might cost. They do not say where the drivers would come from, where the supply of WAVs would be found, or how many WAVs would be needed to provide the level of wait times or reliability they now desire throughout the Bay Area Counties.

64.     While Plaintiffs point generally to New York City, where Lyft has implemented Access mode through a combination of methods, the following fundamental differences exist between New York City and the Bay Area Counties:

a.     New York City is approximately one-fifth the size of the Bay Area

1    Counties: 302 square miles, in contrast to 1,500 square miles.[1]

2    b.    New York City is the most densely populated large city in the United

3    States, with a population density over ten times that of the Bay Area

4    Counties: 27,000 people per square mile, compared to approximately 2,500

5    per square mile.[2]

6    c.    According to data from the New York TLC, there are currently over 2,500

7    drivers with individually owned or leased WAVs in New York City. There

8    is no evidence that there exists such a high number of individual WAV

9    drivers who want to drive for Lyft or other ridesharing platforms in the Bay

10    Area Counties.

## II.    CONCLUSIONS OF LAW

### A.    Plaintiffs' Claim And Requested Remedy.

65.    In this lawsuit brought under Title III of the Americans with Disabilities Act ("ADA"), Plaintiffs seek declaratory relief "stating that Lyft is discriminating in violation of Section 12184 of the ADA by failing to provide wheelchair accessible vehicles in Alameda, Contra Costa, and San Francisco Counties, and that Lyft can reasonably modify its policies, practices, and procedures to provide such service through a combination of making WAVs available for rental through contracts with rental car companies, contracts with third party providers of accessible transportation, and by incentivizing Lyft drivers to provide WAV rides." *See* Joint Pretrial Order, II.A.  To remedy the alleged discrimination, Plaintiffs seek a permanent injunction requiring "Lyft to provide wheelchair accessible service in Alameda, Contra Costa, and San Francisco Counties with benchmarks for reasonable wait times no longer than those set by the California Public Utilities Commission to qualify companies for exemption from payment

---

[1] Census Quick Facts, *New York City, New York; Alameda County, California; Contra Costa County, California; San Francisco County, California*, available at: https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork,alamedacountycalifornia,contracostacountycalifornia,sanfranciscocountycalifornia,US/PST045219 (accessed on February 13, 2021).

[2] *See id.* The population density for the Bay Area Counties was estimated by summing the total estimated populations of the three counties and dividing by the land area of the region.

into the Access Fund, as well as benchmarks for reasonable reliability." *Id.*

66. Under the ADA, Lyft does not have a stand-alone obligation to provide wheelchair accessible vehicles. While Title III of the Americans with Disabilities Act ("ADA") prescribes the general rule that "[n]o individual shall be discriminated against on the basis of his disability in the full and equal enjoyment of the goods, services, privileges, advantages, or accommodations" of a private entity, 42 U.S.C. § 12182(a), the Ninth Circuit has held that "[t]he ordinary meaning of this language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000).

67. That the ADA does not regulate the content of a private entity's goods or services makes sense: "[h]ad Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards." *Doe v. Mut. Of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999).

68. Consistent with its judgment that private entities need not provide different goods or services, Congress also specifically exempted private entities from having to purchase or lease WAVs. 42 U.S.C. § 12184(b)(3). Thus, "a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA." *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006); *accord Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 74 (2d Cir. 2012) ("the ADA, as a whole, does not require the New York City taxi industry to provide accessible taxis"); *Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*, 2018 U.S. Dist. LEXIS 65524, *14, 2018 WL 65524 (S.D.N.Y. Apr. 18, 2018) (under ADA Title III, purchasing or leasing an automobile or a van with a seating capacity of less than 8 passengers does not constitute discrimination).

69. Because the ADA does not require Lyft to purchase or lease WAVs, Plaintiffs have alleged a cause of action for discrimination based on Lyft's alleged "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are

necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A). Consistent with the Ninth Circuit's holding in *Weyer*, the plain meaning of this provision is that Lyft must make reasonable modifications in *how* it offers its services (*i.e.*, "policies, practices, or procedures") when such modifications are necessary to allow Plaintiffs access to *what* it provides (*i.e.*, "such goods, services," etc.).

70.     To prevail on their claim of discrimination, Plaintiffs must prove that: (1) Lyft employed a discriminatory policy or practice; and (2) Lyft discriminated against Plaintiffs based on their disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate plaintiffs' disability. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674, 683 n.38 (2001); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004). *See also Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1036 (9th Cir 2020) (plaintiff must prove that a modification was requested and that the requested modification was reasonable), *citing Lentini v. California Center for the Arts*, 370 F.3d 837, 845 (9th Cir. 2004).

71.     The burden is on Plaintiffs to prove every essential element of their claim. *Fortyune*, 364 F.3d at 1082.

**B.      Plaintiffs Have The Burden Of Persuasion On Their Claim Of Discrimination.**

72.     At the trial stage, the burden-shifting framework that generally applies to ADA and other civil rights claims at the summary judgment stage does not apply. While, at the summary judgment stage, the plaintiff can shift the burden to the defendant by producing evidence of an accommodation or modification that "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases," at the trial stage, this burden-shifting framework falls away. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1101-02 (9th Cir. 2018); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855-56 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003).[3] At trial, Plaintiffs have the ultimate

---

[3] *Snapp*, 889 F.3d 1088, and *Costa*, 299 F.3d 838, are both ADA Title I cases. However, the Ninth Circuit has construed various cases arising under different ADA provisions, including employment discrimination cases arising under ADA Title I, architectural barrier cases arising

burden of persuasion as to their claim of discrimination and must prove, by a preponderance of the evidence, that Lyft discriminated against them based on their disability by failing to make a requested reasonable modification in policies, practices, or procedures that was necessary to accommodate their disability. *Snapp*, 889 F.3d at 1101-02.

73.   Plaintiffs' burden, therefore, requires more than mere speculation or conjecture. Instead, Plaintiffs must come forward with evidence demonstrating: (a) that they have requested a particular modification to a policy, practice or procedure, (b) that the modification being requested is reasonable in cost, and (c) that the proposed modification will effectively deliver the level of WAV service Plaintiffs want throughout the Bay Area Counties. *See*, *e.g.*, *Snapp*, 889 F.3d at 1099-1101 (at trial the employee has the burden to prove by a preponderance of the evidence that the employer could have made a reasonable accommodation); *Wong v. Regents of the Univ. Of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (a plaintiff bears the burden of producing evidence that a reasonable modification exists). *Cf. Lopez*, 974 F.3d at 1036-38 (even under the reduced burden applicable at the summary judgment stage, the plaintiff failed to meet his burden by failing to present any evidence of the cost of the architectural remediation or why the cost does not exceed the potential benefits).

74.   If Plaintiffs can satisfy their burden of persuasion, Lyft must make the modification requested unless it "can demonstrate that making such modifications would fundamentally alter the nature of [its] goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii); *Lopez*, 974 F.3d at 1036, *citing Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1010 (9th Cir. 2017). Lyft bears the burden of persuasion as to its affirmative defense of fundamental alteration. *See Snapp*, 889 F.3d at 1101.

**C.    A "Reasonable Modification" Is One That Effectively Accommodates The Individual With Disabilities And Can Be Made Without Much Difficulty Or Expense.**

75.   A private entity is not required to make "any and all possible accommodations that would provide full and equal access" to individuals with disabilities; rather, they need only make

---

under ADA Title III, and reasonable modification cases arising under ADA Title III, consistently to apply the same burden-shifting analysis in those cases. *See Lopez*, 974 F.3d 1036-37.

modifications that are reasonable. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Fortyune*, 364 F.3d at 1083; *PGA Tour*, 532 U.S. at 688, *citing* S. Rep. No. 101-116, at 61; H.R. Rep. No. 101-485, pt. 2, at 102, U.S. Code Cong. & Admin. News 1990, pt. 2, at pp. 303, 385 (public accommodations "are required to make decisions based on facts applicable to individuals"). *See also US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (the word accommodation conveys the need for effectiveness, as an ineffective modification will not accommodate a disabled individual). Proving "reasonableness," therefore, is an element of Plaintiffs' claim.

76.     "Reasonableness" is separate from undue hardship, which is an affirmative defense that is available in cases involving the failure to make reasonable accommodations in employment, *see* 42 U.S.C. § 12112(b)(5)(A), and in actions involving a private entity's failure to provide auxiliary aids and services, *id.*, § 12182(b)(2)(A)(iii).

77.     The U.S. Supreme Court agrees that "reasonable," in ordinary English, is *not* the same as "undue hardship." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). In ordinary English, "reasonable" means "not extreme or excessive," "moderate," or "inexpensive." *See* https://www.merriam-webster.com/dictionary/reasonable (last visited February 8, 2021); *Bostock v. Clayton Cty.*, ___ U.S. ___, 140 S. Ct. 1731, 1738 (2020) (statutory language should be interpreted in accordance with the "ordinary public meaning of its terms"). *See also Karczewski*, 862 F.3d at 1011 (holding, at the pleading stage, that plaintiff had adequately alleged a reasonable modification based on his plausible allegations that hand controls are inexpensive, easy to obtain, and can be installed by defendant "without much difficulty or expense"); *Celano v. Marriott Int'l, Inc.*, 2008 U.S. Dist. LEXIS 6172, *37, *41, No. C 05-4004-PJH (N.D. Cal., January 28, 2008) (in a case involving a proposed modification that imposed only a "minimal" financial cost on the defendant, observing that "[w]ithin reason, a public accommodation may be required to modify its policies, practices, or procedures to mitigate any disparate impact upon persons with

disabilities").

78.     Regulations promulgated by the Department of Justice ("DOJ"), the entity entrusted by Congress to issue regulations carrying out the non-transportation provisions of Title III of the ADA (*see* 42 U.S.C. § 12186(b)), confirm that a reasonable modification is one that is modest in scope. *See generally* 28 C.F.R. § 36.302. For example, the regulations contemplate that an entity could, as a reasonable modification of a policy or practice, refer an individual with a disability to another entity, if that individual is seeking services outside of the referring entity's area of specialization. *Id.*, § 36.302(b)(1). The regulations also contemplate that a public accommodation shall modify its policies, practices, or procedures to permit the use of a service animal (*id.*, § 36.302(c)(1)), that a store with check-out aisles shall keep open an adequate number of accessible check-out aisles during store hours (*id.*, § 36.302(d)), that hotels should hold accessible guest rooms for use by individuals with disabilities until all other guest rooms of that type have been rented (*id.*, § 36.302(e)(1)(iii)), and that a company that sells events tickets shall modify its policies to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating (*id.*, § 36.302(f)(1)(ii)).

79.     The DOJ further confirmed the modest nature of modifications required of private entities, by affirming that the regulations do not require a private entity to provide its customers, clients, or participants with personal devices, such as wheelchairs (28 C.F.R. § 36.306), or to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities (*id.*, § 36.307).

80.     Regulations issued by the Department of Transportation ("DOT"), the entity charged by Congress with promulgating regulations to carry out the transportation provisions of Title III (*see* 42 U.S.C. § 12186(a)), are in accord. The regulations specifically state that an entity shall not "deny to any individual with a disability the opportunity to use the entity's transportation service for the general public, *if the individual is capable of using that service*," 49 C.F.R. § 37.5(b) (emphasis added), and specifically exempts private entities providing taxi service from having to purchase or lease accessible vehicles. *Id.*, § 37.29(b).

81.     As for "reasonable modifications," examples provided by the DOT make clear that

the modifications are limited to things such as a driver permitting an individual with a disability to board the bus at a location where there is sufficient room for a lift to deploy in the event the bus stop is blocked by snow, or allowing an individual with diabetes to eat or drink aboard a vehicle. 49 C.F.R. Part 37, Appendix E, Examples 1 and 6. The DOT specifies, however, that a passenger's request for special equipment (*e.g.*, the installation of specific hand rails), for a dedicated vehicle so that a rider can avoid certain odors, or for an exclusive paratransit trip, constitute fundamental alterations. *Id.*, Examples 9 and 10. Similarly, requests for service outside the service area or outside regular operating hours may be denied as fundamental alterations under DOT guidance. *Id.*, Example 11.

82.     These regulations also confirm that a proposed modification may prove "unreasonable" based on more than just cost alone. *US Airways*, 535 U.S. at 400-401 (under ADA Title I, demand for an effective accommodation may prove unreasonable because of its impact on fellow employees, even if the impact on the business is minimal).

83.     Based on a plain reading of the statutory language, therefore, the inquiry is whether there exists a moderate, or inexpensive, modification in policies, practices, or procedures, that will deliver WAV service on Lyft's ridesharing platform to Plaintiffs.

**D.      Plaintiffs Have Failed To Meet Their Burden Of Proving A "Reasonable Modification" By Failing To Identify How A Combination Of Methods Could Be Implemented In The Bay Area To Deliver The Outcome They Want.**

84.     Plaintiffs claim that Lyft can reasonably modify its policies, practices, and procedures "through a combination of making WAVs available for rental through contracts with rental car companies, contracts with third party providers of accessible transportation, and by incentivizing Lyft drivers to provide WAV rides." But Plaintiffs have failed to meet their burden of proving that such a modification exists.

85.     Through stipulated facts and witness testimony, including from Lyft witnesses, Plaintiffs have established that Lyft offers some level of WAV service in a number of cities through contracts with third party transportation companies, by offering WAV rental opportunities to drivers, and by incentivizing drivers to provide WAV rides. What Plaintiffs have not offered evidence of, however, is *how* such a combination of these methods would be

implemented in the Bay Area Counties to offer them the level of WAV service they want in the Bay Area Counties specifically.

86.    Indeed, Plaintiffs have submitted no evidence as to what such a "combination" may look like. Among the unanswered questions are:

    a.  How many WAVs in all would be required throughout the 1,500 square mile area to achieve the wait times and "benchmarks of reliability" that Plaintiffs want;

    b.  Of the total number of WAVs required, how many would have to be contracted from a third-party company like First Transit;

    c.  Whether First Transit or another similar company already has a fleet of WAVs at its disposal, or whether Lyft will have to pay to create the WAVs to be deployed on its platform;

    d.  How many more WAVs would have to be supplied through a rental model;

    e.  Whether, in order to arrange the rental of WAVs to drivers, Lyft will have to enter into lease arrangements with one or more rental car companies;

    f.  Whether Lyft will be able to recruit drivers to rent and drive these WAVs on the Lyft platform at all or in sufficient numbers to provide effective service to Plaintiffs; and

    g.  Whether this model anticipates a certain number of drivers who would bring their personally owned or leased WAVs onto the Lyft platform, and if so, how many such drivers can be found in the Bay Area Counties.

87.    Based on these unanswered questions, there is no way to determine how much such a combination of methods would cost.

88.    At the trial stage, Plaintiffs cannot rely on general, high-level suggestions for modifications, but must come forward with facts to show that there exists a set of modifications that are reasonable and effective. *See Snapp*, 889 F.3d at 1101-02; *Fortyune*, 364 F.3d at 1082 (the burden is on the plaintiff to prove every essential element of her claim). The failure to identify the specific modification being requested at this stage is fatal to Plaintiffs' claim, because

1   the essence of the claim alleged by Plaintiffs is that Lyft has failed to make reasonable

2   modifications that they requested. If Plaintiffs cannot describe what such modifications are, Lyft

3   cannot be liable for discrimination. *See Galvez v. Auto. Club of S. Cal.*, No. SA CV 16-0887-

4   DOC (KESx), 2017 U.S. Dist. LEXIS 214650, at *17 (C.D. Cal. May 5, 2017) (granting

5   summary judgment to defendant based on plaintiff's failure to identify the modification

6   requested).

7          **E.      Making The Modifications Requested By Plaintiffs Would Fundamentally
                     Alter The Supply-And-Demand Nature Of Lyft's Ridesharing Platform By
8                    Requiring Lyft To Guarantee Service Availability And ETAs.**

9          89.     Lyft asserts that even if a reasonable modification could be deemed to exist, it is

10  not required to make the modification because "making such modifications would fundamentally

11  alter the nature of [its] goods, services, facilities, privileges, advantages, or accommodations." 42

12  U.S.C. § 12182(b)(2)(A)(ii).

13         90.     Congress did not include in the ADA a definition of "fundamental alteration."

14  Fundamental alteration is a different affirmative defense than undue burden, as demonstrated by

15  Section 12182(b)(2)(A)(iii), in which Congress made available both affirmative defenses of

16  fundamental alteration and undue burden. Under DOT regulations, requests for special

17  equipment, dedicated vehicles, or service outside regular hours constitute fundamental alterations.

18  *See* 49 C.F.R. Part 37, Appendix E, Examples 9-11.

19         91.     The leading case on fundamental alteration under ADA Title III is *PGA Tour, Inc.

20  v. Martin*, 532 U.S. 661 (2001). In *PGA Tour*, petitioner, a gifted athlete with a disability, sought

21  a change to the rules of competition for golf. In addressing the respondent's affirmative defense

22  of fundamental alteration, the Supreme Court observed that a modification of golf tournaments

23  might constitute fundamental alterations in two ways. First, a modification might alter "an

24  essential aspect of the game of golf" such that it affects all competitors equally (*e.g.*, by changing

25  the diameter of the hole from three to six inches). Second, a less significant change might have

26  just a "peripheral impact" on the game but nonetheless fundamentally alter the character of the

27  game by, for example, changing the rules to give an individual competitor an advantage over

28  other golfers. 532 U.S. at 682-83.

92.     Here, Plaintiffs ask Lyft to fundamentally alter the character of Lyft's consumer ridesharing platform in order to provide a specially tailored service for their benefit.

93.     Lyft offers a ridesharing platform that connects drivers and riders. There is no evidence that a supply of WAVs exists on the Lyft platform (or even in the Bay Area at large) to ensure availability of service by WAVs, nor is there evidence of a demand for WAVs to generate a supply of WAVs on the platform. Because there is no natural supply and demand for WAVs in sufficient numbers to sustain a ridesharing platform, Plaintiffs ask instead that Lyft guarantee them certain wait times and "benchmarks of reliability." But what Plaintiffs ask Lyft to provide is not something that Lyft offers to other riders.

94.     Every driver and rider who uses the platform must accept Lyft's Terms of Service. Plaintiffs in this case have not accepted Lyft's Terms of Service because they never downloaded the Lyft App. Lyft does not guarantee riders, either in the Terms of Service or otherwise, that they will be able to get a ride when they want it or where they want it, nor does Lyft guarantee a certain ETA. That riders in Standard mode may nonetheless be able to get rides in under 5 minutes is a function of active supply and demand in the Bay Area Counties.

95.     The guidance of the Supreme Court in *PGA Tour* is that "if the proposed modification changes the 'fundamental character,' 'essential attribute,' or 'rule' of participation, then it is a 'fundamental alteration.'" *A.L. v. Walt Disney Parks & Resorts US, Inc.*, No. 6:14-cv-1544-Orl-22GJK, 2020 U.S. Dist. LEXIS 109205, at *53 (M.D. Fla. June 22, 2020), *citing PGA Tour*, 532 U.S. at 683 n. 38. The "fundamental character" and the "essential attribute" of Lyft's ridesharing platform is that it is a platform premised on supply-and-demand. Requiring Lyft to take steps to create a supply that does not exist, in order to guarantee a certain ETA that is wholly untethered to the supply of, and demand for, WAVs on the platform, is a fundamental alteration. Indeed, requiring Lyft to guarantee a set "ETA" is alone a fundamental alteration.

96.     A finding of fundamental alteration here is consistent with the rulings of the Ninth Circuit Court of Appeal, which has repeatedly held that private entities need not provide different goods or services for individuals with disabilities. *Weyer*, 198 F.3d at 1115. "Th[e] [ADA] does not require provision of different goods or services, just nondiscriminatory enjoyment of those

that are provided." *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 671 (9th Cir. 2010). *See also A.L.*, 2020 U.S. Dist. LEXIS 109205, at *49 ("Applied to a theme park, the business is not required to create a service or access designed exclusively for cognitively-disabled individuals, such as adding an individual 'disabled-only' ride or an exclusive 'disabled-only' entrance line to a ride."); *Schulz v. Bay Area Motivate, LLC*, No. 19-cv-02134-MMC, 2019 U.S. Dist. LEXIS 209256, at *19 (N.D. Cal. Dec. 3, 2019) (provider of rental bikes need not acquire accessible bicycles); *Castelan v. Universal Studios Inc.*, No. CV 12-05481 BRO (AGRx), 2014 U.S. Dist. LEXIS 9092, at *18 (C.D. Cal. Jan. 10, 2014) (no duty under ADA to design a specialized ride).

97.    In addition, a finding of fundamental alteration is consistent with Congress's judgment that private entities should not be burdened with the cost of purchasing or leasing WAVs, 42 U.S.C. § 12184(b)(3), or with the cost of retrofitting vehicles to make them accessible, *id.*, § 12182(b)(2)(A)(iv).

98.    As the DOT has confirmed, "Under the ADA, *no private entity is required to purchase an accessible automobile.*" 49 C.F.R. Pt. 37, App'x D (emphasis added). As noted by the Tenth Circuit, "a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA." *Toomer*, 443 F.3d at 1195; *Livery Round Table*, 2018 U.S. Dist. LEXIS 65524, *14 (under ADA Title III, purchasing or leasing an automobile, a van with a seating capacity of less than 8 passengers does not constitute discrimination).

99.    That Lyft voluntarily offers WAV service in certain cities by creating a supply of WAVs does not change the analysis. In enacting the ADA, Congress made clear state and local authorities may enact laws that provide greater protection than that offered under the ADA. *See* 42 U.S.C. § 12201(b). Thus, while Lyft may have adopted voluntary measures in response to local regulations to create a supply of WAVs or to meet certain wait time requirements, Lyft's voluntary conduct to meet local regulations does modify its obligations under the ADA.

100.    Indeed, it would be bad public policy and contrary to the interests of individuals with disabilities to hold that voluntary actions taken by a private entity in response to local regulations will apply in other regions or will be required under the ADA. Such a holding would

1    create perverse incentives, by discouraging or punishing private entities from taking voluntary

2    actions in response to local laws that are intended to create greater options for individuals with

3    disabilities. *See O'Byrne v. Reed*, No. CV 09-08406 DMG (DTBx), 2010 U.S. Dist. LEXIS

4    153617, at *16 (C.D. Cal. Feb. 5, 2010) (requiring entities to continue voluntary programs that go

5    beyond a statutory duty would create a "perverse incentive" to discourage such activities).

6        101.   The ADA does not require Lyft to take the steps being requested by Plaintiffs in

7    this action to create WAV service in the Bay Area Counties.

8    ### III.    CONCLUSION

9        For all of the reasons stated above, Lyft respectfully requests that the Court adopt the

10   above findings of fact and conclusions of law.

11

12   Dated:  March 10, 2021              FOLGER LEVIN LLP

13                           */s/ Jiyun Cameron Lee*

14                           Jiyun Cameron Lee
                        Attorneys for Defendant
                        LYFT, INC.

15

16

17   1093623.10

18

19

20

21

22

23

24

25

26

27

28