DISABILITY RIGHTS ADVOCATES
Stuart Seaborn (Bar No. 198590)
Michelle Iorio (Bar No. 298252)
Melissa Riess (Bar No. 295959)
Rebecca Serbin (NY State Bar No. 5273255)*
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
miorio@dralegal.org
mriess@dralegal.org
rserbin@dralegal.org

Attorneys for Plaintiffs
*Admitted Pro Hac Vice

FOLGER LEVIN LLP
Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
199 Fremont Street, 20th Floor
San Francisco, CA 94105
Telephone: 415.625.1050
Facsimile: 415.625.1091

Attorneys for Defendant LYFT, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, SASCHA BITTNER, an individual, TARA AYRES, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation;<br><br>Plaintiffs,<br><br>v.<br><br>LYFT, Inc., a Delaware corporation;<br><br>Defendant. | Case No. 3:19-CV-01438-WHA<br><br>**JOINT PROPOSED FINAL PRETRIAL ORDER**<br><br>Judge: Hon. William Alsup<br>Final Pre-Trial Conference: March 17, 2021<br>Courtroom: 12 – 19th Floor |

Following is the Joint Proposed Final Pretrial Order to be considered at the Final Pretrial Conference in this case set for March 17, 2021 at 2:00 PM.

**I.     CLAIMS AND DEFENSES WHICH REMAIN TO BE DECIDED**

    **A.     <u>Plaintiffs' Brief Description of Claims and Defenses</u>**

Lyft operates an on-demand, app-based transportation service that since 2012 has become a major source of transit in the Bay Area and around the country. Lyft has used a wide variety of tools, from technology to marketing to partnerships with rental car companies, to build a transportation service on which passengers can rely at any time of day or night, anywhere in San Francisco, Alameda, and Contra Costa Counties (the "Bay Area Counties"). A Lyft passenger in the Bay Area Counties could expect to wait a few minutes for their standard Lyft ride to arrive. On the other hand, Lyft offered no wheelchair accessible vehicle ("WAV") service in the Bay Area Counties at the time this case was filed. See *infra* Stipulated Fact No. 14. Three months after Plaintiffs filed this action, Lyft launched a limited, five-vehicle pilot program offering WAV service only to passengers in San Francisco with limited service hours. *Id.* This pilot program has been cut back—to two vehicles at the close of discovery, and Lyft continues to offer no WAV service whatsoever in Alameda and Contra Costa Counties. ECF No. 108-3 (Declaration of I. Gerundio) at ¶ 17; Stip. Fact No. 17.

At summary judgment this Court found that Plaintiffs, who are persons with disabilities under Title III of the ADA, had demonstrated that Lyft, an entity covered by the ADA's Title III, had a discriminatory policy, practice or procedure. ECF No. 92 (MSJ Order) at 4–5. The Court also found that Plaintiffs have standing to challenge this discrimination, and that Plaintiffs have identified possible policies, practices or procedures—i.e., proposed reasonable modifications—that would address Lyft's discriminatory policy. *Id.* at 5, 11–12.[1] These proposed modifications include the possibility of Lyft entering into a contractual agreement with a rental car provider to make WAVs available to drivers ("rental model"), or a combination of the rental model,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[1] Despite Lyft's attempt to relitigate issues decided at summary judgment, the Court found that Plaintiffs did propose reasonable modifications and that the proposal was sufficient to satisfy Rule 65 redressability/specificity requirements. *See* ECF No. 92 (MSJ Order) at 4–5, 11–12.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  partnerships with third party WAV providers, and incentives to encourage drivers to provide

2  WAV rides. ECF No. 92 (MSJ Order) at 5. Lyft has implemented some form of these proposed

3  modifications in other cities and had plans to provide the rental model in the Bay Area. *Id.* at 7–

4  9.

5  Thus, because the Court established that Lyft's failure to make reasonable modifications

6  to its policies, practices and procedures necessary to provide wheelchair accessible service in the

7  three Bay Area counties is discrimination in violation of the ADA, the only issue left to be tried

8  is whether the proposed modifications are reasonable. Under Title III of the ADA, Plaintiff must

9  first demonstrate that requested modification are reasonable. *See Lopez v. Catalina Channel*

10 *Express, Inc.*, 974 F.3d 1030, 1036 (9th Cir. 2020) (citing *Lentini v. Cal.Center for the Arts*, 370

11 F.3d 837, 845 (9th Cir. 2004) and *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052,

12 1059 (5th Cir. 1997)). This is a light burden. Plaintiffs need only show that the requested

13 modifications are reasonable in the general sense or "in the run of cases." *See Lopez*, 974 F.3d at

14 1036 (recognizing that Ninth Circuit adopts the burden shifting analysis for reasonable

15 modification cases adopted by the Fifth Circuit in *Johnson*); *Johnson*, 116 F.3d at 1058 (a

16 plaintiff meets the burden of proof on reasonableness putting forth evidence of an

17 accommodation that is generally reasonable, or reasonable "in the run of cases."). Once

18 Plaintiffs have done so, the ultimate burden of persuasion shifts to Lyft to prove that the

19 requested modifications would fundamentally alter Lyft's business. *See Lopez*, 974 F.3d at

20 1036.[2] At summary judgment, this Court rejected Lyft's argument that providing WAV service

21 through the methods proposed would fundamentally alter Lyft's business, reminding Lyft that

22 the only way it could meet its burden here is to prove that providing Plaintiffs' requested

---

[2] Defendant's attempt to import the burden shifting approach discussed in a failure to engage in the interactive process/employment claim under Title I of the ADA (*see Snapp v. United Transp. Union*, 889 F.3d 1088, 1099–1101 (9th Cir. 2018) has absolutely no basis here where Plaintiffs make reasonable modification claims under Title III. Nor have Defendants provided any support whatsoever for their assertion that burdens identified by the Ninth Circuit for addressing reasonable modification claims under Title III somehow disappear at trial. Plaintiffs do not seek to avoid meeting their burden on the reasonableness of the modifications sought. The evidence will demonstrate that they have more than met that burden, which requires a showing that the proposed modifications are reasonable in the run of cases.

modifications would be cost prohibitive. ECF No. 92 (MSJ Order) at 9–10.

Thus, the only issues remaining to be tried are whether Plaintiffs have shown that the modifications they seek are reasonable in the run of cases, and, if so, whether Lyft has met its ultimate burden of persuading the Court that such modifications are cost prohibitive.

### B. Defendant's Brief Description Of Claims And Defenses

Lyft operates a multi-sided technology platform that, among other things, connects people looking for a driver with people who are willing to drive them. Lyft uses computer algorithms to match independent drivers and riders in the same area efficiently, like "brokers" do in many industries. Lyft's platform is a digital marketplace; drivers and riders are free to participate at times and places of their choosing. Lyft does not own or lease any vehicles used for ridesharing on the Lyft platform, nor does it set any schedules or establish any routes for the drivers. Like other platform companies, the key to its business model and success is the density of supply and demand. Unlike some platform companies, however, Lyft's success depends on the density of supply and demand in specific geographic areas.

On Lyft's ridesharing platform, Lyft does not guarantee any particular wait time to riders, nor does it guarantee that a ride or a particular vehicle will be available. Instead, the determination of how quickly or reliably a rider may be able to obtain a type of ride of her choosing depends on the supply of drivers near her location who are available to meet her ride request when she makes the request.

In this lawsuit, Plaintiffs claim that Lyft engages in discrimination by failing to provide WAV service on its platform. Importantly, Plaintiffs *do not claim that there exists a ready supply of WAVs on or off the Lyft platform* to provide the on-demand ridesharing service they want. Instead, Plaintiffs' theory is that regardless of the existence of supply or demand for WAVs, the ADA obligates Lyft to ensure that they can request a WAV when they want it, where they want it, and how they want it, within certain guaranteed wait times.[3]

---

[3] Under Ninth Circuit authority, the ADA does not require Lyft to guarantee a service for Plaintiffs by creating an adequate supply of WAVs. *See Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000). "Th[e] [ADA] does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."

The statutory basis for Plaintiffs' claim is 42 U.S.C. § 12182(b)(2)(A)(ii), which defines discrimination to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." In the Court's Order re Motions for Summary Judgment [Dkt. 92] ("MSJ Order"), the Court rejected the incentive and partner models suggested by Plaintiffs, but left open for exploration at trial a "rental" model or some combination of methods as "reasonable modifications."

The focus of the trial, therefore, is whether Plaintiffs can prove that Lyft failed to make reasonable modifications in policies, practices, or procedures that would be effective in delivering the WAV service they want.[4] The first step for Plaintiffs is to identify the particular modification(s) in policies, practices, or procedures that they claim will deliver the "wait times" and "benchmarks of reliability" they seek throughout the three Bay Area Counties. The need to identify the requested modification at issue was made clear in the Court's MSJ Order: "without more specific evidence regarding, for example, how a different combination of these proposed methods would be implemented in the Bay Area, the supply of WAV drivers that could be deployed, or the financial costs of doing so, it is unclear whether the proposed modifications are reasonable." *See* MSJ Order [Dkt. 92] at 9:19-22. The burden to identify the specific modification sought is on Plaintiffs. *See Snapp v. United Transp. Union*, 889 F.3d 1088, 1099-1101 (9th Cir. 2018) (under Title I of the ADA, it is the employee's burden to prove at trial, by a preponderance of the evidence, that the employer could have made a reasonable accommodation

---

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 671 (9th Cir. 2010). That Lyft offers WAV service in certain cities in response to State or local regulations does not change Lyft's obligations under the ADA. In enacting the ADA, Congress made clear state and local authorities may enact laws that provide greater protections than offered under the ADA. 42 U.S.C. § 12201(b). But nothing in the ADA suggests that Congress intended those local laws would, in turn, modify a private entity's obligations under the ADA.

[4] In Part I.A above, Plaintiffs suggest that the Court has already found Lyft liable for discrimination. Not so: the definition of discrimination at issue in this case is the failure to make a requested reasonable modification in policies, practices, or procedures, that is necessary to afford Plaintiffs access to Lyft's ridesharing platform. *See* 42 U.S.C. § 12182(b)(2)(A)(ii). Until Plaintiffs can meet their burden of proving the necessary elements, no finding of discrimination can be made.

that would have enabled him to perform the essential functions of his job, even in cases where the employer had failed to engage in an interactive process); *Wong v. Regents of the Univ. Of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (a plaintiff bears the burden of producing evidence that a reasonable modification exists); *Galvez v. Auto. Club of S. Cal.*, No. SA CV 16-0887-DOC (KESx), 2017 U.S. Dist. LEXIS 214650, at *17 (C.D. Cal. May 5, 2017) (a plaintiff's failure to identify the specific policy change he is requesting is fatal to his claim).

Plaintiffs must then prove that the specific modification(s) they have identified are "reasonable":[5] "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004). At trial, the burden is on Plaintiffs to prove every essential element of their claim. *Id.,* at 1082.

Unlike at summary judgment, Plaintiffs cannot merely meet their trial burden by showing that the requested modifications are reasonable in the "general sense" or "in the run of cases."[6] At trial, the burden-shifting framework applicable at the summary judgment stage falls away. *Snapp*, 889 F.3d at 1101-02 ("[b]ecause burden shifting frameworks like those articulated in *US Airways* and *McDonnell Douglas* are merely analytical tools for focusing arguments, they

---

[5] Under the ADA, "reasonableness" is an element of Plaintiffs' claim, and is separate from undue hardship, which is an affirmative defense that is available under Title I and actions involving the failure to provide auxiliary aids and services. As the Supreme Court has held, "reasonable," in ordinary English, is not the same as "undue financial burden." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). In ordinary English, "reasonable" means "not extreme or excessive," "moderate," or "inexpensive." *See* https://www.merriam-webster.com/dictionary/reasonable (last visited February 8, 2021).

[6] Even if the Court were to apply the summary judgment cases cited by Plaintiff in Part I.A above, Plaintiffs could not meet their burden. For example, in *Lopez*, the Ninth Circuit affirmed the district court's dismissal of the plaintiff's action based on the district court's finding that while the plaintiff had identified the architectural barrier, he failed to submit evidence "on the question of whether remediating the problem is readily achievable," including evidence of cost. 974 F.3d at 1038. The same is true here: while Plaintiffs have identified the problem as the lack of WAVs on the Lyft platform, Plaintiffs have no evidence as to how the problem can be solved with a modification in a policy, practice or procedure that is reasonable in cost.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

typically fall away at the end of the analysis and leave the ultimate burden of proof (the burden of persuasion) on the plaintiff"); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855-56 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003). Applying the summary judgment burden-shifting framework at trial would constitute an impermissible "departure from the ADA itself which does not place the burden of disproving a reasonable accommodation on the [defendant], but rather, expressly places the burden to prove only the affirmative defense.'" *Snapp*, 899 F.3d at 1100. Plaintiffs thus cannot shift the burden on Lyft to prove a negative. *Id.* at 1098 (if burden were shifted at trial and the employer failed to meet the burden, the net effect may be a finding of liability without identifying an accommodation); *Dalberg v. Avis Rent a Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1108 (D. Colo. 2000) (on summary judgment: "if the court were to accept Dahlberg's argument, the effect would be to foist onto Avis the burden of proving that there are no reasonable modifications"). Instead, it is Plaintiffs who must carry their ultimate burden of persuasion on their claim of discrimination, and prove, by a preponderance of the evidence, that Lyft discriminated against them by failing to make a specific and identifiable modification that is both reasonable and effective. *Snapp*, 889 F.3d at 1101-02.

If Plaintiffs can meet their burden, then the burden will shift to Lyft to show that "making such modifications would fundamentally alter the nature of [its] goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).[7]

---

[7] In its MSJ Order, this Court did not grant summary judgment on Lyft's affirmative defense of fundamental alteration. *See* MSJ Order [Dkt. 92] at 12:4-10. If Plaintiffs can meet their burden of establishing a reasonable modification at trial – which, as the Court stated in its order, was the purpose of holding a trial – then Lyft should have an opportunity to submit evidence on its affirmative defense of fundamental alteration in direct response to the particular reasonable modification identified by Plaintiffs.

## II. STATEMENT OF ALL RELIEF SOUGHT

### A. Plaintiffs' Statement Of Relief Sought[8]:

Plaintiffs seek the following remedies:

1. Declaratory relief stating that Lyft is discriminating in violation of Section 12184 of the ADA by failing to provide wheelchair accessible vehicles in Alameda, Contra Costa, and San Francisco Counties, and that Lyft can reasonably modify its policies, practices, and procedures to provide such service through a combination of making WAVs available for rental through contracts with rental car companies, contracts with third party providers of accessible transportation, and by incentivizing Lyft drivers to provide WAV rides.

2. An injunction with the following elements:

    a. Requirement for Lyft to provide wheelchair accessible service in Alameda, Contra Costa, and San Francisco Counties with benchmarks for reasonable wait times no longer than those set by the California Public Utilities Commission to qualify companies for exemption from payment into the Access Fund, as well as benchmarks for reasonable reliability;

    b. A process for the parties to revisit the wait time and reliability benchmarks annually, based on data gathered during implementation, with the assistance of a neutral third party agreed to by the parties or appointed by the Court;

    c. The Court maintains jurisdiction over the suit for four years;[9]

    d. Removal of the requirement for users of the Lyft App to toggle "Access Mode" to see that WAV service is among the services offered in the Bay Area Counties.

---

[8] Defendant asserts that Plaintiffs' proposed injunction runs afoul of Rule 65, and that Plaintiffs must identify at trial the specific modifications Lyft must make to comply with the injunction, such as the number of WAV vehicles Lyft must place on the road. In its Summary Judgment order, the Court addressed and rejected the argument that a proper injunction in this case would need to require a description of how Lyft must enforce that injunction. ECF No. 92 at 11.

[9] Lyft correctly identifies that the CPUC Access Fund program sunsets in 2026. Plaintiffs do not seek an injunction that extends beyond 2025, and Plaintiffs' proposed injunction builds in the possibility that the feasibility or cost of offering WAV service in the Bay Area Counties may change in the future.

**B.     Lyft's Response:**

Plaintiffs confuse this proceeding – which is a lawsuit under the federal ADA – with the ongoing state regulatory proceeding before the California Public Utilities Commission.[10] Their proposed form of relief fails to meet the requirements for enforceable injunctive relief for at least three reasons.

First, Plaintiffs are not entitled to seek an injunction based on the California Public Utilities Code for an alleged violation of the federal ADA. "A court must limit the conduct it enjoins to that which is found to have been 'pursued [or] persuasively to be related to the proven unlawful conduct.'" *Nelson v. Int'l Bhd. of Elec. Workers, Local Union No. 46*, 899 F.2d 1557, 1564 (9th Cir. 1990).

Second, the injunction must be "tailored to eliminate only the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 at 973, (9th Cir. 1991). Here, the harm alleged is the failure to make reasonable modifications in policies, practices, or procedures (*see* 42 U.S.C. § 12182(b)(2)(A)(ii)), not the failure to meet wait time criteria *that have yet to be established* by the CPUC. As the Ninth Circuit has made clear, Section 12182(b)(2)(A)(ii) only requires those modifications that are *reasonable*, and does not require "any and all possible accommodations that would provide full and equal access" to individuals with disabilities. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). The focus of the injunction must therefore be on the precise nature of the reasonable modifications to policies, practices, or procedures to be implemented, rather than on the results to be achieved from some unidentified modifications.

Third, the proposed injunction does not tell Lyft what "reasonable modifications" it must make to comply with its terms. *See* Fed. R. Civ. Pro. 65(d)(1) (every injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required"). As the Supreme Court has held, "the

---

[10] The California legislature made clear that the regulatory actions of the CPUC were not intended to change a company's obligations under the ADA. *See* Cal. Pub. Util. Code § 5440.5(d) ("Nothing in this section shall . . . be construed to expand . . . obligations, if any, of a transportation network company under existing . . . federal disability access laws.").

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19-CV-01438**
**Joint Proposed Final Pre-Trial Order**                                                                 **8**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Fortyune*, 364 F.3d at 1086-87 (approving the district court's injunction requiring the theater defendant to "modify its policies regarding companion seating to ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats . . . [up until] ten (10) minutes prior to show time" as giving the defendant notice of what the injunction actually prohibits).

If Plaintiffs cannot identify at trial the reasonable modification that will deliver reliable WAV service within the wait times they seek, that should end this case.

## III. ALL STIPULATED FACTS

1. Plaintiffs Judith Smith, Tara Ayres, Julie Fuller, and Sascha Bittner are each individuals with a disability under the Americans with Disabilities Act.

2. The individual Plaintiffs each reside within the three Bay Area Counties.

3. Plaintiff Independent Living Resource Center San Francisco ("ILRC") is a disability rights organization located in San Francisco, California.

4. Plaintiff Community Resources for Independent Living ("CRIL") is a disability rights advocacy and support organization located in Hayward, California.

5. Lyft is a San Francisco-based company that launched its peer-to-peer marketplace for on-demand ridesharing in 2012.

6. Lyft operates a ridesharing platform through the Lyft App ("App").

7. Lyft's ridesharing marketplace is generally available throughout San Francisco, Alameda, and Contra Costa Counties (the "Bay Area Counties").

8. In the Bay Area Counties, Lyft offers the following ride "modes," among others: (a) Standard (its classic rideshare option), (b) XL (larger vehicles for up to 6 riders), (c) Lux (high-end or luxury vehicles), (d) Lux Black (high-end or luxury black car), and (e) Lux Black XL (high-end or luxury black SUV for up to 6 riders).

9. Lyft offers Standard mode in all regions, but does not offer the other modes in all regions. Lyft typically launches a new mode, such as XL or Lux, once it determines that it has a sufficient number of cars already on its platform that meet the requirements for that mode.

10. When a mode is available on the platform in a region, riders are able to request a ride in that "mode" at any time, 24 hours a day, but Lyft makes no guarantee that the ride request will be matched or that a driver will be available or accept the ride request.

11. Wheelchair accessible vehicles ("WAVs") are specialized vehicles built to accommodate fixed-frame wheelchairs. WAVs are more expensive than comparable non-WAV vehicles, have higher gas mileage than comparable non-WAV vehicles, and have higher insurance costs than comparable non-WAV vehicles.

12. Lyft offers WAVs on its platform in markets that have regulatory requirements or where it has a partnership with a transit agency.

13. As of January 2021, Lyft offers WAV service (called "Access" mode) in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California.

14. After Plaintiffs filed their Complaint, Lyft launched a WAV pilot in San Francisco ("SF WAV Pilot") in July 2019 by contracting with First Transit, Inc.

15. First Transit employs the drivers who drive the WAVs, and is responsible for training the WAV drivers in the proper use of the equipment and in providing assistance to riders.

16. The WAVs used in the SF WAV pilot are fully dedicated to providing WAV rides only.

17. Lyft does not offer WAV service in Alameda or Contra Costa Counties.

## IV. FACTUAL ISSUES WHICH REMAIN TO BE TRIED

### A. Plaintiffs' Proposed List of Issues

*The following facts were determined in the Court's Order on the Parties' Cross Motions for Summary Judgment[11]*

1. Lyft currently uses three models for providing WAV service—the "Partner" model, "Rental" model, and using incentives and marketing to attract potential drivers (what Lyft refers to as the "Organic Driver" model).

2. Under the "Partner" model, Lyft contracts with a third-party company to provide WAVs. The third-party company employs the drivers who drive

---

[11] Plaintiffs list these facts already included in the Court's Summary Judgment Order, ECF No. 92, for the sake of efficiency. Defendant declined to create a joint list of previously recognized facts or to stipulate to these background facts to which the parties previously stipulated at Summary Judgment.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

      the WAVs, and is responsible for training the WAV drivers in the proper use of the equipment and in providing assistance to riders.

3. Under the "Rental" model, Lyft contracts with a rental car provider that acquires WAVs and offers them for rent to independent contractor drivers.

4. Under the "Organic Driver" model, drivers who own or have access to WAVs are incentivized to accept WAV rides on the Lyft platform through bonuses.

5. The three models may be used independently or in conjunction with one another.

6. Lyft has estimated that it could recoup between $17 and 22 million in WAV offset from the California Public Utilities Commission ("CPUC") statewide.

7. The First Transit vehicles in the SF WAV Pilot are available from 7am to midnight, and rides must originate in San Francisco.

8. Lyft currently pays $58.62 per hour per vehicle for the SF WAV Pilot.

9. Until March 2020, Lyft planned to launch a Rental Pilot program ("Rental Pilot") in the three Bay Area Counties in 2020.

10. Lyft provides WAV service in New York City through a combination of the "Partner" model, "Rental" model, and "Organic Driver" model.

11. From October 2019 to March 2020, Lyft subsidized approximately $200 for each WAV ride in New York.

*Offering WAV service through the "Rental" model or a hybrid of multiple models is reasonable in the run of cases*

"Rental" Model

12. Lyft planned to launch the Rental Pilot using Lyft's Rental Model through a partnership with Hertz.

13. Lyft planned to include 65 vehicles in the Rental Pilot. These vehicles would serve all three Bay Area Counties.

14. Lyft evaluated the geographic size of the Bay Area Counties compared to the five boroughs of New York City, and the density of likely demand within the three Bay Area Counties to determine that these 65 vehicles would likely cover about 80% of demand for WAV rides.

15. Lyft estimated that the total cost to Lyft of the Rental Program, including driver incentives and subsidizing each of the 65 vehicles approximately $980 per month, was one million dollars a year.

16. Lyft planned to configure the Rental Pilot vehicles so that they could also be cross dispatched to provide Lyft's XL service mode to make the vehicles a more attractive proposition for renters.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*"Partner" Model*

17. In markets where Lyft must meet wait time ("ETA") requirements, Lyft relies in part on a "Partner" model.

18. Currently, where Lyft uses the Partner model, Lyft states that the cost per ride exceeds the revenue collected by at least $100, resulting in Lyft effectively subsidizing the rides for WAV passengers by that amount. For example, in February 2020, of the seven WAV markets where Lyft offered WAV service at least in part using the partner model, five markets (New York, Boston, Dallas, Los Angeles, and San Francisco) had a per-ride cost in excess of $100. Four markets had a per ride cost over $150. San Francisco and Los Angeles had a per ride cost in excess of $900 and $200, respectively.

19. The amount Lyft has paid per ride in San Francisco and Los Angeles does not factor in the potential for Lyft to receive offsets for some or all of those costs.

20. When Lyft launched its SF WAV Pilot using the Partner model, it consisted of five First Transit vehicles.

21. During the COVID-19 pandemic, the pilot consisted of two First Transit vehicles (as of July 2020).

22. In the cities where Lyft uses the "Partner" model, it pays the third-party Partner company between $40 and $60 an hour per vehicle.

23. The amount Lyft pays per hour per vehicle does not factor in any passenger fares Lyft receives during that hour.

24. In December 2019, Lyft began a process of revaluating its contracts, including its contract with First Transit.

25. The average wait times for the SF WAV pilot have become shorter over time. The average weekday wait time for the SF WAV pilot in mid-August 2019, when the program consisted of 5 vehicles, was 27 minutes. In July 2020, when the program consisted of 2 vehicles, the average wait time for the SF WAV pilot was 11 minutes.

26. Lyft has identified that a potential way to lower the cost of offering WAV service is to cross dispatch WAV vehicles, allowing them to accept rides from both WAV and non-WAV passengers.

27. Lyft does not cross-dispatch the vehicles involved in the SF WAV Pilot.

28. Lyft attributes at least some of this improvement in wait times to changing the placement of the First Transit vehicles.

29. Between July 2019 and July 2020, 215 unique users used the SF WAV pilot.

*WAV Demand*

30. Lyft has identified increasing demand for WAV service as a way of decreasing the cost of offering WAV service.

31. Lyft has not taken a number of steps it knows are likely to increase demand for the SF WAV Pilot including advertising the program.

32. In order to see that "Access Mode" is an option for passengers in San Francisco, a passenger must first toggle "Access Mode" under the "Settings" menu in the Lyft App.

33. In New York City, Lyft removed the need for passengers to toggle "Access Mode" in order to see that WAV service is an option on the Lyft App, and saw demand for WAV service approximately double.

34. While Lyft has considered removing the need to toggle "Access Mode" in the Bay Area, it has yet to do so.

*"Organic Driver" Model*

35. Lyft does not currently allow "Organic Drivers," drivers who own or have access to WAV vehicles independently of any rental program arranged by Lyft, to provide WAV service in any of the three Bay Area Counties.

36. Lyft has taken no steps to attempt to recruit "Organic Drivers" to provide WAV service in any of the three Bay Area Counties.

37. Lyft has provided no data about the number of WAV vehicles that exist in the Bay Area Counties.

*California Public Utilities Commission Offset*

38. In California, including in the three Bay Area Counties, the California Public Utilities Commission ("CPUC") collects a 10-cent fee on every rideshare ride, including those provided by Lyft. The fees are collected into what is known as the TNC Access for All Fund.

39. If a rideshare company offers WAV service that meets the CPUC requirements in any California county, it can receive an offset for the funds it spends to offer WAV service.

40. The CPUC has yet to establish final wait time requirements to qualify for this offset, but has established interim standards. Companies can apply for retroactive offsets of prior expenditures by showing they have met the interim standards, and that they have improved their service quarter over quarter.

41. The CPUC plans to evaluate data from this interim phase to establish a final set of wait time requirements for qualifying for the offset.

42. In addition to the offset standards, the CPUC has also established standards for rideshare companies to qualify for an exemption from the 10-cent per ride fee. If a company can show it met these exemption wait time standards for a full year in a given county, it can be exempt from paying the 10-cent per ride fee for the next year in that county

43. For the third quarter of 2019, Lyft sought approximately $368,000 from the CPUC to offset the amount it had spent on the SF WAV Pilot.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

44. For the fourth quarter of 2019, Lyft sought approximately $477,000 from the CPUC to offset the amount it had spent on the SF WAV Pilot.

45. For the first quarter of 2020, Lyft sought approximately $690,000 from the CPUC to offset the amount it had spent on the SF WAV Pilot.

46. For the second quarter of 2020, Lyft sought approximately $436,000 from the CPUC to offset the amount it had spent on the SF WAV Pilot.

47. Lyft must demonstrate that it meets the CPUC's applicable wait time requirements to qualify for the offset.

48. In its application to receive retroactive offset for the first quarter of 2020, Lyft showed that it had provided 60% of WAV rides in San Francisco within 16.2 minutes, and 100% within 45.83 minutes.

49. In its application to receive offset for the second quarter of 2020, Lyft showed that it had provided 90% of WAV rides in San Francisco within 21.67 minutes, and 100% within 40.55 minutes.

50. Lyft has sought CPUC offset to cover both the amount it pays to First Transit for the SF WAV Pilot and additional WAV-related costs such as the hourly cost of Lyft personnel dedicating time to the WAV program.

51. While Lyft emphasizes the high per-hour cost of the First Transit contract, and the high per-ride cost of rides provided through the SF WAV Pilot, it fails to acknowledge that Lyft expects to receive all of those funds back from the CPUC in offset.

52. Similarly, Lyft estimated that it would be able to recoup the full cost of the Rental Pilot, covering all three Bay Area counties, in CPUC offset.

*Lyft WAV Service in other Markets*

53. In New York, Lyft must meet ETA requirements as part of a legal settlement.

54. For June 2019, Lyft was required to offer WAV service through the five boroughs, to provide 60% of WAV rides in under 15 minutes, and 90% of WAV rides in under 30 minutes.

55. Lyft self-reported that it met this requirement.

56. For June 2020, Lyft was required to provide 80% of WAV rides in under 15 minutes and 90% of WAV rides in under 30 minutes.

57. Prior to the pandemic, Lyft provided around 1,000 WAV rides a week in New York City.

58. The cost to Lyft of offering WAV service in New York City has decreased over time.

59. In Chicago, one of Lyft's least expensive WAV markets, Lyft uses the "Organic Driver" model and receives a per-ride subsidy from the City of Chicago.

60. From October 2019 to March 2020, Lyft provided 3,324 WAV rides in Chicago using the Organic Driver model.

*Additional Facts Showing Reasonableness of Providing WAV Service in the Bay Area Counties*

61. In March 2020, Lyft's competitor Uber proposed a WAV plan for the Bay Area Counties with wait times comparable to those in New York.

62. Uber has sought CPUC offset for its WAV service meeting CPUC requirements in Contra Costa county from Q3 2019 through Q3 2020, ranging in from approximately $24,000 to approximately $90,500.

63. Uber has sought a CPUC exemption from remitting TNC Access for All Fund fees for Contra Costa from Q4 of 2020 through Q3 2021 based on its success in meeting CPUC requirements in that county.

64. Uber has sought CPUC offset for its WAV service meeting CPUC requirements in Alameda county from Q3 2019 through Q4 2020, ranging in amounts from approximately $5,500 to approximately $405,000.

65. Uber has sought CPUC offset for its WAV service meeting CPUC requirements in San Francisco county in Q3 and Q4 2019 and both Q2 and Q3 2020. They have sought amounts from approximately $47,500 up to approximately $350,000.

*Lyft has not met its burden to show that the cost of providing WAV service is unreasonable or would fundamentally alter its business*

66. Lyft provided no evidence in discovery of any changes it had to make to its business or of any negative financial impacts on its business of any of its WAV programs in other cities.

67. In 2018, Lyft's revenue was $2.2 billion, representing a 103% growth rate from 2017 to 2018.

68. In a press release issued May 6, 2020, Lyft announced that its first quarter 2020 revenue was $955.7 million, up 23% year over year, and that it had ended the quarter with $2.7 billion in unrestricted cash, cash equivalents, and short-term investments.

**B.     Defendants' Proposed List of Issues**

With their proposed list of issues in Part IV.A above, Plaintiffs seek to, on the one hand, limit the Court's factual inquiry into only those matters they deem helpful to them, while, on other hand, expand the Court's inquiry into inadmissible and irrelevant matters. Plaintiffs' misleading characterization of evidence – including of inadmissible evidence – has no place in this Pre-Trial Order.

Among Plaintiffs' mischaracterizations is their suggestion that Lyft will be able to

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, **Case No. 3:19-CV-01438**
**Joint Proposed Final Pre-Trial Order**                                                                                      15

recover the monies it spends providing WAV service in offset funds from the TNC Access for All Fund (the "Access Fund"). What Plaintiffs' list of factual issues omits is that the CPUC has yet to approve *any* offsets requested by Lyft from the Access Fund, and that disability advocacy groups – including groups aligned with Plaintiffs and their counsel – are actively protesting Lyft's offset applications. Also missing from Plaintiffs' list of factual issues is the fact that *the Access Fund program is temporary*, and will, by its terms, sunset in January 2026. *See* Cal. Pub. Util. Code § 5440.5(e).

The Court should reject Plaintiffs' effort to dictate the boundaries of what facts are relevant for trial. Instead, Lyft proposes that the Court adopt the following as the list of factual issues to be tried:

1. Whether Plaintiffs can identify any modification(s) to Lyft's policies, practices, or procedures which, if made, will result in an on-demand ridesharing service of WAVs that will be effective in delivering the wait times and benchmarks of reliability they seek at a cost that is reasonable.

   a. The wait times sought by Plaintiffs;

   b. The benchmarks of reliability sought by Plaintiffs;

   c. How Plaintiffs' proposed modifications, which is a combination of partnerships, WAV rentals for drivers, and incentives, would be implemented in the Bay Area Counties;

   d. The estimated number of WAVs that would be needed to implement the combination of methods proposed by Plaintiffs throughout the Bay Area Counties;

   e. Whether, and where, the number of WAVs that are necessary to implement the combination of methods proposed by Plaintiffs can be found in the Bay Area Counties;

   f. Whether there exists a sufficient supply of WAV drivers who could be deployed throughout the Bay Area Counties to satisfy the combination of methods proposed by Plaintiffs;

   g. Whether the combination of methods proposed by Plaintiffs requires Lyft to purchase, lease, or otherwise pay to create a supply of WAVs, and if so, how many;

   h. Whether the combination of methods proposed by Plaintiffs will deliver the specified wait times and benchmarks of reliability sought;

   i. The estimated cost to Lyft of the combination of methods proposed by Plaintiffs;

j. The estimated number of WAV rides Plaintiffs expect to take annually after the combination of methods is implemented.

2. Whether there exists an adequate supply of WAVs to create and sustain an on-demand ridesharing platform for WAVs in the Bay Area Counties.

3. Whether there exists an adequate demand for WAVs to create and sustain a supply of WAVs on Lyft's ridesharing platform in the Bay Area Counties.

4. Whether the modification(s) requested by Plaintiffs requires Lyft to create a service that is fundamentally different from the supply-and-demand driven ridesharing platform.

5. Whether requiring Lyft to guarantee wait times and benchmarks of reliability is a fundamental alteration of its supply-and-demand based ridesharing platform.

*/s/ Stuart Seaborn*

Attorney for Plaintiffs

**Disability Rights Advocates**
Stuart Seaborn
Melissa Riess
Rebecca Serbin
Michelle Iorio

*/s/ Jiyun Cameron Lee*

Attorney for Defendant

**Folger Levin LLP**
Jiyun Cameron Lee
Marie Jonas

### FILER'S ATTESTATION

Pursuant to Civil Local Rule 5-1(i), I attest that concurrence in the filing of the document has been obtained from each of the other Signatories.

Dated: March 10, 2021

*/s/ Jiyun Cameron Lee*
Jiyun Cameron Lee

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Independent Living Resource Center San Francisco et al. v. Lyft, Inc.*, Case No. 3:19-CV-01438
**Joint Proposed Final Pre-Trial Order** 17

Appendix 1: Joint Exhibit List

Appendix 2: Plaintiffs' Witness List

Appendix 3: Defendant's Witness List

1101688.1