1   DISABILITY RIGHTS ADVOCATES
    Stuart Seaborn (Bar No. 198590)
2   Michelle Iorio (Bar No. 298252)
    Melissa Riess (Bar No. 295959)
3   Rebecca Serbin (NY State Bar No. 5273255)*
    2001 Center Street, Fourth Floor
4   Berkeley, California 94704-1204
    Telephone: (510) 665-8644
5   Facsimile: (510) 665-8511
    sseaborn@dralegal.org
6   miorio@dralegal.org
    mriess@dralegal.org
7   rserbin@dralegal.org

8   Attorneys for Plaintiffs
    *Admitted Pro Hac Vice
9

10  FOLGER LEVIN LLP
    Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
11  Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
    199 Fremont Street, 20th Floor
12  San Francisco, CA 94105
    Telephone: 415.625.1050
13  Facsimile: 415.625.1091

14
    Attorneys for Defendant LYFT, INC.
15
                    UNITED STATES DISTRICT COURT
16
                    NORTHERN DISTRICT OF CALIFORNIA
17

18

19
    INDEPENDENT LIVING RESOURCE          Case No. 3:19-CV-01438-WHA
20  CENTER SAN FRANCISCO, a California
    non-profit corporation, JUDITH SMITH, an   **JOINT PROPOSED FINAL PRETRIAL**
21  individual, JULIE FULLER, an individual,   **ORDER**
    SASCHA BITTNER, an individual, TARA
22  AYRES, an individual, and COMMUNITY   Judge:  Hon. William Alsup
    RESOURCES FOR INDEPENDENT            Final Pre-Trial Conference: May 26, 2021
23  LIVING, a California non-profit corporation;   Courtroom: 12 – 19th Floor

24          Plaintiffs,

25          v.

26  LYFT, Inc., a Delaware corporation;

27  Defendant.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Following is the Joint Proposed Final Pretrial Order to be considered at the Final Pretrial Conference in this case set for May 26, 2021 at 9:00 AM.

## I.   CLAIMS AND DEFENSES WHICH REMAIN TO BE DECIDED

### A.   Plaintiffs' Brief Description of Claims and Defenses

Lyft operates an on-demand, app-based transportation service that since 2012 has become a major source of transit in the Bay Area and around the country. Lyft has used a wide variety of tools, from technology to marketing to partnerships with rental car companies, to build a transportation service on which passengers can rely at any time of day or night, anywhere in San Francisco, Alameda, and Contra Costa Counties (the "Bay Area Counties"). A Lyft passenger in the Bay Area Counties could expect to wait a few minutes for their standard Lyft ride to arrive. On the other hand, Lyft offered no wheelchair accessible vehicle ("WAV") service in the Bay Area Counties at the time this case was filed.

Indeed, despite billions of dollars in resources, along with evidence and testimony from its own employees that Lyft could provide WAV service in the Bay Area and receive offset funds for much of the cost, Lyft has chosen not to do so.  Nor has Lyft made a good faith effort to engage in the iterative process necessary to implement a functional WAV service in the Bay Area—a process that transportation planners routinely use to determine how to best meet transportation needs when rolling out a service, and the process that Lyft has used to create and grow its non-WAV service around the county, and to meet service standards for its WAV service in New York City. Rather, Lyft seeks to be excused from discriminating against wheelchair users by simply claiming it cannot offer perfect service at the onset—thereby giving it permission to not even try to offer service.  Though Lyft did launch a very-limited five-vehicle "pilot" program offering WAV service only to passengers in San Francisco with limited service hours, it did not conduct any paid marketing for the program and took steps to limit the demand for the program. Since then, this "pilot" program has been cut back—to two vehicles at the close of discovery— and Lyft continues to offer no WAV service whatsoever in Alameda and Contra Costa Counties.

At summary judgment this Court found that Plaintiffs, who are persons with disabilities under Title III of the ADA, had demonstrated that Lyft, an entity covered by the ADA's Title III,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    had a discriminatory policy, practice or procedure.  ECF No. 92 (MSJ Order) at 4–5. The Court

2    also found that Plaintiffs have standing to challenge this discrimination, and that Plaintiffs have

3    identified possible policies, practices or procedures—i.e., proposed reasonable modifications—

4    that would address Lyft's discriminatory policy.  *Id.* at 5, 11–12.[1]  These proposed modifications

5    include the possibility of Lyft entering into a contractual agreement with a rental car provider to

6    make WAVs available to drivers ("rental model"), or a combination of the rental model,

7    partnerships with third party WAV providers, and incentives to encourage drivers to provide

8    WAV rides. ECF No. 92 (MSJ Order) at 5.  Lyft has implemented some form of these proposed

9    modifications in other cities and had plans to provide the rental model in the Bay Area. *Id.* at 7–

10   9.

11        Thus, because the Court established that Lyft's failure to make reasonable modifications

12   to its policies, practices and procedures necessary to provide wheelchair accessible service in the

13   three Bay Area Counties is discrimination in violation of the ADA, the only issue left to be tried

14   is whether the proposed modifications are reasonable. Under Title III of the ADA, Plaintiff must

15   first demonstrate that requested modifications are reasonable.  *See Lopez v. Catalina Channel*

16   *Express, Inc.*, 974 F.3d 1030, 1036 (9th Cir. 2020) (citing *Lentini v. Cal.Center for the Arts*, 370

17   F.3d 837, 845 (9th Cir. 2004) and *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052,

18   1059 (5th Cir. 1997)). This is a light burden. Plaintiffs need only show that the requested

19   modifications are reasonable in the general sense or "in the run of cases." *See Lopez*, 974 F.3d at

20   1036 (recognizing that the Ninth Circuit adopts the burden shifting analysis for reasonable

21   modification cases adopted by the Fifth Circuit in *Johnson*); *Johnson*, 116 F.3d at 1058 (a

22   plaintiff meets the burden of proof on reasonableness by putting forth evidence of an

23   accommodation that is generally reasonable, or reasonable "in the run of cases.").[2]  Once

24   Plaintiffs have done so, the ultimate burden of persuasion shifts to Lyft to prove that the

25

26   [1] Despite Lyft's attempt to relitigate issues decided at summary judgment, the Court found that
     Plaintiffs did propose reasonable modifications and that the proposal was sufficient to satisfy
27   Rule 65 redressability/specificity requirements.  *See* ECF No. 92 (MSJ Order) at 4–5,11–12.

28   [2] The *Johnson* test, which the Ninth Circuit has adopted for reasonable modification claims,
     involved a review of a reasonable modification claim at trial. 116 F.3d at 1056.. Thus, Lyft's
     attempt to claim that somehow that Johnson test does not apply at trial is entirely unsupported.

1   requested modifications would fundamentally alter Lyft's business.  *See Lopez*, 974 F.3d at

2   1036. [3]  At summary judgment, this Court rejected Lyft's argument that providing WAV service

3   through the methods proposed would fundamentally alter Lyft's business, reminding Lyft that

4   the only way it could meet its burden here is to prove that providing Plaintiffs' requested

5   modifications would be cost prohibitive. ECF No. 92 (MSJ Order) at 9–10.

6           Similarly, the Court rejected Lyft's arguments that the modifications at issue would

7   require Lyft to offer a different good or service.  "Lyft has already instituted WAV programs

8   using not only the partnership model, but other models in other geographic regions — it cannot

9   argue that something it is already doing would fundamentally alter its business, though doing so

10  might be cost prohibitive in our region."  ECF No. 92 (MSJ Order) at 10.  The Court also

11  rejected Lyft's argument that the exception in the regulations limiting the obligation of taxi

12  companies to purchase accessible vehicles somehow prevents Plaintiffs from seeking their

13  requested reasonable modifications.  As the Court noted at page 4 of the Order, "Plaintiffs are

14  not, however, trying to require Lyft to purchase or lease WAVs.  The proposed modifications,

15  detailed further below, would require Lyft to work with external parties who would in turn

16  purchase or lease WAVs." ECF No. 92 (MSJ Order) at 4.

17          Thus, the only issues remaining to be tried are whether Plaintiffs have shown that the

18  modifications they seek are reasonable in the run of cases, and, if so, whether Lyft has met its

19  ultimate burden of persuading the Court that such modifications are cost prohibitive.

20          **B.     Defendant's Brief Description Of Claims And Defenses**

21          At the Pretrial Conference on March 17, 2021, this Court made clear that Plaintiffs, not

22  Lyft, have the burden of proof at trial. 03/17/2021 Hrg. Tr. 31:24-33:12. The Court also rejected

23

24  _____

25  [3] Defendant's attempt to import the burden shifting approach discussed in a failure to engage in
the interactive process/employment claim under Title I of the ADA (*see Snapp v. United Transp.
Union*, 889 F.3d 1088, 1099–1101 (9th Cir. 2018) has absolutely no basis here, where Plaintiffs

26  make reasonable modification claims under Title III.  Nor have Defendants provided any support
whatsoever for their assertion that burdens identified by the Ninth Circuit for addressing

27  reasonable modification claims under Title III somehow disappear at trial. Plaintiffs do not seek
to avoid meeting their burden on the reasonableness of the modifications sought. The evidence

28  will demonstrate that they have more than met that burden, which requires a showing that the
proposed modifications are reasonable in the run of cases.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Plaintiffs' misreading of the phrase "run of cases," emphasizing that "run of cases" refers to

2    things that are comparable to a particular situation, and affirmed Plaintiffs have the burden of

3    demonstrating comparability through expert testimony. *Id.*; *see also* 03/18/2021 Hrg. Tr. 18:9-13

4    ("No other city is relevant unless an affirmative showing is made that explains not only why it's

5    relevant, but adjusts for differences between the markets."). The Court then granted Plaintiffs the

6    opportunity to find an expert to fill in these gaps. Final Pretrial Order [Dkt. 149] at ¶ 9. That

7    Plaintiffs continue to rely on the Ninth Circuit's ruling in *Lopez* and the Fifth Circuit's decision

8    in *Johnson* to urge a "light" burden of proof based on a "run of cases" shows they know they

9    lack affirmative evidence to prove their claims.[4]

10        In response to the Court's direction that they find an expert, Plaintiffs retained Dr. Alice

11   Grossman. Dr. Grossman, however, did not make any effort to provide the information explicitly

12   requested by the Court by adjusting the experiences of Lyft or any other provider in any other

13   market to reflect, for example, the impact of different levels of population density. Instead, Dr.

14   Grossman opined that Lyft's provision of WAV service in the Bay Area Counties would be an

15   entirely *new* transportation program for which the total cost, number of vehicles, and service

16   levels to be achieved are not presently knowable. *See* Grossman Report at 4, 7, 19-20, 28-29.

17   Based on her experience in transportation planning, Dr. Grossman opined that the process of

18   implementing an effective WAV service could take one year or more, through an "iterative

19   demand and service assessment" process (in other words, a multi-year pilot) in which every

20

21   [4] *Lopez* does not support Plaintiffs' contention that they have merely a "light burden" and thus
     may prove their case with supposition rather than evidence. *See Lopez*, 974 F.3d at 1039
22   (affirming summary judgment for defendant based on the plaintiff's failure to submit any
     evidence that remediating the problem was readily achievable). *Johnson* also does not help
23   Plaintiffs: the "run of cases" at issue in that case was a Department of Justice regulation
     requiring public accommodations to allow service animals. There is no similar regulation here.
24   In addition, while *Johnson* itself is a case that was appealed after a trial, it relied on a summary
     judgment decision arising under ADA Title I. 116 F.3d at 1058-1059. In contrast to *Johnson*, the
25   Ninth Circuit has conclusively held that the standard of proof at trial - in the civil rights context
     generally - is different from the standard of proof at summary judgment. *See Snapp v. United*
26   *Transp. Union*, 889 F.3d1088, 1101-02 (9th Cir. 2018) (the burden shifting frameworks
     articulated in *US Airways* and *McDonnell Douglas* "typically fall away at the end of the
27   [summary judgment] analysis and leave the ultimate burden of proof (the burden of persuasion)
     on the plaintiff"); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855-56 (9th Cir. 2002), *aff'd* 539
28   U.S. 90 (2003). Both *Snapp* and *Costa* were decided after *Johnson*. Plaintiffs offer no
     explanation for why this Court should follow *Johnson* instead of *Snapp* and *Costa*.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   element – such as the number of vehicles, marketing initiatives, and partnerships with private

2   and government entities – should be adjusted and explored as new data comes in. *Id.*

3       Dr. Grossman's testimony only affirms Lyft's position: WAV service is difficult and

4   unique to every city or region. There is no magic formula – no "reasonable modification in

5   policies, practices or procedures" – by which Lyft can implement a reliable service for Plaintiffs

6   on a "full and equal" basis or otherwise. Dr. Grossman's testimony is an admission that Plaintiffs

7   cannot establish their burden of proving that a reasonable modification exists. *Wong v. Regents*

8   *of the Univ. Of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999) (a plaintiff bears the burden of producing

9   evidence that a reasonable modification exists); *Galvez v. Auto. Club of S. Cal.*, No. SA CV 16-

10   0887-DOC (KESx), 2017 U.S. Dist. LEXIS 214650, at *17 (C.D. Cal. May 5, 2017) (on

11   summary judgment, a plaintiff's failure to identify the specific policy change he is requesting is

12   fatal to his claim).

13       Not only are Plaintiffs unable to prove a "reasonable modification," the service they seek

14   by injunction (*see infra,* Part II.A) is a fundamentally different service than what is available on

15   Lyft's ridesharing platform. Lyft operates a multi-sided technology platform that, among other

16   things, connects people looking for a driver with people who are willing to drive them. Lyft uses

17   computer algorithms to match independent drivers and riders in the same area efficiently, as

18   "brokers" do in many industries. Lyft's platform is a digital marketplace where drivers and riders

19   are free to participate at times and places of their choosing. Lyft does not own or lease any

20   vehicles used for ridesharing on the Lyft platform, nor does it set any schedules or establish any

21   routes for the drivers. Like other platform companies, the key to its business model and success

22   is density of supply and demand.

23       On Lyft's ridesharing platform, Lyft does not guarantee any particular wait time to riders,

24   nor does it guarantee that a ride or a particular vehicle will be available. Instead, the

25   determination of how quickly or reliably a rider may be able to obtain a type of ride of her

26   choosing depends on the supply of drivers near her location who are available to meet her ride

27   request when she makes the request.

28       That kind of service – one dependent on the supply of drivers – is not what Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   want. While Plaintiffs claim that Lyft engages in discrimination by failing to provide WAV

2   service on its platform,[5] Plaintiffs do not claim – because they cannot prove – that there exists a

3   ready supply of WAVs on or off the Lyft platform to provide the on-demand ridesharing service

4   they want. Instead, Plaintiffs' theory is that regardless of the existence of supply (or demand) for

5   WAVs, the ADA obligates Lyft to ensure that they can obtain a WAV according to yet-to-be

6   determined service levels established by the California Public Utilities Commission ("CPUC") or

7   through some unknown process established by this Court.[6]

8          Under Ninth Circuit authority, the ADA does not require Lyft to guarantee a service for

9   Plaintiffs by creating an adequate supply of WAVs. *See Weyer v. Twentieth Century Fox Film*

10  *Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000). "Th[e] [ADA] does not require provision of

11  different goods or services, just nondiscriminatory enjoyment of those that are provided."

12  *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 671 (9th Cir.

13  2010).[7] That Lyft offers WAV service in certain cities in response to state or local regulations

14  does not change Lyft's obligations under the ADA in the Bay Area Counties because, as Dr.

15  Grossman admits, a WAV service to be implemented by Lyft in the Bay Area Counties would be

16  an entirely *new* transportation program. Moreover, in enacting the ADA, Congress made clear

17

18  [5] In Part I.A above, Plaintiffs suggest that the Court has already found Lyft liable for
    discrimination. Not so: the definition of discrimination at issue in this case is the failure to make
19  a requested reasonable modification in policies, practices, or procedures, that is necessary to
    afford Plaintiffs access to Lyft's ridesharing platform. *See* 42 U.S.C. § 12182(b)(2)(A)(ii). Until
20  Plaintiffs can meet their burden of proving the necessary elements, including that any of the
    purported modifications they have proposed is reasonable, no finding of discrimination can be
21  made.

22  [6] As the Court knows, there is no cause of action under the ADA for the failure to meet service
    levels established by the CPUC. Of course, this case did not start as one in which Plaintiffs were
23  demanding compliance with CPUC standards. What Plaintiffs sought in their Complaint was
    "full and equal" WAV service on Lyft's ridesharing platform; what they demanded in their
24  depositions was an array of wait times of no more than 20 minutes, and; what their expert, Dr.
    Grossman, says is that Lyft should engage in an iterative process with the goal of delivering wait
25  times of 30 minute or less in 80% of cases as a starting point. Plaintiffs keep moving the goal
    post because they know there is no reasonable modification that will deliver effective service.
26
    [7] Plaintiffs contend that the Court rejected this argument at summary judgment. *See* MSJ Order
27  [ECF No. 92] at 10. If so, Rule 54(b) of the Federal Rules of Civil Procedure explicitly
    empowers this Court to revise that decision at any time before judgment is entered. *See also City*
28  *of Los Angeles v. Santa Monica Baykeeper,* 254 F.3d 882, 888-89 (9th Cir. 2001) (a district court
    has the power to reconsider its interlocutory orders).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   state and local authorities may enact laws that provide greater protections than offered under the

2   ADA. 42 U.S.C. § 12201(b). Nothing in the ADA suggests that Congress intended local laws in

3   New York City, for example, would alter a private entity's obligations under the ADA in the Bay

4   Area.

5         As the Court stated in the Final Pretrial Order, the issue to be tried is "whether plaintiffs

6   have requested a *reasonable* modification to Lyft's policies, practices, and procedures, which

7   would not fundamentally alter the nature of Lyft's goods, services, facilities, privileges,

8   advantages, or accommodations." Dkt. 149 at ¶ 2, *citing Zukle v. Regents of Univ. of California,*

9   166 F.3d 1041, 1048 (9th Cir. 1999); 42 U.S.C. § 12182(b)(2)(A)(ii). To prove a reasonable

10  modification, Plaintiffs must first identify the specific modification sought. *See Wong,* 192 F.3d

11  at 816 (a plaintiff bears the burden of producing evidence that a reasonable modification exists).

12  They must then prove that the specific modification(s) they have identified are "reasonable," [8]

13  which "involves a fact-specific, case-by-case inquiry that considers, among other factors, the

14  effectiveness of the modification in light of the nature of the disability in question and the cost to

15  the organization that would implement it." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075,

16  1083 (9th Cir. 2004). If Plaintiffs can meet their burden of showing a specific, effective, and

17  reasonable modification, then the burden will shift to Lyft to show that "making such

18  modifications would fundamentally alter the nature of [its] goods, services, facilities, privileges,

19  advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).[9]

20

21

---

22  [8] Under the ADA, "reasonableness" is an element of Plaintiffs' claim, and is different from
    undue hardship, which is an affirmative defense that has no application in this case. As the

23  Supreme Court has held, "reasonable," in ordinary English, is not the same as "undue financial
    burden." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). In ordinary English,

24  "reasonable" means "not extreme or excessive," "moderate," or "inexpensive." *See*
    https://www.merriam-webster.com/dictionary/reasonable (last visited February 8, 2021).

25

26  [9] In its MSJ Order, this Court did not grant summary judgment on Lyft's affirmative defense of
    fundamental alteration. *See* MSJ Order [Dkt. 92] at 12:4-10. If Plaintiffs can meet their burden

27  of establishing a reasonable modification at trial – which, as the Court stated in its order, was the
    purpose of holding a trial – then Lyft should have an opportunity to submit evidence on its

28  affirmative defense of fundamental alteration in direct response to the particular reasonable
    modification identified by Plaintiffs.

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## II.     STATEMENT OF ALL RELIEF SOUGHT

### A.     Plaintiffs' Statement Of Relief Sought[10]:

Plaintiffs seek the following remedies:

1. Declaratory relief stating that Lyft is discriminating in violation of Section 12184 of the ADA by failing to provide wheelchair accessible vehicles in Alameda, Contra Costa, and San Francisco Counties, and that Lyft can reasonably modify its policies, practices, and procedures to provide such service through a combination of making WAVs available for rental through contracts with rental car companies, contracts with third party providers of accessible transportation, and by incentivizing Lyft drivers to provide WAV rides.

2. An injunction with the following elements:

    a. One year (four full quarters) from the date of the injunction, Lyft shall:

        i. provide WAV service throughout the three Bay Area Counties with wait times no longer than those set by the CPUC to qualify companies for exemption from payment into the Access Fund, and that meets benchmarks for reasonable reliability, whether set by the CPUC or by this Court, and provide Plaintiffs and the Court with information sufficient to show that it has meet these wait time and reliability requirements, or

        ii. if it has failed to meet those standards, provide Plaintiffs and the Court with data that shall include wait times, reliability of the service in the three Counties (e.g., percentage of WAV requests accepted), and number of WAV trips for its WAV service during the four quarters following the date of the injunction. Lyft shall also provide information sufficient to identify the efforts Lyft made during that one-year period to market the program to prospective riders and drivers, conduct outreach to stakeholders, take other

---

[10] Defendant asserts that Plaintiffs' proposed injunction runs afoul of Rule 65, and that Plaintiffs must identify at trial the specific modifications Lyft must make to comply with the injunction, such as the number of WAV vehicles Lyft must place on the road. In its Summary Judgment order, the Court addressed and rejected the argument that a proper injunction in this case would need to require a description of how Lyft must enforce that injunction. ECF No. 92 at 11.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

steps to increase demand for the WAV service including removing the need for users to toggle "Access" mode to see the WAV program on the Lyft App, and incentives offered for riders and drivers. Lyft shall provide summaries of this information to Plaintiffs and the Court, and shall also provide a plan that outlines the steps it will take to provide WAV service with wait times no longer than those set by the CPUC to qualify companies for exemption from payment into the Access Fund, and that meets benchmarks for reasonable reliability.

    b.  Each year after, for a total of three additional years:

        i.  Lyft shall provide WAV service throughout the three Bay Area counties with wait times no longer than those set by the CPUC to qualify companies for exemption from payment into the Access Fund, as well as benchmarks for reasonable reliability, whether set by the CPUC or by this Court. Lyft shall provide Plaintiffs and the Court with information sufficient to demonstrate that it has met these wait time and reliability requirements.

    c.  The Court maintains jurisdiction over the suit for four years.[11]

## B.   Lyft's Response:

Plaintiffs ask this Court to enter an injunction that bears *no* relationship to the evidence to be presented at the trial in this case. Indeed, the declaratory relief sought (that Lyft is violating the ADA by not making certain unidentified changes to its platform) contradicts the proposed injunction (which concedes the unidentified changes may not lead to the service levels that Plaintiffs seek). Plaintiffs' fantastical injunction is barred by both fact and law.

*First*, Plaintiffs ask that the Court order Lyft to "provide WAV service throughout the three Bay Area Counties with wait times no longer than those set by the CPUC to qualify

---

[11] Lyft correctly identifies that the CPUC Access Fund program sunsets in 2026. Plaintiffs do not seek an injunction that extends beyond 2025, and Plaintiffs' proposed injunction builds in the possibility that the feasibility or cost of offering WAV service in the Bay Area Counties may change in the future.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  companies for exemption from payment into the Access Fund." What Plaintiffs neglect to tell the

2  Court is that, as set forth in the Rebuttal Report of Lyft expert Dr. Marc Rysman, Lyft and Uber

3  have each spent *millions* of dollars providing WAV service in a subset of California counties at a

4  loss. Rebuttal Report, Figure 3. And neither company has yet been able to qualify for exemption

5  from payment into the Access Fund for those counties. While Uber has met the exemption

6  standard in Contra Costa County, it has done so by meeting wait time requirements for

7  *completed* rides without regard to reliability -- the overall reliability of service provided by Uber

8  in Contra Costa County is that just *one-in-five* riders who request a WAV get a ride. *Id.* Figure 4.

9      *Second,* Plaintiffs neglect to tell the Court that while Lyft and Uber have been able to

10  meet "offset" (as opposed to "exemption") standards established by the CPUC for most but not

11  all quarters, the standards by which the companies may seek an offset have now changed, and

12  will continue to change as the CPUC continues its rule-making process through year 2025.

13  Whether the companies – and Lyft in particular – will be able to meet the changing standards

14  newly imposed by the CPUC is not known.

15      *Third*, Plaintiffs want the Court to order Lyft to meet "benchmarks for reasonable

16  reliability, whether set by the CPUC or by this Court," but fail to identify what those unspecified

17  benchmarks are, how the Court might go about setting them (as no expert will be testifying on

18  the issue), or how much it will cost Lyft to meet those unspecified benchmarks *in addition to* the

19  exemption standards set by the CPUC. The evidence before the Court will be that, despite an

20  enormous investment, current WAV service is inefficient and difficult to provide reliably. By

21  way of example, one way of measuring reliability is by computing the percentage of all ride

22  requests that result in completed rides ("completion rate"). Lyft was only able to achieve

23  completion rates of approximately 80% when it spent $1,000-$2,000 per ride in San Francisco.

24  When it (or Uber) spent anywhere from $240 to $1,254 per ride, however, completion rates were

25  far lower, in some cases just 10-20% for Uber. Rebuttal Report, Figures 5 and 8.

26  Notwithstanding such low reliability rates, to date Uber has been able to meet offset or

27  exemption standards in most but not all quarters. Whether Uber, Lyft, or any other company will

28  be able to meet unspecified reliability standards while also meeting exemption standards set by

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    the CPUC, and at what cost, is entirely unknown and no party will present any admissible

2    evidence to the Court on this issue.

3          There are additional legal reasons why Plaintiffs' form of injunction is not enforceable.

4    First, Plaintiffs may not seek an injunction based on the California Public Utilities Code for an

5    alleged violation of the federal ADA. "A court must limit the conduct it enjoins to that which is

6    found to have been 'pursued [or] persuasively to be related to the proven unlawful conduct.'"

7    *Nelson v. Int'l Bhd. of Elec. Workers, Local Union No. 46*, 899 F.2d 1557, 1564 (9th Cir. 1990).

8          Second, the injunction sought must be "tailored to eliminate only the specific harm

9    alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 at 973, (9th Cir. 1991). Here,

10   the harm alleged is the failure to make reasonable modifications in policies, practices, or

11   procedures (*see* 42 U.S.C. § 12182(b)(2)(A)(ii)), not the failure to meet wait time or reliability

12   standards *that have yet to be established* by the CPUC or this Court. As the Ninth Circuit has

13   made clear, Section 12182(b)(2)(A)(ii) only requires those modifications that are *reasonable*,

14   and does not require "any and all possible accommodations that would provide full and equal

15   access" to individuals with disabilities. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131,

16   1135 (9th Cir. 2012). The focus of the injunction must therefore be on the precise nature of the

17   reasonable modifications to policies, practices, or procedures to be implemented, rather than on

18   the results to be achieved from some unidentified modifications.

19         Finally, the proposed injunction does not tell Lyft what "reasonable modifications" it

20   must make to comply with its terms. *See* Fed. R. Civ. Pro. 65(d)(1) (every injunction must "state

21   its terms specifically" and "describe in reasonable detail—and not by referring to the complaint

22   or other document—the act or acts restrained or required"). As the Supreme Court has held, "the

23   specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed

24   to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to

25   avoid the possible founding of a contempt citation on a decree too vague to be understood."

26   *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Fortyune*, 364 F.3d at 1086-87

27   (approving the district court's injunction requiring the theater defendant to "modify its policies

28   regarding companion seating to ensure that a companion of a wheelchair-bound patron be given

1    priority in the use of companion seats . . . [up until] ten (10) minutes prior to show time" as

2    giving the defendant notice of what the injunction actually prohibits). The CPUC data confirms

3    that no ridesharing company has figured out how to provide reliable WAV service for a

4    reasonable cost.

5          If Plaintiffs cannot identify at trial the reasonable modification that will deliver WAV

6    service within the wait times they seek, that should end this case.

7    **III.    ALL STIPULATED FACTS**

8          1.    Plaintiffs Judith Smith, Tara Ayres, Julie Fuller, and Sascha Bittner are
                 each individuals with a disability under the Americans with Disabilities
9                Act.

10         2.    The individual Plaintiffs each reside within the three Bay Area Counties.

11         3.    Plaintiff Independent Living Resource Center San Francisco ("ILRC") is a
                 disability rights organization located in San Francisco, California.
12
           4.    Plaintiff Community Resources for Independent Living ("CRIL") is a
13               disability rights advocacy and support organization located in Hayward,
                 California.
14
           5.    Lyft is a San Francisco-based company that launched its peer-to-peer
15               marketplace for on-demand ridesharing in 2012.

16         6.    Lyft operates a ridesharing platform through the Lyft App ("App").

17         7.    Lyft's ridesharing marketplace is generally available throughout San
                 Francisco, Alameda, and Contra Costa Counties (the "Bay Area
18               Counties").

19         8.    In the Bay Area Counties, Lyft offers the following ride "modes," among
                 others: (a) Standard (its classic rideshare option), (b) XL (larger vehicles
20               for up to 6 riders), (c) Lux (high-end or luxury vehicles), (d) Lux Black
                 (high-end or luxury black car), and (e) Lux Black XL (high-end or luxury
21               black SUV for up to 6 riders).

22         9.    Lyft offers Standard mode in all regions, but does not offer the other
                 modes in all regions. Lyft typically launches a new mode, such as XL or
23               Lux, once it determines that it has a sufficient number of cars already on
                 its platform that meet the requirements for that mode.
24
          10.    When a mode is available on the platform in a region, riders are able to
25               request a ride in that "mode" at any time, 24 hours a day, but Lyft makes
                 no guarantee that the ride request will be matched or that a driver will be
26               available or accept the ride request.

27        11.    Wheelchair accessible vehicles ("WAVs") are specialized vehicles built to
                 accommodate fixed-frame wheelchairs. WAVs are more expensive than
28               comparable non-WAV vehicles, have higher gas mileage than comparable

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

non-WAV vehicles, and have higher insurance costs than comparable non-WAV vehicles.

12. Lyft offers WAVs on its platform in markets that have regulatory requirements or where it has a partnership with a transit agency.

13. As of January 2021, Lyft offers WAV service (called "Access" mode) in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California.

14. After Plaintiffs filed their Complaint, Lyft launched a WAV pilot in San Francisco ("SF WAV Pilot") in July 2019 by contracting with First Transit, Inc.

15. First Transit employs the drivers who drive the WAVs, and is responsible for training the WAV drivers in the proper use of the equipment and in providing assistance to riders.

16. The WAVs used in the SF WAV pilot are fully dedicated to providing WAV rides only.

17. Lyft does not offer WAV service in Alameda or Contra Costa Counties.

## IV.   FACTUAL ISSUES WHICH REMAIN TO BE TRIED

### A.   Plaintiffs' Proposed List of Issues

*The following facts were determined in the Court's Order on the Parties' Cross Motions for Summary Judgment[12]*

1. Lyft currently uses three models for providing WAV service—the "Partner" model, "Rental" model, and using incentives and marketing to attract potential drivers (what Lyft refers to as the "Organic Driver" model).

2. Under the "Partner" model, Lyft contracts with a third-party company to provide WAVs. The third-party company employs the drivers who drive the WAVs, and is responsible for training the WAV drivers in the proper use of the equipment and in providing assistance to riders.

3. Under the "Rental" model, Lyft contracts with a rental car provider that acquires WAVs and offers them for rent to independent contractor drivers.

4. Under the "Organic Driver" model, drivers who own or have access to WAVs are incentivized to accept WAV rides on the Lyft platform through bonuses.

---

[12] Plaintiffs list these facts already included in the Court's Summary Judgment Order, ECF No. 92, for the sake of efficiency. Defendant declined to create a joint list of previously recognized facts or to stipulate to these background facts to which the parties previously stipulated at Summary Judgment.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

5.      The three models may be used independently or in conjunction with one another.

6.      Lyft has estimated that it could recoup between $17 and 22 million in WAV offsets from the California Public Utilities Commission ("CPUC") statewide.

7.      The First Transit vehicles in the SF WAV Pilot are available from 7am to midnight, and rides must originate in San Francisco.

8.      Lyft currently pays $58.62 per hour per vehicle for the SF WAV Pilot.

9.      Until March 2020, Lyft planned to launch a Rental Pilot program ("Rental Pilot") in the three Bay Area Counties in 2020.

10.     Lyft provides WAV service in New York City through a combination of the "Partner" model, "Rental" model, and "Organic Driver" model.

11.     From October 2019 to March 2020, Lyft subsidized approximately $200 for each WAV ride in New York.

*Offering WAV service through the "Rental" model or a hybrid of multiple models is reasonable in the run of cases*

*"Rental" Model*

12.     Lyft planned to launch the Rental Pilot using Lyft's Rental Model through a partnership with Hertz.

13.     Lyft planned to include 65 vehicles in the Rental Pilot. These vehicles would serve all three Bay Area Counties.

14.     Lyft evaluated the geographic size of the Bay Area Counties compared to the five boroughs of New York City, and the density of likely demand within the three Bay Area Counties to determine that these 65 vehicles would likely cover about 80% of demand for WAV rides.

15.     Lyft estimated that the total cost to Lyft of the Rental Program, including driver incentives and subsidizing each of the 65 vehicles approximately $980 per month, was one million dollars a year.

16.     Lyft planned to configure the Rental Pilot vehicles so that they could also be cross dispatched to provide Lyft's XL service mode to make the vehicles a more attractive proposition for renters.

17.     Lyft never launched the Rental Pilot in the Bay Area and has no plans to launch it in the future.

18.     Lyft has not communicated with Hertz or with any other rental car company about launching the Rental Pilot in the Bay Area since the summer of 2020.

*"Partner" Model*

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

19. In markets where Lyft must meet wait time ("ETA") requirements, Lyft relies in part on a "Partner" model.

20. Currently, where Lyft uses the Partner model, Lyft states that the cost per ride exceeds the revenue collected by at least $100, resulting in Lyft effectively subsidizing the rides for WAV passengers by that amount. For example, in February 2020, of the seven WAV markets where Lyft offered WAV service at least in part using the partner model, five markets (New York, Boston, Dallas, Los Angeles, and San Francisco) had a per-ride cost in excess of $100. Four markets had a per ride cost over $150. San Francisco and Los Angeles had a per ride cost in excess of $900 and $200, respectively.

21. The amount Lyft claims to have paid per ride in San Francisco and Los Angeles does not factor in the potential for Lyft to receive offsets for some or all of those costs.

22. When Lyft launched its SF WAV Pilot using the Partner model, it consisted of five First Transit vehicles.

23. Lyft conducted no paid marketing or advertising of its SF WAV Pilot.

24. During the COVID-19 pandemic, the pilot consisted of two First Transit vehicles (as of July 2020).

25. Lyft continues to offer only two WAV vehicles as a part of its SF WAV pilot.

26. In the cities where Lyft uses the "Partner" model, it pays the third-party Partner company between $40 and $60 an hour per vehicle.

27. The amount Lyft pays per hour per vehicle does not factor in any passenger fares Lyft receives during that hour.

28. In December 2019, Lyft began a process of revaluating its contracts, including its contract with First Transit.

29. The average wait times for the SF WAV pilot have become shorter over time. The average weekday wait time for the SF WAV pilot in mid-August 2019, when the program consisted of 5 vehicles, was 27 minutes. In July 2020, when the program consisted of 2 vehicles, the average wait time for the SF WAV pilot was 11 minutes.

30. Lyft has identified that a potential way to lower the cost of offering WAV service is to cross dispatch WAV vehicles, allowing them to accept rides from both WAV and non-WAV passengers.

31. Lyft does not cross-dispatch the vehicles involved in the SF WAV Pilot.

32. Lyft attributes at least some of this improvement in wait times to changing the placement of the First Transit vehicles.

33. Between July 2019 and July 2020, 215 unique users used the SF WAV pilot.

*WAV Demand*

34. Lyft has identified increasing demand for WAV service as a way of decreasing the cost of offering WAV service.

35. Lyft has not taken a number of steps it knows are likely to increase demand for the SF WAV Pilot including advertising the program.

36. In order to see that "Access Mode" is an option for passengers in San Francisco, a passenger must first toggle "Access Mode" under the "Settings" menu in the Lyft App.

37. In New York City, Lyft removed the need for passengers to toggle "Access Mode" in order to see that WAV service is an option on the Lyft App, and saw demand for WAV service approximately double.

38. While Lyft has considered removing the need to toggle "Access Mode" in the Bay Area, it has yet to do so.

39. Lyft has not consulted with any external parties in planning its provision of WAV service.

*Lyft Can Expand its WAV service in the Bay Area from a Reasonable Starting Point and then Engage in an Iterative Process to collect data and modify the service as needed based on an evaluation of that data.*

40. Transportation planning is an iterative process starting with goals, performance measure identification, analysis, and with multiple feedback loops showing the need to assess and adjust any transportation system post-implementation.

41. Lyft has used this iterative process to build its non-WAV service, and to build its WAV service in New York City to meet applicable service level requirements.

42. Lyft can identify a reasonable starting point for an expanded WAV service pilot in the Bay Area based on Lyft's own origin and destination data, user-level data in the Bay Area, and insights such as popular users and places, and then use data gathered from that pilot to iteratively improve the pilot over a year-long period.

43. Lyft's proposed combination of offering WAV service through a 5-vehicle contract with First Transit and a partnership for 65 vehicles with a rental company, along with incentives to attract independent contractor drivers, is a reasonable starting point for developing an expanded WAV service pilot, based off of Lyft's own estimate of WAV demand in the Bay Area and the small amount of WAV pilot data available at this point.

44. Lyft can implement that starting point of providing 70 plus WAV vehicles in the Bay Area for approximately $3.5 million per year, most of which it can expect to receive in offset, and not factoring in revenue from fares received and the possibility that Lyft will be able to decrease this cost over time.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*"Organic Driver" Model*

45.     Lyft does not currently allow "Organic Drivers," drivers who own or have access to WAV vehicles independently of any rental program arranged by Lyft, to provide WAV service in any of the three Bay Area Counties.

46.     Lyft has taken no steps to attempt to recruit "Organic Drivers" to provide WAV service in any of the three Bay Area Counties.

47.     Lyft has provided no data about the number of WAV vehicles that exist in the Bay Area Counties.

*California Public Utilities Commission Offset*

48.     In California, including in the three Bay Area Counties, the California Public Utilities Commission ("CPUC") collects a 10-cent fee on every rideshare ride, including those provided by Lyft. The fees are collected into what is known as the TNC Access for All Fund.

49.     If a rideshare company offers WAV service that meets the CPUC requirements in any California county, it can receive an offset for the funds it spends to offer WAV service.

50.     The CPUC has yet to establish final wait time requirements to qualify for this offset, but has established interim standards. Companies can apply for retroactive offsets of prior expenditures by showing they have met the interim standards, and that they have improved their service quarter over quarter.

51.     The CPUC plans to evaluate data from this interim phase to establish a final set of wait time requirements for qualifying for the offset.

52.     In addition to the offset standards, the CPUC has also established standards for rideshare companies to qualify for an exemption from the 10-cent per ride fee. If a company can show it met these exemption wait time standards for a full year in a given county, it can be exempt from paying the 10-cent per ride fee for the next year in that county

53.     In Q3 2019, Q4 2019, Q1 2020, and Q2 2020, Lyft requested CPUC offset for its WAV service and received significant offset amounts for each of these quarters.

54.     Lyft must demonstrate that it meets the CPUC's applicable wait time requirements to qualify for the offset.

55.     In its application to receive retroactive offset for the first quarter of 2020, Lyft showed that it had provided 60% of WAV rides in San Francisco within 16.2 minutes, and 100% within 45.83 minutes.

56.     In its application to receive offset for the second quarter of 2020, Lyft showed that it had provided 90% of WAV rides in San Francisco within 21.67 minutes, and 100% within 40.55 minutes.

57.     Lyft has sought CPUC offset to cover both the amount it pays to First Transit for the SF WAV Pilot and additional WAV-related costs such as the hourly cost of Lyft personnel dedicating time to the WAV program.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

58.    While Lyft emphasizes the high per-hour cost of the First Transit contract, and the high per-ride cost of rides provided through the SF WAV Pilot, it fails to acknowledge that Lyft expects to receive all of those funds back from the CPUC in offsets.

59.    Similarly, Lyft estimated that it would be able to recoup the full cost of the Rental Pilot, covering all three Bay Area Counties, in CPUC offsets.

60.    Lyft does not include the quarterly CPUC offset amounts in its cost for providing the SF WAV Pilot.

*Lyft WAV Service in other Markets*

61.    It is a common practice for transportation analysts and planners when developing a new transportation program to look to models and experiences from other regions.

62.    Increases in outreach to WAV-eligible riders correspond with increases in WAV ridership in multiple markets.

63.    In New York, Lyft must meet ETA requirements as part of a legal settlement.

64.    For June 2019, Lyft was required to offer WAV service through the five boroughs, to provide 60% of WAV rides in under 15 minutes, and 90% of WAV rides in under 30 minutes.

65.    Lyft self-reported that it met this requirement.

66.    For June 2020, Lyft was required to provide 80% of WAV rides in under 15 minutes and 90% of WAV rides in under 30 minutes.

67.    Prior to the pandemic, Lyft provided around 1,000 WAV rides a week in New York City.

68.    The cost to Lyft of offering WAV service in New York City has decreased over time.

69.    In Chicago, one of Lyft's least expensive WAV markets, Lyft uses the "Organic Driver" model and receives a per-ride subsidy from the City of Chicago.

70.    From October 2019 to March 2020, Lyft provided 3,324 WAV rides in Chicago using the Organic Driver model.

*Additional Facts Showing Reasonableness of Providing WAV Service in the Bay Area Counties*

71.    In March 2020, Lyft's competitor Uber proposed a WAV plan for the Bay Area Counties with wait times comparable to those in New York.

72.    In Q3 2019, Q4 2019, Q1 2020, and Q2 2020, Uber requested CPUC offset for its WAV service and received significant offset amounts for each of these quarters.

*Lyft has not met its burden to show that the cost of providing WAV service is*

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    *unreasonable or would fundamentally alter its business*

2    73.    Lyft provided no evidence in discovery of any changes it had to make to
3           its business or of any negative financial impacts on its business of any of
            its WAV programs in other cities.

4    74.    In 2018, Lyft's revenue was $2.2 billion, representing a 103% growth rate
5           from 2017 to 2018.

6    75.    In a press release issued May 6, 2020, Lyft announced that its first quarter
            2020 revenue was $955.7 million, up 23% year over year, and that it had
7           ended the quarter with $2.7 billion in unrestricted cash, cash equivalents,
            and short-term investments.

8

9    **B.    Defendants' Proposed List of Issues**

10        With their proposed list of issues in Part IV.A above, Plaintiffs seek to limit the Court's

11   factual inquiry into only those matters they deem helpful to them. Plaintiffs' misleading

12   characterization of evidence has no place in this Pre-Trial Order.

13        Among Plaintiffs' mischaracterizations is their suggestion that Lyft will be able to

14   recover the monies it spends providing WAV service in offset funds from the TNC Access for

15   All Fund (the "Access Fund"). What Plaintiffs' list of factual issues omits is that the CPUC

16   continues to change the standards by which Lyft may seek offsets from the Access Fund, that

17   Lyft and Uber have <u>not</u> been able to recover even close to all the money spent providing WAV

18   service in the Bay Area Counties to date, and that disability advocacy groups – including groups

19   openly aligned with Plaintiffs and their counsel – are actively seeking to have the CPUC impose

20   tougher standards which will not only increase Lyft's costs but decrease the likelihood of any

21   reimbursement. Also missing from Plaintiffs' list of factual issues is the fact that *the Access*

22   *Fund program is temporary*, and will, by its terms, sunset in January 2026. *See* Cal. Pub. Util.

23   Code § 5440.5(e).

24        The Court should reject Plaintiffs' effort to dictate the boundaries of what facts are

25   relevant for trial. Instead, Lyft proposes that the Court adopt the following as the list of factual

26   issues to be tried:

27        1.    Whether Plaintiffs can identify any modification(s) to Lyft's policies,
                practices, or procedures which, if made, will result in an on-demand
28              ridesharing service of WAVs that will be effective in delivering the wait
                times and benchmarks of reliability they seek at a cost that is reasonable.

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

a.    The wait times sought by Plaintiffs;

b.    The benchmarks of reliability sought by Plaintiffs;

c.    How Plaintiffs' proposed modifications, which is a combination of partnerships, WAV rentals for drivers, and incentives, would be implemented in the Bay Area Counties;

d.    The estimated number of WAVs that would be needed to implement the combination of methods proposed by Plaintiffs throughout the Bay Area Counties;

e.    Whether, and where, the number of WAVs that are necessary to implement the combination of methods proposed by Plaintiffs can be found in the Bay Area Counties;

f.    Whether there exists a sufficient supply of WAV drivers who could be deployed throughout the Bay Area Counties to satisfy the combination of methods proposed by Plaintiffs;

g.    Whether the combination of methods proposed by Plaintiffs requires Lyft to purchase, lease, or otherwise pay to create a supply of WAVs, and if so, how many;

h.    Whether the combination of methods proposed by Plaintiffs will deliver the specified wait times and benchmarks of reliability sought;

i.    The estimated cost to Lyft of the combination of methods proposed by Plaintiffs;

j.    The estimated number of WAV rides Plaintiffs expect to take annually after the combination of methods is implemented.

2.    Whether there exists an adequate supply of WAVs to create and sustain an on-demand ridesharing platform for WAVs in the Bay Area Counties.

3.    Whether there exists an adequate demand for WAVs to create and sustain a supply of WAVs on Lyft's ridesharing platform in the Bay Area Counties.

4.    Whether the modification(s) requested by Plaintiffs requires Lyft to create a service that is fundamentally different from the supply-and-demand driven ridesharing platform.

5.    Whether requiring Lyft to guarantee wait times and benchmarks of reliability is a fundamental alteration of its supply-and-demand based ridesharing platform.

1

2      */s/ Stuart Seaborn*

3      Attorney for Plaintiffs

4      **Disability Rights Advocates**
       Stuart Seaborn
5      Melissa Riess
       Rebecca Serbin
6      Michelle Iorio

7

8      */s/ Jiyun Cameron Lee*

9      Attorney for Defendant

10     **Folger Levin LLP**
       Jiyun Cameron Lee
11     Marie Jonas

12

13                              **FILER'S ATTESTATION**

14             Pursuant to Civil Local Rule 5-1(i), I attest that concurrence in the filing of the document

15     has been obtained from each of the other Signatories.

16     Dated:  May 19, 2021

17                                                    */s/ Jiyun Cameron Lee*
                                                      Jiyun Cameron Lee

18

19     Appendix 1: Joint Exhibit List

20     Appendix 2: Plaintiffs' Witness List

21     Appendix 3: Defendant's Witness List

22

23     1110537.5

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 1. | Declaration of Isabella Gerundio in Support of Defendant's Motion for Summary Judgment (originally filed 9/3/2020) | | | |
| 2. | Declaration of Isabella Gerundio in Support of Defendant Lyft Inc.'s Opposition to Plaintiffs' Motion for Partial Summary Judgment (originally filed 9/17/2020) | | | |
| 3. | Declaration of Edward Niedermeyer in Support of Defendant's Motion for Summary Judgment, ECF No. 108-2 | | | |
| 4. | Declaration of Audrey Ren in Support of Defendant Lyft, Inc.'s Opposition to Plaintiffs' Motion for Partial Summary Judgment, ECF No. 108-6 | | | |
| 5. | Defendant Lyft, Inc.'s Response to Plaintiffs' Second Set of Interrogatories, dated July 29, 2020 | | | |
| 6. | LYFT000002024 [Ex. 5 to first deposition of Andres Muñoz, data tables produced in Excel] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 7. | LYFT000002024 [Data report for the period of August 1-September 30, 2019, full copy of data file on disk available for inspection] | | | |
| 8. | LYFT0009253 – LYFT0009256 [Ex. 64 to deposition of Isabella Gerundio, email chain with subject line "Re: Update on XD Coverage Analysis"] | | | |
| 9. | LYFT00009760 [Ex. 36 to deposition of Andres Muñoz, email chain with subject line "Re: CA WAV IC Pilot Doc"] | | | |
| 10. | LYFT0000010580 [Ex. 51 to deposition of Audrey Ren, email chain with subject line "Re: CA WAV IC Pilot Doc"] | | | |
| 11. | LYFT00028812 – LYFT00028815 [Ex. 33 to deposition of Andres Muñoz, document titled "WAV"] | | | |
| 12. | LYFT0009194 [Ex. 65 to deposition of Isabella Gerundio, email with subject line "SF WAV ETA Feedback"] | | | |
| 13. | P002023-P002047 [CPUC "Decision On Track 1 Issues: Transportation Network Company Trip Fee And Geographic Areas" dated July 5, 2019] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 14. | P002048-P002146 [CPUC "Decision On Track 2 Issues: Offsets, Exemptions and Access Provider Disbursements" dated March 19, 2020] | | | |
| 15. | P002147-P002156 [Press Release, "Lyft Announces First Quarter Results" dated May 6, 2020] | | | |
| 16. | LYFT000009552 [data tables produced in Excel] | | | |
| 17. | LYFT000000228 – LYFT000000309 (excerpts) [Ex. 40 to deposition of Edward Niedermeyer, excerpts from Lyft's Amendment No. 1 to Form S-1 Registration Statement] | | | |
| 18. | LYFT00011925– LYFT000001928 [Ex. 80 to deposition of Christopher Wu, email chain with subject line "Fwd: [Update] Team WAV Pilot"] ECF No. 107-7 | | | |
| 19. | LYFT00003701– LYFT000003702 [Ex. 50 to deposition of Audrey Ren, email chain with subject line "Re: Logisticare/Healthcare WAV opportunities"] ECF No. 107-8 | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 20. | LYFT00009579– LYFT00009587 [Ex. 48 to deposition of Audrey Ren, document titled "WAV"] | | | |
| 21. | LYFT000028668– LYFT000028692 [Ex. 46 to deposition of Audrey Ren, Powerpoint presentation titled "WAV National Strategy"] | | | |
| 22. | LYFT00002987– LYFT00002988 [Ex. 45 to deposition of Audrey Ren, email chain with subject line "Re: Logic for CA WAV Pilot of Drivers"] | | | |
| 23. | LYFT000004033 [Ex. 47 to deposition of Audrey Ren, email with subject line "WAV National Solution draft"] | | | |
| 24. | P001502-P001530 [Uber Advice Letter 1A for CPUC Offset Request] | | | |
| 25. | P001531-P001559 [Uber Advice Letter 2A for CPUC Offset Request] | | | |
| 26. | P001560-P001588 [Uber Advice Letter 3A for CPUC Offset Request] | | | |
| 27. | P001589-P001624 [Uber Advice Letter 4A for CPUC Offset Request] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 28. | P001625-P001654 [Uber Advice Letter 4B for CPUC Offset Request] | | | |
| 29. | P001655-P001692 [Uber Advice Letter 6A for CPUC Offset Request] | | | |
| 30. | P001693-P001746 [Uber Advice Letter 7A for CPUC Offset Request] | | | |
| 31. | P001747-P001779 [Uber Advice Letter 8 for CPUC Offset Request] | | | |
| 32. | P001780-P001834 [Lyft Advice Letter 2019 Q3 for CPUC Offset Request] | | | |
| 33. | P001835-P001888 [Lyft Advice Letter 2019 Q4 for CPUC Offset Request] | | | |
| 34. | P001889-P001943 [Lyft Advice Letter 2020 Q1 for CPUC Offset Request] | | | |
| 35. | P001944-P001988 [Lyft Advice Letter 2020 Q2 for CPUC Offset Request] | | | |
| 36. | P001989-P002022 [Lyft Advice Letter 2020 Q4 for CPUC Offset Request] | | | |
| 37. | P002157 [Uber Advice Letter 1A Supplement Data] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 38. | P002158 [Uber Advice Letter 2A Supplement Data] | | | |
| 39. | P002159 [Uber Advice Letter 3A Supplement Data] | | | |
| 40. | P002160 [Uber Advice Letter 4A Supplement Data] | | | |
| 41. | P002161 [Uber Advice Letter 4B Supplement Data | | | |
| 42. | P002162 [Uber Advice Letter 6A Supplement Data] | | | |
| 43. | P002163 [Uber Advice Letter 7A 1 Supplement Data] | | | |
| 44. | P002164 [Uber Advice Letter 7A 2 Supplement Data] | | | |
| 45. | P002165 [Uber Advice Letter 7A 3 Supplement Data] | | | |
| 46. | P002166 [Uber Advice Letter 7A 4 Supplement Data] | | | |
| 47. | P002167 [Uber Advice Letter 8A Supplement Data] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 48. | P002168 [Lyft 2019 Q3 CPUC Offset Request Supplemental Data] | | | |
| 49. | P002169 [Lyft 2019 Q4 CPUC Offset Request Supplemental Data] | | | |
| 50. | P002170 [Lyft 2020 Q1 CPUC Offset Request Supplemental Data] | | | |
| 51. | P002171 [Lyft 2020 Q2 CPUC Offset Request Supplemental Data] | | | |
| 52. | P002172 [Lyft 2020 Q4 CPUC Offset Request Supplemental Data] | | | |
| 53. | Declaration of Andres Muñoz in Support of Lyft, Inc.'s Opposition to Plaintiffs' Motion for Class Certification, ECF No. 50-1 | | | |
| 54. | LYFT00009588 [Ex. 30 to deposition of Andres Muñoz, chart produced in Excel] | | | |
| 55. | LYFT00010080– LYFT00010082 [Ex. 37 to deposition of Andres Muñoz, email chain with subline line "Re: WAV budget"] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 56. | LYFT000002588 [data produced in Excel] [Data report for the period of January 1-December 31, 2019, full copy of data file on disk available for inspection] | | | |
| 57. | LYFT000002589 [data produced in Excel] [Data report for the period of January 1-April 30, 2020, full copy of data file on disk available for inspection] | | | |
| 58. | LYFT00002590 [data produced in Excel] [full copy of data file on disk available for inspection] | | | |
| 59. | LYFT000008783 [data produced in Excel] [full copy of data file on disk available for inspection] | | | |
| 60. | LYFT00002024 [Ex. 7 to deposition of Andres Muñoz, data produced in Excel] | | | |
| 61. | LYFT00001967– LYFT000001979 [Ex. 4 to deposition of Andres Muñoz, May 1, 2019 contract between Lyft and First Transit, titled "Wheelchair Accessible Vehicle Agreement"] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 62. | LYFT00030797– LYFT00030804 [Ex. 34 to deposition of Andres Muñoz, document titled "CA WAV Partner Launch Plan (SFO)"] | | | |
| 63. | LYFT000031902– LYFT000031907 [Ex. 35 to deposition of Andres Muñoz, document titled "WAV"] | | | |
| 64. | LYFT000032148– LYFT00032160 [Ex. 66 to deposition of Isabella Gerundio, document titled "Lyft Wheelchair Accessible Vehicles Overview"] | | | |
| 65. | LYFT00009575– LYFT00009578 [Ex. 67 to deposition of Isabella Gerundio, document titled "WAV 2019/ 2020 + Plan"] | | | |
| 66. | LYFT000013404—LYFT00013406 [Ex. 82 to deposition of Christopher Wu, email chain with subject line "Re: Schedule for this week and Personnel Update"] | | | |
| 67. | P002173 [document from CPUC website titled "Announcement: Funding Year 2021-2022 Access Fund Balance Estimates"] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 68. | P002174 [CPUC Disposition re Lyft Advice Letter 1A re Retroactive Offset for Q3 2019] | | | |
| 69. | P002179 [CPUC Disposition re Lyft Advice Letter 2A re Retroactive Offset for Q4 2019] | | | |
| 70. | P002184 [CPUC Disposition re Lyft Advice Letter 3B re Retroactive Offset for Q1 2020] | | | |
| 71. | P002190 [CPUC Disposition re Lyft Advice Letter 4B re Retroactive Offset for Q2 2020] | | | |
| 72. | P002197 [CPUC Disposition re Uber Advice Letter 1A re Retroactive Offset for Q3 2019] | | | |
| 73. | P002203 [CPUC Disposition re Uber Advice Letter 2A re Retroactive Offset for Q4 2019] | | | |
| 74. | P002209 [CPUC Disposition re Uber Advice Letter 3A re Retroactive Offset for Q1 2020] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 75. | P002215 [CPUC Disposition re Uber Advice Letter 4B re Retroactive Offset for Q2 2020] | | | |
| 76. | P002222-2287 [CPUC "Decision On Track 3 Issues" dated March 8, 2021] | | | |
| 77. | P002288-2300 [Press Release, "Lyft Announces First Quarter Results" dated May 4, 2021] | | | |
| 78. | P002301-2310 [Press Release, "Lyft Announces Fourth Quarter and Fiscal Year Results" dated February 9, 2021] | | | |
| 79. | Expert Report of Dr. Alice Grossman, dated April 30, 2021 | | | |
| 80. | Expert Report of Dr. Alice Grossman, Figure 1 | | | |
| 81. | Expert Report of Dr. Alice Grossman, Figure 2 | | | |
| 82. | Expert Report of Dr. Alice Grossman, Figure 3 | | | |
| 83. | Expert Report of Dr. Alice Grossman, Figure 4 | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 84. | Expert Report of Dr. Alice Grossman, Figure 5 | | | |
| 85. | Expert Report of Dr. Alice Grossman, Figure 6 | | | |
| 86. | Expert Report of Dr. Alice Grossman, Figure 7 | | | |
| 87. | Expert Report of Dr. Alice Grossman, Figure 8 | | | |
| 88. | Expert Report of Dr. Alice Grossman, Figure 9 | | | |
| 89. | Expert Report of Dr. Alice Grossman, Figure 10 | | | |
| 90. | Expert Report of Dr. Alice Grossman, Figure 12 | | | |
| 91. | Expert Report of Dr. Alice Grossman, Table 1 | | | |
| 92. | Expert Report of Dr. Alice Grossman, Table 2 | | | |
| 93. | Expert Report of Dr. Alice Grossman, Table 3 | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 94. | Expert Report of Dr. Alice Grossman, Table 4 | | | |
| 95.-100. | Reserved | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 101. | Expert Report of Marc Rysman, PhD dated July 31, 2020 | | | |
| 102. | LYFT00032435- LYFT00032475 [Lyft Terms of Service dated December 9, 2020] | | | |
| 103. | LYFT00032476 - LYFT00032480 [Lyft Driver Addendum dated December 9, 2020] | | | |
| 104. | Lyft Form 10-Q dated November 12, 2020 | | | |
| 105. | LYFT00000228- LYFT00001273 [Lyft Form S-1/A dated Mar 18, 2019] | | | |
| 106. | Lyft Business Model 101 presentation [Produced with material supporting expert report] | | | |
| 107. | LYFT00002024 [Pivot Table: Cancellations by Mode] | | | |
| 108. | LYFT00002024 [Pivot Table: Completed Rides] | | | |
| 109. | LYFT00002024 [Pivot Table: ETA] | | | |
| 110. | LYFT00002024 [Pivot Table: Avg Daily Drivers] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 111. | LYFT00002024 [Pivot Table: Monthly Passengers & Drivers by County | | | |
| 112. | LYFT00002024 [Pivot Table: Price/Cost by Mode] | | | |
| 113. | LYFT00002024 [Pivot Table: Mode by time of day] | | | |
| 114. | LYFT00002024 [Pivot Table: ETA by Ride Type Zip, Average ETAs] | | | |
| 115. | LYFT00002024 [Pivot Table: ETA by Ride Type Zip, Sum of Requested_Rides] | | | |
| 116. | Intentionally omitted. | | | |
| 117. | LYFT00002588 [Pivot Table: 1: WAV RTAs (minutes)] | | | |
| 118. | LYFT00002588 [Pivot Table: 2: WAV Rides] | | | |
| 119. | LYFT00002588 [Pivot Table: 3: WAV Driver Hours] | | | |
| 120. | LYFT00002588 [Pivot Table: 4: % Difference in DHs per Ride Between WAV & Classic] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 121. | LYFT00002588 [Pivot Table: 5: Difference in DHs per Ride Between WAV & Classic] | | | |
| 122. | LYFT00002588 [Pivot Table: 6: Q4 RTAs by Mode (minutes)] | | | |
| 123. | LYFT00002588 [Pivot Table: 7: Q4 Completed Rides by Mode] | | | |
| 124. | LYFT00002588 [Pivot Table: 8: Q4 Cancellation Rates by Mode] | | | |
| 125. | LYFT00002588 [Pivot Table: 9: Q4 Price per Ride by Mode (excluding WAV)] | | | |
| 126. | LYFT00002588 [Pivot Table: 10: Q4 Cost per Ride by Mode (excluding WAV)] | | | |
| 127. | LYFT00002588 [Pivot Table: 11: RTAs by Mode/Month (minutes)] | | | |
| 128. | LYFT00002588 [Pivot Table: 12: Completed Rides by Mode/Month] | | | |
| 129. | LYFT00002588 [Pivot Table: 13: Price per Ride by Mode/Month (Excluding WAV)] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 130. | LYFT00002588 [Pivot Table: 14: Cost per Ride by Mode/Month (Excluding WAV)] | | | |
| 131. | LYFT00002588 [Pivot Table: 15: Q4 2019 Passenger & Driver Totals] | | | |
| 132. | LYFT00002589 [Pivot Table: 1: WAV RTAs (minutes)] | | | |
| 133. | LYFT00002589 [Pivot Table: 2: WAV Rides] | | | |
| 134. | LYFT00002589 [Pivot Table: 3: WAV Driver Hours] | | | |
| 135. | LYFT00002589 [Pivot Table: 4: % Difference in DHs per Ride Between WAV & Classic] | | | |
| 136. | LYFT00002589 [Pivot Table: 5: Difference in DHs per Ride Between WAV & Classic] | | | |
| 137. | LYFT00002589 [Pivot Table: 6: Q4 RTAs by Mode (minutes)] | | | |
| 138. | LYFT00002589 [Pivot Table: 7: Q4 Completed Rides by Mode] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 139. | LYFT00002589 [Pivot Table: 8: Q4 Cancellation Rates by Mode] | | | |
| 140. | LYFT00002589 [Pivot Table: 9: Q4 Price per Ride by Mode (excluding WAV)] | | | |
| 141. | LYFT00002589 [Pivot Table: 10: Q4 Cost per Ride by Mode (excluding WAV)] | | | |
| 142. | LYFT00002589 [Pivot Table: 11: RTAs by Mode/Month (minutes)] | | | |
| 143. | LYFT00002589 [Pivot Table: 12: Completed Rides by Mode/Month] | | | |
| 144. | LYFT00002589 [Pivot Table: 13: Price per Ride by Mode/Month (Excluding WAV)] | | | |
| 145. | LYFT00002589 [Pivot Table: 14: Cost per Ride by Mode/Month (Excluding WAV)] | | | |
| 146. | LYFT00002589 [Pivot Table: 15: Q4 2019 Passenger & Driver Totals] | | | |
| 147. | LYFT00031951 - LYFT00032128 [Data report - WAV Bonuses – PDF and Native Excel Version] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 148. | LYFT00032385 [Data Report - Historical WAV Expenses] | | | |
| 149. | LYFT00032393- LYFT00032425 [Contract between Lyft and Hertz dated September 28, 2017] | | | |
| 150. | LYFT00032426-LYFT00032434 [Contract between Lyft and Hertz dated February 24, 2020] | | | |
| 151. | LYFT00001849-1856; LYFT00001880-1886; LYFT00001902-1909; LYFT00001894-1901; LYFT00001910-1918; LYFT00001873-1879; LYFT00001959-1966; LYFT00032318-32324; LYFT00001943-1951; LYFT00032326-32336; LYFT00032341-32344; LYFT00001859-1862; LYFT00001919-1927; LYFT00001863-1872 [Additional contracts between Lyft and Third-Party WAV Providers] | | | |
| 152. | [Invoices from Third-Party WAV Providers for WAV services] (various production numbers) | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 153. | Plaintiff Independent Living Resource Center San Francisco's Supplemental Responses to Interrogatories, Set 1 dated May 21, 2020 | | | |
| 154. | Plaintiff Judith Smith's Supplemental Responses to Interrogatories, Set 1 dated May 21, 2020 | | | |
| 155. | Plaintiff Julie Fuller's Supplemental Responses to Interrogatories, Set 1 dated May 21, 2020 | | | |
| 156. | Plaintiff Sascha Bittner's Supplemental Responses to Interrogatories, Set 1 dated May 21, 2020 | | | |
| 157. | Plaintiff Tara Ayres' Supplemental Responses to Interrogatories, Set 1 dated July 13, 2020 | | | |
| 158. | Plaintiff Community Resources For Independent Living's Supplemental Responses to Interrogatories, Set 1 dated May 21, 2020 | | | |
| 159. | Plaintiff Independent Living Resource Center San Francisco's Responses to Interrogatories, Set 2 dated July 13, 2020 | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 160. | Plaintiff Judith Smith's Responses to Interrogatories, Set 2 dated July 13, 2020 | | | |
| 161. | Plaintiff Julie Fuller's Responses to Interrogatories, Set 2 dated July 13, 2020 | | | |
| 162. | Plaintiff Sascha Bittner's Responses to Interrogatories, Set 2 dated July 13, 2020 | | | |
| 163. | Plaintiff Tara Ayres' Responses to Interrogatories, Set 2 dated July 13, 2020 | | | |
| 164. | Plaintiff Community Resources For Independent Living's Responses to Interrogatories, Set 2 dated July 17, 2020 | | | |
| 165. | Plaintiffs' Responses to Requests for Admission dated July 13, 2020 | | | |
| 166. | LYFT00032481 – LYFT00032531 [Current Lyft web pages from https://www.lyft.com/] | | | |
| 167. | LYFT00001987 - LYFT00002023 [Lyft Terms of Service dated August 26, 2019] | | | |
| 168. | LYFT00001672 - LYFT00001676 [Lyft Driver Addendum dated August 26, 2019] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 169. | LYFT00032532 – LYFT00032542 [Screenshots of Lyft App from May 4, 2021] | | | |
| 170. | LYFT00032543 – LYFT00032557 [Uber Proposal on Track 4 Issues dated April 23, 2021] | | | |
| 171. | LYFT00032558 – LYFT00032573 [Track 4 Proposal of San Francisco Municipal Transportation Agency, San Francisco County Transport Authority, and San Francisco Mayor's Office on Disability dated April 23, 2021] | | | |
| 172. | LYFT00032574 – LYFT00032597 [Track 4 Proposals of Disability Rights Education and Defense Fund, Disability Rights California, and the Center for Accessible Technology dated April 23, 2021] | | | |
| 173. | LYFT00032598 – LYFT00032640 [Lyft Advice Letter 4B for CPUC Offset Request] | | | |
| 174. | LYFT00032641 [Lyft 2020 Q2 CPUC Offset Request Supplemental Data to Advice Letter 4B] | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 175. | LYFT00001606 - LYFT00001826  [Web page archives from https://www.lyft.com/] | | | |
| 176. | LYFT00001928 – LYFT00001942 [Contract between Lyft and City Livery Leasing Queens Inc. dated September 12, 2018] | | | |
| 177. | Rebuttal Expert Report of Marc Rysman, PhD dated May 10, 2021 | | | |
| 178. | LYFT00032708 – LYFT000032710 [Photos and Social Media Concerning WAV Misuse in New York City] | | | |
| 179. | **Expert Report of Marc Rysman, PhD Figure 1** | | | |
| 180. | **Expert Report of Marc Rysman, PhD Figure 2** | | | |
| 181. | **Expert Report of Marc Rysman, PhD Figure 3** | | | |
| 182. | **Expert Report of Marc Rysman, PhD Figure 4** | | | |
| 183. | **Expert Report of Marc Rysman, PhD Figure 5** | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 184. | Expert Report of Marc Rysman, PhD Figure 6 | | | |
| 185. | Expert Report of Marc Rysman, PhD Figure 7 | | | |
| 186. | Expert Report of Marc Rysman, PhD Figure 8 | | | |
| 187. | Expert Report of Marc Rysman, PhD Figure 9 | | | |
| 188. | Expert Report of Marc Rysman, PhD Figure 10 | | | |
| 189. | Expert Report of Marc Rysman, PhD Table 1 | | | |
| 190. | Expert Report of Marc Rysman, PhD Table 2 | | | |
| 191. | Expert Report of Marc Rysman, PhD Figure D-1 | | | |
| 192. | Expert Report of Marc Rysman, PhD Figure D-2 | | | |
| 193. | Expert Report of Marc Rysman, PhD Figure D-3 | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 194. | **Expert Report of Marc Rysman, PhD Figure D-4** | | | |
| 195. | **Expert Report of Marc Rysman, PhD Figure D-5** | | | |
| 196. | **Expert Report of Marc Rysman, PhD Figure D-6** | | | |
| 197. | **Expert Report of Marc Rysman, PhD Figure D-7** | | | |
| 198. | **Expert Report of Marc Rysman, PhD Figure D-10** | | | |
| 199. | Rebuttal Expert Report of Marc Rysman, PhD Figure 1 | | | |
| 200. | Rebuttal Expert Report of Marc Rysman, PhD Figure 2 | | | |
| 201. | Rebuttal Expert Report of Marc Rysman, PhD Figure 3 | | | |
| 202. | Rebuttal Expert Report of Marc Rysman, PhD Figure 4 | | | |
| 203. | Rebuttal Expert Report of Marc Rysman, PhD Figure 5 | | | |

**Appendix 1: Exhibit List**

| Trial Exhibit Number | Exhibit Description | Offered in Evidence | Received in Evidence | Limitations on Use |
|---|---|---|---|---|
| 204. | Rebuttal Expert Report of Marc Rysman, PhD Figure 6 | | | |
| 205. | Rebuttal Expert Report of Marc Rysman, PhD Figure 7 | | | |
| 206. | Rebuttal Expert Report of Marc Rysman, PhD Figure 8 | | | |
| 207. | Rebuttal Expert Report of Marc Rysman, PhD Figure 9 | | | |
| 208. | Rebuttal Expert Report of Marc Rysman, PhD Appendix C | | | |
| 209.-300. | Reserved | | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DISABILITY RIGHTS ADVOCATES
Stuart Seaborn  (Bar No. 198590)
Michelle Iorio (Bar No. 298252)
Melissa Riess (Bar No. 295959)
Rebecca Serbin (NY State Bar No. 5273255)*
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
miorio@dralegal.org
mriess@dralegal.org
rserbin@dralegal.org

Attorneys for Plaintiffs
*Admitted Pro Hac Vice

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

INDEPENDENT LIVING RESOURCE
CENTER SAN FRANCISCO, a California
non-profit corporation, JUDITH SMITH, an
individual, JULIE FULLER, an individual,
SASCHA BITTNER, an individual, TARA
AYRES, an individual, and COMMUNITY
RESOURCES FOR INDEPENDENT
LIVING, a California non-profit corporation;

        Plaintiffs,

    v.

LYFT, Inc., a Delaware corporation;

Defendant.

Case No. 3:19-CV-01438-WHA

**PLAINTIFFS' CASE-IN-CHIEF
WITNESS LIST - JOINT PRETRIAL
ORDER APPENDIX 2**

Judge:  Hon. William Alsup
Time: 9:00 a.m.
Date: May 26, 2021
Courtroom: 12 – 19th Floor

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Pursuant to Guidelines for Trial and Final Pretrial Conference in Civil Bench Cases

2 ¶ 2(a)(vi), Plaintiffs hereby submit the following witness list for witnesses that they intend to call

3 at trial:

4    1.    **Dorene Giacopini** – Ms. Giacopini is the President of the Board of Directors at

5 Plaintiff CRIL. Ms. Giacopini will testify about the impact of not being able to use Lyft's on-

6 demand transportation service, the limited transportation options available to CRIL consumers

7 who use WAVs, situations in which she would use Lyft's transportation service if it were

8 accessible to her, and the level of service she would want to see Lyft offer (in terms of both wait

9 time and reliability).

10    2.    **Fiona Hinze** – Ms. Hinze is the Systems Change Coordinator at Plaintiff

11 ILRCSF. Ms. Hinze will testify about the impact of not being able to use Lyft's on-demand

12 transportation service, the limited transportation options available to ILRCSF consumers who

13 use WAVs, situations in which she would use Lyft's transportation service if it were accessible

14 to her, and the level of service she would want to see Lyft offer (in terms of both wait time and

15 reliability).

16    3.    **Judith Smith** – Ms. Smith is an individual Plaintiff. Ms. Smith will testify about

17 the impact of not being able to use Lyft's on-demand transportation service, situations in which

18 she would use Lyft's transportation service if it were accessible to her, and the level of service

19 she would want to see Lyft offer (in terms of both wait time and reliability).

20    4.    **Andres Muñoz**– Mr. Muñoz is a former Lyft employee designated as one of

21 Lyft's FRCP 30(b)(6) witnesses. Plaintiffs expect to use Mr. Muñoz's testimony or deposition

22 testimony regarding Lyft's understanding of the impact or potential impact of the California

23 Public Utilities Commission's ("CPUC") regulations on Lyft's WAV service, the WAV service

24 Lyft offers in markets outside of the Bay Area Counties, the costs of that service and ways of

25 lowering those costs, the SF WAV Pilot, the Bay Area Rental Pilot, and the requirement that

26 Lyft App users toggle "Access Mode" to use WAV service in the Bay Area. Plaintiffs also

27 expect to use Mr. Muñoz's testimony or deposition testimony to authenticate documents.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    5.    **Isabella Gerundio**– Ms. Gerundio is a Lyft employee. Plaintiffs expect to use

2    Ms. Gerundio's testimony or deposition testimony about the scope of the SF WAV Pilot, other

3    plans Lyft has made or considered regarding offering WAV service in the Bay Area Counties,

4    efforts to lower the cost of providing WAV service, Lyft's WAV service in other markets outside

5    of the Bay Area, and Lyft's planning regarding the impact of CPUC regulations. Plaintiffs also

6    expect to use Mr. Gerundio's testimony or deposition testimony to authenticate documents.

7    6.    **Audrey Ren**– Ms. Ren is a Lyft employee. Plaintiffs expect to use Ms. Ren's

8    testimony or deposition testimony regarding Lyft's efforts to provide WAV service in the Bay

9    Area Counties, levers for impacting supply of WAVs, demand for WAVs, and the cost of WAV

10   service. Plaintiffs also expect to use Ms. Ren's testimony or deposition testimony to authenticate

11   documents.

12   7.    **Joyce Chan** – Ms. Chan is a Lyft employee. Plaintiffs expect to use Ms. Chan's

13   testimony or deposition testimony regarding steps Lyft has taken or not taken to expand its WAV

14   service in the Bay Area, and the current status of Lyft's WAV service.

15   8.    **Christopher Wu** – Mr. Wu is a former Lyft employee. Plaintiffs expect to use

16   Mr. Wu's deposition testimony to authenticate documents. Mr. Wu is no longer a Party to this

17   action as a former Lyft employee. Lyft has consented to Plaintiffs using his deposition testimony

18   at trial because Mr. Wu no longer resides in the state of California.

19   9.    **Dr. Alice Grossman, Ph.D.** – Dr. Grossman is a Science Technology Policy

20   Fellow with the American Association for the Advancement of Science and is Plaintiffs' expert

21   in this matter. Dr. Grossman will testify regarding the contents of her expert report, which offers

22   transportation policy and planning insights into the iterative process necessary for the

23   development of an on-demand wheelchair accessible transportation service in the Bay Area, as

24   well as performance measures for evaluating the effectiveness of such a program and any

25   modifications needed going forward.

26   10.   **California Public Utilities Commission Custodian of Records** – If the parties

27   are unable to reach agreement on the authenticity of the CPUC documents produced by Plaintiffs

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

prior to trial, Plaintiffs expect to call a CPUC custodian of records to testify regarding their

knowledge of the authenticity and status of the CPUC documents identified by Plaintiffs

(CPUC's final Track 1,Track 2, and Track 3 decisions, Lyft's and Uber's submissions to the

CPUC, the CPUC's responses to those submissions, and any related CPUC documents).

Plaintiffs may use the following additional testimony:

11.     **Lyft Custodian of Records** – If the parties are unable to reach agreement on the

authenticity of certain documents produced by Lyft, Plaintiffs may call a Lyft custodian of

records to testify regarding the authenticity of those documents.

Plaintiffs reserve the right to call or use testimony or deposition testimony of other

disclosed witnesses in lieu of the testimony listed above, reserve the right to call additional

custodians of record to authenticate documents if needed, and reserve the right to call any

witness identified by Defendant or any other disclosed witness as appropriate for rebuttal.

DATED:  May 18, 2021                              Respectfully submitted,

                                                 DISABILITY RIGHTS ADVOCATES

                                                 _____
                                                 Stuart Seaborn
                                                 Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   FOLGER LEVIN LLP
    Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
2   Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
    199 Fremont Street, 20th Floor
3   San Francisco, CA  94105
    Telephone: 415.625.1050
4   Facsimile: 415.625.1091

5   Attorneys for Defendant LYFT, INC.

6

7

8                         UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10

11  INDEPENDENT LIVING RESOURCE          Case No. 3:19-cv-01438-WHA
    CENTER SAN FRANCISCO, a California
12  non-profit corporation, JUDITH SMITH,   **DEFENDANT LYFT INC.'S CASE-IN-**
    an individual, JULIE FULLER, an         **CHIEF WITNESS LIST – JOINT**
13  individual, SASCHA BITTNER, an          **PRETRIAL ORDER APPENDIX 3**
    individual, TARA AYRES, an individual,
14  and COMMUNITY RESOURCES FOR          Date:       May 26, 2021
    INDEPENDENT LIVING, a California     Time:       9:00 a.m.
15  non-profit corporation,              Courtroom:  12 – 19th Floor

16              Plaintiffs,

17       v.

18  LYFT, Inc., a Delaware corporation,

19              Defendant.

20

21

22

23

24

25

26

27

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

DEFENDANT LYFT INC.'S CASE-IN-CHIEF WITNESS
LIST; CASE NO. 3:19-CV-01438-WHA

1       Pursuant to Guidelines for Trial and Final Pretrial Conference in Civil Bench Cases

2   ¶ 2(a)(vi), Defendant Lyft, Inc. ("Lyft") hereby submits the following witness list for witnesses

3   that may be called at trial:

4       1.      Edward Niedermeyer - Mr. Niedermeyer is Manager of Business Performance,

5   Global Operations at Lyft. Mr. Niedermeyer will testify regarding Lyft's ridesharing platform. He

6   will discuss the Lyft app, the importance of supply-and-demand to the Lyft ridesharing platform,

7   data analytics, the importance of population density, the role of pricing and bonuses, passenger

8   and driver engagement and retention, marketing, and modes in general. Mr. Niedermeyer may

9   also testify about his experience with Lyft's WAV program in the Portland region.

10      *Non-cumulative testimony*: Mr. Niedermeyer's testimony will be non-cumulative.

11  Mr. Niedermeyer will offer unique testimony regarding how Lyft's business functions in practice

12  for its non-WAV modes.

13      2.      Isabella Gerundio - Ms. Gerundio is Program Manager for WAV at Lyft.

14  Ms. Gerundio has worked on Lyft's WAV business since she joined Lyft in February 2019.

15  Currently, as Program Manager for WAV, Ms. Gerundio oversees Lyft's WAV program, called

16  "Access" mode, in every market in which Access mode is offered in the United States: Boston,

17  Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York City, New

18  York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco,

19  California. She will testify regarding Lyft's efforts to offer "Access mode," the differences

20  between regions, the challenge of finding a supply of WAVs, the cost of such efforts, and other

21  operational challenges relating to Access mode.

22      *Non-cumulative testimony:* Ms. Gerundio's testimony will be non-cumulative. She will be

23  the primary source of information concerning Lyft's WAV program, based on her personal

24  knowledge of every market that has Access mode, and different methods of providing WAV

25  service.

26      3.      Dr. Marc Rysman, Ph.D. - Dr. Rysman is a professor of economics at Boston

27  University, and Lyft's expert in this matter. Dr. Rysman will testify regarding the contents of his

28  expert report, which offers economic insights into the functioning of platform industries like

Lyft's and opines on how a WAV service would function in that supply and demand atmosphere.

*Non-cumulative testimony:* Dr. Rysman's testimony is non-cumulative, and will be based on his expert analysis on the feasibility of offering WAV mode on the Lyft platform in a manner similar to Lyft's standard mode.

4.      <u>Audrey Ren</u> - Ms. Ren is General Manager, Partner Relations at Lyft. At Lyft, Ms. Ren has worked on various projects involving WAVs, with a focus on how to reduce the cost of WAV supply. Ms. Ren will testify about her work evaluating possible ways to reduce the cost of WAV supply, including her work on the planned WAV Rental Pilot in the Bay Area.

*Non-cumulative testimony*: Ms. Ren's testimony will not be significantly cumulative of testimony offered by other witnesses. She will focus on her personal experience on project-based work evaluating the expense of WAV supply and her work on the WAV Rental Pilot.

5.      <u>Paul Davis</u> - Mr. Davis is Senior Business Development Manager, Transit Partnerships at Lyft. If called, Mr. Davis will present testimony regarding Lyft's "transit partnerships," which are partnerships with transit agencies, cities, and municipalities, including different methods used by cities and agencies to provide on-demand WAV service in association with their microtransit programs. Mr. Davis may also testify specifically regarding his experience with Lyft's WAV program in Boston, which is offered in connection with a transit partnership.

*Non-cumulative testimony:* Mr. Davis's testimony will not be cumulative. He will focus on the role of WAV in transit partnerships and related challenges.

6.      <u>Dongwon "Don" Lee</u> – Mr. Lee is Operations Strategy Manager at Lyft. If called, Mr. Lee will testify regarding his experience in 2018 and 2019 analyzing options for providing WAV service, including whether it was possible to make it operationally scalable and affordable.

*Non-cumulative testimony*: Mr. Lee's testimony will be largely non-cumulative, as it will focus on his personal experience evaluating options for providing WAV service for a period prior to Ms. Gerundio's employment at Lyft.

7.      <u>Traci Lee</u> - Ms. Lee is Director of Public Policy (West) at Lyft. If called, Ms. Lee will testify regarding Lyft's participation in ongoing CPUC proceedings concerning WAV service in California. Ms. Lee may also testify about her involvement in the development of Lyft's WAV

1  program in San Francisco through its partnership with First Transit.

2      *Non-cumulative testimony:* Ms. Lee's testimony will be non-cumulative and will focus on

3  her personal experience with San Francisco's WAV program and the CPUC proceedings.

4      8.      Abbas Bozorgirad – Mr. Bozorgirad is a Data Scientist at Lyft, who has worked on

5  data analysis in support of Lyft's WAV program. If called, Mr. Bozorgirad will testify regarding

6  his data analysis of Lyft's WAV mode, including his preparation and analysis of data collected in

7  support of this litigation.

8      *Non-cumulative testimony:* Mr. Bozorgirad's testimony will be non-cumulative and will

9  focus on his personal experience with data analysis supporting Lyft's WAV program and related

10  operational challenges.

11     9.      Joyce Chan – Ms. Chan is Vice President, Product Operations at Lyft. Ms. Chan

12  began supervising the division which includes Lyft's WAV program in 2020. If called, Ms. Chan

13  will testify about her supervision of the WAV program, including how Lyft makes business

14  decisions regarding WAV.

15     *Non-cumulative testimony:* Ms. Chan's testimony will be non-cumulative and will focus

16  on senior-level decision-making concerning WAV.

17     10.     Tara Ayers: Lyft may offer deposition or elicit live testimony concerning: the

18  witness's intended use of the Lyft platform; knowledge regarding available supply of wheelchair

19  accessible vehicles; expectations regarding service levels for Lyft's WAV service; knowledge of

20  individuals with interest in driving on the Lyft platform.

21     *Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will

22  focus on her personal preferences, knowledge, and experience.

23     11.     Sascha Bittner: Lyft may offer deposition or elicit live testimony concerning: the

24  witness's intended use of the Lyft platform; knowledge regarding available supply of wheelchair

25  accessible vehicles; expectations regarding service levels for Lyft's WAV service; knowledge of

26  individuals with interest in driving on the Lyft platform.

27     *Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will

28  focus on her personal preferences, knowledge, and experience.

12.  <u>Julie Fuller</u>: Lyft may offer deposition or elicit live testimony concerning: the witness's intended use of the Lyft platform; knowledge regarding available supply of wheelchair accessible vehicles; expectations regarding service levels for Lyft's WAV service; knowledge of individuals with interest in driving on the Lyft platform.

*Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will focus on her personal preferences, knowledge, and experience.

13.  <u>Judith Smith</u>: Lyft may offer deposition or elicit live testimony concerning: the witness's intended use of the Lyft platform; knowledge regarding available supply of wheelchair accessible vehicles; expectations regarding service levels for Lyft's WAV service; knowledge of individuals with interest in driving on the Lyft platform.

*Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will focus on her personal preferences, knowledge, and experience.

14.  <u>Lana Nieves</u>: Lyft may offer deposition or elicit live testimony concerning: Independent Living Resource Center San Francisco (ILRC) background; transportation options available to ILRC consumers who rely on WAVs; definition of "full and equal access" to WAV service on the Lyft platform; witness and ILRC membership, staff, and constituents' intended use of the Lyft platform; knowledge regarding available supply of wheelchair accessible vehicles; witness and ILRC membership, staff, and constituents' expectations regarding service levels for Lyft's WAV service; knowledge of individuals with interest in driving on the Lyft platform.

*Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will focus on her personal preferences, knowledge, and experience, and her knowledge as a representative of ILRC.

15.  <u>Fiona Hinze</u>: Lyft may offer deposition or elicit live testimony concerning: ILRC background; witness and ILRC membership, staff, and constituents' intended use of the Lyft platform; knowledge regarding available supply of wheelchair accessible vehicles; witness and ILRC membership, staff, and constituents' expectations regarding service levels for Lyft's WAV service; knowledge of individuals with interest in driving on the Lyft platform.

*Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will

FOLGER LEVIN LLP
ATTORNEYS AT LAW

1    focus on her personal preferences, knowledge, and experience.

2        16.    Phillip Galvan (PMK): Lyft may offer deposition or elicit live testimony

3    concerning: Community Resources for Independent Living (CRIL) background; transportation

4    options available to CRIL consumers who rely on WAVs; definition of "full and equal access" to

5    WAV service on the Lyft platform.

6        *Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will

7    focus on his knowledge as a representative of CRIL.

8        17.    Dorene Giacopini: Lyft may offer deposition or elicit live testimony concerning:

9    CRIL background; witness and CRIL membership, staff, and constituents' intended use of the

10   Lyft platform; knowledge regarding available supply of wheelchair accessible vehicles; witness

11   and CRIL membership, staff, and constituents' expectations regarding service levels for Lyft's

12   WAV service; knowledge of individuals with interest in driving on the Lyft platform.

13       *Non-cumulative testimony*: The witness's testimony will be non-cumulative as it will

14   focus on her personal preferences, knowledge, and experience.

15

16

17   Dated:  May 19, 2021                          FOLGER LEVIN LLP

18                                                 */s/ Jiyun Cameron Lee*

19                                                 Jiyun Cameron Lee
                                                   Attorneys for Defendant
20                                                 LYFT, INC.

21

22   1110942.1

23

24

25

26

27

28