1  FOLGER LEVIN LLP
   Jiyun Cameron Lee (CSB No. 161667, jlee@folgerlevin.com)
2  Marie Jonas (CSB No. 278952, mjonas@folgerlevin.com)
   199 Fremont Street, 20th Floor
3  San Francisco, CA  94105
   Telephone: 415.625.1050
4  Facsimile: 415.625.1091

5  Attorneys for Defendant LYFT, INC.

6

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11 INDEPENDENT LIVING RESOURCE            Case No. 3:19-cv-01438-WHA
   CENTER SAN FRANCISCO, a California
12 non-profit corporation, JUDITH SMITH,  **DEFENDANT LYFT, INC.'S**
   an individual, JULIE FULLER, an        **RESPONSE TO PLAINTIFFS'**
13 individual, SASCHA BITTNER, an         **[PROPOSED] FINDINGS OF FACT**
   individual, TARA AYRES, an individual, **AND CONCLUSIONS OF LAW AFTER**
14 and COMMUNITY RESOURCES FOR            **BENCH TRIAL**
   INDEPENDENT LIVING, a California
15 non-profit corporation,

16              Plaintiffs,

17       v.

18 LYFT, Inc., a Delaware corporation,

19              Defendant.

20

21

22

23

24

25

26

27

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1   Lyft submits the following response to Plaintiffs' Proposed Findings of Fact and
2   Conclusions of Law after bench trial.

3                       **I.        FINDINGS OF FACT**

4   1.        Plaintiffs Judith Smith, Tara Ayres, Julie Fuller, and Sascha Bittner are each
5   individuals with a disability under the Americans with Disabilities Act.

6   Stipulated at Trial Transcript ("Tr.") 765:14-19.

7   **RESPONSE: Agree.**

8   2.        The individual Plaintiffs reside within San Francisco, Alameda, and Contra Costa
9   counties (the "Bay Area Counties").

10   Stipulated at Tr. 765:22-24.

11   **RESPONSE: Agree.**

12   3.        Plaintiff Independent Living Resource Center San Francisco ("ILRC") is a
13   disability rights organization located in San Francisco, California.

14   Stipulated at Tr. 766:1-4.

15   **RESPONSE: Agree.**

16   4.        Plaintiff Community Resources for Independent Living ("CRIL") is a disability
17   rights advocacy and support organization located in Hayward, California.

18   Stipulated at Tr. 766:6-10.

19   **RESPONSE: Agree.**

20   5.        Lyft is a San Francisco-based company that launched its on-demand ridesharing
21   service in 2012. Lyft's transportation service is generally available throughout the Bay Area
22   Counties.

23   Stipulated at Tr. 766:12-25.

24   **RESPONSE: Disagree.** The parties stipulated that Lyft launched an on-demand
25   ridesharing *marketplace* in 2012. While that marketplace is generally available throughout the
26   Bay Area Counties, the evidence is that Lyft does not guarantee that a ride request will be
27   matched or that a ride will be available within a specific wait time.

28                       ▪   **Stipulation at Tr. 767:19-24**

1
- **Niedermeyer at Tr. 266:7-21, 266:24-267:1, 269:14-25**

2    6.    Lyft's service in the Bay Area Counties includes multiple ride "modes," including

3    Standard mode, and modes featuring larger vehicles and high-end vehicles.

4    Stipulated at Tr. 767:2-9.

5    **RESPONSE: Agree.**

6    7.    Wheelchair accessible vehicles ("WAVs") are specialized vehicles built to

7    accommodate fixed-frame wheelchairs and other non-folding mobility devices.

8    Stipulated at Tr. 768:1-7; Hinze at Tr. 246:12-19.

9    **RESPONSE: Agree.**

10    8.    After Plaintiffs filed their Complaint, Lyft launched a WAV pilot in San Francisco

11    in July 2019.

12    Stipulated at Tr. 768:23-769:2.

13    **RESPONSE: Agree** that the SF WAV pilot launched after the Complaint was filed, but

14    there was no causal relationship. Lyft launched the pilot to participate in the CPUC proceeding.

15
- **Gerundio at Tr. 430:5-18, 431:11-18**

16    9.    Lyft still offers no WAV service in Alameda or Contra Costa Counties.

17    Stipulated at Tr. 769:14-16.

18    **RESPONSE: Agree.**

19    10.    Outside of its WAV service, Lyft uses monetary incentives to influence the

20    behavior of the independent contractor drivers providing Lyft service.

21    Niedermeyer at Tr. 312:8-14, 280:7-19, 312:5-7; Muñoz at Tr. 81:2-9.

22    **RESPONSE: Agree.** Lyft also offers monetary incentives to independent contractor

23    WAV drivers.

24
- **Gerundio at Tr. 403:11-22**

25    11.    These incentives are aimed at both encouraging drivers to join the platform, and at

26    influencing driver behavior to balance supply and demand.

27    Niedermeyer at Tr. 312:5-14, 280:7-19; Muñoz at Tr. 81:2-9.

28    **RESPONSE: Agree,** but incentives only help "at the margins" and "do not actually create

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-2-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

the driver base and the driver supply itself."

■ **Niedermeyer at Tr. 278:13-21**

12.    Outside of its WAV service, Lyft has rental partnerships with companies including Avis, Budget, and Hertz under which drivers can rent vehicles.

Muñoz at Tr. 80:13-24.

**RESPONSE: Disagree.** Ms. Chan testified that Avis now has an exclusive relationship with Uber, and Alamo and National chose to end their relationship with rideshare companies. Hertz no longer provides rideshare rentals in San Francisco.

■ **Chan at Tr. 181:15-183:2, 206:17-207:8**

13.    Lyft continually improves its non-WAV data models and ability to provide transportation service by using an iterative process. Lyft uses an iterative process to manage driver supply and look for opportunities for growth after it launches in a new market.

Niedermeyer at Tr. 274:8-275:10; 285:3-15.

**RESPONSE: Agree** generally that Lyft seeks to continue improving its data models and its platform through an iterative process. Lyft's ability to iterate depends on the density and scale of supply and demand on its platform, so that its machine-learning algorithms can make accurate predictions and facilitate balancing of its supply-and-demand marketplace.

■ **Niedermeyer at Tr. 271:1-272:18, 277:11-280:19, 300:6-301:8, 302:8-303:9, 307:20-308:4**
■ **Bozorgirad at Tr. 317:2-21, 318:12-319:9**
■ **Tr. Ex. 212**

14.    As of January 2021, Lyft offers WAV service ("Access" mode) in nine cities in the United States: Boston, MA; Chicago, IL; Dallas, TX; Los Angeles, CA; New York, NY; Philadelphia, PA; Portland, OR; Phoenix, AZ; and San Francisco, CA.

Stipulated at Tr. 768:14-21.

**RESPONSE: Agree.**

15.    Lyft uses three primary models to offer its WAV service across these markets.

Trial Exhibit ("Ex.") 64 at 3.

**RESPONSE: Agree.**

16.     Under the "Partner" or "W2" model, Lyft contracts with a WAV provider and pays an hourly rate to meet a given service level. The Partner/W-2 model is the most expensive of the three models.

Ex. 64 at 3.

**RESPONSE: Agree.**

17.     Under the Independent Contractor ("IC") or "Organic" model, Lyft incentivizes drivers with access to their own WAVs to provide WAV service. This is the least expensive of the three models.

Ex. 64 at 3; Gerundio at Tr. 141:7-13.

**RESPONSE: Agree.**

18.     Finally, under the "Rental" model, Lyft partners with a rental company to facilitate drivers renting WAVs to drive on the platform.

Ex. 64 at 4.

**RESPONSE: Agree** that Lyft utilizes a Rental model in New York City.

- **Gerundio at Tr. 416:2-4**

19.     When using the "Rental" model, Lyft provides drivers with incentives designed to encourage them to accept WAV rides.

Gerundio at Tr. 141:1-3.

**RESPONSE: Agree** that in New York City, Lyft provides incentives that include per ride bonuses and subsidies on the price of the rental. However, these incentives have not proven to be effective to provide reliable WAV service through the Rental model.

- **Ren at Tr. 132:13-16**
- **Chan at Tr. 241:6-10, 372:2-17, 373:16-19**
- **Bozorgirad at Tr. 328:12- 329:11, 336:11-337:11**
- **Gerundio at Tr. 603:13-21**
- **Tr. Ex. 209**

20.     Lyft sometimes uses a hybrid of these models to provide WAV service. In Boston, Lyft uses the W-2 and Organic driver model. In New York City (referred to by Lyft as "BKN"), Lyft uses a hybrid of all three models.

Ex. 64 at 3-5.

**RESPONSE: Agree**, but there is no evidence in the record that either Boston or New York City is comparable to the Bay Area Counties.

- **Gerundio at Tr. 405:22-406:7**
- **Grossman at Tr. 670:17-675:4**
- **Tr. Ex. 79 at 79-009**
- **Tr. Ex. 220 at p. 3**

21.     To identify what combination of the models to use, Lyft relies on something called a pilot program, which provides Lyft with data about the efficacy of a model or combination of models in a particular market.

Gerundio at Tr. 142:10-17.

**RESPONSE: Agree** that Lyft uses pilot programs but pilots do not always work and do not guarantee certain results. For WAV, due to very small numbers of WAV rides, it is difficult to collect meaningful data.

- **Chan at Tr. 203:22-204:4, 223:17-224:7, 216:12-19**
- **Bozorgirad at Tr. 318:25-319:9, 324:16-325:4, 334:15-335:2, 336:11-337:11**

22.     In New York, Lyft must meet wait time requirements for its WAV service that were created as part of a settlement between Lyft, other rideshare companies, and the local regulator.

Gerundio at Tr. 144:1-7.

**RESPONSE: Agree** that wait time requirements in New York City were set as part of a legal settlement that followed a move by regulators to require that 25% of all trips had to be delivered by WAV, a requirement that would have cost hundreds of millions of dollars.

- **Ren at Tr. 117:13-18, 118:1-9**

23.     Under this settlement, Lyft was required to provide 60 percent of WAV rides in under 15 minutes and 90 percent of WAV rides in under 30 minutes during June 2019.

Gerundio at Tr. 144:11-22.

**RESPONSE: Agree.**

24.     Lyft had approximately a year between agreeing to these requirements and the first measurement period in 2019.

Gerundio at Tr. 144:25-145:8.

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-5-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    **RESPONSE: Agree.**

2        25.    Lyft successfully met these 2019 wait time requirements, using a hybrid of the

3    three service models.

4        Ren at Tr. 104:5-10.

5        **RESPONSE: Agree** that after a "massive fire-drill," Lyft met the standards in June 2019.

6    Lyft struggles to meet the New York City requirements, and is not currently on track to meet the

7    standards for the June 2021 measurement period.

8
- **Ren at Tr. 116:19-117:6, 118:12-16, 119:2-5**
- **Chan at Tr. 375:9-25**
9
- **Bozorgirad at Tr. 326:1-23, 329:22-330:1, 335:6-24**

10       26.    In New York, between October 2019 and March 2020, 756 drivers provided WAV

11   rides through Lyft's Organic driver/IC model.

12       Gerundio at Tr. 145:24-146:2.

13       **RESPONSE: Agree**, but New York City has unique regulations that incentivize IC

14   drivers to own or lease WAVs. Lyft has struggled to recruit IC WAV drivers in other cities.

15
- **Gerundio at Tr. 400:22-401:1, 426:10-427:2**
16
- **Grossman at Tr. 671:15-21**

17       27.    Lyft uses the Rental Model in New York through a contract for up to 100 WAV

18   rental vehicles with City Livery Leasing Queens, Inc. ("CLLQ").

19       Ex. 176 at 1-2; Muñoz at Tr. 87:7-11.

20       **RESPONSE: Agree.**

21       28.    Prior to the pandemic, more than 90 of the 100 WAV rental vehicles in the CLLQ

22   partnership were in use in New York.

23       Muñoz at Tr. 88:22-25.

24       **RESPONSE: Agree**, but the number dropped to 10 or 15 when the pandemic hit. Lyft

25   then had to pay a utilization fee of $90 per vehicle per day while the vehicles were parked.

26
- **Muñoz at Tr. 88:9-89:4**
27
- **Tr. Ex. 176-003 (Sec. 1.6(a))**

28       29.    Under this partnership, CLLQ purchased the WAVs for use in the rental program,

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-6-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

collected the rental fees from drivers, and performed maintenance on the rental vehicles.

Muñoz at Tr. 99:8-17, 99:23-100:2.

**RESPONSE: Agree**, but Lyft bore significant financial responsibility and risk, including subsidizing the rental cost by $250-$300 per vehicle per week, providing financial guarantees to secure the financing as part of the transaction, and paying a utilization fee of $90 per vehicle per day if the vehicles were not rented.

- Ex. 176-002 (Sec. 1.5(c)) and 176-003 (Sec. 1.6(a))
- Muñoz at Tr. 86:19-87:1, 88:2-89:4, 101:6-20

30.    While Lyft faced challenges during the pandemic that impacted the CLLQ rental program, Lyft continues to use this program and the Rental Model to provide WAV service in New York.

Muñoz at Tr. 88:12-89:1, 100:8-10; Chan at Tr. 370:10-15.

**RESPONSE: Agree** that the rental program in New York City continues, but the independent contractor drivers who rent these WAVs are spending under 3 percent of their time providing WAV rides. Lyft has not found a way to make WAV rentals work and does not believe a rental program would be effective in the Bay Area Counties.

- Ex. 176-001, -009, -013
- Ren at Tr. 132:13-16
- Chan at Tr. 197:23-198:4, 241:6-10, 372:2-17, 373:16-19
- Bozorgirad at Tr. 328:12-329:11, 330:20-332:1
- Gerundio at Tr. 414:24-421:11, 603:13-21
- Tr. Ex. 209

31.    In June 2021 Lyft must provide 80 percent of its WAV rides in New York within 10 minutes and 90 percent within 15 minutes. Lyft is currently working toward meeting these requirements.

Ren at Tr. 124:9-125-4, Bozorgirad at Tr. 335:11-24.

**RESPONSE: Agree**, though Lyft is not on track to meet the standards for the June 2021 measurement period. *See* Resp. to Fact No. 25.

32.    From October 2019 to March 2020, Lyft spent $4.1 million on its WAV program in New York City; during the same period, it provided 19,000 WAV rides, resulting in a per-ride subsidy of about $200.

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-7-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

Gerundio at Tr. 149:21-150:4.

**RESPONSE: Agree**, but there is no evidence in the record that costs would be comparable in the Bay Area Counties.

33.    The cost of providing WAV service in NYC has decreased over time.

Muñoz at Tr. 82:9-11.

**RESPONSE: Agree**, but there is no evidence in the record that similar cost savings would be possible in the Bay Area Counties.

34.    Lyft previously required riders in New York to open the Lyft App's settings and flip a "Wheelchair Access" toggle to see that WAV was an available ride mode, and still requires riders to flip the toggle in other markets where it offers WAV in order to see WAV as an option.

Gerundio at Tr. 146:3-149:9.

**RESPONSE: Agree.**

35.    When Lyft removed this requirement and started displaying WAVs along with other available ride modes in New York, Lyft saw its demand for WAVs increase roughly 100 percent.

Gerundio at Tr. 146:3-149:9.

**RESPONSE: Agree** that demand for Access mode increased, but there is evidence that Access mode is being used by individuals who do not use wheelchairs for mobility.

- **Gerundio at Tr. 502:8-511:2**
- **Tr. Ex. 178**

36.    In Portland, Oregon, Lyft must provide WAV service and meet a 30-minute wait time requirement. It provides the service using only the Partner/W-2 model and is typically able to meet the 30-minute requirement.

Niedermeyer at Tr. 306:14-24, 313:25-314:2, 307:8-19.

**RESPONSE: Agree**, though Lyft has "struggled" at times to meet the requirement. There is no evidence in the record that Portland is comparable to the Bay Area Counties.

- **Niedermeyer at Tr. 307:10-19, 313:19-22**

37.    In a document written in 2019, Lyft reported that in the preceding month it had

Folger Levin LLP
Attorneys At Law

-8-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    offered 35% of WAV rides with wait times under 15 minutes and 76% with wait times under 30

2    minutes across all WAV markets.

3        Ex. 20 at 3; Ren at Tr. 111:18-112:13.

4        **RESPONSE: Agree**, but the cited numbers were largely driven by New York City, where

5    the majority of WAV rides occurred.

6        ▪ **Ren at Tr. 111:18-112:13**

7        38.      There is no evidence in the record that Lyft has faced any financial hardship or

8    consequences from offering WAV service in any market.

9        **RESPONSE: Disagree.** There is extensive evidence in the record that providing WAV

10   service is extremely expensive and consequential, both financially and operationally, for Lyft.

11        ▪ **Muñoz at Tr. 86:19-87:1, 88:2-89:4, 94:12-95:10, 101:6-20**
         ▪ **Gerundio at Tr. 154:15-155:3, 415:11-417:19, 417:23-419:2, 438:14-442:24**

12        ▪ **Ren at Tr. 105:16-21, 126:7-127:6**
         ▪ **Chan at Tr. 209:7-210:19, 214:8-17, 216:9-217:6**

13        ▪ **Niedermeyer at Tr. 307:10-19, 313:19-22**
         ▪ **Bozorgirad at Tr. 317:25-321:17, 322:15-324:12, 326:2-23, 330:2-10**

14        ▪ **Tr. Ex. 21 at 21-005**
         ▪ **Tr. Ex. 64**

15        ▪ **Tr. Ex. 150 at 150-002**
         ▪ **Tr. Ex. 176 at 176-003, -004, -015**

16

17        39.      Lyft has not considered leaving or terminating service in any city because of the

18   financial impacts of providing WAV service.

19        Chan at Tr. 240:3-6.

20        **RESPONSE: Agree.**

21        40.      Lyft has not terminated or laid off any employee directly because of negative

22   financial impacts of providing WAV service.

23        Chan at Tr. 240:7-10.

24        **RESPONSE: Agree.**

25        41.      Lyft is "trying to solve [WAV] long-term for our business overall."

26        Chan at Tr. 204:5-20.

27        **RESPONSE: Agree** that Lyft is *trying* to solve this problem, however, there is no

28   evidence that Lyft has, in fact, done so or that the problem is solvable.

FOLGER LEVIN LLP
ATTORNEYS AT LAW

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

42.     In 2019, Lyft outlined a national WAV strategy with the goal of lowering costs, in part by moving away from solely using the Partner/W-2 model.

Ex. 21 at 3.

**RESPONSE: Agree**, but since 2019, Lyft has gained additional experience and its thinking and strategy on WAV has changed.

- **Ren at Tr. 113:3-13, 115:6-16, 131:14-133:3**
- **Gerundio at 419:3-421:11**

43.     As part of this plan, Lyft planned to launch a pilot to test cost levers.

Ex. 21 at 13.

**RESPONSE: Agree.**

44.     The pilot would measure metrics including wait times, the comparative efficiency of W-2/Partner drivers compared to IC drivers, the number of IC drivers and driver hours, and IC driver incentives.

Ex. 21 at 13.

**RESPONSE: Agree**, but even in 2019, Lyft knew there was significant risk that the pilot would fail. Among other things, the cost of a rental program could range significantly ($8 to $40 million) depending on two key levers (driver hours and number of rides per driver hour).

- **Tr. Ex. 21 at 21-012**

45.     As of May 2020, the plan sought to test whether the rental model would work as part of a national WAV strategy using a rental pilot in the Bay Area.

Gerundio at Tr. 417:23-419:2.

**RESPONSE: Agree**, and one big concern Lyft wanted to test was whether it could find drivers to rent these vehicles and retain them week to week.

- **Muñoz at Tr. 91:21-93:14**
- **Ren at Tr. 129:14-130:6**
- **Gerundio at Tr. 419:3-20**

46.     Lyft planned to launch a rental pilot in the three Bay Area Counties through a partnership with Hertz ("Rental Pilot").

Gerundio at Tr. 154:15-155:3.

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    **RESPONSE: Agree.**

2        47.    Lyft considered multiple partners for the Rental Pilot and determined that Hertz

3    was the most cost-effective.

4        Ren at Tr. 105:16-21.

5        **RESPONSE: Agree** that Hertz was more "cost effective" despite the fact Lyft would

6    have to pay $980 per vehicle per month, regardless of whether these vehicles were rented.

7            ▪ **Tr. Ex. 150 at 150-002, -003**

8        48.    Under Lyft's contract with Hertz, Hertz is the entity that acquires the WAV

9    vehicles for use in the Rental Pilot.

10       Muñoz at Tr. 99:2-7; Gerundio at Tr. 155:1-10.

11       **RESPONSE: Agree**, but Lyft was obligated to pay $980 per month for each vehicle,

12   regardless of whether the vehicle is rented. Absent Lyft's willingness to take on these financial

13   risks and obligations, there is no evidence such a rental partnership is possible.

14           ▪ **Muñoz at Tr. 94:2-24**
             ▪ **Ren at Tr. 126:7-19**
15           ▪ **Tr. Ex. 150 at Sec. 5.1 and Sec. 6.2-6.4**

16       49.    In order to incentivize drivers to rent the WAV vehicles in the Rental Pilot, Lyft

17   planned to have the vehicles configured so they could also be cross-dispatched to provide XL

18   rides, a Lyft ride mode that is more lucrative for drivers.

19       Muñoz at Tr. 90:17-91:20.

20       **RESPONSE: Agree**, but there is no evidence this would have provided adequate

21   incentive for drivers to rent these vehicles.

22           ▪ **Muñoz at Tr. 92:23-93:14**
             ▪ **Gerundio at Tr. 419:3-20**
23

24       50.    Lyft also planned to pay driver incentives to the Rental Pilot drivers to encourage

25   them to drive on the platform.

     Gerundio at Tr. 155:14-18.
26
         **RESPONSE: Agree**, but there is no evidence this would have provided sufficient
27
     incentive for drivers to rent these vehicles.
28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-11-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

- **Tr. Ex. 150 at 150-002, -003**
- **Muñoz at Tr. 92:23-93:14, 94:2-24**

51.     Lyft ran an analysis done in collaboration with its "Science" team, based on data it had at the time, observing that the 65 rental vehicles in its rental pilot could cover roughly 80% of the WAV demand across the Bay Area Counties.

Ren at Tr.106:16-25; Ex. 10 at 1.

**RESPONSE: Disagree**. This was a preliminary analysis, based on "limited data" in 2019, and did not take into account CPUC requirements (which had not yet been set). Thus, it was a "rough estimation" and Lyft was not "really sure" if the estimate was correct.

- **Ren at Tr. 106:16-25,107:8-14, 108:3-12**

52.     Lyft planned to cover the other 20% of WAV demand across the counties with W-2/Partner drivers.

Ren at Tr.108:13-16.

**RESPONSE: Disagree**. This was not a "plan," but an assumption to be tested. There was no certainty that 65 rental vehicles could cover 80% of WAV demand or that Lyft could cover the remaining 20% of WAV demand with Partner vehicles. Lyft's current estimate based on its recent experience is that it would take at least 15 Partner vehicles to cover all three Bay Area Counties just to meet CPUC offset requirements, which is not assured.

- **Ren at Tr. 108:13-16**
- **Gerundio at Tr. 567:25-568:24, 570:16-23**

53.     The overall anticipated cost to Lyft of operating the Rental Pilot was $2 million over two years.

Ren at Tr. 105:23-106:2.

**RESPONSE: Agree** that this was a rough estimate at the time, but there is no evidence the program would have been successful at the estimated cost.

- **Grossman at Tr. 667:8-668:9**

54.     If Lyft supplemented the Rental Pilot with five W-2 vehicles, as initially planned, at a cost of $360,000 per vehicle per year, the total cost of the Bay Area WAV pilot would have been approximately $2.8 million.

Folger Levin LLP
Attorneys At Law

-12-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1   Gerundio at Tr. 563:1-6; 564:22-565:14.

2   **RESPONSE: Agree** that this was a rough estimate at the time for a single year, but there

3   is no evidence the program would have been successful at the estimated cost. Lyft had significant

4   concern as to whether it could find drivers to rent the WAVs; in addition, recent analysis suggests

5   that even if rental drivers could be found, Lyft would have needed a larger number of Partner

6   vehicles to supplement them. Indeed, a conservative current estimate of how much it would cost

7   to provide effective WAV service in the Bay Area Counties in a manner that could meet CPUC

8   requirements is at least $6.4 million per year.

9   ▪ **Gerundio at Tr. 567:25-568:24**

10   55.   In July 2019, Lyft launched a 5-vehicle pilot in San Francisco using the

11   W2/Partner model. Lyft operated the pilot through a contract with a company called First Transit

12   ("First Transit Pilot").

13   Muñoz at Tr. 78:7-18.

14   **RESPONSE: Agree.**

15   56.   First Transit Pilot rides must originate in either San Francisco or at SFO airport.

16   The First Transit Pilot does not accept ride requests in Alameda or Contra Costa counties.

17   Gerundio at Tr. 150:16-22, 151:4-11; Chan at Tr. 181:3-6.

18   **RESPONSE: Agree.**

19   57.   The First Transit Pilot is available in San Francisco seven days a week, 7am to

20   midnight.

21   Gerundio at Tr. 151:14-18.

22   **RESPONSE: Agree.**

23   58.   During the month of February 2020, Lyft provided 125 WAV rides in San

24   Francisco, which works out to 25 rides per vehicle.

25   Gerundio at Tr. 153:4-9.

26   **RESPONSE: Agree.**

27   59.   A person who wants to request a WAV ride through the Lyft app in San Francisco

28   will not see that WAV rides are an option until they open the settings menu on their Lyft app and

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-13-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1   flip a toggle labeled "Wheelchair Access."

2       Gerundio at Tr. 146:16-148:7.

3       **RESPONSE: Agree** that the toggle must be activated; however, it need only be activated

4   one time, after which point Access Mode will be visible every time the app is opened.

5           ▪ **Tr. Ex. 34 at 34-027, -029**
            ▪ **Gerundio at Tr. 148:9-14**

6   60.     Based on its experience in New York, Lyft anticipates that if it removes the toggle

7   switch in San Francisco, demand for WAV service will increase.

8       Gerundio at Tr. 152:21-24.

9       **RESPONSE: Agree**.

10  61.     Lyft plans to remove the toggle switch for San Francisco WAV rides when it has

11  created a sufficient supply of WAV drivers and vehicles.

12      Gerundio at Tr. 152:25-153:3.

13      **RESPONSE: Agree**, but in BKN after the toggle was removed, some of the increase in

14  rides was attributable to individuals who did not rely on wheelchairs for mobility, which could

15  negatively impact service levels for users who need WAVs.

16          ▪ **Gerundio at Tr. 502:8-511:2**
            ▪ **Tr. Ex. 178**

17

18  62.     As a result of decreased demand for rides during the pandemic, Lyft reduced the

19  number of First Transit vehicles providing WAV rides in San Francisco from five to two.

20      Gerundio at Tr. 153:15-21; Chan at Tr. 215:4-14.

21      **RESPONSE: Agree**, but decreased traffic overall also contributed to Lyft's ability to

22  meet CPUC offset time standards with fewer vehicles.

23          ▪ **Chan at 215:15-216:19**

24  63.     With those two vehicles, Lyft was able to reduce wait times for WAV riders by

25  placing vehicles in places where it predicted there would be demand for WAV rides.

26      Gerundio at Tr. 153:22-25.

27      **RESPONSE: Agree** that Lyft was able to manually position the two vehicles in order to

28  achieve CPUC offset time standards. Lyft's success in positioning vehicles in San Francisco is

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-14-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

made possible by a very small number of super-users.

- **Chan at Tr. 234:11-17**
- **Gerundio at Tr. 445:3-446:15**

64.     In July of 2020, when the San Francisco WAV First Transit pilot program consisted of two vehicles, the average wait time for the San Francisco WAV pilot was 11 minutes.

Gerundio at Tr. 154:7-10.

**RESPONSE: Agree.**

65.     The annualized cost to Lyft of the five-vehicle First Transit Pilot was approximately $1.5 million.

Muñoz at 78:19-21.

**RESPONSE: Agree**, but those were only the partnership – not internal – costs.

66.     Lyft has submitted offset requests to the California Public Utilities Commission which include costs associated with its W-2 partnership with First Transit.

Ex. 32 (Lyft's Advice Letter for Q3 2019) at 053; Ex 34 (Lyft's Advice Letter for Q1 2020) at 053; Gerundio at Tr. 529:3-530:6.

**RESPONSE: Agree.**

67.     For the four quarters where Lyft has both made an offset request and the CPUC has responded to the request, Lyft received approximately $1.47 million in offset.

Ex. 98 (Summary of CPUC Offset Requests by Lyft and Approvals by CPUC); Gerundio at Tr. 555:4-7.

**RESPONSE: Agree** this is true for San Francisco.

68.     Drivers who have a WAV and want to provide WAV service in the Bay Area Counties through the Lyft platform under the IC/Organic model are not currently permitted to do so.

Gerundio at Tr. 152:5-16.

**RESPONSE: Agree** that Access mode is not enabled for independent contractor drivers in the Bay Area Counties, which is due to training and vehicle inspection requirements for

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-15-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1   reimbursement from the CPUC. Further, there is no evidence of any independent contractor

2   drivers who want to drive on Lyft's platform in the Bay Area Counties.

3           ▪   **Gerundio at Tr. 404:21-405:7**

4           69.     The record contains no evidence that Lyft has made any efforts to recruit

5   "IC/Organic WAV drivers in the Bay Area or offered any incentives to IC/Organic WAV drivers

6   in the Bay Area.

7           **RESPONSE: Agree** that there were no recruitment efforts as Lyft never launched an

8   IC/Organic WAV model in the Bay Area Counties. Lyft believes that an IC/Organic WAV model

9   would be ineffective due to lack of supply of drivers with their own WAVs and drivers willing to

10  drive in Access mode.

11          ▪   **Gerundio at Tr. 456:17-458:15**

12          70.     The IC/Organic driver model is Lyft's least expensive model for offering WAV

13  service.

14          Ex. 64 at 3-4.

15          **RESPONSE: Agree** that the IC/Organic driver model is described as the "least

16  expensive" in Exhibit 64; however, extensive evidence establishes that this model would not be

17  effective to help meet ETAs in the Bay Area Counties.

18          ▪   **Chan at Tr. 197:23-198:4**
            ▪   **Bozorgirad at Tr. 328:12-329:21, 330:20-332:1**
19          ▪   **Gerundio at Tr. 400:19-401:1, 421:18-422:1, 426:10-427:15, 456:17-458:15**
            ▪   **Rysman at Tr. 700:11-703:12, 707:5-12, 713:5-22**
20          ▪   **Tr. Ex. 101 at 101-025 to -026**

21          71.     Lyft decided to pause the launch of the Rental Pilot because of the pandemic.

22          Gerundio at Tr. 155:19-21.

23          **RESPONSE: Agree** that the pandemic contributed to the pause of the Rental pilot. Hertz

24  also declared bankruptcy and stopped operating rideshare rentals in San Francisco.

25          ▪   **Chan at Tr. 181:15-183:2**

26          72.     However, as of May 2020, Lyft was optimistic that the rental model would work

27  as a method of providing WAV service around the country.

28          Gerundio at Tr. 599:18-22.

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-16-                          DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
                             PROPOSED FINDINGS OF FACT AND CONCLUSIONS
                             OF LAW; CASE NO. 3:19-CV-01438-WHA

1    **RESPONSE: Agree** this was the reason for testing the rental model, but since that time,

2    Lyft has gathered additional information and learned that the rental model will almost certainly

3    not serve as a reliable model for providing WAV service.

4         ▪ **Gerundio at 418:3-422:8, 599:23-600:1, 603:13-21**

5    73.    Lyft's Vice President of Partner Operations, an employee high up in Lyft's

6    operations, was not aware of whether Lyft had made any effort to allow Hertz to honor its

7    contract with Lyft despite Hertz' bankruptcy.

8    Chan at Tr. 179:12-22; 230:5-15.

9    **RESPONSE: Agree.**

10   74.    Lyft has not communicated with Hertz or any other rental car company about

11   launching the Rental Pilot since the summer of 2020.

12   Chan at Tr. 183:8-14.

13   **RESPONSE: Agree.**

14   75.    At least some WAV vehicles are currently available for rent in the Bay Area.

15   Giacopini at Tr. 67:5-12.

16   **RESPONSE: Agree** that WAVs may be available for rental by consumers. There is no

17   evidence that any consumer rental providers would be willing to rent to rideshare drivers, or that

18   they would be willing or able to get in the business of rideshare rentals.

19        ▪ **Chan at Tr. 182:5-183:1, 202:4-204:4**

20   76.    The person at Lyft who oversees its WAV program across the United States and

21   Canada does not believe the problem with using the Rental model is finding a partner.

22   Gerundio at Tr. 136:4-8 (job title and role); 602:17-603:14.

23   **RESPONSE: Agree** that Ms. Gerundio oversees WAV. **Disagree** with the

24   characterization of her testimony. Ms. Gerundio testified:

25        [F]undamentally, I don't think the problem is finding a partner,
     Judge. I think what my concern is, is that the rental model **will not**
26   **work, no matter which partner we implemented it**. Because they
     will still act as ICs, Judge. So if you're trying to implement certain
27   liability metrics, ETA metrics, the issue is not the partner and the

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW                    -17-         DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
                                                 PROPOSED FINDINGS OF FACT AND CONCLUSIONS
                                                 OF LAW; CASE NO. 3:19-CV-01438-WHA

supply. The issue is ICs, we cannot control ICs, and when, where
they will drive and if they will accept WAV rides.

▪ **Gerundio at Tr. 603:14-21** (emphasis added)

77.     Instead, she testified that the difficulty with the rental model is the difficulty of
controlling driver behavior, but that Lyft has yet to try any of the tools it can use to increase its
influence over drivers' behavior in the Bay Area.

Gerundio at Tr. 603:15-607:12.

**RESPONSE: Disagree.** Ms. Gerundio testified the rental model would be ineffective in
the Bay Area Counties no matter what because, even with incentives, independent contractor
drivers do not provide a reliable source of WAV rides, techniques to improve reliability have not
proved successful, and based on Lyft's research, are unlikely to be successful.

▪ **Gerundio at Tr. 603:14-21, 605:14-22, 606:16-18**

78.     The sole document in evidence Lyft introduced to demonstrate its recent concerns
about implementing the Bay Area Rental pilot it had planned was Exhibit 209.

Ex. 209 (Jan 2021-May 2021 WAV rental utilization rates in New York City); Chan at Tr.
368:15-369:2 (Ex. 209 reflects recent concerns), 382:7-21 (proposed Ex. 210 not in evidence).

**RESPONSE: Disagree and object** to the mischaracterization of evidence. **Agree** that
Exhibit 209 demonstrates Lyft's concerns with the Rental model; however, doubts were also
reflected in other documents such as Exhibits 10 (describing analysis for the Rental pilot as an
"initial estimate"), 21 (ability to save costs through a Rental model can range significantly based
on number of hours driven by rental drivers and number of WAV rides they accept), 64 ("No way
to force cover 24/7. Requires high volume of drivers to help with SLAs") and 150 (limiting initial
delivery to 10 WAVs under Hertz contract due to doubts about the ability to rent out), as well as
sworn testimony at trial. As Ms. Gerundio testified, Lyft has learned a great deal about the Rental
model since May 2020, and she and other witnesses testified under oath regarding their ongoing –
and increasing – concerns regarding the effectiveness of the Rental model.

▪ **Ren at Tr. 129:1-130:6 (discussing Tr. Ex. 10), 122:1-123:17 (discussing Tr.
Ex. 21)**
▪ **Muñoz at Tr. 92:21-93:21**

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-18-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

- **Chan at Tr. 201:14-205:14, 222:23-223:22, 241:6-10**
- **Gerundio at Tr. 599:19-600:1, 603:13-21**
- **Bozorgirad at Tr. 328:12-329:6, 331:1-332:1**

79.     This document, Exhibit 209, created "a week or two" prior to trial, simply shows that utilization of cross-dispatched WAV rental model vehicles in New York, while low, had actually shown improvement from January to May 2021.

Ex. 209 (Jan 2021-May 2021 WAV rental utilization rates in New York City); Chan at Tr. 367:25-368:23.

**RESPONSE: Agree** that Exhibit 209 shows low utilization of WAVs rented by independent drivers, but **disagree** with the characterization of the chart as showing any meaningful "improvement" in utilization. As established by witness testimony, Exhibit 209 shows extremely low WAV utilization by WAV rental drivers in New York City, who are spending just 1-3 percent of their time giving WAV ("Access") rides.

- **Chan at Tr. 375:6-377:13**

80.     Lyft continues to use a rental model in the New York City market.

Muñoz at Tr. 88:12-89:1, 100:8-12; Chan Tr. at 370:10-15.

**RESPONSE: Agree** that the model is still in use as the contract's term is three years, and thus extends until September 2021.

- **Ex. 176-001, -009, -013**

81.     Lyft's witnesses testified that it is working toward meeting wait time requirements for June 2021 in the New York City market.

Ren at Tr. 124:9-125-4; Bozorgirad at Tr. 335:11-24

**RESPONSE: Agree** that Lyft's witnesses testified that they are "struggling" and using "trial and error" to attempt to meet the wait time standards for June 2021, but have not gotten close to meeting them.

- **Chan at Tr. 375:9-25**
- **Bozorgirad at Tr. 326:1-23, 329:22-330:1, 335:6-24**

82.     Though Lyft's witnesses expressed concerns about cross-dispatched rental WAVs potentially being unavailable for WAV rides while being used in Standard mode, Lyft admitted

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-19-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    there are methods it can test to ensure cross-dispatched WAVs are available for WAV rides.

2         Gerundio at Tr. 449:22-452:24; 601:10-17.

3         **RESPONSE: Disagree.** The cited testimony refers to cross-dispatching partner WAVs,

4    not rental WAVs. Moreover, no one "admitted there are methods [Lyft] can test to ensure cross-

5    dispatched WAVs are available for WAV rides." The evidence is that Lyft has tested cross-

6    dispatching its partner WAVs and learned that with cross-dispatch, ETAs go up and availability

7    goes down. Although Lyft continues experimenting as it looks for ways to reduce costs, there is

8    no evidence that there are any methods of cross-dispatching that will "ensure" availability.

9              ▪ **Gerundio at Tr. 603:13-21, 605:14-22, 606:16-18**

10        83.    Lyft has tested the use of cross-dispatching to allow WAV drivers to fulfill ride

11   requests in modes other than WAV.

12        Gerundio at Tr. 447:8-448:18.

13        **RESPONSE: Agree** that Lyft has tested cross-dispatching its partner WAVs, but has

14   learned that it leads to higher ETAs and less reliability.

15             ▪ **Niedermeyer at Tr. 308:5-25**
              ▪ **Gerundio at Tr. 603:13-21, 605:14-22, 606:16-18**
16

17        84.    Lyft has not tested adjusting its algorithm to allow WAV drivers to be cross-

18   dispatched at certain times but not at other times.

19        Gerundio at Tr. 601:10-14, 602:22-607:9

20        **RESPONSE: Object** that the fact is ambiguous. **Agree** that Lyft has not tested all

21   possible methods of cross-dispatch.

22        85.    Lyft's witnesses also testified that Lyft could supplement its rental model with W-

23   2 WAVs to better cover WAV demand, in addition to cross-dispatched rental model vehicles.

24        Ren at Tr. 108:3-16; Ex. 10; Gerundio at Tr. 601:10-14; Bozorgirad at Tr. 337:12-18.

25        **RESPONSE: Disagree.** The cited testimony refers to three different things: analysis of

26   the rental pilot in 2019 (Ren); cross-dispatching of partner (W-2) WAVs (Gerundio); and a

27   hypothetical question regarding supplementing rental WAVs with partner vehicles (Bozorgirad).

28   None of the cited testimony supports any current view at Lyft that a combination of rental and W-

1    2 WAVs could "cover WAV demand" throughout the Bay Area Counties.

2           86.    Lyft has not consulted with any external parties in planning its provision of WAV

3    service.

4           Chan at Tr. 190:20-22.

5           **RESPONSE: Agree.**

6           87.    The record contains no evidence of any emails, memos, formal written analysis, or

7    anything in writing indicating that Lyft's planned Bay Area WAV pilot (combination of Rental

8    Pilot and W-2/Partner vehicles) would not be effective or that it could not be implemented, that

9    the WAV pilot or national WAV plan needed to be abandoned, or that Lyft's analysis of how it

10   could cover WAV demand in the Bay Area using a combination of the requested models was

11   incorrect.

12          **RESPONSE: Object** to the mischaracterization of the record. Doubts regarding the

13   Rental pilot were reflected in several documents and witnesses provided extensive testimony

14   under oath regarding the reasons why Lyft no longer intends to move forward with a Rental pilot

15   in the Bay Area Counties. *See* Lyft's Resp. to Fact No. 78.

16          88.    Pursuant to Cal. Pub. Util. Code § 5440.5 ("TNC Access for All Act"), Lyft

17   charges its riders a ten-cent surcharge on each Lyft ride they take within California, which Lyft

18   then pays into a fund administered by the California Public Utilities Commission (CPUC).

19          Ex. 13 (CPUC Track 1 Decision) at 024, *see also id.* at 009-014.

20          **RESPONSE: Agree.**

21          89.    Lyft can be exempted from paying ten-cent fees into the CPUC fund for a year for

22   a county if it demonstrates that it has satisfied CPUC exemption requirements for that county for

23   four consecutive quarters.

24          Ex. 14 at 087 (exemption requirements), *see also id.* at 093-094, 046-050; Gerundio at Tr.

25   156:23-157:16.

26          **RESPONSE: Agree.**

27          90.    An entity meets the exemption standards if it provides 80% of WAV rides within

28   16 minutes in San Francisco County, 80% within 20 minutes in Alameda County, and 80% within

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-21-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1   40 minutes in Contra Costa County.

2          Ex. 14 at 087, 093.

3          **RESPONSE: Agree.** Lyft has never met the exemption time standard in either San

4   Francisco or Los Angeles Counties.

5             ▪ **Gerundio at Tr. 488:7-489:7**

6          91.    Lyft can offset its quarterly payment into the CPUC fund for each county by the

7   amount it spent to provide WAV service in that county in the previous quarter, if it meets wait

8   time requirements established by the CPUC and demonstrates quarterly improvement.

9          Ex. 14 (CPUC Track 2 Decision) at 086 (providing "interim" offset wait time

10  requirements), *see also id*. at 017-025 (discussing proposals and reasoning for accepted

11  requirements.)

12         **RESPONSE: Agree** that this is the current standard, which is subject to change.

13         92.    Lyft proposed its own set of benchmarks to the CPUC "'for Year 1 of Lyft's WAV

14  program' because there is insufficient data to project response times for subsequent years."

15         Ex. 14 at 015.

16         **RESPONSE: Agree.**

17         93.    Lyft's proposal was that entities receive offset during just the initial year of the

18  program for showing: 50% of rides in San Francisco within 20 minutes or 75% within 40

19  minutes, 50% of rides in Alameda County within 30 minutes or 75% within 60 minutes, and 50%

20  of rides in Contra Costa County within 40 minutes or 75% within 80 minutes.

21         Ex. 14 at 016.

22         **RESPONSE: Agree.**

23         94.    After considering Lyft and the other Parties' proposals, the CPUC adopted a set of

24  "interim" offset wait time standards.

25         Ex. 14 at 086.

26         **RESPONSE: Agree.**

27         95.    In San Francisco, an entity meets the CPUC's "interim" offset wait time standards

28  if it shows that either 50% of its rides had wait times within 15 minutes or 75% of its rides had

1    wait times within 30 minutes.

2            Ex. 14 at 086.

3            **RESPONSE: Agree.**

4            96.     In Alameda and Contra Costa counties, an entity meets the "interim" offset wait

5    time standards if 50% of its rides had wait times within 30 minutes or 75% of its rides had wait

6    times within 50 minutes.

7            Ex. 14 at 086.

8            **RESPONSE: Agree.**

9            97.     The CPUC adopted these "interim" offset wait time requirements due to the lack

10   of "actual response time data" regarding WAV service and stated that it intended to adjust

11   requirements as more data is gathered.

12           Ex. 14 at 019-020; Ex. 76 (CPUC Track 3 Decision) at 060-061, 012-015; Gerundio at Tr.

13   572:4-10.

14           **RESPONSE: Agree.**

15           98.     In its Track 3 decision, the CPUC further pushed out the adoption of new wait

16   time requirements to allow additional data to be gathered and adopted an offset requirement of

17   showing improved trip completion rates compared to previous quarters. The CPUC stated:

18                  We acknowledge parties' interest in setting a minimum completion
19                  percentage (such as 50%) or gradually increasing benchmarks, as a
                    means to incentivize TNCs to accept and complete a higher number
20                  of trip requests. It is necessary, however, to balance the need to
                    incentivize WAV service development and expansion . . . without
21                  setting an unrealistic requirement that discourages WAV
                    development. At this time, there is insufficient record for the
22                  Commission to determine the appropriate minimum percentage or
                    appropriate increasing benchmarks. The Commission believes that
23                  before adopting a minimum standard, it is prudent to first evaluate
                    actual WAV trip completion rates by geographic area and over a
24                  longer time period than currently available data allow to better
25                  understand an appropriate minimum requirement.

26           Ex. 76 (CPUC Track 3 Decision) at 012-013, 060-061, 012-015; Gerundio at Tr. 572:4-

27   10.

28           **RESPONSE: Agree.**

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-23-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

99.     The CPUC is currently considering updated wait time and trip completion requirements in its Track 4 rulemaking.

Ex. 96 (CPUC Track 4 Scoping Memo) at 2-4; Gerundio at Tr. 573:2-11.

**RESPONSE: Agree** that the CPUC is considering these, among other, issues.

100.     Lyft has submitted proposed wait times and trip completion rates for San Francisco County in its comments to the CPUC.

Ex. 97 (Lyft's Comments to CPUC on Track 4) at 6; Gerundio at Tr. 580:8-584:4.

**RESPONSE: Agree** that the proposal was submitted; however, there is no evidence that Lyft's proposal will be adopted.

101.     In Lyft's proposal, entities would have to provide 54.5% of rides in San Francisco within 15 minutes in Q3 2021 and improve on that standard until it would be required to provide 80% of rides within 15 minutes in Q4 2025.

Ex. 97 at 6.

**RESPONSE: Agree** that this was the proposal submitted for San Francisco; however, there is no evidence that this standard will be adopted.

102.     In Lyft's proposal, entities would have to provide 82% of WAV rides in 30 minutes in Q3 2021, and improve on that standard until it would be required to provide 99% of rides within 30 minutes in Q4 2025.

Ex. 97 at 6.

**RESPONSE: Agree** that this was the proposal submitted for San Francisco; however, there is no evidence that this proposal will be adopted.

103.     Additionally, in Lyft's proposal, entities would have to show a ride completion rate of 71.5% and ride acceptance rate of 81.5% for Q3 2021, and eventually show a ride completion rate of 80% and ride acceptance rate of 90% in Q4 2025.

Ex. 97 at 6.

**RESPONSE: Agree** that this was the proposal submitted for San Francisco; however, there is no evidence that this proposal will be adopted.

104.     Pre-pandemic, Lyft's analysis showed that Lyft could meet the CPUC's offset wait

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-24-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1  time requirements for San Francisco of 50 percent of rides within 15 minutes and 75 percent of

2  rides within 30 minutes.

3      Gerundio at Tr. 160:11-161:6; 162:3-164-25.

4      **RESPONSE: Agree.**

5      105.   Lyft believed it also had good chance of meeting the CPUC offset requirements for

6  Alameda County and Contra Costa County.

7      Gerundio at Tr. 160:11-161:6; 162:3-164-25.

8      **RESPONSE: Agree** that based on preliminary assumptions, Lyft believed it had a chance

9  of meeting offset requirements in Alameda and Contra Costa County with 5 First Transit

10 vehicles; however, Lyft now believes it would need at least 15 vehicles in the three Bay Area

11 Counties to meet current offset requirements.

12          ▪ **Gerundio at Tr. 567:25-568:24**

13     106.   Lyft satisfied the offset requirements for San Francisco for Q3 2019 through Q2

14 2020, and the CPUC approved a total of $1,467,798.04 in offsets for those four quarters.

15     Ex. 98 (Summary of CPUC Offset Requests by Lyft and Approvals by CPUC); Gerundio

16 at Tr. 555:4-7.

17     **RESPONSE: Agree** that Lyft satisfied the requirements in SF for this period; however,

18 Lyft missed the offset requirements for SF for Quarter 4, 2020, and due to the pandemic, the

19 amounts available for offset were significantly reduced in Quarters 1, 2 and 3, 2020.

20          ▪ **Gerundio at Tr. 492:10-493:15**
           ▪ **Tr. Ex. 98**
21          ▪ **Tr. Ex. 177 at 177-016**

22     107.   Lyft's offset requests for Q3 2020 and Q1 2021 are pending. It did not submit a

23 request for Q4 2020. Lyft has never submitted an offset request that the CPUC denied.

24     Ex. 98 (Summary of CPUC Offset Requests by Lyft and Approvals by CPUC); Gerundio

25 at Tr. 555:4-7.

26     **RESPONSE: Agree** regarding the status of offsets requested. Lyft does not apply for

27 reimbursement when it does not meet offset requirements.

28          ▪ **Gerundio at Tr. 492:10-493:15**

■ **Tr. Ex. 98**
■ **Tr. Ex. 177 at 177-016**

108.   During the pandemic, the number of rides Lyft provided decreased, and so did its payments into the CPUC fund. As the number of rides Lyft provides increases as the pandemic subsides, Lyft will pay more into the fund and be eligible for more in offset.

Gerundio at Tr. 159:15-22; Chan at Tr. 190:14-19.

**RESPONSE: Agree** that payments to the fund decreased during the pandemic. While Lyft is hopeful that its business will return to pre-pandemic levels, there is no evidence in the record as to when or whether it will.

109.   For the largely pre-pandemic quarter of Q1 2020, Lyft paid approximately $543,000 into the CPUC fund for San Francisco.

Ex. 98; Gerundio at Tr. 559:23-560:13.

**RESPONSE: Agree.**

110.   For the pre-pandemic quarter of Q4 2019, Lyft paid $60,000 into the CPUC fund for Contra Costa County and $240,000 for Alameda County.

Gerundio at Tr. 563:13-564:8.

**RESPONSE: Agree.**

111.   Lyft provides no WAV service in Alameda or Contra Costa County, and thus has neither sought nor received any offset of any of the funds it has paid into the CPUC fund in either county.

Chan at Tr. 224:18-225:16.

**RESPONSE: Agree.**

112.   If Lyft's CPUC fund payments referenced above in ¶¶ 109 and 110 are annualized across four quarters, then pre-pandemic Lyft contributed approximately $3.37 million to the CPUC fund annually for San Francisco, Alameda, and Contra Costa Counties combined.

Gerundio at Tr. 563:13-565:14.

**RESPONSE: Disagree** and **object** that this "fact" is purely hypothetical and contradicted by the evidence. There is no basis for "annualizing" these sums, as evidence shows that in Q2 and

Q3 2020, Lyft paid just $78,690 and $127,861, respectively, into the Access Fund for San Francisco County, amounts that fall far short of $543,000 for Q1 2020. Evidence also shows that in Q1 2021, Lyft paid just $133,198 for San Francisco County and approximately $100,000 combined for Alameda and Contra Costa Counties. Again, these amounts fall far short of the amounts paid in Q1 2020 or Q4 2019. There is no evidence as to when the amount paid by Lyft into the Access Fund will return to Q1 2020 levels, if ever.

- **Gerundio at Tr. 463:1-9, 493:16-494:2**
- **Tr. Exs. 215 and 216**

113.     Lyft's business was impacted significantly during the pandemic, and it is now "in the midst of a resurgence."

Ren at Tr. 133:4-6; Chan at Tr. 211:9-11.

**RESPONSE: Agree**, but no evidence was presented at trial as to whether or when business would return to pre-pandemic levels.

114.     At the end of the first quarter of 2021, Lyft reported approximately $2.2 billion in unrestricted cash equivalents and short-term investments.

Lyft SEC Form 10-Q for Q1 2021, ECF. No. 185-2 at 20.

**RESPONSE: Agree**, but Lyft also reported total liabilities of approximately $3.1 billion as of the end of the first quarter of 2021.

- **Lyft SEC Form 10-Q for Q1 2021, ECF. No. 185-2 at 6**

115.     Lyft reported approximately $609 million in revenue for the first quarter of 2021.

Lyft SEC Form 10-Q for Q1 2021, ECF. No. 185-2 at 41.

**RESPONSE: Agree**, but Lyft also reported approximately $416 million in loss from operations and $427 million in net losses as of the end of the first quarter of 2021. Losses were not unique to the first quarter of 2021; Lyft similarly reported $414 million in loss from operations and $398 million in net losses as of the end of the fourth quarter of 2020.

- **Lyft SEC Form 10-Q for Q1 2021, ECF. No. 185-2 at 7 and 41**

116.     Annualizing Lyft's ten-cent fee payments for the last quarter prior to the pandemic (Q1 2020), Lyft paid approximately $3.37 million into the fund for the three counties, making

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-27-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

$3.37 million available to offset the costs of providing WAV service in those counties.

Gerundio at Tr. 563:13-565:14; Finding of Fact ("FF") ¶ 91; $543,000 x 4 = $2.17 million; $300,000 x 4 = $1.2 million; $2.17 million + $1.2 million = $3.37 million.

**RESPONSE: Disagree** and **object** this "fact" is purely hypothetical and speculative, and contradicted by the evidence. In Q1 2020, Lyft paid approximately $543,000 into the Access Fund for San Francisco, and in Q4 2019, it paid approximately $300,000 for Alameda and Contra Costa Counties. There is no basis for "annualizing" these sums, as evidence shows that in Q2 and Q3 2020, Lyft paid just $78,690 and $127,861, respectively, into the Access Fund for San Francisco County, amounts that fall far short of $543,000 for Q1 2020. Evidence also shows that in Q1 2021, Lyft paid just $133,198 for San Francisco County and approximately $100,000 combined for Alameda and Contra Costa Counties. Again, these amounts fall far short of the amounts paid in Q1 2020 and Q4 2019. There is no evidence as to when the amount paid by Lyft into the Access Fund will return to Q1 2020 levels, if ever.

- **Gerundio at Tr. 463:1-9, 493:16-494:2**
- **Tr. Exs. 215 and 216**

117.    $3.37 million in ten-cent-per-ride fees reflects fees collected from approximately 33.7 million rides annually, across the three Bay Area Counties.

$3.37 million/ 10 cents per-ride= 33.7 million rides.

**RESPONSE: Object** this "fact" is purely hypothetical and speculative, and is contradicted by the evidence. *See* Resp. to Fact No. 116.

- **Gerundio at Tr. 463:1-9, 493:16-494:2**
- **Tr. Exs. 215 and 216**

118.    Lyft collects approximately $15 in revenue per ride.

Rysman at Tr. 714:25-715:5.

**RESPONSE: Disagree.** Dr. Rysman testified that the $15 figure is the average amount paid by the consumer in February 2020, which is not the same as the amount Lyft collects in "revenue" for each ride. Lyft's revenue from each ride is limited to service fees and commissions it retains from the fare it collects on behalf of the driver.

- **Lyft SEC Form 10-Q for Q1 2021, ECF. No. 185-2 at 13**

119.    If Lyft collects approximately $15 per ride in revenue for 33.7 million rides, then Lyft made approximately $505.5 million in annual revenue across the Bay Area Counties prior to the pandemic.

33.7 million rides x $15/per ride= $505.5 million.

**RESPONSE: Object** this "fact" is purely hypothetical and speculative, and is contradicted by the evidence. **Disagree** because this "fact" is based on incorrect and hypothetical assumptions, such as that the full fare amount collected from riders constitutes "revenues" to Lyft. To the contrary, Lyft's revenue for each ride is limited to service fees and commissions. *See* Lyft's Resp. to Fact Nos. 116-118.

120.    Given the scope of Lyft's business in the Bay Area, it could collect an additional $337,000 in annual revenue by charging an additional one cent per ride.

33.7 million rides x $.01= $337,000.

**RESPONSE: Object** this "fact" is purely hypothetical and speculative, and is contradicted by the evidence. **Disagree** because this "fact" is based on incorrect and hypothetical assumptions. *See* Lyft's Resp. to Fact Nos. 116-117.

121.    If Lyft charged an additional 5 cents per ride, it would collect an additional $1.85 million annually, a sum which would pay for the cost of the 65-vehicle Bay Area WAV rental pilot.

33.7 million rides x $.05= $1,685,000; Ren at Tr. 105:23-106:2.

**RESPONSE: Object** this "fact" is purely hypothetical and speculative, and is contradicted by the evidence. *See* Lyft's Resp. to Fact Nos. 116-117.

122.    Lyft provided no evidence to refute Plaintiffs' calculation of the revenue it makes in the three Bay Area counties.

**RESPONSE: Disagree.** *See* Lyft's Resp. to Fact Nos. 113-121.

123.    It is standard industry practice to engage in an iterative process to develop a transportation service. The iterative process involves identifying goals and performance outcomes, launching a pilot, and adjusting the service based on data gathered through that pilot.

Grossman at Tr. 634:20-635:25; Ex. 79 (Grossman Expert Report) at 006-008.

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-29-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    **RESPONSE: Agree.**

2    124.    Lyft's ability to predict where demand for WAV rides will be and place vehicles

3    accordingly to fulfill that demand is affected by how much data it has.

4    Gerundio at Tr. 154:1-6.

5    **RESPONSE: Agree.**

6    125.    It is common to engage in the iterative process for at least a year to gather

7    sufficient data.

8    Grossman at Tr. 648:12-649:12.

9    **RESPONSE: Agree.**

10   126.    No one will know exactly how many vehicles will be required to provide a certain

11   level of WAV service, and exactly how much it will cost to provide WAV service, until Lyft

12   begins piloting its service with actual vehicles on the streets.

13   Grossman at Tr. 654:3-13; 662:18-663:15.

14   **RESPONSE: Agree.**

15   127.    Lyft's proposed 65-vehicle rental pilot plus the five-vehicle First Transit pilot is an

16   example of a reasonable starting point for rolling out a WAV program in the three Bay Area

17   counties and then beginning to gather the information necessary to help better determine the exact

18   combination of service models, vehicles, vehicle placement, and other mechanisms to effectively

19   provide WAV service going forward.

20   Grossman at Tr. 640:14-642:8; Ex. 79 (Grossman Expert Report) at 023-025.

21   **RESPONSE: Object** this proposed finding states an opinion, not a fact. Moreover, no

22   evidence was offered to show such a pilot would be effective in providing reliable service. To the

23   contrary, evidence at trial showed a rental pilot would not be effective because, among other

24   things, there is no rental partner, no evidence that drivers would rent these vehicles, and no

25   evidence that these drivers would accept WAV ride requests.

26       ▪ **Chan at Tr. 203:1-204:20, 206:17-207:8, 241:6-10**
    ▪ **Muñoz at Tr. 92:21-94:9**

27       ▪ **Gerundio at Tr. 599:19-600:1, 603:13-21**
    ▪ **Tr. Ex. 150 at ¶ 3.2**

28       ▪ **Tr. Ex. 209**

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-30-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

128.     Reasonable initial target performance outcomes for Lyft to provide WAV service in the three counties would be 80% of rides in under 30 minutes and 100% of rides in under 65 minutes.

Grossman at Tr. 650:21-651:22; 652:17-25; Ex. 79 at 026.

**RESPONSE: Object** this proposed finding states an opinion, not a fact. Also, there was no evidence offered at trial as to whether providing WAV service in the three counties at 80% within 30 minutes and 100% within 65 minutes is "reasonable" based on effectiveness and cost.

129.     These initial target performance outcomes are based on average wait times for WAV service provided through programs in Los Angeles (under 15 minutes), Seattle (under 15 minutes), Chicago (15 minutes), and New York (20-30 minutes).

Grossman at Tr. 652:4-653:5; Ex. 79 at 026.

**RESPONSE: Agree** but no evidence was presented that these programs or cities are comparable to any program that could be offered in the Bay Area. Witness admitted she did not conduct a statistical analysis with control variables.

- **Grossman at Tr. 671:22-672:4**
- **Tr. Ex. 220 at p. 3**

130.     Plaintiffs' proposed remedy allows Lyft a full year to meet reasonable benchmarks for wait times and reliability.  This allows Lyft to engage in an iterative process, utilizing a reasonable starting point, to gather data and make any changes it needs to the number of vehicles, placement of vehicles, and other changes that may help Lyft more effectively provide WAV service in the Bay Area.

ECF 157 at 8 (Plaintiffs' Proposed Remedy).

**RESPONSE: Agree** this is Plaintiffs' proposed remedy, but there was no evidence offered as to (a) what "benchmarks for wait times and reliability" are "reasonable" based on effectiveness and cost, (b) what is a "reasonable starting point" based on effectiveness and cost, and (c) whether the proposed remedy would be "reasonable" based on effectiveness and cost.

## II.     CONCLUSIONS OF LAW

131.     Under Title III of the ADA at 42 U.S.C. § 12184(b)(2)(A), which applies to

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-31-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    transportation providers, unlawful discrimination includes the failure to make reasonable

2    modifications consistent with those required under 42 U.S.C. § 12182(b)(2)(A)(ii), which defines

3    discrimination as:

> a failure to make reasonable modifications in policies, practices, or
> procedures, when such modifications are necessary to afford such
> goods, services, facilities, privileges, advantages, or
> accommodations to individuals with disabilities, unless the entity
> can demonstrate that making such modifications would
> fundamentally alter the nature of such goods, services, facilities,
> privileges, advantages, or accommodations.

9    **RESPONSE: Agree.**

10    132.    The language of the statute makes clear that the ADA does not just require

11    reasonable modifications to a covered entity's policies, but also to make reasonable modifications

12    to practices and procedures. Further, nothing in the language of the statute or case law restricts

13    the scope of reasonable modifications to mere changes to written policies. *See, e.g., Celano v.*

14    *Marriott Int'l, Inc.*, No. C 05-4004 PJH, 2008 WL 239306, at *18 (N.D. Cal. Jan. 28, 2008)

15    ("[T]he court finds that the provision of accessible golf cart(s) at Marriott's courses, is both

16    reasonable and necessary to accommodate the plaintiffs' disabilities in this case.")

17    **RESPONSE: Agree** that the statute requires "reasonable modifications in policies,

18    practices, or procedures." Lyft has never taken the position that the law "restricts the scope of

19    reasonable modifications to mere changes to written policies." *Celano* is consistent with Lyft's

20    position. That case involved Marriott's practice of providing golf carts at its golf courses; the

21    "goods, services, facilities" offered by Marriott was the golf course, not the golf carts, and

22    Plaintiffs in *Celano* did not request the creation of a different course. Here, the "goods, services,

23    facilities" offered by Lyft is its on-demand ridesharing platform, and because Plaintiffs know

24    there is not a sufficient supply of, or demand for, WAVs to support an on-demand WAV

25    platform, Plaintiffs want Lyft to create and maintain a new and different service: an on-demand

26    service by WAVs with guaranteed service levels (*e.g.*, wait times and reliability), including in

27    geographic areas where Lyft does not have WAV service in the ordinary course of business. *See*

28

Folger Levin LLP
Attorneys At Law

-32-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

28 C.F.R. § 36.307. No court has ever ordered such an expansion of a private entity's goods or services under the ADA, either under the guise of a "modification in policies, practices, or procedures" or otherwise. The ADA "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000).

133.   Here, the Court granted summary judgment for Plaintiffs regarding "the existence of a discriminatory policy, practice, or procedure." ECF No. 92 ("MSJ Order") at 12.

**RESPONSE: Agree** that in its MSJ Order, the Court stated that it was granting summary judgment for Plaintiffs "as to the existence of a discriminatory policy, practice, or procedure." The Court, however, identified several potential "policies, practices, or procedures," such as driver incentives and marketing (Dkt. 92 at 4), acknowledged that the modifications Plaintiffs were seeking were vague (*id.*), and stated that "the key question is whether making these modifications in the Bay Area Counties would be reasonable." *Id.* at 5. The Court, therefore, did not identify any specific "policy, practice, or procedure" to be modified, and has not yet ruled on the key question of whether, under Section 12182(b)(2)(A)(ii), Lyft has engaged in any "discrimination" by failing "to make reasonable modifications in policies, practices, or procedures." In addition, the MSJ Order was based on a more limited record. The factual record at trial was expanded to include the testimony by Plaintiffs' new expert witness who admitted that what Plaintiffs seek is an entirely *new transportation service*. *See* Tr. at 662:14-17. Under the circumstances, it is appropriate for the Court to revisit its prior ruling, including whether Plaintiffs have identified a discriminatory policy, practice, or procedure. *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (successive motion for summary judgment is appropriate on an expanded factual record).

134.   The Court also found that the Lyft is a covered entity under Title III of the ADA, Plaintiffs have standing to challenge the discriminatory policy, practice or procedure at issue, and that Plaintiffs have identified policies, practices, or procedures that can be implemented to address the discriminatory policy, practice, or procedure. *Id.* at 3, 5, and 12.

**RESPONSE: Agree** as to the first two points but **disagree** as to the third point, because

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-33-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

the Court did *not* state in its MSJ Order "that Plaintiffs have identified policies, practices, or

procedures that can be implemented to address the discriminatory policy, practice, or procedure."

*See also* Lyft's Response to Proposed Conclusion of Law ("Resp. to Law") No. 133.

135.    Regarding the available defense of fundamental alteration, the Court stated:

> Lyft has already instituted WAV programs using not only the
> partnership model, but other models in other geographic regions —
> it cannot argue that something it is already doing would
> fundamentally alter its business, though doing so might be cost
> prohibitive in our region.

*Id.* at 10.

**RESPONSE: Agree** that the above statement is in the MSJ Order. However, in the Final

Pretrial Order, the Court stated: "The issue to be tried at this trial is whether plaintiffs have

requested a reasonable modification to Lyft's policies, practices, and procedures, *which would not

fundamentally alter* the nature of Lyft's goods, services, facilities, privileges, advantages, or

accommodations." Dkt. 149 at 1 (emphasis added). Moreover, at trial, Plaintiffs' transportation

planning expert testified that WAV service in the Bay Area Counties would be a new

transportation service. *See* Tr. at 662:14-17; *see also Hoffman*, 593 F.3d at 911. Requiring Lyft to

create a new, specialized transportation service in the Bay Area Counties constitutes a

fundamental alteration because it requires Lyft to create a supply of WAVs that does not exist,

and guarantee specific wait times and reliability "benchmarks," thereby changing the

"fundamental character" or "essential attribute" of its ridesharing platform. *See PGA Tour, Inc. v.

Martin*, 532 U.S. 661, 674, 682-83 (2001).

136.    Thus, the Court held "a trial on the main issue of whether the proposed

modifications, specifically a rental model or a combination of the models, are reasonable." *Id.* at

12.

**RESPONSE: Agree**. The Court also stated that "without more specific evidence

regarding, for example, how a different combination of these proposed methods would be

implemented in the Bay Area, the supply of WAV drivers that could be deployed, or the financial

costs of doing so, it is unclear whether the proposed modifications are reasonable." MSJ Order at

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-34-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

9.

137.    In this Circuit, Plaintiffs must demonstrate that their requested modification is reasonable "on its face."  *See Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1036 (9th Cir. 2020) (*citing Lentini v. Cal. Center for the Arts*, 370 F.3d 837, 845 (9th Cir. 2004) (applying burden-shifting framework from *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997))).

**RESPONSE: Disagree.** *Lopez* was a summary judgment case (concerning a different subsection of the ADA, with different affirmative defenses), and did not equate a plaintiff's summary judgment burden with its trial burden. As the Ninth Circuit held in *Snapp v. United Transp. Union*, 889 F.3d 1088, 1100 (9th Cir. 2018), the "remedial burden shifting" at summary judgment "is a departure from the generally understood apportionment of burdens of proof to plaintiffs," and "also is a departure from the ADA itself which does not place the burden of disproving a reasonable accommodation" on the defendant.

138.    Under *Johnson*, "[t]he plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable. The plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases." 116 F.3d at 1059.

**RESPONSE: Incomplete quote.** The Fifth Circuit went on to state: "While the defendant may introduce evidence indicating that the plaintiff's requested modification is not reasonable in the run of cases, the plaintiff bears the ultimate burden of proof on the issue." *Id.*

139.    This allocation of a light burden on Plaintiffs recognizes that to place the burden differently "would be asking too much of plaintiffs, especially considering that defendants have more knowledge and information regarding their own facilities," *Lopez*, 974 F.3d 1030, 1038 (9th Cir. 2020) (describing similar burden shift in context of ADA Title III barrier removal claim).

**RESPONSE: Disagree** that *Lopez* established a "light burden" on Plaintiffs at trial. As noted above, *Lopez* was a summary judgment case. As the Ninth Circuit held in *Snapp*, while the informational imbalance between the parties (such as that described in *Lopez*, quoted by Plaintiffs above), has led courts to adopt burden-shifting at summary judgment, such imbalance is "likely to

1    be greatly diminished after full discovery and after the opportunity to present evidence for

2    resolution of factual questions." 889 F.3d at 1100. Moreover, even at summary judgment, the

3    Ninth Circuit held in *Lopez* that "to satisfy their initial burden, ADA plaintiffs must plausibly

4    show how the cost of removing the architectural barrier at issue does not exceed the benefits

5    under the circumstances." 974 F.3d at 1038. The Ninth Circuit thus affirmed the district court's

6    grant of summary judgment, finding the plaintiff's failure to put forward any evidence of cost as

7    "patently insufficient." *Id.* at 1039. Here, Plaintiffs have not only failed to submit any cost

8    evidence, but they also admit that cost is presently unknowable. Pls. Fact No. 126.

9        140.    The determination of whether a particular modification is reasonable, " . . .

10   involves a fact-specific, case-by-case inquiry that considers, among other factors, the

11   effectiveness of the modification in light of the nature of the disability in question and the cost to

12   the organization that would implement it." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075,

13   1083 (9th Cir. 2004) (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995)).

14       **RESPONSE: Agree**. Here, Plaintiffs admit they have no evidence of effectiveness or

15   cost: "[n]o one will know exactly how many vehicles will be required to provide a certain level of

16   WAV service, and exactly how much it will cost to provide WAV service, until Lyft begins

17   piloting its service with actual vehicles on the streets." *See* Pls. Fact No. 126. Based on Plaintiffs'

18   admission, this Court should find that Plaintiffs failed to prove their case.

19       141.    While the Court in *Fortyune* did not provide a specific test for analyzing cost

20   under this section, the Court did explain that "[t]he standard for reasonableness under the ADA

21   does not differ from the one employed under the Rehabilitation Act," and that "[i]n the context of

22   the Rehabilitation Act, the Supreme Court has stated that an '[a]accommodation is not reasonable

23   if it imposes 'undue financial and administrative burdens.'" 364 F.3d at 1083 (citations omitted);

24   *see also Vinson v. Thomas*, 288 F.3d 1145, 1152, n.7 (9th Cir. 2002) ("We examine cases

25   construing claims under the ADA, as well as section 504 of the Rehabilitation Act, because there

26   is no significant difference in the analysis of rights and obligations created by the two Acts.");

27   *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999), *as amended* (Nov. 19,

28   1999) (holding that the terms "reasonable accommodation" (as used in Title I of the ADA) and

1   "reasonable modification" (as used in Titles II and III) "do not differ in the standards they

2   create").

3       **RESPONSE: Agree** that "the Court in *Fortyune* did not provide a specific test for

4   analyzing cost," but **disagree** that the Ninth Circuit incorporated the "undue burden" standard

5   into the definition of "reasonable." Here, the analysis of cost is irrelevant because as Plaintiffs

6   admit in their proposed Fact No. 126, no one knows how much it will cost to provide WAV

7   service in the Bay Area Counties. Moreover, "undue burden" does not appear in the statutory

8   language of Section 12182(b)(2)(A)(ii); there is no basis for importing the "undue burden"

9   concept from the Rehabilitation Act to deem an otherwise unreasonable modification reasonable,

10  simply because Lyft is a large company.

11      In *Fortyune*, the Ninth Circuit adopted the "fact-specific, case-by-case" inquiry for

12  evaluating the reasonableness of a proposed modification, citing *Staron*, 51 F.3d at 356. As the

13  Second Circuit did in *Staron*, the Ninth Circuit merely summarized the approaches taken by

14  different courts for determining "reasonableness," including in *School Bd. Of Nassau Cty. v.*

15  *Arline*, 480 U.S. 273, 288 n. 17 (1987), observing: "[i]n the context of the Rehabilitation Act, the

16  Supreme Court has stated that an '[a]ccommodation is not reasonable if it . . . imposes 'undue

17  financial and administrative burdens.'" *Compare Fortyune*, 364 F.3d at 1083, *with Staron*, 51

18  F.3d at 356. This is the only reference to "undue" burden in *Fortyune*, and this single reference

19  cannot be the basis for importing an affirmative defense from the Rehabilitation Act into the

20  "reasonable modification" provision of Title III.

21      That this Court should not incorporate "undue burden" in deciding what is "reasonable" is

22  confirmed by the fact that 15 years after *Arline*, the Supreme Court made clear that the two

23  statutory phrases – "reasonable accommodation" and "undue" burden or hardship – used in ADA

24  Title I, which, like the Rehabilitation Act in *Arline*, governs employment cases, are distinct and

25  separate phrases and not mere "redundant mirror images." *U.S. Airways, Inc. v. Barnett*, 535 U.S.

26  391, 400-02 (2002). That the phrases are not mirror images is plain: while it is correct that an

27  accommodation is not reasonable if it imposes undue burdens, it is *not* correct that the only way

28  an accommodation could be deemed *un*reasonable is if it would result in undue burdens. An ADA

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-37-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

plaintiff has the burden of demonstrating reasonableness (whereas a Title I defendant has the burden of proving undue hardship), and the Supreme Court clarified that an "ordinary English meaning" should be applied to the word "reasonable." *Id.*; *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) (statutory language should be interpreted in accordance with the "ordinary public meaning of its terms"). Consistent with this "ordinary English" approach, the Ninth Circuit has held that a reasonable modification is one that is "inexpensive," "easy to obtain," and can be implemented "without significant difficulty or expense." *Karczewski v. DCH Mission Valley*, 862 F.3d 1006, 1011 (9th Cir. 2017). *See also* https://www.merriam-webster.com/dictionary/reasonable (last visited June 18, 2021) (defining "reasonable" to mean "moderate" or "inexpensive," and "not extreme or excessive").

*Fortyune* does not require a defendant in reasonable modification cases to prove an "undue burden" (or to show that a modification would be "cost-prohibitive," such that it would be forced to leave a market or lay off employees, *see* Pls. Fact Nos. 39, 40) in order to *disprove* a finding of reasonableness. *See also Snapp*, 889 F.3d at 1100 (the ADA does not place the burden of disproving a reasonable accommodation on the defendant); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (entities need not "make *any and all* possible accommodations"; only those "that are reasonable"). Undue burden is not an affirmative defense under Section 12182(b)(2)(A)(ii), and it should not be turned into a sword by which a plaintiff can require a defendant to undertake expensive, difficult, or otherwise unreasonable modifications merely because it has financial resources.

142.    The regulations implementing the Rehabilitation Act's requirement to provide reasonable accommodations state that:

> In determining . . . whether an accommodation would impose an undue hardship on the operation of a recipient's program or activity, factors to considered include . . .[t]he overall size of the recipient's program or activity with respect to number of employees, number and type of facilities, and size of budget . . . [and the] nature and cost of the accommodation needed.

45 C.F.R. § 84.12(c)(1), (c)(3); *see also* 28 C.F.R. § 36.104 (undue burden under the Title III regulations "means significant difficulty or expense," determined by considering factors

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-38-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1  including "the overall financial resources of the site or sites involved in the action . . . [and] the

2  effect on expenses and resources.")

3      **RESPONSE: Disagree** that these regulations apply. First, 45 C.F.R. § 84.12 clearly does

4  not apply here because it regulates the employment practices of "each recipient of Federal

5  financial assistance from the Department of Health and Human Services and to the program or

6  activity that receives such assistance." *See* 45 C.F.R. §§ 84.2, 84.11. Second, while 28 C.F.R.

7  § 36.104 applies to private entities under ADA Title III, "undue burden" is not relevant to

8  reasonable modification claims arising under Section 12182(b)(2)(A)(ii). Under the statute,

9  "undue burden" is an affirmative defense to claims involving the failure to provide auxiliary aids

10 and services under Section 12182(b)(2)(A)(iii). *See also* Resp. to Law No. 141.

11     143.    While "[a]n institution's past decision to make a concession to a disabled

12 individual does not obligate it to continue to grant that accommodation in the future, nor does it

13 render the accommodation reasonable as a matter of law," it does provide persuasive evidence

14 that the accommodation was reasonable.  *Am. Council of Blind v. Astrue*, No. C 05-04696 WHA,

15 2009 WL 3400686, at *23 (N.D. Cal. Oct. 20, 2009) (Alsup, J.) (citation omitted). *See also Wong*,

16 192 F.3d at 820 ("The fact that the school previously made the exact modification . . . that Wong

17 requested . . . is certainly persuasive evidence . . .").

18     **RESPONSE: Agree** the cases so state, but **disagree** that the remedy Plaintiffs seek is a

19 "modification" in policies, practices, or procedures, or that it is reasonable. The accommodation

20 sought in *American Council of the Blind* was for the Social Security Administration to provide

21 publications in *braille* to facilitate access to social security benefits; in *Wong*, it was an eight-

22 week reading period before starting a clerkship. In contrast, Plaintiffs seek to have Lyft establish

23 a new transportation service of unknown cost and of indefinite duration, one that requires the

24 creation of specialized vehicles that do not currently exist. *See* Resp. to Fact Nos. 45-54, 126-127.

25 Moreover, the fact that Lyft may offer Access mode through a particular model or combination of

26 models in one jurisdiction does not mean that the same model or combination of models would be

27 "reasonable" in the Bay Area Counties. Although the Court gave Plaintiffs the extraordinary

28 opportunity – after discovery had closed – to retain an expert so that they could make "a case-by-

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-39-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    case showing that [a] comparison jurisdiction is sufficiently similar" (*see* Final Pretrial Order

2    [Dkt. 149] at 3), Plaintiffs still failed to provide any evidence that other jurisdictions where Lyft

3    provides Access mode are comparable to the Bay Area.

4        144.    Specificity under Rule 65 does not require actually telling a party "how to enforce

5    the injunction." *See* ECF 92 at 11 (*citing Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075,

6    1087 (9th Cir. 2004) ("*Fortyune*, cited by both sides, is helpful here. . . . Although AMC argued

7    the injunction was too vague, our court of appeals upheld the injunction, finding that specificity

8    under Rule 65 did not require actually telling a party 'how to enforce the injunction.'")).

9        **RESPONSE: Agree** the Court stated the above in its MSJ Order. However, at trial, in

10   connection with Plaintiffs' requested remedy of an "iterative process," this Court drew a sharp

11   contrast between this case and *Fortyune*, noting that in *Fortyune* "there was a very specific

12   modification involving a companion seating next to the wheelchair spot." Tr. at 546:11-13.

13   Moreover, while specificity under Rule 65 may not require telling a party "how to enforce the

14   injunction," Rule 65 does require giving Lyft notice of what the injunction actually prohibits. *See*

15   *Granny Goose Foods, Inc. v. Bhd. of Teamsters, Local No. 70*, 415 U.S. 423, 444 (1974); Fed. R.

16   Civ. P. 65 (d)(1)(B) & (C) (injunction must "state its terms specifically" and "describe in

17   reasonable detail . . . the act or acts restrained or required").

18       145.    "There is no need explain how to enforce the injunction by, for example,

19   delineating how many third-party drivers are necessary, how many WAVs to rent, or what

20   combination of the above-mentioned policies and procedures to implement, especially given, as

21   defendant alleges, the complexities of certain procedures such as a rental program." MSJ Order at

22   11-12.

23       **RESPONSE: Agree** the Court stated the above in its MSJ Order, but **disagree** that an

24   injunction based on an "iterative process" or outcomes (*e.g.*, a requirement that Lyft meet certain

25   wait times or "reliability" metrics) –  which is a different injunction than one Plaintiffs demanded

26   at summary judgment – would meet Rule 65 requirements by giving Lyft notice of what the

27   injunction actually prohibits. *See Granny Goose Foods*, 415 U.S. at 444; Fed. R. Civ. P. 65

28   (d)(1)(B) & (C). The proposed injunction requires Lyft to meet unspecified standards, and

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-40-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    contemplates that the standards may be impractical to meet, and subjects Lyft to potential

2    contempt depending on the "effort" it made. Jt. Prop. Final Pretr. Order [Dkt. 157] at 8-9. Lyft

3    would not know that it was violating the injunction until after the fact when, at the end of each

4    quarter, it learned it had failed to meet the required wait time standard or the metric for

5    "reasonable reliability." The Court also would not know how to enforce compliance in the event

6    of an alleged violation: for example, it is possible that Lyft cannot find a willing rental partner or

7    a sufficient number of drivers to rent the WAVs; it is also possible that Lyft is not able to meet

8    wait time or "reliability" standards, despite making good faith efforts to do so. Enforcing an

9    injunction like the one proposed by Plaintiffs is made especially difficult because as the trial

10   showed, *no one has yet figured out how to deliver on-demand WAV service effectively, at a*

11   *reasonable cost*. There is no basis on which this Court could form an injunction or on which this

12   Court, or anyone else, could judge whether Lyft is in good faith compliance with its terms. *See*

13   *C.F. v. Capistrano Unified Sch. Dist.*, 647 F. Supp. 2d 1187, 1194 (C.D. Cal. 2009) (the court has

14   "neither the power to grant" a vague and overbroad injunction, "nor [the power] to enforce it").

15        146.    Plaintiffs have more than met their burden of showing that the proposed

16   modifications, providing WAV service in the three Bay Area counties using a hybrid of supply

17   models (Partner/W2, Rental, and/or Organic Driver/IC), are "reasonable in the general sense, that

18   is, reasonable in the run of cases." *Johnson*, 116 F.3d at 1059.

19        **RESPONSE: Disagree.** Plaintiffs again state the wrong legal standard. At trial, Plaintiffs

20   bear "the ultimate burden of proof (the burden of persuasion)." *Snapp*, 889 F.3d at 1102. This is

21   more than simply identifying a modification that "*seems reasonable on its face*, i.e., ordinarily or

22   in the run of cases," which is the burden of production that a plaintiff must meet to avoid

23   summary judgment. *Id.* (quoting *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006)

24   (emphasis in original)). *See also Johnson*, 116 F.3d at 1059 ("the plaintiff bears the ultimate

25   burden of proof"). Plaintiffs cannot meet that burden in any event. "Run of cases" refers to a

26   modification that would be required in the ordinary case based on a consensus among courts (*e.g.,*

27   *U.S. Airways*, 535 U.S. at 403-04), a DOJ regulation (*e.g., Johnson*, 116 F.3d at 1060 (service

28   animals)), or an internal policy or practice (*e.g., Mannick v. Kaiser Found. Health Plan, Inc.*, No.

1    C-03-5905-PJH, 2006 U.S. Dist. LEXIS 57173, *33 (N.D. Cal., July 31, 2006)). In contrast, no

2    court or regulatory body responsible for implementing the ADA has ever held that a ridesharing

3    company must provide WAV service, and Lyft does not have a policy or practice of providing

4    WAV service absent regulatory or contractual reasons. What is more, no evidence was presented

5    at trial demonstrating that anyone has yet figured out a way of delivering reliable, on-demand

6    WAV service at a reasonable cost.

7            147.    Lyft has demonstrated that it has been able to use some combination of the

8    proposed modifications at issue to provide effective WAV services for riders with disabilities

9    when it decides it wants to.

10           a.      Lyft has implemented WAV programs in nine cities. FF ¶ 14.

11           b.      Lyft has consistently met service benchmarks for WAV service, including wait

12                   time benchmarks. FF ¶¶ 25, 36, 106.

13           c.      Lyft already uses a combination of the models (the modification Plaintiffs seek) in

14                   New York City. Lyft has met service-level benchmarks in New York City in the

15                   past, and it is working to meet current service-level benchmarks. FF ¶¶ 22-25, 31.

16           d.      Lyft has already provided limited WAV service in San Francisco County using a

17                   W-2/partner model, where it has routinely met service level benchmarks. FF ¶¶ 55,

18                   106.

19           **RESPONSE: Disagree** based on the law and the proposed factual findings cited above.

20   As a preliminary matter, establishing a new transportation program is not a "modification in

21   policies, practices, or procedures"; rather, it is a new "good or service," which the ADA does not

22   demand of Lyft. *See Weyer*, 198 F.3d at 1115. Lyft has established WAV programs, in large part,

23   to meet regulatory requirements, including requirements in cities like New York and Portland that

24   set out strict wait time benchmarks. In San Francisco and Los Angeles, Lyft has met service level

25   benchmarks in order to offset its WAV costs. *See* Resp. to Fact Nos. 8, 106-107. None of Lyft's

26   efforts can be deemed "reasonable" – that is, easy or inexpensive. *See Karczewski*, 862 F.3d at

27   1011. To the contrary, the evidence is that (a) Lyft spent a total sum of $4.1 million during a *six-*

28   *month* period from October 2019 to March 2020 to provide WAV service in New York City (Pls.

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-42-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    Fact No. 32), and (b) Lyft spent an average of $1,500 *per ride* in San Francisco from Q4 2019 to

2    Q3 2020. *See* Dkt. 198, Lyft's Fact No. 47. None of these are one-time costs, such as costs that an

3    entity would incur in case of an architectural barrier removal; instead, they are ongoing, recurring

4    costs. In addition, Plaintiffs failed to prove that the combination of models being used in New

5    York City can be implemented in the Bay Area Counties, because they failed to offer any

6    evidence of comparability in terms of geographic area, population density, or regulatory structure.

7    Lyft's Fact No. 35.

8         148.    Lyft ran its own analysis to determine how to effectively cover WAV service

9    demand in the three Bay Area Counties and planned to implement a Bay Area WAV pilot based

10   on that analysis. FF ¶¶ 51, 52.

11        a.    The Bay Area pilot included a Rental Pilot consisting of 65 rental WAVs to cover

12              80% of demand, supplemented with W-2/Partner vehicles to cover the remaining

13              demand. FF ¶¶ 51, 52.

14        b.    The pilot is a reasonable starting point for WAV service in the three Bay Area

15              counties based on Lyft's analysis and comparisons to other regional WAV

16              programs. FF ¶ 127.

17   **RESPONSE: Disagree** that Lyft's "analysis" done in 2019 shows that the Rental Pilot

18   would be (or would have been) effective. Plaintiffs rely on a single email from November 2019

19   (Tr. Ex. 10), and ignore the witness's testimony that the analysis was a "rough estimate" based on

20   limited data. *See* Resp. to Fact Nos. 51, 52. Ironically, while Plaintiffs advocate for an "iterative

21   process" (Pls. Fact No. 123), they ask the Court to order Lyft to start a new transportation

22   program based on an outdated "analysis," and to ignore the evidence gathered by Lyft since

23   November 2019 in the course of its "iterative process," particularly in New York City concerning

24   the ineffectiveness of the Rental model and independent contractor drivers in meeting WAV

25   demand. *See* Resp. to Fact Nos. 19, 25, 28-30, 76-78.

26        149.    To the extent any changes are needed to the combination of models, number of

27   vehicles, vehicle placement, or other inputs, Plaintiffs' proposed remedy provides Lyft a full year

28   to launch WAV service, gather data, and make any needed changes prior to having to meet

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-43-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    service benchmarks.

2        **RESPONSE: Disagree** that an iterative process constitutes a "reasonable modification in

3    policy, practice, or procedure." No court has ever ordered an iterative process as a "reasonable

4    modification." *Cf. Disabled in Action v. Bd. Of Elections in New York*, 752 F.3d 189, 203-04 (2nd

5    Cir. 2014) (remedial order included specific provisions "tailor[ed] . . . to fit the nature and extent"

6    of the violations; "iterative process" triggered only to explore alternative accommodations). It is

7    Plaintiffs' burden to identify a particular modification, and demonstrate its reasonableness by

8    proving its effectiveness and cost. *Fortyune*, 364 F.3d at 1082. Plaintiffs seek to bypass their

9    burden of proof by asking the Court to order an iterative process, so that they can gather evidence

10   of effectiveness and cost. *See* Pls. Fact No. 126 (admitting no evidence of effectiveness or cost

11   will exist until Lyft begins piloting a program with "vehicles on the streets"). Moreover, Plaintiffs

12   are not entitled to an "iterative process" as a modification because they never requested such a

13   modification before April 2021. *Johnson*, 116 F.3d at 1059 ("[t]he Plaintiff has the burden of

14   proving that a modification was requested"); *see also* Resp. to Law No. 148.

15       150.   Lyft paused its planned Bay Area WAV pilot due to the pandemic, and presented

16   scant evidence that it could not effectively implement the planned WAV pilot in the Bay Area. FF

17   ¶¶ 71, 72, 76-80, 87.

18       a.    Lyft admitted that finding rental partner was not the problem with using the Rental

19             Model. FF ¶ 76.

20       b.    Although Lyft expressed concerns that cross dispatching WAV vehicles could

21             limit WAV vehicle utilization in Access mode, Lyft admitted it can test methods

22             for addressing such concerns but has yet to do so, and that it could supplement the

23             cross-dispatched rental vehicles with W-2 vehicles to better serve WAV riders. FF

24             ¶¶ 77, 82, 83, 85.

25       c.    Lyft has used data it gathers through the iterative process, along with incentives, to

26             create a new form of transportation, and in under ten years grow into a company

27             valued at billions of dollars. It uses these methods to improve the efficiency of its

28             non-WAV service and its witnesses suggested that it was considering, but had not

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-44-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    yet tested, such approaches in the Bay Area. FF ¶¶ 10, 11, 13, 77, 82, 83, 85.

2        **RESPONSE: Disagree.** Overwhelming evidence showed a significant likelihood of the

3    Rental and Independent Contractor models failing in the Bay Area. *See* Resp. to Fact Nos. 51-52,

4    54, 69-72, 75-78, 127. Moreover, it is not Lyft's burden to disprove the reasonableness of a

5    modification. Plaintiffs have the burden of persuasion on their claim. *Snapp*, 889 F.3d at 1102.

6        151.    Further, the evidence shows that the proposed modifications are reasonable

7    because the cost of implementing the modifications would be reasonable, in light of Lyft's actual

8    and estimated cost of offering WAV service, Lyft's overall assets, and the significant likelihood

9    that Lyft will receive offset of many, if not all, of its expenses from the CPUC. FF ¶¶ 32, 33, 53,

10   54, 65 (evidence of Lyft's prior and estimated WAV expenditures); 109, 110, 112, 114-122

11   (evidence of Lyft's overall assets and revenue); 106, 107 (evidence regarding Lyft's receipt of

12   offset from the CPUC); *see also* ¶¶ 38 (no evidence of financial hardship/consequences for

13   providing WAV), 39 (Lyft has not considered leaving or terminating service in a city due to

14   WAV service), 40 (Lyft hasn't terminated or laid off employees as a result of WAV).

15       **RESPONSE: Disagree.** *See* Resp. to Fact Nos. 38, 51-52, 69-72, 75-78, 105, 112, 127-

16   128. As the U.S. Supreme Court found, the word "reasonable" in the ADA should be interpreted

17   in accordance with its "ordinary" meaning. *U.S. Airways*, 535 U.S. at 400-01; *see also*

18   *Karczewski*, 862 F.3d at 1011. Plaintiffs cite no legal basis for interpreting "reasonable" on a

19   sliding scale based on Lyft's "overall assets and revenue," or even "financial hardship." *See also*

20   Resp. to Law No. 141, above. In addition, even if the affirmative defense of "undue burden" were

21   at issue in this case (which it is not), courts demand analysis of an entity's profitability or lack

22   thereof, not gross revenues or "overall assets" untethered to the entity's expenses or liabilities.

23   *See, e.g.*, *Mannick*, 2006 U.S. Dist. LEXIS 57173, *57-59 (gross revenues are not relevant in

24   determining what is "readily achievable," which includes assessing the entity's overall financial

25   resources). As for the possibility of future CPUC offsets, what the final standards for offsets will

26   be, whether Lyft will meet such standards, and what amount of offsets might be obtainable, are all

27   unknown. *See* Dkt. 198, Lyft Fact Nos. 51-68. In deciding whether a modification is

28   "reasonable," the Court cannot find that costs will be reasonable based on a standard or facts that

1   do not currently exist. *See Fortuyne*, 364 F.3d at 1082 (requiring consideration of "cost to the

2   organization").

3        Finally, Lyft may choose to comply with the Access for All Act by simply depositing the

4   funds it collects. *See* Cal. Pub. Util. Code § 5440.5 (a)(1)(B)(i), (ii). Congress specifically

5   contemplated that states may enact more stringent laws than the ADA (*see* 42 U.S.C. § 12201(b)),

6   and nothing in the ADA evidences congressional intent to require Lyft not just to meet, but to

7   *exceed* state laws as a reasonable modification. *See Cal. Dep't of Toxic Substances Control v.*

8   *Westside Delivery, LLC*, 888 F.3d 1085, 1093 (9th Cir. 2018) ("Congress when it enacts a statute

9   is not making the application of the federal act dependent on state law").

10       152.    Plaintiffs propose as a remedy that Lyft be required to meet wait time benchmarks

11   (benchmarks no longer than those set by the CPUC to qualify for exemption from payment into

12   the Access Fund, ECF 157 at 8) that are well within Lyft's capacity and are in line with what the

13   CPUC has determined is feasible. If Lyft meets these standards, it will be exempt from paying

14   into the Access Fund, leaving Lyft with significant funds to cover a large majority, if not all, of

15   the cost of its Bay Area WAV program.  FF ¶¶ 54, 89, 116.

16       **RESPONSE: Disagree** that an injunction that requires Lyft to meet "wait time

17   benchmarks" is proper, because it would fail to give Lyft notice of what the injunction actually

18   prohibits as required under FRCP 65(d). *See Granny Goose Foods*, 415 U.S. at 444. In addition,

19   injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v.*

20   *McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (citations omitted); *see also Salazar v.*

21   *Buono*, 559 U.S. 700, 718 (2010) ("A court must find prospective relief that fits the remedy to the

22   wrong or injury that has been established"). Here, the specific harm alleged is a failure to make a

23   reasonable modification in policies, practices, or procedures, but the injunction sought by

24   Plaintiffs seeks to require Lyft to meet "wait time benchmarks." Just as a court, in a Lanham Act

25   case, cannot enter an injunction restricting all "producing, licensing, marketing or selling" of the

26   product at issue because such an injunction would reach beyond the scope of the alleged false

27   advertising claim, *see Nutrition Distribution, LLC v. New Health Ventures, LLC*, No. 16-cv-2338-

28   BTM-MDD, 2018 U.S. Dist. LEXIS 52220, at *8-9 (S.D. Cal. Mar. 27, 2018), this Court should

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-46-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    not enter an injunction requiring Lyft to meet certain wait times and reliability benchmarks that

2    are unrelated to any identifiable "reasonable modification."

3          Moreover, there is no evidence that Lyft can meet the Exemption Time Standards set by

4    the CPUC, which standards Lyft has *never* met before. *See* Resp. to Fact. No. 90. Nor is there

5    evidence as to how much money Lyft will save as a result of meeting the Exemption Time

6    Standards, or the extent to which the saving will offset the overall cost of a new transportation

7    program covering all three Bay Area Counties. The only available evidence is that a conservative

8    estimate for providing effective WAV service would require 15 partner vehicles at an annual cost

9    of $5.4 million. *See* Dkt. 198, Lyft Fact Nos. 91-92. In contrast, the available offset amount for all

10   three Bay Area Counties in Q1 2021 was approximately $340,000 per quarter. *Id.* at No. 67. *See*

11   *also* Resp. to Fact Nos. 109-113. Finally, Plaintiffs are not entitled to "wait time benchmarks" as

12   a modification because they never requested such a modification before filing suit. *Johnson*, 116

13   F.3d at 1059.

14         153.    Further, to the extent the Court seeks to modify Plaintiffs' proposed benchmarks in

15   its Order, possible modified benchmarks that Lyft has shown it has the capacity to meet include:

16   the CPUC's offset requirements, the WAV service benchmarks Lyft has successfully met outside

17   of the Bay Area, and/or the wait times and reliability standards proposed by Lyft to the CPUC for

18   its service in San Francisco. FF ¶¶ 89, 90 (CPUC exemption standards); 104-106 (CPUC interim

19   offset standards); 95, 96 (Lyft meeting CPUC interim offset standards); 93 (Lyft's initial proposal

20   for first year of CPUC offset standards); 100-103 (Lyft's 2021 proposal for offset and reliability

21   standards through 2025); 22-25, 36, 37, 64, 106 (wait time standards Lyft has previously met for

22   WAV service inside and outside the Bay Area).

23   **RESPONSE: Disagree** that an injunction that requires Lyft to meet "wait time

24   benchmarks" is proper. *See* Resp. to Law No. 152. In addition, based on the plain language of

25   Section 12182(b)(2)(A)(ii), the Court may not craft its own "modification" and impose it on Lyft,

26   because the statute requires Plaintiffs to have requested a particular reasonable modification

27   before filing the lawsuit. *Johnson*, 116 F.3d at 1059.

28         154.    Plaintiffs' proposed remedy also offers Lyft flexibility to best determine how to

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-47-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    meet service benchmarks.  Plaintiffs' proposed remedy would provide Lyft a full year to engage

2    in the industry-standard iterative process, FF ¶¶ 123-125, that Lyft itself uses, FF ¶¶ 13, 21, 31,

3    42-45, before having to meet reasonable benchmarks for WAV service, but Plaintiffs do not ask

4    the Court to order that Lyft engage in an iterative process. Plaintiffs do not ask that Lyft be

5    ordered to take any specific steps to comply with such an order (e.g. requiring Lyft to start its

6    service with any set number of vehicles, or by entering into any particular contract).

7        **RESPONSE: Disagree** that Plaintiffs are entitled to such a vague, "flexible" remedy

8    under the ADA or under Rule 65(d). What Plaintiffs seek is not a remedy but an attempt to use an

9    injunction to find a reasonable modification they failed to prove at trial. *See* Lyft's Resp. to Law

10   Nos. 146-153, *supra*.

11       155.    This Court has confirmed that while Lyft may not be obligated under 49 C.F.R. §

12   37.29(b)) and 42 U.S.C § 12184(b)(3) to purchase or lease WAVs – and nor are Plaintiffs trying

13   to require Lyft to purchase or lease WAVs – this exemption "does not, however, negate the

14   ADA's requirement for entities like Lyft to make reasonable modifications to rectify a

15   discriminatory policy, practice, or procedure."  ECF No. 92 at 3-4. As the Court noted, "Plaintiffs

16   are not, however, trying to require Lyft to purchase or lease WAVs. The proposed modifications,

17   detailed further below, would require Lyft to work with external parties who would in turn

18   purchase or lease WAVs." *Id*. at 4.

19       **RESPONSE: Agree** that Section 12184(b)(3), which specifically exempts private entities

20   from having to purchase or lease WAVs, does not negate the requirement to make reasonable

21   modifications in policies, practices, or procedures under Section 12182(b)(2)(A)(ii). However, it

22   is improper to construe Section 12182(b)(2)(A)(ii) to eliminate the specific exemption that

23   Congress provided in Section 12184(b)(3), by requiring Lyft to undertake the financial burdens or

24   risks of the purchase or lease of WAVs by a third party. The evidence in this case is that there is

25   no fleet of WAVs available for rental to drivers on the Lyft platform. Dkt. 198, Lyft Fact Nos. 74-

26   77. The only way Lyft has been able to facilitate rental opportunities for drivers is by subsidizing

27   the rental costs and otherwise taking on the financial risk of creating these specialized vehicles.

28   *Id.* at Fact No. 76. Even under the Partner model, the evidence is that Lyft's partner creates

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-48-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1  WAVs for Lyft as needed, and that in addition to paying high hourly rates for these vehicles, Lyft

2  retains a financial risk in the event the vehicles are not used. *Id.* at Fact Nos. 39-43. Under

3  principles of statutory construction, "a 'narrow, precise, and specific' statutory provision," such

4  as a provision exempting entities like Lyft from having to purchase or lease WAVs, cannot be

5  "overridden by another provision 'covering a more generalized spectrum' of issues," such as a

6  provision requiring "reasonable modifications in policies, practices, or procedures." *See Perez-*

7  *Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016).

8         156.    In fact, every court to consider this issue in the context of WAV users seeking

9  access to the services ridesharing companies such as Uber or Lyft has found that such entities are

10  still subject to the requirement to make reasonable modifications despite this exception. *Equal*

11  *Rts. Ctr. v. Uber Techs., Inc.*, No. 17-CV-1272 (KBJ), 2021 WL 981011, at *19 (D.D.C. Mar. 15,

12  2021); *Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *4 (N.D. Cal.

13  Mar. 1, 2018); *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020) ("A

14  covered entity under Section 12184 is subject not just to the narrow requirements associated with

15  the purchase of new vehicles, but the statute's broader anti-discrimination mandate."); *cf. Toomer*

16  *v. City Cab Co.*, No. 2:04 CV 397 DAK, 2005 WL 67091, at *2-3 (D. Utah Jan. 10, 2005), *aff'd*

17  *sub nom. Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006)) (plaintiffs did not specifically

18  request modifications other than the purchase of accessible vehicles).

19         **RESPONSE: Agree** that *at the pleading stage*, the courts in *Equal Rts. Ctr.*, *Crawford*,

20  and *Namisnak* permitted the cases to go forward on the *theory* that Uber is subject to the

21  requirement to make reasonable modifications in policies, practices, or procedures. None has held

22  that Uber is required to create WAV service or to bear the cost of creating a supply of WAVs.

23         157.    Here, not only do Plaintiffs not seek to require Lyft to purchase or lease vehicles,

24  but there is no evidence in the record that Lyft has ever provided WAV service by purchasing or

25  leasing vehicles in any of its ten WAV markets.  Further, under the proposed Hertz contract, the

26  only acquiring of any vehicles was to be done by Hertz and the only renting or leasing by the

27  drivers. FF ¶ 48; *see also* FF ¶ 29 (CLLQ WAV Rental contract in New York).

28         **RESPONSE: Agree** that Plaintiffs do not seek to require a direct purchase or lease of

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-49-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    WAVs by Lyft, but **disagree** that under the structure of the Hertz contract, the acquisition of

2    WAVs was done solely by Hertz or that the renting or leasing of the WAVs was done solely by

3    the drivers. *See* Resp. to Fact Nos. 29 and 48.

### III.    CONCLUSION

5        158.    The evidence demonstrates not only that Plaintiffs' requested modifications are

6    reasonable in the run of cases, but that Lyft is fully capable of providing effective WAV service

7    in the Bay Area counties in a way that, considering its resources and the possibility of offsets, is

8    by no means cost-prohibitive or otherwise unreasonable. Despite bringing in hundreds of millions

9    of dollars in revenue in the Bay Area, Lyft has refused to apply its powerful data analysis tools

10   and problem-solving capabilities to make its transportation service accessible, excluding people

11   with disabilities who need WAVs.

12       **RESPONSE: Disagree** that Plaintiffs have satisfied their burden of proving that a

13   "reasonable modification" in policies, practices, or procedures exists, or that what Plaintiffs seek

14   – "effective WAV service in the Bay Area counties" – is a modification in policies, practices, or

15   procedures as a matter of law. *See* Resp. to Law Nos. 132, 141, 146-51. Plaintiffs have failed to

16   demonstrate the effectiveness or cost of any purported "modification" in policies, practices, or

17   procedures, and in fact admit they have no evidence of *actual* effectiveness or cost. *See* Pls. Fact

18   No. 126; *see also* Resp. to Fact Nos. 54, 72, 76-78; Dkt. 198, Lyft Fact Nos. 98-99. The standard

19   of "reasonableness," moreover, does not require Lyft to prove that a modification is "cost-

20   prohibitive." To the contrary, it is Plaintiffs' burden to prove that a modification is reasonable,

21   meaning that it can be accomplished without much difficulty or expense. *Karczewski*, 862 F.3d at

22   1011; *see also* Resp. to Law Nos. 141, 146-151.

23       Plaintiffs failed to present any evidence at trial demonstrating that *anyone* – be it Lyft,

24   Uber, the CPUC, or anyone else – has figured out how to provide reliable, on-demand WAV

25   service at a reasonable cost. The lack of a current solution means there can be no "reasonable

26   modification" as a matter of law.

27       Lyft respectfully requests that the Court enter judgment in its favor.

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-50-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA

1    Dated:  June 22, 2021                              FOLGER LEVIN LLP

2                                                       */s/ Jiyun Cameron Lee*

3                                                       Jiyun Cameron Lee
                                                        Attorneys for Defendant
4                                                       LYFT, INC.

5

6    1115587.5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOLGER LEVIN LLP
ATTORNEYS AT LAW

-51-

DEFENDANT LYFT, INC.'S RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CASE NO. 3:19-CV-01438-WHA