DISABILITY RIGHTS ADVOCATES
STUART SEABORN (Bar No. 198590)
MICHELLE IORIO (Bar No. 298252)
MELISSA RIESS (Bar No. 295959)
REBECCA SERBIN (NY State Bar No. 5273255)*
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
sseaborn@dralegal.org
miorio@dralegal.org
mriess@dralegal.org
rserbin@dralegal.org

Attorneys for Plaintiffs
*Admitted Pro Hac Vice

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING RESOURCE CENTER SAN FRANCISCO, a California non-profit corporation, JUDITH SMITH, an individual, JULIE FULLER, an individual, SASCHA BITTNER, an individual, TARA AYRES, an individual, and COMMUNITY RESOURCES FOR INDEPENDENT LIVING, a California non-profit corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>LYFT, Inc., a Delaware corporation,<br><br>            Defendant. | Case No. 3:19-cv-01438-WHA<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S**

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.     FINDINGS OF FACT

### A.     Lyft And Its Ridesharing Platform

1.     Defendant Lyft, Inc. ("Lyft") launched its peer-to-peer marketplace for on-demand ridesharing in 2012.

  - Stipulation at Tr. 766:12-15

**Response**: Agree.

2.     Lyft is a platform company. A platform company is one that connects market participants, and Lyft uses computer algorithms to connect riders looking for a ride with drivers willing to drive them via the Lyft App ("App").

  - Niedermeyer at Tr. 260:10-15
  - Rysman at Tr. 683:14-684:2

**Response**: Agree that Lyft operates a transportation service via an app-based platform, but Lyft is also "a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce" under 42 U.S.C. § 12184 of the Americans with Disabilities Act. Summary Judgment Order, ECF 92 at 3.

3.     Participation in the platform is governed by Lyft's Terms of Service, which describes the platform as follows:

> The Lyft Platform provides a marketplace where ... persons who seek transportation to certain destinations ("Riders") can be matched with transportation options to such destinations. One option for Riders is to request a ride from rideshare drivers who are driving to or through those destinations ("Drivers"). Drivers and Riders are collectively referred to herein as "Users," and the driving services provided by Drivers to Riders shall be referred to herein as "Rideshare Services." As a User, you authorize Lyft to match you with Drivers or Riders based on factors such as your location, the requested pickup location, the estimated time to pickup, your destination, User preferences, driver mode, and platform efficiency, and to cancel an existing match and/or rematch you with a Driver or Rider based on the same considerations. Any decision by a User to offer or accept Rideshare Services is a decision made in such User's sole discretion. Each Rideshare Service provided by a Driver to a Rider shall constitute a separate agreement between such persons.

  - Niedermeyer at Tr. 263:17-264:-22

1                                 ■   Tr. Ex. 102-002

2      **Response**: Agree.

3           4.      Using the Lyft App, riders are able to request a ride at any time, 24 hours a day,

4  throughout the Bay Area Counties.

5                               ■   Stipulation at Tr. 766:21-24, 767:19-24

6      **Response**: Agree, except for that passengers using the Lyft App to order Access mode

7  service in San Francisco may only use that ride mode between 7am and midnight. Gerundio at Tr.

8  151:14-18.

9           5.      As stated in its Terms of Service, Lyft does not guarantee that a ride request will

10  be matched with a driver or that a driver will be available or accept the ride request. Lyft also

11  makes no guarantee as to how quickly a driver will arrive.

12                               ■   Stipulation at Tr. 767:19-24
                                ■   Niedermeyer at Tr. 266:7-21, 266:24-267:1, 269:14-25

13      **Response**: Agree.

14           6.      The amount of time any rider must wait is the direct result of the active supply-

15  and-demand dynamic on the platform at the time and place of the ride request.

16                                ■   Niedermeyer at Tr. 267:2-11

17

18      **Response**: Agree in part. However, the proposed finding ignores the tools that Lyft

19  utilizes to manipulate supply where needed, such as incentives, vehicle placement, and the use of

20  a rental model in its Standard mode. Niedermeyer at Tr. 312:5-14, 280:7-19; Muñoz at Tr. 80:13-

21  24, 81:2-9.

22           7.      On Lyft's ridesharing platform, riders are free to participate at times and places of

23  their choosing. Likewise, drivers on the Lyft platform are independent contractors who drive their

24  own vehicles, and drive when they want, where they want.

                                ■   Niedermeyer at Tr. 266:14-19

25                              ■   Chan at Tr. 197:24-25, 242:16-22
                              ■   Tr. Ex. 102-009 to -010

26      **Response:** Agree that Lyft riders are free to participate at times and places of their

27  choosing. Agree that some drivers on the Lyft platform are independent contractors who drive

28

their own vehicles and drive when and where they want, but the record shows that some drivers on the Lyft platform rent their vehicles through Lyft partnerships, Muñoz at Tr. 80:13-24, and some drivers on the Lyft platform are not independent contractors, but drivers providing Access mode service through Lyft's W2/Partner model. ECF No. 199 (Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pltfs.' FF")) at ¶¶ 16, 20, 36, 55.

8.      In the Bay Area Counties, Lyft makes available the following ride "modes," among others: (a) Standard (its classic rideshare option), (b) XL (larger vehicles for up to 6 riders), (c) Lux (high-end or luxury vehicles), (d) Lux Black (high-end or luxury black car), and (e) Lux Black XL (high-end or luxury black SUV for up to 6 riders).

- ▪ Stipulation at Tr. 767:1-9

**Response**: Agree.

9.      Riders pay more (and in turn, the drivers receive more) for rides in XL or Lux modes than they would pay for rides in Standard mode.

- ▪ Niedermeyer at Tr. 296:5-21

**Response**: Agree.

10.     Lyft offers Standard mode in all regions where it operates, but does not offer the other modes in all regions.

- ▪ Niedermeyer at Tr. 293:2-14, 21-22, 295:1-10

**Response**: Agree.

11.     Lyft does not recruit drivers by the type of car they drive. Instead, Lyft typically launches a new mode, such as XL or Lux, once it determines that it has a sufficient number of cars already on its platform that meet the requirements for that mode.

- ▪ Stipulation at Tr. 767:11-17
- ▪ Niedermeyer at Tr. 293:21-294:25

**Response**: Agree that Lyft typically launches a new mode after determining that it has a sufficient number of cars on its platform that fit within that mode. Disagree that the cited testimony supports that Lyft does not recruit drivers based on the type of car they drive. This conflicts with testimony in the record, *see, e.g.*, Lyft's Proposed Findings of Fact and Conclusions of Law ("Lyft's FF") at ¶ 86 (recruiting WAV drivers).

12.     The key to the success of Lyft's platform is the density of supply and demand available in a specific geographic region.

- Niedermeyer at Tr. 279:17-25, 280:7-17
- Bozorgirad at Tr. 318:16-231
- Rysman at Tr. 689:10-691:15

**Response**: Agree that the cited testimony shows that the density of supply and demand play a role on Lyft's platform, but disagree that the cited testimony reflects that density is the "key to success" of that platform. *See also* Niedermeyer at Tr. 283:3-7 (describing launch of Lyft service in Wyoming part of an effort to expand Lyft service to the entirety of the United States). Further, the proposed finding ignores the tools Lyft uses to manipulate supply and vehicle placement, including incentives, and additional supply models beyond independent contractors who own their own vehicles. *See* Pltfs.' FF ¶¶ 10-13; Bozorgirad at Tr. 324:5-15.

13.     Drivers on the platform tend to drive most in areas of high demand to maximize their earning opportunities. Drivers can increase earnings by increasing their "utilization" – that is, the amount of time spent actively giving rides, in comparison to the amount of time spent waiting for a ride request.

- Niedermeyer at Tr. 267:19-24, 269:1-6, 290:17-291:20, 293:21-294:25
- Bozorgirad at Tr. 328:21-329:6

**Response**: Agree.

14.     Greater density in population tends to generate greater density in demand, which then tends to increase the number of drivers in the area.

- Niedermeyer at Tr. 279:17-21

**Response**: Disagree that the cited testimony supports this statement.

15.     A higher number of drivers is good for riders because it results in shorter wait times (or "ETAs"), meaning that riders do not have to wait a long time for a driver to arrive.

- Niedermeyer at Tr. 279:21-280:25

**Response**: Agree

16.     Balancing supply and demand is critical to the success of Lyft's platform.

- Niedermeyer at Tr. 277:11-278:21, 280:1-6, 280:9-17

**Response**: Agree.

17.     If there are too few drivers in comparison to the number of riders, riders will have to wait longer for a ride or there may be no drivers available. This may lead to dissatisfaction, leading riders to seek out other options, and ultimately to stop using the Lyft platform.

- Niedermeyer at Tr. 267:12-268:2, 278:22-279:9, 291:8-20
- Tr. Ex. 101-008 to -009 at ¶¶ 15-18

**Response**: Agree that too few drivers can lead to longer wait times or no driver being available, but disagree that the cited testimony supports that this leads to passengers seeking other options or no longer using the platform. Neither the cited testimony nor anything in the record indicate how long the wait times need to be to cause riders to seek other transportation options or to stop using Lyft either for Lyft's Standard service or for its WAV service.

18.     If there are too many drivers in comparison to the number of riders, driver utilization rates will decrease. Drivers who are no longer able to generate sufficient opportunities will stop driving on the platform.

- Muñoz at Tr. 92:6-8
- Chan at Tr. 197:24-198:4
- Rysman at Tr. 761:24-762:6

**Response**: Disagree that the cited testimony supports this statement, apart from that drivers may leave the platform if they cannot generate sufficient opportunities.

19.     Lyft's data for Standard mode shows that population density in a certain ZIP code is closely related to the number of rides requested, such that the number of rides requested increases with an increase in population density.

- Rysman at Tr. 695:15-697:17
- Tr. Ex. 101-019 (Fig. 5)

**Response**: Agree.

20.     Wait times are also strongly correlated to population density. Higher population density is closely correlated with lower wait times.

- Rysman at Tr. 698:15-21
- Tr. Ex. 101-020 (Fig. 6)

1    **Response**: Agree in part, though the proposed finding fails to consider the tools Lyft uses

2    in standard and other modes mode to increase and better place supply and lower wait times.

3    Pltfs.' FF ¶¶ 10-13; Bozorgirad at Tr. 324:5-15.

4        **B.    No Population Density To Support WAV Platform**

5        21.    Wheelchair accessible vehicles ("WAVs") are not mass-produced for sale at a

6    typical car dealership, but are specialized vehicles retrofitted to accommodate fixed-frame

7    wheelchairs. WAVs are typically equipped with a wheelchair ramp or lift, a lowered floor, and a

8    securement device to keep the wheelchair in place.

9            ▪ Stipulation at Tr. 768:1-7
             ▪ Muñoz at Tr. 82:25-83:15
10           ▪ Gerundio at Tr. 404:25-405:7, 440:19-441:2
             ▪ Tr. Ex. 32-021 to -024

11   **Response**: Agree.

12       22.    Because WAVs are specially modified vehicles, they are more expensive than

13   comparable non-WAV vehicles. A new WAV can cost over $50,000, or individuals may pay

14   $20,000 or more to modify a standard van or SUV to include a ramp or lift, and other equipment.

15           ▪ Giacopini at Tr. 73:20-23
             ▪ Muñoz at Tr. 82:25-83:15
16           ▪ Smith at Tr. 341:10-342:1

17   **Response**: Agree.

18       23.    WAVs also have higher gas mileage and have higher insurance costs than

19   comparable non-WAV vehicles.

20           ▪ Stipulation at Tr. 768:1-7

21   **Response**: Agree.

22       24.    The population of potential WAV users is not sufficiently large to support a

23   platform for on-demand WAV service.

24           ▪ Rysman at Tr. 700:11-703:12
             ▪ Tr. Ex. 101-025 to 026 at ¶ 49-52
25

26   **Response**: Disagree.  Dr. Rysman only considered the use of independent contractor

     drivers *who own their own WAV vehicles* despite acknowledging that, even in Standard mode,

27
     Lyft utilizes other supply models, and despite the fact that the modifications at issue in this trial

28

include the rental model or a combination of supply models.  Rysman at Tr. 739:22-740:21.

Additionally, Dr. Rysman looked only at WAV service with five-minute wait times, Rysman at

Tr. 701:8-12, and the conclusion is false when using Dr. Rysman's analysis to consider wait times

longer than five minutes, Rysman Tr. at 754:1-755:19 (using Rysman's analysis to consider

density needed to support 8, 10, and 15 minute wait times). Dr. Rysman's analysis suggests that

achieving a wait time of 8 minutes would require a population density of 1,422 people per square

mile; 10 minute and 15 minute-wait times would require population densities of 399 and 16.7

people per square mile, respectively. Rysman at Tr. 745:18-755:19.

25.     A conservative estimate, based on reporting from the SFMTA, is that roughly .6

percent of the population uses wheelchairs. Applying that percentage to the Bay Area Counties,

the population density of potential WAV users is just 14.75 people per square mile.

- Rysman at Tr. 701:23-702:18
- Tr. Ex. 101-025 at ¶ 51

**Response**: Agree.

26.     In contrast, the population density in San Francisco County is approximately

18,656 people per square mile; in Alameda County, it is approximately 2,242 people per square

mile, and; in Contra Costa County, it is approximately 1,581 people per square mile.

- Tr. Ex. 177-011 (Figure 1)

**Response**: Agree.

27.     Estimating the population of riders and drivers, the evidence shows that an

unrealistic level of demand for WAV rides and supply of WAVs would be needed to sustain a

platform for WAV service comparable to non-WAV service.

- Rysman at Tr. 707:5-12, 713:5-22

**Response**: Disagree, *see* Pltfs.' Response to Lyft's FF ¶24. Indeed, considering 10 minute

wait times, the population density needed under Dr. Rysman's analysis would be 399 people per

square mile. Considering 15-minute wait times, the population density needed would be 16.7

people per square mile. In addition, Dr. Rysman failed to consider the supply models at issue in

this case. Rysman at Tr. 739:22-740:21. Moreover, Dr. Rysman failed to account for the fact that

WAV users may tolerate slightly longer wait times due to the existing lack of on-demand transportation options in the Bay Area. Rysman at Tr. 744:24-745:17; see also Ex. 79; Giacopini at Tr. 71:19-73:3; Hinze at Tr. 250:25-251:22.

28.     Specifically, to generate a wait time of five-minutes, every WAV user would need to take at least 2.5 rides per day on Lyft's WAV platform. This is more than 100 times greater than the number of rides generated by the population at large.

- Rysman at Tr. 707:5-12

**Response**: Disagree. *See* Responses to Nos. 24, 27.

29.     There is no evidence of such high demand. Dorene Giacopini, President of the Board of Directors of CRIL, testified that she would use Lyft's on-demand WAV service in limited situations, such as if her car was in the shop, she had a medical appointment where she would be sedated, she did not want to drive to a meeting, or the weather was bad.

- Giacopini at Tr. 70:23-71:18

**Response**: Disagree. Misstates the testimony. Ms. Giacopini did not limit the situations where she would use Lyft's on-demand WAV service to just the situations listed, but rather offered those situations as examples. Giacopini at Tr. 70:17-71:18.

30.     Fiona Hinze, Director of System Change of ILRC, also testified that she would use Lyft's on-demand WAV service in limited situations, such as if she could not use paratransit, her dad was not available to take her, or she had to travel outside of San Francisco.

- Hinze at Tr. 250:10-21

**Response**: Disagree. Ms. Hinze did not limit the situations where she would use Lyft's on-demand WAV service to just the situations listed, but rather offered those situations as examples. Hinze at Tr. 250:10-21.

31.     A platform-based WAV service is also unrealistic because, based on a conservative estimate of the number of personally-owned WAVs in the Bay Area Counties, 6.5% of all WAV owners would have to drive on the platform at any given hour. This level of participation is more than 50 times greater than that by standard automobile owners.

- Rysman at Tr. 713:5-22

**Response:** Disagree. The proposed finding is unsupported by the evidence at trial. Dr. Rysman failed to consider relevant supply models that Lyft uses in both its standard and WAV service, including the combination of supply models at issue in this case, and even using his analysis, the proposed conclusion fails when considering wait times longer than five minutes. Rysman at Tr. 701:8-12, 739:22-740:21; *see also* Pltfs.' Response to Lyft's FF ¶ 24. Further, Lyft already offers WAV service using different combinations of the supply models at issue here and has consistently met service benchmarks. Pltfs.' FF ¶¶ 14-37; *see also* Stipulated at Tr. 768:14-20 (Lyft offers WAV service in nine cities as of January 2021).

### C.   Lyft's Access Mode

32.   In recent years, Lyft has been required by certain local government entities to offer WAV service, which Lyft calls "Access" mode.

- Stipulation at Tr. 768:9-12

**Response**: Agree.

33.   As of January 2021, Lyft offered Access mode in nine cities in the United States. Lyft offers Access mode in those cities because there are regulatory requirements or partnerships with a transit agency.

- Stipulation at Tr. 768:9-21
- Gerundio at Tr. 398:17-399:1

**Response**: Agree except that two of the listed cities where Lyft offers Access mode are San Francisco and Los Angeles, where there is no evidence that Lyft has either a transit agency partnership or is subject to a requirement to provide WAV service, Lyft's FF ¶ 37.

34.   Because there is not a supply of WAVs on its platform, the biggest challenge Lyft faces in each city where it provides WAV service is finding an adequate supply of WAVs.

- Gerundio at Tr. 399:2-22
- Tr. Ex. 64-002 (1. Supply)

**Response**: Agree in part. While ensuring sufficient supply of WAV vehicles is a challenge, Lyft has ensured it meets coverage needs for WAV service in other cities, Pltfs.' FF ¶¶ 14-37, and, in the Bay Area, Lyft has made the task more difficult by blocking drivers who own their own WAV vehicles from participating in Access mode, Pltfs. FF ¶ 68. Moreover, Ms.

Gerundio, who oversees Lyft's WAV program nationwide, testified she didn't "think the problem was finding a [rental] partner." Gerundio at Tr. 602:17-603:21.

35.     Each market where Lyft offers Access mode is different in terms of population density and regulations, among other things. There is no evidence that any other market where Lyft offers WAV service is meaningfully analogous to the Bay Area Counties in terms of regulatory environment, size, or population density.

- Gerundio at Tr. 405:22-406:7
- Grossman at Tr. 670:17-675:4
- Tr. Ex. 79-009 ("Regions differ based on…")
- Tr. Ex. 220 at 175:05-09

**Response**: Agree that Lyft's Access mode markets have differences in population, density, and so forth, but disagree that this means the markets are not meaningfully analogous. The record reflects that Lyft used data/information from other Access mode markets to inform its strategy in the Bay Area. *See, e.g.*, Ex. 10 at 001 ("Initial estimate of the number of drivers needed in SF was calculated . . . and was based on calculating the average IC drivers per WAV ride in [New York] and [Philadelphia] as a proxy.")  The record also reflects that Lyft has met service benchmarks including wait times in multiple markets despite differences in population densities, among other factors, in those markets. Pltfs.' ¶¶ FF 14-37; Niedermeyer at Tr. 313:19-314:2 (Lyft "typically" meets ETA requirements in Portland).

36.     Lyft began offering Access mode in San Francisco (including San Francisco Airport) and Los Angeles in 2019, in response to the TNC Access for All Act, which set up a framework for rule making proceedings before the CPUC.

- Stipulation at Tr. 768:23-769:2
- Gerundio at Tr. 430:8-18
- Tr. Ex. 13

**Response**: Agree that Lyft launched Access mode in San Francisco and LA in 2019, but it did not do so solely in response to the TNC's Access for All Act, *see* Lyft FF ¶ 37.

37.     Although the Access for All Act does not require Lyft to provide WAV in California, Lyft decided to pilot WAV service in San Francisco and Los Angeles because (a) it was an opportunity to serve an underserved community, (b) it allowed Lyft to be a part of the conversation in the CPUC proceedings, and (c) the CPUC proceedings gave Lyft an opportunity

to see if it could make it work while having the opportunity to recoup some of its costs.

- Gerundio at Tr. 430:5-18, 431:11-18

**Response**: Agree.

38.     At the time Lyft launched WAV in San Francisco and Los Angeles, the CPUC had not yet established requirements or a process for receiving offsets. Lyft believed the offset process would be fairly straightforward.

- Gerundio at Tr. 430:22-431:10

**Response**: Agree.

39.     Lyft provides WAV service in San Francisco by contracting with First Transit, Inc., a third-party transportation company. First Transit supplies the WAVs and employs and trains the drivers.

- Gerundio at Tr. 139:5-19, 405:19-21, 432:5-18
- Tr. Ex. 61

**Response**: Agree.

40.     In exchange, Lyft pays First Transit an hourly rate of $58.62 per vehicle from 7 a.m. to midnight, seven days a week, to have the vehicle available in San Francisco.

- Gerundio at Tr. 429:18-25, 433:7-12
- Tr. Ex. 61-012

**Response**: Agree.

41.     First Transit vehicles do not provide Standard mode or any other non-WAV mode of ride. This means that if there are just two requests for WAV rides in one day, the First Transit vehicles (and their drivers) are on standby for all the other remaining hours.

- Gerundio at Tr.  411:19-412:8, 463:24-464:10

**Response**: Agree

42.     Lyft does not "cross-dispatch" the First Transit vehicles because if WAV partner vehicles are dispatched to provide rides in other Modes, they may not be available when a WAV is requested, leading to lower reliability for WAV users.

- Niedermeyer at Tr. 308:5-25
- Gerundio at Tr. 447:8-448:12, 607:8-12

**Response**: Agree that Lyft does not cross-dispatch the First Transit vehicles and that Lyft has expressed concerns about the potential impact of cross-dispatching. *But see* Pltfs.' FF ¶ 82-84 (Lyft's failure to test methods to decrease any negative impact of cross-dispatching). Further, Lyft has continued to use cross-dispatched rental vehicles in the New York City market despite the concerns expressed. *Id.* at ¶¶ 78-87.

43.     First Transit vehicles used on the Lyft platform were not a part of a pre-existing fleet; they were created specifically for use on the Lyft platform. Acquiring even one extra vehicle, and hiring sufficient drivers to operate that vehicle, is a time consuming process.

- Gerundio at Tr. 432:13-18, 440:8-441:20

**Response**: Agree.

44.     Managing the First Transit contract is operationally difficult.

- Gerundio at Tr. 410:4-15; 438:21-439:4

**Response**: Agree.

45.     For example, Lyft must strategically and manually position First Transit vehicles near riders who most frequently request Access mode. Such manual positioning of vehicles never occurs in Lyft's non-WAV modes.

- Bozorgirad at 319:1-14, 321:6-17, 323:1-19
- Gerundio at Tr. 446:7-15

**Response**: Agree that Lyft strategically places the vehicles to "get us a shorter ETA and more reliable service," for frequent riders, Gerundio at Tr. 446:12-15, but disagree that testimony reflects that Lyft "must" do this.

46.     Lyft actively tracks partner performance such as acceptance rates so that riders using Access mode are assured of a short wait time when they need a ride.

- Gerundio at Tr. 410:10-413:5

**Response**: Agree, and cited testimony further reflects that Lyft does this so that it can meet ETA requirements. Gerundio at Tr. 410:11-15.

47.     Providing WAV service through the contract with First Transit in San Francisco is

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW  3:19-CV-01438-WHA

1    expensive. From Quarter 4 2019 through Quarter 3 2020, Lyft paid First Transit almost $1.5

2    million. During that same period, First Transit provided 955 WAV rides in San Francisco, at an

3    average cost of over **$1,500 per ride**.

4                     ▪  Tr. Ex. 177-018 (Figure 5) (derived arithmetically)

5         **Response**: Agree that this reflects the amount Lyft spent through the contract. However,

6    this statement is misleading as it neither reflects that Lyft received nearly $1.5 million in offset

7    from the CPUC for the cost of offering the First Transit program from Quarter 3 2019 through

8    Quarter 2 2020, Pltfs.' FF ¶ 106, nor does it reflect that Lyft has failed to take steps it knows

9    would increase demand for the First Transit program, *see, e.g.*, Pltfs.' FF ¶¶ 59-60 (Lyft's failure

10   to remove Wheelchair Access mode toggle), or directly lower the cost of providing WAV service,

11   *see, e.g.*, Plfs.' FF ¶¶ 68-70 (Lyft's failure to even try to IC/Organic, its cheapest supply model, in

12   the Bay Area). The statement also is misleading because three of the quarters referenced occurred

13   during the COVID-19 pandemic.

14        48.    Lyft does not offer Access mode in Alameda or Contra Costa counties, because it

15   has not yet found a way of providing reliable WAV service in these counties at a reasonable cost.

16                     ▪  Gerundio at Tr. 406:17-22, 456:15-458:4, 463:1-465:12, 567:15-569:14
                       ▪  Tr. Ex. 216
17                     ▪  Chan at Tr. 223:23-226:11

18        **Response**: Agree that Lyft does not offer Access mode in those counties, but disagree that

19   this is because it has not identified a way to do so at a reasonable cost. Pltfs.' FF ¶¶ 46, 51-53

20   (planned, but never launched, Rental pilot that would have covered all three counties). Also, Lyft

21   is a company with extensive data and transportation planning capacity. Niedermeyer at Tr. 271:9-

22   20 ("[D]ata is core to many decisions we make at Lyft. In many of my conversations I've had,

23   whether it's informed through decisions or defining metrics or just in day-to-day conversations,

24   the question is always: Would the data support that assumption or this decision? Data is really

25   one of the core foundations of Lyft. So collecting data on ride requests, on rides, again, allows us

26   to make better and more informed decisions.") Yet during litigation Lyft produced no written

27   analysis, data or documentation of any kind refuting its pre-pandemic analysis that the proposed

28   Bay Area Rental pilot would be effective. Pltfs.' FF ¶¶ 71-87.

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
                         PROPOSED FINDINGS OF FACT AND CONCLUSIONS
                         OF LAW 3:19-CV-01438-WHA

49.     Alameda and Contra Costa counties are both much larger, and far less densely populated, than San Francisco (or New York City).

- Chan at Tr. 204:25-205:14, 223:1-10
- Tr. Ex. 177-011 (Figure 1)

**Response**: Agree.

50.     San Francisco County is approximately 47 square miles, Alameda County is approximately 739 square miles, and Contra Costa County is approximately 723 square miles.

- Tr. Ex. 177-011 (Figure 1)

**Response**: Agree.

**D.     Ability To Offset Costs From The Access Fund**

51.     Under the standards set by the CPUC, transportation network companies ("TNCs") pay a $.10 fee per ride into an "Access Fund." The funds are tracked by county and by quarter.

- Tr. Ex. 13-023

**Response**: Agree.

52.     If a TNC meets certain performance standards in a particular county (described more fully in the next section), it may qualify to recover (or to "offset") some or all of the money paid into the Access Fund for that particular county.

- Tr. Ex. 14-006, 14-085 to -087

**Response**: Agree.

53.     If a TNC meets stricter exemption standards, it may qualify to be exempt from paying into the Access Fund for a period of time.

- Tr. Ex. 14-046, 14-085 to -087

**Response**: Agree.

54.     The CPUC rule-making process has not concluded. The CPUC is currently reevaluating the applicable standards for receiving offsets.

- Tr. Ex. 96 at 3-6

**Response**: Agree.

**1.     Requirements For Offset**

55.     As of June 2021, in order to qualify for an offset from the Access Fund, a TNC

such as Lyft must meet three distinct requirements.

**Response**: Agree.

56.     First, it must meet wait time standards established by the CPUC ("Interim Offset Time Standards"). Currently, the Interim Offset Time Standards require:

- For San Francisco: 50 percent of WAV rides within 15 minutes or 75 percent of rides within 30 minutes
- For Alameda and Contra Costa: 50 percent of WAV rides within 25 minutes or 75 percent of rides within 50 minutes

  - Tr. Ex. 14-086

**Response**: Agree.

57.     Second, a TNC must show quarter-over-quarter improvement of the Interim Offset Time Standard: "If a TNC received an offset in the prior quarter, the TNC must achieve an Offset Time Standard that exceeds the percentage achieved in the prior quarter in either a Level 1 or a Level 2 Offset Time Standard."

  - Tr. Ex. 14-086 to -087
  - Tr. Ex. 76-060 to -061

**Response**: Agree.

58.     This is the most difficult standard to meet, as it is not possible to continue to improve wait times quarter-over-quarter forever.

  - Gerundio at Tr. 475:3-11

 **Response**: Agree with the concept that it is not possible to continue to improve wait times "forever," but disagree that the record reflects that Lyft has come anywhere close to a point where it has improved its wait times as much as is possible for it to do. Further, the CPUC's improvement requirements allow significant flexibility. For example, a TNC is viewed as improving quarter-over quarter if it improves service for the Level 1 benchmarks listed in one quarter, and then improves service for the Level 2 benchmarks in the second quarter (even if it doesn't improve its Level 1 benchmarks in that second quarter). Gerundio at Tr. 475:21-477:12.

59.     Third, a TNC must meet the "Trip Completion Standard." This requires showing an increase in the total number or percentage of completed WAV trips compared to the previous quarter in the same geographic area.

1          ▪   Tr. Ex. 76-060

2      **Response**: Agree.

3      60.     The Trip Completion Standard is a new standard recently imposed by the CPUC,

4  and is effective starting in the second quarter of 2021.

5          ▪   Tr. Ex. 76-060

6      **Response:** Agree.

7      61.     While Lyft has qualified for offsets in most quarters, it did not qualify for an offset

8  in San Francisco in the fourth quarter of 2020. Lyft also failed to qualify for an offset in Los

9  Angeles in the fourth quarter of 2019, and is at risk of missing the offset requirements in the

10  current quarter (second quarter of 2021) in Los Angeles.

11          ▪   Gerundio at Tr. 492:7-12, 495:12-17
           ▪   Tr. Ex. 215

12

13      **Response**: Agree, though the fourth quarter of 2020 was at the height of the pandemic.

14          **2.     Exemption From Paying Into The Access Fund**

15      62.     TNCs may qualify for an exemption from paying the $.10 per ride access fee by

16  meeting the stricter "Exemption Time Standard".

17          ▪   Tr. Ex. 14-046, 14-085 to -087
           ▪   Gerundio at Tr. 488:7-489:7

18

19      **Response**: Agree.

20      63.     The Exemption Time Standard requires:

21  ▪   80 percent of WAV rides within 16 minutes in San Francisco
   ▪   80 percent of WAV rides within 20 minutes in Alameda County
   ▪   80 percent of WAV rides within 40 minutes in Contra Costa County

22

23          ▪   Tr. Ex. 14-046, 14-087, 14-093
           ▪   Gerundio at Tr. 488:7-489:7

24      **Response**: Agree.

25      64.     A TNC must meet the Exemption Time Standard for four consecutive quarters in

26  order to qualify for the exemption.

27          ▪   Tr. Ex. 14-093

28      **Response**: Agree.

65.     While Lyft has qualified for offsets in most quarters, it has never met the
Exemption Time Standard. There is no evidence in the record that Lyft could meet the Exemption
Time Standard, or how much that would cost.

- ▪ Gerundio at Tr. 488:7-489:7
- ▪ Grossman at Tr. 657:10-659:15

**Response**: Agree that Lyft has qualified for offsets in most quarters and that it has not yet
met the Exemption Time Standard, but disagree that there is no evidence in the record that it
would be feasible for Lyft to so. *See, e.g.*, Pltfs.' FF ¶¶ 23, 25, 31 (evidence re: Lyft having
met and currently working to meet similar wait time requirements in New York); Niedermeyer at
Tr. 310:24-311:6, 313:19-314:2 (Lyft meets ETA requirements in Portland using just 2-3
vehicles).

### 3.     Funds Available For Offset Limited By County

66.     Funds available for offset are limited to the amount collected by a TNC in a
particular county in a particular quarter.

- ▪ Gerundio at Tr. 458:11-459:8
- ▪ Tr. Ex. 13-024 at ¶ 3-5
- ▪ Tr. Ex. 14-086 to -087

**Response**: Agree.

67.     For Quarter 1 of 2021, approximately $130,000 in funds were available for offset
for San Francisco County, $70,000 for Alameda County, and $30,000 for Contra Costa County.

- ▪ Gerundio at Tr. 459:22-24, 493:22-494:2

**Response**: Agree that Ms. Gerundio testified to these approximate numbers during the
mid-pandemic first quarter of 2021.

68.     There is no evidence what amount of Access Funds will be available in future
quarters, or when (if ever) the amount of Access Funds will return to pre-pandemic levels.

**Response**: Agree that neither Lyft nor Plaintiffs can see into the future, but record
includes testimony from Lyft witnesses that Lyft's business is experiencing a resurgence, Chan at
Tr. 211:9-11, and that significantly more funds were available to Lyft under non-pandemic
circumstances than are described in Lyft's FF ¶ 67. *See* Pltfs.' FF ¶¶ 109-110 (prior to the
pandemic, Lyft made a quarterly contribution to the Access Fund of approximately $840,000 for

the three counties, based on its contributions for San Francisco for Q1 2020 and for Alameda and Contra Costa Counties in Q4 2019).

**E.**     **Plaintiffs' Requested Remedy**

69.     Plaintiffs seek to have Lyft offer on-demand WAV service throughout the Bay Area Counties.

- ▪ Joint Pretrial Order [Dkt. 157] at Part II.A

**Response**: Agree.

70.     Plaintiffs have not identified a specific modification of a policy, practice, or procedure that would make on-demand WAV service available through Lyft's App. Instead, Plaintiffs seek, for the first year of the injunction, to have Lyft engage in an "iterative process" to figure out how to provide WAV service that meets CPUC's Exemption Time Standards and standards for "reasonable reliability."

- ▪ Joint Pretrial Order [Dkt. 157] at Part II.A
- ▪ Grossman at Tr. 662:13-24
- ▪ *See also* Comments of Counsel at Tr. 11:20-12:1, 777:14-25

**Response**: Disagree that Plaintiffs have not identified a specific modification of a policy, practice, or procedure. Plaintiffs have requested that Lyft use the hybrid of supply models and tools it has used to build its non-WAV service, and to provide WAV service outside of the Bay Area, and the Court granted Summary Judgment to Plaintiffs (and against Lyft) as to the existence of a discriminatory policy, practice, or procedure, and found that Plaintiffs have identified policies, practices or procedures that can be implemented to address that discrimination. MSJ Order (ECF 92) at 5, 12. Agree that Plaintiffs' proposed remedy includes giving Lyft a year to meet service level and reliability benchmarks, and that Plaintiffs have proposed using the CPUC's Exemption Time Standards.

71.     According to Dr. Alice Grossman, Plaintiffs' transportation planning expert, WAV service in the Bay Area Counties would be a new transportation service.

- ▪ Grossman at Tr. 662:14-17
- ▪ Tr. Ex. 79-006, 79-009

**Response**: Agree that this was Dr. Grossman's testimony, but that Dr. Grossman also recognized that Lyft currently provides WAV service in San Francisco. Grossman at Tr. 676:12-

1    18.

2        72.     According to Dr. Grossman, a "reasonable" starting point for this new

3 transportation service would be: five vehicles via a partnership with First Transit, 65 rental

4 vehicles for independent drivers to rent via an arrangement with an unknown rental partner, and

5 an unknown number of independent contractor drivers.

6              ▪   Grossman at Tr. 664:6-13

7    **Response**: Agree.

8           **1.**      **Rental Model Is Not Reliable**

9        73.     A key component of Dr. Grossman's starting point for the iterative process is the

10 rental model. The rental model requires Lyft to contract with a third-party rental car company to

11 procure and offer 65 WAVs for rental to independent contractor drivers on Lyft's platform.

12              ▪   Grossman at Tr. 668:11-22

13    **Response**: Agree that the 65 vehicle Rental pilot Lyft had planned in the Bay Area was a

14 component of the possible starting point Dr. Grossman described, but disagree that Dr. Grossman

15 testified or made judgments about which were the "key components" of that starting point.

16        74.     Before the pandemic, Lyft had planned to pilot a WAV rental program in the Bay

17 Area Counties through Hertz. The program is not going forward because Hertz declared

18 bankruptcy and no longer operates a rental program for Lyft drivers in San Francisco.

19              ▪   Chan at Tr. 181:15-183:2

20    **Response**: Agree that Lyft planned a Hertz pilot, but disagree that Hertz' bankruptcy is

21 the reason Lyft is not launching a Rental pilot in the Bay Area. Pltfs.' FF ¶ 76 (finding a rental

22 partner is not the problem); 73, 74 (Lyft has not communicated with Hertz or any rental company

23 about launching Rental pilot since summer 2020). *See also* Lyft FF ¶ 83 (Lyft's unrelated,

24 alternative justification for not moving forward with Rental program).

25        75.     Under the contract with Hertz, Lyft was responsible for making a substantial

26 monthly payment for each WAV "acquired and made available for rental" by Hertz. For the first

27 twenty-four months, Lyft would make a monthly payment of $980 per vehicle, and thereafter,

28 $550 per month per vehicle.

1            ▪ Tr. Ex. 150-002 at ¶ 5.1

2       **Response**: Agree.

3       76.    Without Lyft agreeing to undertake the financial risk of creating these specialized

4   vehicles, a WAV rental program is not possible.

5            ▪ Muñoz at Tr. 86:7-87:1, 94:10-96:3
             ▪ Ren at Tr. 126:10-19
6

7       **Response**: Disagree that this statement is supported by the cited testimony, but agree that

8   Ms. Ren testified she did not locate a large rental chain that already had 65 WAV vehicles in its

9   fleet. Ren at Tr. 126:15-19.

10      77.    There is no evidence of an alternative rental provider in the Bay Area Counties

11  who may be willing to partner with Lyft on a WAV rental program for Lyft drivers.

12           ▪ Ren at Tr. 126:10-19
             ▪ Chan at Tr. 203:1-204:20, 206:17-207:8
13           ▪ Grossman at Tr. 668:19-22

14      **Response**: Disagree.  The evidence reflects that Lyft views finding a rental provider as

15  "not the problem," Pltfs.' FF ¶ 76, and that Lyft made no effort to locate an alternative rental

16  provider after pausing the Hertz pilot, Pltfs.' FF ¶ 74. Plaintiffs testified to renting WAV vehicles

17  in the Bay Area. Giacopini at Tr. 67:5-12. The DOJ letter cited by Lyft in its proposed findings

18  also notes the existence of "nationwide rental companies have entered into cooperative

19  agreements with companies who specialize in renting lift-equipped vans, making these services

20  more generally available than they once were."  *See* Lyft FF ¶ 123.

21      78.    Lyft had, and continues to have, serious doubts about the viability of a WAV

22  rental program in the Bay Area Counties. Chief among Lyft's concerns is that independent

23  contractor drivers would not want to rent these specialized vehicles.

24           ▪ Ren at Tr. 129:1-130:6 (discussing Tr. Ex. 10)
             ▪ Muñoz at Tr. 92:21-93:21
25           ▪ Gerundio at Tr. 599:19-600:1, 603:13-21

26      **Response**: Disagree. As of May 2020, Lyft was optimistic about the viability of the rental

27  model. Pltfs.' FF ¶ 72. While Lyft employees expressed vague concerns about the rental model at

28  trial, they failed to offer any evidence to support those concerns, Pltfs.' FF ¶¶ 77-79, 82-84, 87,

1    and Lyft continues to use a rental model in its New York WAV program, Pltfs.' ¶ 80.

2        79.    To reduce its risk under the Hertz contract, Lyft limited the initial delivery of

3    WAVs to just ten vehicles, with the option to request additional WAVs up to a total of 65.

4        ▪ Muñoz at Tr. 93:22-94:9
         ▪ Tr. Ex. 150-001 at ¶ 3.2

5    **Response**: Agree.

6        80.    Even if Lyft could find drivers to rent the WAVs, the drivers are independent

7    contractors who can elect to drive in other, non-WAV, modes.

8        ▪ Ren at Tr. 132:13-16
9        ▪ Chan at Tr. 241:6-10
         ▪ Bozorgirad at Tr. 328:12-329:6
         ▪ Gerundio at Tr. 603:13-21
10

11   **Response**: Agree in part. However, the testimony showed the Lyft has identified methods

12   it could test to increase utilization of cross-dispatched WAV vehicles, but that Lyft has not yet

13   done that testing. Pltfs.' FF ¶¶ 77-86.

14       81.    In New York City, Lyft has found that Access mode utilization by drivers who rent

15   WAVs is only about 2%, meaning that drivers who rent WAVs are spending just 2% of their time

16   on the platform providing WAV rides.

17       ▪ Chan at Tr. 372:2-17, 373:16-19
         ▪ Tr. Ex. 209
18       ▪ Bozorgirad at Tr. 329:7-11

19   **Response**: Agree only that Exhibit 209 and related testimony shows such utilization rates

20   in New York City between January 2021 and May 2021, but disagree that the record supports that

21   this is the case during any other time period, including prior to the pandemic.

22       82.    This is because independent drivers tend to drive in the areas of densest demand in

23   Standard (or classic) rides, where earning opportunities are highest.

24       ▪ Chan at Tr. 197:23-198:4
         ▪ Bozorgirad at Tr. 328:12-329:6

25   **Response**: Agree, but the record also reflects that Lyft has tools to influence independent

26   driver behavior. Pltfs.' FF ¶¶ 10, 11, 77-87.

27       83.    Because the independent contractor drivers in the rental program have not proven

28   to be a reliable source for meeting WAV demand, Lyft does not have any current plan to pilot a

-21-

WAV rental program in the Bay Area Counties.

- Chan at Tr. 181:15-183:7, 202:7-204:20, 241:6-10
- Gerundio at Tr. 406:17-22, 420:12-421:11

**Response**: Agree that Lyft has no plans to launch the rental program, but disagree that the record supports that an inability to control IC driver behavior was the reason Lyft is not planning to launch a Rental pilot in the Bay Area, *see* Pltfs.' Response to Lyft FF ¶ 77-87.

## 2. Independent Contractor Model Is Not Reliable

84.      There is no evidence of a supply of independent contractor drivers with personal WAVs who want to drive on the Lyft platform.

- Muñoz at Tr. 83:16-23
- Gerundio at Tr. 457:9-20

**Response**: Agree that Lyft witness testified that here are "very few" IC WAV drivers on the Lyft platform, Muñoz at 83:16-23.

85.      In addition to WAVs being more expensive to acquire and maintain, WAV rides take longer to perform and require special training.

- Gerundio at Tr. 404:25-405:7
- Rysman at Tr. 715:12-25

**Response**: Agree.

86.      In the past, Lyft has been unsuccessful in recruiting independent contractor WAV drivers in other markets. For example, Lyft sent out an inquiry to 27,000 drivers in the Philadelphia area, and ended up with just one independent contractor WAV driver.

- Gerundio at Tr. 426:10-427:2

**Response**: Agree that the cited testimony reflects Ms. Gerundio's description of efforts in Philadelphia, but the record also reflects that Lyft successfully recruited about 20 IC WAV drivers in Philadelphia. Gerundio at Tr. 427:6-15. *See also* Pltfs.' FF ¶¶ 26 (756 Lyft IC WAV drivers in New York).

87.      Independent contractor drivers who drive their own WAVs on the Lyft platform spend most of their time providing non-WAV rides.

- Bozorgirad at Tr. 328:12-329:21
- Gerundio at Tr. 421:18-422:1, 427:3-15
- Chen at Tr. 197:23 – 198:4

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW  3:19-CV-01438-WHA

1   **Response**: The cited testimony only reflects that this has been in the case in some markets

2   in the past, but not that it is generally or always true. *See also* Pltfs.' Response to Lyft ¶¶ 82-83

3   (regarding methods Lyft can use to influence driver behavior and increase WAV utilization that it

4   has identified but not tested yet.)

5   88.   Plaintiffs have not submitted any evidence to show that there is a sufficient

6   number of independent drivers with WAVs who wish to drive on the Lyft platform in the Bay

7   Area Counties to provide reliable service.

8   **Response**: Agree, but the record reflects that Lyft has successfully recruited IC WAV

9   drivers outside of the Bay Area, Pltfs.' FF ¶ 26, Gerundio at Tr. 427:6-15, and that Lyft has

10  neither made any effort to recruit IC WAV drivers in the Bay Area nor does Lyft even allow

11  WAV IC drivers to provide WAV service in the Bay Area. Pltfs.' FF ¶¶ 68-69. Nor is it

12  Plaintiffs' obligation to identify and recruit WAV drivers.

13  ### 3.   Partner Model Is Expensive

14  89.   The evidence shows contracting with First Transit is the only potential way to

15  provide WAV service in the three Bay Area Counties in a manner reliable enough to achieve the

16  CPUC standards for reimbursement.

17  ▪   Gerundio at Tr. 458:11-15, 567:25-568:13

18  **Response**: Agree that the evidence shows this is the only way Lyft has tried to provide

19  WAV service in the three counties, but disagree that the record reflects that it could not use other

20  models, as it had planned to do pre-pandemic, Pltfs.' FF ¶¶ 46-54, 71-87, and as it has

21  successfully done to meet similar wait time requirements in New York, Pltfs.' FF ¶¶ 23, 25.

22  90.   Lyft currently contracts with First Transit to provide WAV service in San

23  Francisco. However, there is no evidence that five First Transit vehicles would be sufficient to

24  provide effective WAV service throughout the three Bay Area Counties.

25  ▪   Gerundio at Tr. 567:8-568:24, 569:9-14, 570:16-23

26  **Response**: Agree.

27  91.   A conservative estimate of the number of partner vehicles that would be needed to

28  provide effective WAV service in the Bay Area Counties is at least 15 – five in each county – and

could be higher.

- Gerundio at Tr. 567:8-568:24

**Response**: Agree that this was Ms. Gerundio's testimony, but note that this estimate was offered for the first time at trial, is not consistent with any document produced in this case, including documents Lyft produced reflecting Lyft's own analysis done in collaboration with its "Science" team, *see* Pltfs.' ¶¶ FF 51-52, and is not supported by the testimony of any other Lyft witness.

92.     At a cost of $360,000 per vehicle, per year, service provided via these vehicles would cost $5.4 million, exclusive of other internal costs.

- Gerundio at Tr.530:7-531:1, 567:8-568:24

**Response**: Agree that this reflects the math described in the cited testimony.

93.     The "partner model" is not consistent with a platform industry like Lyft's ridesharing marketplace.

- Rysman at Tr. 761:24-762:6

**Response**: Disagree that the cited testimony supports this statement. Nor is it supported by the evidence at trial, which demonstrates that Lyft used a variety of supply levers beyond independent contractors who own their own vehicle in both standard and other modes, including a rental model—as well as the fact that Lyft already utilizes the partner model in several other markets. *See* Pltfs.' FF ¶¶ 10-20.

### 4.     No Evidence That Plaintiffs' Remedy Would Be Effective

94.     Plaintiffs presented no evidence as to what combination of partner, rental, and independent contractor vehicles would be needed in order to provide reliable WAV service in the Bay Area Counties.

- Grossman at Tr. 662:25-663:15

**Response**: Agree that Plaintiffs do not seek to dictate the specific combination of partner, rental, and independent contractor vehicles that would be needed to provide reliable WAV service, but note that Lyft has found its own successful mix of these three models to provide reliable WAV service in New York City.  Pltfs.' FF ¶ 25. Further, the evidence shows that Lyft

1   ran an analysis done in collaboration with its Science team that would be able to utilize a

2   combination of rental and W-2 drivers to meet WAV demand in the Bay Area and there is scant

3   evidence in the record refuting this analysis.  *See* Pltfs.' FF ¶¶ 51-52, 71-87.

4         95.    Dr. Grossman does not know how many WAVs would be needed to provide

5   reliable service in the Bay Area Counties, and believes that the only way to know the number of

6   vehicles needed would be to "try it."

7         ▪  Grossman at Tr. 664:6-665:25, 666:4-18
          ▪  Tr. Ex. 220 at 170:02-14

8         **Response**: Agree.

9         96.    After one year, Plaintiffs want Lyft to offer WAV service with specific wait times

10  that would be sufficient to meet the Exemption Time Standards for the CPUC proceedings and an

11  undefined threshold for "reasonable reliability." However, Dr. Grossman expressed no opinion on

12  whether Lyft could meet the Exemption Time Standards from the CPUC.

13        ▪  Joint Pretrial Order [Dkt. 157] at Part II.A
          ▪  *See also* Comments of Counsel at Tr. 17:1-8
14        ▪  Grossman at Tr. 657:10-659:15, 660:12-661:7

15        **Response**: Agree that Plaintiffs want Lyft to offer WAV service that meets specific wait

16  times after a year, that Plaintiffs have proposed the Exemption Time Standards as one possible set

17  of benchmarks the Court could impose, and that Plaintiffs have not proposed specific reliability

18  standards. Agree that Dr. Grossman expressed no opinion as to whether Lyft could meet this

19  particular set of wait time standards. However, Dr. Grossman found that WAV providers in

20  different regions with different population densities, among a range of other differences, managed

21  to achieve wait times within a relatively narrow range including the wait times Plaintiffs propose.

22  Ex. 79 at 009, 025-026.

23        97.    Plaintiffs presented no evidence that the reliability generated by the "iterative

24  process" would be sufficient for each of them to use the Lyft App.

25        **Response**: Disagree as the record reflects that Lyft has successfully used the iterative

26  process to build its reliable, non-WAV service, Pltfs.' FF ¶ 13, and Plaintiffs do not seek a service

27  that has greater reliability than that non-WAV service. Further, the record reflects that Lyft's own

28  witnesses described its transportation planning in general as "an 'iterative process' that we are

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW 3:19-CV-01438-WHA

continually improving these models and making them more accurate." Niedermeyer at Tr.
274:11-275:10; Bozorgirad at Tr. 323:1-326:21 (describing how Lyft "reiterated" to develop
models, and to meet WAV service level requirements in New York.)

### 5. No Evidence Of How Much Plaintiffs' Remedy Will Cost

98.     Plaintiffs presented no evidence of what their proposed remedy will cost.
According to Dr. Grossman, the data needed to estimate the cost of WAV service in the three Bay
Area Counties does not exist, and will not exist until the iterative process is tried.

- Grossman at Tr. 667:8-668:10

**Response**: Agree that Dr. Grossman did not estimate the cost of providing WAV service.
Disagree that there is any lack of evidence in the record of the potential cost of providing reliable
WAV service. Pltfs.' FF ¶¶ 32, 33, 53, 54, 65 (evidence of Lyft's prior and estimated WAV
expenditures); 109, 110, 112, 114-122 (evidence of Lyft's overall assets and revenue); 106, 107
(evidence regarding Lyft's receipt of offset from the CPUC); *see also* Pltfs.' FF ¶¶ 38 (no
evidence of financial hardship/consequences for providing WAV), 39 (Lyft has not considered
leaving or terminating service in a city due to WAV service), 40 (Lyft has not terminated or laid
off employees as a result of WAV).  Further, Lyft presented no counter analysis or data
demonstrating that its pre-pandemic plan for Bay Area WAV service supported by its Science
team would not be effective at an annual cost of approximately $2.8 million. *See* Pltfs' FF ¶¶ 46-
54, 71-87. Agree that Plaintiffs cannot know the exact mix of the hybrid of models that Lyft will
decide to use to provide WAV service in the Bay Area, and thus cannot know the precise cost of
that service.

99.     Plaintiffs presented no evidence of what it would cost to provide WAV service that
meets Exemption Time Standards in the three Bay Area Counties.

- Grossman at Tr. 667:8-668:10

**Response**: Disagree. *See* Pltfs.' Response to Lyft FF ¶ 98.

### II.      CONCLUSIONS OF LAW

### A.      Plaintiffs Have Failed To Meet Their Burden Of Proof.

100.    To prevail on their claim of discrimination, Plaintiffs must prove that: (1) Lyft

1   employed a discriminatory policy or practice; and (2) Lyft discriminated against Plaintiffs based

2   on their disability by (a) failing to make a requested reasonable modification that was

3   (b) necessary to accommodate plaintiffs' disability. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674,

4   683 n.38 (2001); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004).

5         **Response**: Agree that this is a reasonable modification case under Title III of the ADA.

6   However, the Court has already ruled that Lyft has a discriminatory policy practice or procedure,

7   that Plaintiffs have standing to challenge that discriminatory policy practice or procedure, that

8   Plaintiffs have identified policies, practices or procedures that can be implemented to address that

9   discrimination and that the proposed modifications requested by Plaintiffs would not

10  fundamentally alter Lyft's business. ECF 92 at 3-5, 10-12. Thus, the Court held a trial on the

11  main issue of whether the proposed modifications, specifically a rental model or a combination of

12  the models are reasonable. *Id.* at 12.

13        101.   As this Court stated in its Order re Motions for Summary Judgment, "[t]he burden

14  is on plaintiff[s] to demonstrate that a modification is reasonable." Dkt. 92 at 5, citing *Zukle v.*

15  *Regents of Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999). *See also Snapp v. United*

16  *Transp. Union*, 889 F.3d 1088, 1101-02 (9th Cir. 2018) (the ADA does not place the burden of

17  disproving a reasonable accommodation on the defendant); *Johnson v. Gambrinus*

18  *Company/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (the plaintiff "bears the ultimate

19  burden of proof").

20        **Response**: Agree that, in the context of a reasonable modification claim, Plaintiffs must

21  demonstrate that the requested modifications are reasonable. However, this is a light burden. In

22  this Circuit, Plaintiffs must demonstrate that their requested modification is reasonable "on its

23  face." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002) (plaintiff "need only show that

24  an "accommodation" seems reasonable on its face, i.e., ordinarily or in the run of cases"). *See*

25  *Lopez v. Catalina Channel Express, Inc*., 974 F.3d 1030, 1036 (9th Cir. 2020) (citing *Lentini v.*

26  *Cal. Ctr. for the Arts*, 370 F.3d 837, 845 (9th Cir. 2004) (applying burden-shifting framework

27  from *Johnson*, 116 F.3d at 1059)). Under *Johnson*, "[The plaintiff meets this burden by

28  introducing evidence that the requested modification is reasonable in the general sense, that is,

1    reasonable in the run of cases." 116 F.3d at 1059.  The allocation of a light burden on Plaintiffs

2    recognizes that to place the burden differently "would be asking too much of plaintiffs, especially

3    considering that defendants have more knowledge and information regarding their own facilities,

4    which allows them to quickly and easily counter implausible barrier-removal proposals." *Lopez*,

5    974 F.3d at 1038 (discussing rationale for light burden in Title III cases where access barriers are

6    alleged and adopting Second Circuit's framework that plaintiffs must only "articulate a plausible

7    proposal for barrier removal, the costs of which, facially, do not clearly exceed its benefits")

8    (quoting *Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 373 (2d. Cir. 2008); *Borkowski v. Valley*

9    *Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

10          102.    Plaintiffs request an "iterative process." There was no evidence that Plaintiffs

11   requested the "iterative process" as a modification before filing the lawsuit, or at any time before

12   April 2021. *Johnson,* 116 F.3d at 1059 ("[t]he Plaintiff has the burden of proving that a

13   modification was requested"). In addition, there is no decision by any federal court ordering or

14   upholding an order of an iterative process as a reasonable modification under the ADA.

15          **Response**: Disagree.  Defendants misconstrue Plaintiffs' request for relief. Plaintiffs do

16   not ask the Court to order that Lyft engage in an iterative process. Rather, Plaintiffs propose as a

17   remedy that Lyft be required to meet wait time benchmarks (benchmarks no longer than those set

18   by the CPUC to qualify for exemption from payment into the Access Fund, ECF 157 at 9) that are

19   well within Lyft's capacity and are in line with what the CPUC has determined is feasible, and

20   reliability standards. If Lyft meets these standards, it will be exempt from paying into the Access

21   Fund, leaving Lyft with significant funds to cover a large majority, if not all, of the cost of its Bay

22   Area WAV program. Pltfs.' FF ¶¶ 54, 89, 132; ECF 157 at 9 (Plaintiffs' Proposed Remedy).

23   Plaintiffs' proposed remedy would provide Lyft a full year to engage in the industry-standard

24   iterative process, Pltfs.' FF ¶¶ 123-125, that Lyft itself uses for both its Standard and Access

25   services, Pltfs.' FF ¶¶ 13, 21, 31, 42-45, before having to meet reasonable benchmarks for WAV

26   service, but Plaintiffs do not ask the Court to order that Lyft engage in an iterative process.

27          103.    *Disabled in Action v. Bd. Of Elections in New York*, 752 F.3d 189 (2nd Cir. 2014),

28   cited by Plaintiffs, did not conclude that an iterative process is a reasonable modification. The

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW 3:19-CV-01438-WHA

remedial order granted in that case included specific operational and barrier removal provisions "tailor[ed] . . . to fit the nature and extent" of the violations. *Id.,* at 203 (*citing United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1235 (2nd Cir. 1987)). The "iterative process" was to be triggered only if there was a need to explore alternative means of accommodating individuals with disabilities; the iterative process was not the starting point for the remedy itself. *Disabled in Action*, 752 F.3d at 203-04. Unsurprisingly, the Second Circuit did not rule that an "iterative process" is permissible, or even confront any argument on that score.

**Response**: Disagree. Again, Defendant misconstrues Plaintiffs' request for relief. As discussed at Plaintiffs' Response to Lyft ¶ 102, Plaintiffs do not ask the Court to order that Lyft engage in an iterative process. *See* ECF 157 at 9-10.  Plaintiffs have included in the proposed remedy a year-long grace period that allows Lyft the time needed to roll out a WAV program, gather data, and make any changes needed to it meets ensure effective provision of WAV service. *Id.*; Pltfs.' FF ¶¶ 13, 21, 31, 123-125. The evidence in the record demonstrates that Lyft is fully capable of meeting reasonable service benchmarks for the provision of WAV service in the Bay Area, especially if given a year to do so. Pltfs.' FF ¶¶ 147-150.

104.    Moreover, an iterative process is not a "modification" because it is simply a process that must be undertaken in order to determine whether a potential modification can be found. As Plaintiffs' expert Dr. Grossman admitted, she does not know the number of vehicles needed to provide effective service to Plaintiffs, and the only way to know is to "try it." (Fact Nos. 70, 94-95). The data for estimating the cost is also not available, and will not be available unless and until an iterative process is tried. (Fact Nos. 98-99).

**Response**: Disagree. In addition to misconstruing Plaintiffs' request for relief, the proposed conclusion ignores the Court's finding that Plaintiffs have already proposed modifications that can be implemented, including the rental model or a combination of the requested models, which also include the partner model and the use of marketing and/or incentives to attract independent contractor drivers. ECF 92 at 5. Moreover, nothing in Dr. Grossman's testimony is inconsistent with the evidence in the record indicating that Lyft is fully capable of meeting service benchmarks, and as this Court, following the Ninth Circuit's

1   instruction, has already stated:

2
3              *Fortyune*, cited by both sides, is helpful here. . . . Although AMC
               argued the injunction was too vague, our court of appeals upheld
               the injunction, finding that finding that specificity under Rule 65
4              did not require actually telling a party '*how* to enforce the
               injunction . . . There is no need explain how to enforce the
5              injunction by, for example, delineating how many third-party
               drivers are necessary, how many WAVs to rent, or what
6              combination of the above-mentioned policies and procedures to
               implement, especially given, as defendant alleges, the complexities
7              of certain procedures such as a rental program.

8   ECF 92 at 11-12 (*citing Fortyune*, 364 F.3d at 1087) (emphasis original).

9          105.    Reasonableness turns on "the effectiveness of the modification in light of the

10  nature of the disability in question and the cost to the organization that would implement it."

11  *Fortyune*, 364 F.3d at 1082; *see also Karczewski v. DCH Mission Valley*, 862 F.3d 1006, 1011

12  (9th Cir. 2017) (a modification that is "inexpensive," "easy to obtain," and can be implemented

13  "without significant difficulty or expense" is reasonable). Not only did Plaintiffs fail to offer any

14  evidence regarding the effectiveness or cost of Dr. Grossman's iterative process, they failed to

15  prove that a combination model of 65 rental WAVs and five First Transit vehicles could work

16  today based on the lack of a Hertz-Lyft rental partnership in the Bay Area and Lyft's recent

17  experience with rental drivers. (Fact Nos. 73-83).[1]

18         **Response**: Disagree. Defendant's selective citation misstates the law in this Circuit. Under

19  *Fortyune*, when the reasonableness of the cost of the proposed modification is at issue, "[t]he

20  standard for reasonableness under the ADA does not differ from the one employed under the

21  Rehabilitation Act," and that "[i]n the context of the Rehabilitation Act, the Supreme Court has

22  stated that an '[a]accommodation is not reasonable if it imposes 'undue financial and

23  administrative burdens.'" *Fortyune*, 364 F.3d at 1083 (quoting *Sch. Bd. of Nassau Cnty. v. Arline*,

24  480 U.S. 273, 288 n. 17 (1987)). The regulations implementing the Rehabilitation Act's

25  requirement to provide reasonable accommodations state that:

26

27  _____

28         [1] These facts also show that a rental or independent contractor model, which depend on
    independent drivers, would be ineffective. (Fact Nos. 21-31, 73-88).

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW 3:19-CV-01438-WHA

1
2
3
4

> In determining . . . whether an accommodation would impose an
> undue hardship on the operation of a recipient's program or
> activity, factors to considered include . . .[t]he overall size of the
> recipient's program or activity with respect to number of
> employees, number and type of facilities, and size of budget . . .
> [and the] nature and cost of the accommodation needed.

5   45 C.F.R. § 84.12(c)(1), (c)(3). *See also* 28 C.F.R. § 36.104 (undue burden under the Title III

6   regulations "means significant difficulty or expense," determined by considering factors including

7   "the overall financial resources of the site or sites involved in the action . . . [and] the effect on

8   expenses and resources.").

9          Plaintiffs more than met their burden of demonstrating that Lyft can effectively utilize

10  some combination of the proposed modifications to implement an effective WAV program in the

11  Bay Area (*See* Pltfs.' FF ¶¶ 147-150), and that the cost of implementing the modifications would

12  be reasonable, in light of Lyft's actual and estimated cost of offering WAV service, Lyft's overall

13  assets, and the significant likelihood that Lyft will receive offset of many, if not all, of its

14  expenses from the CPUC. Pltfs.' FF ¶¶ ¶¶ 32, 33, 53, 54, 65 (evidence of Lyft's prior and

15  estimated WAV expenditures); 109, 110, 112, 114-122 (evidence of Lyft's overall assets and

16  revenue); 106, 107 (evidence regarding Lyft's receipt of offset from the CPUC); *see also* Pltfs.'

17  FF ¶¶ 38 (no evidence of financial hardship/consequences for providing WAV), 39 (Lyft has not

18  considered leaving or terminating service in a city due to WAV service), 40 (Lyft hasn't

19  terminated or laid off employees as a result of WAV). Moreover, in response to evidence

20  demonstrating that Lyft takes in approximately $500 million in annual revenue in the three Bay

21  Area counties—at least when looking at pre-pandemic numbers, *see* Pltfs.' FF ¶¶ 116-119–Lyft

22  failed to produce any evidence to the contrary and refused to produce any evidence whatsoever of

23  its Bay Area revenue to the Court. Lyft has thus waived any argument challenging the

24  reasonableness of the cost of the proposed modifications, which, when compared to the overall

25  size and revenue Lyft takes in, as required under *Fortyune*, is more than reasonable.

26         106.    The only evidence of a potentially viable solution presented for all three Bay Area

27  Counties was a 15-vehicle First Transit fleet at a recurring annual cost of $5.4 million (Fact Nos.

28  91-92). Not only is this extremely expensive, it is operationally intensive. (Fact Nos. 44-46).

1   Moreover, there is no guarantee that First Transit could even acquire the extra vehicles or hire the

2   extra drivers needed to serve the three Bay Area Counties. (Fact No. 43). Its reliability, likewise,

3   is not guaranteed. (Fact No. 91). Moreover, this Court has previously held that a partner model

4   alone is not "reasonable." Dkt. 92 at 7.

5       **Response**: Disagree. Defendant misstates the record.  The evidence demonstrates that,

6   prior to the pandemic, Lyft ran an analysis, indicating it could cover 80% of WAV demand in the

7   Bay Area with 65 rental model vehicles and supplement those vehicles with the five W-2/Partner

8   vehicles, to cover the remaining demand, at a cost of approximately $2.8 million.  *See* Pltfs.' FF

9   ¶¶ 51-54. Further, Lyft presented scant evidence at trial in support of the concerns it now raises

10  about the planned Bay Area pilot—concerns which are not documented in any written analysis or

11  writing of any kind other than a single chart produced "a week or two" before trial that fails to

12  support those concerns. *See* Pltfs.' FF ¶¶ 71-87.

13      Though Ms. Gerundio speculated about the possibility of using five W-2 vehicles in each

14  of the three counties, this speculation is belied by the evidence in the record, including her

15  testimony that the lack of a rental partner is not a problem in the Bay Area, that there are methods

16  Lyft can test to address how to ensure increased utilization of cross dispatched rental vehicles,

17  and Lyft's testimony that, despite concerns raised about cross-dispatched rental vehicles in New

18  York, Lyft still uses a Rental model in New York and is working towards meeting wait time

19  requirements there. *See id*. Further, if Lyft were to determine after rolling out WAV service in the

20  Bay Area that the annual cost would need to increase even another million or two, it would still

21  be a drop in the bucket compared with the approximately $500 million in annual Bay Area

22  revenue, Pltfs.' FF ¶ 119, and possibility of $3.37 million in annual offsets, based on pre-

23  pandemic numbers, Pltfs.' FF ¶ 112.

24      107.    That Lyft is a large, national company does not change the outcome. Just as no

25  court has held that a private entity must incur millions in recurring, annual costs to provide

26  specialized services to individuals with disabilities as a "reasonable modification," no court has

27  held that the cost of a modification is to be measured on a sliding scale depending on the

28  defendant's financial resources. The word Congress used is "reasonable," and the Court should

-32-

1   construe the word in accordance with its ordinary meaning, *see Bostock v. Clayton Cty.*, 140

2   S. Ct. 1731, 1738 (2020), instead of applying the definition Congress set out for another phrase,

3   "undue burden." *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020)

4   (the court should presume difference in meaning in the words chosen by Congress).

5         **Response**: Disagree.  Defendant ignores Ninth Circuit precedent instructing the Court to

6   consider the undue burden analysis under the Rehabilitation Act when considering the

7   reasonableness of the cost of the proposed modifications, which looks at the overall resources,

8   size of the entity's budget, among other factors.  *See* Pltfs.' Response to Lyft ¶ 105.

9         108.    That Lyft may be able to recover some of its costs through the CPUC process also

10   does not render any proposed modification reasonable. Not only is the possibility of future offsets

11   mere speculation (Fact Nos. 51-68), but the CPUC does not require Lyft to provide WAV service

12   or to meet standards for offset. Lyft may choose to comply with the Access for All Act by simply

13   depositing the funds it collects. *See* Cal. Pub. Util. Code § 5440.5(a)(1)(B)(i), (ii). Congress

14   specifically contemplated that states may enact different laws (*see* 42 U.S.C. § 12201(b)), and

15   nothing in the ADA evidences Congressional intent to require Lyft not just to meet, but to *exceed*

16   state laws as a reasonable modification. *See Cal. Dep't of Toxic Substances Control v. Westside*

17   *Delivery, LLC*, 888 F.3d 1085, 1093 (9th Cir. 2018) ("in the absence of a plain indication to the

18   contrary, Congress when it enacts a statute is not making the application of the federal act

19   dependent on state law") (citation omitted).

20         **Response**: Disagree. *Fortyune* requires the determination of the reasonableness of a

21   proposed modification to be "a fact-specific, case-by-case inquiry . . . ." *Fortyune*, 365 F. 3d at

22   1083. The fact that the counties at issue here are in a region where the possibility of an offset

23   exists, and where Lyft has sought offsets and never had one of its offset requests denied, is an

24   additional factor in support of the idea the cost of implementing the requested modifications here

25   is reasonable. Further, while the existence of the CPUC regulations provide factual support for

26   the reasonableness of Plaintiffs' requested modification, Plaintiffs' claim for that modification

27   arises under the ADA and does not rely on a regulator requiring Lyft to provide the service.

28         109.    Because Plaintiffs have failed to come forward with any evidence of a particular

modification, its effectiveness, or cost, Plaintiffs have failed to meet their burden of proof. *Fortyune*, 364 F.3d at 1083.

**Response**: Disagree. Defendant ignores the evidence in the record and the Court's finding at summary judgment that Plaintiffs had already identified proposed modifications that can be implemented. *See* Pltfs.' Responses to Lyft ¶¶ 100-108. Moreover, Defendant ignores that Plaintiffs' burden is light because they have far less access to information regarding Lyft's resources, facilities, extensive data capacity, etc. As the Ninth Circuit recognized in *Lopez*, the allocation of a light burden on Plaintiffs recognizes that to place the burden differently "would be asking too much of plaintiffs, especially considering that defendants have more knowledge and information regarding their own facilities . . . . ." *Lopez*, 974 F.3d at 1038 (describing similar burden shift in context of ADA Title III barrier removal claim).

Here, Plaintiffs have provided more than enough evidence that Lyft can use some combination of the requested models to provide effective WAV service (*See* Pltfs.' FF ¶¶ 147-150) at a reasonable cost, particularly when considering Lyft's revenue and resources (Pltfs.' FF ¶ 151), thereby demonstrating that the proposed modifications are reasonable in the general sense, or in the run of cases. *See Johnson*, 116 F.3d at 1059. Lyft's attempt to require Plaintiffs to determine all aspects of the program down to the number of vehicles under each supply model and in each County, and to penalize Plaintiffs for utilizing Lyft's own plans for providing WAV service, while providing scant evidence refuting the effectiveness of its pre-pandemic plans despite its extensive data science capacities, belies both the letter and the spirit of controlling precedent and the ADA.

**B.    Requiring Lyft To Provide WAV Service Is Not A "Modification In Policies, Practices, Or Procedures."**

110.    Plaintiffs are not entitled to relief for the additional reason that requiring Lyft to provide WAV service is not a "modification in policies, practices, or procedures," reasonable or otherwise.

**Response**: Disagree. Defendant ignores the Court's finding that Plaintiffs have requested modifications that can implemented.  ECF 92 at 5 ("Since plaintiffs have identified policies,

1    practices and procedures that can be implemented, the key question is whether making these

2    modifications in the Bay Area Counties would be reasonable."). Further, Defendant ignores the

3    fact that every court to have addressed the legal issue of whether reasonable modifications claims

4    apply to the failure of a ridesharing company to provide its on-demand transportation service to

5    WAV users has found that they do. *See Equal Rts. Ctr. v. Uber Techs., Inc.*, No. 17-CV-1272

6    (KBJ), --- F. Supp. 3d ----, 2021 WL 981011, at *19 (D.D.C. Mar. 15, 2021); *Crawford v. Uber*

7    *Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018) ("Uber's

8    fixation on whether WAVs are specifically required by statute is unavailing in light of the broad

9    language of the ADA . . . Uber could very well be required to provide WAV service through

10   some mechanism in order to comply with the anti-discrimination provisions of Section

11   12184(b)(2)."); *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020);

12   *O'Hanlon v Uber Techs., Inc.*, 2021 WL 2415073 (LPL), at *8 (W. D. Penn. June 14, 2021) ( ". .

13   . as Plaintiffs correctly note, 'the ADA does not focus narrowly on the purchase of vehicles to

14   achieve its broad goal of full and equal access for people with disabilities. Its mandate is broader,

15   and more balanced: covered entities must make reasonable modifications to their service in order

16   to make it accessible to people with disabilities.'") (internal citation omitted).

17           111.    The remedy Plaintiffs seek in this case includes having Lyft establish WAV

18   service in Alameda and Contra Costa Counties. Based on the evidence presented and the language

19   of Sections 12182(b)(2)(A)(ii) and 12184(b)(2)(A), having Lyft establish WAV service is not a

20   "reasonable modification" in Lyft's "policies, practices, or procedures."

21           **Response**: Disagree. *See* Pltfs.' Response to Lyft ¶ 100. Moreover, nothing in the

22   language of the statute or case law restricts the scope of reasonable modifications to mere changes

23   to written policies. *See, e.g.*, *Celano v. Marriott Int'l, Inc.*, No. C 05-4004 PJH, 2008 WL 239306,

24   at *18 (N.D. Cal. Jan. 28, 2008) (In a reasonable modification case under Title III of the ADA

25   where there was no specific regulation requiring the provision of accessible golf carts at golf

26   courses, "[T]he court finds that the provision of accessible golf cart(s) at Marriott's courses, is

27   both reasonable and necessary to accommodate the plaintiffs' disabilities in this case").

28           112.    The Ninth Circuit has construed the terms "goods, services, facilities, privileges,

advantages, or accommodations" to mean the goods or services provided by the entity: "Title III prohibits discrimination in the enjoyment of 'the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.' The ordinary meaning of this language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000).

**Response**: Agree. Title III prohibits discrimination in the enjoyment of Lyft's on-demand transportation service by individuals with disabilities who need wheelchair accessible vehicles.

113.     The goods or services Lyft provides to the general public is its two-sided on-demand ridesharing platform. (Fact Nos. 1-7). The question is whether Lyft can provide WAV service on its ridesharing platform in the Bay Area Counties by reasonably modifying its "policies, practices, or procedures."

**Response**: Disagree.  This misstates the evidence and ignores the Court's order at summary judgment, which found that, " . . . Lyft is a private entity that is primarily engaged in the business of transporting people . . . ." ECF 92 at 3.  Lyft is a transportation provider that uses multiple supply models, including the rental model, and multiple methods of increasing the supply of vehicles in circulation in its standard transportation service and its existing WAV service. *See* Pltfs.' FF ¶¶ 10-20.

114.     Examples of modifications in policies, practices, or procedures cited in DOJ regulations include: (a) referrals to specialty medical practices; (b) accommodations of service animals; (c) ensuring the availability of accessible check-out aisles; (d) reservation policies for accessible hotel rooms; and (e) ticketing policies for accessible seating at stadiums and theaters. 28 C.F.R. § 36.302; *see also* DOJ Technical Assistance Manual § III-4.2000. Each example relates to modifications in *how* an entity offers its goods or services to the public, not *what* an entity provides.

**Response**: Disagree. Defendant misreads the cited regulation. While the 28 C.F.R. § 36.302 does offer specific instructions for certain categories of regulations at 28 C.F.R. § 36.302(b)-(f), nothing in those subsections limits the regulations "general" requirement at 28

1  C.F.R. § 36.302(a) that covered entities make reasonable modifications to their policies, practices

2  and procedures. *See also* Pltfs.' Response to Lyft ¶ 111 (provision of accessible golf carts

3  deemed to be a reasonable modification) and Response to Lyft ¶ 110 (recognizing that all courts

4  to have addressed the legal issue of whether the reasonable modification provision applies to the

5  claims of persons who need wheelchair accessible vehicles seeking access to ridesharing services

6  such as Uber and Lyft have found that it does apply). Also disagree to the extent Lyft is implying

7  that Plaintiffs are seeking a modification in "what" Lyft provides. Not so. Plaintiffs seek access to

8  the same on-demand service that Lyft provides to members of the public who do not need

9  wheelchair accessible vehicles and propose modifications that Lyft is already utilizing in multiple

10  markets.

11        115.    The evidence at trial showed that the only way Lyft could effectively provide

12  WAV service in all three Bay Area Counties is by expanding its contract with First Transit (or by

13  entering into a new contract with another company) to provide a standing supply of at least 15

14  "partner" vehicles, at the *recurring* annual cost of $5.4 million. (Fact Nos. 91-92). This is not a

15  mere modification in "policy, practice, or procedure"; it is the establishment of a new

16  transportation program, as admitted by Plaintiffs' expert. (Fact No. 71). Adding a new service in a

17  market where there is insufficient supply and demand for that service goes well beyond Lyft's

18  ordinary course of operations as a two-sided platform (Fact Nos. 2, 11). *See* 28 C.F.R. § 36.307.

19        **Response**: Disagree. Misstates the evidence. *See* Pltfs.' Response to Lyft ¶ 106

20  (describing unrefuted evidence that Lyft ran an analysis and determined that it can provide WAV

21  service in the Bay Area utilizing a combination of its planned rental pilot and W-2 drivers); Pltfs.'

22  Response to Lyft ¶ 112 (describing evidence presented demonstrating that the proposed

23  modifications are not new at all, but are supply models Lyft already uses in its WAV and standard

24  service in a variety of markets throughout the country.) Further, Plaintiffs' expert recognized that

25  Lyft currently provides WAV service in San Francisco. Grossman at Tr. 676:12-18.

26        116.    None of the cases arising under Section 12182(b)(2)(A)(ii) suggests that

27  "reasonable modifications in policies, practices, or procedures" would encompass a new

28  transportation service. *See, e.g., PGA Tour*, 532 U.S. 661 (modification of PGA tour rules to

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW  3:19-CV-01438-WHA

1    permit the use of a golf cart); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012)

2    (modification of policy permitting motorized wheelchairs to allow Segways); *Lentini v.*

3    *California Center for the Arts*, 370 F.3d 837 (9th Cir. 2004) (modification of policy excluding

4    service animals who make noise during a performance); *Fortyune*, 364 F.3d 1075 (modification

5    of accessible seating policy at a movie theater).

6          **Response**: Disagree. Misstates the evidence and misapplies the law. *See* Pltfs.' Response

7    to Lyft ¶ 112 (Lyft already utilizes the proposed modifications Plaintiffs seek in its WAV and

8    standard service and thus, Plaintiffs are not seeking a new transportation service.) Moreover,

9    Defendant's non exhaustive list of reasonable modification case by no means limits the

10   application of Section 12182(b)(2)(A)(ii) to the few examples listed. *See, e.g.*, *Celano*, 2008 WL

11   239306, at *18 (applying reasonable modification requirement to the provision of accessible golf

12   carts at golf courses despite absence of specific regulation); *see also* Pltfs.' Response to Lyft ¶

13   110 (recognizing that all courts to have addressed the legal issue of whether the reasonable

14   modification provision applies to the claims of persons who need wheelchair accessible vehicles

15   seeking access to ridesharing services such as Uber and Lyft have found that it does apply).

16         117.    Indeed, no court has held that a private entity could be required to establish a new

17   service, to build a new store, or to provide specialized goods as "reasonable modifications in

18   policies, practices, or procedures." The Ninth Circuit has held instead that the ADA "does not

19   require provision of different goods or services, just nondiscriminatory enjoyment of those that

20   are provided. Thus, a bookstore cannot discriminate against disabled people in granting access,

21   but need not assure that the books are available in Braille as well as print. '[L]ikewise, an

22   insurance office must be physically accessible to the disabled but need not provide insurance that

23   treats the disabled equally with the non-disabled.'" *Weyer*, 198 F.3d at 1115, *quoting Ford v.*

24   *Schering-Plough Corp.*, 145 F.3d 601, 613 (3d. Cir. 1998); *see also Arizona ex rel. Goddard v.*

25   *Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 671 (9th Cir. 2010) ("*Harkins*").[2] Plaintiffs'

26

27         [2] Consistent with *Weyer* and *Harkins*, the Ninth Circuit's decision in *Baughman* confirms
     that the goal of Section 12182(b)(2)(A)(ii) is not to provide "full and equal access" to individuals
28   with disabilities: "[f]acilities are not required to make any and all possible accommodations that

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW 3:19-CV-01438-WHA

1    demand for a new transportation service is not a modification in policy, practice, or procedure. At

2    a minimum, the fact that typical policy modifications do not involve the costly creation of new

3    services show that the expensive WAV program Plaintiffs demand is unreasonable. *Cf.* 28 C.F.R.

4    § 36.302.

5        **Response**: Disagree. Misapplies the law and misstates the evidence. The proposed

6    modifications do not seek that Lyft provide a different or new service. As the Court noted at

7    Summary Judgment, addressing Lyft's argument under *Weyer*, "Lyft has already instituted WAV

8    programs using not only the partnership model, but other models in other geographic regions — it

9    cannot argue that something it is already doing would fundamentally alter its business, though

10   doing so might be cost prohibitive in our region."  ECF 92 at 10.  Moreover, the other

11   modifications, including the use of a rental model as well as marketing and/or incentives to

12   independent contractor drivers, are examples of existing models Lyft not only uses in its WAV

13   service, but also in its standard service. Pltfs.' FF ¶¶ 10-20.

14       Also, while "'[a]n institution's past decision to make a concession to a disabled individual

15   does not obligate it to continue to grant that accommodation in the future, nor does it render the

16   accommodation reasonable as a matter of law,'" it does provide persuasive evidence that the

17   accommodation was reasonable." *Am. Council of Blind v. Astrue*, No. C 05-04696 WHA, 2009

18   WL 3400686, at *23 (N.D. Cal. Oct. 20, 2009) (Alsup, J.) (quoting *Wong v. Regents of Univ. of

19   Cal.*, 192 F.3d 808, 820 (9th Cir. 1999) (which also states, "The fact that the school previously

20   made the exact modification . . . that Wong requested . . . is certainly persuasive evidence . . .");

21   *see also* Pltfs.' Responses to Lyft ¶¶ 113- 114.

22       **C.    The ADA Does Not Require Lyft To Implement Either A Rental Model Or A
               Partner Model Of WAV Service.**

23

24       118.    Plaintiffs are not entitled to their remedy for the additional reason that the ADA

25   does not require Lyft bear the cost of creating WAVs.

26       **Response**: Disagree. This ignores Ninth Circuit precedent instructing the Court to

27
     would provide full and equal access to disabled patrons; they need only make accommodations

28   that are reasonable." 685 F.3d at 1135.

1    consider the undue burden analysis under the Rehabilitation Act when considering the

2    reasonableness of the cost of the proposed modifications, which looks at the overall resources,

3    size of the entity's budget, among other factors.  *See* Pltfs.' Response to Lyft ¶ 105.

4        119.    The uncontested evidence at trial was that there is no supply of WAVs in third

5    party fleets, including in fleets of rental car companies. (Fact Nos. 43, 75-77). For Lyft to offer a

6    rental model, it must arrange to have WAVs built by acquiring minivans and having them

7    retrofitted, subsidize the cost of the rental of WAVs by drivers, and retain the financial risk in

8    case the vehicles are not rented. (Fact Nos. 75-76). For Lyft to offer a partner model, the evidence

9    showed that Lyft pays an hourly fee of $58 in San Francisco. (Fact No. 40). The vehicles are

10   created at Lyft's request, and the annual cost to Lyft of a single vehicle in San Francisco for 17

11   hours per day, seven days a week, is $360,000. (Fact Nos. 40, 92).

12       **Response**: Disagree. This misstates the evidence at trial, including testimony from the

13   person that oversees Lyft' WAV program in the United States and Canada that finding a rental

14   partner is not the problem with using the rental model, and testimony from Lyft that it had not

15   communicated with any rental car company about launching a rental pilot since summer 2020, in

16   the middle of the pandemic. *See* Pltfs.' FF ¶¶ 71-77.  Nor does the proposed conclusion

17   acknowledge the existing stock of WAV vehicles at other accessible transportation providers such

18   as the numerous paratransit providers in the Bay Area. Ex. 79 at 025. Indeed, the DOJ letter

19   Defendant cites at paragraph 123 noted that "nationwide rental companies have entered into

20   cooperative agreements with companies who specialize in renting lift-equipped vans, making

21   these services more generally available than they once were."  *See* Lyft ¶ 123 (citing Letter No.

22   150 at https://www.justice.gov/crt/core-letters-0).

23       120.    Requiring Lyft to bear the cost of WAVs is inconsistent with the ADA. Congress

24   made clear that private entities like Lyft are not responsible for the cost of WAVs by specifically

25   stating that private entities need not purchase or lease WAVs, except in certain circumstances that

26   are not present in this case. *See* 42 U.S.C. § 12184(b)(3).

27       **Response**: Disagree. This misapplies the cited statute.  42 U.S.C. § 12184(b)(3) governs

28   whether a transportation providers newly purchased or leased vehicles need to be readily

-40-                           PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
                               PROPOSED FINDINGS OF FACT AND CONCLUSIONS
                               OF LAW  3:19-CV-01438-WHA

accessible or usable by persons with disabilities. This case does not involve the accessibility of any vehicles Lyft has newly purchased or leased, but rather 42 U.S.C. § 12184(b)(2)(A) which requires transportation providers to make reasonable modifications to their policies, practices, or procedures consistent with those required under section 12182(b)(2)(A)(ii).

121.    The Department of Transportation ("DOT"), which Congress entrusted to issue regulations to carry out the goals of the ADA (*id.* § 12186(a)(1)), agrees: "Under the ADA, no private entity is required to purchase an accessible automobile." 49 C.F.R. Pt. 37, App'x D. "Discrimination" occurs *not* when an entity fails to provide accessible service, but when an entity denies an individual with a disability "the opportunity to use the entity's transportation service for the general public, *if the individual is capable of using that service*." 49 C.F.R. § 37.5(b) (emphasis added); *see also* 49 C.F.R. § 37.29(b) ("Providers of taxi service are not required to purchase or lease accessible automobiles.").

**Response**: Disagree. This Court has confirmed that while Lyft may not be obligated under 49 C.F.R. § 37.29(b) and 42 U.S.C § 12184(b)(3) to purchase or lease WAVs, this exemption "does not, however, negate the ADA's requirement for entities like Lyft to make reasonable modifications to rectify a discriminatory policy, practice, or procedure."  ECF No. 92 at 3-4. As the Court noted, "Plaintiffs are not, however, trying to require Lyft to purchase or lease WAVs. The proposed modifications, detailed further below, would require Lyft to work with external parties who would in turn purchase or lease WAVs." *Id*. at 4.

In fact, every court to consider this issue in the context of WAV users seeking access to the services ridesharing companies such as Uber or Lyft has found that such entities are still subject to the requirement to make reasonable modifications despite this exception. *See* Pltfs.' Response to Lyft ¶ 110 (citing cases). Here, not only do Plaintiffs not seek to require Lyft to purchase or lease vehicles, but there is no evidence in the record that Lyft has ever provided WAV service by purchasing or leasing vehicles in any of its ten WAV markets. Further, under the proposed Hertz Rental contract, the only acquiring of any vehicles was to be done by Hertz and the only renting or leasing by the drivers. Pltfs.' FF ¶ 48; *see also* Pltfs.' FF ¶ 29 (CLLQ WAV Rental contract in New York).

122.    Courts have agreed that private entities are not required to purchase or lease WAVs. *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) ("a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA")*; accord Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 74 (2d Cir. 2012); *Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*, 2018 U.S. Dist. LEXIS 65524, *14, 2018 WL 65524 (S.D.N.Y. Apr. 18, 2018).

**Response**: Disagree. See Pltfs.' Response to Lyft ¶ 121. Additionally, among the multiple reasons *Toomer* is distinguishable, in that case, the plaintiffs did not specifically request modifications other than the purchase of accessible vehicles. *Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006)).

123.    Congress also provided that private entities need not remove transportation barriers in existing vehicles by retrofitting them to install hydraulic or other lifts. 42 U.S.C. § 12182(b)(2)(A)(iv). Relying on this provision, the Department of Justice ("DOJ"), in 1994, issued an opinion letter advising that rental car companies need not retrofit vehicles or acquire or lease lift-equipped vehicles. *See* Letter No. 150 at https://www.justice.gov/crt/core-letters-0 (last visited June 10, 2021); *see also Dahlberg v. Avis Rent a Car Sys.*, 92 F. Supp. 2d 1091, 1094-1095 (D. Colo. 2000) (summarizing DOJ investigation of Avis and resulting settlement agreements, which did not require Avis to make WAVs available for rental).

**Response**: The cited sections are not relevant to the requested modifications at issue in this trial.  Plaintiffs do not ask Lyft to retrofit any vehicles it may have among the existing vehicles in its fleet.  Further, the existence of a settlement agreement requiring the provision of hand controls does not in any way limit claims for reasonable modifications under 42 U.S.C. § 12184(b)(2)(A), and neither does the non-binding DOJ letter, which references the purchase or lease exception and retrofitting of existing vehicles, without addressing the reasonable modification requirements under the statute at all.

124.    By Sections 12184(b)(3) and 12182(b)(2)(A)(iv), Congress specifically exempted Lyft from having to purchase, lease, or retrofit WAVs in order to create a new transportation program. Section 12182(b)(2)(A)(ii), the provision that generally requires private entities to make

"reasonable modifications in policies, practices, or procedures," cannot override these specific statutory exemptions in the statute: "a 'narrow, precise, and specific' statutory provision is not overridden by another provision 'covering a more generalized spectrum' of issues." *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016), *quoting Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153-54 (1976).

**Response**: Disagree. As discussed in Plaintiffs' Response to Lyft ¶¶ 120-122, the statutory subsections do not apply to this case. The reasonable modifications at issue neither involve the accessibility of newly purchased or leased vehicles, nor do they involve the retrofitting of existing vehicles in Lyft's fleet. Defendant is attempting to utilize the narrow purchase or lease section in the regulations to swallow the statutory requirement that covered entities provide reasonable modifications to their policies, practices and procedures, an approach every court to address this specific issue in the context of ridesharing companies has rejected. *See* Pltfs.' Response to Lyft ¶ 110 (citing cases).

125.    Requiring Lyft to bear the cost of WAVs would be an improper end-run around the provisions exempting private entities from having to purchase, lease, or retrofit WAVs. Based on the plain language of Sections 12182(b)(2)(A)(iv) and 12184(b)(3), Lyft is not required to undertake financial risks akin to the purchase or lease WAVs, or be responsible for retrofitting existing vehicles to create WAVs. In addition, the fact that Congress barred any requirement to purchase or lease WAVS is a strong indication that a requirement to take essentially equivalent actions – for instance, paying a third party to provide WAVS – cannot be considered a mere policy modification. It is also a strong indication that the costs associated with such actions cannot be considered reasonable ones within the meaning of the ADA.

**Response**: Disagree. *See* Pltfs.' Responses to Lyft ¶¶ 120-124. Further, to the extent the cost of the proposed reasonable modifications are at issue, the Ninth Circuit instructs the Court to consider the undue burden analysis under the Rehabilitation Act when considering the reasonableness of the cost of the proposed modifications, which looks at the overall resources, size of the budget, among other factors. *See* Pltfs.' Response to Lyft ¶ 105.

1

**D.      The Injunction Requested By Plaintiffs Does Not Meet The Specificity Requirement Of Rule 65(d).**

2

3      126.    Plaintiffs are also not entitled to the injunction they seek. Plaintiffs ask the Court

4   to order Lyft to engage in an iterative process for one year, then order Lyft to meet the

5   "Exemption Time Standards" set by the CPUC and unspecified "reasonable reliability" metrics.

6      **Response**: Disagree. Defendant misconstrues the relief Plaintiff seeks. *See* Pltfs.'

7   Response to Lyft ¶ 102.

8      127.    As a preliminary matter, there is no evidence on which this Court can find that

9   Lyft will be able to meet "Exemption Time Standards" set by the CPUC. The evidence presented

10  at trial was that Lyft has been unable to meet these standards after nearly two years of providing

11  WAV service in San Francisco and Los Angeles Counties. (Fact No. 65, 96). Moreover, Plaintiffs

12  provided no evidence as to what "reasonable reliability" might look like, or whether such

13  reliability metrics can be met in any of the Bay Area Counties.

14     **Response**: Disagree.  Defendant ignores evidence in the record that Lyft has consistently

15  met wait time standards and other service benchmarks for WAV service in multiple regions

16  throughout the country, despite differences in density and geography. Pltfs.' FF ¶¶ 22-25, 31, 36-

17  37.  Defendant has met more stringent wait time benchmarks in the New York market, using the

18  same combination of supply models requested here. *See id*. Defendant also ignores Lyft's own

19  analysis that it could meet WAV demand in the Bay Area with a combination of a rental model

20  and W-2 model, a plan it paused during the pandemic. Pltfs.' FF ¶¶ 51-54, 71-72.  The proposed

21  remedy allows flexibility in reasonable reliability metrics, including the possibility of those

22  utilized by the CPUC (which currently only requires improvement, see Ex. 76 (Track 3 Decision)

23  at 060)), but this is further indication of reasonableness. Further, Lyft proposed its own reliability

24  metrics for San Francisco, which would require quarterly improvements in reliability throughout

25  the CPUC proceeding. Ex. 97 at 6.

26     128.    Any standard set by the CPUC, moreover, is irrelevant to Plaintiffs' ADA claim.

27  As noted above, the California legislature and/or the CPUC may set more stringent standards. 42

28  U.S.C. § 12201(b) (other laws may provide "greater or equal protection for the rights of

-44-

individuals with disabilities than are afforded by this Act"). Plaintiffs' claim in this case arises under the ADA, and Lyft's compliance under federal law does not depend on the state Public Utilities Code. *See Cal. Dep't of Toxic Substances Control*, 888 F.3d at 1093.

**Response**: Disagree. *Fortyune* requires the determination of the reasonableness of a proposed modification to be "a fact-specific, case-by-case inquiry. . . . " *See Fortyune*, 365 F. 3d at 1083.  The fact that the counties at issue here are in a region where the possibility of an offset or exemption exists, and where Lyft is fully capable of qualifying for such an exemption, is an additional factor in support of the idea the cost of implementing the requested modifications in this case is reasonable. While the ADA imposes obligations independent of those set by state and local regulators, the CPUC standards are a relevant and useful point of reference for a reasonableness analysis because they reflect consideration by a public entity based on comment by the public, disability advocates, as well as transportation network companies including Lyft itself, and analysis of WAV service data to date by Commission staff. This is particularly true in light of the CPUC's explicit efforts to ensure the metrics it sets are reachable. Pltfs.' FF 98 (Ex. 76 (CPUC Track 3 Decision) at 012-013, 060-061, 012-015; Gerundio at Tr. 572:4-10.).

129.    The terms of the requested injunction fail to give Lyft notice of what the injunction actually prohibits. *Granny Goose Foods, Inc. v. Bhd. of Teamsters, Local No. 70*, 415 U.S. 423, 444 (1974); *see* Fed. R. Civ. P. 65(d)(1)(B) & (C) (injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required"). Indeed, Lyft would not know that it was violating the injunction until after the fact when, at the end of each quarter, it learned it had failed to meet the Exemption Time Standard or the metric for "reasonable reliability" in a county.

**Response**: There is no mystery to Plaintiffs' proposed remedy.  The benchmarks serve as a metric for Lyft to meet—as it has self-reported for WAV service in multiple regions throughout the country. Plaintiffs have utilized the existing metrics for exemption from paying into the Access Fund as a tool to help ensure Lyft gets assistance in covering the costs of the proposed modifications, though, even without offset or exemptions, those costs are reasonable when considering Lyft's resources and Bay Area revenue.  Further, to the extent the Court seeks to

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW 3:19-CV-01438-WHA

1  modify Plaintiffs' proposed benchmarks in its Order, it can. Other possible benchmarks that Lyft

2  has shown it has the capacity to meet include: the CPUC's offset requirements, the WAV service

3  benchmarks Lyft has successfully met outside of the Bay Area, and/or the wait times and

4  reliability standards proposed by Lyft to the CPUC for its service in San Francisco. Pltfs.' FF ¶¶

5  104-106 (Lyft meeting and estimating that it could meet CPUC interim offset standards); 95, 96

6  (CPUC interim offset standards); 93 (Lyft's initial proposal for first year of CPUC offset

7  standards); 100-103 (Lyft's 2021 proposal for offset and reliability standards through 2025); 22-

8  25, 36, 37, 64, 106 (wait time standards Lyft has previously met for WAV service inside and

9  outside the Bay Area). *See also* Pltfs.' Response to Lyft ¶ 104 (Under *Fortyune*, specificity does

10  not require telling Defendant how to enforce the injunction, nor what exact combination of the

11  requested modifications to implement).

12      130.    Finally, the injunction requires this Court to assume the role of Lyft's regulator.

13  But the ADA does not contemplate that a court would supervise the private entity's conduct:

14  "[h]ad Congress purposed to impose so enormous a burden on the retail sector of the economy

15  and so vast a supervisory responsibility on the federal courts, we think it would have made its

16  intention clearer and would at least have imposed some standards." *Doe v. Mut. Of Omaha Ins.*

17  *Co.*, 179 F.3d 557, 560 (7th Cir. 1999).

18      **Response**: Disagree. The cited case addresses the "different goods or services" exception

19  for public accommodations and whether requiring retail stores to stock different goods or services

20  would constitute a fundamental alteration. *See Doe v. Mut. Of Omaha Ins. Co*., 179 F.3d 557, 560

21  (7th Cir. 1999). *See* Pltfs.' Response Lyft ¶ 117.  As the Court noted at summary judgment,

22  addressing Lyft's argument under *Weyer*, "Lyft has already instituted WAV programs using not

23  only the partnership model, but other models in other geographic regions — it cannot argue that

24  something it is already doing would fundamentally alter its business, though doing so might be

25  cost prohibitive in our region."  ECF 92 at 10.  Moreover, the other modifications, including the

26  use of a rental model as well as marketing and/or incentives to independent contractor drivers, are

27  examples of existing models Lyft not only uses in its WAV service, but also in its Standard

28  service.  Pltfs.' FF ¶¶ 10-20.

PLAINTIFFS' RESPONSE TO DEFENDANT LYFT, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW 3:19-CV-01438-WHA

1

2

**E.      Making The Modifications Requested By Plaintiffs Would Fundamentally Alter The Supply-And-Demand Nature Of Lyft's Ridesharing Platform By Requiring Lyft To Guarantee Service Availability, Reliability And ETAs.**

3

4

5

6

131.     Even if a reasonable modification could be deemed to exist, Lyft is not required to make the modification because "making such modifications would fundamentally alter the nature of [its] goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

7

8

**Response**: Agree that this cites the language describing the affirmative defense within this section of the ADA.

9

10

11

12

132.     Congress did not include in the ADA a definition of "fundamental alteration," which is a different affirmative defense than undue burden. *See id.,* § 12182(b)(2)(A)(iii). Under DOT regulations, requests for special equipment, dedicated vehicles, or service outside regular hours constitute fundamental alterations. *See* 49 C.F.R. Part 37, Appendix E, Examples 9-11.

13

14

15

16

**Response**: Irrelevant. The cited examples in Appendix apply to the provision of paratransit service, which already expressly contemplates the use of wheelchair accessible vehicles, and the special requests discussed beyond serving persons who need accessible transportation are not at issue in this case.

17

18

19

20

21

22

133.     The leading case on fundamental alteration under ADA Title III is *PGA Tour v. Martin*, 532 U.S. 661 (2001). In *PGA Tour*, petitioner sought a change to the rules of competition for golf, and the Supreme Court held that a modification need not alter an "essential aspect of the game of golf" to be a fundamental alteration. Instead, a rule change that has only a "peripheral impact" on the game may still constitute a fundamental alteration if it gives an individual competitor an advantage over others. 532 U.S. at 682-83.

23

24

25

26

27

28

**Response**: Disagree with conclusion Defendant seeks to draw from the *Martin* case. First, in *Martin*, the proposed modification was deemed not to be a fundamental alteration. 532 U.S. at 690. Second, Plaintiffs are not seeking an advantage over non-disabled riders, but rather that Lyft make modifications, using proposed supply models it already uses for both WAV and non-WAV services to provide service for WAV users here in the Bay Area. *See* Pltfs.' Responses to Lyft ¶¶ 112, 130.

134.     Here, Plaintiffs ask Lyft to fundamentally alter the character of Lyft's supply-and-demand driven, consumer ridesharing platform in order to provide a specially tailored service for their benefit. Plaintiffs seek certain wait times and "benchmarks of reliability," thus guaranteeing them results that Lyft does not offer to other riders on its platform.

**Response**: Disagree. Plaintiffs seek access to Lyft's on-demand transportation service. The proposed benchmarks are merely metrics designed to ensure the WAV service is reasonably close to Lyft's non-WAV service in the sense that WAV users can reasonably expect to be able to request a ride and have one be available within a reasonable amount of time. As Plaintiffs testified, they have some flexibility with wait times, particularly in light of the lack of available on-demand transportation options available to WAV users here now. Giacopini at Tr. 71:19-73:3; Hinze at Tr. 250:25-251:22.

135.     "[I]f the proposed modification changes the 'fundamental character,' 'essential attribute,' or 'rule' of participation, then it is a 'fundamental alteration.'" *A.L. v. Walt Disney Parks & Resorts US, Inc.*, No. 6:14-cv-1544-Orl-22GJK, 2020 U.S. Dist. LEXIS 109205, at *53 (M.D. Fla. June 22, 2020), *citing PGA Tour*, 532 U.S. at 683 n. 38. Requiring Lyft to take steps to create a supply of WAVs that does not exist, in order to guarantee a certain ETA that is wholly untethered to the supply of, and demand for, WAVs on the platform, changes the "fundamental character" and an "essential attribute" of Lyft's platform for Plaintiffs. Indeed, requiring Lyft to guarantee a set "ETA" is alone a fundamental alteration.

**Response**: Disagree. First, as discussed in Plaintiffs' Response to Lyft ¶ 112, this Court has already found that the proposed modifications do not fundamentally alter Lyft's business because Lyft already uses the proposed supply models to provide its standard service and its WAV service in a variety of regions. Second, the evidence has shown that Lyft can provide WAV service in the Bay Area, that Lyft can obtain WAV supply through rental or W-2 partners, and that although Lyft does not even currently allow IC/WAV Organic supply to provide WAV service in the Bay Area, it could recruit additional supply through this model and does not consider securing a supply of WAVs to be a barrier to providing the service. *See* Pltfs.' Response to Lyft ¶¶ 106, 119; Pltfs.' FF ¶¶ 26 (Lyft Organic IC drivers in NY), 68-70 (Lyft currently

1    prohibits Organic IC WAV drivers in Bay Area); Gerundio at Tr. 427:6-15 (Lyft Organic IC

2    WAV drivers in Philadelphia), Pltfs.' FF ¶ 76 (securing a supply of vehicles is "not the

3    problem.")

4         136.    That Lyft offers WAV service in certain cities by creating a supply of WAVs does

5    not change the analysis, because state and local authorities may enact greater protections. *See* 42

6    U.S.C. § 12201(b).

7         **Response**: Disagree. Lyft's argument is that ADA's antidiscrimination provisions only

8    extend to areas where companies are forced to comply with local regulations. That is simply not

9    the case.  Further, as discussed in Plaintiffs' Responses to Lyft ¶ 106 and ¶ 112, the proposed

10   modifications involve supply models and incentives Lyft already utilizes in *both* its WAV and

11   standard service.  *See Am. Council of Blind*, 2009 WL 3400686, at *23 (past decision to make a

12   concession to a disabled individual, while not creating an obligation or requirement as a matter of

13   law, is persuasive evidence that the accommodation was reasonable) (quoting *Wong*, 192 F.3d at

14   820, which also states, "The fact that the school previously made the exact modification . . . that

15   Wong requested . . . is certainly persuasive evidence . . .").

16        137.    Indeed, it would be bad public policy and contrary to the interests of individuals

17   with disabilities to hold that good faith, actions taken by a private entity in response to local

18   regulations, including voluntary actions, will apply in other regions or will be required,

19   permanently, under the ADA. Such a holding would create perverse incentives, by discouraging

20   or punishing private entities from taking actions in response to local laws that are intended to

21   create greater options for individuals with disabilities. *See O'Byrne v. Reed*, No. CV 09-08406

22   DMG (DTBx), 2010 U.S. Dist. LEXIS 153617, at *16 (C.D. Cal. Feb. 5, 2010) (discussing

23   "perverse incentive").

24        **Response**: Disagree.  Again, Lyft is arguing that the antidiscrimination requirements of

25   the ADA should only apply in areas where local regulators have their own requirements, ignoring

26   the national scope of the ADA's antidiscrimination mandate. Lyft has demonstrated it can provide

27   WAV service without any documented harm to its business, Pltfs.' FF ¶¶ 38-40, and particularly

28   in light of the benefits it receives from operating a transportation business in the Bay Area,

including hundreds of millions of dollars in revenue, providing modifications it has already made

elsewhere and determined through analysis that it can provider here is by no means a fundamental

alteration.

### III.    CONCLUSION

For all of the reasons stated above, Lyft respectfully requests that the Court adopt the

above findings of fact and conclusions of law.

**Response**: Disagree, for the reasons stated above.

DATED:  June 22, 2021                              Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

_____
Stuart Seaborn
Attorneys for Plaintiffs